**Pages 1 - 34**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | |
|---|---|
| Opticurrent, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | **NO. CV 17-3597 WHO** |
| ) | |
| Power Integrations, Inc., et ) | |
| al, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

San Francisco, California
Wednesday, March 28, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:           FRIEDMAN SUDER & COOKE
                         Windall Square Warehouse No. 1
                         604 East 4th Street, Suite 200
                         Fort Worth, TX   76102
                    **BY:  JONATHAN T. SUDER, ESQ.**

                         Goldstein Faucett & Prebeg, LLP
                         1177 WEST LOOP SOUTH, SUITE 400
                         HOUSTON, TX   77027
                    **BY:  CORBY R. VOWELL, ESQ**.

                         Hudnell Law Group, PC
                         800 West El Camino Real, Suite 180
                         Mountain Viw, CA   94040
                    **BY:  LEWIS E. HUDNELL, III, ESQ.**


For Defendants:          Fish & Richardson, PC
                         500 Arguello Street, Suite 500
                         Redwood City, CA   94063
                    **BY:  MICHAEL R. HEADLEY, ESQ.**
                    **NEIL A. WARREN, ESQ.**

**Wednesday - March 28, 2018**                                    **2:10 p.m.**

**P R O C E E D I N G S**

**---ooo---**

THE CLERK:  Calling civil matter 17-3597, Opticurrent LLC, versus Power Integrations, Inc., et al.  Counsel, please come forward and state your appearance.

MR. HEADLEY:  Good afternoon, Your Honor.  Michael Headley with Fish & Richardson on behalf of the defendant, Power Integrations.  With me is my colleague, Neil Warren.  And from Power Integrations our vice-president of corporate development, Cliff Walker, from San Jose.

THE COURT:  Welcome.

MR. SUDER:  Good afternoon, Your Honor.  John Suder and Corby Vowell of Friedman, Suder & Cooke in Fort Worth, along with Lewis Hudnell, on behalf of plaintiff.

THE COURT:  Good afternoon.

All right.  So I need some help, and I know that you're both going to provide me with that help, but I want to start with Power Integrations.

And I want you to tell me what does the fourth pin do?  And how is it different from the description that's in the '623 patent in column 14, lines 43 to 47, which is the fourth pin power supply for normal operation and potentially even for enhancement purposes but still operates, for example, as a fail safe feature without power applied.

**MR. HEADLEY:** Certainly, Your Honor. I've prepared some slides that I think will be useful if I may hand them up.

**THE COURT:** Can you answer me directly? Does your pin do that? Does your pin do something different than what is described in column 14, 43 to 47.

**MR. HEADLEY:** Absolutely. This is not a fail safe. This is not something you can cut off and still have the chip work at all. That is the power supply for the chip. When the switch turns on, power comes through the BP, the bypass pin, from that capacitor and powers the chip.

So if you cut that off, it doesn't work. It's not a fail safe. It is the power. And that's what our 30(b)(6) witness testified to, that's what their expert said. He confirmed where the power comes for the chip through that fourth terminal.

And all of the statements they want to make about external; about, you know, all of these other issues; are not related to the claim language or the claimed invention or the explicit carve-out of what is not covered. We are not covered based on what we do because we power the chip from the fourth terminal. Plain and simple.

**THE COURT:** So walk me through your slides.

**MR. HEADLEY:** Yes, Your Honor. I have a couple of copies. I didn't appreciate how many clerks and externs would be here, but I have a few for the Court and for opposing

counsel.

(Pause.)

**THE COURT:**  Okay.  Thanks.  All right.  Go ahead.

**MR. HEADLEY:**  Just to orient the Court here, we have a switch with only three terminals.  The thrust of our argument is not just the fact that there is a fourth terminal that is somehow some kind of a gotcha or an ah-ha here at this stage. The issue is the court's construction, which is three terminals and not a fourth terminal connected to a power supply.  Here that fourth terminal is what powers the chip.

Well, first of all, there's no dispute that that fourth terminal is a terminal, is a pin.  There's never even an objection from plaintiffs about that.  So the BP pin is the fourth terminal, period.  There are no three terminal chips accused in this case right now.

What is that fourth terminal connected to.  Each of the accused products it is connected to the bypass capacitor which powers the chip.  At slide 6 we've quoted from the data sheet. The language is the same in all of our product data sheets explaining how they work.

The device operates from the energy stored in the bypass capacitor.  We talk about capacitors being a bucket for current.  They're holding power.  And when the switch is on, the power comes from that capacitor through the fourth pin. That's how the chip is powered.  That is explicitly what's

excluded under the court's construction which Opticurrent argued for at the hearing in the claim construction hearing. They said we're not talking about fourth terminals that are connected to a power supply.

On the next slide, slide 7, we look at Power Integration's 30(b)(6) testimony.

**THE COURT:**  I'm sorry.  Where are you?

**MR. HEADLEY:**  This is on slide 7 in the middle.  We've cut and pasted the 30(b)(6) testimony from Power Integrations about the operation of all of its accused chips.  And Opticurrent had an opportunity after looking at our schematics, after looking at all the material, and they asked, Do you have a power connection?  And our witness said, Yes.  That is the BP pin.

That is where the power supply is for the chip.  We operate off that.  So this is not some sort of backup or nice to have add-on for some other fail safe feature.  That's the power.  If you cut that off it wouldn't work.  But that dispute about how -- you know, what you do with that pin is not before the Court.  They don't dispute.  Opticurrent does not dispute how these chips operate.

Instead, they're saying that there's some extra language that never made it into the court's construction that somehow their expert wants to differentiate our products from the court's construction.  But it is not permissible to point to

irrelevant things to create an issue of triable fact.

**THE COURT:** Well, do you think that this language that I've been focusing on in column 14, 43 to 47, is consistent with -- and I haven't read all your claim construction briefing -- but was consistent with what Judge Gilstrap ultimately -- how he ultimately construed the term?

**MR. HEADLEY:** This one sentence -- you know, if I could direct the Court to the beginning of that paragraph in column 14, it discusses embodiments, plural, of the present invention. And one of the principles we're dealing with here I think in this sort of language at the end of specifications for patents, not every embodiment is going to be claimed. Not every embodiment. Right? Their argument's you're -- one side or the other wants to exclude an embodiment or one wants to import an embodiment. But fundamentally, not every set of claims has to cover every disclosure in the specification. Parties can file continuations and claim things here.

So we would say the only tree terminals language would distinguish that language in that paragraph. But either way, it is neither here nor there because we have the language that is clear about what that fourth terminal carve-out is, and we clearly meet it.

The only distinction that plaintiffs want to point to, none of those words appear in the claim construction, none of those words are operative legally. And there's no dispute

about how our chip works here.

THE COURT:  All right.  And so you have to be so basic with me when -- and when I'm going through this.  But do you believe that the language describing the fourth pin in column 14 is consistent with what Judge Gilstrap -- how Judge Gilstrap construed the term?  That was my question.

MR. HEADLEY:  I don't think that that embodiment is coextensive with claim 1 as claimed in the language.

THE COURT:  So the answer would be no.  Is that right?

MR. HEADLEY:  I think that's right, but I don't want to say it's inconsistent in that they're talking about different things.  There are different embodiments --

THE COURT:  You're saying that it's a different embodiment, and this embodiment doesn't count when you're looking at the construction.

MR. HEADLEY:  I think that's right.  But even if you did, we're different from what is carved out here because we're not an add-on fourth terminal separate functionality fail safe.  That's the power.  If there's no BP pin, this chip doesn't work.  It's just a doorstop.  Very small door stop, but nonetheless.

THE COURT:  All right.  Go ahead.

MR. HEADLEY:  Okay.  So starting on page 8 we've put side by side here for the Court the actual claim language, the court's construction, and the responses Opticurrent has raised

in attempting to manufacture a dispute that is legally operative.  None of those distinctions matter.

And perhaps I should actually step back to the page before just to make sure this wasn't lost on the Court.  Not only did Power Integrations 30(b)(6) witness testify that the chips run off the fourth pin, that's where the power is supplied, but Opticurrent in its opposition papers said that that testimony confirmed Dr. Zane's understanding of the operation of our chips.

This is not just us saying it; they agree, there is no dispute of fact how the chips operate, or that that BP pin, the fourth terminal, is where the power supply is for the pin.

So we walk through their responses.  None of these additional language, additional points, that Opticurrent wants to wrap into the claims are operative.  And I counted at least four.  We've tried to call them out separately for the Court to make sure there's no confusion here.

On slide 9 Opticurrent talks about having some additional power supply.  There is nothing clearly in the court's construction about an additional power supply.  Indeed, when I thought through this in driving up here, if their complaint is about an additional power supply, then certainly the fourth terminal itself already has a power supply connected to it.  So if they're saying there has to now be some additional other power supply, it's just not in the court's construction.  That

is not consistent with what Judge Gilstrap said.  There's nothing to distinguish based on some --

THE COURT:  Right.  And just so that it's clear, I think looking at what Judge Gilstrap -- the way that Judge Gilstrap construed the claim, that you're right.  It seems that your motion would succeed.  I'm just not positive that he's correct, and even though he's much wiser than I am and far more experienced.  And so that's why I'm asking you the questions that I am.

And so I don't want you to assume just because Judge Gilstrap said it that that will be the law of the case.  Because my job is, as it is in any case, is to get the construction right sometime between now and trial.

MR. HEADLEY:  Certainly.

THE COURT:  Or when it goes up on appeal.

MR. HEADLEY:  If we were on appeal before the federal circuit we would certainly be challenging the construction if we lost this case.  The only language couldn't be any more clear.  There's a whole history there.  But anyway, we don't need to debate that for purposes of our motion.  We win on the construction about fourth terminal having a power supply because we have one.

So the next thing that Opticurrent tries to graft onto the construction, which doesn't exist, has to do with being -- deriving all power.  And that's not in there.  At all.  I don't

know where the deriving comes from.  Instead, we just need to be connected to a power supply at the fourth terminal, and we are.  So again, disputing our power supply based on deriving power is not material and does not raise an issue of -- a dispute for trial.

The required for operation issue, on slide 11 here, yet another purported distinction that didn't make it into the Court's claim construction, it's not there.  We could dispute about whether it's required.  As I said, the chip doesn't work without that fourth terminal with the power that powers the chip.

But it's neither here nor there for purposes of summary judgment because it's not part of the claimed construction.  It just does not matter.  The Court used the phrase does not have a fourth terminal connected to as power supply; not something about required, derived, or what have you.

And last but not least here was this point about something being external.  Again, this one is even more pronounced. Opticurrent repeatedly tried to shoehorn external into the claim construction.  I don't know why.  I don't see how that would even help them.  But even if that were -- because we're connected to an external power supply even if that was part of the construction.  But, again, it's not part of the construction.  It was not obtained.

So what we see here, the proverbial nose of wax.  The

claim terms keep evolving throughout the case.  And now that we have the construction, Opticurrent wants to change them once again while saying they're not doing so.

They have said that it's undisputed there's no more claim construction necessary.  We agree there's no claim construction necessary.  We don't think we do what they do at all.  We never did.  We told them right away when they filed this case that we're nothing like what you're accusing and we don't understand your infringement claims.  But certainly now that we have this construction with the carve-out that saves -- saved their case, in their view, at claims construction, actually lost.  They didn't come forward and put forth anything under the court's construction to respond to the fact that all of the accused products have a fourth terminal, and these fourth terminals are connected to the power supply.

In particular, I just flag at the end of this discussion for the Court this notion of vitiation is extremely important.  In addition to not being literally what's covered under the claimed invention, there is no chance that Opticurrent can resurrect its claims by pointing to the doctrine of equivalents.

Plaintiff loved the doctrine of equivalents, but the vitiation doctrine is very clear.  A is not the same as not A.  Metallic cannot be -- a claim term that covers metallic cannot be changed under the doctrine of equivalents to be nonmetallic.

In the *SciMed* case we've cited for the Court, Judge Jenkins in this courthouse granted summary judgment of no DOE -- no doctrine of equivalents -- on the basis of a dual lumen structure not being the same as a coaxial configuration where there were two tubes in an angioplasty catheter versus one tube inside another tube.  And it was very clear, and the federal circuit affirmed summary judgment of no doctrine of equivalents.

So the same situation would apply here.  We have a very explicit carve-out of what is not claimed in Opticurrent's claim 1, all of Power Integrations's products have that.  We cannot infringe, literally, and they certainly recapture that. The vitiation doctrine precludes that from being an equivalent of not having a fourth terminal connected to a power supply. In no way, shape or form can that be converted to, Well, it's okay if you have a fourth terminal connected to a power supply.

**THE COURT:**  Okay.  Thank you.

Mr. Suder.

**MR. SUDER:**  Yes, Your Honor.  A couple of points.  The only evidence before you from one skilled in the art is by Dr. Regan Zane, our expert.  Everything Mr. Headley told you is attorney argument.  They could have put an expert before you to say, This is how the products are.  I've applied the claim construction as Judge Gilstrap construed it, and this is my opinion.

They did not do that.  We did.  Dr. Zane is eminently qualified, has not been objected to, his qualifications have not been challenged, and his statements are not conclusory in any respect.

He says beginning on paragraph 39 of his report -- or, his declaration:  I have reviewed and relied upon the Court's memorandum and order regarding claim construction; including this language.  And he goes on and explains.  More importantly in paragraph 44 of his report, Your Honor, he says:  The accused products derive all of their operating power from the second and third terminals and do not have a fourth terminal connected to a power supply.  He then quotes what they say, what Mr. Headley says, and then says:  It is my opinion that this capacitor is not a power supply.

A capacitor to one skilled in the art is kind of like, Your Honor, if you hold a cup under the faucet and you turn on the faucet and the cup is holding the water.  The cup is not a power supply.  If it's gone there is no source for the power.

The point is, he explains in his report in detail why the accused products -- and he goes through each family of products -- needs the express language of a limitation.  It derives its power from the second and third terminals, and does not have an external pin connected to a power supply.

He may also say external or this.  We're not changing the claim construction, Your Honor.  And that was the point of our

sur-reply. They want to make it sound like we lost claim construction. Their argument was that only three can only mean three. And also said, Your Honor, in light of your comments -- they made the representation to Judge Gilstrap, because we also had the transfer motion that day, Judge, if you transfer the case we're not going to reurge; we're bound by the claim construction.

So there's going to be a potential judicial estoppel issue if there's a change in the claim construction in this case. I understand what the Court said, and I've dealt with that. It's your duty to get it right.

**THE COURT:** Okay. But -- it is my duty. But you're satisfied with the claim construction as it is.

**MR. SUDER:** Yes, absolutely. It's what we argued, Judge. The point is, our expert has said -- and it is the only testimony and evidence in this record on summary judgment by someone competent that's not objected to -- that says what their products do, the use of a capacitor is not a power supply. Whether that's right or wrong is not for this Court at this time. It is for the jury to hear.

And I guess they chose not to put a competing expert in because then they'd fall into your cases like *France Telecom* and other patent summary judgments where one expert says, The light's red; one expert says, The light's green. It's for the jury to decide.

Our expert says that the use of an external capacitor in these accused products is not used to derive source of the power. The power comes in the second and third terminals, exactly what occurs under the claims. And the Court is exactly right on column 14.

You can have a fourth pin. You can have a fifth pin, a sixth pin, lots of terminals. But a three-terminal noninverting switch is a term of art where it says you have three terminals, one connected to ground, one to the other points, that that's where you derive your power. They want to argue this to the jury and say we're wrong, only means three, and this is different; or say that a capacitor to this expert is a power supply.

That is for the jury, Judge. But they had their chance. And the evidence here is clear -- and it's the only evidence -- that what these accused products do under Judge Gilstrap's strict claim construction is satisfied literally and under DOE.

The issue of vitiation under the doctrine of equivalents, Your Honor, is if there's something structural. If Judge Gilstrap said, You can only have three and no more; and we said, Yeah, but four is three. It's almost three. That's a different issue for vitiation.

That's not what we have here under the current claim construction. I'm not going to concede that. But I see the point. If you say -- the claim says at the top -- because it

says it has to be at the top, and you're just short of the top, that's an issue of claim vitiation under the cases.  That's not what we have here.  You can have other pins, other terminals, they just can't be connected to a power supply.

And a use of a capacitor here is not, under the state of this record, a power supply.  So we think, Judge, on this issue this is an easy one for the Court at this stage under your precedent under Rule 56, and under just a basic *Celotex*, what is competent evidence.  You're not asked to strike -- a lot of your opinions deal with corresponding motions to strike the expert and then rule on summary judgment.  We don't have that here.

**THE COURT:**  No, I get your point.  So you would, then, have a consistent argument as your colleague that if I find that there is literal infringement, or if I don't, vitiation and -- what's the other thing that I'm looking at here?  They would fall consistently with however I rule on the first issue.  Because the issue is fundamental to what I figure out the fourth pin is.  If the fourth pin is what Mr. Headley says it is, then he's going to be right about the doctrine of equivalents.

**MR. SUDER:**  It depends, Your Honor, here we're clearly dealing with the capacitor; and there is an issue of equivalents on what is a capacitor.  Again, a capacitor, as Mr. Headley says, in our view is not a power supply.  It is a

holding tank, if you will. And when it's gone, you don't -- you can't get power from that capacitor. When you drink the last water from that cup, and you're thirsty and the cup's empty, you've got to go to some other source to get your water.

**THE COURT:** Right. You're applying the Judge -- you would have me apply Judge Gilstrap's construction on literal infringement. And you'd say -- there's a question of fact here.

**MR. SUDER:** Absolutely, yes.

**THE COURT:** So that's it. And that deals with the doctrine of equivalents, as far as you're concerned. The same argument is going to apply to each of those.

**MR. SUDER:** If the Court revisits claim construction then, yes, we would be having that discussion. But under this claim construction you're limited -- you can't have others depending on what they do. But if you can only have three and never more, despite the specification says there are noninverting switches that have fourth, fifth, sixth, seventh eighth, ninth, tenth terminals, it raises a different issue. If it's three and you can't have any more, then I have to represent to the Court I'd have the shorter stick, if you will, in that argument.

**THE COURT:** Right. You would. No question.

**MR. SUDER:** Yes. Because it's structural. Because it is structural.

THE COURT: Right. And it's not what Judge Gilstrap found.

So take on the question of fact issue. The expert testimony.

MR. HEADLEY: Sure, Your Honor. Two things. One, the plaintiff is now making a defense argument. The plaintiff has the burden to put admissible evidence on the table to go forward with its case. And they even had an additional fact discovery period to do so. We're relying on their contentions which cement their infringement theories -- which we objected to, the Court allowed, that's how this works, we understand -- but their contentions are insufficient as a matter of law because they don't tackle a fundamental part of these products.

We don't come in and have a battle of the experts when there's no evidence. Plaintiffs just lose as a matter of law. And here they have not come forward with evidence in their contentions which we put in the record, nor have their responses, including Mr. Zane's declaration, provided anything that is relevant to the actual claim language.

I would direct the Court to paragraph 44. That's my favorite paragraph, as well, from his declaration. I've read it over and over again. And the only conclusion to be drawn from this paragraph is that Mr. Zane thinks that our power supply isn't a power supply because of a whole bunch of things that aren't in the Court's claim construction.

That's not a fact dispute.  They agree how the products operate.  If they disagreed about how the products operate, if we came in and we said what it's really about is how these things are wired up, and how they run, and how they function, we might have a fact dispute if it was tied to a claim limitation.

But whether or not a capacitor initially gets its power from somewhere else and then powers the chip is not the dispute.  Is that fourth terminal connected to a power supply? That's the dispute.  And it supplies power.

Many of the statements in paragraph 44 at least implicitly, if not more overtly, concede that the power to the chip comes from that capacitor.  They just talk about whether you need to have an additional power supply or whether that capacitor derived its power from one place or another, or there's that external thing which still doesn't make sense to me because the capacitor is external to the chip.  But they keep arguing it as though it mattered.  That word is not in court's construction and does not matter.

But you don't have to take my word for it, Your Honor. That's not the crux of our argument.  Our argument is based purely on Opticurrent's failure to come forward with any admissible evidence that is relevant on this issue.  In their amended infringement contentions, they didn't have it in their original infringement contentions.  And with respect to

Dr. Zane, he doesn't cut it either because he doesn't actually dispute what's going on with these chips or the actual language of the court's construction that's before us here today.

THE COURT: Okay. Well, let's go on to the other issues that are raised.

Mr. Suder, go ahead.

MR. SUDER: Your Honor, I just disagree with that.

THE COURT: I think I know that.

MR. SUDER: We had a big fight before Your Honor on our amended infringement contentions and trying to add these very claims. And Dr. Zane in his report goes to their documents, their schematics, and gives his opinion. And the summary what I say in paragraph 44 is their external capacitor is not a power supply. He says it, and explains why.

For summary judgment, we submit that ought to be the end of the analysis.

THE COURT: Okay. So I promise you that I'm going to go back and look carefully at all of this, including paragraph 44. But let's go on to the pre-filing priority day question.

MR. HEADLEY: Your Honor, my colleague, Neil Warren, is going to address the lack of corroboration and the implications of our argument on that point, if I may.

THE COURT: Okay.

MR. WARREN: Thank you, Your Honor. Neil Warren for Power Integrations.

**THE COURT:**  Okay.  You have to wait, Mr. Warren, because I'm going to say stuff first and then you can address it after that.

So it seems to me -- and you may not have a lot to say.  So, Mr. Suder, on this I'm interested in why none of the witnesses to the page in the notebook presented any evidence -- maybe they're not alive anymore -- with respect to it.  But even if the notebook page got me to conception, I don't see sufficient evidence of reduction to practice or any corroboration of diligence.  So I'm inclined to make Mr. Warren's argument for him on that.

**MR. SUDER:**  Yes, Your Honor.  I'm holding in my hand the breadboard that's referenced -- that's referenced in the document.  This is reduction to practice (indicating.)  The law is if you have actual reduction to practice, diligence is not an issue.  Diligence is from the time you conceive to the time you file, because your filing date is deemed as your constructive reduction to practice date.

Diligence is a nonissue.  It's a red herring in this case legally, because we have actual reduction to practice.  The breadboard is referenced in the drawing, and Dr. Zane goes very carefully to explain that the pins on this very drawing correspond exactly to the diagram that it references, that it's tagged on, and contain each and every element of the claims of the patent.

This is corroboration. It is reduction to practice. It is referenced in the -- in engineering notebook which is signed and dated. It's dated. And authenticated. And, Your Honor, I'd also point out for summary judgment that drawing is in evidence. The signatures are in evidence. They didn't object that they're hearsay or they're unauthenticated. In fact, Mr. Congdon testified that he personally saw them sign it. He brought it to one of their kitchen tables.

So we have authenticated in the record. And again, may be a matter of procedure, but they should have objected to the use of that document in evidence. So simply from a procedural standpoint, but we can get to the merits. It's before you. It is evidence that cannot be objected. That cannot be excluded.

**THE COURT:** I'm not excluding the document but I'm wondering why you didn't have one of them sign a declaration saying, I was there.

**MR. SUDER:** Your Honor, I guess because we think legally it's unnecessary. We have -- when you have signed and dated contemporaneous documentation. The idea that you have to have an inventor get a third-party to prove up everything he did violates -- it's an impossible test sometimes. If you have a diligent notebook that's signed and dated, the cases are clear under the rule of reason test.

When you look at the totality of the circumstances, is it credible that he conceived of it on that day? And he says, I

saw them sign it.  Again, we're at summary judgment, Your Honor.  And it's not that you're being -- again, it's not a motion strike that exhibit or that testimony of Mr. Congdon that I saw each of these three witnesses sign.

The law -- I believe that the law is pretty clear that corroboration is about inventor's testimony.  You have a piece of prior art; Well, I invented it first.  The law requires you to have more than your testimony.  And when you have physical corroborative evidence that is contemporaneous and dated, I mean, it's --

**THE COURT:**  But just -- but just that.  That's what you've got.  You've got the inventor, you've got the document which certainly would appear to have been created when it said that.  And then you've got his testimony about what that document says.  And that's enough.

**MR. SUDER:**  Under these circumstances.  The cases they cite is when it's after the fact, it's undated.  You have an email to your brother-in-law that describes it in general terms, was one of the cases.  But the language in their cases, particularly the *Guardian Media* case cited by them, you look at all the pertinent evidence, including contemporaneous disclosures, and does that enable one skilled in the art to make the invention?

So when Dr. Zane in his report says, I looked at the breadboard with the actual pins -- and, Your Honor, this

breadboard is the very breadboard that's identified in the upper left-hand corner.  Dr. Zane links it and says, This is this (indicating) is this (indicating) matches the claims; then the Court has to say, Is that sufficient at a summary judgment stage when this is all properly before the Court, including the signatures and the testimony that I saw them sign it?  That's sufficient.

THE COURT:  Okay.  All right.  Mr. Warren.

MR. WARREN:  Your Honor, from a high level what fundamentally has to be true, and what is consistent throughout all of the cases, is that if an inventor comes in and says it, if an inventor produces from his own documents, and an inventor produces from his own physicals, he can pile as much stuff as he wants on the table; but if it's only his say-so tied to it and there's no evidence in the record from any third-party who's independent, that's not good enough.  And as a matter of law that's what we've got here.

Contrary to what Mr. Suder said, we do take exception to those signatures.  We mentioned in our briefing they're un-- they're uncorroborated in any way.  They're not authenticated. We cite cases, and this is -- I have the cases blown out for you if you want to reference them.  They're on slide 26, for the record.

The cases make clear that a witness's signature, it doesn't matter unless the witness says, I signed it.  Otherwise

it's just hearsay.  Mr. Congdon, with all due respect, could have written all of the signatures himself.  He didn't find this breadboard until midway through this litigation.

And so there's nobody on this earth who has evidence in this record, except Mr. Congdon, who can say anything about what happened in 1997.  And the case law draws a bright line.  There's a bright line rule for corroboration.  That's why we use the word "corroboration."  That there has to be somebody, somebody other than Mr. Congdon, who puts in admissible evidence -- or possibly admissible evidence.  At this stage there's no evidence in the record.  But possibly admissible evidence for trial that would authenticate those signatures.

Mr. Congdon, and as the cases make clear, cannot authenticate a third-party's signature.  And if you look at their initial disclosures, the Rule 26 disclosures, none of those individuals are on them.  Throughout the entire fact discovery period, they never took a deposition, they never got a declaration.  So at this point, I mean, Rule 37 should bar them from bringing them to trial.

The evidence is what it is right now.  And as a matter of law, Mr. Congdon can't authenticate somebody else's signature.  So if you take this starting with the evidence of conception, the drawing, it is only his say-so.

**THE COURT:**  Right.  I got your point.

**MR. WARREN:**  And on the breadboard, I mean, it's a

very nice breadboard.  But with all due respect, nobody saw it until halfway through this litigation.  And so there's no evidence of any third-party who can say, I saw that in 1997, I know it existed.

And so barring that, there's a bright line rule that they don't even get to the threshold issue here.  They don't even get to what is the disclosure of the drawing.  Does that, as a matter of fact, match the drawing?  We can dispute all that stuff later.  At this stage they don't get over the threshold issue; is there anyone besides Mr. Congdon whose say-so is in the record?

**THE COURT:**  I hear you.  Okay.

**MR. SUDER:**  Your Honor, may I say something on that?

**THE COURT:**  Go ahead.

**MR. SUDER:**  In our brief we cite the *Mass Engineering* case where the court held where an inventor submits physical evidence in support of his testimony, such as a time-verified drawing, additional corroboration is not necessary.  A jury is free to conclude the drawing does not show the invention, but judgment as a matter of law is inappropriate.

And then, Your Honor, the *Guardian* case they cite is that there is no particular formula that an inventor must follow in providing corroboration of testimony of conception.  Testimony of conception.  Rather, whether a putative inventor's testimony has been sufficiently corroborated is determined by the rule of

reason analysis in which an evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached.

They're not claiming forgery.  They're not claiming he signed those signatures.  I would submit from a hearsay standpoint that if he saw them see it (sic), it's an operative fact.  But that's an evidentiary *limine* issue.

THE COURT:  You are arguing that the rule of reason and not the bright line applies.

MR. SUDER:  No, Your Honor.  I believe a bright line test is that you corroborate the testimony with physical evidence.  They are conflating that bright line test.  Where you have -- if you just have a drawing that's undated and you don't know where it came from --

THE COURT:  They have a line in a different place than you have it.

MR. SUDER:  Yes.  That is correct.  We submit the bright line case under the cases is, you have testimony.  Like we would have his interrogatory answer.  And then what do you have?  We have drawings.  They're dated, they're corroborated.  And by all indicia, if they want to claim he forged it or he made it up or it's not where he says it was, that goes to his credibility, and that's a fact issue.

THE COURT:  All right.  Is there -- is there any other issue that -- there was an issue with respect to the

TOPSwitch-GX.  And it's no longer an accused product.  So I think it's an issue that can be raised at trial for credibility basis, but I don't see it as an estoppel issue.  But go ahead, Mr. Warren.  You're shaking your head, so go ahead.

**MR. WARREN:**  Your Honor, I would respectfully disagree.  I think that the *Vanmoor* case and the series of cases that we cite make clear it is the accusation of infringement that operates as an admission in the invalidity context.  And we've had this in numerous cases in which a plaintiff perhaps accidentally accuses the prior art.  They -- and they say, You know what?  This piece is infringed.  And the defendant comes back and he says, This is prior art.  I'm before you.  And so the *Vanmoor* case what it says is that it's the accusation of infringement itself that operates as an admission.  And they accused it.

Now, if every single plaintiff who made that mistake could simply say, We're sorry, we withdraw that; that would end the inquiry and you wouldn't have any of these cases because everybody would simply drop the infringement allegation instead of risking losing their patent to invalidity.  But it is the accusation of infringement itself that operates as an admission.

On the record we have, also I direct you to what their contentions were originally.  They were -- this is not a case where they just got a data sheet off the internet and filed

some contentions. They did detailed reverse engineering. They paid a firm to decap the chip and develop schematics before this case even started. They did detailed reverse engineering to know exactly what is the circuit structure of those parts.

And if you look at -- I provided them at the end of the slides, but we also attached them to the briefing. For example, slide 31.

What you see in their contentions are the detailed schematics that resulted from their reverse engineering. They did detailed schematic work. They knew exactly what the chip was, they knew exactly how it operated, they knew circuit by circuit what it was, and yet they still filed infringement contentions. Under the Northern District those would be binding.

You know -- I mean, the Northern District takes contentions very seriously. They had to have a Rule 11 basis for serving those contentions. And in their mind they did, they knew exactly what the circuit structure was, so there's nothing they learned from us in terms of the schematics or anything that changed their mind. They simply made a mistake by accusing the prior art.

That -- and so here this is not a case of whether or not it is or it is not a factually disputed issue on what is the content of the chip. They knew what the content of the chip was. They screwed up. They accused the prior art. They did

it a detailed analysis. They said, That infringes, and under our infringement theory, that's the infringement theory we're going to go forward with; your circuit, which we know exactly what it is, meets that theory. And they went forward with the case. They had a Rule 11 basis for doing that.

We later point out, That's the prior art, we were first; and they said, Okay, we're going to drop that.

They don't get to just erase the history of what happened and get to keep their patent. They are bound by that as an admission. And that's what the *Vanmoor* case says. The *Vanmoor* case says that you accuse a product and it turns out to be prior art, that is an admission that's binding in the prior art sense. And it doesn't even require an element by element analysis on -- of the invalidity. It wouldn't be a typical invalidity contention, for example. Your accusation is the admission that it meets the claims. And if it turns out to be prior art, your patent's invalid.

**THE COURT:** Okay. Mr. Suder.

**MR. SUDER:** Couple points, Your Honor. First of all, we sought leave to amend the infringement contentions in the Eastern District, if you recall. And the first thing we did here was seek leave under the Northern District.

**THE COURT:** I think what the defendant's argument is, tough crackers. You've made your bed.

**MR. SUDER:** But then why have expert reports? You

have infringement contentions.  There's no evidence that it was done by one skilled in the art who studied the claim even got documents during production.

But, Your Honor, a couple of other points.  They didn't raise -- this is not prior art because of the priority date of our patent.  And that's the fight here.  But more importantly, as we say in our moving papers, they haven't properly proved up -- there's a question as to when this piece of art was even available.  There's different dates on it.  And there's no testimony, no declaration, no explanation.

The other thing is, this piece of alleged prior art is not in their invalidity contentions.  They have to put forth all the art that they claim invalidates our patent.  We sought leave to amend and got permission to drop this not knowing they were going to claim it was prior art, because it wasn't in their invalidity contentions.  Our expert looked at it.  And our expert, Dr. Zane, went through careful detail why it's missing the critical language of element C.

This is not estoppel.  And as the Court said, we may have a *limine* on this.  But that's an issue of if they want to attack our corporate representative on the stand that he asserted it.  And why did he assert it?  Dr. Zane never looked at it until the summary judgment.  And if they're free to cross-examine him and say, Do you know your client asserted it? They're free to have that exchange in front of the jury.

**THE COURT:** Mr. Warren, last word here.

**MR. WARREN:** Yes, Your Honor. We did submit evidence. They raised that issue in their opposition. In our reply we provided a declaration from Mr. Walker that corroborates the fact that the press release was a real press release, it was publicly available, these things were being sold as of November 2000, which is prior to the January 2001 date.

So if they lose their date -- and this goes back to the *Collaborative Agreements v. Adobe* case in front of Judge Chen. You know, if they lose their date there's no second chance, right? They knew before the case started everything they needed to know to make their priority contention. They made their priority contention. If they lose that, they're back to their provisional application. And the provisional application date is in front of this chip that they have accused of infringement.

And for them to say, Yeah, we made these really detailed, contentions, but we got it wrong because we hadn't talked to Dr. Zane yet; that is not credible at all, frankly. They did a lot of pre-suit diligence. They knew exactly what was in here.

This case -- if you talk to Mr. Congdon and Mr. Brunell, who's the principal, they had been researching this case for like ten years before they brought it. This was not some fly by night, we made contentions, and then Mr. Zane told us, Hey, by the way, you got this wrong. They simply accused the prior

art and they want to take it back.

On the issue of the contentions, this was an accused product at the time we did our invalidity contentions. It wasn't until after we served our invalidity contentions that they got leave to remove it. And so respectfully, I don't think that we should be required -- we would say that we came first with our circuits, but it's not our burden to admit infringement at the time given that at the time we did our invalidity contentions we would have been doing an element-by-element analysis to show that our own product does meet the claim when it's an accused product. That's not what the contentions require.

The time it was an accused product and the debate was over priority. It still is. Once they -- they have now taken the chance to remove it as an accused product, but that doesn't change the fact of the admission occurred. And on the record that we have, this is very detailed contentions. For them to say, You know what? We just got it wrong. I mean, I would ask the Court to really look at these contentions and see if that's credible.

It's just -- it's not. Especially given record of a ten-year preparation for this case and the fact that they did extensive costly reverse engineering, to then say, But Dr. Zane told us we got it wrong and so we changed course and it had nothing to do with the date, that's not credible at all.

**THE COURT:** All right. Some people have to go back to Texas, I understand.

**MR. SUDER:** It is opening day, Your Honor. Tomorrow.

**THE COURT:** Oh, well, good for you. Good for you. Are you in Houston?

**MR. SUDER:** We're playing Houston, so it's going to be a long season for the Rangers.

**THE COURT:** Well, I wish you luck.

**MR. SUDER:** But we have your star Giants pitcher now, so we're all rooting for him.

**THE COURT:** I am very hopeful that Mr. Lincesum will do well for you.

**MR. SUDER:** Hope so.

**THE COURT:** So I will let you go. The matter's submitted. I'll try to get an order out as soon as I can. Thank you.

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, April 9, 2018

_____/s/Vicki Eastvold_____

Vicki Eastvold, RMR, CRR
U.S. Court Reporter