1

2

3

4                           UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    OPTICURRENT, LLC,                          Case No. 17-cv-03597-WHO

8                       Plaintiff,

                                                 **ORDER GRANTING IN PART AND**
9              v.                                **DENYING IN PART MOTION FOR**
                                                 **SUMMARY JUDGMENT**
10   POWER INTEGRATIONS, INC., et al.,
                                                 Re: Dkt. Nos. 103, 104
11                      Defendants.

12                                 **INTRODUCTION**

13         Plaintiff Opticurrent, LLC ("Opticurrent") is the owner of United States Patent No.

14   6,958,623 ("the '623 Patent"), which relates to a circuit design for transistor switches. Opticurrent

15   alleges that defendant Power Integrations, Inc. ("PI") manufactures and sells certain products that

16   infringe Claim 1 of the '623 Patent, and provides such products for distribution to companies,

17   including defendant Mouser Electronics, for sale within the United States. Opticurrent brings this

18   lawsuit against defendants for willful, direct, and induced infringement. The claims against

19   Mouser Electronics have since been severed and stayed pending resolution of the claims against

20   PI. *See* Dkt. No. 34 at 8–9. Opticurrent's claim of willful infringement has also been dismissed.

21   *See id.* at 3–4. PI now moves for summary judgment against Opticurrent on the grounds of

22   invalidity as well as non-infringement. While I conclude that Opticurrent is not entitled to a pre-

23   filing priority date, there are material disputes of fact that preclude summary judgment. For the

24   reasons stated below, I GRANT IN PART and DENY IN PART PI's motion.

25                                  **BACKGROUND**

26   **I.      The '623 Patent**

27         The '623 Patent, titled "Three Terminal Noninverting Transistor Switch," was filed on

28   January 19, 2001, and issued on October 25, 2005, to sole inventor James Congdon. *See*

United States District Court
Northern District of California

Complaint ("Compl.") Ex. 1 ("'623 Patent"). It relates to a novel circuit design for transistor switches used in semiconductor devices that minimizes current leakage between the second and third terminals of a transistor switch. *See* Compl. ¶ 13; '623 Patent at 2:43–47. Claim 1 of the '623 Patent recites:

> 1. A noninverting transistor switch having only three terminals, said terminals being a first terminal, a second terminal, and a third terminal, said noninverting transistor switch comprising:
>    (a) a transistor connected to the second and third terminals, said transistor having an on switching state in which current is able pass between the second and third terminals and an off switching state in which current is interrupted from passing between the second and third terminals,
>    (b) a voltage stabilizer connected to the second and third terminals, and
>    (c) a complementary metal oxide semiconductor (CMOS) inverter connected to the first terminal, the second terminal, said transistor and said voltage stabilizer, said CMOS inverter interrupting the passing of current between said voltage stabilizer and the second terminal when said transistor is in its off switching state.

'623 Patent at 14:50–15:2. Congdon assigned all rights, title, and interest in and to the '623 Patent to Opticurrent in 2012. Headley Decl. Ex. 8 [Dkt. No. 87-1], at 86:4–6.

Congdon claims that he first conceived of the invention of the '623 Patent prior to filing his patent application, no later than February 23, 1997, *see* Gunter Decl. Ex. 2 [Dkt. No. 105-3], at 8, as evidenced by a notebook drawing, *see* Headley Decl. Ex. 6 [Dkt. No. 103-8]. Congdon also testified that he reduced his invention to practice by creating a "dusty breadboard" evidencing each element of Claim 1 of the '623 Patent, which still exists. *See* Gunter Decl. Ex. 4 [Dkt. No. 105-5], at 511:19–22. While Congdon admitted that he modified the breadboard over time, he testified that the changes "don't make any substantial change in how the circuit works. The—the circuit still operates as is 623 as it did before those were added." Gunter Decl. Ex. 3 [Dkt. No. 105-4], at 384:20–23.

PI manufactures certain products, including the LNK585, LNK605, TNY179, TNY277 (collectively, the "accused products"), and TOPSwitch-GX (also known as TOP247YN). The TOPSwitch-GX product family was on sale in the United States prior to January 19, 2001. *See* Headley Decl. Ex. 10 [Dkt. No. 103-12] (press release announcing the TOPSwitch-GX family dated November 20, 2000).

2

**II.     Procedural History**

On April 1, 2016, Opticurrent brought suit against PI and Mouser Electronics, originally alleging infringement with respect to the LNK585, LNK605, TNY179, TNY277, and TOPSwitch-GX products. *See* Compl. ¶ 15. That case was brought in the United States District Court for the Eastern District of Texas, and was assigned to the Honorable Rodney Gilstrap. On June 16, 2016, Opticurrent served its Infringement Contentions upon PI, which included all five of the named products. *See* Gunter Decl. Ex. A [Dkt. No. 64-2]. After briefing and hearing on claim construction, Judge Gilstrap construed the dispute terms of the '623 Patent in an order filed on April 18, 2017. *See* Dkt. No. 58.

On May 18, 2017, Opticurrent moved for leave to serve Amended Infringement Contentions, seeking, among other things, to remove the TOPSwitch-GX product from its Infringement Contentions. *See* Dkt. No. 64. Opticurrent explained that "[f]ollowing Defendant's document production during the course of discovery, Plaintiff is no longer alleging infringement of the TOPSwitch family of products and is removing any such allegation . . . ." *See id.* at 5. PI did not oppose its removal. Prior to resolving Opticurrent's motion, however, Judge Gilstrap transferred the case to this District on May 26, 2017. *See* Dkt. No. 68. I was assigned the case and granted Opticurrent's motion for leave to serve the amended infringement contentions on October 3, 2017. *See* Dkt. No. 96. On February 13, 2018, PI moved for summary judgment. *See* Dkt. No. 103.[1]

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

---

[1] Opticurrent has also filed an administrative motion to seal certain portions of and exhibits to the opposition brief because they contain certain materials designated highly confidential by PI. *See* Dkt. No. 104. PI has submitted a declaration in support of Opticurrent's motion on the grounds that the sealed or redacted contents pertain to the highly confidential and proprietary product information that would cause serious competitive harm if made public. *See* Dkt. No. 107. I agree with PI that compelling reasons exist to seal or redact these documents because they contain trade secrets, and the redactions are very narrowly tailored so as not to overly hinder the public's right to access. *See Kamakana v. City and Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). Opticurrent's administrative motion is GRANTED.

1  judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the

2  outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a

3  material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

4  the nonmoving party.

5  The party moving for summary judgment bears the initial burden of identifying those

6  portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue

7  of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party "is

8  entitled to a judgment as a matter of law [when] the nonmoving party has failed to make a

9  sufficient showing on an essential element of her case with respect to which she has the burden of

10 proof." *Id.* (internal quotation marks omitted). The moving party need only show "that there is an

11 absence of evidence to support the nonmoving party's case." *Id.* at 325.

12 Once the moving party meets its initial burden, the nonmoving party must go beyond the

13 pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a

14 genuine issue for trial. Fed. R. Civ. P. 56(c). "Factual disputes that are irrelevant or unnecessary

15 will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record

16 in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

17 The nonmoving party has the burden of identifying, with reasonable particularity, the evidence

18 that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the

19 moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322.

**DISCUSSION**

20

21 **I.      Pre-Filing Priority Date**

22 Under Section 102(a) of the Patent Act, a patented invention must be "new." 35 U.S.C. §

23 102(a). Section 102(a) precludes the patenting of any invention that "was known or used by

24 others in this country, or patented or described in a printed publication in this or a foreign country"

25 before the date of the invention. *Id.*; *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313,

26 1352 (Fed. Cir. 2003). "It is presumed that the invention date is the filing date of the asserted

27 patent . . . until an earlier date is proved." *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796

28 F. Supp. 2d 1025, 1061 (N.D. Cal. 2011). Because PI's allegedly infringing product predates the

4

United States District Court
Northern District of California

1    filing date of Opticurrent's patent, Opticurrent must show that it is entitled to a pre-filing priority

2    date in order to succeed on its claims.

3    The question of priority "focuses on which party *first* invented the subject matter of the

4    count." *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993). "Priority is a question of law

5    which is to be determined based upon underlying factual determinations." *Id.* In determining

6    priority, the Federal Circuit has instructed courts to look at when both conception of the invention

7    occurred as well as reduction to practice. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577

8    (Fed. Cir. 1996). "In the United States, the person who first reduces an invention to practice is

9    prima facie the first and true inventor." *Id.* (internal quotation marks omitted). "However, the

10   person who first conceives, and, in a mental sense, first invents . . . may date his patentable

11   invention back to the time of its conception, if he connects the conception with its reduction to

12   practice by reasonable diligence on his part, so that they are substantially one continuous act." *Id.*

13   (internal quotation marks omitted). Diligence is not required, however, where a party shows

14   priority through actual reduction to practice. *See Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261

15   F.3d 1356, 1362–63 (Fed. Cir. 2001) ("[A] showing of diligence is necessary for a party who was

16   first to conceive but second to reduce to practice.")

17   In order to establish conception, "an inventor must have formed in his or her mind a

18   definite and permanent idea of the complete and operative invention, as it is hereafter to be applied

19   in practice." *Mahurkar*, 79 F.3d at 1577 (internal quotation marks omitted). Where a party seeks

20   to show conception through the oral testimony of an inventor, the Federal Circuit requires

21   corroboration and applies a rule of reason analysis. *Id.* Under this analysis, "[a]n evaluation of all

22   pertinent evidence must be made so that a sound determination of the credibility of the inventor's

23   story may be reached." *Id.* However, where a party seeks to prove conception through physical

24   exhibits, corroboration is not required. *Id.* Instead, "[t]he trier of fact can conclude for itself what

25   documents show, aided by testimony as to what the exhibit would mean to one skilled in the art."

26   *Id.*

27   In order to show reduction to practice, a party "must demonstrate that the invention is

28   suitable for its intended purpose." *Scott v. Finney*, 34 F.3d 1058, 1061 (Fed. Cir. 1994).

1    "Reduction to practice, however, does not require actual use, but only a reasonable showing that

2    the invention will work to overcome the problem it addresses." *Id.* at 1063. This burden falls on

3    the party seeking to demonstrate priority by clear and convincing evidence. *See Mahurkar*, 79

4    F.3d at 1578.

5            **A. Evidence of Conception**

6            PI contends that Opticurrent fails to point to any independent evidence proving conception

7    on February 23, 1997.[2] Opticurrent argues that in addition to Congdon's deposition testimony, it

8    has also produced physical evidence in the form of Congdon's notebook drawing dated February

9    23, 1997, also signed and dated by three witnesses. It maintains that physical evidence in and of

10   itself is sufficient and does not require corroboration, but the signatures provide further evidence

11   of conception. PI characterizes this evidence as "the naked say-so of the inventor" accompanied

12   by inadmissible, unauthenticated signatures of third parties. Mot. at 12.

13           The sole piece of physical evidence in support of conception is a handwritten notebook

14   drawing, reproduced here:

United States District Court
Northern District of California

---

25   [2] Opticurrent contends that conception and reduction to practice occurred "on or before" February
26   23, 1997. *See, e.g.*, Gunter Decl. Ex. 4 [Dkt. No. 105-5], at 405:22–23; 406:12–13; 409:10.
     Pursuant to Patent Local Rule 3-1(f), I will consider Opticurrent alleged date of conception and
27   reduction to practice to be February 23, 1997. *See Harvatek Corp. v. Cree, Inc.*, No. C 14-05353
     WHA, 2015 WL 4396379, at *2 (N.D. Cal. July 17, 2015) (striking "no later than" language
28   because "Patent L.R. 3-l(f) particularly requires a patent holder to assert a specific date of
     conception, not a date range . . . .").

*See* Headley Decl. Ex. 6. Opticurrent states and PI does not dispute that Congdon made this drawing and that it contains each and every element of Claim 1 of the '623 Patent. At issue, however, are the three signatures that appear at the bottom of the drawing. Each reflects that the drawing was "[r]ead and understood" by three separate individuals on February 24, 1997, February 26, 1997, and September 29, 1999, respectively. *Id.* The signatories to the document have not provided any testimony or declarations in this litigation.

The parties vigorously debate whether this is the type of physical evidence that does not require corroboration. *See Mahurkar*, 79 F.3d at 1577. The case law on this issue is less than clear. On the one hand, the Federal Circuit has stated in various opinions that "[t]he inventor . . . must provide *independent* corroborating evidence in addition to his own statements *and documents.*" *Hahn v. Wong*, 892 F.2d 1028, 1031 (Fed. Cir. 1989) (emphasis added); *see also Procter v. Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 998–99 (Fed. Cir. 2009)

1    (affirming district court's rejection of party's proffer of inventor's laboratory notebook in support

2    of earlier conception date because "this entry was unwitnessed and was not corroborated by any

3    other evidence").

4    Yet in *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, for example, the Federal Circuit

5    reversed the district court's finding that there was no credible evidence of conception because the

6    inventor's "laboratory notebooks, alone, are enough to show clear error in the findings that

7    underlie the holding that the invention was not conceived before May 1980." 802 F.2d 1367, 1378

8    (Fed. Cir. 1986). Despite the fact that "some of the notebooks were not witnessed until a few

9    months to one year after their writing," the court nonetheless explained that that fact "d[id] not

10   make them incredible or necessarily of little corroborative value." *Id.*; *see also Price v. Symsek*,

11   988 F.2d 1187, 1195 (Fed. Cir. 1993) (finding that "[t]he board erred in its understanding that

12   what a[n inventor] drawing discloses invariably needs to be supported by corroborating evidence"

13   because "'corroboration' is not necessary to establish what a physical exhibit before the board

14   includes").

15   I follow the reasoning of *Procter* and *Hahn* more persuasive, particularly in light of the

16   purpose behind the corroboration requirement. It exists "[b]ecause of a concern that inventors

17   testifying in patent infringement cases would be tempted to remember facts favorable to their case

18   by the lure of protecting their patent or defeating another's patent." *Cordance Corp. v.*

19   *Amazon.com, Inc.*, 658 F.3d 1330, 1334 (Fed. Cir. 2011) (internal quotation marks omitted).

20   Thus, "[t]he requirement of *independent* knowledge remains key to the corroboration inquiry."

21   *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006) (emphasis added). Here,

22   the only physical evidence that Opticurrent offers is not independent, but rather the inventor's own

23   drawing, which, like his testimony, bears the risk of bias in his favor. I will therefore look to see

24   whether the drawing is sufficiently corroborated.

25   Opticurrent argues that the drawing is corroborated by the three signatories to the

26   document, two of whom read and understood the document within three days of its creation. *See*

27   Headley Decl. Ex. 6. PI argues that these signatures are inadmissible because they have not been

28   authenticated; the three signatories have not provided any testimony or declarations in this suit,

8

1    and Congdon's own testimony is insufficient to corroborate and authenticate third-party

2    signatures. Mot. at 12 (citing *Chen v. Bouchard,* 347 F.3d 1299, 1311 (Fed. Cir. 2003) ("[N]o

3    witness who signed any of Dr. Chen's or any other involved researchers' notebooks testified in

4    this proceeding, and all of the information within those notebooks therefore remains

5    uncorroborated.")). In *Chen*, however, the Federal Circuit rejected the unauthenticated signatures

6    as corroboration of reduction to practice, which, as PI notes, is subject to a more stringent

7    corroboration requirement than conception. *See* Rep. at 10. While PI argues that the signatures

8    are unauthenticated, and there was no showing that the witnesses were unavailable, PI does not

9    provide any evidence that the signatures are forged or otherwise incredible. As such, thee

10   signatures are at least sufficient to raise a genuine issue of material fact as to corroboration and

11   therefore conception.

12       **B. Evidence of Reduction to Practice**

13       Similarly to the argument regarding conception, PI again argues that Opticurrent fails to

14   produce independent evidence of actual reduction to practice. Opticurrent points to Congdon's so-

15   called "dusty breadboard," *see* Gunter Decl. Ex. 4 at 509:9–11; 511:13–22, which Opticurrent

16   contends is physical evidence of an actual reduction to practice because it contains each of the

17   elements required by Claim 1. PI argues that (1) there is no corroboration that the breadboard

18   existed at all on February 23, 1997; (2) Congdon cannot testify as to the state of the breadboard on

19   February 23, 1997 due to his numerous modifications; and (3) Congdon conceded that the

20   breadboard did not function for its intended purpose.[3]

21       As with conception, reduction to practice also requires corroboration, and it is "a more

22   stringent standard than that required to corroborate a conception." *Singh v. Brake*, 222 F.3d 1362,

23   1370 (Fed. Cir. 2000). While Opticurrent defends the breadboard against PI's attacks with

24   Congdon's deposition testimony, the inventor's own testimony cannot constitute independent

25   corroboration that the breadboard existed on February 23, 1997, or its state at that time. The only

26

27   _____

[3] While it is not material to my decision, I note that the "dusty breadboard" and the notebook page
28   were not disclosed until April 2017, well after the commencement of the litigation and only a
     month before the close of fact discovery.

9

1   other corroboration of the breadboard is the single-page drawing from Congdon's notebook, which

2   very briefly references the breadboard in notes on the top left of the drawing.  *See* Headly Decl.

3   Ex. 6.  Although the notebook, with its unauthenticated signatures, was sufficient to raise a

4   genuine issue of material fact as to conception, the Federal Circuit is clear that it cannot as to

5   actual reduction to practice.  *See Singh*, 222 F.3d at 1370 ("Indeed, a notebook page may well

6   show that the inventor *conceived* what he wrote on the page, whereas it may not show that the

7   experiments were *actually performed*, as required for a reduction to practice.") (emphasis in

8   original); *see also Chen*, 347 F.3d at 1311; *Mikus v. Wachtel*, 542 F.2d 1157, 1161 (C.C.P.A.

9   1976) (holding that an invention record, based on unwitnessed laboratory notebook and results,

10  may provide sufficient evidence of conception but not reduction to practice under rule of reason).

11  Because Opticurrent fails to point to independent evidence corroborating the breadboard, it cannot

12  raise a genuine issue of material fact as to actual reduction to practice.

13        **C.  Evidence of Diligence**

14        A party that is first to conceive but second to reduce to practice may nonetheless show

15  priority if it can establish diligence.  "Precedent requires that an inventor's testimony concerning

16  his diligence be corroborated."  *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006).

17  "Unlike the legal rigor of conception and reduction to practice, diligence and its corroboration

18  may be shown by a variety of activities, as precedent illustrates."  *Id.*  Despite this relaxed

19  standard, however, Opticurrent nonetheless fails to show a genuine issue of material fact as to

20  diligence because it offers no independent corroborating evidence.  The only evidence in the

21  record as to Congdon's diligence is his own testimony.  *See* Opp. at 18 n.10.  Accordingly,

22  Opticurrent cannot show diligence.

23        While Opticurrent succeeds in demonstrating a genuine issue of material fact as to

24  conception, Opticurrent fails to do so with respect to actual reduction to practice and diligence,

25  and therefore cannot survive summary judgment as to the issue of priority.  Because Opticurrent

26  does not raise a genuine issue of material fact as to entitlement to a pre-filing priority date, the

27  relevant priority date is the date of filing of the patent on January 19, 2001.

28

## II.     Validity of the '623 Patent

PI next contends that because the proper priority date is January 19, 2001, and PI's product TOPSwitch-GX was on sale in the United States at least as of its official release on November 20, 2000, the '623 patent is invalid.  Opticurrent counters that it has dropped the TOPSwitch-GX from this lawsuit after determining that it does not infringe the '623 Patent, and thus its date of sale is irrelevant and cannot invalidate the Patent.  Opticurrent also provides the expert testimony of Dr. Regan Zane, who testifies that the TOPSwitch-GX does not include each limitation required by Claim 1, and therefore does not infringe on or invalidate Claim 1.  *See* Declaration of Regan Zane ("Zane Decl.") at ¶¶ 65–70.

PI does not address Dr. Zane's testimony, but instead responds that Opticurrent's original infringement contentions serve as binding admissions, pointing to Opticurrent's pre-suit reverse engineering to confirm the TOPSwitch-GX's transistor-level circuit structures.  The cases PI cites in support of its argument, however, are distinguishable.  In *Gammino v. Spring Commc'ns Co. L.P.*, the district court considered the patentee's accusations of infringement as a "binding admission" of invalidity only because the patentee had previously argued the same in another case and had a "full and fair opportunity to litigate the claims;"  therefore, the court thought it appropriate to apply a "collateral estoppel effect."  No. 10-2493, 2011 WL 3240830, at *2–3 (E.D. Pa. July 29, 2011).  *Google Inc. v. Beneficial Innovations, Inc.* is more analogous to the current case, but there the district court recognized that the general rule is that "a plaintiff cannot prove infringement based on contentions alone, and must proffer sufficient evidence supporting the allegations set forth in the infringement contentions."  No. 2:11-cv-00229, 2014 WL 4215402, at *4 (E.D. Tex. Aug. 22, 2014).  Moreover, in *Google*, the patentee had not withdrawn the infringement allegations, nor had it proffered expert testimony as to the relevant product's non-infringement.

Given that Opticurrent has not only dropped the contentions with respect to the TOPSwitch-GX, which PI did not oppose, and has submitted unrefuted expert testimony on the issue, I do not find that Opticurrent's original infringement contentions are binding admissions.  And while PI argues that Opticurrent's timing is all too convenient, there is no evidence that

1   Opticurrent has acted in a manipulative way or with bad faith.  Because PI did not include this

2   specific theory of invalidity, based on preexistence of the TOPSwitch-GX on the market prior to

3   the '623 Patent's filing date, in their invalidity contentions, Opticurrent was not aware of this

4   argument at the time that it decided to drop the TOPSwitch-GX from the suit.  Nor is there any

5   evidence that Opticurrent was aware of the release date of the TOPSwitch-GX family of products

6   at that time.  While PI is free to raise the issue at trial, Opticurrent has succeeded in raising a

7   genuine issue of material fact regarding invalidity that is sufficient to survive summary judgment.

8   **III.    Infringement**

9   As claim construction has already occurred, I turn directly to the question of patent

10  infringement.  Patent infringement is a question of fact.  *See Bayer AG v. Elan Pharm. Research*

11  *Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000); *see also Catalina Marketing Int'l, Inc. v.*

12  *Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002) ("Summary judgment of no literal

13  infringement is proper when, construing the facts in a manner most favorable to the nonmovant,

14  no reasonable jury could find that the accused system meets every limitation recited in the

15  properly construed claims.").  "To prevail, the plaintiff must establish by a preponderance of the

16  evidence that the accused device infringes one or more claims of the patent either literally or under

17  the doctrine of equivalents."  *Bayer*, 212 F.3d at 1247.

18  "Literal infringement requires the patentee to prove that the accused device contains each

19  limitation of the asserted claim(s)."  *Bayer*, 212 F.3d at 1247 (citing *Mas–Hamilton Group v.*

20  *LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998)).  "If any claim limitation is absent from the

21  accused device, there is no literal infringement as a matter of law."  *Id.*  "If an asserted claim does

22  not literally read on an accused product, infringement may still occur under the doctrine of

23  equivalents if there is not a substantial difference between the limitations of the claim and the

24  accused product."  *Id.* at 1250; *see also Catalina Marketing*, 289 F.3d at 812 ("Infringement under

25  the doctrine of equivalents requires the patentee to prove that the accused device contains an

26  equivalent for each limitation not literally satisfied.").  "Insubstantiality may be determined by

27  whether the accused device "performs substantially the same function in substantially the same

28  way to obtain the same result" as the claim limitation."  *Catalina Marketing*, 289 F.3d at 813.

**A. Literal Infringement**

PI's argument for no literal infringement rests on the theory that the claims, as construed, do not allow for a fourth pin connected to an external power supply. Thus, because the accused products each have a fourth terminal connected to a power supply, they do not infringe the '623 Patent. Opticurrent responds that this argument rehashes those at claim construction, is contrary to the specification of the '623 Patent, and is refuted by expert testimony.

At claim construction, Judge Gilstrap reviewed the parties' arguments regarding the phrase "a noninverting transistor switch having only three terminals" as well as the patent specification. Judge Gilstrap noted that "the specification [] states that a three terminal noninverting transistor switch may have a fourth terminal/pin and still be considered a three terminal switch." *See* Memorandum Opinion and Order dated Apr. 18, 2017 ("Claim Construction Order") [Dkt. No. 58] at 12. He cited to the patent specification:

> For example, the scope of the present invention also includes three terminal noninverting transistor-switches that use a "fourth" pin (power supply) for normal operation (and potentially even for enhancement purposes) but still operate (for example as a "fail-safe" feature) without power applied to this "fourth" power pin.

'623 Patent at 14:41–46. Finding that the distinction between three and four terminal switches in the context of the patent is "the connection to a power supply by a fourth terminal," he construed the phrase as "a noninverting transistor switch with three terminals that does not have a fourth terminal connected to a power supply." *See* Claim Construction Order at 12. PI asserts and Opticurrent does not dispute that each of the accused products includes a fourth terminal, the BP/M pin, that is connected to a capacitor. *See* Mot. at 18; Opp. at 22. The question is whether the capacitor to which the fourth terminal is connected is a "power supply."

In support of its argument, PI submits datasheets for each of the accused products that show that the BP/M pins are connected to external $C_{BP}$ capacitors. *See* Headley Decl. Ex. 12 [Dkt. No. 103-14], at PI_OPT0000001; Ex. 13 [Dkt. No. 103-15], at PI_OPT0000095; Ex. 14 [Dkt. No. 103-16], at PI_OPT0000150; Ex. 15 [Dkt. No. 103-17], at PI_OPT0000230. It contends that the evidence and Opticurrent's own admissions demonstrate that the capacitor is a power supply because it stores energy and provides power. For example, the datasheet for the TNY179 states

13

1   that "[t]he BYPASS/MULTI-FUCNTION pin is the internal supply voltage node. When the

2   MOSFET is on, the device operates from the energy stored in the bypass capacitor." Headley

3   Decl. Ex. 14, at PI_OPT0000152; *see also* Ex. 12, at PI_OPT0000003; Ex. 13, at

4   PI_OPT0000097; Ex. 15, at PI_OPT0000232. And at the claim construction hearing, Opticurrent

5   explained that "the key difference between a three terminal non-inverting switch is that those first

6   three terminals are connected to the same type of thing, input signal, load, and ground; however,

7   there is no fourth terminal that's connected to an external power supply . . . ." Headley Decl. Ex.

8   11 [Dkt. No. 103-13], at 6:12–16; *see also id.* at 10:3–6 ("The issue is really where there's some

9   other pin that's connected to an external power supply as opposed to the power being supplied by

10  the voltage stabilizer to the rest of the circuit.").

11       In response, Opticurrent argues that the BP/M pin does not negate infringement because

12  "all of the energy that the capacitor connected to the BP/M pin receives is derived and regulated

13  from the output terminals." Opp. at 23. It points to the deposition testimony of David Kung, PI's

14  30(b)(6) representative, who explained that the capacitor "gets charged . . . because of the

15  operation current that it provides to the chip. Then the chip gets replenished through drain,"

16  supporting Opticurrent's contention that the power was derived from the drain as opposed to a

17  fourth terminal connected to a power supply. Gunter Decl. Ex. 9 [Dkt. No. 105-10], at 30:19–23.

18  It also submits Dr. Zane's testimony, who opines that the $C_{BP}$ capacitor "is not a 'power supply'"

19  because the accused products "derive all of their operating power from the second and third

20  terminals" and "[t]he capacitor merely acts as a filter for the internal power supply of the product."

21  Zane Decl. ¶ 44.

22       While a close call, Opticurrent has at least raised a genuine issue of material fact regarding

23  whether the capacitors in the accused products are power supplies or not. Opticurrent argues, and

24  there is evidence that, the capacitor in PI's products is used as energy storage for energy generated

25  by the other three terminals, and does not generate any energy on its own. Under Opticurrent's

26  characterization, the capacitor does not supply any energy but instead acts as an energy storage

27  tank. If Opticurrent is correct, then a reasonable jury may find that the capacitor is not a power

28  supply, and the accused products thus do not have a fourth terminal connected to a power supply.

14

1    Because Opticurrent raises an issue of material fact, I cannot grant summary judgment on this

2    record.

3              **B.  Infringement Under the Doctrine of Equivalents**

4              Even if Opticurrent's characterization is incorrect and PI's products do not literally

5    infringe, I would nonetheless deny summary judgment on the grounds that Opticurrent raises a

6    genuine issue of material fact as to the doctrine of equivalents.  Opticurrent argues that the

7    accused products contain each limitation of the claim or its equivalent, as supported by Dr. Zane's

8    expert opinion, and therefore the doctrine of equivalents necessarily applies.  While PI does not

9    dispute that the accused products contain each limitation of the claim or its equivalent, PI contends

10   that the accused products do not infringe the '623 Patent under the doctrine of equivalents because

11   finding otherwise would violate both the vitiation and ensnarement doctrines.

12             **1.  The Vitiation Doctrine**

13             While "[t]he test of the equivalence of a proposed substitute for a missing element is

14   ordinarily a factual inquiry reserved for the finder of fact," "'vitiation' is not an exception to the

15   doctrine of equivalents, but instead a legal determination that 'the evidence is such that no

16   reasonable jury could determine two elements to be equivalent.'"  *Deere & Co. v. Bush Hog, LLC*,

17   703 F.3d 1349, 1357 (Fed. Cir. 2012).  "There is no set formula for determining whether a finding

18   of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule."

19   *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1359 (Fed. Cir. 2005).  "Rather, courts

20   must consider the totality of the circumstances of each case and determine whether the alleged

21   equivalent can be fairly characterized as an insubstantial change from the claimed subject matter

22   without rendering the pertinent limitation meaningless."  *Id.*

23             "The vitiation concept has its clearest application where the accused device contain[s] the

24   antithesis of the claimed structure."  *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342,

25   1347 (Fed. Cir. 2013) (internal quotation marks and citation omitted).  "This makes sense"

26   because "two elements likely are not insubstantially different when they are polar opposites."  *Id.*

27   The Federal Circuit has clarified that the vitiation test cannot be satisfied (1) "by simply noting

28   that an element is missing from the claimed structure or process," since the doctrine of equivalents

1    by definition assumes as much; nor (2) "merely by noting that the equivalent substitute is outside

2    the claimed limitation's literal scope." *Id.* "Rather, vitiation applies when one of skill in the art

3    would understand that the literal and substitute limitations are not interchangeable, not

4    insubstantially different, and when they do not perform substantially the same function in

5    substantially the same way, to accomplish substantially the same result" *Id.*

6           Given the evidence as well as Dr. Zane's testimony, I cannot find that no reasonable jury

7    could find equivalence. PI's argument boils down to merely noting that the equivalent

8    substitute—here, the accused products' fourth pin, connected to a capacitor—is outside the

9    claimed limitation's literal scope. But Opticurrent argues that the evidence shows that even if the

10   capacitor can function as a power supply, it is not used as one because the power comes from the

11   drain; instead, the capacitor acts as a mere filter for the internal power supply. *See* Gunter Decl.

12   Ex. 9, at 30:19–23; Zane Decl. ¶ 44. Finding equivalence in this limited instance would not vitiate

13   the claim limitations such that any transistor switch with a fourth terminal connected to a power

14   supply would fall within Claim 1 of the '623 Patent; instead, Opticurrent argues that despite the

15   presence of a fourth terminal connected to a capacitor, the capacitor does not function as a power

16   supply and therefore the accused products function substantially the same way as a transistor

17   switch having only three terminals. For this reason, Opticurrent has raised a genuine issue of

18   material fact as to whether PI's accused products infringe Claim 1 under the doctrine of

19   equivalence.

20           **2.    The Ensnarement Doctrine**

21          "A patentee may not assert a scope of equivalency that would encompass, or ensnare, the

22   prior art." *Intendis GMBH v. Glenarmk Pharm. Inc., USA*, 822 F.3d 1355, 1363 (Fed. Cir. 2016).

23   Thus, even if an accused element meets functional equivalency, "no equivalent will be found if the

24   scope of equivalency would capture the prior art." *Id.*

25          PI argues that Opticurrent has recognized in various stages of the litigation that a four-

26   terminal device with a fourth terminal connected to a power supply was the prior art, pointing to

27   the patent specification, the claim construction hearing, and Judge Gilstrap's Claim Construction

28   Order. Similar to its arguments on literal infringement and vitiation, Opticurrent responds that the

16

fourth terminal in the accused products does not negate their infringement because the capacitor does not act as an external power supply.  Given that Opticurrent is not claiming all four-terminal devices with a fourth terminal connected to a power supply, but rather three-terminal devices or four-terminal devices where the fourth terminal is attached to something that does not function as a power supply, this limitation does not pose an ensnarement issue.

Moreover, at claim construction, Judge Gilstrap recognized that "[t]he specification contrasts three terminal switches to four terminal switches, a distinction that is apparently well known in the art."  Claim Construction Order at 11.  He also noted, however, that "the specification again states that a three terminal noninverting transistor switch may have a fourth terminal/pin *and still be considered a three terminal switch*."  *Id.* at 12 (emphasis added).  The patent specification specifically describes its scope as inclusive of "three terminal noninverting transistor switches that use a 'fourth' pin (power supply) for normal operation . . . but still operate . . . without power applied to this 'fourth' power pin," *id.* (citing '623 Patent at 14:41–47), which is how Opticurrent and its expert characterize the accused products.  Given this specific carve-out, which does not ensnare all products that contain four terminals or even all products that contain four terminals connected to a power supply, Opticurrent's theory under the doctrine of equivalents does not impermissibly ensnare the prior art.

## CONCLUSION

While Opticurrent is not entitled to a pre-filing priority date, it has successfully raised a genuine issue of material fact as to the validity of the '623 Patent as well as infringement.  For the foregoing reasons, I GRANT IN PART and DENY IN PART PI's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: April 9, 2018

William H. Orrick
United States District Judge