UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OPTICURRENT, LLC,

Plaintiff,

v.

POWER INTEGRATIONS, INC., et al.,

Defendants.

Case No. 17-cv-03597-WHO

**ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE OR LIMIT EXPERT TESTIMONY**

Re: Dkt. Nos. 142, 143, 145

## INTRODUCTION

Plaintiff Opticurrent, LLC ("Opticurrent") is the owner of United States Patent No. 6,958,623 ("the '623 Patent"), and alleges that defendant Power Integrations, Inc. ("PI") manufactures and sells products that infringe Claim 1 of the '623 Patent. PI initially moved for summary judgment against Opticurrent on the grounds of invalidity as well as non-infringement. *See* Dkt. No. 103. In the corresponding Order I concluded that Opticurrent was not entitled to a pre-filing priority date, considering the inventor's notebook drawing ("OPTI000810") was introduced with three uncorroborated signatures. *See* Dkt. No. 122.

After Opticurrent provided new evidence corroborating the signatures with the notebook drawing, a motion for reconsideration was granted. With permission, PI now moves for summary judgment a second time, claiming that Opticurrent is not entitled to a pre-filing priority date on the merits because of a lack of evidence that the drawing discloses all elements of the asserted patent claim. *See* Dkt. No. 142. Coinciding with the motion for summary judgment, PI and Opticurrent filed *Daubert* motions to limit or exclude expert testimony. *See* Dkt. Nos. 143, 145. PI seeks to exclude the entire opinion of Opticurrent's damages expert, Larry W. Evans, and Opticurrent seeks to exclude PI's technical expert, William Bohannon, from testifying on a "practicing the

prior art" defense in his rebuttal report. *Id.* After briefing was completed, Opticurrent also filed a request for a sur-reply. *See* Dkt. No. 159. Finally, Opticurrent brings a discovery dispute that it believes is relevant to its *Daubert* motion. *See* Dkt. Nos. 154–155.

For the reasons stated below, PI's motion for summary judgment is DENIED, both *Daubert* motions are GRANTED, and Opticurrent's request for discovery and motion to file a sur-reply are DENIED.

**BACKGROUND**

**I.     THE '623 PATENT**

The '623 Patent, titled "Three Terminal Noninverting Transistor Switch," relates to a novel circuit design for a three-terminal switch used in semiconductor devices that minimizes current leakage between the second and third terminals. *See* Compl. ¶ 13; Mot. Summ. J. at Ex. B, the '623 Patent at Claim 1. The patent was filed on January 19, 2001 and issued to sole inventor James Congdon. *Id.* Claim 1 of the '623 Patent recites:

> 1.  A noninverting transistor switch having only three terminals, said terminals being a first terminal, a second terminal, and a third terminal, said noninverting transistor switch comprising:
>     (a) a transistor connected to the second and third terminals, said transistor having an on switching state in which current is able pass between the second and third terminals and an off switching state in which current is interrupted from passing between the second and third terminals,
>     (b) a voltage stabilizer connected to the second and third terminals, and
>     (c) a complementary metal oxide semiconductor (CMOS) inverter connected to the first terminal, the second terminal, said transistor and said voltage stabilizer, said CMOS inverter interrupting the passing of current between said voltage stabilizer and the second terminal when said transistor is in its off switching state.

'623 Patent at 14:50–15:2. Opticurrent became the assignee of the '623 Patent in 2012. *See* Dkt. No. 122 at 12–13.

**II.     CONCEPTION**

Opticurrent claims that Congdon first conceived of the invention practicing the '623 Patent prior to filing his patent application, no later than February 23, 1997. *See* Oppo., Ex. 4 at 405:17–23; 412:21–413:2. Congdon relies on his notebook containing a schematic purportedly showing the invention. The notebook drawing is titled "23 Feb 1997" and is signed with Congdon's name

at the top. It contains the names of three other individuals and the date on which they signed the document near the bottom of the page. Congdon also drew color-coordinated circles around the components required of Claim 1, and he referred to this copy during his deposition. *See* Oppo., Ex. 3 at 21:15–21, 219:9–15; Ex. 10.

In addition to the notebook schematic, there is a physical model of the drawing. The so-called "dusty breadboard" purported to reduce the drawing to practice. *See* Oppo. Ex. 10. Congdon confirmed that the breadboard was the same invention referenced in the drawing and that the breadboard contained all the limitations of Claim 1. *See* Oppo. Ex. 4 at 516:23–517:1; 537:16–23. Opticurrent also presented an affidavit from one of the three signatories of the notebook schematic, Mackillop, who testified that he witnessed the drawing as well as the working dusty breadboard as of February 24, 1997. *See* Oppo., Ex. 6 at 81:9–17, 33:13–34:7.

Finally, Opticurrent's technical expert, Dr. Zane, opined that the notebook drawing disclosed each element of Claim 1. *See* Mot. Summ. J., Ex. C ¶ 183; Oppo. Ex. 8 ¶ 183. He also provided a picture of the dusty breadboard with color coordinated circles matching Congdon's drawing, illustrating where he identified each disclosed element of Claim 1. Oppo. Ex. 8 ¶¶ 185–187. However, the parties draw different conclusions about the sufficiency of Zane's opinion and whether the drawing references the claim elements. PI offered its own technical expert analysis of the notebook drawing from Bohannon, who opined that the drawing contains no element for a CMOS inverter, no element that could function as a voltage stabilizer, and no element that could function to interrupt current passing between a voltage stabilizer and second terminal when in the off switching state. *See* Mot. Summ. J., Ex. D ¶¶ 30–32.

## III. PROCEDURAL HISTORY

On April 1, 2016, Opticurrent sued PI and Mouser Electronics in the United States District Court for the Eastern District of Texas, alleging infringement with respect to several products. *See* Compl. ¶ 15. After serving infringement contentions, as well as briefing and hearing argument on claim construction, the Texas court construed the disputed terms of the '623 Patent in an Order filed on April 18, 2017. *See* Dkt. No. 58.

On May 26, 2017, the case was transferred to this District, while a motion for leave to

serve amended infringement contentions was pending. *See* Dkt. No. 68. I was assigned the case and granted Opticurrent's motion for leave to serve the amended infringement contentions on October 3, 2017. *See* Dkt. No. 96. On February 13, 2018, PI moved for summary judgment. *See* Dkt. No. 103. I granted in part and denied in part PI's motion, holding that Opticurrent did not establish with adequate corroborating evidence that the physical breadboard was reduced to practice consistent with the signatures and dates on the notebook drawing. *See* Dkt. No. 122. *Id.* at 9–10.

After the Order, Opticurrent asked for leave to file a motion for reconsideration based on a new declaration from one of the signatories, Mackillop, who confirmed his signature and date on the notebook drawing. I granted the request for leave to file a motion reconsideration and subsequently granted the motion. *See* Dkt. Nos. 125, 132. A further case management conference was held on September 25, 2018, and the parties agreed on a briefing schedule for dispositive motions and *Daubert* motions. On October 15, 2018, consistent with the schedule, PI brought a second motion for summary judgment, *see* Dkt. No. 142, and the parties filed their *Daubert* motions, Dkt. Nos. 143, 145. Opticurrent has also requested leave to file a sur-reply and brought a discovery dispute related to its *Daubert* motion which the parties have fully briefed. *See* Dkt. Nos. 154–155, 159–161.

## LEGAL STANDARD

### I.      SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party "is

4

1 │ entitled to a judgment as a matter of law [when] the nonmoving party has failed to make a

2 │ sufficient showing on an essential element of her case with respect to which she has the burden of

3 │ proof." *Id*. (internal quotation marks omitted).  The moving party need only show "that there is an

4 │ absence of evidence to support the nonmoving party's case." *Id*. at 325.

5 │       Once the moving party meets its initial burden, the nonmoving party must go beyond the

6 │ pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a

7 │ genuine issue for trial.  FED. R. CIV. P. 56(c).  "Factual disputes that are irrelevant or unnecessary

8 │ will not be counted." *Anderson*, 477 U.S. at 248.  It is not the task of the court to scour the record

9 │ in search of a genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

10 │ The nonmoving party has the burden of identifying, with reasonable particularity, the evidence

11 │ that precludes summary judgment.  *Id*.  If the nonmoving party fails to make this showing, "the

12 │ moving party is entitled to a judgment as a matter of law."  *Celotex*, 477 U.S. at 322.

## II.     MOTIONS TO STRIKE

### A.    Federal Rules

15 │       Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an

16 │ insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  FED. R.

17 │ CIV. P. 12.  Federal Rule of Evidence 702 allows a qualified expert to provide an opinion where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

23 │       Expert testimony is admissible under Rule 702 "if it is both relevant and reliable." *Cooper*

24 │ *v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).  "[R]elevance means that the evidence will assist the

25 │ trier of fact to understand or determine a fact in issue." *Id*.  Under the reliability requirement,

26 │ expert testimony must "relate to scientific, technical, or other specialized knowledge, which does

27 │ not include unsubstantiated speculation and subjective beliefs." *Id*.  "Importantly, there must be a

5

recognized body of knowledge, learning, or expertise upon which the witness relies. Where there is no field of expertise, nobody will qualify as an expert witness on the subject." *Perez v. Seafood Peddler of San Rafael, Inc.*, No. 12–cv–00116–WHO, 2014 WL 2810144, at *2 (N.D. Cal. June 20, 2014) (internal quotation marks omitted). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. FED. R. EVID. 702 advisory committee notes.

"Trial courts must exercise reasonable discretion in evaluating and in determining how to evaluate the relevance and reliability of expert opinion testimony." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006). A district courts serves as "a gatekeeper, not a factfinder." *Id.* at 654.

## B. Patent Local Rules

Patent Local Rule 3 "requires patent disclosures early in a case and streamlines discovery by replacing the series of interrogatories that parties would likely have propounded without it." *ASUS Computer Int'l v. Round Rock Research, LLC,* No. 12–cv–02099–JST, 2014 WL 1463609, at *1 (N.D. Cal. Apr. 11, 2014) (internal quotation marks and modifications omitted).

Patent Local Rule 3–1 requires that a party claiming patent infringement serve a "Disclosure of Asserted Claims and Infringement Contentions" that includes "[e]ach claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. § 271 asserted." Patent L.R. 3–1(a). This requires "a limitation-by-limitation analysis, not a boilerplate reservation." *Rambus Inc. v. Hynix Semiconductor Inc.*, No. 05–cv–00334–RMW, 2008 WL 5411564, at *3 (N.D. Cal. Dec. 29, 2008).

Patent Local Rule 3–3 requires parties accused of infringement to serve invalidity contentions in response to the allegations against them. The invalidity contentions must identify "each item of prior art that allegedly anticipates each asserted claim or renders it obvious." Patent L.R. 3–3(a). If obviousness is alleged, the invalidity contentions must contain "an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness." Patent L.R. 3–3(b).

6

Given the purpose of the Patent Local Rules, "a party may not use an expert report to introduce new infringement theories, new infringing instrumentalities, new invalidity theories, or new prior art references not disclosed in the parties' infringement contentions or invalidity contentions." *Verinata Health, Inc. v. Sequenom, Inc.,* No. 12–cv–00865–SI, 2014 WL 4100638, at *3 (N.D. Cal. Aug. 20, 2014) (internal quotation marks omitted); *see also Golden Bridge Tech. Inc v. Apple, Inc.,* No. 12–cv–04882–PSG, 2014 WL 1928977, at *3 (N.D. Cal. May 14, 2014) ("Expert reports may not introduce theories not set forth in contentions."). "Any invalidity theories not disclosed pursuant to Local Rule 3–3 are barred…from presentation at trial (whether through expert opinion testimony or otherwise)." *MediaTek Inc. v. Freescale Semiconductor, Inc.,* No. 11–cv–05341–YGR, 2014 WL 690161, at *1 (N.D. Cal. Feb. 21, 2014). In determining whether to strike some or all of an expert report for failure to comply with the patent local rules, courts in this district have asked, "will striking the report result in not just a trial, but an overall litigation, that is more fair, or less?" *Apple Inc. v. Samsung Electronics Co.,* No. 11–cv–01846–PSG, 2012 WL 2499929, at *1 (N.D. Cal. June 27, 2012).

## DISCUSSION

### I.   PI'S MOTION FOR SUMMARY JUDGMENT

PI's second motion for summary judgment addresses whether the notebook drawing, OPTI000810, objectively discloses to a person of ordinary skill in the art ("POSITA"), all the elements of Claim 1 for purposes of obtaining a pre-filing priority date. To establish invention conception dates and determine priority, "an inventor must have formed in his or her mind a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1577 (Fed. Cir. 1996) (internal quotation marks omitted). Where a party seeks to show conception through the oral testimony of an inventor, the Federal Circuit requires corroboration and applies a rule of reason analysis. *Id.* Under this analysis, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id.* However, where a party seeks to prove conception through physical exhibits, corroboration is not required. *Id.* "Determination of a patent's priority date is purely a question of law if the facts underlying that

determination are undisputed." *Medtronic CoreValve, LLC v. Edwards Lifesciences Corp.*, 741 F.3d 1359, 1363 (Fed. Cir. 2014).

### A. Dr. Zane's Declaration

Before reaching the merits, PI insists that it is improper to consider Zane's declaration as new evidence attached with the opposition to the motion for summary judgment. PI seeks to exclude the declaration and argues that Zane cannot offer new theories for the first time that were not disclosed in discovery or introduced in Zane's original report. To do so would violate Federal Rule of Civil Procedure 26(a)(2)(D) as well ignore case law in this district applying Rule 26. *See Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 980–84 (N.D. Cal. 2014) (excluding untimely expert opinion offered for the first time in opposition to summary judgment).

Opticurrent only relies on Zane's report in a select set of paragraphs, and otherwise the expert opinion evidence corroborating Congdon's opinion of the drawing is based on Zane's more recent declaration. *See* Oppo. at 8:12–16, 13:4–5 (citing Ex. 8 Zane Report ¶¶ 183, 185-188). I agree with PI's characterization of the law and would strike Zane's declaration to the extent it does offer new theories. However, the report states plainly that Zane "can confirm that the above drawing discloses each and every limitation of Claim 1 of the '623 Patent," *id*. ¶ 183, and that he "can confirm that [the dusty breadboard] includes the components and connections present in the drawing with respect to the elements required by Claim 1." *Id*. ¶ 185. This suffices as a disclosure of Zane's intent to opine on the presence of all claim elements evident in the drawing and breadboard. Accordingly, there is no basis to exclude the declaration when it discusses the same subject matter as in his original report.

### B. Disclosure of the CMOS Inverter Claim Requirement

PI first disputes, on the merits, whether Congdon's notebook schematic disclosed "a complementary metal oxide semiconductor (CMOS) inverter" as required by Claim 1 limitation (c). PI's expert found there was "no CMOS inverter disclosed in the drawing" because it has no CMOS inverter symbol or transistor level structure. *See* Mot. Summ. J. Ex. D ¶ 30. In contrast, PI argues neither Congdon nor Opticurrent's expert, Zane, identified the CMOS inverter in the drawing or explained how a POSITA could find such a structure in the drawing.

If no inventor or corroborating expert identifies a CMOS inverter in the drawing, as is PI's position, then there is a failure to evince "appreciation" of the invention or a disclosure as a matter of law. *See Mycogen Plant Science v. Monsanto Co.*, 243 F.3d 1316, 1335 (2001) ("There must be contemporaneous recognition and appreciation of the invention represented by the counts."). However, this argument is belied by Congdon's testimony, about which the parties draw different conclusions.

PI interprets Congdon's testimony as failing to identify a CMOS inverter in the drawing in two respects. First, he stated at points in his deposition that the operative switch was "[n]ot a CMOS inverter." Mot. Summ. J. Ex. E, Congdon Depo. at 224:12–225:1. Second, he described the component circled in yellow on the notebook drawing as a Schmitt trigger, and later stated that a Schmitt trigger is not the same as a CMOS inverter. *See id.* at 226:12–227:23. In response, Opticurrent contends that focusing on the Schmitt trigger testimony is a "red herring."

Congdon testified that the operative switch would inform an engineer that there is a CMOS inverter because "it would be extraordinarily unusual to drive such a CMOS switch from anything but a CMOS device output with a similar power." *Id.* at 224:15–225:13. When asked repeatedly if a Schmitt trigger was the same as a CMOS inverter, Congdon attempted to explain that "[a] CMOS inverter may or may not be a Schmitt trigger" depending on hysteresis. *Id.* at 226:6–19. He discussed that the symbol on the drawing shows the "inverter in this schematic has a Schmitt trigger, [and] has a hysteric action," *id.* 227:10–14, making the symbol in the yellow circle on the notebook drawing "a CMOS inverter whether it's a Schmitt or not." *Id.* at 225:19–227:4. Congdon does testify that the drawing discloses the CMOS inverter, exhibiting his appreciation that it was a part of the invention he intentionally drew into the schematic.

At bottom, there remains a dispute between two experts regarding Congdon's own account of the CMOS inverter. Bohannon opines that a Schmitt trigger is not a CMOS inverter, that "[t]here is no express showing in OPTI000810 of a CMOS inverter," and that there is "no basis to allege that a Schmitt trigger symbol would convey to a POSITA the presence of a CMOS inverter." Mot. Summ. J. Ex. D ¶ 30. These opinions do not rebut Zane's opinion, however, which tends to corroborate Congdon's testimony that a CMOS inverter is disclosed and matches

9

the dusty breadboard.

Opticurrent contends that a POSITA could recognize a CMOS inverter within the drawing because Zane was able to identify one. *See* Oppo. Ex. B, Zane Decl. ¶¶ 62–63 (Dkt. No. 149-3). Zane describes a "triangle symbol" on the drawing as the industry standard to denote an inverter, and he identifies a demarcation within the triangle that indicates hysteresis consistent with the patent specification on use of hysteretic inverters. *Id.* ¶¶ 49–54, 59. Next, he disagrees with Bohannon and opines that "a CMOS inverter with hysteresis is a Schmitt trigger. The Schmitt trigger used in the drawing and the physical breadboard is a CMOS inverter." *Id.* ¶ 62. Zane explained that the inverter shown in the drawing "shares a package with other components [which] are clearly utilizing CMOS technology," and with this context in mind he "would recognize that the inverter is likewise utilizing CMOS technology." *Id.* ¶ 65. Zane also gathered that the inverter would use CMOS technology because "the circuit would only work properly if they are realized as CMOS inverters." *Id.* ¶ 60.

Additionally, PI does not fully address the dusty breadboard, which has been authenticated by Mackillop since the motion for reconsideration, as a separate piece of evidence corroborating a CMOS inverter in the notebook drawing. Mackillop attested to his signature on the notebook drawing, as well as to seeing the drawing reduced to practice in the breadboard. *See* Mackillop Affidavit ¶ 5 (Dkt. No. 123-2) ("I recall seeing a working prototype of the circuit depicted in the schematic as of February 24, 1997."). Zane also reviewed the breadboard himself and found a component that corresponded to the CMOS inverter in the drawing. *See* Oppo. Ex. B, Zane Decl. ¶ 61 (explaining how he reached the conclusion that "the Schmitt trigger is realized using CMOS technology and is therefore a CMOS inverter.").

Considering Congdon's inventor testimony, the expert opinions of Bohannon and Zane, and the corroborated dusty breadboard, there is a dispute concerning whether the CMOS inverter was disclosed in the drawing.

### C.  Disclosure of the "Interrupting" Claim Requirement

PI next argues that there is no element in the notebook drawing that can meet the claim language requiring a CMOS inverter "interrupting the passing of current between said voltage

1  stabilizer and the second terminal when said transistor is in its off switching state." '623 Patent at

2  14:50–15:2.

3  Zane identifies the voltage stabilizer as the LND1E component circled in green in the

4  notebook drawing, the first terminal as the left-most red circled box labeled "IN," the second

5  terminal as the bottom right red circled box labeled "GND," and the third terminal as the top right

6  red circle labeled "OUT." *See* Oppo. Ex. 7, Zane Decl. ¶ 23; Ex. 8, Zane Rep. ¶ 183; Ex. B, Zane

7  Decl. ¶ 45. PI argues that these components, as identified by Opticurrent's expert, could not

8  actually prevent leakage current as required by Claim 1.

9  Zane opined that the LND1E component was functionally the same as the voltage

10  stabilizer in the '623 Patent referred to as "MOSFET 123." In the off switching state, the current

11  is interrupted from passing between the second terminal "115" and the third terminal "117," by the

12  CMOS inverter identified as "139." *See* Oppo. Ex. 8, Zane Rep. ¶¶ 130, 132–133. Zane found

13  that the CMOS inverter disclosed in the drawing would interrupt passing current between the

14  voltage stabilizer and the second terminal when in the off switching state like "CMOS inverter 212

15  of switch 211 in Fig. 5 of the '623 Patent." Oppo. Ex. B, Zane Decl. ¶¶ 66, 69.

16  PI presented Bohannon's opinion that no element in the circuit design could meet the

17  "interrupting…" requirement. Mot. Summ. J., Ex. D ¶ 31. According to Bohannon, current could

18  still pass "from the alleged voltage stabilizer to the second terminal through the Zener diode and

19  100k resistor when the voltage on the 1μF capacitor is high enough to overcome the Zener

20  breakdown voltage." *Id*.

21  Zane disagrees with Bohannon in two relevant respects. First, Zane found that the other

22  pathways Bohannon focuses on are not part of the primary function of the transistor switch in the

23  '623 Patent, and that during normal operation the pathways would "have either zero current or

24  very low bias current (well below the tens to hundreds of microamps considered in the '623

25  Patent)." Oppo. Ex. B, Zane Decl. ¶ 71. Second, Zane opined that the additional pathway

26  components in the drawing "could be removed without impacting the functional operation of the

27  required claim limitations." *Id*.

28  PI challenges the relevance of Zane's opinions as a matter of law. It contends that there is

no reason to limit the "passing of current" language to primary functions of the '623 Patent. PI also notes that Zane does not opine that the drawing indicates other pathways are optional and therefore cannot establish "objective evidence of what the inventor has disclosed to others." *In re Jolley*, 308 F.3d 1317, 1323 (Fed. Cir. 2002). Nonetheless, Zane does offer testimony that the drawing illustrates the capabilities of the technology practiced in the patent, suggesting to him that Congdon had conceived of the invention at the time of the drawing.

The experts disagree regarding objective evidence that the pathways meet the disclosure of the "interrupting" claim requirement. It seems that a POSITA could recognize a CMOS inverter interrupting the passing current between a voltage stabilizer and the second terminal when the transistor is in its off switching state, as required by Claim 1.

### D. Disclosure of the "Voltage Stabilizer" Claim Requirement

As discussed above, Opticurrent identifies the voltage stabilizer in the notebook drawing as the LND1E component. PI asserts that summary judgment is proper because no one has opined that this element maintains "a constant voltage level" as required by the Court's Claim Construction Order. *See* Dkt. No. 58. Once again, this dispute comes down to experts who disagree. Considering the inventor's testimony and each expert's opinion, I find that there is a question of fact whether a "voltage stabilizer" is disclosed as required by the claim.

Congdon's understanding, as the inventor, was that a component performing the voltage stabilizer function does so by "reduc[ing] the likelihood of the voltage on the CMOS inverter…from going too high so as to damage the CMOS inverter, and the other extreme, it will provide enough voltage for the thing to work." Mot. Summ. J. Ex. 3, Congdon Depo. at 25:2–6. When asked if the voltage stabilizer would provide variable voltage during operation, he testified that it typically would be variable. *See id.* at 99:15–21.

Zane also opined that functionally there may be small variances in voltage but "nevertheless a constant voltage supply in the expected modes of operation." *See* Oppo. Ex. B, Zane Decl. ¶ 44. He clarified that, "a constant voltage level does not mean that the output voltage of the voltage stabilizer cannot have any variation whatsoever, but instead refers to the fact that the constant output voltage of the voltage stabilizer should have no more variation than what is

acceptable for normal and safe operation…" *Id.* ¶ 150.  Finally, he found that the drawing resembled the transistor "MOSFET 123" in the '623 Patent in which the depletion transistor supplies current from the third terminal as the source voltage goes below a desired level, and which reduces its current to maintain the source terminal at a constant voltage level. *See id.*  45; *see also* Oppo. Ex. 8, Zane Rep. ¶¶ 130, 132–133.

In PI's expert rebuttal report, Bohannon found that the drawing as designed in the LND1E structure did not disclose whether it could maintain a constant voltage.  *See* Ex. D. ¶ 32 ("Maintaining a constant voltage level would, at the minimum, require a connection to a power supply that is not shown in the drawing.").  His opinion relied in part on Congdon's testimony that the voltage stabilizer did not maintain constant voltage in the most exacting sense, and rather functioned to reduce voltage fluctuations that normally would occur without the component.  *Id*.

Bohannon's strict interpretation of the phrase "constant voltage" does not appear to apply the phrase as earlier construed.  During claim construction, the Hon. Rodney Gilstrap in the United States District Court for the Eastern District of Texas noted that PI "admits that in this art, supplying a regulated voltage is the same as supplying a constant voltage."  Order at 16; *see also* PI's Reply to Claim Construction Brief at 14 ("In this art, supplying a 'regulated' voltage means to supply a constant voltage, i.e., the voltage is being regulated (typically using a feedback mechanism) to a constant value.") (Dkt. No. 48).

Both Congdon and Zane offered testimony that the drawing illustrates constant voltage like the claim was ultimately construed and understood by the Court.  Accordingly, there is sufficient evidence that the notebook drawing does not fail to disclose to a POSITA the "voltage stabilizer" element of Claim 1 in the '623 Patent.  In light of my finding that a POSITA could identify each contested element of Claim 1 disclosed in the drawing, there remains a genuine issue of material fact concerning conception and PI's motion for summary judgment is DENIED.

## II.    PI'S DAUBERT MOTION TO EXCLUDE DAMAGES EXPERT OPINIONS

PI brings a *Daubert* motion to exclude Larry W. Evans from offering opinions on reasonable royalties owed to Opticurrent based on what it believes are unsupported assertions, factual errors, unreliable methodology, and misstatements of current patent law on damages.  *See*

Mot. to Exclude at 1 (Dkt. No. 143).

As part of his report on damages, Evans assumed a "hypothetical negotiation" between the parties that is "intended to simulate, as nearly as possible, the negotiation of an actual license of the patent" by Opticurrent to PI. Evans Report ¶ 22 (Headley Decl., Ex. A) (Dkt. No. 143-2). The hypothetical negotiation was set in 2006, when the alleged infringement began, according to several other framework assumptions. *Id*. ¶ 66. Evans also analyzed fifteen factors widely accepted from *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), to determine reasonable royalties to be paid by an infringer. *Id*. ¶ 23. Based on the hypothetical negotiation and the *Georgia-Pacific* factors, he opined that "the royalty rate of 1.5 cents per accused product would…represent a minimum rate," amounting to only 8-15% of PI's infringing profit. *Id*. ¶¶ 55, 64. He concluded that "in the hypothetical negotiation [PI] would have agreed to pay [Opticurrent] a royalty of at least $18,142,449.55." Evans Report, Ex. C. PI raises several reasons for excluding this opinion, some of which have merit.

### A.     The Proper Parties to the Hypothetical Negotiation

PI asserts that Evans failed to conduct the hypothetical negotiation between the proper parties. *See* Mot. to Exclude at 3. Opticurrent did not exist in 2006, and it was not assigned the patent until its creation in 2012. *Id*., Exs. B, C. According to PI, the hypothetical negotiation should have been between Congdon and PI, and the entire *Georgia-Pacific* analysis failed to consider the substantially different bargaining positions between an individual and a corporate entity. *See Warsaw Othropedic, Inc. v. Nuvasive, Inc.*, 2016 WL 4536740 (S.D. Cal. June 15, 2016) (granting a motion to exclude an expert report for failing to conduct a hypothetical negotiation with the proper parties who "at that time held all right, title and interest [in the patent].").

Opticurrent attempts to distinguish *Warsaw Orthopedic*, asserting that the licensor and licensee in the case were competitors while Opticurrent and PI are not. It also claims, along with Evans, that there is no difference between Opticurrent (a non-operating company) and Congdon (an individual) in terms of their bargaining positions in 2006. *See* Oppo., Ex. 2 Evans Decl. ¶ 7 (Dkt. No. 151-9) ("Congdon and Opticurrent are in essentially the same bargaining position" such

14

that the hypothetical negotiation Evans conducted in his expert report would not have changed.).
These arguments miss the mark.

In *Warsaw Orthopedic*, the first inquiry was whether plaintiffs had a right, title, or interest in the patent at the time of infringement. *See Warsaw Orthopedic*, 2016 WL 4536740, at *5; *see also Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1117 (N.D. Cal. 2011) (finding that "injecting [plaintiff] into the bargaining room was wrong" because at the time the alleged infringement began plaintiff was not the patentee). The court did not reach Opticurrent's argument whether, theoretically, one party would have the same bargaining position as the proper party because it found that a proper party first needed an interest in the patent at the time of infringement.

Even if Evans gives a post-hoc explanation that there is no difference between Opticurrent and Congdon in terms of their bargaining positions in 2006, he is not basing his hypothetical negotiation on the proper parties. His opinion on this issue is also conclusory and counter-intuitive. In hypothetical negotiation analysis, "[r]elevant economic facts may inform this judicially-sanctioned speculation," but the analysis must begin with the proper parties in mind. *Mahurkar*, 79 F.3d at 1579.

Opticurrent does not argue that it was the proper party in 2006 as a matter of right, which is no surprise since it did not exist at the time. It has not provided cases contrary to the position expressed in *Warsaw Orthopedic*. Accordingly, Evans's expert opinion on a hypothetical negotiation should have been analyzed between Congdon and PI, not Opticurrent and PI. Exclusion is appropriate on this basis alone. I will continue to address PI's other arguments for the sake of completeness.

## B. Use of a Vacated Jury Verdict

PI believes Evans's reliance on a jury verdict from a case between PI and Fairchild Semiconductor in 2015 is improper for four reasons: (i) it ignores that the jury verdict was vacated after the Federal Circuit reversed infringement findings; (ii) it fails to explain why the hypothetical parties would consider a jury verdict for a patent licensing discussion; (iii) it does not reliably apply the jury verdict; and (iv) it does not apply the same methodology used in the *Fairchild* case

15

1    to this one.  *See* Mot. to Exclude at 4–5.  I find that even if each of these contentions go to the

2    strength of Evans's opinion, at a minimum relying on the vacated jury verdict introduces

3    significant Rule 403 issues that merits an additional basis to exclude Evans's damages opinion.

4          First, PI asserts that the jury verdict was vacated and therefore cannot add value to any

5    hypothetical negotiation.  Evans's justification for considering the vacated verdict in 2015 for a

6    hypothetical negotiation in 2006 is the concept of "the book of wisdom."  *Sinclair Ref. Co. v.*

7    *Jenkins Petrol. Process Co.*, 289 U.S. 689, 698 (1933) (finding post-infringement evidence can be

8    a relevant "book of wisdom").  However, the book of wisdom is not a blank canvas on which an

9    expert may consider any piece of evidence.  As the Federal Circuit found in *Aqua Shield v. Inter*

10   *Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014), it is incorrect to replace "the hypothetical

11   inquiry into what the parties would have anticipated, looking forward when negotiating, with a

12   backward-looking inquiry into what turned out to have happened."  A jury verdict from an

13   unrelated case in 2015 is far from a meaningful data point to predict a party's expectations

14   surrounding a hypothetical negotiation in 2006.

15         Second, PI contends that "jury-determined damages are not evidence of arm's-length

16   negotiations between parties, and will not help the trier of fact determine a royalty."  *Acceleration*

17   *Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 489 (D. Del. 2018).  PI provides no

18   case within this jurisdiction for that proposition, and it overlooks a later portion of the

19   *Acceleration Bay* opinion in which the court explained the jury verdict could not be used "because

20   it is not sufficiently comparable to the circumstances" of that case.  *Id*.  In this case, Evans

21   believes that the jury verdict involves comparable technology based on analysis performed by

22   Opticurrent's technical expert, Zane.  *See* Evans Decl. ¶ 11; Evans Report ¶ 54.  Evans utilized the

23   jury verdict to consider each party's relative bargaining positions, *see id*. ¶ 55, and explained

24   further that the verdict was relevant to real world licensing negotiations based on his own

25   experience as an expert in the field.  *See* Evans Decl. ¶¶ 9–10.

26         Third, PI disputes Evans's arrival at a 1.5 cent per unit royalty rate based on the lump sum

27   of $2,385,000 damages shown in the *Fairchild* jury verdict form.  *See* Mot. to Exclude, Ex. E.

28   Evans explained, however, that he reached the 1.5 cents per unit rate, in part, after a careful review

of the trial testimony of Fairchild's expert (who opined a 2 cent per unit rate was merited). Evans Decl. ¶ 13. Opticurrent also notes PI's own acknowledgement that effectively the jury's royalty rate was 1.5 – although PI continued to dispute this value in the post-trial briefs. *See* Oppo., Suder Decl. Ex. F at 17.[1] Again, this appears to be a disagreement on the basis or persuasiveness of Evans's opinion rather than its admissibility.

Fourth, PI criticizes Evans's use of the jury verdict form to devise the royalty rate, while simultaneously failing to apply the same methodology of a cost reduction analysis that was used in the case. *See* Mot. to Exclude Ex. A ¶ 65 ("the jury in the '972 patent infringement litigation discussed above was based on the reduced cost [PI] realized as a result of its infringement."). Opticurrent does not respond to this argument specifically. However, Evans did appear willing to consider cost reduction analysis. He stated that PI "has not produced information sufficient to permit" cost reduction analysis, but that "it appears to be clear" that eliminating a fourth terminal in circuitry would result in significant cost savings. *Id.*

In addition to the problems PI identified, at least one of which I agree with, there are significant issues under Rule 403 concerning unfair prejudice to PI, jury confusion, and wasted time, resulting from Evans's potential testimony on the *Fairchild* vacated jury verdict. Even if the book of wisdom would permit Evans to consider the verdict, it has little probative value and will almost certainly cause unfair prejudice to PI and lead to jury confusion. The parties will most likely have to engage in lengthy explanations of the *Fairchild* case, re-litigate those unrelated issues in this trial, and as a result confuse the jury about the facts and circumstances of this dispute.

Opticurrent asserts that if a piece of evidence is relevant and comparable, as Evans opined above, it can be considered. *See Finjan, Inc. v. Blue Coat Sys.*, No. 13–cv–03999–BLF, 2015 U.S. Dist. LEXIS 88760, at *24 (N.D. Cal. July 8, 2015) (finding results from litigation were "relevant to Defendant's state of mind entering the hypothetical negotiation and to the parties' relative

---

[1] Opticurrent filed an administrative motion to seal Exhibit B to the Suder Declaration based on PI designating excerpts of the 30(b)(6) deposition highly confidential. *See* Dkt. No. 150. PI did not object to this material being filed in the public record. Accordingly, the sealing motion is DENIED.

bargaining strength."); *see also Mars, Inc. v. TruRX LLC*, No. 13–cv–526–RWS–KNM, 2016 U.S. Dist. LEXIS 121889, at *16 (E.D. Tex. Apr. 18, 2016) (excluding testimony on a jury verdict for failing to compare it to the license at issue in the case). However, unlike *Finjan* in particular, here the vacated verdict form is not from "around the time of the hypothetical negotiation" and does not involve the same patents. 2015 U.S. Dist. LEXIS 88760, at *24.

For the foregoing reasons, I would find that Evans's consideration of a vacated jury verdict is excluded under Rule 403. The vacated verdict offers limited usefulness, even if I were to allow it under the book of wisdom concept, and it carries with it substantial risk that such testimony will lead to prejudice, confusion, and wasted time relitigating disputes in the *Fairchild* trial.

### C.    Apportioning Value Added

PI next contends that because the accused infringing products include patented and unpatented features, apportioning the damages is required to determine "the value added by such features." *Finjan, Inc. v. Blue Coat Sys.*, 2015 U.S. Dist. LEXIS 91528 at *12 (N.D. Cal. July 14, 2015). Indeed, "expert testimony opining on a reasonable royalty rate must carefully tie proof of damages to the claim invention's footprint in the market place" to be admissible. *Id*. at *12–13.

Opticurrent's response can be distilled into three points. First, Evans has already taken apportionment into account based on his review of the *Fairchild* case. Second, PI's argument is counter to what it argued in the *Fairchild* case. Third, Evans relied on Zane's conclusions that the technology in the '623 Patent is fundamental to the operation of PI's accused switches. None of these arguments excuses the lack of apportionment here.

#### 1.    The *Fairchild* Case

The royalty rate inferred from *Fairchild*, in which an expert did follow apportionment, does not absolve Evans from engaging in the same analysis. Evans acknowledged that the accused infringing products have features other than claimed in the asserted patents. *See* Ex. A ¶ 46 (discussing "the majority of the functionality of the chip…"); ¶ 60 ("the patented three terminal transistor switch disclosed and claimed in the '623 patent is only a part of the accused chip sets…"). Nonetheless, he opined that "apportionment is unnecessary in this case in view of the royalty rate determination in the jury verdict in the Fairchild" case. *Id*. ¶ 60. The royalty rate may

18

help inform his opinion in a hypothetical negotiation with comparable technology, as discussed above, but it cannot be the sole reason why no apportionment is considered in this case. This is a different case with different products and a different patent.

### 2. PI's Previous Arguments

Next, Opticurrent attempts to paint PI as disingenuous for taking the opposite position in the *Fairchild* case than it does here. *See* Oppo. at 12:20–22 ("in the Delaware trial against Fairchild this week, where [PI] is the plaintiff, it is asking the jury to award it a royalty of 9 cents per unit."). I do not see the significance of this observation. PI's past litigation behavior as the plaintiff in a different trial speaks more to a plaintiff's distinct interests in apportionment than to whether conducting an apportionment analysis is required in a particular case. PI's past trial strategy is not relevant to the apportionment inquiry here.

### 3. Technology Fundamental to the Accused Products

Opticurrent's last and best argument is that Evans relied on Zane's conclusion that the technology in the '623 Patent is fundamental to the accused products. *See* Evans Report ¶ 55; Zane Report ¶¶ 195–201. In *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014), the court held "[t]he law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product."

That said, I agree with PI that apportionment is required. *See id.* ("Whether viewed as valuable, important, or even essential, the patented feature must be separated.") (internal quotation marks omitted). Evans offers his opinion that a demand-based exception applies to apportionment here, but within the same report he also admits that only "as much as 75% of the value of the accused products results from" practicing the asserted patents. *See* Evans Report ¶ 60. Although this would normally suffice as recognizing the apportionment of value added by the patented technology, Evan's conclusion of a 75% value is not explained with any reference to specific portions of Zane's technical opinion. *Id.* (stating only that "Professor Zane characterizes the switch as the essential functionality of the accused chipsets" before concluding that 75% is an appropriate apportionment, if any.). Apportionment is not only required in this case, but there is

no apparent basis for Evans's conclusory approximation of a percentage value.

### D. Expected Share of Profits Paid to a Licensor

PI sought to exclude Evans's opinions on the licensor's expected profit share percentage because it disputes his licensing experience in semiconductor technology. More critically, PI contends that Evans's opinions on the expected range of royalty rates are not tied to the technology or facts of this case. His report does not list experience in semiconductor technology and his opinion does not appear to be tied to his experience in that industry.

In *Uniloc USA, Inc. v. Microsoft Corp.*, the Federal Circuit held that a general application of the "25 percent rule of thumb" was "inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue." 632 F.3d 1292, 1315 (Fed. Cir. 2011). The expert's reasonable royalty rates must be based in fact "to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Id.* at 1317. The court clarified that this aligns with the *Georgia-Pacific* factors in that "evidence purporting to apply to these [Factors 1, 2, and 12], and any other factors, must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Id.* at 1318.

Here, Opticurrent contends that Evans did not arbitrarily apply a rule as in *Uniloc,* and that he reached a range that depends on the circumstances of the hypothetical negotiation. Evans states he has near five decades of "hands-on" licensing experience, awareness of the experiences of his peers, and that he reviewed many licensing agreements to justify his range of 15-40%. Evans Report ¶ 64. This is the sole basis for Evans's suggested range.

On its face, Evans's conclusion is not tied to the semiconductor industry. *Id.* ("In my more than four decades of hands-on licensing experience, I have learned that in the licensing of patents or other forms of intellectual property, licensors' share of the licensee's profit from the license is usually in the range of 15-40%."). The experience listed in his expert report also omits the semiconductor industry. Evans Report ¶ 3. However, in his declaration, Evans clarified that the report includes only his "actual licensing experience" and that he has unlisted experience "as an

expert witness on damages…in a number of cases involving, semiconductors" in which he has reviewed hundreds of semiconductor patent licenses.  Evans Decl. ¶ 22.

If I were not precluding his testimony altogether, Evans could have offered an opinion on the expected share of profits paid to the licensor based on his personal experience as an expert witness reviewing semiconductor licenses, to the extent he applied that experience to the facts and technology of this case.

### E.    Comparability of the QBAR License

PI seeks to exclude Evans's opinion because he considers a license agreement for a different patent between Congdon and QBAR Technology, Inc. in the hypothetical negotiation without analyzing its comparability to the facts of the case.  The Federal Circuit holds that "use of past patent licenses…must account for differences in the technologies and economic circumstances of the contracting parties."  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010).  Although the degree of comparability "is a factual issue [] best addressed by cross examination and not by exclusion," there must be some comparability to begin with.  *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).  I find that Evans has provided sufficient analysis of comparability to allow him to consider the QBAR license in the hypothetical negotiation.

Evans's report discusses the QBAR license as a "similar but technically inferior three terminal non-inverting transistor switch" based on Zane's technical expertise.  *See* Evans Report at Ex. C, p. 42; *see also id.* ¶ 51 ("the '323 patent discloses and claims an earlier three terminal non-inverting transistor switch that had the disadvantage of current leakage between the second and third terminals.").  Zane found that the QBAR license was comparable because even though '323 Patent is an earlier inferior technology to the '623 Patent, both incorporate technology of a three-terminal noninverting transistor switch.  *See* Oppo. Ex. E, Zane Report ¶¶ 192–194.

It is clear that Evans considered the comparability of the QBAR license and accounted for the difference in technologies (i.e., finding the QBAR license was inferior) in the context of the hypothetical negotiation.  PI's argument disagrees with the degree of comparability, which is more appropriate for the jury to assess than for me to exclude.  But because his testimony is struck, he

1    may not opine on this issue.

2        **F.    *Georgia-Pacific* Fifth Factor**

3        PI seeks to exclude Evans's views on the *Georgia-Pacific* fifth factor because his opinion

4    is not based in facts or data, nor the product of an established method or principle under Federal

5    Rule of Evidence 702.  The fifth factor analysis focuses on "the commercial relationship between

6    the licensor and licensee, such as whether they are competitors."  *Georgia-Pacific*, 318 F. Supp. at

7    1120.

8        PI disagrees with Evans's position on the fifth factor because it contradicts the well-

9    established principle that "the patent owner's bargaining power in the hypothetical negotiations

10   *clearly would be greater* if the owner … was a competitor of the infringer."  1 Chisum on Patents

11   § 20.07[2][c] (2018) (emphasis added).  PI then asserts that case law recognizes this principle.  *See*

12   *Telemac Corp. v. US/Intelicom, Inc.*, 185 F. Supp. 2d 1084, 1101–02 (N.D. Cal. 2001) ("Telemac

13   would not have willingly licensed a direct competitor such as USI and, if forced to do so, would

14   only have licensed USI at the highest possible royalty rate it could obtain.").

15       Rather than dispute PI's principle, Opticurrent restates that Evans's analysis was based on

16   his five decades of "hands-on" experience in licensing.  Evans Report ¶¶ 25, 64.  Evans concludes

17   that "it is my experience that competitors are less likely to require higher than normal royalty rates

18   because they may be concerned that the next time the 'shoe may be on the other foot'…".  *Id*. at

19   Ex. C p. 40.  In other words, he believes a non-competitor does not have the same concerns as a

20   competitor who is a repeat player and "who wants to avoid setting a precedent that may be

21   asserted against it when the other party has a patent for which a license is needed."  *Id*. ¶ 55.

22       PI does not challenge the validity of Evans's experiences.  Rather, it disagrees with

23   forming a conclusion based on experience without tying the experience to cited studies, economic

24   literature, or other data points.  Experts can utilize their specialized experience to extrapolate from

25   existing facts and data.  FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the

26   case that the expert has been made aware of or personally observed. If experts in the particular

27   field would reasonably rely on those kinds of facts or data in forming an opinion on the subject,

28   they need not be admissible for the opinion to be admitted.").

22

United States District Court
Northern District of California

Evans only bases his opinion on experience without the slightest recognition of the accepted view that a competitor would have a much firmer bargaining position than a non-competitor. Because his experience-based opinions are not premised in facts or data apparent in his report and do not account for a countervailing principle that directly contradicts his view, this presents another basis for exclusion.

### G.    Energy Star Compliance

Lastly, PI seeks to exclude Evans's opinion on Energy Star compliance for lack of foundation. *See* Evans Report ¶¶ 39, 67(a)(3) (opining that the '623 Patent helped PI obtain Energy Star compliance). PI asserts that Evans is not a qualified technical expert to reach any conclusion on Energy Star compliance, *see id.* ¶ 2, and that Opticurrent's technical expert did not form any opinion on that issue. I agree.

Opticurrent provides Evans's declaration with its opposition, in which he clarifies two ways he arrived at his opinion. *See* Evans Decl. ¶¶ 27–29; *see also* Evans Report ¶¶ 36–42. First, Evans had conversations with Zane that concerned "how the '623 patented technology assists [PI] in achieving energy efficiency." *Id.* ¶ 28. Evans states that Zane explained to him the technology "essentially eliminated" current leakage and "clearly contributes to Energy Star compliance." *Id*. However, Zane did not opine on Energy Star compliance in his own report. PI also notes that there is no testimony about whether the accused features are required for Energy Star compliance in the first instance.

Second, Evans stated that he reviewed financial documents provided by PI. These documents included press releases which relayed "that standby power is estimated to account for up to 10% of residential energy usage." *Id*. ¶ 29. In PI's annual report, Evans also read that "$18 billion in annual energy waste in the US is attributed to 'always on' devices" and that PI's switches were offered as energy efficient. *Id*. Yet, even considering these financial documents, the issue remains that Evans is not an expert in Energy Star compliance and would not be able to offer a reliable or helpful opinion on the impact of the '623 Patent technology on PI's particular ability to be Energy Star compliant. Accordingly, his testimony on Energy Star compliance is also excludable.

23

In sum, Evans engages in a hypothetical negotiation without considering the proper parties, he considers a vacated jury verdict form that does not pass muster under Rule 403, he does not conduct any apportionment analysis, and several of his opinions are premised only on his general professional experience without tying that experience to data or considering relevant established principles as required by Federal Rule of Evidence 702. PI's *Daubert* motion to exclude his testimony is granted.

## III.    OPTICURRENT'S DAUBERT MOTION TO EXCLUDE TECHNICAL EXPERT REBUTTAL OPINIONS

Opticurrent brings its own *Daubert* motion to exclude Bohannon's patent invalidity opinions in his rebuttal report. *See* Mot. to Exclude at 1 (Dkt. No. 145). Opticurrent contests Bohannon's rebuttal for improperly inserting a "practicing the prior art" defense under the pretext of non-infringement. Specifically, it seeks to exclude testimony comparing several PI prior art products to the accused products, and it also insists that the testimony would be highly prejudicial and confusing if allowed to be given to a jury.

As both parties recognize, the Federal Circuit has unequivocally rejected a "practicing the prior art" defense to infringement. *See, e.g.*, *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1336 (Fed. Cir. 2011). In *Cordance*, the Federal Circuit explained the typical impermissible "practicing the prior art" defense is a situation "where an accused infringer compares the accused infringing behavior to the prior art in an attempt to prove that its conduct is either noninfringing or the patent is invalid as anticipated." *Id.* at 1337; *see also Tate Access Floors v. Interface Architectural Res.*, 279 F.3d 1357, 1366 (Fed. Cir. 2002) (stating that infringement is not determined "by comparing the accused device to the prior art."). This is not a valid defense, as "[q]uestions of obviousness in light of the prior art go to the validity of the claims, not to whether an accused device infringes." *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir. 1995).

### A.    TOPSwitch-GX Opinions

In the first section of Bohannon's rebuttal report, Opticurrent focuses on the assertion that the TOPSwitch-GX product and its product family (including the TOP247YN chip component)

are prior art. *See* Gunter Decl., Ex. 1, Rebuttal Report at 88–109; ¶¶ 178–79. Bohannon opines that the TOPSwitch-GX and product family are prior art, and he also concludes that there is no infringement because TOPSwitch-GX – which Zane found did not meet all limitations of the asserted claim – is substantially similar to the other accused products. *See id.* ¶ 173.

PI portrays Bohannon's rebuttal report as merely relying upon statements of Opticurrent's own expert, which is permissible. *See, e.g., In re Lithium Ion Batteries Antitrust Litig.*, 2017 U.S. Dist. LEXIS 57340 at *71 (N.D. Cal. Apr. 12, 2017) ("experts can rely upon the opinions of other experts."). It is accurate that Bohannon discusses how Zane's opinions about PI's TOP247YN product show that the accused products also do not infringe the '623 Patent. However, interspersed in the rebuttal report is his opinion comparing the accused products with prior art, without any indication that this is relevant to infringement. *See id.* ¶ 173 ("I understand that TOPSwitch-GX is prior art…In my opinion, the circuitry accused in the TOPSwitch-GX is substantially similar to that of the other accused products, and Dr. Zane's reasoning equally applies to those products and confirms that they do not infringe.").

PI admits that "whether or not the TOP247YN is prior art is beside the point: what matters here is that Opticurrent's own expert, Zane, said the TOP247YN does not meet the limitations of the '623 patent, and the accused products are the same as the TOP247YN." Oppo. at 7:9–11. Still, PI's acknowledgment of the prior art references and their irrelevance does not change the text of Bohannon's rebuttal report and that he appears intent on comparing the prior art of TOPSwitch-GX and other products to the accused products. Bohannon's testimony need not compare the accused products with prior art to make the point that certain qualities or components of a product do not contain all the elements of Claim 1.

The rebuttal report is not only about non-infringement when plainly Bohannon raises prior art defenses for products that were not raised in the first motion for summary judgment and were not included in Bohannon's initial invalidity report. PI relies on *Alloc, Inc. v. Norman D. Lifton Co.*, 653 F. Supp. 2d 469 (S.D.N.Y. 2009), as instructive of its distinction that prior art can serve as evidence to support a non-infringement defense if used consistently with an argument that its products do not satisfy the asserted claim elements. However, *Alloc, Inc.* is unpersuasive. Setting

aside that this case is not binding authority in this district, it provides only a cursory application of the prior art case law in a footnote. Without more information on the expert testimony in that case, I also cannot glean much value from the court's application of the law.

In any event, applying the same case law relied upon in *Alloc, Inc.*, particularly *Baxter*, necessitates restraint from making irrelevant prior art comparisons. The Federal Circuit in *Baxter* dealt with an argument that an accused product was constructed using only teachings of a prior art reference. 49 F.3d 1575, 1583 (Fed. Cir. 1995). The court rejected the comparison because "implicit" was that "in order to establish literal infringement, [plaintiff] must prove…[defendant's] accused devices embody all the limitations in the asserted claims, and…must not be an adoption of the combined teachings of the prior art." *Id.*

Allowing Bohannon to testify about the accused products and comparing them to prior art repeats the implicit concerns raised in *Baxter*. Furthermore, Bohannon's prior art testimony, even if based in part on Zane's opinion, still ignores the Federal Circuit's clear directive that "infringement is determined by construing the claims and comparing them to the accused device, not by comparing the accused device to the prior art." *Tate Access Floors v. Interface Architectural Res.*, 279 F.3d 1357, 1366 (Fed. Cir. 2002). Bohannon can testify regarding why accused products do not contain all elements of the claim without comparing them to prior art.

### B. TOPSwitch-II and TinySwitch Plus Opinions

In the second section of the rebuttal report, Opticurrent believes that Bohannon offers an inadmissible opinion that the value of the claimed invention is minimal because the accused products have operated in TOPSwitch-II since 1995 and TinySwitch Plus since 1998. *See id.* at 110–144. This is more like a "practicing the prior art" defense than the earlier comparisons.

Bohannon is clear that the first reason he concludes the patent has "little if any technical value" is because PI has been using the same circuitry as the accused product since 1995. *Id.* ¶ 205(1). He goes on to explain that the circuitry is not unique and "is instead prior art [PI] technology." *Id.* ¶ 205(2). Unlike with the TOPSwitch-GX discussion, PI does not refer to Zane's opinions because Zane did not raise the validity of the claims as to TOPSwitch-II or TinySwitch Plus.

Opticurrent compares PI's arguments to a case in this district, *Mediatek Inc. v. Freescale Semiconductor, Inc.*, No. 11–CV–5341–YGR, 2014 WL 690161 (N.D. Cal. Feb. 21, 2014), in which the defendant's expert rebuttal also included comparisons to prior art in its damages analysis. The court rejected the damages testimony on two grounds that are instructive in this case.

First, the court found that comparing accused products to prior art under a damages theory was improper because the defendant "should have disclosed this theory in its invalidity contentions." *Id.* at *2. PI disclosed the prior art theory for TOPSwitch-II and TinySwitch Plus in its invalidity contentions, but not for TOPSwitch-GX. *See* Gunter Decl. Ex 2; s*ee also Verinata Health, Inc.*, 2014 WL 4100638, at *3 ("a party may not use an expert report to introduce new infringement theories…or new prior art references not disclosed in the parties' infringement contentions or invalidity contentions."). Moreover, Bohannon did not include any of these products as prior art in his original report on invalidity.

Second, in *Mediatek* the expert improperly opined that the prior art was "very close to, if not identical to" the accused products. 2014 WL 690161 at *2. Much like the "identical to" language in *Mediatek*, Bohannon prefaces his damages opinions on his view that "there is no identifiable benefit or technically substantial difference" between the accused products and the prior art, *see* Rebuttal Report ¶ 205(1), and that they "are not different in any manner material to the asserted claim," *id* ¶ 205(3). The prior art comparisons in the first section of Bohannon's rebuttal report spanning pages 88–109 share this same issue.

To the extent Bohannon's infringement opinion is based on prior art references, this is a defense entering invalidity territory. Accordingly, portions of Bohannon's rebuttal report pertaining to prior art products like the TOPSwitch-II, TinySwitch Plus, and TOPSwitch-GX, must be struck and any corresponding testimony offered at trial must be excluded. .

## IV.   DISCOVERY DISPUTE AND SUR-REPLY

Opticurrent and PI have filed briefs regarding a dispute over the relevance of PI licensing agreements with subsidiaries that came to light in the *Fairchild* trial. *See* Dkt. Nos. 154–155. Opticurrent requests that I compel PI to produce license agreements related to damages from the

*Fairchild* case and that I allow Opticurrent to supplement its expert report with the information, as well as issue sanctions for PI's lack of full disclosure. *See* Dkt. No. 154 at 1:2–6. It also requests all expert reports from the *Fairchild* litigation related to damages, the identity of the CEO and 30(b)(6) witness who testified in a deposition for the *Fairchild* litigation, and that Ned Barnes's report on damages be struck in its entirety. *Id.* at 2:7–14.

After a December 22, 2017 discovery dispute, I denied Opticurrent's request to compel production of certain damages-related documents arising from the *Fairchild* litigation because the cases were unrelated, the experts were unrelated, they involved different patents, and Opticurrent already had sufficient materials in the public record related to the case. *See* Minute Order (Dkt. No. 99). Now Opticurrent argues that PI unfairly withheld a license agreement in the *Fairchild* case that is relevant here. PI continues to dispute its relevance.

At the hearing, PI argued that *Sentius Int'l, LLC v. Microsoft Corp.* supports denying the discovery request. *Sentius*, No. 13–cv–00825–PSG, 2015 U.S. Dist. LEXIS 10423, at *24–27 (N.D. Cal. Jan. 27, 2015). In *Sentius*, the court found that an expert's consideration of a license agreement was excludable because the licenses to which it was compared in the hypothetical negotiation were from "vastly different situation[s];" namely, the economic circumstances of the agreements were not related considering that one license was international and the other domestic. *Id.* at *26–27 ("In the Arendi settlement, Arendi alleged that Microsoft had infringed United States and European patents, whereas here Sentius alleges that Microsoft has infringed only United States patents."). PI contends that the license at issue in *Fairchild* conveyed no United States rights and only conveyed intellectual property, trade secrets and trademarks not related to the original request for documents. *See* Transcript of Proceedings at 29:18–30:7 (Dkt. No. 168).

Opticurrent gave no direct response to PI's reliance on *Sentius*. Instead it reaffirmed its belief that the license was relevant and should have been included in the original request for documents. However, although Opticurrent now disputes the relevance of the license, it provides no indication that this is a new circumstance not encompassed in the prior discovery dispute regarding *Fairchild* litigation damages materials. *See* Statement on Discovery Dispute (Dkt. No. 97); Minute Entry (Dkt. No. 99). The joint statement on their discovery dispute makes clear that

Opticurrent was aware of licenses that PI asserted were irrelevant at the time. The operative Rule 30(b)(6) document request also only sought licenses that PI "contends are relevant to the hypothetical negotiation," and which continues to exclude – in PI's view – the license that Opticurrent now requests. PI Response on Discovery Dispute at 1 (Dkt. No. 155). For these reasons, Opticurrent's requests for additional discovery is DENIED.

On a related note, Opticurrent filed an administration motion for relief under Local Rule 7-11 to file a sur-reply. PI opposed further briefing, and Opticurrent filed a reply in response. Opticurrent attempted to utilize the relief contemplated by Local Rule 7-11 to reargue points that have been fully briefed and need no response. No new arguments are raised in PI's reply, which responded to arguments Opticurrent made in its opposition. *See* Oppo. at 2–4. Accordingly, the motion to file a sur-reply is also DENIED.

### CONCLUSION

As stated above, PI's second motion for summary judgment is DENIED because whether the notebook drawing discloses each element of Claim 1 raises questions of fact between the experts. Both *Daubert* motions are also GRANTED. Evans's damages opinions and Bohannon's rebuttal opinion regarding a practicing the prior art defense to infringement are excluded. Finally, Opticurrent's discovery request and administrative motion to file a sur-reply are DENIED.

**IT IS SO ORDERED.**

Dated: December 21, 2018

William H. Orrick
United States District Judge