Pages 1-32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

OPTICURRENT, LLC,,                    )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )
                                      ) No. 3:17-cv-03597-WHO
POWER INTEGRATIONS, INC.,             )
                                      )
            Defendant.                )
_____)
                San Francisco, California
                   December 5, 2018


                TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

For Plaintiff:

FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, Texas  76102
BY:   **JONATHAN T. SUDER**
      **CORBY R. VOWELL**


For Defendant:

FISH & RICHARDSON
500 Arguello Street, Suite 500
Redwood City, California  94063
BY:   **NEIL A. WARREN**
      **JOHN W. THORNBURGH**
      **MICHAEL R. HEADLEY**


REPORTED BY:  MARLA F. KNOX, RPR, CRR

Wednesday, December 5, 2018                    3:00 p.m.

P R O C E E D I N G S

.oOo.

(Whereupon, the following proceedings commenced in open court:)

THE CLERK:  Calling civil matter 17-3597, Opticurrent, LLC versus Power Integrations, Incorporated, et al.  Counsel, please come forward and state your appearance.

MR. SUDER:  Good afternoon, your Honor, John Suder and Corby Vowell for the Plaintiff.  Mr. Hudnell had to be out of town on another matter so he is not going to be here.  I will be addressing the Daubert issues, and Mr. Vowell will be addressing the summary judgment issues.

MR. WARREN:  Good morning, your Honor, Neil Warren of Fish & Richardson.  Also with me is John Thornburgh and Michael Headley also of Fish & Richardson on behalf of Power Integrations.  Mr. Thornburgh will be discussing the damages issue.

THE COURT:  Okay.  So let me give you my perspective on the four different issues that need to be resolved which include the discovery dispute.  So the first one with respect to the Motion for Summary Judgment, I'm inclined to deny it.  Ultimately, I think

this is -- all the issues will boil down to a question of fact between the experts. I'm not going to consider Dr. Zane's declaration -- those attached to the opposition -- to the extent -- to the extent that it offers new theories, but the original report at 183 and 185 to 188 disclosed his intent to testify regarding the claim elements. The CMOS inverter presence is a question of fact. It seems to me that POSITA can recognize that from the context of the drawing. Experts -- the experts disagree regarding objective evidence of disclosure of the use of pathway components, and the preliminary injunction argument regarding the voltage stabilizer does seem inconsistent with the position that was taken by claim construction. So that's my thinking on the Motion for Summary Judgment.

On the counter regarding damages, I have a lot of questions about the -- Mr. Evans' report. I don't know why he is not required to use a patentee for a hypothetical negotiation. I don't know why he should be able to use the vacated jury verdict in the unrelated case because I do think that that at a minimum raises 403 issues that are important.

I don't know what basis he has got for the apportionment opinion. His opinion isn't tied to the semiconductor industry. Apparently, it is not listed in

his report.  There is no recognition of a stronger bargaining position of -- that a competitor has than a non-practicing entity and -- so -- and I don't think you can just rely on his experience for that.  I don't know -- he does not seem to have any basis to opine on Energy Star compliance.  So I'm very interested in argument on that.

With respect to Bohannon's rebuttal -- the Daubert on Bohannon's rebuttal -- everybody seems to agree; and I would certainly hope that you can't use practice and prior art defense to infringement, and he does seem to compare the TOPSwitch-GX and other products -- two accused products.  So I'm inclined to grant on that.  So I would like to hear some argument there.

With respect to the discovery dispute, I already denied Dr. Barnes' (sic) request for more information from the Fairchild litigation; and there is no explanation of why there is a new circumstance, so it is still denied.

MR. SUDER:  Will you entertain my position on that, your Honor?

THE COURT:  I will hear anything.  I think you are the one that has to go back to Texas?

MR. SUDER:  Yes.

THE COURT:  Whoever it is that has a flight; but

anyway, I'm willing to hear argument on all of these issues. Let's start with the Motion for Summary Judgment.

MR. WARREN: Certainly, your Honor. All I would ask is that the clarification on the scope of what the testimony at trial will be should be bounded by his original expert report and not kind of expanded based on what is in the supplemental declaration.

THE COURT: I agree.

MR. WARREN: With that, I have no other comments.

THE COURT: All right. So now, Mr. Evans.

MR. SUDER: Yes, sir, your Honor, Mr. Evans on a high level -- neither his qualifications nor his methodology of using Georgia-Pacific No. 5 and how he applied the Georgia-Pacific is being questioned. What they really don't like are the data points that he considered. Certainly the data points they just don't like, but the point is those data points in his experience -- in real life licensing experience -- and his experience as an expert witness -- as he details in his affidavit and our reply -- is that that information is both relevant and reliable because all that information comes from the Defendants, and he considered it. He views it as reliable, and I reviewed your order

in the *Finjan versus Sophos* Daubert issue where you rely on cases we cite, eye-for-eye and the *Primiano* case, where even if it is shaky or challengeable if it goes to -- if you question it -- you question -- shakiness I think is the word.

THE COURT:  I know because I wrote that opinion, and there is shaky and then there is unreliable.  So that is the thing that you have to be arguing.

MR. SUDER:  Yes.  And our position is they are reliable.  For the patentee issue, Mr. Evans explains -- and whether it was a mistake or -- he corrects it in his declaration afterwards -- he says it is a distinction without a difference because neither one is a competitor.

In the case that they cite, the Warsaw case, was the difference between the patentee and the subsequent owner of the patent was a competitor of the Defendant; and that mattered for the purposes of the hypothetical negotiation.  Here, Mr. Evans says there is really no difference between whether it is Opticurrent, a non-practicing entity, and Mr. Congdon, an individual. They are in the same relative position.  It wouldn't change his opinion with regard to who it was.  Should it have been Mr. Congdon from the beginning?  Yes, I will tell you it should have; but it is a distinction without

a difference.  And the case they rely on is not -- should not carry the day here because there, there was a difference between the patentee and the Plaintiff.  So we think that was taken care of.

The vacated jury verdict, your Honor, it was vacated not -- not on damages.  It was vacated on liability, so it is relevant.  The cases we cite, jury verdicts are relevant if they are comparable.  And the only evidence before, your Honor, is that Dr. Regan Zane said, I reviewed those patents and the technology there is comparable.  In fact, it is the same accused products as are in this case.  Some of them are the same.

So they have not supported -- put any evidence before you that it is not comparable; and what Mr. Evans said is I'm not a semi-conductor expert.  I'm not a power electronics expert, but I spoke to Regan Zane.  I read his opinion.  I had a discussion with him; and based on what he tells me, I will view this as a comparable.

THE COURT:  But Dr. Zane didn't opine in this case on that.  So how does he -- how does he become -- how does doctor -- Mr. Evans get to rely on some untested information from an industry that he doesn't know anything about?

MR. SUDER:  Your Honor, because an expert is

entitled to rely on information that he typically relies on.  He went to Dr. Zane who is the expert in this case; and Dr. Zane in his report before your Honor, says, I reviewed the patents at issue in the Fairchild litigation.  I looked at them.  I compared them.  I know them.  I'm unskilled in the art.  They go through the same fundamental features and issues that are irrelevant in the patents in this case where he is our expert.  He has not been challenged, your Honor, on anything, on conception, on infringement, on his invalidity, opinions and rebuttal nor on comparability.  He says, I looked at that.  And Mr. Evans says, I'm relying on what Dr. Zane tells me.

So if the jury -- if in Cross-Examination, the jury believes that this is not comparable, then the jury is not going to follow it because that's the issue in the *Primiano* eye-for-eye.  It is subject to Cross-Examination.  It is by attack, by counterevidence. But we have evidence from one skill of the art that is unrebutted that it is comparable.  Therefore, we are dealing with a jury verdict in a comparable technology that involves the exact same products.

So we believe that if you look at the cases we cited -- the *Mars* case and the *Finjan versus Blue Coat Systems* -- you start with the premise is the technology

comparable.  If it is, then it is relevant.  We submit that the evidence before you -- and the only evidence before you -- is that we have met that threshold.

So then the question becomes if it's relevant and it's comparable, can you cure it with an instruction as the Court has done with lots of other cases.  If there is concern with 403, that is an issue for an instruction, a curative instruction.  It is relevant and reliable and what Mr. Evans says is in real life experience and as an expert -- again, this is unrebutted.  They don't have an expert that says this is wrong.  I have considered jury verdicts.  I think they are a relevant data point; that the jury can ascribe whatever weight it wants to that fact.  The fact that it has been vacated on liability, argue that as a way in Cross-Examination; but that's -- the point is that an expert says it is relevant.

The only case that they cite the jury verdicts are, per se, not considered is a case where the expert in that case says, I'm taking another verdict and I'm simply applying a calculation; and I'm going to go 6 to 15 times higher than that jury verdict because it is higher than here.  The Judge says, Wait a minute.  It doesn't cite any authority.  It just says, I'm not going to let that in.  That is different than the *Mars* case,

the *Finjan* case, the other cases we have cited, where if it is relevant and it is comparable, then it can be considered.

In this one, your Honor, the other point is that the hypothetical negotiation in the Fairchild case, the verdict was in 2015; but the actual hypothetical negotiation was in 2011, a few years after. There is the Book of Wisdom. The issue that the -- and they don't take issue with that. When they are the Plaintiff, as we submitted, the Book of Wisdom counts; but when it's the Defendant, it's like No, you can't consider that.

The cases they cite about future licenses can be excluded -- the *Odetics* case, the other cases that are cited -- can be excluded if there is changed technological differences, if there is changed financial conditions, if there is reasons why it is so different -- even though it is in the future; I'm not going to let it -- none of that has been alleged here.

Your Honor, in fact, we know that these products are still out there. The Fairchild case that went to trial last month, same products. There is no showing that you can parse out the Book of Wisdom. It is a relevant data point; and if it is shaky, if it is because it has been vacated, it is still a relevant data

point; and we deal with that with a curative instruction.

So, your Honor, I can deal with the other points; but I don't know if you just want to take the jury verdict issue and then we can go to the apportionment, the bargaining position.

THE COURT:  No.  I want you to finish your arguments.

MR. SUDER:  Okay.  So that is the jury verdict case; that we think that it is a relevant data point because there is no attempt -- in fact --

THE COURT:  You have made this point.  Go onto the next one.

MR. SUDER:  Thank you, your Honor.  On the issue of apportionment, what Mr. Evans says is if you consider the jury verdict in everything else, there has already been an apportionment.  I looked at the trial testimony from that case and what the Plaintiff was asking and what the Defendant was arguing, and there was an apportionment done because the jury verdict was less than what Fairchild was asking; but he also considered Dr. Zane's testimony that this technology is fundamental.  It is the single most important aspect of this.  It is critical, fundamental, essential.  Those are words that Dr. Zane used in his report that Mr.

Evans relies on and cites.

We also submitted evidence that the CEO of Power Integrations just testified that 85 -- minimum 85 -- up to 100% of the -- of what drives demands of their chips is this energy saving feature.  That is a data point that he considered and talked about.

Mr. Barnes, their expert, your Honor, in his rebuttal expert doesn't apportion.  He does not criticize Mr. Evans for not apportioning.  If they want to go to the jury and say, You should apportion this, again -- finally, your Honor, the QBAR license that we did, that Mr. Evans considered it.  He said it goes -- that license went to the complete chip.

So, again, these are data points on why he says if there was a sufficient apportionment or there doesn't need to be anything further done; and that is not challenged by Mr. Barnes.  So that's the issue of apportionment.

On the bargaining position, that is Georgia-Pacific Factor No. 5.  All Mr. Evans says is, I considered Georgia-Pacific Factor No. 5, and there are reasons sometimes when you are in a better position if you are not a competitor because the word gets out and you have got to protect; that we fight hard; and that I have in my own personal experience, Mr. Evans explains,

in some instances you are better off not being a competitor and licensing your technology.

So the point is he went through Georgia-Pacific Factor No. 5.  Gave his rationale based on his experience.  His experience is not challenged, and they just don't like what he said.  That again goes to the weight.

The last thing I would say is on the Energy Star aspect, which I believe is Georgia-Pacific Factor 15, which Mr. Evans discussed in his very detailed claim chart or Georgia-Pacific chart, because I spoke to Larry Evans.  He directed me and explained to me -- I spoke to Regan Zane, and Dr. Zane explained to me why that is so important that you get your Energy Star rating; and that this technology impacts your ability to have that Energy Star rating.  So what Mr. Evans says is I talked to an expert.  He said that was important so I considered it. It doesn't -- it is just a data point that I considered that is reliable and relevant that informs my ultimate opinion.

THE COURT:  I think that is -- I got confused earlier when I was talking to you about Dr. Zane's opinion.  Dr. Zane didn't say anything about that in his report.

MR. SUDER:  Dr. Zane did talk about Energy Star

compliance, and it is an important aspect that this feature goes to; that according to the website of Power Integrations, they promote their Energy Star rating and that this chip -- and all they do that saves energy is important in preserving that there is a relationship between the two.  Dr. Zane talks about it.

THE COURT:  Okay.  All right.

MR. SUDER:  That's everything on Mr. Evans.

THE COURT:  All right.  So let's take on Mr. Evans.

MR. WARREN:  Thank you, your Honor.  We obviously agree with the Court's analysis.  I can respond briefly to Counsel.  If there are any particular points that you --

THE COURT:  No.  I think you should -- you know, I don't -- I don't like to toss experts unless they are really unreliable, and there is a line between somebody using their experience and having more -- a more scientific basis, so I do want you to take it on.

MR. WARREN:  Thank you, your Honor.  We very much do believe that Mr. Evans has used improper and unlawful methodology and data points.  For example, the vacated jury verdict is a legally unrecognized data point.  The Plaintiff has had no response to the fact that a vacated verdict is a novelty to the Supreme Court

and the Ninth Circuit say it is as if it didn't happen. So they can't really use it for anything.

THE COURT:  If it wasn't vacated because of its own -- because of the deficiency in the -- in what the verdict found, there is some other reason why the verdict was vacated, why wouldn't it be a useful data point?

MR. WARREN:  It's because it got vacated on liability grounds which means we never got to challenge the damages.  We think the damages are wrong.  The Federal government didn't reach that issue because they found infringement.  This would put us in a position of saying to this jury that these Fairchild damages are wrong.  They are wrong for A, B and C; and we would have to re-litigate the Fairchild case basically.  It is not an economic substitute for an agreement because it is not something that Power Integrations ever agreed to. We think it is wrong.  It is not a proxy for what party the hypothetical negotiation would agree to because it is not something anyone did agree to.

So this is why the cases that we cited -- most notably the *Sentius* case from this district -- looked at a very similar issue like the *Microsoft* case where the Plaintiff was trying to use -- it wasn't a verdict.  It was a Court's judgment, a JMOL judgment; and the *Sentius*

court said A, that is not an economic basis.  It is not a proxy for an agreement.  B, it is super prejudicial because it makes the Defendant look like a serial infringer.  It would require a trial within a trial to explain why the first judgment was also wrong.

When you take all that together, it doesn't make sense to include it; and the narrow cases where courts have permitted the opposite -- we discussed these in our brief -- in one of those cases -- it was a Court was looking at it -- and, you know, if it was a Court, we wouldn't object.  Judges look at precedent all the time and it is normal.  Juries don't do that.

And the *Finjan* case in this district was an unusual case because it was the same Plaintiff and the same patents.  So you have this verdict very close in time to the hypothetical negotiation on the same patent.  Opticurrent had just gotten a verdict on their patent and damages on their patent around the same time of the hypothetical negotiation.  Clearly, that would be on everyone's mind during the hypothetical negotiation.  That is very different, and that is a very narrow exception and does not change the overall rule.

Then on the parties to the hypothetical negotiation, they now say that they were wrong.  It can't be Opticurrent.  It has to be the inventor.  That

doesn't matter.  The reason why that is not a good response, one, it is a new opinion on this motion; two, it is conclusory -- Counsel supplies oral argument for their experts -- and three, it is wrong because the individual inventor was a person who wanted a job at Power Integrations.  He had very few resources.  So coming into the hypothetical negotiation, he would be looking for a partner to commercialize his technology; whereas Opticurrent is a company that has lawyers and investors, and they have to get a return from those investors from litigation.  It is a very different entity.

On the apportionment, you know, this is another example where he just follows the wrong methodology. The case law says you have to apportion in every case except for EMVR, which is not at issue, and their expert I don't think I have to apportion in this case.  It is very black and white.  It is just wrong; and when they quote our -- you know, this is an example of why using testimony from Fairchild litigation is very misleading, they quote PI's CEO saying 85% of the value of some chip relates to a patent.  He is talking about our patent in a case where we were using EMVR.  So the technology that he said 85% is not this case at all but a different PI patent.  They say that our expert doesn't apportion.  It

is not our job.  It is the Plaintiffs' job to apportion.

On the QBAR the problem is not that -- you know, their technical expert, Dr. Zane, talks about QBAR and the analogy.  What Mr. Evans does not do is address how it is comparable and not comparable in order to calibrate for damages purposes, and that is what the federal circuit in the case law we cited says you are not going to do it.  Take in account the differences and explain.  He doesn't do that at all.  He doesn't discuss it.

Same thing with Energy Star.  There is no linking.  Dr. Zane does talk about it and says it is important.  He says efficiency is important.  PI witnesses say efficiency is important.  What is missing is any link at all in the record between Opticurrent's patent and Energy Star.  No one has testified that their patent does anything for Energy Star.  It is just not in the record.

I think those are all the major issues; and I agree with, your Honor, that it is a big deal to exclude an expert.  It does happen.  It is happening more often than it used to for damages expert.  It is a big deal.  We think it is absolutely justified in this case.  The question is what next, and we think that the federal circuit in *Apple v. Motorola* addresses that.  The

statute does say that.  You have a memo of a reasonable -- the best answer is that they get to go on trial.  Put whatever evidence they have of value, and it becomes a fact issue for the jury, and we may have to come back with a post-trial motion depending on what the verdict is, if we think it is still legally improper; but that's what we would suggest happens.

THE COURT:  Mr. Suder?

MR. SUDER:  Yes, your Honor.

THE COURT:  Briefly on this.

MR. SUDER:  Yes.  Mr. Evans has testified in semiconductor cases and not been stricken.  That is in his declaration.  The point on the verdict in the *RescueNet* case, which changed damages, the settlement reads in litigation are admissible data points.  Those are not when there is a finding of consumer liability.  So it shows you that these are all relevant, and you can argue is it settlement, was it the cost to the defense, whatever you want to say.  They come in and it goes to the weight.

The *Sentius* case that they rely on is a JMOL.  That is a not a Georgia-Pacific analysis.  The jury verdict is a Georgia-Pacific analysis that they went through and considered.  JMOL is sufficient evidence in the record.  A completely different standard.

Your Honor, the other cases cite, *In Re: Innovatio* where counsel cited where the Court considered the jury verdict. It was dealing with Larry Evans, and the court said Larry Evans can testify. You can see he has never been stricken in his experience.

On the QBAR issue, your Honor, Dr. Zane goes to great lengths to say -- and it is in Mr. Evans' report -- that it was the license of the prior patent that was inferior, and he does consider it. So, again, just like the weight -- if they want to argue that Mr. Congdon wanted a job and so he would have done anything, that is Cross-Examination for the jury.

Again, everything that they are saying is that they just don't like these data points. They have arguments, and those arguments should be made to the jury.

THE COURT: Okay. I will look very closely at this one when I get off the bench, and I appreciate the argument on that. So go ahead.

MR. THORNBURGH: Thank you, your Honor. I would just like to follow on what we just heard is that the Plaintiff's position that the patented feature provides -- I think he said the most valuable aspect in this chip is the patented feature. And so what we contend is that Mr. Bohannon should be able to say whatever the value in

these chips -- in PI's chips is -- gives them the energy efficiency benefits they have, is the same thing that they always had because the circuits are the same.  So all he does is he shows that the circuit of the accused product and the prior art product are the same in a value context.  How can it be such that this patented invention added some monumental new value -- 75% for most important aspect -- if it is exactly the same circuit as PI created a long time ago?  It is part of PI's development story.  They developed this technology. Whatever energy efficiency benefit they gleaned from the circuit, they developed it; and it can't be what is in the patent.  So I think it would be very prejudicial to not allow us to tell that story, and the mechanism for telling that is Mr. Bohannon saying, Look at these two things are the same in a value context.  We are not going to say it is invalidity and certainly with an instruction that the Court can craft what the jury may consider.  You can craft an instruction that says you can consider this in the context of valuing the invention.  So we think it would be very prejudicial and he can't do that.

On the separate issue of the TOPSwitch-GX, they opened the door to this.  They initially accused TOPSwitch-GX of infringement.  They then changed their

mind and took that back, and they actually had their expert give an affirmative opinion spelling out why it doesn't infringe.  They did that to try to avoid invalidity.  We are not arguing invalidity, but we get to say whatever he said doesn't infringe TopSwitch-GX. It is the same thing in this -- this circuit in the accused products, they have been using the same circuit in all of the products.  They are all the same.  So we should be able to cross-examine Mr. Zane about that, about the original opinion, about the change in the opinion, about his opinions about -- that don't infringe; and then Mr. Bohannon should be able to testify, Listen, what you just heard from Mr. Zane is this X makes it not infringe.  X is right here in this product.  And we think that they opened the door to that, and it is perfectly proper expert testimony.  We will not be making the type of non-infringement argument that is improper which is where you don't discuss the claims; where you just put your product -- you do a product-to-product comparison without comparison to the claims.  Our non-infringement defense is wholly rooted in the claims.  Our products don't have hardly any -- we are going to be make a big presentation about the elements of the claims because we don't hardly have any of them.

THE COURT:  Mr. Suder?

MR. SUDER:  Yes, your Honor.  Dr. Zane did not give any opinions about the product whether it infringes.  He countered a summary judgment motion. There are three products that Mr. Bohannon talks about in his rebuttal report of infringement, the TOPSwitch-GX the TOPSwitch-2 and the TinySwitch.  The one that Mr. Warren's is talking about is not in their invalidities, is not in their expert report; and what Mr. Bohannon says in his report, his rebuttal for non-infringement, is that the TOPSwitch-GX is prior art to the 623 patent. He puts that in his rebuttal report of non-infringement when it is not in their invalidity -- never in their invalidity contention or in their expert reports.

So this is -- let's call it what it is.  The other two, the TinySwitch and TinySwitch Plus, the TOPSwitch-II and TinySwitch Plus, are not in the summary judgment, are not in the invalidity reports and no one ever talked about them.  Dr. Zane never talked about those, yet he wants to say that we are comparing -- we want to look at the technology and evaluate this technology.

The other point I would make, your Honor, is that their damage expert, Mr. Barnes, doesn't mention this at all.  He doesn't say, Oh, according to Mr.

Bohannon there is no value here because it was done before. So that -- it really is the guise we are trying to backdoor in issues to tell the jury. This is nothing new, and the best -- the thing I have been saying is Judge Rogers' decision, which is in our reply brief, has a quote that we quoted in our last brief which is spot on on this issue. The expert's opinion improperly brings invalidity into the infringement analysis even if offered in the guise of a damage mitigation theory on account of non-infringing alternatives. Had Defendant wished to assert invalidity on these grounds, it should have disclosed this theory in its invalidity contentions. Having failed to do so, it cannot now offer this evidence through back door of a damages theory. Motion to strike is granted.

That is exactly what they are doing. And to say that I move for summary judgment on a piece of art that was never raised by me in my invalidity instructions and we have to respond to it and now say, I'm going to cross you on that, that's not right.

MR. THORNBURGH: I will take this in pieces starting with Dr. Zane's opinions. So we made the argument -- as you will recall, it was an admission on their part -- they had accused us of infringement -- now he -- Mr. Suder just said that he never provided an

opinion on non-infringement, but he did.  What he did is he took the TOPSwitch-GX and said which claim elements are not there.  He did it to rebut invalidity because their backup argument that they shouldn't be tagged with the admission was beyond the claim.  But he is an expert and he has rendered an opinion that this product doesn't have these claim elements.  We should -- that is a sworn declaration.  That is his expert opinion.  We should be able to cross him on the fact that those same things are in the accused products.  For the same reason, they don't infringe; and there is no reason Mr. Bohannon shouldn't be able to testify on that.  They opened the door to this, and he did provide that testimony.  We are responding to that, and we are using that.  If the fact that the TOPSwitch-GX doesn't infringe is missing those same claim elements, as the accused products, we should be able to bring that out.

The fact that Mr. Barnes doesn't consider it -- we are the Defendant.  We are entitled to poke holes in their case however we can.  Show their evidence that doesn't meet burden.  We don't have the burden.  We don't have to have expert testimony to tie this up.  As a factual matter, we can show that this element here is not the same as this element here; and that absolutely goes to value.  So the jury will consider all of the

Georgia-Pacific factors.  They will be instructed on that.  They can take those facts.  It doesn't have to come in through an expert on the damages issue.

So what we can do is we can have -- the jury will have to consider whether or not this value is the most important aspect of the chip, whether or not these energy savings features are the most valuable things and whether or not that comes from that patent.  That's the apportionment.  It is actually not even present in their damages analysis.  That's the apportionment the jury will have to do.  They will have to look at this patent and decide what is the value of these chips as secured by this patent.  As a marginal, you know, addition, whatever they -- and if Power Integrations can show whatever benefit they are saying -- these amazing Energy Star, however they want to characterize it -- was exactly the same as what they had before they allegedly started using this patent, there is no reason as a Defendant we shouldn't be able to make that defense.

THE COURT:  Okay.

MR. SUDER:  Your Honor, if you claim that you are practicing the prior art, that is the defense.

MR. THORNBURGH:  If that's the issue --

MR. SUDER:  Excuse me.  This is entrapment, your Honor.  You denied the summary judgment motion saying

that we dropped that claim before any issues of validity.  There is no evidence that we did because we knew what they were going to say.  So they followed on it anyway.  It is entrapment.  It is a civil case, but that is what this is.  They opened up the door, not us.

THE COURT:  Okay.  I will remember that as I'm going back to look at this.  Let's go onto the final motion.

MR. SUDER:  Yes.  Your Honor, on the discovery issue, you made your ruling.  We are not asking you to reconsider that.  But we just learned that they have a license agreement that should have been produced, and it wasn't; and we learned it because we were at the trial watching Ned Barnes, the expert in this case, testify about that license agreement in the case against Fairchild on comparable technology.

It is -- we asked for those expert reports.  You said no, we got the verdict.  That's enough.  We would have seen the discussion about this license.  We submit it should have been produced under the Rules of East Texas.  It was called for under Judge Gilstrap's standing order.  The letter covers it.  It was not in effect at the time because it was dated earlier.  There was no excuse that this document -- and we asked Mr. Walker about it.  Do you have any relevant licenses

other than the two you talk about?  No.  How about ones that are not relevant?  Do you got any of those?  No.

We are supposed to ask for a technology transfer agreement when the CEO of Power Integrations testified and gave that testimony that this is a third party, arm's length license agreement where we receive consideration.

So the question is:  Why wasn't that produced?  If they want to argue in a Daubert motion or whatever that Mr. Evans, you can't consider this or it goes to the weight, but it was -- in the Fairchild case it was produced.  It was the subject of a Daubert motion; obviously denied and both parties talked about it at the trial.  Yet, we were denied because we said, Judge, we want these expert reports; and this is why we wanted it; to see what experts might have said from Power Integrations about similar technology.

So what we are asking for now, Judge, is they produce it to the Court now as an exhibit.  We are like, Okay, that doesn't do us a lot of good now; and we submitted the declaration of Mr. Evans that this license is relevant, and it is a data point that would have informed my analysis.

THE COURT:  All right.  What is the response?

MR. THORNBURGH:  So, your Honor, the response --

we agree with the Court that this is really more of the same that the Court already denied.  In addition it is a very, very late motion to compel that could have been brought two years ago when we very clearly told them that we were going to produce only licenses that we contend are relevant to the hypothetical negotiation.  They asked for lots more.  They gave us very broad requests, and we responded; and there was back and forth and we said, Look, we are willing to do the ones we think are relevant that we would actually use at trial, and they finally acquiesced.  They narrowed their 30(b)6 topics.  They understood the value proposition of document production; and they didn't move to compel and, you know, until now and it is just too late.  Discovery is closed.  Expert reports are done.  There is no reason to go backwards.

THE COURT:  But speak to the merits of it.

MR. THORNBURGH:  On the merits, it is another thing that it is exactly like the *Sentius* case; that there was an attempt to use an international portfolio license and the Court excluded that as irrelevant on both grounds.  The license at issue is not only from PI to its subsidiary, but it is PI to its international subsidiary in order to sell PI's products internationally.  It doesn't convey any U.S. rights at

all, and it conveys intellectual property, all of PI's patents, all of its trade secrets, all of its trademarks.  So it is virtually impossible to apportion such a broad license down to one single patent like we have in this case.  It has never even been commercialized and sold.  It is not even apples and oranges.  It is apples and -- so, you know --

THE COURT:  Mr. Suder, the last word.

MR. SUDER:  Yes, your Honor.  We submit the testimony that this was an arm's length license by the CEO.  It was covered by our request even though we didn't have to make a request in East Texas.  We sent a letter.  Produced all license agreements from 2005. They are saying it was from 2003.  We say it was in effect.  We say we produced all agreements where there was money going to you or money coming from you.  This was covered.  We didn't know about it.  We asked Mr. Walker are there any relevant agreements; are there any irrelevant agreements?  No and no.

Your Honor, at the trial in Fairchild they argued because it came into evidence.  It was produced and came into evidence there.  Fairchild tries to say, Look at this license because Power was saying that license is too low.  We want $0.09 a unit.  This is only $0.02 a unit or whatever.  So when they want to fight

this, don't defend this jury because it's too low.  Now they don't want us to have it.  It is technology.  It is all these other reasons from the merits when we were never even given the licensing agreement to study it.  It now goes to the weight.  It doesn't go to why was this not produced to us so it can be considered.

Mr. Evans said, I'd like to speak.  It raises one last point, your Honor, it is not just the license.  We ask for these expert witnesses.  Mr. Headley was sitting next to Mr. Walker in Fairchild when we were asking if there were any other agreements.  They said no knowing that this agreement exists.  It begs the issue, what about these other expert reports that we asked to see?  They said, Oh, it's burdensome.  It's all this you can have.  The Court said, You have enough.  Okay.  Now it raises the issue, what else is there that they had an affirmative obligation to produce?  We don't know and that is just unfair.

THE COURT:  All right.  Thank you all for your argument.  I will get an order out when I can get an order out.

MR. THORNBURGH:  May I say one last word, your Honor?

THE COURT:  Sure.

MR. THORNBURGH:  On this issue, we are asking

that it be considered that Mr. Evans can supplement his report to consider it and how it informs his decision and it be done on an expedited basis.  We also ask for the other reports; but at least as to this, we ask to consider it.  Now that we have it -- because they produced it to Court and to us -- that we would like the opportunity to evaluate it and we have the right to supplement our report accordingly.  I was implicit I'm sure, but I just wanted to say it.

THE COURT:  I heard you thank you.

MR. THORNBURGH:  Thank you, your Honor.

(Proceedings concluded.)

CERTIFICATE OF REPORTER


    I, MARLA KNOX, Official Court Reporter for the United States Court, Northern District of California, do hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/_____

       MARLA F. KNOX, RPR, CRR
       U.S. Court Reporter

Date:  Monday, December 17, 2018