**Pages 1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

OPTICURRENT, LLC,                    )
                                     )
          Plaintiff,                 )
                                     )
  VS.                                )   **NO. C 17-03597 WHO**
                                     )
POWER INTEGRATIONS, INC.,            )
                                     )
          Defendant.                 )
_____     )

                         San Francisco, California
                         Monday, January 7, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    FRIEDMAN, SUDER & COOKE
                    604 East 4th Street, Suite 200
                    Fort Worth, TX  76102
                **BY:  JONATHAN T. SUDER, ESQ.**
                    **DAVID R. GUNTER, ESQ.**

For Defendant:
                    FISH & RICHARDSON PC
                    500 Arguello Street, Suite 500
                    Redwood City, CA 94063
                **BY:  MICHAEL HEADLEY, ESQ.**
                    **NEAL A. WARREN, ESQ.**
                    **FRANK E. SCHERKENBACH, ESQ.**

                    FISH & RICHARDSON PC
                    12390 El Camino Real
                    San Diego, CA 92130
                **BY:  JOHN W. THORNBURGH, ESQ.**

Also Present:       **Joseph Warden, Esq.**

Reported By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, CSR No. 7445

**Monday - January 7, 2019**                                    **1:52 p.m.**

**P R O C E E D I N G S**

---o0o---

(Call to Order of the Court.)

**THE CLERK:**  And we are here in Case Number 17-3597, Opticurrent, LLC versus Power Integrations Incorporated, et al.

Counsel, if you would please come forward and state your appearance for the record.

**MR. SUDER:**  Yes.  Jon Suder and Dave Gunter of Friedman, Suder & Cooke in Fort Worth.

Mr. Hudnell is not here today.

**THE COURT:**  Welcome.

**MR. HEADLEY:**  Good afternoon, Your Honor.  Michael Headley with Fish & Richardson on behalf of Power Integrations.

With me are some familiar faces and some new faces.  I have John Thornburgh and Neal Warren.

New faces to you would be Frank Scherkenbach, my colleague --

**MR. SCHERKENBACH:**  Nice to meet you, Your Honor.

**MR. HEADLEY:**  -- and Joseph Warden as well, who does not yet have a pro hac on file.

We'll do so here shortly, in advance of trial.

**THE COURT:**  All right.

**MR. HEADLEY:**  And you may recall Cliff Walker, Power Integrations' vice president of corporate development.

Also glad to be here today.

THE COURT:  Welcome.

MR. HEADLEY:  Thank you.

THE COURT:  All right.  So we'll go through the motions first, and then I want to talk about timing.

So, first, I'm not inclined to revisit the order regarding Mr. Evans because I think there are just too many deficiencies in his testimony.  It would require an entire redo on the fundamental issues, like apportionment; failure to identify the proper party for the hypothetical negotiation; equating the negotiating strength of Opticurrent and Mr. Congdon; his lacking competence to testify regarding Energy Star compliance; and his making conclusory analyses based on his experience not even described with respect to the semiconductor industry instead of following reliable principles and methods using sufficient facts or data.

He's simply being used as a mouthpiece for plaintiff's theory of damages.  It doesn't meet Federal Rule of Evidence 702 standards.

And allowing a do-over at this point would be unfair to the defendant, who, for the third time, has raised significant deficiencies in plaintiff's prosecution of its case.

Plaintiff can proceed without an expert under the *Apple versus Motorola* case.

What the plaintiff is asking for is not a supplemental

report.  It's a new report on the eve of trial.  And that, it can't do.

The cases that Opticurrent cites, the *MEMC* case is -- the cases are not apposite.  *MEMC* isn't apposite because it's just not one thing that's deficient in Mr. Evans' opinion.

The *Meritor* case, the facts are not analogous.  Allowing a redo would push the case back, raise litigation costs on the eve of trial.  It was an antitrust case where a damages expert was necessary to testify regarding damages.

And the *Labyrinth* case, again, was discussing a supplement on a specific issue; and this is not a supplement, in my view.

So, Mr. Suder, you've argued this and you've briefed it twice.  If there's something new that you have to say or you want to make an impassioned and short plea, go ahead.

**MR. SUDER:**  Yes, Your Honor.  Thank you.

Your Honor, with respect to the wrong party -- first of all, let me just start.  Mr. Evans, by his qualifications, was never challenged on his qualifications.

**THE COURT:**  So, Mr. Suder, remember that we had this argument.

**MR. SUDER:**  Yes.  Fair enough.

**THE COURT:**  So what I want to hear is something --

**MR. SUDER:**  Yes.

**THE COURT:**  -- new, different.

**MR. SUDER:**  Yes.

**THE COURT:**  Something that I said that's just flat wrong.

**MR. SUDER:**  Yes, Your Honor.

With regard to the proper party, Mr. Evans corrected it.

But I would like to point to the Court's attention that Mr. Barnes, their expert in rebuttal, who criticized each and every aspect, as you can imagine, of Mr. Evans' report says in his report:

"The relevant hypothetical negotiation seeks to determine the amount that Opticurrent (as a willing licensor) and Power Integrations (as a willing licensee) would agree to as a royalty . . . ."

Mr. Barnes missed it also.  He made -- because it was such a minor point.  He criticized everything, but he never said: Hey, you got the wrong party.  If he did, we would have corrected it right away, like when they filed their motion, we submitted a declaration of Mr. Evans.

Also, at the hearing, the transcript on December 5th, where you had me give all my arguments -- and I'm not going to rehash them -- the first one was about the party.  Mr. Warren stood up.  And I reviewed the transcript on the way out.  He didn't mention the proper party issue.  He went right into the jury verdict with *Fairchild*; then the apportionment; then the other issues.

The point is, Your Honor, you excluded -- you could argue

**PROCEEDINGS**

that your opinion, everything after you excluded him for the wrong party is somewhat of dicta, because you made your decision -- and I respect that -- but it was a decision without an opportunity to correct when the difference is so -- I hate to say the word "insignificant"; but in the scheme of it, it really was, because they were not competitors.

You criticized us for not finding a different case with the *Warsaw* case.  As Mr. Evans says in his declaration, the *Warsaw* case was the inventor who assigned it to a competitor of the defendant, as opposed to two non- -- an individual and a company that is assisting Mr. Congdon.

The point is, Your Honor, we fixed it.  And it wasn't an issue for them in their rebuttal report.  And it was an error that we'd immediately taken.  And we think that that point should not be the basis to exclude Mr. Evans on that point, because neither side really -- and it's almost a game of "Gotcha" on that one.

And I said in the hearing on December 5th, it should have been Mr. Congdon but that it was a distinction without a difference in our point.

And if they want to argue in front of the jury --

"Well, you got the wrong party, didn't you?"

"Well, I made a mistake, but I fixed it."

-- and attack them on cross-examination, they're free to do so.

So that's the issue I would make on the party thing. I think we're being severely prejudiced by not having -- by that one ruling.

On the issue of the jury verdict, Your Honor, your ruling was very specific that it was a 403.

THE COURT:  I didn't mention the jury verdict in my tentative here.

MR. SUDER:  Oh, I know.  But I'm just saying, Your Honor, that when you struck the -- Mr. Evans considering the jury verdict, he considered a relevant datapoint.  It's just something the Court determined was too prejudicial.  And, again, we'd be prejudiced by not being able to have a chance to correct that and not consider that datapoint because you said the QBAR license was a datapoint.

And the last thing that I would say, Your Honor, on that is the other license that we now have that was produced is a datapoint where distinctions go to the weight.

But my point is, Your Honor, Mr. Evans is qualified.  He did do an apportionment, did talk to Mr. -- Dr. Zane, Professor Zane.  And we think at this point we're being unfairly prejudiced.

And I'd just simply like to comment on your tentative about these constant redos of us.  Your Honor, we've never been before you on a discovery dispute, not complying with a court order, not doing anything.  The first, quote, redo is when,

while the case was in Texas and we discovered that breadboard, we amended our infringement intentions, and the case got transferred. And they claimed it was a redo.

Then, on the conception and reduction to practice, I won't revisit it.

The point is, Your Honor, we've never changed our theory. We've never said: "Oh, you're right on that claim. We'll go to this claim." Or: "Oh, we're not correct here. We're going to do this." We have been consistent throughout and have complied with the rules.

And on this one, on the party, Mr. Evans, on the party, was corrected.

On the other things, it's just fundamentally -- and I'm just going to -- it's fundamentally unfair to deny us our day in court without an expert because we don't think -- even though they cite the *Apple* case that you quoted, that was a summary judgment case.

I don't know how we're going to be able to get to trial with just Mr. Congdon talking about a QBAR license that he gave with no evidence of apportionment or knowledge of the *Georgia-Pacific* factors.

Mr. Evans has been doing this for 50 years on both the plaintiff side and defendant side. He's a licensee. He's got experience. And his qualifications were never challenged because they can't be.

And the idea that he got the wrong party -- and he said, "I made a mistake," and corrected it.

Their expert did the same thing, Judge.  He said the relevant hypothetical negotiation is between Opticurrent and Power Integrations.

So, again, am I appealing to your sense of equity?  Yes, I am.  But we think, under the circumstances -- and we think this could be done without a significant delay.

And the other thing about the prejudice, I would just add, Your Honor.  Neither side deposed the other's experts in this case.  It's not like:  Oh, we've got to redo it, and we've got to redepose this person; we've got to re- -- there were no expert depositions by either side in this case.

And the other thing is, Mr. Barnes, their expert, did not counter Mr. Evans by saying:  "Your royalty base is wrong.  I come up with a different royalty rate."  All he says is that "Opticurrent paid Congdon so much; so that's indicative of what the royalty should be."

He doesn't give an alternative royalty rate or royalty base.  In fact, the royalty base really isn't even in dispute in this case.

So, Your Honor, I think under the circumstances, to say that, oh, we've got to redo everything, it may sound good, but it really isn't true because, if the Court will recall, when you granted us leave to amend our infringement contentions,

they said:  We have to redo the *Markman*.  We're going to have to redo our invalidity contentions.  We need more --

And you said okay.

They never did, Judge.  We never revisited *Markman*.  We never revisited invalidity contentions.

And then, when we got MacKillop's declaration on reduction to practice, which you then considered, they said:  Oh, we've got to do all this over again.  We've got to file another summary judgment on the exact same issue.

And you said okay, over our objection, and nothing changed.

So my point is, Your Honor, it may sound like everything's got to be redone; but in reality, it really doesn't.

THE COURT:  Except for Mr. Evans' report --

MR. SUDER:  Except --

THE COURT:  -- which is what --

MR. SUDER:  Yes.

THE COURT:  -- we're talking about.

MR. SUDER:  Yes.

THE COURT:  That's the --

MR. SUDER:  But his report --

THE COURT:  -- whole issue --

MR. SUDER:  -- is --

THE COURT:  -- Mr. Suder.

MR. SUDER:  -- is meant to --

THE COURT:  You're interrupting me.

MR. SUDER:  I'm sorry.  I'm sorry, Your Honor.

THE COURT:  Usually, when we're in court, one person talks.  And when it's the judge who's interrupting, then the lawyer is quiet.

It would be a good thing to sort of establish in your mind as we move forward.

MR. SUDER:  Yes, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. SUDER:  Your Honor, Mr. Evans is not redoing his report.  He's supplementing.

He wants to correct the party.  He wants to take into account the QBAR, which he did, and this newly produced license agreement, which is a third-party license agreement -- they can characterize it however they want.  That goes to the weight -- and apply it and clarify the apportionment that he did as an alternative theory.

So you said, he can't consider this; he can't do this.

But in terms of his qualifications, what he studied, what he did, this is not a new -- a complete do-over with new theories.  It is simply saying:  Okay.  You won't let me consider this relevant datapoint.  I now have this license.  Let me consider this relevant datapoint, and I'll give you a new report.

And in terms of timing, Judge, we're asking for permission

here.  So whatever you tell me I need timing-wise, we will do.

**THE COURT:**  All right.  Thank you, Mr. Suder.

Does anybody want to make a response?

**MR. THORNBURGH:**  Thank you, Your Honor.  This is John Thornburgh for PI.

If Your Honor would like, I will respond to each of the points that counsel made.

First, with regard to our expert, Mr. Barnes, we asked him to do a very limited critique, not on all issues, and certainly not to give his own opinion.  This was a legal issue, and so we put it in a motion.  We didn't ask him to address it.  And so what counsel quoted, he's taking the framework that Mr. Evans used and critiquing it.  He's not creating his own scenario for the hypothetical negotiation.

As to whether the issue is important to the parties to the hypothetical negotiation, it's extremely important.  It's actually the issue that we first led with in our initial motion.

What Your Honor said about the apportionment issue is exactly right.  And substituting out the jury verdict for the other licenses leaves them in the exact same point position where their apportionment is completely conclusory.

How they do trial without an expert, their pretrial statement that they filed a couple of days before their emergency motion, on page 2, in the first paragraph, lists all

the evidence that they would use for damages.

And the Court has excluded the jury verdict but has not excluded most of what they list.

On the consequences of the redo, you know, if it gets into a new apportionment, it would involve both of their experts. The accountant can't say the value of technology versus other things, and so we would be faced with two new expert reports.

They're right that we didn't choose to depose their experts the first time around because we thought they were so, you know, fundamentally flawed that we would be here where we are, and so we didn't spend the money.  But if they do more work, we might very well choose to take their depositions. Certainly, we would have to do our own report.

And most importantly, we want to file another *Daubert* because we don't think that, you know, they would be able to do the apportionment in the proper way.

And so it would all take a very long time.

And then, just in terms of the big picture on how many redos there have been, the first redo was very much where plaintiff took back their position because they realized that they had actually accused the prior art of infringement.  And so that was the basis -- when they took back their accusation of the GX, that was the new infringement contention.  So this really would be the third major redo in this case.

So for all the reasons Your Honor gave at the very

beginning, we think that the initial order should stick.

THE COURT:  All right.

MR. HEADLEY:  Thank you.

THE COURT:  Thank you.

MR. SUDER:  May I say something, Your Honor?

THE COURT:  Go ahead.

MR. SUDER:  If I may, may I hand the Court a copy of Mr. Barnes' report, where he makes the statement, not in the context of what Mr. Evans said, but says, here's the legal standard, and it would be a hypothetical negotiation, one explains, and who the parties are.

He makes that statement.  He doesn't say, "Well, this is what Mr. Evans says."  He's very clear.  And then he's talking about what the standard is of a hypothetical negotiation.

So, again, it's the same issue that I think -- but I've made my point.

THE COURT:  Okay.  And what paragraphs do you want me to look at --

MR. SUDER:  It is paragraph --

THE COURT:  -- when I get off the bench?

MR. SUDER:  -- 4, beginning on page 3 of Mr. Barnes' report, where he talks about *Georgia-Pacific*, what it is, what the analysis is.

And then he says:

"The relevant hypothetical . . . seeks to

determine the amount that Opticurrent (as a willing

licensor) and PI (as a willing licensee) would agree

to as a royalty rate for a license to the '623

patent."

**THE COURT:** All right.  All right.  Well, I will look at this one more time.  I'm not, as I'm sitting here, inclined to change my tentative on this.

So let's go to the motions in limine.  And, first, I'll do -- I'll do them all at once because I think they all pretty much flow, and then you can argue any one that you want to.

Plaintiff's Number 1, the defendant may not disparage plaintiff's business model and/or its activities, but it may point out facts that are relevant to obviousness and damages, at a minimum.  Perhaps they're relevant to other issues.

To the extent that there is some issue that comes up during trial that you think goes beyond that, plaintiff should object, and I'll deal with it as it comes up.

I'm going to go through all of the motions, Mr. Suder, and then we can come back.

With respect to Number 2, I agree that unrelated legal proceedings should not be referenced.

And so that also goes to Defendant's Number 1. Cross-examination of defendant's expert for inconsistency is fine.

Number 3, I think, was dealt with in my order of

December 21st regarding Bohannon.

Number 4 is agreed.  There shouldn't be any denigration of the Patent Office or the system.

5, I think, is moot with respect to Mr. Evans.

6 is agreed with respect to Mr. Barnes.

7 is agreed.  Testimony ought to be limited to the report.

8 is denied without prejudice.  I need specific testimony to consider.  I would think that cross-examination is the remedy for inconsistent testimony with a 30(b)(6) witness.

And 9 is denied without prejudice.  The other patents could be relevant; so I'll allow it, at least at the moment.

With respect to defendant's motions, I dealt with 1.

2, I think, is moot with respect to the license.

3 is moot.  The December 21st order addressed the expert reports.

And 4, regarding the actual revenue information, would be moot if I stick with my tentative.

So with that, Mr. Suder, what would you like to point out?

**MR. SUDER:**  I was going to say, Your Honor, I understand all remedies, it just simply means that if we want to raise it, we approach the bench first.

**THE COURT:**  Yeah.

**MR. SUDER:**  And that would apply to everybody?

**THE COURT:**  Say it again.

**MR. SUDER:**  If we wanted to --

THE COURT:  And come up to the mic, please.

MR. SUDER:  I'm sorry.

I assume -- this applies for both sides -- the limines, by its nature, means that we simply approach the bench if we want to raise an issue that's subject to a motion in limine.

THE COURT:  Well, so I've given you what my understanding of the issues are and what my rulings are.

When I'm in trial, at 7:30 in the morning, you can come in, and we can discuss any issue that you think ought to be discussed before the jury comes in.

I don't like to have sidebar conferences.  So if you're planning on doing something different than what I've ruled in limine, then you'd better raise it at 7:30 and there ought to be a thoughtful explanation as to why.

MR. SUDER:  Absolutely.

THE COURT:  Okay.  All right.  So beyond that, Mr. Suder, did you have anything that you wanted to raise with respect to any of these issues?

MR. SUDER:  On the limines, no, Your Honor.

But it does raise, if I may, the issue of how -- we were very up-front in our emergency motion that we don't know how we can put on a case because there's no -- we have no one that's going to explain *Georgia-Pacific* and what the standard is, and that is very problematic for us.

THE COURT:  Well, so if I stuck with my tentative,

one -- there are two ways to deal with it.

One is to put on evidence.  I think you can.  If you don't think that you can or decide that it's not a very good use of your time to do that, you could stipulate, I suppose, to a judgment and then raise this as the issue on appeal.  That's another way of going.

MR. SUDER:  I'll be totally candid with the Court.  That's something that weighs heavily on us right now.

THE COURT:  Okay.  All right.  Let's deal with the motions in limine, and then we'll get back to that.

Mr. Warren?

MR. WARREN:  Thank you, Your Honor.  Neal Warren for Power Integrations.

With respect to the in limines that dealt with limiting things to the scope of the expert reports, we wanted some clarification on what your procedure is for when we believe an expert may have gone beyond the scope or is about to.  Sometimes we can't discern that just by looking at the demonstratives, and it's hard to unring the bell.

So do you want in trial, stand up, "Objection; beyond the scope," and then argument right then?

THE COURT:  Yes.  And if you do that, I'll go to the side and be very annoyed with either side that's right or wrong on the topic.

So make sure that you've got -- that you stay within the

scope.  The Federal Rules, I think, are very clear that you stay within the bounds of the report.  And if there is something -- if the slides raise the issue, then raise it ahead of time, at 7:30.

But aside from that, do raise it.  Stand up and object, and I'll go to the side, and you can explain what the problem is.

**MR. WARREN:**  The other issue is, we have the issue of the additional declarations that were filed by Mr. Zane.

And in using the word "expert report," I assume you mean the actual expert report that he filed that excludes those later declarations.

**THE COURT:**  Well, didn't I -- you'll have to remind me about this.  Didn't I exclude one of his supplemental declarations or no?

**MR. WARREN:**  Yes.  So at the last hearing that we had, I asked you a similar question.  And you said that, yes, you would not be considering the declaration.

Then, when we got the order on the *Dauberts*, it appeared that you had considered some of the ex information in ruling on that motion -- or summary judgment.

And so I understand that you can consider, you know, what you want on summary judgment; but in terms of what his testimony is bounded in the trial, my understanding was that it would be bounded to what he had actually written in his expert

report.  And if we object and he can't point to something in his expert report where he actually said it in the report itself, then that should be beyond the scope.

THE COURT:  Well, generally, I agree with you.

I don't know.  Mr. Suder, are there specific issues in the supplemental declarations that you think should be treated as part of his report?

MR. SUDER:  Well, Your Honor, I hate to say "yes and no," but it went to the discrete issue of conception and whether the schematic taught him certain aspects of the CMOS inverter, the voltage stabilizer, and he elaborated on that.  But his original opinion is that this document, along with the breadboard and everything else, shows me that the inventor had the state of mind for this conception date.

Their summary judgment was very pointed that the schematic itself does not comply with the Court's construction, and he elucidated on that point.

Honestly, I don't think we ever get that deep at trial on that issue.  But it's not a new opinion.  But the Court did -- the Court did say in his order that, I'm not considering that for purposes of summary judgment, but still denied the motion.

THE COURT:  Well, so I'll have to look back at those and think about it.

Generally, the purpose of the rule is to make sure that nobody's surprised by what's there.

You've made a determination, it sounds like, that you didn't need to depose the experts, which may -- and maybe that's not true for Zane.

MR. WARREN:  It is true for Zane.

MR. SUDER:  No expert --

THE COURT:  No expert was deposed.

So you have that information.  You know how to develop a cross-examination based on it.

So I guess I will look at the issue, but I'm not -- I don't -- I don't think I would preclude his testimony if it's just an extension of an opinion that he's already given.

MR. WARREN:  And I think that's the issue that we wanted to know about.  And if that's the case, we respect that, and that's how we'll proceed.

THE COURT:  Okay.  All right.

MR. SUDER:  Your Honor, did you want Mr. Barnes' report?

THE COURT:  That'd be fine.  Otherwise, I'll just pick it up.

(Document handed up to the Court.)

THE COURT:  Thank you, Mr. Suder.

MR. THORNBURGH:  And, Your Honor, John Thornburgh again.

I would like to just comment on our Motion in Limine Number 4, the total revenue of Power Integrations.

THE COURT:  Yeah.

MR. THORNBURGH:  There are some ways in which that might not be moot, even in light of the exclusion of Mr. Evans.

I think in their opposition, plaintiff conceded that they would not tell the jury PI's total revenues and profits as a way of trying to justify a large damages number.  And we think that that should also extend to the total accused revenue, the total amount, how many tens of millions of dollars are accused of infringing.  That was the holding of the *Uniloc* case.

And it skews the horizon if they stand up, for example, and say:  "PI sold a hundred million dollars worth of these parts.  We're only asking for $3 million.  It's not that much"; that that's not the proper way to go about arguing damages to a jury, even without an expert.

THE COURT:  All right.  Mr. Suder?

MR. SUDER:  Your Honor, the evidence on the royalty base is, they produced worldwide sales.  Their 30(b)(6) witness testified that 30 percent of that is what goes into the United States.

That's what Mr. Evans said is the appropriate royalty base.  So it's going to be, you have this much and 30 percent of that goes here.

We have their witnesses on our witness list.  And on the pretrial order, they're not really taking -- in their motion in limine, they're really not taking issue with that.  They're

just saying we have to put on our evidence of that.

But it's going to be, here's the big number; take 30 percent of that and that is your royalty base.

So I'm not sure how we can do that with what Mr. Thornburgh just said.

THE COURT:  Okay.

MR. THORNBURGH:  And so, Your Honor, our point is that they should not skew the horizon, as the Federal Circuit said, by talking about those big numbers.

So far, their previous damages theory was 1.5 cents per unit, and so we would not object if that were allowed -- we'd object to it on other grounds -- that they could take 1.5 cents and multiply it by the number of units.  That would be okay.

If they switched to a percentage instead of a per unit rate, then they could attempt to say that, you know, if the product -- the price of the product is 10 cents and they want, you know, 3 cents, or 3 percent, or something like that, they could do the per unit math and then multiply it by the number of units.

But they don't get to prejudice us by using --

THE COURT:  By using the gross number.

MR. THORNBURGH:  -- these very big numbers first.

THE COURT:  Okay.

MR. SUDER:  I don't see how you can -- you start with how much you sold, take 30 percent of that.  This is your

average selling price per unit and then applying a percentage to that.

So you can't just say:  Here's the royalty base.  We're going to apply a percentage.

That's not giving the jury the full context of the apportionment, of the value, and what they do.  It's you start with this, you take this, and you take this.

And we're making it smaller.  We're not really --

**THE COURT:**  Yes.  What you're suggesting is just the flip of what the defendant's saying.  You're starting high to come down to one and a half cents, or wherever it is; and they're suggesting that you should build up from the one and a half cents.

But what would the basis be to start there?

**MR. SUDER:**  Exactly.

**MR. THORNBURGH:**  So if you go with a per unit royalty, you would look at the average selling price per unit.  So it would be a much smaller number.

These products usually sell for less than a dollar; so let's say a dollar.

So if you're saying the product costs a dollar; we want one and a half pennies.  You sold X number of products.  We're going to multiply X by the one and a half pennies to get our damages, rather than starting with the big number, which sort of is eye-popping.

And, you know, it's what the Federal Circuit says.  It skews the horizon.  So it's really a bottom-up rather than a top-down, is what we're arguing.

THE COURT:  All right.  Well, so I didn't understand that that was the issue that was being argued.  I will take another look.

I'm not persuaded at the moment that a different way of approaching the same number is something that I'm going to exclude.

MR. THORNBURGH:  Understood, Your Honor.  But I would note that they did concede that the total company revenues would --

THE COURT:  Right.

MR. THORNBURGH:  Thank you, Your Honor.

THE COURT:  All right.  Okay.  So then the final question is one that you think has already been settled, which is:  When will this case go to trial?

I have two trials set on February 4th.  And I set two trials every Monday, and I lay them out a year and a half in advance, or however long in advance.

And yours is the junior case.  And the other case is showing every sign of going forward.  I've got another case that is going to trial, that will not settle, on February 19th.

It is unclear to me, although I will know very soon, how long the parties think that the senior case on February 4th,

which is the North Bay case, will take.

However, I can guarantee you that this case will go to trial no later than February 19th.  The jury may be selected during the week before.  There's going to be some play in here, but your case is going to trail on February 4th for at least, I think, that first week.  And I think likely things will be happening in the second week.

You have a settlement conference on January 17.

MR. SUDER:  Yes.

THE COURT:  I have pretrials on my trials for February 4th and the 19th on January 18th.

So we can have a CMC on January 22nd.  You can call in, at which time I can tell you specifically when things will get going.  But one way or another, it will probably be in the second week in February, starting --

MR. HEADLEY:  May I talk with co-counsel?

THE COURT:  Go ahead.

(Pause in proceedings.)

MR. HEADLEY:  Your Honor, this case was filed in 2016 in the Eastern District of Texas.  To the extent there's any ranking of --

THE COURT:  Your -- that's -- no.

MR. HEADLEY:  Okay.  I wanted to make sure.

THE COURT:  Okay.

MR. HEADLEY:  I cannot commit that any of our

witnesses are available two weeks later at this point, unfortunately.  I just have to circle back around.  But I know we've been trying to schedule -- this is our, sort of, third trial in a row, and we've had a lot of time in fitting everyone in.

THE COURT:  This case is set for trial.

MR. HEADLEY:  On the 4th.

THE COURT:  And I am -- yes, on the 4th.

But you don't get to sort of make your own determinations as to when -- I'm setting something within a very short period of time.  I am moving mountains to make this happen, and this case is going.

MR. HEADLEY:  Okay.  I appreciate that.  I just --

THE COURT:  All right?  Do you understand that?

MR. HEADLEY:  Sure, Your Honor.

THE COURT:  Okay.  Good.

MR. HEADLEY:  I just wanted to make clear that I need to consult with my client.

THE COURT:  Well, I wanted to make clear that the case is going to trial.

MR. HEADLEY:  Oh.  Understood.

THE COURT:  Okay.

MR. HEADLEY:  Understood.

THE COURT:  All right.  Then the final thing is that you estimated five trial days, I think.  So -- which would make

it 11 hours and a quarter per side, because my trial days are four and a half hours.  So that will be the amount of time.

That will be inclusive of opening and closing, for which you could budget up to two hours, which would be more than you need, I think, for that.

MR. HEADLEY:  Two hours total for opening and closing, Your Honor?

THE COURT:  Yes.  Like half an hour and an hour and a half --

MR. HEADLEY:  Okay.

THE COURT:  -- or 45 minutes and an hour and 15 minutes.

MR. HEADLEY:  That was one of our questions.  We had kind of estimated about seven that we could get in, because sometimes judges' trial days aren't actually the full window.  But if 11 is the number --

THE COURT:  I think this case can deal with that.

MR. HEADLEY:  Yes.

THE COURT:  Okay.  All right.  And then, so the final thing, you need to know, Mr. Suder, what I'm going to do with respect to Mr. Evans, and I will issue something as soon as I can.

MR. SUDER:  Can I say one more thing on that?

THE COURT:  Yeah.

MR. SUDER:  I would simply point out that the

discussion Mr. Warren and the three of us just had about the damages and the royalty base is very straightforward.  There really isn't an issue whether you start from the top, get to the bottom.  There's not a lot of dispute, as you can see.

The issue is the rate and what do you apply as the rate.  And you said the QBAR license is a datapoint and whether this new license agreement that we now have is a datapoint.

And to the extent Mr. Evans can supplement his report, it would be a very short report on -- we could have it done this week, that would simply say:  This is all I'm doing and here is why the apportionment.

And it could be done in a very expedited fashion.  If they want to depose Mr. Evans, we'll make him available whenever.  If they want to file an emergency *Daubert* and you say "Have your response in in 24 hours," we'll do it.

I don't want -- we want to go to trial.  But we think that it's going to be very difficult to have a 70-year-old in not good health try to explain what he'd accept as a royalty.

Really, Judge, we've survived *Markman*.  We've survived summary judgment.  We've survived everything to get to this point.  I'm really just pleading to the mercy of the Court, I'll be honest.

THE COURT:  Well, no.  I understand that, and I understand the predicament that you have.  And you obviously have a very different view of the sufficiency of Mr. Evans'

initial report, but I don't.  I just, I don't.  I thought it was deficient in a number of significant ways that make what you're asking for basically a new report.  And that's what -- so that's what I think.

I don't like the idea of striking this expert.  I know that it's an important issue for you.

And I also think we've been here a couple of times before; and each time you've pulled the issue out, relying, in part, on the mercy that you're looking for now.  And I find it really problematic, Mr. Suder.

**MR. SUDER:**  May I say something, Your Honor?

I understand.  And the Energy Star is not a material issue.  Factor 5, those are what I would call minor points.  They're not really germane.

But if you go back and look at the detail of Mr. Evans, and not a summary, he really gives a very detailed report.  It's, like, 70 pages.  He gives a chart going through each factor of the *Georgia-Pacific*.  He gives a chart giving his experience in the semiconductor industry.

And the two issues that really, I believe -- and I'm -- are fundamental is the party, which you understand my position on, and the jury verdict.  We put a lot of weight on the jury verdict because we -- it was comparable technology.

And the Court said:  It's a relevant datapoint, but I'm going to keep it out on 403.

And so if we can't use that, you're going to throw out the whole thing.

And that's what -- that's really what I'm asking about, is that it was a relevant datapoint, and we shouldn't be punished for a determination that it's a 403 analysis and not a 402 analysis.

That's all.

**THE COURT:** All right.  Anything else that we ought to do while we're here?

**MR. HEADLEY:** Nothing from the defendant, Your Honor.

**MR. SUDER:** One more --

**THE COURT:** All right.  Thank you.

Whatever I decide, you should go forward on the 17th, recognizing what you know about your cases.

**MR. SUDER:** Yes.  And we've delivered our report to Judge Laporte today --

**THE COURT:** Great.

**MR. SUDER:** -- as required.

**THE COURT:** Okay.

**MR. HEADLEY:** One point of clarification, I guess.  I apologize, Your Honor.

Did we set a CMC on the 22nd in this case, or was that just the other North Bay case that's --

**THE COURT:** No.  What I want you to do is to call in on the 22nd, and I can tell you with certainty the date that

**PROCEEDINGS**

the jury will be selected and the case will proceed.

MR. HEADLEY:  Just call the courtroom deputy?

THE COURT:  So it's during my normal case management conference time period.  And so at some point during the calendar, I'll tell you what the deal is.

MR. HEADLEY:  Great.  Thank you, Your Honor.

THE COURT:  Okay.

MR. SUDER:  Thank you, Judge.

THE COURT:  Thank you.

(Proceedings adjourned at 2:33 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Friday, January 11, 2019

_Ana M. Dub_

_____

Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
Official Reporter, U.S. District Court