Pages 1 - 110

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | |
|---|---|
| OPTICURRENT, LLC , ) <br> ) <br>      Plaintiff, ) <br> ) <br>  VS. ) <br> ) <br> POWER INTEGRATIONS, INC., ) <br> ) <br>      Defendant. ) <br> _____ ) | **No. C 17-3597 EMC** <br><br><br><br><br> San Francisco, California <br> Monday, February 11, 2019 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          FRIEDMAN, SUDER & COOKE
                        604 East 4th Street, Suite 200
                        Fort Worth, Texas 76102
                   **BY:  JONATHAN T. SUDER, ESQ.**

                        HUDNELL LAW GROUP P.C.
                        800 W. El Camino Real Suite 180
                        Mountain View, California 94040
                   **BY:  LEWIS E. HUDNELL, III, ESQ.**

For Defendant:          FISH & RICHARDSON P.C.
                        500 Arguello Street, Suite 500
                        Redwood City, California 94063
                   **BY:  MICHAEL R. HEADLEY, ESQ.**
                        **NEIL A. WARREN, ESQ.**

 (Appearances continued on next page)

Reported By:          Katherine Sullivan, CSR, RMR, CRR

**APPEARANCES (CONTINUED):**

For Defendant:              FISH AND RICHARDSON PC
                            222 Delaware Avenue, 17th Floor
                            Wilmington, Deleware 19899
                       **BY:  JOSEPH B. WARDEN, ESQ.**

For Defendant/              FISH & RICHARDSON P.C.
Counter-Claimant:           12390 El Camino Real
                            San Diego, California 92130
                       **BY:  JOHN WINSTON THORNBURGH, ESQ.**

**Monday - February 11, 2019**                                    **2:38 p.m.**

**P R O C E E D I N G S**

**---oOo---**

THE CLERK:  Calling civil action 17-3597, Opticurrent, LLC, versus Power Integrations, Inc., et al.

Counsel, please approach the podium and state your appearances for the record.

MR. SUDER:  Yes.  Good afternoon, Your Honor.  John Suder, with Friedman, Suder & Cooke in Fort Worth.  With me is Lewis Hudnell, our local counsel, on behalf of plaintiff.

THE COURT:  All right.  Thank you, Mr. Suder.

MR. WARDEN:  Good afternoon, Your Honor.  Joseph Warden, with Fish & Richardson, on behalf of Power Integrations.  With me at counsel table are Michael Headly, Neil Warren, and John Thornburgh.

THE COURT:  Okay.

MR. WARDEN:  We also have Cliff Walker, the vice president of corporate development at Power Integrations, with us today.

THE COURT:  All right.  Thank you.

Welcome, first of all.

Let me first ask whether, before we proceed much further, there's any interest or prospect of any further settlement discussions between the parties.

MR. SUDER:  I think I speak on their behalf.  The

answer is no, Your Honor.

**THE COURT:** All right.

**MR. WARDEN:** That's right, Your Honor.

**THE COURT:** All right. Then I'm going to presume we're going to proceed to trial. If for some reason you change your mind and you want the offices of this court, whether it's through a mediator or magistrate judge, to do a last-minute discussion, let me know, and we'll see if that can be arranged.

So I thought it would be a good idea for you to give me the benefit of your expertise to explain a bit about the technology.

I've read the patent, I've read the rulings. I have a general understanding, but probably not as thorough an understanding as I would like.

So I want to devote the next, I don't know, 15, 20 minutes, to give you a chance to do a mini tutorial.

**MR. SUDER:** Sure, Your Honor. May I?

**THE COURT:** Yeah.

**MR. SUDER:** Judge, the technology at issue that we're dealing with is power electronics. Very simply, how do you get high-voltage AC from wall socket to run your phone, your washing machine, anything, your computer, your laptop, anything. You have to take high-voltage AC and convert it to low-voltage DC. And so that's what it is.

As we all know, and your children -- you teach your

children to stay away from the socket, it's dangerous.  It's not just dangerous to humans, it's dangerous to equipment, because if you get a surge of current or too much voltage, it'll fry.

So the exercise of engineers is how to convert that power from there to the devices we use in every day.  And, historically, as technology has improved, the challenge is to find cheaper, lighter, smaller ways to do it.

That's -- and so what we're talking about here are power conversion devices, semiconductor chips, integrated circuits. And that's all Power Integrations does is make those chips.

Some of them are freestanding like this (indicating). They sell one of the -- one of the largest sellers is phone chargers.  I don't know if it's an Apple or Nokia.

Others are embedded into your washing machine, your television.  All of those devices that are plugged into the wall have a power conversion.

So first you convert this to DC.  And then there's a switch in here that goes on and off thousands of times a second, and that controls the flow of energy that's coming. And they use it in a semiconductor device.

The best way to understand that, Judge, is think of water shooting out from a fire hydrant.  You can't drink the water from the fire hydrant, so how do you get that water shooting out into a nice steady water fountain?

That's what electrical engineers, power electronic engineers work on.  So that's the technology we're dealing with.

And one of the problems, Judge, is that back in the early days when you had bigger -- if you remember back when you had your laptop, and you had that cord that had the big box connected to it.

That was a power conversion device.  Had a lot of circuits, they were big, they were expensive.  But as technology has advanced, like everything else in technology, they've gotten smaller.

And the old way was what was called a four-terminal switch.  It was -- you had two terminals that are basically the on and off of a light switch.  A third terminal, imagine if that's your finger turning it on.  And then a fourth terminal that would supply power to activate the switch.

So what we're talking about in the patent and the technology is the switch, the transistor switch, that runs the power, controls the power to operate your devices.  Those were bigger, they were bulkier in size.

And what happened in the late '80s, early '90s is you had what's known as three-terminal switches where you have the on and off, and then the third one that tells it whether to be on and off.

But the way it was configured -- this is what power

electronic engineers work on -- there's enough current there that you can power the device by harnessing that energy without having a separate fourth terminal.

Don't have a fourth terminal, you have less circuits, it's lighter, it's cheaper, it can be mass produced.

So what happens now is you have three-terminal noninverting switches.  Noninverting means that the high current matches up with the high current as opposed to inverting.  And that's a technical term.  It really has nothing to do with the case.  We're dealing with, really, three-terminal switches to convert AC to DC.

THE COURT:  So the three terminals, does that include the two terminals by which current passes from one to another?

MR. SUDER:  Yes.

THE COURT:  And the switch turns it off and on, essentially in the middle, interrupts that --

MR. SUDER:  Yes.  But it's -- it's not like you go press it on and the lights come on.  It's going thousands of milliseconds, turns on and off --

THE COURT:  The switch.

MR. SUDER:  -- the switch.  And that's how it's controlling the flow.

And then that voltage that's coming there can be harnessed through other components, like a voltage stabilizer, which can take it and reduce it to a low volt to operate and turn on the

switch, because the switch itself is electrical, and the switch itself has to be powered on.  So you want just a little bit of power to turn on the switch to get it started.

And so that's -- that is the essence of what we're talking about.  And Mr. Congdon, the inventor, went to Stanford, was a power electronics engineer his whole life, holder of a lot of patents, had his own company, but he made his own version of these.  He had an earlier patent of a three-terminal switch.  It's the '323 patent that's referenced.

What he discovered is, yeah, I can solve the problem by going from four terminals down to three terminals, and it's cheaper, mass produce, solved that problem.  But there was another problem called leakage.

And what, to the layperson, you don't know is that -- I suspect that you have a phone charger somewhere that's plugged into the wall right now, not hooked up to your phone.  As long as this is plugged into the wall, it's sucking energy.

And even though this is not being used, if it's sitting by your night table, it's leaking.  And if your TV is off, as long as it's plugged in, it is still absorbing energy.

In fact, a lot of the evidence -- what Power Integrations markets is that when this is plugged in this is called an energy vampire because it has two teeth, sucks in.  And so that's how they call it.  And the goal is to stop that leakage.

Now, what Mr. Congdon's patent does -- and he says it

right in his patent -- is he says, My earlier patent was an example of the three-terminal switch, but the problem is it had leakage.

So I have a new way of doing a three-terminal switch by adding new components that have never been used this way before, and it substantially reduces the leakage.

THE COURT:  Is the leakage coming through what normally could be switched off, notwithstanding, let's say, the switch being in the off position, the leakage going through, or the switch itself --

MR. SUDER:  The switch itself is working as long as it is plugged into that high voltage.

THE COURT:  Where is the leakage?

MR. SUDER:  Even though this is turned off, you can't completely stop it.  It is not like a faucet.

THE COURT:  So is it the current that is feeding the switch that continues to flow?

MR. SUDER:  Yes.  There's a very small amount of leakage.  And you see on your refrigerators and televisions that Energy Star rating.  That's because it's regulated to save energy.  You want to have more energy-efficient products.

So the leakage is measured in nano amps and other terminology, but the only way to completely stop leakage, the only way, is to unplug it from the wall, because you've got to make that disconnection.  Otherwise, it is drawing energy out.

And there are studies here in California that show how much energy is being used.

**THE COURT:**  I'm aware of that.  I understand the commercial context of this.

**MR. SUDER:**  Yes.  And, Your Honor, the term is called "no-load."  When you are -- have something that's drawing power, but you're not using it, you're in a no-load situation. And so the trick was how to reduce that load, that use, as small as possible.  And that's what the patent teaches.

And if you look at the summary of the invention, one of the objects is a transistor switch which limits the current leakage between the third terminal and the second terminal.

**THE COURT:**  I've seen that.  So tell me, what does the third and what does the second terminal do?

**MR. SUDER:**  The second terminal and the third terminal are the two output signals that operate -- if you look, Judge, at column -- if you look at Figure 1, for example, of the patent --

**THE COURT:**  Yeah.

**MR. SUDER:**  -- that is his prior art.  And what -- what that is, is -- if you look at 17 and 15 on Figure 1, the figure -- 17 is called the drain.  It is bringing in the power. That's one term- -- that's the second terminal.  15 is what's called ground.  It goes to ground.  That is the third terminal. 17 and 15.

23, in between it, is the transistor switch that's cycling on and off.

And then if you look far to the --

**THE COURT:** That's the first terminal?

**MR. SUDER:** No. The first terminal is 13, on the other side. That is the input. That's where the -- that's where it's coming through. So 13 is the first terminal.

And what you're doing is -- the 23 is switching on and off, and you have current flowing between 17 and 15. And that was the old way. And even when it's off, you still had a measurable amount of current that was going from 17 through to 15.

**THE COURT:** Is that because the switch, number 23, is not completely a hundred percent --

**MR. SUDER:** Disconnected.

**THE COURT:** -- interruptive?

**MR. SUDER:** Yes.

**THE COURT:** Or is that because it's flowing through some other alternative route?

**MR. SUDER:** No, it's because you cannot absolutely limit it short of pulling it out of the wall. As long as there's current coming from 13, you're going to have some measure between 17 and 15.

And what the old standard was -- I forget the number, it was a range; our expert will explain it. And the goal is to

get that number down as low as possible when you're in a no-load situation. So that was -- as he says, Figure 1 is the prior art.

Figure 2 is a sample of his invention. And you see around 127, on the left-hand side, there's a whole bunch of new circuitry that he adds.

And what he adds is a voltage stabilizer, which says, let's take the current between 17 and 15 and, when it's off, redirect it and bring it down, like siphon it down to a very small, measurable voltage. And that operates what's called a CMOS, metal oxide -- I forget exactly.

Judge, what the CMOS is, is it's like a drawbridge. When one is up, the other's down. When they're both on, they're both down. It works like a drawbridge of current flowing through it.

So when the switch is off and the current is redirected between 117 and 15, it goes through these new components, and that's what interrupts the flow. It doesn't completely eliminate it. That's going to be an issue for the jury.

But Mr. Congdon explains in his patent that the goal is to substantially and significantly reduce leakage, because, as our expert will explain, you can never totally eliminate leakage as long as you're plugged in.

As long as the energy vampire is sucking energy, you can't completely eliminate it. But you can reduce it. And that's

what this patent is about.

And so the whole issue is going to be whether or not their accused products are configured with three terminals, have a voltage stabilizer, and a CMOS in accordance with how those terms were construed by Judge Gilstrap when the case was in Texas, and then, if so, what have you.

And, Judge, the only other thing I would point out is, in column 14 -- I would simply point out also, Judge, on page -- column 7, line 55, he says, "With the switch both turned off, the amount of current leakage which occurs between the third terminal and the second terminal is significantly reduced, which is highly desirable."

That's what he's going for, is to significantly reduce the leakage.

And then, Judge, if you look at column 14, right before the claims in line 42, Mr. Congdon explains that the scope of the present invention also includes three-terminal non-inverted transisting switches that use a fourth pin for normal operation but still operate without power supply.

So, in other words, even though the claim is written as only having three terminals, the way the claim was construed -- and it's never been challenged since -- you can have additional terminals for lots of other things that go on in it.  But the essence:  Is this a three-terminal switch for converting AC to DC.

**THE COURT:**  All right.  Thank you.

**MR. SUDER:**  So unless you have any questions, I think that's what we're talking about.

**THE COURT:**  All right.  Let me see if the other side has any other comments.  If I have questions, I'll ask both of you.

**MR. WARREN:**  Thank you, Your Honor.  Neil Warren for Power Integrations.

Let me just begin by clarifying the answer that was given to one of Your Honor's questions.

If we look at page 2 of the patent, the Figure 1 and Figure 2, you asked whether or not the leakage is happening through the switch that gets turned off or whether or not it's through something else.  The answer is it's through something else.

If you look at these two and you compare it to what's in his '323 patent, the only thing that changed between the prior art and the new invention is the element 19 in Figure 1 was replaced with the CMOS inverter.

And so a CMOS inverter is well-known to be a two-transistor element.  So what he did was he swapped out a one-transistor element, which can have leakage, with a two-transistor element, which can have less leakage.

Everything else, in terms of the switch and in terms of the voltage stabilizer, is exactly the same.  The voltage

stabilizer 21 matches up with the voltage stabilizer 123.

And the inventor was very candid during his deposition that what his invention was, was replacing that -- this transistor -- these are all transistors -- the transistor 19 with two transistors of the CMOS inverter, 121 and 119, it looks like.  And that's what his invention was.  And it was to reduce leakage.

But what I want to emphasize here, and this is part of what's the key aspect of the case and what we just heard in this tutorial, is that there's an attempt by the plaintiff to equate their switch, right, this three-terminal switch, with Power Integrations' products which are power supply controllers.

If you read this patent, the '623 patent, you're not going to see anything about power supply controllers.  Okay.  You're not going to see elements of what actually makes a power supply controller, which has to do with how you know when to turn that switch on and off.

What we heard from the tutorial just now was that, you know, the switch turns on and off to regulate the power from the input to the output.  At a high level, that's true.  This is the element that they claim is the switch.

What Power Integrations' products are -- and I don't know if you have the exhibits in front of you or if I may hand up one of the data sheets.

**THE COURT:** Okay.

**MR. WARREN:** This is a data sheet for the TinySwitch III family of products, which is one of the accused products. As you'll see, it's a 24-page document that explains all the features.

And if you compare the five-element transistor device that we see in the '623 patent, this is not the same thing. And so when we talk about a switch that's in the '623 patent, that is not the same thing as what we're talking about when we talk about a switch in the Power Integrations products.

This is going to be an element disputed at trial. Obviously, the plaintiff wants to equate what their inventor came up with with our products, but they are not the same.

**THE COURT:** Well, isn't the question whether the invention is incorporated into the TinySwitch?

**MR. WARREN:** Yes, Your Honor. That's exactly right.

And so, now, this gets into the whole three terminal versus four terminal thing that was alluded to at the end.

And Mr. Suder directed you to that portion of column number 14. Now, he made a statement that the claim construction hasn't been disputed. The claims construction is what it is. We're not waiving, obviously, any disagreement with it. It is what it is.

But I would direct you to actually read what he directed you to. It does not say -- there's a couple of important

distinctions that I think were blurred in what was said.

The element of 14 doesn't use the word "only."  It says that three-terminal switches can include a fourth pin, parentheses, power pin, for normal operation and perhaps even enhancement purposes, but -- and here's the key part -- it must still operate, for example, as a failsafe without power supply to this fourth pin.

And so this is the language that the Court cited when it came up with the claim construction, which, just to refresh Your Honor, it defines a noninverting transistor switch having only three terminals.  That's the claim language.

And the construction is a noninverting transistor switch with three terminals that does not have a fourth terminal connected to a power supply.

So the key here, the factual distinction, and the thing the jury is going to hear about is, yes or no, do the Power Integrations products have a fourth pin connected to a power supply?

It does not have anything to do with normal operation. Okay.  That was the claim construction argument that they made, that it had to be somehow -- that it could operate only in normal operation.

But what the Court actually ruled on was a very black-and-white distinction.  It is not within the scope of the claim if it has a fourth pin -- fourth terminal connected to a

power supply.  That's the black-and-white distinction.

And what I direct you to is in the TinySwitch data sheet that I handed up, on the second page.  I'll let you -- let me know when you're --

**MR. SUDER:**  Can I get a copy?

**MR. WARREN:**  Absolutely.

**THE COURT:**  Yes.

**MR. WARREN:**  Just for reference, this is Trial Exhibit 14 that I've handed up.

The second page shows a block diagram of this chip.  And what I wanted to highlight for you is that, in the upper corners of this block diagram, there are four terminals, okay, four terminals.

So nobody is going to dispute -- the claim says only three terminals.  No one is going to dispute that the accused products all actually have four.  That's not disputed either.

What's disputed is whether or not they have a fourth pin connected to a power supply.  And so that is the dispute.

And we also dispute whether or not -- we don't actually believe that any of the elements of the claim, as you -- as you noted, Your Honor, it's whether or not the elements were incorporated into this product.  Actually, none of them are there.

But putting that aside for the moment, the easiest thing to show is that this has four terminals.  And when we look at

the cover page, there's actually a block diagram of a power supply at the very upper right-hand corner.

And what this diagram is showing is on the far left side is where the input comes in.  So this is where you plug it into the wall.  And on the far left side -- sorry, the far right side is the output.  That's what you'd connect to your laptop.

And in the middle there is this rectangle, which is labeled TinySwitch III.  That's Power Integrations' product.  You can see it has four terminals that are connecting to it.  And if you look at the one that's labeled BPM, it's connected to two little lines drawn in parallel and then to ground.  Those two little lines are what's called a capacitor, and that's what provides power.

So this is -- putting aside the fact that we disagree that we have anything to do with the patent, putting aside the fact that the patent doesn't have anything to do with power supply controllers, we are actually exactly what the Court has carved out in its claim construction, a fourth pin connected to a power supply.  And so that is one of the key issues you'll hear about.

**THE COURT:**  The question is whether capacitor constitutes a power supply within the meaning of the claim construction.

**MR. WARREN:**  That is, I suppose, one -- that is one dispute.  I think that their expert will say that it's not

connected to a power supply, and that he will say that the capacitor that's connected there isn't the power supply.

But what I wanted to emphasize is that all this stuff about normal operation and trying to equate the switch that's in the claim and the switch that's in their patent with the fact that our products include inside of them a switch, they are not the same thing.

And so, you know, in terms of a tech tutorial, I don't --

**THE COURT:**  But the main thing I glean from this tutorial is that what you're telling me is that the leakage, which is one of the problems that is addressed by the '623, occurs not through the transistor, not through the switch or the gate or whatever it is, but occurs through the switching circuitry around it.

**MR. WARREN:**  So let me make an important point.  The leakage that you hear talked about in Mr. Congdon's patent is actual leakage during operation around the switch through the CMOS converter.

That's completely different than the leakage you hear about when you hear about Energy Star or, you know, the fact that your energy vampire in the wall consumes power.  They may both be able to be described by leakage.  They are not the same thing.  They are not the same thing at all.

When a power supply operator is operating, it's drawing power to power the chip.  And there's certain amounts of power

that is -- when we talk about leakage, we mean does everything from the input get converted to the output?  Is there 100 percent conversion from what's on the input to the output?

The answer is no.  Especially during the no-load condition, you have to have some power that trickles in to power the circuitry of the device to know if it needs to supply power.  That's not leakage in the context of the '623 patent.  That is inefficiency.  It's what we talked about.

And, unfortunately, the press that has written about this considers it leakage, but what we're talking about are fundamentally different things.

The plaintiff's case is built around taking the marketing speech about leakage and saying our patent is about leakage, ah-hah, they're about the same thing.  They are nothing the same.

The leakage that happens in the TinySwitch III product, for example, is what is required to power the chip when nothing is connected.

So you would assume that if you leave the power supply connected to the wall and nothing is connected on the other end, you might assume that it draws no power.

That's not true because a tiny little bit of power is required to run the circuitry to detect if something is actually plugged in on the other side.

That tiny bit of trickle of power that comes in to keep

the circuitry -- not the switch; this has nothing to do with the switch because the switch isn't running at this time, but the power to keep that circuitry operating everything else that's in our chip, that's not their invention, that requires a small amount of power.

And there are certain inefficiencies that happen when you switch, but none of these, except for the fact that they use the same English work "leakage" in the media and Mr. Congdon's patent, have anything to do with each other.

Mr. Congdon's leakage that he's describing is a very specific problem that is associated with his own prior art '323 patent.  He came up with a three-inverter switch.

A transistor is a three-inverter switch, and so I can't tell you exactly why he thought that was an invention, but he filed a patent on a very specific circuit and he got a patent on a very specific circuit.

And his circuit of the '623 was aimed at reducing leakage that occurred in his prior art very-specific circuit.  It has nothing to do with Power Integrations' products, and it has nothing to do with the leakage that occurs from what we describe in the media as energy vampires.

**THE COURT:**  But the leakage that is addressed in the '623 pertains to the amount of current that flows through either the -- what used to be number 19, the transistor switch, as opposed to the dual transistor switch, which is 121 and 119,

is what you're telling me.

MR. WARREN: Yes, that's correct.

THE COURT: So if the prior art was used -- prior art being the '323 versus the '623 -- all in all, whatever uses this circuitry is going to use more current in the off position.

MR. WARREN: Yes. It will have more leakage. And it's not just during the off position. This circuit right here --

THE COURT: Whether it's off or on, there's going to be more leakage.

MR. WARREN: Yes. If you compare the use of his '323 circuit with the use of his '623 circuit, you will probably see a reduction in leakage, which is the constant leakage.

Because these are passive elements, you're going to constantly get some leakage to run these -- the elements that are on the left-hand side of the circuit. And you can block that leakage more effectively using the CMOS inverter.

But what's important is that that's not what is the leakage when we hear about energy vampires or anything else. That's the plaintiff locking onto the same English word being used and using it to, you know, make their case in a patent litigation trial. But it is not the technology.

THE COURT: All right. Well, this helps me acquaint myself a little bit with the technology.

I'd like to now hear a little bit about what this trial is going to look like without turning this into a full opening statement.  But I'd like to know, essentially, what is the gist of the infringement claims.

And we'll get into this.  Given the ruling which I am going to reaffirm with respect to the exclusion of Dr. Evans -- we're not going to change that; I've looked at it independently and believe that Judge Orrick was correct -- how are you going -- and this gets into the papers you filed, too, is, what are you going to put on in terms of damages?

So I'd like to hear a brief synopsis of what your case is going to look like.

**MR. SUDER:**  Yes, Your Honor.  And let me say also, and I guess Mr. Warren can confirm, but they advised me before you came out that they are dropping their invalidity challenge to the patent and conception.

**MR. WARREN:**  That's correct.  So during the trial the issues will be noninfringement or infringement and damages.

**THE COURT:**  Oh, okay.  That was one of my questions, because we had all these instructions that were disputed about -- I was going to ask you about the niceties and differences between anticipation and prior invention.

So I'm glad to hear that we don't need to fuss with those instructions.  Is that right?

**MR. SUDER:**  Yes.  That would eliminate a lot of the

instructions.  All the stuff about obviousness comes out.  And at some point -- you tell me if I should do it at the start of trial -- we would ask for a judgment on their counterclaim of invalidity.

THE COURT:  Wait.  So you are not asserting invalidity?

MR. WARREN:  Correct.  At trial, we're not going to present evidence to challenge invalidity.

THE COURT:  So that includes obviousness.

MR. SUDER:  Written description.

THE COURT:  Right.

MR. SUDER:  Anticipation, obviousness.  Everything that they have the burden on, yes.

THE COURT:  All right.

MR. WARREN:  The flip side of that is that we believe that also takes out of the trial priority.  So throughout the trial there's been a lot of evidence presented on priority and the challenge over priority.

THE COURT:  Right.

MR. WARREN:  We don't believe that there's any reason now for that evidence --

THE COURT:  I don't see that either.  Because that only relates to -- statute of limitations is not at play because that's -- doesn't go back no matter what.

It only comes into play -- priority comes into play only

if you were talking about anticipation, et cetera. And now that that's out --

MR. SUDER: Yes, Your Honor, with one caveat. It's important that the inventor be able to explain his invention and what he was doing, and put it in context, and that he wrote it down.

I mean, if we're going to be on the clock, that's my time, but I think it's important that the jury see that this is an inventor and what he did in terms of getting the patent and how he studied it. It's not that he just thought of this one day and, voila, he has a patent.

So I believe that a fair amount of latitude and just having him explain --

THE COURT: Well, some background is fine. I don't think we need to spend hours and hours on that, but -- at some point we get into more of a 403 kind of issue. But I'm going to allow some context, background, the difference between the '323 and the '623. I mean, that's fair.

MR. WARREN: Yes, Your Honor. And I think the context this comes up in is, A, we have a witness, Mr. MacKillop, who is -- given the history here, there's a summary judgment presented on -- on --

THE COURT: The question about the signatures on the drawings.

MR. WARREN: Right. And so Mr. MacKillop was allowed

late into the case, after discovery, for the purpose of authenticating his signature.

He had a time-limited deposition.  I took his deposition, it was two hours.  We only talked about the signature and some minor other things.  But he was only offered and only allowed into this case at the very last minute, after summary judgment, for the purpose of validity.

So we don't see -- what we're worried about is that he was not part of the normal fact discovery.  If they call him, we're not -- you know, and ask him questions outside of, you know, authenticating his signature, which no longer has any relevance, he becomes kind of an open question about what he's going to say.

And he wasn't subject --

THE COURT:  Well, let me ask, are you going to, in your cross -- is it Dr. Congdon, or Mister?

MR. SUDER:  Mr. Congdon.

MR. WARREN:  Mr. Congdon.

THE COURT:  In your cross of him, will you question the authenticity of -- if you're not going to question him on cross, then I don't see the need for an independent witness, because he was there for corroboration.

MR. SUDER:  We -- not for corroboration, but in terms of background and context, they've worked together, he knows him as a true inventor.

**THE COURT:**  Yeah, but Mr. Congdon can testify to that.  I don't know why you need somebody to --

**MR. SUDER:**  Because, Your Honor, when you meet Mr. Congdon, and you see what they're going to do, why they don't want Mr. MacKillop -- he is an inventor in the -- in the strangest sense of the word.  And he's older.  He has some health issues, some stuff.

And just to put him in context that this is a real inventor, we intend to put Mr. MacKillop on --

**THE COURT:**  He's not able to explain his invention?

**MR. SUDER:**  He can, but he's not -- this is why they want him out, because they took Mr. Congdon's deposition two or three times on issues, because Mr. Congdon -- he has bipolarity, Your Honor.

And he's -- it's just that Mr. MacKillop, for very short -- just to explain, I worked with him, I saw this, he's devoted his life to this field, and he's a real inventor.

One of their trial things, Judge, is that he's just an inventor, he hasn't done anything.  They're going to try to minimize who he is and what he is.

And so Mr. MacKillop is going to be less than 15 minutes, at the most, just to explain, I've worked with him, I saw it, he showed it to me, I've seen his work and, yeah, he -- he does this regularly.

**THE COURT:**  So he's sort of there to amplify and

support what Mr. Congdon would say.

And you're telling me, because he's a problematic witness because of some, perhaps, mental health conditions, that this is an exception to the normal rule that a witness can testify on their own and doesn't need help?

**MR. SUDER:**  Yes.  And it would be very -- I'm going to be on the clock, so it's in my interest to keep it short.

**THE COURT:**  Well, I think I'm going to have to see Mr. Congdon's testimony.  If it is apparent that he's having trouble with clarity for reasons that are, in my view, not just based on credibility issues but health issues or something along those lines, I would consider allowing, perhaps, brief testimony from Mr. MacKillop.

Normally, I would not, because I don't think it's that relevant here now that we don't have priority as an issue.

**MR. WARREN:**  Well, what -- Your Honor, a couple of comments on that.  The problem with that is exactly what I said.  He wasn't here during fact discovery, so we don't know what he's going to say.

And it's completely prejudicial to allow him to now come up and amplify something Mr. Congdon said, who, by the way, this is the first time I have ever heard that Mr. Congdon has mental health problems.

**THE COURT:**  Well, that hasn't come up at all in any prior --

**MR. WARREN:**  No, it has not.  And, in fact, at his deposition I'm sure I asked him, do you have any problems or any reason you can't testify, and he said no.  Right.  This has never once come up.  This is all being sprung on us right now that he has mental health problems.

He is older, but he has been deposed and sat through the deposition numerous times.  He did fine.  And there's no -- there's never been -- during fact discovery it was never disclosed that he has bipolarity or anything else.  I'm not aware of a medical diagnosis.  I don't think Mr. Suder is qualified to make that medical diagnosis.

And this is exactly what I was worried about, because if you let Mr. MacKillop come in when he wasn't disclosed during fact discovery -- if they had disclosed at the beginning of this case Mr. MacKillop, who's going to provide information about X, Y, and Z and help amplify the testimony, that would be one thing.  He has never been disclosed as a witness in this case.

**THE COURT:**  All right.  Let me ask, why -- if you knew about Mr. Congdon's mental health problems, one, why wasn't it disclosed previously; and, two, why didn't you name Mr. MacKollop --

**MR. SUDER:**  MacKillop.

**THE COURT:**  MacKillop.

**MR. SUDER:**  Your Honor, on the mental health issues,

we were not aware of it.  It's not something -- until recently, until Mr. MacKillop's deposition and he told us.

**THE COURT:**  He's been through depositions.

**MR. SUDER:**  Yes.

**THE COURT:**  I assume you talked to him prior to depositions.

**MR. SUDER:**  Yes, yes, yes.  But, Your Honor, I guess the best evidence -- you'll see for yourself he's a lovely man. He's a nice man, he's an older man, but he just has -- sometimes he has a little trouble staying on task.

But, Your Honor, Mr. MacKillop was examined.  How long have you known him?  Did you all work together?  What did you do?  It wasn't, Did you sign this?  Okay.  Thank you.  No more questions.

They spent two hours with Mr. MacKillop going through --

**THE COURT:**  So he was deposed?

**MR. SUDER:**  Yes.

**MR. WARREN:**  Mr. MacKillop was deposed at a two-hour deposition for the limited purpose of finding out if there was fraud or something.

Judge Orrick had some concern that there was -- you know, Mr. MacKillop had given this declaration, it came out of the blue, we didn't know anything about this guy.  And so he let us take a two-hour deposition that -- and let us inquire into whether or not this was a real declaration and --

**THE COURT:** What would he testify to that he wasn't examined on? What's he going to testify to specifically?

**MR. SUDER:** He wasn't examined on nothing, Judge. How long have you known Mr. Congdon? Did you work together? Everything that was -- I'll be glad to furnish the transcript to the Court.

And I'll agree that if I go beyond that, that I should be admonished in front of the jury. We're not going -- this isn't for surprise. It's just part of the context.

**THE COURT:** So you would confine your direct to the matters that he had been subject to deposition?

**MR. SUDER:** Absolutely, Judge.

**MR. WARREN:** If this is for mental health, then why is Mr. Congdon testifying at all?

**MR. SUDER:** It's not for mental health.

**MR. WARREN:** This is -- so we would request that, you know, if Mr. Congdon -- first of all, what I just heard from counsel is that they only found out about Mr. Congdon's mental health problems from Mr. MacKillop, which is -- I mean, first of all, who is Mr. MacKillop to make that diagnosis? This has come out of the blue.

If there are serious mental health problems with this guy testifying such that he has to have somebody else for the sole purpose of amplifying his testimony, that's a bigger problem than, you know, this one witness.

And it certainly can't serve as a justification for this witness without some proof that he has that mental health problem, that -- I mean, we're hearing about this for the first time.  It's kind of outrageous.

And we only hear about it because they found out about it from Mr. MacKillop.  The deposition of Mr. MacKillop was a long time ago.

**THE COURT:**  Well, let me ask you this:  With respect to the matters on which Mr. MacKillop would testify to, which is not the damages stuff or any of that, it's about the invention, I mean, the invention sort of speaks for itself.

We have the patent, we have the application, we have the notes, and now we have the claim construction, which I'm also going to reaffirm, from Judge Gilstrap.

I'm not sure -- this was all -- we're talking about background, just give -- so I'm not sure why we need to bolster testimony just for background information, because the key questions on infringement are going to be things we talked about; this fourth terminal, does it hook up to a power supply or not, et cetera, et cetera.

I'm not seeing where this general testimony -- other than general background --

**MR. SUDER:**  That's all it is, Judge.  And I'm not -- for the record, I'm not claiming there's a mental health issue with Mr. Congdon.  I'm just telling you that he is -- he's

fine.  He takes medicine, and he's fine and lucid and clear and he'll be fine.

But I just wanted to be fair to the Court.  I didn't want to spring this in the middle of trial.

**THE COURT:**  Well, all right.  Based on what I've heard, I'm not going to allow the testimony of Mr. MacKillop. I don't think it's necessary.  It's no longer relevant since priority is no longer an issue.

To the extent it is relevant at all, it really is to sort of bolster the credibility testimony of Mr. Congdon on just general background information.  It really doesn't go to the critical issues, as I perceive it to be, with respect to infringement or not.

So I don't think it's relevant, I think it would create more issues under 403, and so I don't see the need for his testimony at this point.

**MR. SUDER:**  Yes, Your Honor.

**THE COURT:**  So let's hear -- what are the issues then on infringement?  Besides -- I hear one of them now is this question of whether the fourth terminal and TinySwitch III is really looked up to a power supply or not.

And I kind of understand that issue.  There's a debate about whether capacitor stores energy and, therefore, constitutes, quote, a power supply, et cetera, et cetera.

**MR. SUDER:**  Your Honor, good for you.  That is the

exact issue.

Our expert is going to say that a capacitor is a cup of water and when the cup is empty you can't drink from it.  So this is a power supply?  And that's going to be -- that's for the jury to decide.

**THE COURT:**  Is that the key issue on infringement?

**MR. WARREN:**  No.

**MR. SUDER:**  They have an issue on everything, but that's one of the -- that's one of the noninfringement.

**THE COURT:**  That's one I kind of understand.

**MR. WARREN:**  Right, Your Honor.  So I think that the -- the other issues on infringement, we're not waiving any of the elements.  We actually believe, if I just reference the claim, so certainly the preamble of the claim that has the only three language, and then after that, there are set out three sub elements, A, B, and C.

Now, we get into some other issues when we talk about the voltage stabilizer.  There are also other issues with the complementary metal-oxide semiconductor inverter, which is the CMOS inverter.

As you may see, there is a claim construction about the voltage stabilizer having to provide a constant voltage.

**THE COURT:**  Yeah.

**MR. WARREN:**  You know, in our opinion, there's certainly nothing in our product that provides a constant

voltage.

THE COURT:  Is the key what "constant" means?  Whether it provides --

MR. WARREN:  No, it's really not.  We're not even in the ballpark.  It's not providing -- the elements that Mr. Congdon lists in his patent are nothing like our product.

And now there has been -- the plaintiff has done some box drawing, but we will argue that the boxes that they draw things around at various points, somewhat random points, in our product have nothing to do with the actual construed elements and what has to be done.

And the same is true with the CMOS inverter.  There's actually a statement inside of this patent -- and I don't remember the exact cite for you -- where Mr. Congdon talks about how this is a special CMOS inverter because it's not connected to the rail and ground as a normal CMOS inverter is because he has this special connection to his voltage stabilizer and so, you know, what my invention is, is not using CMOS inverter in the standard way.

If you look at our products, of course, they're used in exactly the standard way.  We're not doing anything like Mr. Congdon did.  So at the end of the day, fundamentally, there's actually none of the elements that are met, in our opinion.

THE COURT:  So the jury will be asked to look at each

of these elements, and there's going to be some dispute besides the power supply question; for instance, the configuration of the CMOS inverter?

**MR. WARREN:**  Well, so what I can tell you is that the four versus three and the power supply thing will be the vast majority of our presentation.

**THE COURT:**  All right.

**MR. WARREN:**  We're not waiving anything or admitting any of the other elements.  And so, for example, you know, if they cross our expert and say, well, you didn't spend very much time talking about this, you must think it's met, of course, he's going to say, no, in my opinion, in my expert report I said it wasn't met.

But in terms of our trial presentation, we certainly will be focusing on the clearest, you know, most plain reason, you know, that this thing says it has to have only three terminals, and we don't have only three terminals, so we're not sure why we're here.  But that's what we'll be arguing.

**THE COURT:**  Okay.

**MR. SUDER:**  For the record, their expert does not dispute that there's a transistor.  They don't challenge the second element in their report.

But, Your Honor, this is so clear they didn't move for summary judgment on infringement.  They moved on everything else.

**THE COURT:** All right. Well --

**MR. WARREN:** Yes, we did move for summary judgment on noninfringement.

**THE COURT:** But it wasn't granted.

**MR. WARREN:** That's correct.

**THE COURT:** So on the witness list, if we remove Mr. MacKillop --

**MR. SUDER:** MacKillop, yes, Your Honor.

**THE COURT:** -- you still have Brunell, Congdon, Dr. Zane, and Vowell?

**MR. SUDER:** No, Vowell was one of my young partners that was going to prove up -- that's unnecessary.

**THE COURT:** Okay.

**MR. SUDER:** Yes. We have three witnesses, and we have three of the defendant's witnesses that are all here live. They're within jurisdiction.

So we'll be putting on hung -- Mr. Kung, excuse me -- Mr. Kung, Mr. Sutherland, and Mr. Walker.

**THE COURT:** You'll be calling those as adverse witnesses in your case-in-chief?

**MR. SUDER:** Yes.

**THE COURT:** And you will be --

**MR. WARREN:** Well, this is the first we've heard about Mr. Kung, certainly. So we understand that Your Honor's strong preference is that a witness only testify once. We are going

to be calling those in our direct case.

We'd ask if the plaintiff wants to cross them or call them, with the exception of Mr. Walker -- we understood that Mr. Walker would be called only in their case, he would not be called in our case, but Mr. Sutherland and Mr. Kung will be called in our case.

And we'd ask that, you know, they only be called once, especially for Mr. Sutherland, who, due to prior conflicts, is only going to be available on Friday.  So he can only testify, given the way this trial -- the date was changed, he's only available on Friday, which we've notified the plaintiff of.

So he would be testifying on Friday, which given the timing, puts him during our case.  We're perfectly happy to let the plaintiff hold their case open if they believe there's information they need to get from either of them.

Mr. Kung will be, obviously, testifying at the beginning of our case.  And so he -- if they want to cross him on whatever they need to, we're perfectly willing to have them hold their case open during that so that we only have to call each witness once.

**MR. SUDER:**  Your Honor, I notified -- I don't know Mr. Warren, but Mr. Headley and I have spoken.  Mr. Kung has always been part of our case and he was going to be there, and Mr. Walker was going to be part of our case.

They said I did not need to subpoena them.  And they did

say Mr. Sutherland was going to be on Friday, and I said that's fine.

**THE COURT:**  So the question is whether you would call them during your case-in-chief and leave your case-in-chief open until they call him and then you use your -- you resume your case-in-chief during cross.

**MR. SUDER:**  Your Honor, as the plaintiff, they're here, I need them -- I offered that Mr. Kung -- if we could stipulate on some product summaries, which I think are already in evidence anyway, that I would not need to call Mr. Kung in my case, but we have not reached that agreement.

So I need --

**THE COURT:**  Otherwise, you would call him in your case-in-chief and then he could be recalled --

**MR. SUDER:**  Yes.

**THE COURT:**  -- or, alternatively, you could use your cross as direct --

**MR. WARREN:**  He's our primary witness on this stuff. He's coming in our case.

**THE COURT:**  Well, all right.  He's going to be around. So the only -- he can be called twice if needed.

The question is, Mr. Sutherland is only here on Friday, so he has to be called wherever we are in this case at that point.

**MR. WARREN:**  Yes.

**MR. SUDER:**  I've said that's fine.

**THE COURT:** If you're already done with your case, you'll hold it open for him.

**MR. SUDER:** Yes.

**THE COURT:** And if you're not through with your case, you'll call him. And if you want to use your cross as part of your direct case-in-chief so you only call him once, you can exceed the normal scope of cross, if you want to do that, or if you want to call him separately, I'll leave that to you.

**MR. WARREN:** We'll be calling him separately, I believe.

**THE COURT:** All right. So we've got -- looks like six witnesses; right? That's nice and compact.

**MR. WARREN:** On our side, it will be Mr. Kung and Mr. Barnes at the end. I'm not sure of the count on the six.

**MR. SUDER:** Bohannon.

**MR. WARREN:** Bohannon, Sutherland, Barnes.

**THE COURT:** Oh, right. Okay. So that's Barnes, Bohannon --

**MR. WARREN:** Barnes, Bohannon, Sutherland, whenever he gets called.

**THE COURT:** So there's two expert witnesses and six percipient witnesses, essentially.

**MR. WARREN:** Yes, Your Honor.

**THE COURT:** Okay.

All right. Let's talk about what the damages to this --

what you briefed, and let's talk about where we are with that.

So the first question I have is:  Your main witness will be Mr. Congdon; right?

**MR. SUDER:**  Mr. Brunell.

**THE COURT:**  And what will Brunell -- what will he testify to?

**MR. SUDER:**  He is the representative of the company that now owns the patent.  How he met Mr. Congdon, how they evaluated it, what he did to acquire the patent, why he acquired the patent, why he brought this lawsuit on behalf of him and Mr. Congdon.

**THE COURT:**  And did he acquire -- remind me -- this -- I guess as a standalone, the '623, was it a part of a package --

**MR. SUDER:**  He bought the '323 and the '623.  He bought Mr. Congdon's portfolio.

**THE COURT:**  Was there more to the portfolio or just those two?

**MR. SUDER:**  There was -- the products that he had an inventory, the bit parts that he'd sold, because Mr. Congdon had a company, qbar, and then bit parts when qbar shut down, was what held the inventory.  And so they did buy -- they bought lock, stock, and barrel.

**THE COURT:**  All right.  In terms of the intellectual property, it's the '323 and the '623?

**MR. SUDER:**  Yes.

**THE COURT:**  And that was all bought at the same time?

**MR. SUDER:**  Yes.

**THE COURT:**  Mr. Congdon will opine -- attempt to opine, at least, as to a specific royalty number, a percentage number --

**MR. SUDER:**  No, there'll be no opining.  He will testify as to the qbar license, how it came about, the rate, how that came about.

Mr. Brunell will testify that he evaluated that royalty agreement when he acquired the patent and what -- what factually that entered into his decision-making to acquire the patent and assist Mr. Congdon in enforcing the patents.

**THE COURT:**  All right.  Tell me a little bit more about the qbar license.  Qbar, was it controlled by Mr. -- owned and controlled by --

**MR. SUDER:**  It was owned by Mr. Congdon and a partner.

**THE COURT:**  And a partner.

**MR. SUDER:**  Yes.  And, Your Honor, just so you know, qbar -- Q, my understanding, is the sign in engineering for transistor or switch, an inverted Q.  And then the bar means that it's inverted.  So it's kind of a play on a technical name, why he came up with that.  He didn't just call it the ABC company.

**THE COURT:**  Yeah.  And did he control that negotiation

over the '323?

**MR. SUDER:**  Did he control it?  I'm -- he worked with his partner, Mr. Travathan, who was Canadian, who was the business side of the agreement.  And they owned qbar together.

**THE COURT:**  But the business partner did not otherwise own -- have an interest in the '323?

**MR. SUDER:**  Correct.  The -- qbar was a company with Mr. Congdon and Mr. Travathan.  I don't know if there was another person involved.  If there was, it was very minor.  And they then took a license from Mr. Congdon to make products under the '323.

**THE COURT:**  What was the product or products?

**MR. SUDER:**  It was called a QBT.  It was -- it was a three-terminal switch.  And he sold it to companies, had some minor special success.  And it's no secret, he ran out of money.

**THE COURT:**  So this is a switch that was then incorporated into larger products?

**MR. SUDER:**  Yes, yes.

**THE COURT:**  So it was commercialized --

**MR. SUDER:**  Yes.

**THE COURT:**  -- through qbar?

**MR. SUDER:**  Yes.

**THE COURT:**  And what will -- obviously, one of the things the jury will have to consider the comparability or not

with respect to --

**MR. SUDER:**  And that's what Mr. Zane will testify to.

**THE COURT:**  On the technical level.

**MR. SUDER:**  Yes.  And on the economic level, it is -- you have Mr. Congdon and Mr. Brunell saying -- evaluating what they considered in evaluating what it is that they were trying to do and whether he could license it and who he was selling to.

But the comparability is -- Dr. Zane will say that it's a comparable license for purposes of the technology at issue and that, in fact, it's an inferior product.

**THE COURT:**  Right.  I take it he's not going to try to quantify what the increased royalty value might be --

**MR. SUDER:**  No.  No.

-- due to the technological improvement.

**MR. SUDER:**  Yes.

**THE COURT:**  That's something that will be left for the jury to determine.

**MR. SUDER:**  Exactly.  Exactly.

And the Court will instruct the jury on the *Georgia Pacific* factors.  I think we've submitted an agreed charge on that, on its form, and the jury will apply that in hearing the evidence.

**THE COURT:**  Let me ask you -- I know you want to use the summaries to establish as a base the sales --

**MR. SUDER:**  Yes.

**THE COURT:**  -- but there was a figure -- and I think Dr. Evans was going to try to use this -- that 30 percent of these sales were U.S. sales, which would be subject to the royalty.

**MR. SUDER:**  And that's why we're calling Mr. Sutherland.

**THE COURT:**  So you intend to obtain that 30 percent through Mr. Sutherland?

**MR. SUDER:**  Correct.  In fact, Mr. Evans relied on Mr. Sutherland's 30(b)(6) testimony in coming up with that figure.

**THE COURT:**  All right.  Your response.

**MR. THORNBURGH:**  So, Your Honor, we -- and I should say I'm John Thornburgh on this issue.

We have put our thoughts in writing.  We would start by saying that Your Honor's question about Dr. Zane, will he be focused on technical comparability, and I think I heard counsel say yes.

And that's our understanding as well, and that they actually do not have any witness who can compare Power Integrations with its billion dollars' worth of sales to qbar and its almost zero sales.

And so the issue is whether or not a 2 or 3 percent license to your own company with a partner for a company that

has little or no sales is economically comparable to a hypothetical license to, you know, the leading company in the field that -- in this case, you know, they're talking about a billion dollars' worth of sales.

That's the thing about percentages, that they're a little bit misleading.  You say it's 2 percent, it's always 2 percent, but 2 percent of a billion is a lot more.

**THE COURT:**  You will certainly make that argument to the jury, I anticipate.

**MR. THORNBURGH:**  We would make it to the jury, but we think that the Federal Circuit has stepped in in this area and said that the Court has a gatekeeping responsibility, when it's just not comparable, that they -- it's the plaintiff's burden to come up with some evidence that would apportion it down.

And they have no downward adjustment to say, okay, fine, it's 2 percent for this little company.  Given Power Integrations is so much bigger, we need to adjust it downwards. Then you do some calculations, you look at the circumstances.

And they don't have that witness.  Maybe Mr. Evans could have been that witness, but he's been excluded.  And he never offered this theory to begin with because this is what they came up with after he was excluded.

**THE COURT:**  And just to affirm, as I understand it, that Dr. Evans based his analysis on the Fairchild verdict, not on the qbar.

MR. SUDER:  Yes.

THE COURT:  It was background, but it was not.  And so this is sort of new in that sense because you've had to adjust now because of Judge Orrick's ruling.

MR. SUDER:  And we're just relying on Evans.  And since Mr. Evans' report, Your Honor, is -- you may not know the full circumstances -- on our exhibit list is a license that they did with their subsidiary.

That's called a license agreement for all of their products, including the products we've accused at a much, much higher rate.  And they want to say it's between two companies and related, but that's all for the jury.

And we're not asking for that much higher rate, but it does show you that there is evidence that -- and we --

THE COURT:  I'm going to get to the evidentiary objections, the bellwether things.  We'll talk about that.

MR. SUDER:  Yes, Your Honor.

THE COURT:  But your argument is -- are you saying there should be essentially a non-suit or -- because of a lack of noncomparability here?

MR. THORNBURGH:  So --

THE COURT:  What are you asking for?

MR. THORNBURGH:  So what we're asking for, to be very precise, is we're asking for the Court to exclude evidence of PI's total accused revenue because they have not laid the

foundation that the Federal Circuit requires.

They can't invoke the entire market value rule because they don't even claim that this feature is the basis of demand. They have failed to --

**THE COURT:**  Well, I'm not sure that they're really seeking the entire market theory.  I mean, to the extent that -- if they're basing it on a comparable license and putting aside factual questions whether there's enough comparability here, you can sort of make a reasonable case, normally, if something is a comparable license, as the *Commonwealth-Cisco* case kind of points out, it sort of incorporates an allocation as between patentability or patented and nonpatented elements.

So if the patented device is only a small part of whatever the unit is, that's -- that's going to be reflected in the fact that, instead of 70 percent or 50 percent or 25 percent royalty, it's a 2 percent or 1 percent.

So, I mean, it's -- I don't necessarily see that they are seeking the entire market value if they're trying to use the qbar license, which was, what, 2 to 3 percent.

**MR. SUDER:**  Yes, Your Honor.  That's entirely right. Yes.

**MR. THORNBURGH:**  So that's --

**MR. SUDER:**  All we're doing is we're saying evidence. Judge Orrick said there's evidence in the record.  And the fact

that we are free to argue what that evidence means is what lawyers get paid to do.  It goes to the weight.

And you asked the question.  They're trying to exclude our damage theory, but they're not trying to exclude the evidence. And so it's left for us, like in any case, to argue what we believe the evidence shows.  And that's all we are doing.

**THE COURT:**  So wouldn't it be left to you to argue, among other things, that the value of your -- the accused products derive from all sorts of other things, other aspects, other patents, other intellectual property, other features?

And even if there was an element here, switch circuitry, that was found to be infringing, it is just a small part and, therefore, compared to the product that the QBT -- which apparently the whole thing was a switch -- it leaves it to you to then argue that there ought to be an allocation down. Right?

**MR. SUDER:**  Judge --

**THE COURT:**  I'm asking him.

**MR. THORNBURGH:**  Yes.  And if I can go back and answer your previous question at the same time, we -- when I was getting started on the entire market value, I agree with the Court it's agreed that that's not at issue in this case.

And so, yes, Your Honor, they are now down to arguing something like *Commonwealth*, which is a very rare case where the Federal Circuit said that under those facts a economically

comparable license could do the job of apportionment.  And in that case it's true.

But we have to recognize that there were benchmark licenses in the record in *Virnetex*, there were benchmark licenses in the record in *LaserDynamics*.  And so just because they have a license with a percentage in it doesn't get them past this problem of admitting our entire revenue.  The usual rule is they can't do it.

And so they have the burden of showing that they have taken into account the differences of the economic circumstances to allow them to do it.  And their argument for comparability is pretty much like the *Bio-Rad* case that they cited, where Judge Andrews, in Delaware, said you can say you have this other agreement and that takes care of apportionment, but just saying those words is not a magic wand, that they would actually have to do the work.

**THE COURT:**  Well, and it may be.  And it may be that when the jury looks at the criteria and you make your argument and your presentation, the jury may conclude that not comparable at all, you can't -- you can't just simply transfer the 2 to 3 percent of a QBT product, whatever it's called, to the entire line of accused products that PI does; and, therefore, even if there is infringement, it's not going to be anywhere near the 2 or 3 percent.

What you're asking for is to exclude what would be

essential to any royalty analysis; that is, that you really couldn't even get in the front door if you don't have the base. If you have a royalty rate, you've got to apply it to something.  And you want to exclude the sales figures, which would essentially be like a nonsuit on damages.

**MR. THORNBURGH:**  For example, in *Virnetex* it was reversible error to give the jury this question, and we don't think this is an appropriate question for the jury.  We don't think it's a nonsuit as to damages because the Federal circuit has also said you can't do that.  So I --

**THE COURT:**  Does it have the net effect of, essentially, if you don't have -- you need two things to multiply, and if you're missing one element, there's nothing to multiply?

**MR. THORNBURGH:**  There are other kinds of royalties. There can be lump sums.  So, for example, Mr. Brunell paid $15,000 for this portfolio.  That would be admissible.  And they could argue that the patent is worth $15,000.

**MR. SUDER:**  Mr. Barnes, their expert, says that.  And he'll be able to put out all of his qualifications that he's an expert, that he did all this, and in his opinion that's all this is worth.

They have an expert that --

**THE COURT:**  Well, let me ask you, if I were to admit the summaries that allows the total sales to be multiplied by

whatever number, if the jury came to that, I mean, you can then move for a verdict -- judgment notwithstanding the verdict, et cetera, et cetera.  I forget what it's called now --

MR. SUDER:  JMOL.

THE COURT:  -- in state court.  JMOL.  I'm still used to state court terminology.

So the risk is what you want to avoid -- you don't want to see that number out there put in front of the jury because you think that that will -- could prejudice your position if, for instance, they go for a lump sum or they -- and they see the numbers.

MR. THORNBURGH:  Right.

THE COURT:  It's really a prejudice issue.  There's a remedy if you think that, as a matter of law, at the end of the evidence they really didn't prove sufficient comparability, et cetera, et cetera.

MR. THORNBURGH:  Your Honor, we agree that there's a prejudice issue, but there is also a substantive rule.  The *Ericsson* case explains that there's two sides of this juris prudence.  One is exactly what Your Honor stated, which I think started with the *Unilog* case, where they're talking about skewing the horizon.

And it's just very much true.  If they start with a billion dollars, it will sound like, okay, what's a couple million.  The jury will be prejudiced and say, we might as well

give this sympathetic inventor a couple million dollars if PI has a billion.  That's the prejudice argument.

But the substantive argument is what you get from cases like *Virnetex*, which is, you know, the Federal Circuit had held as a matter of law it was wrong and impermissible to even consider Apple's total revenue because the plaintiff had failed to meet its burden of showing a proportioning.

**MR. SUDER:**  Your Honor, may I say something?

**THE COURT:**  Yeah.

**MR. SUDER:**  *Virnetex* involved this, and the total sales of the phone for limited functionality.  *LaserDynamics* was a laptop for a patent on a disc drive.  So those really have nothing to do with what we're talking about.

We're not saying they only make a switch.  It's a small saleable unit.  And that's what we're accusing.  That's what Jim Congdon made.  That's what they made.

So the *Virnetex* and *LaserDynamics* cases really don't apply in this situation.  We're not taking a larger device.  If -- if Power Integrations made the washing machines that had the disc and we wanted to include the sale of the entire washing machine, then *LaserDynamics* and *Virnetex* may have a place in this case, but that's not what we're talking about.

What they want is prejudice.  And this came up with Judge Orrick, is, do you start on the top number and work your way down, or can you start down and work your way up?  And

Judge Orrick said they can do it either way.  You just don't want to see --

**THE COURT:**  Let me ask you this:  Do you intend to elicit in your case-in-chief, let's say, before the tables are introduced in the summaries of the sales, why you think -- or why your client thinks that the licenses would be comparable, that there's sufficiently comparable technology or explain reasonably comparable economic circumstances, kind of -- I don't know if you call it *prima facie* case, at least making the *prima facie* case.

**MR. SUDER:**  Yes, that is Mr. Brunell and that is Dr. Zane.  And we cite the *Minks* case, Your Honor, out of the District Court, that was affirmed by the Federal Circuit, that this very situation happened.  And the plaintiff testified, and they didn't even have documents about, well, we talked about 20 percent royalty even though there was a written agreement for 4 percent, and the jury went with it because there was evidence.

And the Court made a great quote there, which we quoted, that "damage analysis is inherently speculative in what it is."  And that's part of the jury's decision.

But whether we start -- we're not going to come in -- and we already agreed with Mr. Thornburgh, before Judge Orrick, we're not going to come in and talk about that their total sales under the SEC filings are in the billions of dollars.

We're starting with the sales of the accused products. That's all we're doing.  We have agreed --

**THE COURT:**  What are the sales of the accused products?

**MR. SUDER:**  The sales of the accused products are 4 billion -- about -- it's 4 billion units with about a billion dollars in total revenue.  When you take the one-third at their average price, it's about 275 million.

So we're not talking about all the other products that they sell, all their other families of products, all the billions of dollars that they make.  We agree that's not our intent.

But we're talking about -- they gave us a spreadsheet to show this, and we're simply relying on the spreadsheet.  And that's what the 1006 summaries are.  They're simply summaries of literally thousands of pages of prices of the units that are accused.

**THE COURT:**  All right.  Here's what we're going to do: I'm going to start with the presumption that the summaries with the sales numbers will be admissible because I think otherwise it would come pretty close talking about -- tantamount to a nonsuit.

On the other hand, I'm going to listen to the testimony and see whether or not -- in terms of order of things, I want that to be the last part of the damages analysis.  You know,

your client will -- or your witnesses will put on the evidence about comparability, qbar, et cetera, et cetera.

If I find that this is not anywhere near the ballpark and there's no way that the jury would apply a reasonable royalty rate analysis, I may well find at that point that it's not admissible to bring in these figures.

So I'm going to wait, but I'm going to tell you right now my presumption is that it does come in, and any reasonable doubt is going to be brought in favor of the plaintiff because I don't want to preempt the jury in that regard.  And I'm not going to presume that they would be so prejudiced as to -- just by the numbers, as to skew the tables here.

**MR. SUDER:**  Your Honor, just so we're clear.  And thank you, but -- I understand.  What I believe -- so I don't want to conflate two different things.  Make sure we're all on the same page.

They're not disputing the number of units that they sold.  They just don't want the dollars.

**THE COURT:**  No, I understand that.

**MR. SUDER:**  Okay.  So I just want to make sure.

**THE COURT:**  I understand that.  And you represented that you're going to be able to put on at least a colorable case that there is a reasonable royalty analysis that could apply here based on qbar, licensing --

**MR. SUDER:**  Yes.

**THE COURT:**  -- and sort of -- I won't say transference, but extrapolation to this situation.  And so long as it's a plausible colorable case, I think the numbers come in notwithstanding the potential -- what you fear is prejudice, because I think the jury can also -- I'm going to presume they can follow the instructions.

On the other hand, if it is so wildly off that it essentially renders irrelevant these numbers, and the numbers at that point only have prejudicial value, no probative value, then at that point there could be a 403 problem.

But, again, I start with the presumption that those tables and those numbers will be admissible.

**MR. THORNBURGH:**  Your Honor, if I may clarify one thing.  We understand your ruling.  Obviously, we maintain our objection substantively and on the prejudice grounds.

There's an ancillary issue which is, we also disagree with the actual summaries, that we think that they are not representative of the case.  And that was another reason why these particular exhibits we flagged in Friday's filings.

Would you like us to talk about that now?

**THE COURT:**  Yes.  I thought there was a stipulation that the summaries were accurate.

**MR. THORNBURGH:**  There has not been yet, Your Honor.  We said that we would work with them -- if the Court ruled that the revenue was admissible, we would work with them to come up

with representative summaries.  But the TX 210 and 211 we don't think are that yet.

**THE COURT:**  Okay.  So what's the --

**MR. THORNBURGH:**  And I have copies if Your Honor would like me to --

**THE COURT:**  Is it 210 and 211 that's problematic?

**MR. THORNBURGH:**  Yes.  Yes, Your Honor.

**THE COURT:**  Now, there's a disc that had some tables, spreadsheets, 46 and 47, I think it was, or something like that.

**MR. SUDER:**  Yes.  Those are literally the thousands of pages.  And we're not offering those under 1006, we're just making them available.

**THE COURT:**  Okay.  So the key is 211, 210, which summarizes that?

**MR. THORNBURGH:**  Yes.  Yes, Your Honor.

**THE COURT:**  Okay.  By the way, these are dollars?

When it says "LinkZero Revenue Summary," these are dollars here?  265 million?

**MR. SUDER:**  Yes.  One is a revenue, and then there's a corresponding unit.

**THE COURT:**  But the revenue is in dollars?

**MR. SUDER:**  Yes.

**THE COURT:**  Okay.  All right.  So what's the dispute here about the accuracy?

**MR. THORNBURGH:**  So the biggest problem we have with TX 210 is that it includes products that were never accused by their technical expert, Dr. Zane.  And so we don't think these products should be included in the totals.

**THE COURT:**  Which products are those?

**MR. THORNBURGH:**  So in the Tiny III/Tiny-LT group, per the expert reports -- and I would refer to pages 19 through 25 of Dr. Zane's technical report -- that family should just be the TNY274 through 280 and the TNY174-180.

So the things that were added to the revenues that were not accused of infringement are the DAP021, the SC1011, the SC1128, the SC1129, the SC1138, and then the Tiny-PK family, including the TNY375-380.  So that's for one group.

For the next group, the LinkSwitch II grouping, according to Dr. Zane, should just be the LNK603-606, the LNK613-606, and the LNK632.  But they have now added DAPO21, Link CV family, including the LNK623-636 and the SC -- the part that starts with SC.

And then, finally, in the LinkZero AX grouping, that should just be the LNK584-586, per Dr. Zane.  But they have added the LinkZero-LP family, including the LNK574 and 576. And they've added the SPS1013P-TL.

**THE COURT:**  All right.  So what about that?

**MR. SUDER:**  Yes, Your Honor.

We took their corporate -- they produced the data sheets

for each of these families.  We took the corporate deposition of Mr. Kung and of Mr. Sutherland about how they operate. Mr. Kung was designated.

They told us that, for purposes of the patent, they all operate the same way within the family.

THE COURT:  So even though they're not named in Dr. Zane's, you're saying, deposition they are part of the accused family?

MR. SUDER:  And Dr. Zane said in his report that they are representative and they all operate the same way.  And Mr. Bohannon, their technical expert, is not saying that any of these operate differently.

And then when we took Mr. Sutherland's deposition, the spreadsheet was produced, the disc.  And he identified that they list all the products within each of the accused family and list the units and revenues from which we created the tally.

So they gave us this information, said it's representative, and now they're saying -- this is the first time we are hearing this, Your Honor, is here right now.  This is the first time we're hearing this, that these summaries are not accurate and these go beyond the scope of Dr. Zane.  Never said that before.

And when Mr. Evans gave his report and included all this information, they did not move to strike him or otherwise

challenge with their expert that this information was incorrect.

MR. THORNBURGH:  Several responses to that, Your Honor.  Our witnesses didn't say what counsel represents, so we disagree on the factual predicate.

If I can also hand up to Your Honor excerpts from Dr. Zane's reports, I think it might be helpful.

THE COURT:  Well, isn't the way to do this is to break this down further?  That is, there's some that are uncontroverted that are covered.

You can do a summary of all the ones that are expressly expressed by Dr. Zane.  Summarize those.  You may have different numbers.

And then you can have a second table -- and this may be in dispute -- that you will claim that these are also infringing. And if they're identified in the complaint, they're identified in your infringement contentions, even if they were not expressly opined on by Dr. Zane.

You know, what the jury finds, I don't know.  But it will give the jury a chance to see that there may be some differential between these two groups of products.

MR. THORNBURGH:  And, Your Honor, we would object to that because they are not in the infringement contentions.  We think these parts are actually different.  But whether or not they're the same, they're not part of this case because they

were never identified by the plaintiff as accused products in any form.

**MR. SUDER:**  Your Honor, we accused representative products.  We took the deposition -- that's why we want to call Mr. Kung in our case, is to establish that all of these accused products within each of those four families operate the same way.

They're different sizes, they're different dimensions. But in terms of their core functionality as it relates to the claims, they all operate the same way.  That's what we intend to use Mr. Kung for.

And then Mr. Sutherland in our case is to prove up the spreadsheet and say, yes, I printed this out; we took all the products in these four families that have been accused of infringement, and here's the sales figures.

**MR. THORNBURGH:**  And the problem with that, Your Honor, is that Dr. Zane did use representative products, but he did not ever say that these products are represented.  They're not in the represented group.

**MR. SUDER:**  Dr. Zane applies the data sheet for each of the four products.  And then say all these products --

**THE COURT:**  What I'm going to ask you to do is -- because you didn't really lay this out in this level of detail in your objections.

I want you to file supplemental briefs by tomorrow on

those subject -- I want you to file supplemental briefs by tomorrow identifying on the defense part those products that you think are not covered by this lawsuit either because they're not sufficiently identified in the infringement contentions and not identified with sufficient notice.

Now, Dr. Zane said this is an example, and I'm leaving the door open for other exemplary products. That may be one thing. So I would have to look at the language. I want you to identify those things and why you think they are not at issue.

And you, conversely, why they are at issue.

Meanwhile, I think you should prepare the backup as a summary to break it down to have two tables, sub tables, or 1006 charts, one for the disputed ones and one for the undisputed ones. That way if I rule one way or the other, you don't have to scramble last minute.

**MR. SUDER:** Yes, Your Honor.

**THE COURT:** So I'll have to decide that based on whether there's fair notice here.

**MR. THORNBURGH:** We'll do that, Your Honor. Thank you.

**MR. SUDER:** I still don't know which ones they say are covered and which --

**THE COURT:** Why don't you after this -- I'm going to assume everything is covered, but you convey exactly what you think are not covered.

**MR. THORNBURGH:**  We'll do that, Your Honor.

**THE COURT:**  Do that after this hearing.

**MR. THORNBURGH:**  We will do that.

And if I may just make one other point on TX 211 --

**THE COURT:**  Yeah.

**MR. THORNBURGH:**  -- if Your Honor has that, or I can hand it up --

**THE COURT:**  I have it.

**MR. THORNBURGH:**  -- it looks to me like a demonstrative.  It's not a summary of any sales records.  So I don't know why plaintiff is offering it and why it would be admissible.

**THE COURT:**  So why do you need the list of products?

**MR. SUDER:**  Your Honor, these are the products that Dr. Zane will show all operate the same way based on the TinySwitch III data sheet that was produced.

It is a demonstrative, but it's also -- there are a lot of products, but for purposes of the representation, this data sheet and this schematic applies the same way to all these products.  Otherwise, we'd be doing an infringement analysis on each and every one of those.

**THE COURT:**  Well --

**MR. SUDER:**  It's just simply --

**THE COURT:**  It's not a summary.  It's not a 1006. It's essentially a demonstrative that might be adopted by your

witness --

**MR. SUDER:**  Well --

**THE COURT:**  -- testimony.

**MR. SUDER:**  It is a summary of the information on that disc, Your Honor.  We've taken all the products on that spreadsheet within the family group and simply listed them without the dollar figure units.  So it kind of fits into both buckets, if you will.

**THE COURT:**  All right.  Well, I will allow it because -- it may not come in unless he testifies to what the relevance of these things are, what they aren't, and his opinion that each of these are infringing products, then you essentially have a summary document.

**MR. SUDER:**  Yes.

**THE COURT:**  All right.  I had some questions on -- let's see.

**MR. SUDER:**  Your Honor, you want both briefs submitted by --

**THE COURT:**  Tomorrow, 5 o'clock.

**MR. SUDER:**  Yes, sir.

**THE COURT:**  Now I'll address some of the objections. She needs a break.  Give me a chance to get my evidence together here.  We'll take a 10-minute break.

**MR. THORNBURGH:**  Thank you, Your Honor.

**MR. SUDER:**  Thank you, Your Honor.

(Recess taken at 4:02 p.m.)

(Proceedings resumed at 4:14 p.m.)

**THE COURT:**  All right.  I had a couple of questions on some of the matters that you had highlighted in terms of the bellwether questions.  One of them you'd alluded to at the outset, and that is, the license between PI and PI, Ltd., the international subsidiary, which is TX57.

**MR. SUDER:**  Yes, Your Honor.

**THE COURT:**  And I take it you want that to come in to show the potential value of the reasonable royalty rate here?

**MR. SUDER:**  No, Your Honor.  It's simply to show that they do grant licenses and -- for things, and there are licenses between related companies.

That's not unheard of.  Mr. Walker signed it.  We have testimony that this was a commercial arm's length transaction.  So when they try to say, as Mr. Thornburgh said, that qbar was related to Mr. Congdon so it's not a real license, this is a commercial arm's length license between a parent and a subsidiary for the very products at suit here.  And we're trying to say this is more than we're asking for.  It helps show that it's reasonable.

And, Your Honor, if Mr. Barnes is going to testify, we have Mr. Barnes' testimony from the case when plaintiff was -- when they were against Fairchild, where he talked about this license and that it was too low.

And it also relates to Mr. Walker in his 30(b)(6) deposition.  When he asked him if there were any licenses, he said there weren't any.  And then in the litigation, Your Honor, this was not produced to us.

We found it as a result of the Power Integrations-Fairchild litigation in October, after Mr. Evans gave his report, after everything.  One of the things is we asked Judge Orrick if Mr. Evans could supplement to include this.  You know what happened.

But the point is that, factually, it is evidence of a license that we have that can be used to impeach Mr. Walker, Mr. Barnes.  And it is relevant.

**THE COURT:**  Well, all right.  If Mr. Barnes -- if they now concede that there was a license between PI and PI Ltd., and it covered, you know, X products, why do you need anything more?  Why do you need this document?  Why do you need a number that shows the 9-point-something percent?

**MR. SUDER:**  Because it shows that 2 to 3 percent is very small.

**THE COURT:**  So you are using it in a quantitative way?

**MR. SUDER:**  Yes.

**THE COURT:**  You want that number to come in.  In other words, if that number were blocked out, this wouldn't be of much value to you other than for impeachment value?

**MR. SUDER:**  Correct.  But I'm also -- I want to show

that we are not -- and I'll say we are not -- in our interrogatory answers and in our briefing to the Court we said we are not asking for this, that this is something that's out there to show that we are reasonable.

THE COURT:  Well, you're not using it directly, but you're using it indirectly to know what a reasonable --

MR. SUDER:  Yes.

THE COURT:  -- number, whatever, as a yardstick for the jury.  And the problem that I have is that, number one, this was an international license that, conversely, did not pertain to any U.S. rights; whereas, your reasonable royalty would be based only on U.S.

Two, I don't know what -- it licenses a whole range of PI technology.  I assume there are other intellectual property rights that were conveyed, not just the '623 but some other stuff that went along with that.

MR. THORNBURGH:  It wasn't the '623 at all.  And, in fact, it was 75 -- it was all of PI's own patents.  It was at least 75 of them, plus trademarks.

THE COURT:  It's such a broad thing, it's not even comparable.  I think, if nothing else, under 403, to let the jury see a number without knowing that this involved a whole portfolio of intellectual property rights that were totally distinct from the '623 could be very misleading.

MR. SUDER:  I'll be glad to take out the rate if that

would appease the Court.

Our point is that Mr. -- they are going to challenge the fact that there was a relationship between qbar and Mr. Congdon, and that that somehow diminishes the value of that license, when they did the very same thing.

And they said under oath and to the SEC that this is a commercial arm's length agreement.  I should be entitled to go into that with the jury when they challenge Mr. Congdon, and I should be able --

**THE COURT:**  Each license to a subsidiary may be different from situation to situation and company to company. I don't know what the relationship between PI and PI Ltd. --

**MR. SUDER:**  It's a wholly-owned subsidiary.

**THE COURT:**  But what the circumstances were, whether there was an independent board or not, whether there was other incentives, I mean, it may be comparable, maybe not.

I mean, you certainly can elicit from -- whether it's Barnes or Walker, whether it's not unusual to have a license agreement between an affiliate and a parent company and whether it's possible to have fully negotiated under certain circumstances.  That general fact, I think you can elicit that.

Now, if they end up giving testimony that's different and deny the existence of this license, I may allow you to impeach with this license, but with that number blocked out, because I think that number under 403 is misleading.

But I don't know if we're going to get to that because it is -- it's already like a step removed.  And for impeachment purposes, I don't know if you'll need it or not.  That's the only way I can see it coming in, really, is direct impeachment.

**MR. SUDER:**  Your Honor, that's fair, because my -- I'm the plaintiff, I go first, so I don't mind telling everyone we're calling Mr. Walker because, under oath, he was designated as a 30(b)(6) representative on licenses of the agreement and did not identify this license, though he signed it.

And so from cross-examination I should be able to impeach him with it.  Whether I offer it into evidence, I understand the Court's admonitions.

**MR. THORNBURGH:**  And, Your Honor, if I may comment on that.  They're now proposing to take a discovery dispute to the jury.  And it's a discovery dispute that they actually lost.

They made all of these same arguments to Judge Orrick, and we demonstrated, when they filed their emergency discovery motion on this, that Mr. Walker's deposition was entirely accurate, that they started off their 30(b)(6) notice very broad, all possible licenses that PI has entered.  And we said no, we object to that --

**THE COURT:**  Well, so, number one, whatever you ask Mr. Walker is going to have to be relevant to your case.  If you want to ask him about stuff to impeach him for no appropriate 402 purpose or relevance purposes, I'm not going to

allow that.

Number two, if it is relevant, you know, without asking him how he answered in a deposition or somewhere else, you can ask him now what the situation is.  If he answers, in your view, truthfully now, you don't have to -- then it's irrelevant as well.

"But you lied before, didn't you?"  I mean, I'm not going to allow that.  If he says something now that's inconsistent, if he gets up on the stand and says, no, we've never licensed anything, then you can impeach him directly with that.

**MR. SUDER:**  Fair enough, Your Honor.

**THE COURT:**  So that's how it could come in.  And it may not come in.  In no event will the number come in.

**MR. WARDEN:**  And the same thing with Mr. Barnes, because did not identify this license, and he testified to it in a case where he was the plaintiff.

**THE COURT:**  I understand.  And all I'm saying is we're not going to allow testimony to set up impeachment just for impeachment purposes.

**MR. SUDER:**  Fair enough, Your Honor.  And if you notice, in fairness, our briefing we did not rely on this license to support our damages.

**THE COURT:**  Right.

**MR. SUDER:**  It is simply evidence that may be relevant during the course of the trial.

THE COURT: All right. So if it does somehow come in on impeachment that -- the numbers, the percentage will be blocked out.

MR. THORNBURGH: Thank you, Your Honor.

THE COURT: All right. Now, the schematic -- the TX 125 schematic related to TopSwitch to other non-accused products, I assume that is all going to relevant, if at all, to invalidity. Does it have anything to do with this case at this point?

MR. WARREN: Yes, it does, Your Honor, for the same reason that the plaintiff wants to talk about what their inventor invented back in 1997, the designer of these chips, Mr. Kung, designed the first chip, say TinySwitch I, that was where the bulk of his -- you know, the actual, you know, making the watch was done. Then there were incremental changes that happened for TinySwitch II, incremental changes that happened for TinySwitch III.

Now, the only accused product is TinySwitch III, and so if he's not allowed to talk about how -- the original impetus for the TinySwitch on/off control, which is, you know --

THE COURT: This shows the iterative process to reach the accused product?

MR. WARREN: Yes. So he's going to -- the reason why we have to use, you know, four terminals instead of three, the on/off control, a lot of the energy efficiency, all of those

gains were the work that he actually did on TinySwitch I.

Now, we're not going to call it prior art. It's not relevant that it's prior art. Now that validity is off the table, the prior art isn't there.

And so this is not the same issue that was at issue with different parts -- these are different parts than what were at issue at, quote, practicing the prior art defense.

What had happened there was, when the case was first filed, they accused a product called the TopSwitch GX. They then found out that product was prior art and they --

**THE COURT:** Yeah, I'm familiar with that.

**MR. WARREN:** Right.

**THE COURT:** And then it got withdrawn, and it's a question of trying to stop them and all sorts of stuff.

**MR. WARREN:** Correct. And so that is off the table, the TopSwitch GX, right. We're not talking about TopSwitch GX.

What we're talking about here is the iterative process of Power Integrations' developing of their technology. And in order for the designer of the chip to talk about how did they come up with the idea for, you know, the first on/off control, you know, that happened back in the late '90s, and it had a lot to do with, you know, the standby energy efficiency. All of that story comes in through the development of the first TinySwitch, and so he has to be able to discuss how he developed that.

**THE COURT:** And how does that actually inform the ultimate question, infringement or not, of the ultimate accused product? How do the development of earlier iterations --

**MR. WARREN:** In exactly the same way for the same reason that the inventor gets to talk about his inventive process.

**THE COURT:** So it's really contextual background?

**MR. WARREN:** It's contextual background, Your Honor.

**THE COURT:** I'm going to do the same thing. I mean, to the extent I'm going to allow a bit of contextual background for Mr. Congdon, I'll allow a bit. But I don't see spending a lot of time talking about why it went from one circuit to the next.

**MR. WARREN:** I understand.

So the other issue here -- so there's two separate issues. There's the prior TinySwitch products and then there's the prior TopSwitch products.

So the very first TopSwitch products used three terminals. So this is actually the opposite of a practicing the prior art defense. We want to talk about the reason why we transitioned from three terminals to four terminals, right.

You know, as part of telling our noninfringement story, we want to say, you know, TopSwitch -- the original TopSwitch, not the GX, not the one that was accused -- the original TopSwitch combined that power terminal and the feedback terminal and we

were able to do three terminals.  As an intentional conscious choice, we separated out that power terminal and the feedback terminal in the TinySwitch, and we're now intentionally using four.  And that is the core of our noninfringement position.

The other aspect --

**THE COURT:**  The existence of four is the core of your noninfringement position.  How you got there, I'm not sure why that's relevant.

**MR. WARREN:**  Well, so the point is they're going to argue that that fourth terminal is not a power supply, it's not what supplies the power.

We're going to say yes, it is.  And you can see that we used to have three.  We intentionally had to make it four, and that is because we had to separate the feedback from the power.

It goes to the fact that that is a power supply, that we had to separate those two things out.

**THE COURT:**  It goes to the functionality of the fourth terminal.

**MR. WARREN:**  Yes, Your Honor.

This also goes to the issue of damages.  So they want to talk about how the -- their invention -- as I think we heard during the tutorial today, you know, they're going to argue that the reason that our products are able to be energy efficient, the reason that they meet Energy Star is because Mr. Congdon's invention is inside there.

And we want to argue, no, that's not true.  The efficiency comes on from on/off control, it comes from PI's own developed inventions.  And there's several specific patents that we cite.  And this goes to apportionment.

We're going to say the benefits of energy efficiency come from our prior technologies, and it's an iterative process going from the three-terminal TopSwitch to the four-terminal much more efficient TinySwitch that got then expanded to the accused TinySwitch III.

And so in order for us to tell that story, you know, we're not focusing on the prior art nature of it.  This has nothing to do with validity.  I mean, I'm sure the plaintiff is going to say validity is off the table, you won't hear about that.  This isn't about practicing the prior art, because we're saying we're not practicing it.  It's different.

And so the fact that it's different, it ameliorates both of the arguments that we heard from the plaintiff.  Basically --

**THE COURT:**  Essentially, it goes to functionality of the fourth terminal, to show it is not -- it is a power supply; and, two, it informs the question of damages by showing that there are alternatives or other technologies that lent value; and, therefore, if there is going to be reasonable royalty rate, it ought to be a lot smaller because the contribution of this patent, which was found to have infringed by the jury as a

predicate to any damages, was of little marginal value.

MR. WARREN:  Yes.  Those are the two substantive issues.

And then, also, on the iterative process of the fact that the work that actually went into designing the accused product was mostly in the TinySwitch I.  So that's kind of contextual lining that up with the inventor story.

MR. SUDER:  Your Honor, this was argued to Judge Orrick.  It is a 403 issue, at best, for them, because they want to argue, look at what we did, we have patents.  What is the inference they're saying?

They're confusing the jury and telling them, We're using our own stuff that we did before.  And it's not in their expert's invalidity report, it's not in their damage report. They don't submit a damage report on a noninfringing alternative.

So Judge Orrick has already ruled that the parties are limited to what's in their reports.  So to say that we used to have a three and went to a four, they -- we are looking at the claims and we're looking at the accused products, and do the accused products match up to the claims?

And if they want to go through this, quote, iterative process to say, look at how we developed this, wink-wink, from before your patent in the early '90s, is what Mr. Warren said, the clear inference is they're trying to get in validity even

if they're not asking for validity, to say it's not that big a deal.

THE COURT:  Well, let me ask, how are these -- how's TX 125 going to be introduced?  Is it through an expert to talk about --

MR. WARREN:  No.  So this -- respectfully, the damages -- or the *Daubert* motion that was filed, we agreed, took this out of the realm of the expert report because the expert report talked about the TopSwitch GX.

This will be coming in through Mr. Kung and Mr. Sutherland, if at all.  If at all I mean with Mr. Sutherland.  It will definitely be coming in with Mr. Kung.

MR. SUDER:  He's going to claim, I invented this first, Judge.  That's what he's saying.  That's a matter of validity.

MR. WARREN:  That's what defendants do.

MR. SUDER:  When they have a validity case.

THE COURT:  Well, so there's a difference, it seems to me, between testimony on the TinySwitch iterations, which is more of a background, seems to me, than anything else; whereas the TopSwitch evolution may have some probative value as to the question of whether something is -- whether there's a power supply connected to the fourth terminal and whether or not the value of the intellectual property offered by the '623 had much value.

MR. WARREN:  If I may --

THE COURT:  Hold on.

So why shouldn't at least some of the TopSwitch evidence come in?

MR. SUDER:  Because Mr. Barnes, their damage expert, doesn't talk about it.  He is their rebuttal expert on damages.  They said he's going to testify.  He's limited to what's in his report.

He doesn't discuss the TopSwitch.  He doesn't say there's a noninfringing alternative that, if we had to do this, we could go back to the old TopSwitch that predates your product and we're fine.

They're limited to what their expert said, Judge, and now they're trying to get it back in when they never proffered it properly.  We have an in limine on that.

THE COURT:  What about the question about what functions as a power supply, the fourth switch?  The fact that it had three before and then they went to a four terminal.

MR. SUDER:  Their expert doesn't talk about that either.  Their expert simply looks at their products that have been accused and say there is a fourth power supply.

He does not address this iterative process history.  He doesn't say he spoke to Mr. Kung and I understand this is the way it evolved.

And that was Judge Orrick's problem, is that Mr. Bohannon

did not address any of this in his invalidity report, and so it was tantamount to practicing the prior art.

And Judge Orrick said you can do a little bit of background, but you will not try to lay the foundation that you're practicing the prior art with your products because it was not disclosed.

MR. WARREN:  So a couple of things, Your Honor. First, Mr. Barnes.  It's ironic that we're hearing so much argument that our experts didn't consider this and so it should be excluded when they have no damages expert.

Mr. Evans didn't apportion at all.  And so our expert said, look, he didn't apportion at all.

This is not coming in through an expert.  This is going to come in through a fact witness.  And for all the same reasons that they get to argue damages as a factual issue, we get to argue, you know, apportionment is a factual issue.  And this goes to that.

The fact that Mr. Barnes didn't consider it because he was acting in rebuttal to Mr. Evans, who also didn't consider it, is not probative.

More importantly, the TinySwitch story is not simply the iterative development of TinySwitch.  So what I want to clarify is that the transition from three to four terminals from TopSwitch, that happened with the first TinySwitch.  So we can't simply talk about how TopSwitch used to have three and

then we transitioned to four, because the reason for that transition is that very first TinySwitch.

And so what we need to be able to do is say, listen, we had TopSwitch, it had three, and then Mr. Kung was working with the engineers and everything and they came up with this brand-new way of doing a power supply, that was the original TinySwitch, and that necessitated the transition to four.

And that helps show why -- you know, we're going to hear testimony from their expert, from their lawyer, saying that you could disconnect that fourth terminal and it would operate just fine, that it would run just fine with only three terminals. And that's absolutely not true.

And part of the reason we're going to show that that's not true is it was an intentional choice to go to four. And we had three, we had to go to four to get this. That's our story as the defendant.

And for the only -- for the same reason, you know, Mr. Suder says this is about reading the patent on the claims. Then Mr. Kung shouldn't be able to talk about anything before the patent issued, frankly. What's his invention story have to do anything with the claims or anything else?

So for the same reason that the plaintiff wants to be able to tell their invention story, we as a defendant have to be able to say, you know, no, we didn't steal his technology, we didn't take his technology. You can look Mr. Kung in the eye

and see that he designed this himself.  And that's part of, you know, defendant's story.

THE COURT:  That's not really relevant.  You don't need intent.  This is not a copyright case.

MR. WARREN:  I agree, but it goes to the same contextual basis --

THE COURT:  Well, that's a little different.  That's suggesting to the jury an intentionality and lack of intentionality that might inform their verdict, and that would be misleading.

MR. WARREN:  We're not arguing that.  They're going to see Mr. Kung and judge his credibility when he says, I developed this product.  It's inherent.  He's going to say it.

And in order for him to describe how he designed the product, he has to be able to talk about TinySwitch I, because that's when the design actually happened.

And I don't see a principal difference between the plaintiff being able to discuss the invention story, which, you know, every --

THE COURT:  Again, I'm still not clear.  You talk about TopSwitch going from three to four terminals, and I sort of understand that.

Why does the TinySwitch iteration, why is that necessary to inform the TopSwitch?

MR. WARREN:  The transition -- so TopSwitch was always

a three-pin product.  The new product that came with four was TinySwitch.  So TopSwitch has always been a three-pin product. It's a three-pin product today.

But so original TopSwitch -- the original design -- the way TopSwitch works is what we call pulse switch modulation control.  I won't go into the details.  But that -- the way you do the feedback on that allows you to combine power and feedback into one terminal.

All of the accused products, every single one of them, is a new type of power supply control called on/off control, okay, and that requires four terminals.  And that was Power Integrations' big invention.

That was one of their -- the biggest invention, actually, in power supply history, which happened in the late '90s.  And the first product to use that was TinySwitch, and that necessitated four terminals.

And so the transition from all of PI's prior products that were a three-terminal to a four-terminal product demonstrates the necessity of using that fourth terminal, which goes directly against their argument that it's optional.

**THE COURT:**  All right.  I'm going to allow limited testimony for those purposes.  But if it begins to look like sort of showcasing the inventor's inventiveness and going from TinySwitch I, II, and III for background information, I'm going to limit that under 403.

I think you have a stronger argument that there's some probative value with respect to the whole question about power supply, essentiality, and terminal four, et cetera, et cetera; and I think, therefore, some discussion and explanation of the process by which the switch went from three to four will be admitted.

But if you get much beyond that, before that, beyond that, you're going to get the edges of 403, and I'm going to -- I may call the question and limit that testimony.

**MR. WARREN:**  Understand.

**MR. SUDER:**  Your Honor, may I ask for clarification on that?

**THE COURT:**  Yeah.

**MR. SUDER:**  I take it that defendant cannot give a date for the TinySwitch I that predates our patent because that would be suggestive.

If he wants to talk about it as an iterative process, but he puts a timeline --

**THE COURT:**  I think that's a fair proposal.  Exact dates are not critical.  You need not line that up vis-a-vis --

**MR. WARREN:**  So I guess the question is, is Mr. Congdon going to -- what date are we talking about?

If Mr. Congdon comes in and says that, I invented this in 1997, certainly, you know, we're not going to say -- I don't think the TinySwitch was developed before that.  You know,

that's kind of why this is ironic.  It's not -- I don't think it was developed before 1997.  It might have been right around there.  But, certainly, we're not going to say that TinySwitch predated it.

The TopSwitch, just in terms of telling the story, came first because we're going to say it transitioned.  We have patents on these things, right, and so the patents go straight to apportionment and to DOE.  And the patents -- we're not going to redact the dates off of them, but we're not going to highlight them.

**THE COURT:**  Well, the dates are not going to be very important.  I don't think it'll be very noticeable to the jury because there's not going to be priority date question.  None of those issues are going to be presented.

So I think it's a fair point that he's not -- your witnesses will not be allowed to say, well, at the time that I invented this the -- you know, the '623 wasn't in existence.

I mean, there's going to be no --

**MR. WARREN:**  Right.

**THE COURT:**  -- you know, sort of referencing that.

**MR. WARREN:**  Correct.

**THE COURT:**  If he wants to say, well, I started working on this X, Y, and Z, likely the jury won't even notice because the date's not an issue anymore.

**MR. WARREN:**  Correct.

**THE COURT:** So no cross-referencing vis-a-vis the concurrent or nonconcurrent development of the '323 or the '623.

**MR. WARREN:** Absolutely.

**THE COURT:** All right. So I've talked about the 1006. I'm going to reserve judgment on that with the presumption that they will be allowed, but I do want to make sure we have this accuracy thing squared away.

I did notice part of the exhibits that were identified were also SEC 10-Ks, Form 10-Ks, Exhibits 41 and 42. Were you intending to --

**MR. SUDER:** No, I think they have them on theirs.

**THE COURT:** Somebody had that. I don't know -- I wasn't sure what the relevance of this was.

**MR. THORNBURGH:** So, Your Honor, our objection on that was, again, the financials. Those would include the much larger numbers that, I think, plaintiff has said that they would not use.

**THE COURT:** I don't think we need that. I mean, at the end of the day you just want the summary -- maybe a stipulation of the summary.

**MR. SUDER:** They have about ten 10-Ks on their exhibit list. They may be opening the door.

**THE COURT:** Are you seeking to introduce 10-Ks for anything?

**MR. THORNBURGH:**  I'm not aware of a reason we would at this point.  I think if we need to do it to rebut some point, then we could cross the bridge, perhaps redacting out --

**THE COURT:**  Nobody is intending to admit any 10-Ks in their case-in-chief.  This is not a securities fraud case.

All right.  The last thing, there are other Congdon patents, the TX 212 through 220.  I don't see how those are relevant.  I mean, I know you want to enhance his credibility in front of the jury, but those seem pretty far afield to me.

**MR. SUDER:**  They have some of their patents on their exhibit list.  It's kind of like both sides are inventors.  What's good for the goose --

**THE COURT:**  You can ask him generally, have you invented other things?  Have you gotten patents?  Are they in the field?

But I don't think we need to put patents in front of the jury.  It's just going to confuse them when they see other patents.

**MR. SUDER:**  Does that go both ways, Judge?

**THE COURT:**  Well, their patents aren't --

**MR. WARREN:**  Your Honor, our patents are -- so there's several issues here.  Our patents go directly to apportionment, damages, and DOE.  So they're going to be arguing DOE under the law.  Having our own patents is an element that's relevant to that.  Federal Circuit has held that many times.

The fact that we have patents on our own technology -- these aren't prior art patents necessarily.  These are patents on, like, the LinkSwitch 2, on the way that the dormant control works.  These are not prior art patents, but they go to the apportionment showing that we are in a damages context.

There's no validity issue here, and --

**THE COURT:**  So that the accused device practices other patents that you have, essentially.

**MR. WARREN:**  Correct.  And so -- and, also, on the issue of these patents, these specific patents were never disclosed during fact discovery.  He wasn't deposed on them, and so there's a --

**THE COURT:**  I'm not --

**MR. SUDER:**  Ours are out.  Ours are out.

**MR. WARREN:**  Right.

**MR. SUDER:**  Just talking about yours.

**MR. WARREN:**  Right.  So this also comes into one of the MILs that was brought, and Judge Orrick actually already denied this as to one of our own patents because it goes to damages.

**THE COURT:**  Well, if they are -- if they are patents that are practiced in the accused device, I could see that.  If they're also relevant to a doctrine of equivalents, they can come in in that way.  If they're just out there to show the genius of your staff, that's not going to come in.  It would

not be relevant.

MR. WARREN:  No, and, in fact, none of the inventors on our patents are testifying.  They're actually different people.  So the objection there is not that we're trying to bolster our inventors, it's that our products use our patents.  And it goes to apportionment.

And this was -- this was spelled out expressly in the expert reports.  They never objected to that.

THE COURT:  All right.

Last thing, there's a page from the PI website.  I didn't know what -- is that going to be introduced?  221?

MR. WARREN:  Yeah, so I think that they had copied a page from the PI website.  You know, frankly, I don't know how they plan to use that.  I assume they want to cross one of our witnesses with something off of our website.

I'm not sure why -- I mean, that's fine.  I don't -- I mean, if they want to cross one of our witnesses with something off of our website, I don't --

THE COURT:  All right.  Is there a question of authenticity or accuracy of this web page?

MR. WARREN:  I don't believe so.  It's their -- they printed it off.

MR. SUDER:  No.

THE COURT:  I don't want to have that kind of argument in front of the jury.

**MR. WARREN:** Right. I can't say that I lined them up perfectly, but if they're representing they printed this off of our web page and that they just want to cross one of our witnesses with something off our web page --

**THE COURT:** Okay.

**MR. SUDER:** That is correct, Your Honor.

**THE COURT:** All right. Fair enough. Thank you.

The hour is late. Let me say a couple of things, housekeeping matters.

Jury instructions. So I'm working on the jury instructions. My practice -- I think it's a little bit different from Judge Orrick's -- I like to work out the instructions as much as possible before we start the trial. It's subject to adjustment, obviously. But partly so you know what's coming, you know how you might want to use them in your openings. Partly it also guides me in terms of evidentiary issues that may come up.

So what I'm going to do is, I'm going to have kind of a proposed set of instructions after looking at your comments, and I'm going to ask you to participate in a off-the-record jury instruction conference with my law clerk to see if you can all come to an agreement.

If not, then I'll have to resolve the final differences in language. I think that's the most efficient way to do it.

I will start with what I think looks reasonable, and you

can react to it.  I think now that we don't have invalidity that's going to cut down most of the disputes, frankly, that were in that area.  And that's where there was a lot of, kind of, creative crafting.  So I think it's going to be a lot more straightforward.

So I do want to get that done before we start jury selection.  So either tomorrow or the day after, I'll have my law clerk contact you.

**MR. SUDER:**  Logistically, I'm going home in the morning, back to Texas, and I'm coming back out Thursday morning.  I could participate by telephone.

**THE COURT:**  All right.  We'll figure it out.  We can either do it by telephone -- what time are you here on Thursday?

**MR. SUDER:**  I leave about 4 o'clock.

**THE COURT:**  Thursday afternoon?

**MR. SUDER:**  Yes.

**THE COURT:**  All right.  We may have to do it by telephone.  We'll figure that out.

**MR. SUDER:**  Thank you.

**THE COURT:**  All right.  In terms of voir dire, I have your voir dire questions.  I will ask some of those.  There's a lot of them.  A lot of them, actually, you both sort of agree.  But I'm going to ask questions about people's familiarity with patents, their views about patent law, expertise in this area,

et cetera, et cetera.

I will leave about 20 minutes per side.  So stuff I don't cover you can cover.  But I will cover all the basics about who they are, where they're from, where they work, education, background, hobbies, just kind of personal stuff, as well as prior experience on a jury, and then the questions you've asked.

So I'm going to get the bulk of those things out.  We're going to call in probably about 35, a panel of about 35 within which to choose.  My intent at this point is to seat eight.  So if we lose two, we'll still have six.

You'll get three peremptory challenges each under the rules.  So the goal is to get to a final set of 14 before you exercise your peremptories.

And what I generally do is ask the entire room hardship questions so we can see where we're at.  Hopefully, we don't get two-thirds of the room having hardships.

And I'll ask them basic cause questions about their -- whether anybody knows any of the witnesses, the parties, the attorneys or court staff, or have any religious or philosophical problems of serving as a jury.

And then once we get past those, we can have a sidebar.  We'll give the jury a break and figure out who we can excuse for hardship and for cause.  And then we'll start the substantive voir dire.

**MR. SUDER:** Judge, will we be able to have -- before the substantive voir dire and before we exercise our peremptories, we'll be able to break and caucus with our teams?

**THE COURT:** Yeah.  I'll give you a chance.

What I normally do is you exercise your peremptories with a sheet that we pass back and forth.  Unless you insist, I let the jury take a break so you don't have to do that in front of them, and you can exercise your peremptories there.

Hopefully, we can complete that in two to three hours.  We'll start at 8:30.  So you'll have your jury.  We'll swear them in.  And then start first thing right after the President's Day, with opening statements.

Judge Orrick allocated 11.25 hours apiece, which includes openings and closing arguments.  He put a limit of two hours of argument and openings on each.  I think that's -- especially since we don't have invalidity, that should be plenty of time to open and close, seems to me.

**MR. WARREN:** Well, there has been some discussion, Your Honor, among the parties that we may be able to reach an agreement to shorten that time.

Certainly, we don't think that --

**THE COURT:** Certainly welcome that.  With just six witnesses and two experts, I would think it might go faster than that.

**MR. SUDER:** Yes.  We're going to try to get this done,

our goal, we're going to try if we can -- and that leads to my questions for the Court -- is try to be done with the evidence by Friday.

**MR. WARREN:**  Yes.

**MR. SUDER:**  That's our goal.  We don't know, but that's certainly our goal.

But, Your Honor, one of the things I have there is about -- I don't know the Court's practice in terms of preadmitting exhibits or how the Court -- if there's really no objections, because a lot of these documents I feel like we should be able to sit down and either preadmit them or -- I don't know if the Court has a preference on that.

**THE COURT:**  I can preadmit them.  The problem I've had before is that -- what I don't want is the parties say, okay, well, there's 400 here and we don't object so we're -- half these are never alluded to and never used, and then the jury gets it and, what is this?

So in some ways I've now, before I admit everything, I at least want to know it's going to be alluded to or explained one way or another by way of stipulation or a witness or something.

So although it's a bit more painstaking, you know, I think it's a cleaner record if we admit as we go along.  If there's no objection, it will take two seconds.

And if you want to admit a series of ones, a whole series of documents that are kind of a group, just move to admit, you

know, 29 through 56 or whatever it is.

**MR. SUDER:**  May I make an offer -- so one thing that I've seen done and has worked is they get preadmitted but only those that are talked about actually go back into the jury room.  So those that were admitted but aren't used get pulled and work with the Court's personnel, so there really is no time on offering.

**THE COURT:**  Well --

**MR. WARREN:**  Your Honor, the problem I have with that is foundation.  I think that it's important that the jury hears what a document is.  And so what I don't want is to have, you know, say, one of their experts who just preadmits everything and then they never have to talk about it.

So what we've heard today is a lot of discussion about, say, the sales numbers, that they intend to cross our witnesses and bring those in.  They don't have any percipient witness who knows anything about PI's sales.

So the only proper witness who could move in one of those documents and lay a foundation is one of our witnesses.  And so we believe that they should have to call a witness, have them lay the foundation for the document, and then move it in.

Allowing them to move in documents -- what I'm concerned about is that we're just going to hear a flurry of documents that then get argued in the closing argument but that the jury has never heard anything --

**THE COURT:**  Well, that's why I want to avoid that. You were trying to address that by saying only those that have been addressed.  I think it's cleaner -- I know it's a little bit more cumbersome, but let's do it the traditional way.

**MR. SUDER:**  It may take longer, but that's okay.  My goal is to try to get this quickly.  But if that's the Court's preference, we obviously --

**THE COURT:**  We'll do it that way.  I think it's a cleaner record, plus incentive to make sure you want to limit the number of exhibits because it means you have to burn a little bit of time on that.  Helps me make sure it's really needed.

There were some stipulations of facts, I noticed, in the joint pretrial statement.  Not many.  About four.  What I'd like the parties to do is see if you can reach any further stipulations of fact and, within the next two days, just submit to me whatever you agreed if anything more than these four.

But I think we want to have a jury instruction at some point to say what a stipulation is and here are four, five, six, nine, ten, twenty facts, but right now we've got four. And hopefully you can enhance that a little bit.

I do need a brief -- I know there's a summary in the jury instructions of the case that's been sort of argued over, but to introduce the case to the entire panel, need just a one-paragraph summary.

If you could see if you could come up with a joint summary that doesn't argue your whole case, and at least they know it's a patent case and not an assault case or something else.  I just need a one-paragraph summary that I will then read to the jury.

And that's the basis of what I'll ask them if anybody -- just on that, whether they have any philosophical problems or religious problems or anything else in being a juror on that.

I would also like to make sure I have the full unredacted reports of all the experts who will testify.

And I guess that's three of them; right?  Three experts. Barnes, Zane, and Bohannon?

**MR. WARREN:**  Yes.

**THE COURT:**  I think I have some, but I -- because there's a question -- if there's a question of beyond the scope of the report, I'm going to need that report.  So if you could file that.  You can file it under seal, I guess, because some of that is -- I want to see the unredacted.

Now, in terms of copies of exhibits that are under seal, and I don't remember what's been sealed or not, but for trial purposes are there going to be exhibits -- there probably will be -- that you want to maintain under seal?  Am I assuming correctly?

**MR. WARREN:**  Yes, so --

**THE COURT:**  Like the sales figures?

**MR. WARREN:**  What we've done in the past, Your Honor, is that we don't clear the courtroom, say, if a schematic goes up.  And the schematics do go back to the jury.  But we're not waiving confidentiality over those.  So it's not as if we're entering them into the public record.  There's no de facto waiver of confidentiality.  And as a procedural matter, it saves us the trouble of clearing the courtroom and doing that.

But for some of the schematics, obviously, we don't want them in the public domain, but at the same time we recognize the logistical problem of clearing the courtroom and showing them to the jury.

**THE COURT:**  One thing we can do, right, Angie, is we can turn off the monitors, those two monitors that face the audience, so the jury, you and I can see it.  And I guess if someone wanted to crane their neck, they could see it, but they wouldn't see it flashed on the screen.  So we can try to do that to maintain some semblance of nonpublication to the public.

**MR. WARREN:**  And so for that, would we, you know, announce that we're going to get to some confidential material and to dim them, or would we do it at the beginning of the testimony of the witness?

**THE COURT:**  Well, the witness may have nonconfidential documents.  We would do it document by document.

I think, Angie, you can turn it off at any time.

THE CLERK:  Sure can.

THE COURT:  You can tell me.  I haven't kept track of what's under seal.  If there's something you want to keep under seal, just indicate so and we'll turn off those monitors.

MR. WARREN:  Absolutely.

THE COURT:  Now, when the witness testifies, you know, that's always a little tricky situation how specific do they get.

If we get to the point where it's so sensitive and he or she has to testify about something that's highly confidential, if we have to clear the courtroom, I'm going to ask you to make that motion, and I'll have to look at it.

If there's a way to avoid that by referencing numbers and pointing to things without breaching critical information, then I'll leave you to your good judgment to try to get around that.

Let's see.  So I think that's all I need at this point.  Yeah.

MR. SUDER:  I have some questions, Your Honor.

THE COURT:  Yeah.

MR. SUDER:  Do you know how the panel will be seated when they come in?  Will they be sitting there, back there, numerically?

THE COURT:  What we generally do is seat the first -- I've got room -- 14 there, and I usually seat maybe 20, 18 or 20, and take up that first row.  So you'll know the order of

the first 18 or 20 or so.

MR. SUDER: When will we be able to get juror information?

THE COURT: You will get that when they -- when they send the jurors down at 8:30. Or whenever they come down, you will get the list. They will be in somewhat random order.

I will have a list that is ordered, that will seat them. So you'll have to do a little -- you know, whatever device you use, whether it's Post-Its. That's what I use.

And then we just -- but my initial questions will be to everyone in terms of whether they have a problem serving for the next six days, et cetera, et cetera.

MR. SUDER: Judge, we agreed on the showing of the patent video, and we placed it -- we agreed that during the preliminary instructions is when we'd ask it be shown.

THE COURT: Yes.

MR. SUDER: Typically, with that video there is a representative patent of a chair or a stool. I've seen some judges use it, some not. I don't know if you wanted that. I don't think we do, but they reference it and, you know, sometimes --

THE COURT: As a demonstrative, you mean?

MR. SUDER: Yes. So they can follow along with the person on the video. I didn't know if the Court had a preference on that.

**THE COURT:** I don't. If it's simple enough, I don't know if we need --

**MR. WARREN:** We typically don't do that. What I don't think we want -- you know, it's distracting because it's not the patent that's at issue in this case. And, obviously, we wouldn't give them the patent that's at issue in this case right off the bat, or any of the evidence, so it's --

**MR. SUDER:** I agree. Just going through my list, yes, I don't think we need it, but I don't know if the Court had a preference.

**THE COURT:** I don't think we need it.

**MR. SUDER:** Also, Judge, we would ask that the jurors gets a notebook with their copy of the patent and a chart of the Court's definitions and then some blank pages.

**THE COURT:** I did see that. So instead of -- we usually give the little secretary notepad. But if we had a notebook, if there's no objection, I don't see a problem with the patent. And you say --

**MR. SUDER:** The patent, the claim terms, if construed. And then just some blank pages so they can all write their own notes in there.

**THE COURT:** Any objection to that?

**MR. WARDEN:** Can we just confer for one moment, Your Honor?

**THE COURT:** Yeah.

**MR. WARREN:** No one from our side actually remembers agreeing to that. And I'm not sure if it's referenced in the pretrial order or if there's something Mr. Suder can point us to, if we have it here.

**THE COURT:** I think there was a request.

**MR. SUDER:** Yes. I'm just asking.

**THE COURT:** There was no stipulation. I guess that's the question now, whether you have any objection to that.

**MR. WARREN:** Let us discuss it. In general, I think it's distracting if they're flipping through the patent or if they have a bunch of documents there. I'm not sure that that's going to be helpful to the jury.

Notebook paper we do not object to. We believe they should have notebook paper to take notes.

**THE COURT:** Normally, we give them a steno pad kind of thing, but in a patent case they may need a bigger pad.

Why don't you see whether that would be useful or not.

And I think there was also -- maybe it's in Judge Orrick's order about photographs. Of course, we only have six witnesses, so it's not as critical. In a long trial, we like to have photos of the witnesses and names the jury can remember. Frankly, this is a short trial with six witnesses and two experts. I don't think that's going to be necessary.

**MR. WARREN:** We have no objection if you want to do it, Your Honor.

**MR. SUDER:** I don't think -- our witnesses, I don't think it's necessary either, Judge.

**THE COURT:** Yeah. I'm inclined not to do that because then I have to bring in the printer and other equipment and stuff, unless you want to do it.

If the parties want to do it, I'm happy to accommodate. Right now, given the short length of the trial and the limited number of witnesses, I don't think it's necessary.

**MR. SUDER:** On the housekeeping side, will we be able to keep our boxes in the courtroom, maybe pushed in the corner overnight?

**THE COURT:** Yeah. But no bailment is created, no warranty.

(Laughter)

**MR. SUDER:** Fair enough.

And, Your Honor, the only other thing I have on my list are the exhibits and objections for the first day, which is a Tuesday, whether it should be -- we would ask it be done on Monday because the voir dire and the weekend to prep and the witnesses coming in, to -- because we don't need the Court to file anything, exchange them and view them on Monday.

If we have objections, we'll be here first thing in court.

**MR. WARDEN:** Your Honor, we did have a question on that. I think we had initially agreed, in the pretrial order with Judge Orrick, about a procedure for exhibits.

**THE COURT:** Yeah.

**MR. WARDEN:** Our understanding is that Your Honor prefers to actually have objections to exhibits filed the day before, which was not something we'd agreed with with Judge Orrick.

We're fine with that, but we wanted to get guidance from the Court whether the Court does, in fact, want us to file written objections the night before. And if so, whether the objections that we might make to their Tuesday exhibits should be filed on Friday or on Monday.

**THE COURT:** Good question.

Is there a problem -- you know who's going to testify on Tuesday?

**MR. SUDER:** Ordinarily, I'd say yes, but we have a lot to do between now and Friday and everything and the travel. I don't know if I could have it all done on Friday so I can prepare the written objections for the Court.

And since Monday is a holiday, I was hoping to give it to them and we could try to work it out and file our objections and take it up first thing Tuesday morning.

**THE COURT:** All right. Let's do this. I'll allow you to file it -- well, you've got to show it early enough on Monday so they have a chance to --

**MR. SUDER:** Absolutely.

**THE COURT:** -- respond and get the objections to me

by, you know, 5 o'clock.

Since we have electronic document, we can pull it down and look at it.  And we would meet here at 8:00, because the jury is going to start -- we're going to start in earnest at 8:30.

But I'd like to meet you 15 or 30 minutes early exactly for these reasons.  If there's an objection, a major problem, I want to iron it out without -- my number one goal is to minimize delay, sidebars, et cetera.  Sometimes it happens, but the jury appreciates if we go right through.

**MR. SUDER:**  I take it for Tuesday, the same schedule should be for our slides for opening?

**THE COURT:**  Yeah.

**MR. WARDEN:**  Sorry.  Just a clarification on that, Your Honor.

On the slides for opening, I think our preference would be to try and resolve those this Friday, because there could be significant or substantive changes made.

**THE COURT:**  Yeah, if it's going to be -- if you're going to have a large demonstrative that's going to be subject to extensive objections, then I do want that.  I think that's fair to do that in advance.

I thought you were talking about a handful of exhibits or something like that.

**MR. WARDEN:**  I think what we've talked about -- I think we're still working out the exact time of day because

different people are on flights at different times.  But my understanding is we were going to exchange opening demonstratives this Wednesday, exchange objections and meet and confer some on Thursday.  And our view was, to the extent there remain objections to those opening demonstratives, we could discuss them with the Court after jury instructions --

(Unreportable simultaneous colloquy.)

MR. SUDER:  That's fine.  That's fine.

THE COURT:  All right.

MR. WARDEN:  One other point of clarification.  You said for Tuesday objections, file them by 5 o'clock on Monday.

Does 5 o'clock work going forward for each day's objections, if they're filed by 5 o'clock the day before?  I think your standard order says 4 o'clock.

THE COURT:  I would prefer 4 o'clock so we have a chance to look at it.

MR. WARDEN:  The only reason we thought maybe 4:30 was to give us more time to actually meet and confer about the objections before we file them, in an effort to try and narrow down what we actually file.

THE COURT:  4:30.

MR. WARDEN:  Okay.  Thank you very much, Your Honor.

THE COURT:  All right.

MR. WARDEN:  I'm sorry, I'm reminded I have two other questions.

One is I think the court calendar says that there's a hearing on Wednesday of trial, at 1:00 or 1:30.  We're not sure if that's still the case and if we're going to be ending early that day.

THE COURT:  We have the criminal calendar; right?

(The courtroom deputy and the Court confer off the record.)

THE COURT:  I guess we'll have a shorter day.  We'll have to adjourn shortly before 1:00, I think, on Wednesday.

MR. WARDEN:  Okay.  And then just a second question, if the Court knows generally the timing of the breaks the Court plans to take each day.

THE COURT:  Usually try to break every hour and a half, 90 minutes, and give a 15-minute break.  Then I give, like, a half-hour or 40-minute break so they can get something to eat at the lunch.

However, now, Tuesday we're going all day; right?

Yeah, we're going to go all day, to 4:30.

MR. WARDEN:  Okay.

THE COURT:  So we'll get a lot of testimony in there.

Wednesday we'll have half a day.

Thursday we are dark because I've got law and motion.

Friday we're all day; correct?

MR. SUDER:  Friday until 4:00 as well?

THE COURT:  Yes.  So we're going to try to get as much

in as possible, if we can get all the testimony in and get it to the jury.

**MR. WARDEN:**  I think, candidly, I don't think we knew we were going to do all day on Tuesday and Friday.  That makes it much more likely we'll be able to get through the evidence by Friday and then perhaps do closings the following Monday morning.

**MR. SUDER:**  So 4:30 on Tuesday and Friday?

**THE COURT:**  Yeah.

**MR. SUDER:**  Okay.

**MR. WARDEN:**  On the short day, on Wednesday will we still have a short lunch break or will we just go --

**THE COURT:**  No, I think we'll, you know --

**MR. WARDEN:**  Okay.

**THE COURT:**  -- we'll just end it.  And that way people can go to lunch on their own at that point.

**MR. WARDEN:**  Thank you, Your Honor.

**MR. SUDER:**  The only other thing, Judge, is in light of their statement that they're not seeking to challenge the validity, we would formally ask on the record that judgment be entered on their counterclaim of invalidity and on their affirmative defense of invalidity.

**MR. WARDEN:**  I think, Your Honor, we should discuss this amongst ourselves first.  I'm not sure whether that's the right approach.  We can discuss it.

THE COURT:  Why don't you discuss that and see if that can be resolved.

MR. WARDEN:  Okay.

THE COURT:  So the record is clear, you will not be presenting any evidence or making any argument on invalidity.

MR. WARDEN:  That's correct.

THE COURT:  Thank you.  Appreciate it.

MR. SUDER:  So 8 o'clock Friday?

THE COURT:  8 o'clock Friday.

The jury probably won't come down until a little after 8:30, but we'll try to get started early.

MR. SUDER:  Thank you, Judge.

(At 5:08 p.m. the proceedings were adjourned.)


CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, February 13, 2019




*Katherine Sullivan*

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter