**Volume 1**

**Pages 1 - 176**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

OPTICURRENT, LLC ,               )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   **No. C 17-3597 EMC**
                                 )
POWER INTEGRATIONS, INC.,        )
                                 )
          Defendant.             )
_____)   San Francisco, California
                                     Friday, February 15, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          FRIEDMAN, SUDER & COOKE
                        604 East 4th Street, Suite 200
                        Fort Worth, Texas 76102
                   BY:  **JONATHAN T. SUDER, ESQ.**
                        **DAVE R. GUNTER, ESQ.**

                        HUDNELL LAW GROUP P.C.
                        800 W. El Camino Real, Suite 180
                        Mountain View, California 94040
                   BY:  **LEWIS E. HUDNELL, III, ESQ.**

For Defendant:          FISH & RICHARDSON P.C.
                        One Marina Park Drive
                        Boston, Massachusetts  02210-1878
                   BY:  **FRANK E. SCHERKENBACH, Esq.**

(Appearances continued on next page)

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

**APPEARANCES (CONTINUED):**

For Defendant:              FISH & RICHARDSON P.C.
                            500 Arguello Street, Suite 500
                            Redwood City, California 94063
                       BY:  **MICHAEL R. HEADLEY, ESQ.**
                            **NEIL A. WARREN, ESQ.**

                            FISH AND RICHARDSON PC
                            222 Delaware Avenue, 17th Floor
                            Wilmington, Delaware 19899
                       BY:  **JOSEPH B. WARDEN, ESQ.**

For Defendant/              FISH & RICHARDSON P.C.
Counter-Claimant:           12390 El Camino Real
                            San Diego, California 92130
                       BY:  **JOHN W. THORNBURGH, ESQ.**

**I N D E X**

Friday, February 15, 2019 - Volume 1

|                | PAGE | VOL. |
|----------------|------|------|
| Jury Voir Dire | 19   | 1    |

**<u>Friday - February 15, 2019</u>**                              **<u>8:12 a.m.</u>**

**<u>P R O C E E D I N G S</u>**

**---000---**

(NOTE:  This hearing began without the official court reporter present.  FTR was utilized for the first minutes of the hearing. It is not a part of this transcript.)

**THE COURT:**  ... And then I'm going to give you each 20 minutes to follow up.  And then we'll take for cause challenges, again at sidebar during a break.

And the goal is to get down to the final 14, because you'll have three peremptories each, which will leave us with eight.  And that will be our jury.

And we're not -- I'm not going to give any instructions other than "don't talk about the case, don't do any research," et cetera, et cetera.  I don't think it does any good to give them any substantive instructions now.  We'll start it Tuesday morning first thing with instructions, including the video which you requested that we play, and then launch into your openings at that point.

We do have a few things to resolve.  Let me -- frankly, I have not had a chance to look at the slide objections, but I have thought a little bit about the open question regarding the summary exhibit and whether we include the additional devices in addition to those that were expressly identified.

You know, I don't have Exhibits A through D, the claims

charts that were attached to the infringement contentions.  I don't know if that was filed.  We couldn't find it.  Does anybody have that?

MR. SUDER:  Electronically, Your Honor.  I apologize. We have them electronically.  We don't have copies.

THE COURT:  At some point, if someone can find those, that might be useful.

But let me ask.  I think the critical question here is, what are the differences in circuitry between the -- the sort of newly accused products like the TinySwitch-PK and all of the other -- the ones that were identified previously in Dr. Zane's report and in the infringement contentions.

MR. SUDER:  Yes, Your Honor.  The data sheets that were produced were for the families.  The four families.  And in Mr. Kung's deposition as a 30(b)(6) representative on those -- and this is cited in our brief and in the record -- he said that they all operate the same way within the family.

THE COURT:  So if one were to look at the TinySwitch-PK family -- and I see the schematic -- how that compare to the -- what family does that allegedly belong to with respect to the ones that have been disclosed?

MR. SUDER:  That would be the TinySwitch-III.

THE COURT:  TinySwitch-III.  So what does the TinySwitch-III schematic look like?

MR. SUDER:  It's one data sheet for their entire

family.  They did not give us any other data sheets, separate data sheets, even for the specific products we listed.  They said everything in the family operates the same way.

**MR. WARREN:**  My name is Neil Warren, with Fish & Richardson.

So the families -- the reason the Tiny-PK isn't in this case is because it's not part of the TinySwitch-III family. You can look at the top of the data sheet and it says TinySwitch-PK family.

**THE COURT:**  Can I see the TinySwitch-III family data sheet?  Does somebody have that?

**MR. WARREN:**  Yes.  Absolutely.  We do.

**THE COURT:**  Can I see it?

**MR. SUDER:**  Your Honor, and also the schematics.

**THE COURT:**  Let me look at it.

**MR. WARREN:**  Let me hand this up for you.  This is trial Exhibit TX-14 for the record.  And now what's on the cover of the data sheet is not a schematic of the part itself. That's just a power supply that uses it.  So they all look very similar because they were all four-terminal devices.  But the point is that the internal circuitry --

**THE COURT:**  Wait a minute.  You're telling me this schematic here -- oh.  So the TinySwitch-III is within the circuitry.

**MR. WARREN:**  It's that rectangle in the middle, right.

THE COURT:  How would I know whether -- what the difference is between the III and the PK?

MR. WARREN:  Well, you would have to look at the actual circuit schematics, which are about 30 pages of detailed circuit drawings.  And I can guarantee you, their expert never did that because they were never produced in this case because that part was never accused.  But the TinySwitch-PK differs substantially from the TinySwitch-III in its functionality.

Now all of the TinySwitches look generally the same from the top level because they're all four-terminal devices that have the same terminals.  But internally, the circuits are quite different.  I mean, if you look at the schematic, the top-level schematic for the LinkSwitch, or even the TopSwitch, right? which is back from 1994, they'll all look very similar. But internally, they're completely different.  And Power Integrations keeps those internal differences propriety.  We're not publishing all of those internal differences.  I mean, that's --

THE COURT:  Well, there's a schematic of the switch itself, I assume.  Not just its general placement, but of the actual internal circuitry that's within the chip.

MR. WARREN:  Yes.  So the actual chip, just to put it into context, has 1,500 or so actual transistors.  So 1,500 --

THE COURT:  And the chip is different for the PK compared to the III?

MR. WARREN:  Yes, absolutely.

THE COURT:  Do you have a schematic of the chip?  Or something more detailed?  A lower -- a more granular schematic other than this general placement within the power supply?

MR. WARREN:  I don't think that was ever produced in this case because --

THE COURT:  But do you have it?

MR. WARREN:  Do I have it?  I have it.  Well, I don't have it with me, but I know my client has it.  So the schematics do exist.

But if you take, for example, say -- a much starker example is the LinkZero-AX and the LinkZero-LP.  So between those two parts, Power Integrations, just for background, had a very popular part called the LinkSwitch-LP.  It stands for low power.  LP.  And it was one of their most popular parts.

And they added an invention they came up with called "dormant mode" to it.  And that turned it into the LinkZero-LP.

Now, the LinkZero-AX didn't start with the LinkSwitch-LP.  It's completely different.  The only similarity between the LinkZero-LP and the LinkZero-AX is they both incorporated this brand new invention called "dormant mode" which allowed you to get down to zero standby waste, which is why they called it the LinkZero.

But other than that, those two parts share nothing in common.  They didn't start with the same base, they weren't

designed by the same inventors, they weren't designed by the same engineers.  They were completely separate projects.

**THE COURT:**  So the jury application of the patent could yield different results.  Or --

**MR. WARREN:**  Absolutely.

**THE COURT:**  -- require different analysis.

**MR. WARREN:**  Yes, Your Honor.  And it's up to the plaintiff to actually do that analysis.  And those schematics are nowhere in -- that analysis does not exist in their case.

**THE COURT:**  All right.  What's your response?

**MR. SUDER:**  Your Honor, first of all, if you look at the thing, it's called the TinySwitch family.

**THE COURT:**  No.  No.  Says TinySwitch-PK family.

**MR. SUDER:**  No.  Exhibit 15 says TinySwitch-III family.

**THE COURT:**  I'm looking for whoever submitted this Exhibit B.

**MR. SUDER:**  I'm sorry.

**THE COURT:**  This is Power Integrations -- I don't know if you call it a data sheet or what for the TNY 375-380. TinySwitch-PK family.

And then what was handed up to me is a TNY 274-280.

**MR. SUDER:**  That's the one I was referring to, Your Honor.

**THE COURT:**  It says TinySwitch-III family.

MR. SUDER: Yes. When we asked Mr. Kung -- this is on page 8 of our brief -- the TinySwitch-III family, we asked about this data sheet. Is it representative? He said: I believe so. To be clear, this represents the LT aside from the differences we discussed. They are -- he answered: If you compare the exhibits, the schematic to them, they are basically identical. That exchange is in each one of the four families.

THE COURT: Right. But he says they're, basically, identical. You can't win an infringement case based on that testimony alone. You'd have to put that schematic up and show how the '623 reads on it.

MR. SUDER: Absolutely.

THE COURT: And if it's a different schematic internally between the III and the PK, you've got a different analysis. It may be the same in the end, the jury may be the same, but it's a different analysis.

MR. SUDER: But the analysis that the 30(b)(6) witness said, and what we're entitled to ask him on the stand, is as relates to these -- this circuitry, these terminals, this voltage stabilizer, this CMOS, do they all work the same within this family?

That's what we endeavored to find out in the 30(b)(6) and he said: Yes, we do. And we relied on that.

And, Your Honor, when we asked him to produce the documents of the sales, they were categorized in the

spreadsheet by all the sub-products within each family.  So we relied on testimony and the documents they produced, and we said:  These families, give us the schematics.  And this is what they gave us.

And, Your Honor, just let me say.  The cases that they cite were when there was a motion to strike the infringement contentions.  There was a motion to strike the expert report.  And the courts even granted motion for leave to amend.  So there was an affirmative action taken by the defendants to say, Hey, you're infringement contentions are too vague, they're too broad.  You can't just say the phone with this functionality.

But they didn't do that here, Judge.  They opposed our amended infringement contentions where we laid this out, and they never raised that as a basis to oppose it before Judge Orrick.

THE COURT:  Let me ask about the Kung deposition.

MR. WARREN:  So the Kung deposition -- absolutely -- if you read what he said, it's exactly correct.  What he said was the TinySwitch-III data sheet in the schematics are representative of that family.  And if you look at the cover page of TX-14, kind of on the right-hand side down, you'll see about six or so different products.  TNY, III-something -- I don't have it in front of me -- listed.  Those are each different products.

And what Mr. Kung was saying was that each one of those,

yes, is representative of the TinySwitch-III.  And if you look at what -- the testimony Mr. Suder cited, he said that's also true for a family called the TinySwitch-LT.

So the TinySwitch-III and the TinySwitch-LT were based on the same part.  And LT stands for light.  It had some features disabled, but generally speaking they were the same part.  So what Mr. Kung was saying, yes, the TinySwitch-III and the TinySwitch-LT together have the same internal schematic, or similar internal schematic, such that they're representative. So that means that the numbers that are listed on the TinySwitch-III data sheet as being part of that family are. And those are the same numbers that were in the expert report.

The reason we never moved to strike any of this is because we actually had no idea -- we had no way of knowing that the TinySwitch-PK or the LinkZero-LP was what they considered as being part of the TinySwitch-III family.

**THE COURT:**  Let me ask.  Where does Mr. Kung refer to the TinySwitch-PK family expressly?  I don't see it in your brief, your quotation, from his depo.

**MR. SUDER:**  Your Honor, we just talked about TinySwitch-III family.  And --

**THE COURT:**  Where does he say the PK is exactly the same thing?

**MR. GUNTER:**  Dave Gunter, G-U-N-T-E-R, for plaintiff. Your Honor, the testimony from Mr. Kung was about the

TinySwitch-III family, stating that the products within the TinySwitch-III family are representative of the schematics that they produced.

Now, the testimony of the 30(b)(6) witness from Mr. Sutherland, the documents produced in relation to the financial spreadsheets, also categorized by family name.  The TinySwitch-PK products that Mr. Warren is referring to are categorized as the TinySwitch-III in that document.

**THE COURT:**  Well, for marketing purposes is one thing.  But for technical purposes, something else.  But where does the Kung deposition say the PK family schematics and functions are identical to the TinySwitch-III family.

**MR. SUDER:**  We didn't ask him that specific question on that, Your Honor.

But, for example, on the LinkSwitch-II family on page 8 of our brief we ask him:  So the information relative to the entire product family would be represented in this set of schematics unless there's some slight differences that we've discussed in the other specific product.  And he said:  Yes, I agree with that.

**MR. WARREN:**  Yes.  That's all of the LinkSwitch-II's.  But LinkSwitch-CV, which is the additional one that they're trying to lump in with the LinkSwitch-II, isn't part of that family.  To talk about --

**THE COURT:**  Let me ask.  If the bottom line is -- I've

said this already.  If you're going to prove infringement, unless you get a stipulation that the schematic is exactly the same, you're going to have to put on testimony about that particular family on the schematic that is representative of that family.  It's now been represented to me that the schematic for the PK is different from the schematic of the III.

MR. SUDER:  I will ask -- Mr. Kung will be here as part of our case and I will take my time and ask him those questions.

We relied on the information that they gave us and the fact that they never said anything.

THE COURT:  Okay.  I'm ruling.  It's not admissible. It was not disclosed.  The purpose of infringement contentions is to disclose with specificity.  So we don't get into exactly this situation.

Now, here we are on the eve of trial -- literally on the eve of the trial -- debating on whether the schematic is the same; if they're different, what are the material differences? What is the jury going to look at?  And now you want me to open up to the jury a whole area of inquiry of families with different schematics, and you've not demonstrated to the contrary a different schematic.  And you want an infringement analysis applied where there's been no predicate set forth other than some vague statements by Mr. Kung and

Mr. Sutherland.

There's been no -- nothing presented.  And you've not identified it.  You had a chance to identify it.  I understand the estoppel argument.  I understand that they said before Judge Orrick, Hey, the tables look accurate.

But when you get down to it, there's a function to infringement contentions in the degree of specificity that we require.  And you cannot come in at the last minute and join products that are undisputably at this point -- you do not dispute -- that the schematic is different for these other added products.

**MR. SUDER:**  Your Honor, I understand your ruling with the TinySwitch-III products.

With the LinkSwitch-II family, each one is different.  We specifically asked him if the schematic they produced is represented -- the entire family would be represented in this set of schematics.  And he said:  Yes.

**THE COURT:**  Where is that?  Where is that in your brief?

**MR. SUDER:**  That is on page 8 of our brief.  If you look at the testimony of Mr. Kung at 87, line 25, he says:  So this information relative to the entire product family would be represented in this set of schematics, with the slight differences we discussed about size and capacity.  And he said:  Yes, I agree with that.

So at least as to the LinkSwitch-II family, we're entitled to rely on his testimony that all products that they have within that family operate under the set of schematics that Mr. Zane -- Dr. Zane, testified about.  Again, it's on page 8 of our brief.

**MR. WARREN:**  Your Honor, if I may, I'll hand up the data sheet for the LinkSwitch-II so that you can see what we're talking about here.

What Mr. Kung said is exactly accurate.  Again, the LinkSwitch-II gives a list of products, and the schematics are representative of that list.

Attached to our brief was a separate data sheet for the LinkSwitch-CV family, which is a very different family.  And this one you can see the difference on the cover of the schematic.  Because if you look at the characteristic, the LinkSwitch-II is what we called a "constant current."  And so you'll see a straight line when you see the schematic and the characteristic on the front page.  LinkSwitch-CV doesn't even have constant current.  They're nothing alike.  One's a constant current; one's a constant voltage.

And what I'm referring to is the figure that appears right below the schematic.  One will look like kind of a rectangle with a hard edge; one will look like a triangle that folds back under.  And what that's showing is these are completely different functionalities.  One's a constant current switcher;

one is a constant voltage switcher.  And the schematics are nothing alike.

And Mr. Kung never said the schematics were anything alike, and they never asked Mr. Kung about the LinkSwitch-CV family of products, because it's not in this case.

**THE COURT:**  Again, there are differences.

**MR. WARREN:**  There are absolutely differences.

**THE COURT:**  And infringement analysis would have to be applied to this particular family.  The CV family.

**MR. WARREN:**  Absolutely.  Those are not similar.

**THE COURT:**  We got the same problem.

**MR. SUDER:**  Your Honor, they all have differences.  That's why they're named different.  But their core -- you have different models of a Ford, it would have the same engine, if we're accusing the engine.

**THE COURT:**  There are sufficiently material differences here.  It's not like you've got a widget that's green and a widget that's blue, but everything's exactly the same.  There's some different functionality here.  And, again, would require a discrete analytical analysis by the jury.

So unless they're actually identical, I don't see how you can just bring these in at this moment.

So my ruling applies to the LinkSwitch-CV, as well.

So the table is going to have to be amended -- I don't know if you've already done that or not -- to include just the

products that were identified in the infringement contentions and/or by Dr. Zane.

**MR. SUDER:** We have done that. We have not exchanged it. But -- it's not just a -- it's a laborious task. We've already done it. But we will exchange with them over the weekend.

**THE COURT:** All right. So that's my ruling on that. The jury's ready.

**THE CLERK:** They will be in five or --

**THE COURT:** Obviously, we're going to have to take up the opening slides issue. And as I say, I have not had a chance to absorb these, but we're going to have to take it up at some point, maybe during a break or something. And these are for your openings, right? These are your demonstratives?

**MR. WARREN:** Yes.

**THE COURT:** You both have objections to each other's slides?

**MR. WARREN:** Yes, Your Honor.

**MR. SUDER:** Your Honor, our objection goes to the vast majority of their slides. We spoke last night. And I think on our slides we made some corrections. We have three specific ones, maybe four, that need to be addressed very specifically. Two of them, obviously, need to be changed in light of your ruling just now.

**MR. WARREN:** We have six total objections that we need

to discuss on their slides.

THE COURT: All right.  Let's take a break.  And the jury will be down momentarily, and that's the first order of business to get the jury selected and seated.  And then hopefully that won't take too long and we can get to the slides.

MR. WARREN:  Thank you, Your Honor.

(Recess taken at 8:32 a.m.)

(Proceedings resumed at 8:54 a.m.)

(Prospective jurors entering the courtroom.)

### JURY VOIR DIRE

THE CLERK:  Calling civil action 17-3597, Opticurrent versus Power Integrations.

Counsel, please state your appearances for the record.

MR. SUDER:  John Suder, along with Corby Vowell, Dave Gunter and Lewis Hudnell, on behalf of the plaintiff.

THE COURT:  All right.  Thank you.

MR. SUDER:  Good morning, Your Honor.

MR. SCHERKENBACH:  Good morning, Your Honor. Frank Scherkenbach, of Fish & Richardson, on behalf of Power Integrations.  With me, Neil Warren, Joseph Warden, Michael Headley.

THE COURT:  All right.  Thank you.

This is the time set for trial in Civil Case Number C-17-3596, Opticurrent LLC versus Power Integrations, Inc.

Are the parties ready to proceed?

**MR. SUDER:**  Yes, Your Honor.

**MR. SCHERKENBACH:**  We are, Your Honor.

**THE COURT:**  All right.  Thank you.

Good morning, ladies and gentlemen.  On behalf of the Federal District Court for the Northern District of California let me welcome you.  My name is Judge Chen, and I am a District Judge of this court and I will be presiding over the trial in this case.

Ladies and gentlemen, the remarks I'm about to make apply to those of you who have been summoned to jury service.  The term of court for which you have been requested to serve as jurors is anticipated to last approximately one week.  We will be in trial next week, after President's Day.  We will start on Tuesday, Wednesday, we are off on Thursday, and then we will have further trial on Friday.  And then we'll continue into the following week on Monday and, if necessary, Tuesday.

But we anticipate that the case will be completed, at least the evidence will be completed no later than Monday of -- two Mondays from now, the Monday after this Monday.  And possibly even earlier than that, but we'll see how it goes.  So it is essentially about one week of service.

After the jury is selected today, as I mentioned, on Tuesday, the 19th, trial will begin.  We will first hear opening statements on behalf of each of the parties, the

plaintiff and the defendant.  We will then commence presentation of evidence and you will hear from witnesses.

We start each morning as 8:30, and we will generally go until 4:30 each day we are in trial, with 15-minute breaks every hour and a half, and a 45 minute lunch break.

Now, on Wednesday of next week we actually will have a short day.  We will adjourn at 1:00 p.m. because I have other matters in the afternoon.  The other days we'll go through to 4:30.  We will not have trial on Thursday of next week because I have other matters every Thursday to hear.  And as I mentioned, we will resume trial on Friday, the 22nd and then Monday the 25th.

So as I mentioned, the Court hopes that the parties will be able to submit the case to you, if not by Friday of next week then by Monday the 25th.

So let me begin by saying the Court understands and appreciates that being summoned to serve as a potential juror is an imposition on your time.  However, by being here this morning each one of you is discharging one of the most important obligations of a citizen.  One of the highest duties of American citizenship is that of jury service.  This is because your jury service aids in preserving an institution as great as any other, which gives life and meaning to our free society.

For over 200 years, our Constitution, including the Bill

of Rights, has stood as a safeguard for our freedoms.  The jury process is guaranteed by the Bill of Rights.  Nowhere in the American concept of justice "of the people, by the people, and for the people" better embodied than in the jury box.  Jurors keep law in the United States close to the people, preserving the guarantee of freedom and democracy that many in the world are still struggling to achieve.

The jury process reflects the collective conscious of the community.  In contrast to other countries where judges alone often decide issues, American jurors help balance the scales of justice.  It preserves a right rooted deeply in history that allows Americans to have their case, both civil and criminal, heard not by government officials but by peers within their community.  You have an opportunity to provides a great service, but you also have an awesome responsibility.

Our system entitles the parties to an impartial jury of their peers to resolve the factual issues raised in the case. In order to obtain such a jury, we call persons throughout the area which comprises this federal judicial district.  These persons are selected at random to assure that they represent a fair cross-section of the community.  It was through this random process that brought you here today.  And it is important that all of you who are called make every effort to accept the responsibility to serve because only in this way will the litigants in this court receive the trial by their

peers which is so fundamental to our judicial system.

Thus, your willingness to serve as jurors is not only appreciated by the Court and the parties herein but it is also necessary in order for our judicial system to continue to work.

Ms. Meuleman, has the oath been administered?

**THE CLERK:** Yes, it has, Your Honor.

**THE COURT:** All right. Thank you.

Ladies and gentlemen, the case for which we are selecting a jury today is a civil trial. Not a criminal trial but a civil trial. The jury for a civil trial in this court will be composed of eight persons. Our task this morning is to select among you eight persons to serve as jurors to try this case.

I will have the clerk select 20 names from the panel to what say is -- we call fill the box. You will take seats in the 14 seats here in the jury box, and then six of you will sit in the front row.

And then I will ask some general questions of all of you, all 35 of you, about your ability to serve. And after some period of questioning I will then address questions to those 20 persons whose names were called.

But it's important for all of you to listen to the questions and in your own mind determine how you would answer them, because there's a chance that someone from the group, the first group of 20, may have to drop out and you may be called to take their place. So it will increase our efficiency if you

have in mind answers to some of the questions that we've asked.

Now, the purpose of this questioning process is to allow the Court and the parties to ensure that jurors selected will be able to serve and will be fair and impartial in this case.

The questions are not designed to pry unnecessarily into your personal lives or affairs.  Each question is designed to assist attorneys in selecting the fairest jury possible.  So please do not withhold information in order to be seated on this jury.  Be straightforward in your answers rather than answering the way you feel the lawyers or I would expect you to answer.

Now, if you feel that your answer to a particular question might be embarrassing, please let me know and I will give you an opportunity to answer privately outside the presence of other members of the jury pool.

After we complete our questioning of prospective jurors, the law permits the Court and each side to excuse some jurors from this case.  When prospective jurors are excused in this process it is not because of any personal like or distrust, but it is in order to get a final jury that is impartial and that has the kind of balance the parties feel is appropriate for this case.

If you happen to be one of those excused in this case, please do not consider it any reflection on you or quality of your service as a juror.

For example, a person may be challenged and excused because one side or the other believes that from the juror's occupation that his or her point of view is unduly represented among those occupying the jury box.  The procedure whereby the members of the jury are chosen is part of our system of justice and has evolved with the purpose of fairness to both sides.

You have done your full duty by your presence and your readiness to serve if called.  In fact, once you are excused, you are to report back to the jury assembly room.  There is a chance that you may be called to another courtroom.

The challenges, along with my decision to excuse jurors, will be exercised confidentially.

So, Ms. Meuleman, if you could call the first 20 names.

**THE CLERK:**  Jane Leonido Santillano is number 1.

Ben Wong, number 2.

Number 3, Malia Valerie Nims.

Number 4, Nada Younis Alkhairull.

Number 5, Donell Wall.

Number 6, Pocholo he is Dilla.

Number 7, Paul Pierce.

Number 8, Noelle Lynn Tolentino.

Number 9, Wonchalurm Aksomboon.

Number 10, Manuela Nimmo.

Number 11, Alexa Anneli Lefebvre Dargence.

Number 12, Tiffany Thanh Vo.

Number 13, William Jansen Verplank.

Number 14, Joy Elizabeth Vigil.

Number 15, Timothy Michael Cruse.

Number 16, Stephanie Nichole Willoughby.

17, Sheryl Kay Howard Watson.

18, Andrea Carolina Vas.

19, Steven Megn Pech.

And, number 20, Amelia Jeanne Lindstrom.

Twenty are seated, Your Honor.

**THE COURT:** All right. Thank you, Ms. Meuleman.

So I'm going to first address questions to everybody in the room, not just the names who have been called. Please listen carefully to my questions and tell me anything that each question brings to mind. It is your duty to answer truthfully and completely.

As I said, none of these questions are intended to embarrass or invade your privacy. And if you feel the answer to a particular question might be embarrassing please let me know and I will give you an opportunity to answer privately outside the presence of other members of the jury pool.

As I mentioned, the typical court day will begin at 8:30 and end at 4:30, with 15-minute breaks every hour and a half, and a 45 minute lunch break in the middle. It is anticipated this trial will last approximately one week. And, as I mentioned, we'll be in session next Tuesday, Wednesday, and

Friday, and possibly the Monday after that.  During --
depending on jury deliberations, it is possible that your
service could run longer.

So my first question is whether any of you -- and I'm
again addressing everybody in the room -- do not speak,
understand or read English?  Raise your hand if you do.

All right.  Thank you.

**THE CLERK:**  Your Honor --

**THE COURT:**  Would any of you find it extremely
difficult or impossible to participate in the period of time I
mentioned?

Wait a minute.  We have a --

**PROSPECTIVE JUROR WONG:**  I cannot read English.

**THE COURT:**  You don't read English?

**PROSPECTIVE JUROR WONG:**  Yeah.

**THE COURT:**  Tell me, how long have you been in the
United States?

**PROSPECTIVE JUROR WONG:**  Almost 30 year.

**THE COURT:**  30 years.  And what is your occupation?
What do you do for a living?

**PROSPECTIVE JUROR WONG:**  Restaurant.

**THE COURT:**  You work at a restaurant?

**PROSPECTIVE JUROR WONG:**  Yeah.

**THE COURT:**  And did you have schooling here in the
United States?

**PROSPECTIVE JUROR WONG:**  Two or three years.  That's it.

**THE COURT:**  Of high school or college, or what?

**PROSPECTIVE JUROR WONG:**  College.

**THE COURT:**  You had two or three years of college?

**PROSPECTIVE JUROR WONG:**  Yeah.

**THE COURT:**  Where?

**PROSPECTIVE JUROR WONG:**  City College.

**THE COURT:**  San Francisco City College?

**PROSPECTIVE JUROR WONG:**  Yeah.

**THE COURT:**  And I take it the instruction and the curriculum was in English.

**PROSPECTIVE JUROR WONG:**  Not that good.

**THE COURT:**  What kind of classes did you take?

**PROSPECTIVE JUROR WONG:**  Just English.

**THE COURT:**  English classes?

**PROSPECTIVE JUROR WONG:**  Yeah.

**THE COURT:**  Did you take any other courses, like history or math?

**PROSPECTIVE JUROR WONG:**  No.

**THE COURT:**  Just English?

**PROSPECTIVE JUROR WONG:**  Yeah.

**THE COURT:**  Did you get an AA degree?

**PROSPECTIVE JUROR WONG:**  No.

**THE COURT:**  So in your English classes you feel that

you weren't able to -- you're not able to read English?

**PROSPECTIVE JUROR WONG:**  No, I cannot read English.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR WONG:**  Just a little bit.  Not that much.

**THE COURT:**  Just a little bit?

**PROSPECTIVE JUROR WONG:**  Yeah.  Not that much.

**THE COURT:**  Do you read newspapers?

**PROSPECTIVE JUROR WONG:**  No.

**THE COURT:**  You don't read any newspapers?

**PROSPECTIVE JUROR WONG:**  I had (shakes head).

**THE COURT:**  At your work do you have to read English?

**PROSPECTIVE JUROR WONG:**  No.

**THE COURT:**  Where do you work?

**PROSPECTIVE JUROR WONG:**  Chinese restaurant.

**THE COURT:**  All right.  What about any other correspondence, do you have to read letters or write letters in English at all?

**PROSPECTIVE JUROR WONG:**  No.

**THE COURT:**  All right.  Anybody else?

Okay.  So my second question then -- thank you Mr. Wong -- is whether any of you would find it extremely difficult or impossible to serve for the period of time that I mentioned.

(Show of hands.)

**THE COURT:**  All right.  So let's take it one at a

time.  If you could state your name for the record and maybe explain your situation.

**PROSPECTIVE JUROR SANTILLANO:**  Hi, my name is Jane Santillano.

**THE COURT:**  Thank you, Ms. Santillano.

**PROSPECTIVE JUROR SANTILLANO:**  I'm a student at Chabot College.  And it might be difficult for me to serve on the jury because I take BART.  But I'm not that comfortable taking BART alone, so I would have to have my father come with me every day to serve on jury if I get picked.

**THE COURT:**  Okay.  So you don't commute -- you live in the East Bay, I take it.

**PROSPECTIVE JUROR SANTILLANO:**  Yes, I do.

**THE COURT:**  So you normally don't come into -- you don't take BART to go to other parts of the Bay Area?

**PROSPECTIVE JUROR SANTILLANO:**  No, sir.

**THE COURT:**  Okay.  So it's the transportation, not so much the fact that you're taking classes then, that's the problem?

**PROSPECTIVE JUROR SANTILLANO:**  Well, I do take classes Monday, Wednesday, Friday.  And if I come here to San Francisco or if I go to Oakland then I would have to have my father come with me so that I have, basically, someone to company me.

**THE COURT:**  Do you take public transportation to your classes?

**PROSPECTIVE JUROR SANTILLANO:**  Usually bus, but I usually drive by myself.  But if I'm driving, if I come here, I don't know how to take freeway.

**THE COURT:**  Right.  So normally you drive, you don't take BART around?

**PROSPECTIVE JUROR SANTILLANO:**  If I were to take public transportation coming here, then I would have to have my dad come with me.

**THE COURT:**  Okay.  All right.  Thank you.

**PROSPECTIVE JUROR SANTILLANO:**  You're welcome.

**THE COURT:**  All right.

Somebody else on the top row.  All the way down to Mr. Pierce, is it?  No, Mr. --

**PROSPECTIVE JUROR DILLA:**  Hello, Your Honor, I'm Pocholo Dilla.  And my reason to be excused is I'm a new parent and my -- I leave my son to my in-laws.  And she's taking care of two -- two grandsons which is just three months apart.  My son is turning a year on February 20th.  So this is going to be just a burden for her.

**THE COURT:**  So your -- is it your in-laws that are taking care of your child?

**PROSPECTIVE JUROR DILLA:**  Yes, sir.

**THE COURT:**  So -- and you go to work during the day?

**PROSPECTIVE JUROR DILLA:**  4:00 a.m. in the morning.

**THE COURT:**  So if you had to come here to court on

next Tuesday, Wednesday, Friday, and then Monday after, why is that a burden if your child is already --

**PROSPECTIVE JUROR DILLA:**  She's cancer survivor. She's around 60, and she can't take care of two grandkids.

**THE COURT:**  Oh, so you're saying your in-laws could not take care of your child?

**PROSPECTIVE JUROR DILLA:**  Yeah.  I take over my son's --

**THE COURT:**  What time do you get home?

**PROSPECTIVE JUROR DILLA:**  Around 12:45.

**THE COURT:**  So you normally end work at 12:45 and take care of your child?

**PROSPECTIVE JUROR DILLA:**  Once I get off.  I come to work at 4:00 a.m. to 12:45.

**THE COURT:**  I see.  So if you had to stay here until 4:30, that would be the hardship because you would unable to take care of your child?

**PROSPECTIVE JUROR DILLA:**  Not only that, my wife already use her maternity leave.  I'm still new at work, just for a year, so it's going to be financial after -- you know, still going to be a financial burden.

**THE COURT:**  So it would be a hardship for you to miss work?

**PROSPECTIVE JUROR DILLA:**  Yes, sir.

**THE COURT:**  Where do you work?

**PROSPECTIVE JUROR DILLA:**  In Hayward.

**THE COURT:**  Who do you work for?

**PROSPECTIVE JUROR DILLA:**  Pacific Cheese Warehouse.

**THE COURT:**  Do you know if they pay for your jury time?

**PROSPECTIVE JUROR DILLA:**  Yes, just for a week.

**THE COURT:**  Okay.  So they would pay for your week?

**PROSPECTIVE JUROR DILLA:**  Yes.

**THE COURT:**  So that would not be a financial hardship then?

**PROSPECTIVE JUROR DILLA:**  Afterwards.

**THE COURT:**  If it goes more than a week?

**PROSPECTIVE JUROR DILLA:**  Yes, sir.

**THE COURT:**  I see.  The main thing is your child, you need to take care of your child at 12:45 every day?

**PROSPECTIVE JUROR DILLA:**  Yes, sir.

**THE COURT:**  Because your in-law is not able to handle --

**PROSPECTIVE JUROR DILLA:**  No.

**THE COURT:**  Okay.  All right.  And then is it Mr. Pierce next to you?

**PROSPECTIVE JUROR PIERCE:**  Good morning, Your Honor. I have a 7-year-old grandson that's autistic, and I keeps him five days a week.  And like in the mornings, I get him dressed for this private service come pick him up and take him to

school.  And then in the afternoon, around about 2 o'clock I have to be there to keep him.  I keep him until about 7 o'clock at night.

And like today, he get out early, like 1:30, so I have to be there, you know, when they pull up, so I can keep him.  So I feed him and I bathe him and, you know, all that stuff, you know.

But my wife, she's there, but she can't keep him.  And she has a childcare, and she keeps 14 kids.  So I'm -- I'm retired so, you know, they put everything on me.

**THE COURT:**  Okay.  Nobody else that could stand in your place?

**PROSPECTIVE JUROR PIERCE:**  Nah.

**THE COURT:**  All right.  Thank you.

**PROSPECTIVE JUROR PIERCE:**  Okay.

**THE COURT:**  Can you hand the mic back to the front row.  Why don't you go ahead and state your name.

**PROSPECTIVE JUROR DARGENCE LEFEBVRE:**  I'm Alexa Dargence.  I'm a designer [indecipherable] hotel.  We have a presentation with our biggest client on the 25th, which is two Mondays from now.  The presentation needs to be done, and I'm the only one who at my work can do it.  So the work would -- it would be very difficult to get the work done.  I would probably have to be going every night after jury to complete it, if at all.

And then to not be there for the presentation would be really damaging for our relationship with the client.  The meeting cannot be rescheduled.

THE COURT:  The meeting can't be rescheduled?

PROSPECTIVE JUROR LEFEBVRE:  It's in Southern California, and there are, I would say, maybe nine people attending.  And probably -- to reschedule it would throw off a whole construction schedule with the hotel.

THE COURT:  And you're the only one?

PROSPECTIVE JUROR LEFEBVRE:  Yeah.

THE COURT:  Thank you.

Was there somebody else?  Ms. Tolentino.

PROSPECTIVE JUROR TOLENTINO:  I'm currently unemployed right now, but I'm seeking.  And I was asked to come in for an interview next week for the first round.  They said if I passed that round then I'd go into the next interview, which will be the next couple of weeks after.

THE COURT:  What day is your interview?

PROSPECTIVE JUROR TOLENTINO:  The 22nd, Friday.

THE COURT:  Friday.  All right.  I guess you're not in a position to ask them to reschedule that?

PROSPECTIVE JUROR TOLENTINO:  (Shakes head.)

THE COURT:  Okay.  Thank you.

Anybody else on this row?

Okay.  There's some other hands there.

**PROSPECTIVE JUROR CRUSE:**  Good morning, Your Honor.

**THE COURT:**  All right.  Mr. Cruse.

**PROSPECTIVE JUROR CRUSE:**  My name is Timothy Cruse.  I have a 7-year-old son who's autistic.  He's got issues.

So what I mean by that, the school calls and I got to get out of work to pick him up.  Me and my wife bounce back and forth.  I'm also a supervisor at Tesla.  And it's been -- it's been a little bit tough, you know, when you got to leave and you're leaving crews and stuff like that.

My wife does payroll for a company, so she's taking time off as well.  I take time off as well.  I also pick him up in the afternoon, too.  So I leave work right around 2:30, and I pick him up so --

**THE COURT:**  What time does he usually get picked up?

**PROSPECTIVE JUROR CRUSE:**  He gets dropped off at day-care with Ms. Bonnie probably around 6:10.  But the issues are at school right now he's been getting in verbal confrontations with kids.  He's just learning how to communicate and stuff.  So he's not severe autistic, but he is autistic and he has been physical lately.

So I feel I need to be, you know, accessible, either me and my wife.  And my wife can't just leave on a whim.  I have a little bit more flexibility.

**THE COURT:**  So you're sort of on call, basically, to respond to your son's needs?

**PROSPECTIVE JUROR CRUSE:**  Yeah, well, I'm a dad.  I also have a daughter, as well, too.

**THE COURT:**  And does it happen often -- if you were here for a week, is there a fair chance that you might be called to come and get your son or do something?

**PROSPECTIVE JUROR CRUSE:**  Yes, sir.

**THE COURT:**  It happens enough even in a week's time --

**PROSPECTIVE JUROR CRUSE:**  It's the communication with other kids.  So he's in normal gen ed too.  And then half the time he's in sensory and speech.  So if he can't communicate out on the playground or something, he puts his hands on somebody, it's time to go home.

**THE COURT:**  All right thank.  You.

Somebody else in the front row?

**PROSPECTIVE JUROR WILLOUGHBY:**  Hello.  My name is Stephanie Willoughby.  I take care of my 2-year-old daughter every Monday, all day, and then I have to get her when I get off of work, from my grandma who has a hard time getting around because of her knees.

And I'm also -- sorry.  I've got a cold.  I am also the only other person in my office, other than the doctor herself.  I'm the receptionist.  I take all the phone calls.  I do all the billing and paperwork up in the front.  So if I'm here for a week, she's without a second person.

**THE COURT:**  What time do you pick up your daughter

from your mother's?

**PROSPECTIVE JUROR WILLOUGHBY:** On Mondays, I have her all day. From Tuesday through Thursday I pick her up about 3:30'ish. And on Friday I have her all morning. And then I have a late shift that day, and I pick her up by 6:30.

**THE COURT:** And is there anybody else that could take your place, or you're the only one?

**PROSPECTIVE JUROR WILLOUGHBY:** I'm the only one. Most of my family lives far away.

**THE COURT:** And you live in Castro valley?

**PROSPECTIVE JUROR WILLOUGHBY:** Yes.

**THE COURT:** So you have a long ways to go from here. As far as your work, it's just you that is the reception?

**PROSPECTIVE JUROR WILLOUGHBY:** It's me the receptionist and the doctor herself.

**THE COURT:** Oh, there's a receptionist and you?

**PROSPECTIVE JUROR WILLOUGHBY:** Me and the doctor. I'm the receptionist.

**THE COURT:** You are the receptionist?

**PROSPECTIVE JUROR WILLOUGHBY:** Yes.

**THE COURT:** If you are not there, is there a substitute?

**PROSPECTIVE JUROR WILLOUGHBY:** There's nobody else. She's a small business owner.

**THE COURT:** Okay. Thank you.

Anybody else in the front row?

State your name please.

**PROSPECTIVE JUROR CARDIASMENOS:**  Steven Cardiasmenos.

**THE COURT:**  Yes, okay, Mr. Cardiasmenos.

**PROSPECTIVE JUROR CARDIASMENOS:**  Steven Cardiasmenos.

I'm a self-employed private music teacher who has 32 students during the week.  More than half of those are scheduled before 4:30, so that would be a financial hardship for me.

**THE COURT:**  So you'd have to lose or cancel --

**PROSPECTIVE JUROR CARDIASMENOS:**  I'd have to cancel about 20 of them, or maybe more with travel time back home.

**THE COURT:**  All right.  Thank you.

Anybody else?  State your name, please.

**PROSPECTIVE JUROR ALBANIA:**  Good morning, Your Honor. My name is Martin Albania.  Your Honor, my company won't pay for me for jury duty, so it's going to be a financial hardship for me.

**THE COURT:**  Who do you work for?

**PROSPECTIVE JUROR ALBANIA:**  Stanford Healthcare.

**THE COURT:**  They don't pay for jury duty?

**PROSPECTIVE JUROR ALBANIA:**  No, sir.

**THE COURT:**  That's a little bit surprising.  But we'll have to have a word with Stanford about that.  Okay.  They don't even pay for a week then?

**PROSPECTIVE JUROR ALBANIA:**  No, Your Honor.

**THE COURT:**  All right.  Anybody else?  Hand back there.

Good morning, Your Honor.

**PROSPECTIVE JUROR FABRIS:**  Good morning.  My name is Deanna Fabris.

**THE COURT:**  Okay.  Hold on a second.  Yes, Ms. Fabris.

**PROSPECTIVE JUROR FABRIS:**  On Friday I have a preplanned vacation.  My flight and my hotel are already booked.

**THE COURT:**  And is this a nonrefundable or refundable situation?

**PROSPECTIVE JUROR FABRIS:**  Nonrefundable.  Both are.

**THE COURT:**  That's starting on Friday?

**PROSPECTIVE JUROR FABRIS:**  Correct.

**THE COURT:**  All right.  Anybody else?

**PROSPECTIVE JUROR HEGARTY:**  Good morning, Your Honor. Patrick Hegarty.

**THE COURT:**  Mr. Hegarty.

**PROSPECTIVE JUROR HEGARTY:**  I'm employed by a small tech consulting company, and I'm working as a contractor at Samsung in Mountain View.  I get paid hourly.  So missing five days of work would be a financial hardship.  I live by myself and I'm the sole responsible income.  I'm responsible for rent.

**THE COURT:**  All right.  So would you lose pay,

basically, and you're working full-time?

**PROSPECTIVE JUROR HEGARTY:**  Yes.

**THE COURT:**  All right.  Thank you.

Somebody else raised their hand there.

**PROSPECTIVE JUROR LOPEZ-FLORES:**  Hello my, name is Magdalena Lopez-Flores.

**THE COURT:**  All right.  Ms. Lopez-Flores, yes.

**PROSPECTIVE JUROR LOPEZ-FLORES:**  I'm unemployed.  The reason is why my mother is 55 years old, and at the moment she's unwell.  So I'm taking care of her, taking her to the doctor and translating for her.

**THE COURT:**  And is there anybody else in your family that can help her if you're not there?

**PROSPECTIVE JUROR LOPEZ-FLORES:**  Everyone else is working.  I'm the only one that's with her.

**THE COURT:**  And so you're with her during the week then?

**PROSPECTIVE JUROR LOPEZ-FLORES:**  Yes, every day.

**THE COURT:**  All right.  Anybody else?

**PROSPECTIVE JUROR MAK:**  Good morning, Your Honor.  My name is Manuel Mak.

**THE COURT:**  Mr. Mak.

**PROSPECTIVE JUROR MAK:**  I have a scheduled nonrefundable conference 25th through the 27.  I'm also a federal employee in the process of retiring and moving out of

state.

**THE COURT:**  Are you moving within the next two weeks?

**PROSPECTIVE JUROR MAK:**  Early March 3rd.

**THE COURT:**  In March.  Okay.  But you have a nonrefundable, you say, conference?

**PROSPECTIVE JUROR MAK:**  Yes, in Southern California.

**THE COURT:**  Is it a work related conference?

**PROSPECTIVE JUROR MAK:**  Yes, sir.

**THE COURT:**  And that's on the 25th, which is Monday?

**PROSPECTIVE JUROR MAK:**  Monday through Wednesday.

**THE COURT:**  And is this a conference -- what would happen if you didn't attend this conference?

**PROSPECTIVE JUROR MAK:**  I'm going for a peer review. It's a five year peer review for board certification.

**THE COURT:**  All right.  And you are part of the peer review process?

**PROSPECTIVE JUROR MAK:**  I'm being reviewed.

**THE COURT:**  You're being reviewed?

**PROSPECTIVE JUROR MAK:**  Yes, sir.

**THE COURT:**  So you have to be there?

**PROSPECTIVE JUROR MAK:**  Right.

**THE COURT:**  All right.  And that can't be rescheduled?

**PROSPECTIVE JUROR MAK:**  No, sir.

**THE COURT:**  All right.  Anybody else?  There was a hand in the back.

**PROSPECTIVE JUROR OWEN:**  Good morning, Your Honor.  My name is David Owen.  I live in Sonoma County, about an hour drive at best.  And I don't have a very reliable form of transportation.  And I'm concerned that if any of these days my car breaks down I won't have a backup transportation option from the north bay.

**THE COURT:**  Have you had resent car troubles?

**PROSPECTIVE JUROR OWEN:**  So far it's been good.  It's a Honda Civic, but it's still a '90s Honda Civic.  And with the weather I sometimes get electrical, DC, issues with the water.

**THE COURT:**  Okay.  Well, you got hereby today I guess.

**PROSPECTIVE JUROR OWEN:**  I did.

**THE COURT:**  Okay.  All right.  Anybody else?  There's another hand back there.

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  Yes, Your Honor.  I'm Veronica Perez-Sutherland, and I have a lower back problem which doesn't allow me to sit for a very long time, so I have to move around or stand up.

So if that's an issue with the Court, that would be a problem for me.  Or if it's distraction for people.  I wouldn't be able to sit for quite a long time.

**THE COURT:**  All right.  Well, you're not the first.  A lot of us have back problems.  And, actually, we do make accommodation.  If you need to stand you, can stand anytime.

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  Good.  Thank you.

As long as you don't get distracted by me getting up and moving around.  Thank you.

**THE COURT:**  No, I think we would understand.  Thank you.

Yes.

**PROSPECTIVE JUROR WITTMER:**  Hello, Your Honor.  My name is Ken Wittmer.

**THE COURT:**  All right.  Mr. Wittmer.

**PROSPECTIVE JUROR WITTMER:**  I have really a small issue, but it just came up the last couple of weeks.  My mom has been in and out of emergency care.  She's 86 years old. She does live by herself, and we do not live with her.  But today she was scheduled to go on a cruise, which we cancelled. But my brothers and sisters, I have three of them, are all getting on the cruise and leaving for the Panama Canal for the next two and a half weeks.  So I'm the primary person to assist her.

Today, because I had court, I did arrange for my wife to take her to a doctor's appointment today, which they're going to schedule some type of exploratory surgery sometime in the future.

I can honestly tell you it could be beyond the court date, so it may not be a factor for me.  But if not I had promised, you know, that I would be the one to take her.  But if I had to make arrangements, my wife could try to get out of work

herself.  That would be a possibility.  My job is not a concern.

THE COURT:  It says you're an air traffic --

PROSPECTIVE JUROR WITTMER:  Well, I'm four years retired air traffic.  But I went back as a contractor supervisor, working in the same building, as a manager.

THE COURT:  I see.  So your concern is if the medical appointment indicates that your mother needs surgery, that that surgery might --

PROSPECTIVE JUROR WITTMER:  Yeah, it's an exploratory-type surgery, so it's in one day, out.  But she's not allowed to drive until they get to the bottom of her medical condition.  So she does require transport.  It's not impossible to find something else.  There's other things I can do.

THE COURT:  So your main concern is if there's something imminent, in terms of surgery, you would have to be around.

PROSPECTIVE JUROR WITTMER:  That could potentially be, since my brothers and sisters leave today at 3 o'clock from San Francisco.  I would be the primary.

THE COURT:  Otherwise, there's not an immediate --

PROSPECTIVE JUROR WITTMER:  No, there's no --

THE COURT:  You could work around this one-week schedule?

**PROSPECTIVE JUROR WITTMER:**  Potentially, yes.

**THE COURT:**  All right.  Appreciate that.  We have a hand here in the front row.

Ms. Nims.

**PROSPECTIVE JUROR NIMS:**  Yes.  My issue is more like a quality of service than an actual conflict.  My job lets me off at work at midnight, to 12:30.  I live in Marin, San Rafael. And, obviously, I don't go to sleep immediately right when I get home.  So, like, today I'm running on two and a half hours of sleep.  And I just am concerned about my alertness and focus on being here all morning.

**THE COURT:**  All right.  So lack of sleep.  Not enough hours to get to bed and get here?

**PROSPECTIVE JUROR NIMS:**  Yes.

**THE COURT:**  And your job is like a swing shift kind of --

**PROSPECTIVE JUROR NIMS:**  I'm the store manager at an adult boutique, so we have long hours.

**THE COURT:**  Okay.  Anyone else?

All right.  I have some additional questions.  One of you has already alluded to, I was going to ask about health conditions.

Besides the back condition, does anybody else have a health condition that would prevent you from serving as a juror without accommodation?

All right.  Do any of you have any ethical, religious, political or other beliefs that would prevent you from serving as a juror?

All right.  Before we go any further, let me introduce the court personnel.  And I do this just to make sure that you don't know anyone or that if you do that that won't affect your ability to serve.

My secretary is Leni Doyle-Hickman.  Our courtroom deputy, whom you've met, is Angela Meuleman.  The court reporters are Vicki Eastvold and Katherine Sullivan.  And my law clerks are Robert Sandoval, Shao-Bai Wu, Terry Ding, and Erika Watts.  I also have three law externs, who are students, who will be observing this trial.  They are Breana Burgos, Christy England and Alexandra Wolf.

Do any of you know either me or any of the names that I've just mentioned?  It's happened before actually.  Okay.  Thank you.

Now, let me introduce the lawyers and their clients.  The plaintiff is represented by Jonathan Suder, Corby Vowell, Dave Gunter of Friedman, Suder & Cooke, and Lewis Hudnell of Hudnell Law Group PC.

Do any of you know any of these individuals on a social or professional basis?

All right.  Mr. Suder, could you name -- either introduce or name the clients, your clients, to make sure there are no

principals here that the folks know.

**MR. SUDER:**  Yes, Your Honor.  This is Brad Brunell.
He is a part owner of plaintiff.  And his partner is a
gentleman by the name of Phil Bachon, B-a-c-h-o-n.

**THE COURT:**  Thank you.  Do any of you know any of
these individuals?  All right.

The defendant is represented by Frank Scherkenbach,
Michael Headly, Neil Warren, John Thornburg, and Joseph Warden
of Fish & Richardson, PC.

Do any of you know these individuals on a social or
professional basis?  Okay.

Would you state your name, please.

**THE COURT:**  Yes.

**PROSPECTIVE JUROR ALKHAIRULL:**  Nada Alkhairull.  I'm a
pharmacist, and I know one of the lawyers as a client.

**THE COURT:**  Okay.  Do you know that person socially?

**PROSPECTIVE JUROR ALKHAIRULL:**  No.

**THE COURT:**  Would the fact that that is one of your
clients, would that affect your ability to be fair and
impartial in this case?

**PROSPECTIVE JUROR ALKHAIRULL:**  I don't think so.

**THE COURT:**  All right.  You wouldn't be biased for or
against one side just because that person happens to be a
client?

**PROSPECTIVE JUROR ALKHAIRULL:**  No.

**THE COURT:** Okay. Is that lawyer somebody you see often? Or just periodically to refill prescription, that sort of thing?

**PROSPECTIVE JUROR ALKHAIRULL:** Exactly.

**THE COURT:** All right. Anybody else know any of these individuals? All right.

Counsel, could you please introduce the principals whose names should be made known to the jury.

**MR. SCHERKENBACH:** Yes, Your Honor. The principals for Power Integrations would be Mr. Cliff Walker, vice president for corporate development.

**THE COURT:** All right. Does anybody know Mr. Walker? There are a number of witness who are going to be called to testify. They may or may not testify, but I want to be over-inclusive here. If you know any of these individuals please raise your hands.

Brad Brunell. Phil Bachon. James Congdon. Regan Zane. David Kung. Ben Sutherland. Clifford Walker. William Bohannon. And Ned Barnes.

Okay. So no one is familiar with any of the witnesses.

What I will say now is intended to serve as an introduction to the trial of this case. It is not a substitute for the detailed instructions on the law and the evidence I will give you, but I want to briefly say something about this case and ask whether there would be a problem with any of you

serving.

This case involves a patent of an electronic circuit for powering devices.  The parties in this case are plaintiff Opticurrent LLC, and the defendant is Power Integrations.

For those of you selected to serve as jurors, I will give you more detailed instructions once you are sworn in as jurors and again at the conclusion of the case.  But for now I will simply tell you that the plaintiff accuses the defendant of infringing its patent by making, using, selling, offering for sale, or importing certain products.  Defendant denies that its products infringe the patent.

You will hear from witnesses and see evidence from both sides.  You will then be asked to determine whether the defendant has infringed on the asserted claim of the patent.

If you find that the asserted claim is infringed, then you will be asked to determine what sum of money would be adequate to compensate for any infringement.

So other than what I've just stated, do any of you have any knowledge of this case?

Is there anything about the appearances of any of the parties or their attorneys that causes you to have a negative opinion about any of them or affect your ability to give that party a fair trial?

Is there anything about the nature of this case that would make you unwilling or reluctant to serve as a juror in this

particular case?

All right.  What I'm going to do is take a brief break and ask the attorneys and the parties to stay.  But I'm going to excuse you for the next 15 minutes.  You can take a break, and we'll have you come back.

If you can remember, the 20 of you whose names have been called, where you sat, that will be helpful.  And so if you can come back in 15 minutes, I appreciate it.

THE CLERK:  All rise for the jury.

(Prospective jurors exit courtroom.)

THE COURT:  Have a seat, counsel.

Let's talk about cause and excuses for hardship or other reasons so far.  And let's just take them in order.

Juror number 1, Ms. Jane Santillano, who is the one who for some reason is not comfortable taking BART.  Sounds like there are some other issues there, but she's obviously not comfortable.  So I would propose excusing her.  Any objection?

MR. SUDER:  No, Your Honor.

MR. SCHERKENBACH:  No objection.

THE COURT:  All right.  Now, Mr. Wong, who says he doesn't reads English, even though he's been here for 30 years and taking classes as City College.  I'm a little sceptical.

On the other hand, if this were a DUI case or assault and battery, a simple tort, this case does involve some reading ability.  And so as reluctant as I am to excuse somebody who I

think probably does read some English, this may not be the right case.

**MR. SCHERKENBACH:**  Agreed.

**MR. SUDER:**  We agree.

**THE COURT:**  All right.

Ms. Nims, who works until midnight.  I guess my initial view is that that's difficult.  On the other hand, this is not a three-week trial.  And, frankly, we've got a lot of people here who have raised their hands, and I'm concerned about the numbers.  But, you know, since it's really a 3-day or 4-day trial, I'm not as concerned.

**MR. SUDER:**  I agree.  I don't think that it rises to the level of a hardship.

**MR. SCHERKENBACH:**  I agree as well.  She didn't seem like she wanted to be excused, which helps.

**THE COURT:**  All right.  Then I won't excuse her.  At least not at this point.

Ms. Alkhairull, the one who's a pharmacist.  I don't know which of you she knows, but it seems like it's a very casual kind of acquaintance that I don't think would affect -- I didn't hear anything that would affect --

**MR. SUDER:**  But there's an ongoing relationship. They're going to fill prescriptions.  No one knows anyone, so to have one person that knows someone doesn't seem to make a lot of sense.  And we have lots of other jurors.

**MR. SCHERKENBACH:**  I don't feel strongly.  I mean, obviously she said she only sees the person periodically.  It's not like they're talking about work.

My concern, honestly, is there's a whole lot of people who we have on the list who have stronger reasons.  So maybe we could circle back to her.

**THE COURT:**  Were you going to say something?

**MR. WARREN:**  I was going to volunteer she is my pharmacist.

**THE COURT:**  Okay.  Is that somebody -- how often do you see this person?

**MR. WARREN:**  Several times a month.

**THE COURT:**  Is it -- I mean, there are pharmacists and there are pharmacists.  Without getting into your private -- I mean there are some where you just fill a prescription, others where you actually get to know the person.  Is this somebody that you --

**MR. WARREN:**  She's been my pharmacist for several years.  Okay.  I mean, it is refilling a prescription.  She is not my doctor.

**THE COURT:**  Right.  Let's pass for a moment.  I'm going to put a yellow flag on this one.  Let's see where we're at.

No issue with Wall.

Mr. Dilla, who is the parent who has got to pick up the

child every day at 12:45.

**MR. SUDER:**  I did get the sense from that one that was quite the level of the family hardship of taking care of an elderly mother.  He did say his in-laws take care of the kids. And it's just a matter of a few hours on Tuesday, Friday, and, you know, who knows, the following week.

**THE COURT:**  All right.  Your response?  Your views?

**MR. SCHERKENBACH:**  It struck me that he had a pretty good reason.  I thought it was that he has childcare issues that no one else could cover for.  That was my note.

**MR. SUDER:**  I had he was a new parent and his in-laws take care of his kids, but he relieves them.

**THE COURT:**  Yeah, I'm trying to remember that's the one where the in-law has limited capacity.  I think that's the one where the mother, or somebody, already has a couple of kids.

**MR. SCHERKENBACH:**  That was my note, that he has to do it at 12:45, or something.  Every day it's his responsibility to take care of the child.

**THE COURT:**  Well, I'm going to put a flag on that one. Let's hold off on that.

Paul Pierce has got the autistic child, and he's the only one, and he's got to watch the child five days a week.  That seems like a pretty strong hardship case.

**MR. SUDER:**  Yes.

MR. SCHERKENBACH:  Agreed.

THE COURT:  All right.

Noelle Tolentino, who's unemployed and got an interview on Friday.

MR. SUDER:  The only thing is I would like to know if she could call and maybe make the interview on Thursday, when we're not having court.

THE COURT:  I think I did ask her if she was in a position to do it another day, and she said she wasn't.

MR. SUDER:  I'm okay with excusing her, Your Honor.

THE COURT:  All right.  Do you agree?

MR. SCHERKENBACH:  As am I.

THE COURT:  Okay.

Nothing from Aksomboon or Nimmo.  And then we have Dargence Lefebvre, who is the designer and has got to be at this presentation in Southern California on Monday.

MR. SUDER:  My only hesitation, she says she's one of nine people and that she just needed to be there.  She didn't say "this is my presentation."

THE COURT:  I think she did say it's hers.  Said she's the only one that can do it.  There's nine people being there, including probably the client and others.  She said she's the only one who can do it.

MR. SCHERKENBACH:  That's what she said.

MR. SUDER:  I'd let her go, Judge.

THE COURT:  Okay.

Vo, there's nothing.  Verplank, nothing.  Vigil, nothing. Cruse, Timothy Cruse, has the 7-year-old autistic son.  Now, he's the Tesla supervisor and he gets called occasionally to have to come in.  But we don't know.

MR. SUDER:  That was the problem I had.  He's on call. And we have alternates if he has to go.

THE COURT:  Yeah.

MR. SUDER:  That's why we have alternates.

THE COURT:  Well, that's true.  We're going to seat eight, and we could lose two.  We could hope that nothing happens during the week.

MR. SCHERKENBACH:  It was hard to get a handle. Again, he seemed willing to serve.  I don't think he was trying to get out.  He said his wife can sometimes cover.

THE COURT:  Right.  And it's a day-to-day kind of thing.

MR. SCHERKENBACH:  Yes, yes.

THE COURT:  All right.  I'll just put a flag on him, but we won't excuse him yet.

Ms. Willoughby has a 2-year-old daughter and has to pick the daughter -- has to care for the daughter on Mondays and Friday mornings and afternoons after 3:30.  Also, she's the only receptionist in a 2-person office.

MR. SCHERKENBACH:  Seems like a hardship to me.

MR. SUDER:  Yes.

THE COURT:  Okay.  So let's see.  The ones that we've seated, I don't have anything that came up.  Let's talk about the others who did.

There was Manuel Mak, who has a nonrefundable conference.  And he's being peer reviewed on the 25th.  It's a little hard to reschedule that, I would imagine.

MR. SUDER:  I have no problem with excusing him, Judge.

THE COURT:  All right.

MR. SCHERKENBACH:  I have no problem excusing him.  Didn't he say he was retiring March 30th?  It seemed a little odd he had a peer review one month --

THE COURT:  That is interesting.

MR. SCHERKENBACH:  Only the government would do that.

THE COURT:  Right.  Don't ask for a rational reason.  If you want I can ask him more.

MR. SCHERKENBACH:  It's fine.  It just didn't really add up.

THE COURT:  All right.  There's Mr. Owen, the guy with the unreliable Honda Civic.  But he made it here.

MR. SUDER:  He made it here.

THE COURT:  So, again, that's why we have alternates.  If he can't make it, we could lose somebody.  But right now, given the numbers, I am more inclined just to kind of hang on

to him, at least for now.

MR. SCHERKENBACH:  Agreed.

THE COURT:  Okay.  Deanna Fabris has a paid nonrefundable vacation Friday.

MR. SUDER:  Yeah.

MR. SCHERKENBACH:  Excuse.

THE COURT:  Grounds.

Magdalena Lopez-Flores has a mother who is in ill health, and she's the only one who can take care of her and translate for her.

MR. SCHERKENBACH:  Seems like cause.

MR. SUDER:  Yes.

THE COURT:  Okay.  Martin Albania doesn't get paid.  I can't believe Stanford does not --

MR. SUDER:  That seems odd.

MR. SCHERKENBACH:  I can't either.  I went to Stanford.  I'm embarrassed.

THE COURT:  You should be.

MR. SCHERKENBACH:  It's hard to believe.

THE COURT:  Well, I've done this before, I could keep him on for now, and get a number and call and confirm.

MR. SUDER:  Judge, we don't know if he'll make it into the group of the first 20 that are being removed anyway.

THE COURT:  We don't, but just looking at the numbers I'm getting nervous here.  Why don't I put a yellow flag, and

maybe we can confirm that.  Maybe he has got his information wrong.  I can't believe Stanford --

MR. SCHERKENBACH:  He seemed confident he knew the answer.

THE COURT:  And he's not -- he's an anesthesia technician.  It's not like he's got a small job.

MR. SCHERKENBACH:  Yeah.

THE COURT:  We may make some independent inquiry here about this.

MR. SCHERKENBACH:  Well, I have had judges call employers and say --

THE COURT:  That's what I'm thinking we may do.

MR. SCHERKENBACH:  Yeah.

THE COURT:  If we need him.

   Kenneth Wittmer, let's see.  That's the mother who's 86, she's in emergency care.

MR. SUDER:  Everyone else went on a cruise.

THE COURT:  The rest of the family is going on a cruise.  It's not clear, the wife is taking her to the surgery, so it's not clear -- it sounds like she -- this is exploratory surgery.  She may not need surgery immediately.  So it didn't sound like it was actually clear he's going to be needed.

MR. SUDER:  Again, I don't think he looked like he was trying to get off the jury.

THE COURT:  Yeah.  I think he was more warning us --

MR. SUDER:  Yes.

THE COURT:  -- of the possibility.

MR. SCHERKENBACH:  I agree.  I think we should keep him.

THE COURT:  All right.  And then there's Brian Hegarty, who's being paid hourly and would lose -- he's a consultant.  So I think that's a hardship.

MR. SUDER:  Yes.

MR. SCHERKENBACH:  Agreed.

THE COURT:  Steven Cardiasmenos, he's also self-employed, would lose money from his teaching, music teaching.

MR. SUDER:  That would be a hardship.

THE COURT:  Okay.

MR. SCHERKENBACH:  I agree.

THE COURT:  And Ms. Perez-Sutherland, sounds like we can accommodate her.

MR. SUDER:  With the back.

THE COURT:  With the back.

So we've agreed to relieve, Santillano, Wong, Pierce, Tolentino, Lefebvre, Willoughby.  That's six so far; right?  Mak, Fabris, Lopez-Flores, Hegarty, and Cardiasmenos.  So that's 11.

Mr. Scherkenbach, are you in accord?

MR. SCHERKENBACH:  That matches.

THE COURT: That's still pretty good. Leaves us 24. And we've got -- some of the ones we sort of questioned we have room to excuse them at some point. We should hang on to the rest. Let's go through the substantive voir dire and see who we lose next.

MR. SUDER: Again, with the pharmacist, you said we'd come back. I mean, I had I have small kids. My pharmacist I have a relationship. No one knows anyone. To have one person that knows one person should be avoided if it could be.

THE COURT: I may ask a few more questions of her. So there's a few people I have yellow tagged. There's one, two, three, four, five -- maybe five or six. I don't know, four or five more that I have sort of yellow tagged. They're not in the clear yet, but I want to kind of proceed, and then we can make a final assessment.

MR. WARREN: Your Honor, one comment on the pharmacist. I have recently moved. So, actually, she was my pharmacist here. So after I moved, she's no longer. So going forward -- it occurred to me, you know, going forward she wouldn't be my pharmacist.

THE COURT: So you're out of the area, so you wouldn't see her anymore?

MR. WARREN: Correct. I don't live in this area anymore.

THE COURT: The biggest concern is if there's kind of

an ongoing on -- even if it's a casual relationship, the question is would you fell comfortable having ruled against or ruled adversely and seeing this person, in addition to the partiality question.

If there's an ongoing relationship, I think that's -- that first issue kind of presents itself, that you're going to see -- you know, we ask that question all the time.  Your brother-in-law is a cop, and you rule against cops, you're going to see them at every family gathering, how are you going to explain yourself kind of thing.

If you're not going to see this person --

**MR. WARREN:**  Correct.  My prescriptions are no longer actually under her.  It didn't occur to me, actually, I just recently moved.

**THE COURT:**  That's a helpful point.  So I intend to go ahead and excuse the folks that I have mentioned, and then we'll replace people in the box, and then start with the substantive voir dire.  Okay.

**MR. SUDER:**  Yes, sir.

**MR. SCHERKENBACH:**  Very good.  Thank you.

**THE COURT:**  Okay.  Call them back in.

**MR. SUDER:**  Your Honor, can I ask for a five-minute warning on my 20 minutes.

**THE COURT:**  A five minute --

**MR. SUDER:**  A five-minute warning on my -- I have 20

minutes.

THE COURT:  Oh, yes.

MR. SUDER:  I don't want to be presumptuous, so thank you.

THE COURT:  Okay.

(Prospective jurors return to courtroom.)

THE COURT:  All right.  Thank you, ladies and gentlemen.  At this point I'm going to thank and excuse the following prospective jury members and ask them to go back to the jury assembly room to report.  And then I've got a few follow-up questions for some of the others, and then we're going to ask some more questions.

So the following individuals should report to the jury assembly room:

Ms. Jane Santillano.  Thank you.

PROSPECTIVE JUROR SANTILLANO:  Thank you.

THE COURT:  Mr. Wong, thank you.

Mr. Pierce, thank you.

Ms. Tolentino, thank you.

Ms. Dargence Lefebvre, thank you.

Ms. Stephanie Willoughby, thank you.

Mr. Cardiasmenos.  And Mr. Hegarty.  Mr. Mak. Ms. Fabris.  And Magdalena Lopez-Flores.

If you could report to the jury room, I would appreciate it.

So why don't we go ahead and fill the slots in those first 20.  So, I guess, Mr. Owen.

**THE CLERK:**  Okay.  Mr. David Sterling Owen.

Ms. Angela Catherine Vrbanac-Libby.

Nick Bodnar.

Victoria Marie Johnston.

Ma'am, right here.

Alenjandro Vargas.

**THE COURT:**  Did we call Mr. Bodnar?  Oh, there, okay.  Let me get my things in order here.  And we just called Mr. Vargas; right?

**THE CLERK:**  Yes.

**THE COURT:**  If you can take a seat in the front row, that space in between.

Okay.  Let me just ask a follow-up question of Ms. Alkhairull, about the pharmacy.

I've just learned that your former client is moving and you may not be his pharmacist in the future.  I just want to make sure that you feel that you could be -- the fact that you have known this person in the past would not make you uncomfortable in any way, the fact that he's a lawyer for one of the parties here; that you could judge this case fairly and evenly and not be favoring one side or the other just because you know the lawyer from the past.  Do you have any doubt about that?

**PROSPECTIVE JUROR ALKHAIRULL:**  No.

**THE COURT:**  Okay.  Thank you.

And, Mr. Dilla, with your childcare situation, if you could remind me, I know you are a new parent.  Were you the one that said your mother-in-law or your in-law is taking care --

**PROSPECTIVE JUROR DILLA:**  Yes.

**THE COURT:**  And she's already got a couple of grandchildren.

**PROSPECTIVE JUROR DILLA:**  Yes.  My brother-in-law, they just three months apart.

**THE COURT:**  I see.  So until 12:45, when you pick up your child your --

**PROSPECTIVE JUROR DILLA:**  I take over.

**THE COURT:**  Okay.  But she has your --

**PROSPECTIVE JUROR DILLA:**  She has -- I help her out with the other kid, too, because my brother-in-law works around 6:00 a.m. or around 8:00 a.m. in the morning, sir.

**THE COURT:**  But she takes care of two children or three children?

**PROSPECTIVE JUROR DILLA:**  Yes, two children, two boys.

**THE COURT:**  In the morning?

**PROSPECTIVE JUROR DILLA:**  In the morning, yes.

**THE COURT:**  One of them is your child?

**PROSPECTIVE JUROR DILLA:**  Yes, sir.

**THE COURT:**  And then you relieve her at 12:45?

**PROSPECTIVE JUROR DILLA:**  Yes, I will take over.

**THE COURT:**  So if she were to have to continue to take care of your child until 5:00 or 5:30, is that a problem?

**PROSPECTIVE JUROR DILLA:**  In a way, because she's already around 60-year-old -- around 60, so.

**THE COURT:**  Yeah.

**PROSPECTIVE JUROR DILLA:**  They're -- like I said, my son is turning 1-year-old.  So they're just a handful.

**THE COURT:**  Okay.  And you think she's not able to watch your child the full day?

**PROSPECTIVE JUROR DILLA:**  We try to -- me and my wife try to minimize the workload on her.

**THE COURT:**  Is your wife able to pick up your child?

**PROSPECTIVE JUROR DILLA:**  She works at 9:00 a.m. in the morning.  She already use her maternity leave.

**THE COURT:**  She works from 9:00 to 5:00?

**PROSPECTIVE JUROR DILLA:**  Yes, sir.

**THE COURT:**  Okay.  All right.  Well, that's -- those are the questions I have.

So let me ask some additional questions here.

This is at the point where I would want to focus on the first 20 people.  And do we have the board, or do we have on the screen the questions?

**THE CLERK:**  Yes, we do, Your Honor.

**THE COURT:**  Okay.  So what I'd like to do is just go

down the row here, starting with Juror Number 1.

Mr. Owen, if you could just kind of give that basic information about yourself, we'd appreciate it.

**PROSPECTIVE JUROR OWEN:**  Yes, my name is David Owen. I currently reside in city of Glen Ellen, California.  I'm currently a caretaker, cook, and water operator for a small music camp in Cazadero.  But I recently am in the hiring process of working for the City of Rohnert Park, as a water meter technician.

My educational background, I have a mechanical engineering degree, bachelor's of science.  I'm currently not part of any professional organizations or any organizations.  My hobbies are target archery and hiking generally.

I am single, but I have a 6-year long-term relationship with a girlfriend.  And she is a music teacher.  I have no children.

And I have never served on any jury.  And I've never been in the military.

**THE COURT:**  All right.  And where did you get your B.S. from?

**PROSPECTIVE JUROR OWEN:**  Cal-Poly Pamona.

**THE COURT:**  All right.  Thank you.

Ma'am, Ms. Vrbanac --

**PROSPECTIVE JUROR VRBANAC-LIBBY:**  Angela Vrbanac-Libby.  I live in Livermore.  I'm retired.  I have an

undergrad degree in music therapy, and a master's in public administration, with a concentration in health services administration.

Do you want to know all the organizations I'm involved with?

THE COURT:  Well, if you could --

PROSPECTIVE JUROR VRBANAC-LIBBY:  I'm a member of the American Music Therapy Association, also the Western Region American Music Therapy Association.  I'm on the California Advocacy Board for Music Therapy.

I also work -- it's kind of a hobby, I guess -- with the Alzheimer's Association of Northern California, and involved as a committee member on their marketing for the East Bay Walk to End Alzheimer's.

I guess those are -- hobbies, I like to work out, playing the piano, getting involved with lots of fundraiser-type things.  And I'm also a docent at a museum.

And I am married.  My husband has just recently retired. We have no children.  I have been a juror on another case, but never a grand juror and never in the military.  However, my first husband was a military officer.

THE COURT:  And the case that you served on, is that a civil or a criminal case?

PROSPECTIVE JUROR VRBANAC-LIBBY:  It was criminal.

THE COURT:  And was a verdict reached in that case?

**PROSPECTIVE JUROR VRBANAC-LIBBY:**  It was.

**THE COURT:**  Okay.  Thank you.

All right.  If you could pass the microphone down.
Appreciate it.  Thank you.

**PROSPECTIVE JUROR NIMS:**  My name is Malia Nims.  I
live in San Rafael, California.  Like I said before, I'm a
store manager and buyer of an adult boutique.  Let's see.  I
have had some college, but no degrees, in fashion design and
psychology.

No organizations.  I am not married.  I have no children.
Never been on a jury and not in the military.

**THE COURT:**  All right.  Thank you.

**PROSPECTIVE JUROR ALKHAIRULL:**  So my name is Nada
Alkhairull.  I live in Union City.  I'm a pharmacist.  I have a
bachelor degree in pharmacy.  I have a license with California
and Nevada Board of Pharmacy.

I like to cook.  I'm married.  My husband is an engineer.
I have two kids, 12 and 16.  And I never served as a juror or a
grand juror or was in the military.

**THE COURT:**  What kind of engineer is your husband?
What kind of --

**PROSPECTIVE JUROR ALKHAIRULL:**  Hardware engineer.

**THE COURT:**  Hardware?

**PROSPECTIVE JUROR ALKHAIRULL:**  Yeah.

**THE COURT:**  Thank you.

Let me understand, what kind of equipment does he work on? Do you know what kind of equipment?

**PROSPECTIVE JUROR ALKHAIRULL:**  No.  He work with SK Hynix Company, so I'm not sure.

**THE COURT:**  Okay.  All right.

**PROSPECTIVE JUROR WALL:**  My name is Donell Wall.  I live in Napa.  I am a registered nurse.  I have an associate degree in nursing.  I am a member of the Nurses Union.

Hobbies, I like home remodel and watching movies.  I am engaged and previously married.  Divorced.  I have -- oh, my fiance works in laboratory repair.  My children, I have two, 16 and 20.

I've never been a juror before.  And my ex-husband was in the Navy.  And my fiance was in the Air Force.

**THE COURT:**  And lab repair, can you explain what that is, your fiance?

**PROSPECTIVE JUROR WALL:**  Yeah, for hospitals and laboratories.  He works on the ultra low freezers and centrifuge and equipment, the -- repairs and replaces those.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR DILLA:**  Hello.  My name is Pocholo Dilla.  I live in Hayward, California.  I'm married.  I've got one kid.  And my hobbies are mountain biking, basketball.  And my spouse occupation is -- she's some sort of pharmacist.

So I served -- I've been picked as a juror before in

Hayward, about five years ago.  That's pretty much it.

THE COURT:  Was that a civil or criminal case?

PROSPECTIVE JUROR DILLA:  Civil.

THE COURT:  Was a verdict reached in that case?

PROSPECTIVE JUROR DILLA:  Yes, sir.

THE COURT:  And could you remind me, what's your employment?

PROSPECTIVE JUROR DILLA:  I'm a warehouse, just warehouse.

THE COURT:  You work at a warehouse?

PROSPECTIVE JUROR DILLA:  Yes, sir.

THE COURT:  And educational background?

PROSPECTIVE JUROR DILLA:  I finished high school and CNA program.

THE COURT:  Any college?

PROSPECTIVE JUROR DILLA:  No, sir.

THE COURT:  Thank you.

PROSPECTIVE JUROR BODNAR:  Hello.  My name is Nicholas Bodnar.  I live in Martinez, California.  I am a chemist at an environmental testing lab.  I have a bachelor degree in chemistry.

Don't belong to any organizations.  For hobbies I like to hike and cook.  I'm not married.  No children.  Not a juror in another case.  Never been a grand juror.  And I have never been in the military.

THE COURT: All right. Thank you, Mr. Bodnar. If you could pass the microphone up to the front row, to Ms. Johnston, please.

PROSPECTIVE JUROR JOHNSTON: Hello, my name is Victoria Johnston. I am from Santa Rosa. I recently retired out of the banking industry.

I have a high school education and held several licenses. I've been a member of several boards and organizations. Currently the only one I'm on is the Wine Country LPGA Amateurs. My hobby is golfing, working out, hiking, traveling with my family.

I'm currently married. My spouse is a director of Petaluma Poultry. I have three children, two stepchildren, 12 grandchildren. The ages of my children are 37, 38, 34, 33, and 30. I've never been a juror. And never served in the military.

THE COURT: Great. Thank you.

PROSPECTIVE JUROR AKSOMBOON: My name is Steve Aksomboon. I am a resident of Oakland, California. I'm employed as a systems and network administrator for a IT managed service provider. I have a degree in design visualization.

I'm not a member of any organizations. Hobbies include archery, PC building, and video gaming. I'm married. My wife is a instructional assistant for special needs children. We

have no children.

Never been selected as a juror.  I've never been a grand juror, and never been in the military.

**THE COURT:**  Let me ask, you do design and visualization --

**PROSPECTIVE JUROR AKSOMBOON:**  No, that's what I went to school for, but I don't actually practice it.

**THE COURT:**  Is that a technical --

**PROSPECTIVE JUROR AKSOMBOON:**  Oh, sorry, graphic design.

**THE COURT:**  Do you have much training in, like, electrical engineering or anything like that?

**PROSPECTIVE JUROR AKSOMBOON:**  Not formal training.

**THE COURT:**  More on-the-job stuff?

**PROSPECTIVE JUROR AKSOMBOON:**  Yeah, when I was going to school, I was working in the IT field.

**THE COURT:**  You weren't involved in circuitry design?

**PROSPECTIVE JUROR AKSOMBOON:**  No.

**THE COURT:**  All right.  Thank you.

**PROSPECTIVE JUROR NIMMO:**  Hi.  My name is Manny Nimmo. I live in Pleasanton.  I am a technology specialist for an elementary school.  I have a bachelor's degree in marketing and public relations.

I'm in PTA, boosters, various school-type organizations. Hobbies, I like to read, travel.  Marital status, I'm married.

My husband is an IT director for the Lawrence Livermore lab.

THE COURT:  What kind of director?

PROSPECTIVE JUROR NIMMO:  IT director.

I have two kids, a daughter 17 and a kid who just passed. He was 14.  I have never been a juror.  I have never been a grand juror.  And I am not in the military, but my stepdad was.

THE COURT:  Thank you.

PROSPECTIVE JUROR VARGAS:  My name is Alejandro Vargas.  I'm a resident of Concord, California.  I'm a security guard.  I am a high school graduate with a few years of community college.

Not part of any organizations.  My hobbies are reading and collecting vinyl records.  I'm not married and have no kids.  I was never a juror on any other case, and never been in the military.

THE COURT:  All right.  Thank you, Mr. Vargas.

PROSPECTIVE JUROR VO:  Hi.  May name is Tiffani Vo.  I live in Union City.  I do revenue account for a medical device company.  I have a -- went to four year college, but I don't have the degree.

I not belong to any organization.  My hobbies are hiking and tennis.  I'm married with two kids.  My kids are 15 and 12. My husband is the director of finance.

I'm not a juror, and I never been to, like, the grand jury, or never been in the military.

**THE COURT:**  And the college courses you took, were they in --

**PROSPECTIVE JUROR VO:**  Relating to finance.

**THE COURT:**  Financing?

**PROSPECTIVE JUROR VO:**  Yeah.

**PROSPECTIVE JUROR VERPLANK:**  I'm William Jansen Verplank.  I live in San Mateo.  I am a music teacher as well as part-time fundraiser for the school that I teach at.

I have a bachelor's in politics.  I don't belong to any organizations.  Hobbies, primarily music.  I'm married.  My spouse is a graphic designer.  No children.

I have never been a juror on any other case, or a grand juror.  And I've never been in the military.

**PROSPECTIVE JUROR VIGIL:**  Good morning.  I'm Joy Vigil.  I am married with one son, 12 years old.  I have multiple part-time jobs in order to be a full-time mom.  I guess my primary one is I'm an elementary school art teacher. I'm also a figure skating instructor and coach, as well as substitute preschool teacher.  My husband owns his business. It's a printing business.  And I also work there part-time.

My hobbies are any sort of arts and crafts.  Ice skating. I am involved in the PTA with my son's school, as well as the ISI, the Ice Skating Institute.  And I have never been a juror and never been in the military.

**THE COURT:**  Thank you.  Pass the microphone down.

Yes.

**PROSPECTIVE JUROR CRUSE:**  My name is Tim Cruse.  I live in the city of Oakley.  I'm a licensed electrician for Tesla Energy.  Educational background, graduated high school, some community college.

No organizations.  Hobbies, I'm a coach in softball for my daughter.  She plays travel ball.  I am married to Hilary Cruse.  She's a bookkeeper.  Let's see here.  My son, Lucas is 7.  My daughter is 13.

I have been a juror in a criminal case in Martinez.  Never been a grand jury.  Never been in the military.

**THE COURT:**  By coincidence you have a son named Lucas.  So do I.  Have a son who is on the autistic spectrum, as do you.  So small world.

Let me ask you, you're an electrician.  Have you had much training in the area of, like, circuitry design?  Or is it basic electrical theory?

**PROSPECTIVE JUROR CRUSE:**  Commercial, some industrial.  We primarily work on the new Tesla lithium ion battery that goes in residential homes.  So not too much into computer circuitry.

**THE COURT:**  You're not involved in, like, design of integrated circuits at that level?

**PROSPECTIVE JUROR CRUSE:**  No.

**THE COURT:**  All right.  Thank you.

**PROSPECTIVE JUROR ALBANIA:**  Good morning.  My name is Martin Albania, from Fremont.  I'm an anesthesia technician in Stanford.  I have a bachelor's degree in nursing in the Philippines.

I'm married.  My wife works at home as an online support for an online company.  No kids.  Never been a juror.  Never in the military.

**THE COURT:**  I wanted to ask you a little more about the Stanford thing.  Is there -- so it is the policy throughout Stanford, or just your department, not to pay for jury service?

**PROSPECTIVE JUROR ALBANIA:**  Your Honor, I'm not sure if it's the whole Stanford.  But I've been talking to some people asking about jury duty.  They said some of them didn't get paid, some of them got paid small amount, not their full salary.

**THE COURT:**  Is there -- do you know if there's a general HR department there?

**PROSPECTIVE JUROR ALBANIA:**  Yes.  Yes, Your Honor.

**THE COURT:**  Does that cover -- are you at the hospital?  Which part of Stanford are you at?

**PROSPECTIVE JUROR ALBANIA:**  In the operating room. I'm in the hospital, Your Honor.

**THE COURT:**  At Stanford?

**PROSPECTIVE JUROR ALBANIA:**  Uh-huh, yes, Your Honor.

**THE COURT:**  Well, if you don't have any objection we

may make a call -- we won't mention your name, but I do want to find out what -- I'd be surprised if they don't pay. But we'll find out. Thank you.

**PROSPECTIVE JUROR WATSON:** Hi. Name Sheryl Watson. I live in Menlo Park. I am an apartment manager. I have an AA degree. I don't belong to any organizations. I like to work out, like to read and cook and gardening. I'm divorced. I have one son.

I was a juror on another case. It was a long time ago. I think it was criminal. And we did reach a verdict in that. And no military service.

**THE COURT:** All right. And your AA was in what field?

**PROSPECTIVE JUROR WATSON:** That was social studies.

**THE COURT:** Social studies?

**PROSPECTIVE JUROR WATSON:** Yeah.

**THE COURT:** Okay. Thank you.

**PROSPECTIVE JUROR VAS:** Thanks. Andrea Vas. I live in Oakland. I'm an information systems manager, senior manager at a company that does energy efficiency.

My educational background is I have a bachelor's in applied mathematics with an emphasis in engineering mechanics. And I have a master's in energy and resource management.

I belong to a few LGBT organizations, some politically aligned democratic party organizations, the Hispanic Association of Engineers, and Women in Sciences.

My hobbies include painting and political activism.  I am divorced and currently partnered.  I don't have any children.

I did serve on -- I think it was a civil case, about two years ago, in Alameda.  And I was never in the military.

**THE COURT:**  Was a verdict reached in that civil case?

**PROSPECTIVE JUROR VAS:**  It was settled out of court.

**THE COURT:**  Tell us a little bit more about the energy efficiency company you work for.  What is it that they do?

**PROSPECTIVE JUROR VAS:**  We work with the primary utilities in California and throughout the United States, to run efficiency programs.  My particular programs are distributed energy resources and storage.

We deal with a lot of data analysis and rebate processing. So part of my work is designing the software that determines the rebate that you'll get, and also analyzing equipment performance of storage and renewable systems.

**THE COURT:**  Have you been involved or have you been trained in designing circuitry at, sort of, the electrical --

**PROSPECTIVE JUROR VAS:**  Only the circuits class I took in undergrad.

**THE COURT:**  Where did you go to undergrad?

**PROSPECTIVE JUROR VAS:**  UC Merced.

Part of my work does include reviewing electrical schematics for proper installation of storage in renewable systems.

**THE COURT:** All right. Would that be at the integrated component level or the integrated circuit level?

**PROSPECTIVE JUROR VAS:** Yeah, the battery, the controller, the inverter, seeing which way the electricity is flowing and making sure that we're compensating the proper balances and analyzing interval data.

**THE COURT:** And your classwork includes, you mentioned some engineering?

**PROSPECTIVE JUROR VAS:** Yeah. So it's applied mathematics in engineering mechanics. So lots of the -- full spectrum of the engineering.

**THE COURT:** And does that include some electrical engineering?

**PROSPECTIVE JUROR VAS:** Yeah. It's like one or two courses.

**THE COURT:** All right. Thank you.

**PROSPECTIVE JUROR PECH:** Hi. My name Steven Pech. I live in San Francisco. I'm a postal employee. I have two year college. And my hobby is yoga. I'm married. No children. My wife assistant teacher. Never served in jury. Never in the military.

**THE COURT:** And your college, what kinds of classes did you take?

**PROSPECTIVE JUROR PECH:** General.

**THE COURT:** General. Okay. Any science or

engineering?

PROSPECTIVE JUROR PECH:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR LINDSTROM:  My name is Amelia Lindstrom.  I live in Berkeley.  I'm a manager for Peet's in Berkeley.  I have a year of liberal arts and a year of culinary school, but no degrees.

I belong to the Democratic Socialists of America, East Bay Chapter.  My hobbies are cooking, activism, wine tasting, video games, computer building.

I am in a 10-year relationship, cohabiting.  My boyfriend is an IT specialist for a managed service provider.  We have no kids.

I've never been a juror and I've never been in the military.  My brother was in the Marines.

THE COURT:  All right.  We have five more people in the back, don't we?  I normally don't, but we might as well do the whole room and give everybody a chance to -- if you could state your name and go through that list, I would appreciate it.

PROSPECTIVE JUROR VUONG:  My name is Priscilla Vuong. I work downstairs in IRS criminal investigation.

THE COURT:  Can you hang on just a second.  I have to find your name.

You work at IRS?

**PROSPECTIVE JUROR VUONG:**  Yes, criminal investigation downstairs.

**THE COURT:**  Okay.  That's convenient.

**PROSPECTIVE JUROR VUONG:**  My educational background, I have a B.S. in biology.  And I have a juris doctorate with a specialization in intellectual property.

I'm -- I'm in California Lawyers for the Arts.  Hobbies are video gaming.  I'm currently married.  And my husband is an IT coordinator at a school.  No children.  And I've never been a juror on the case.

**THE COURT:**  All right.  And you said -- you specialize in intellectual property.  You got a certificate along with your J.D.?

**PROSPECTIVE JUROR VUONG:**  Yeah.  I've studied copyrights, trademarks, and patents.

**THE COURT:**  Where was that at?

**PROSPECTIVE JUROR VUONG:**  Golden Gate University.

**THE COURT:**  Did you ever practice intellectual property law?

**PROSPECTIVE JUROR VUONG:**  No.

**THE COURT:**  And how long have you been at the IRS?

**PROSPECTIVE JUROR VUONG:**  Since late 2017.

**THE COURT:**  And prior to that?

**PROSPECTIVE JUROR VUONG:**  Prior to that, graduated from school.

**THE COURT:** Oh, okay. So you went from school to the --

**PROSPECTIVE JUROR VUONG:** Yeah, straight to the IRS.

**THE COURT:** All right. Thank you.

**PROSPECTIVE JUROR AL-GHANIM:** Hi. I'm Alia Al-Ghanim. I currently live in Fremont. I am currently not working. I'm going to be starting an internship next month. I'm currently pursuing a B.S. in environmental studies with a concentration in restoration and conservation, at San Jose University.

I currently belong to Sierra Club. My hobbies include anything outside, really. Activism. Not married. I do not have any kids.

I've never been on a jury, and I've never been in the military.

**THE COURT:** And where will you be serving your internship?

**PROSPECTIVE JUROR AL-GHANIM:** At Vegilution in San Jose.

**THE COURT:** Vegilution?

**PROSPECTIVE JUROR AL-GHANIM:** Yeah.

**THE COURT:** What do they do?

**PROSPECTIVE JUROR AL-GHANIM:** It's a community garden, basically for the east side of San Jose.

**THE COURT:** I see. All right. Thank you.

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:** My name is

Veronica Perez-Sutherland.  I live in the City of El Sobrante in the East Bay.

My occupation is in pharmacy at Children's Hospital.  My education is in -- I have a master's from Berkeley in architecture.

And don't belong to any organizations.  Hobbies, traveling and hiking and gardening.  I am married.  My husband works for PG&E.  No children.

I have been a juror on a criminal case, and we did arrive at a verdict.  And no military service.

**THE COURT:**  And what does your husband do for PG&E?

**PROSPECTIVE JUROR PEREZ SUTHERLAND:**  He works in the gas department, and he runs a yard.

**THE COURT:**  Great.  Thank you.

**PROSPECTIVE JUROR WITTMER:**  My name is Ken Wittmer.

**THE COURT:**  All right.

**PROSPECTIVE JUROR WITTMER:**  I live in San Ramon, California.  Retired operations manager for air traffic, but I'm currently employed as a contractor in the same building that I worked in, running the training department.

Educational background, high school only, with some college in kinesiology.  Organizations, belong to none. Hobbies, coaching and working out.

Married status will be 43 years at the end of this month. My wife's occupation is a college counselor at the high school

we met at.  I have three children, 38, 37 and 33, with five grandkids.

I've been a juror before.  It was a criminal case.  And we did reach a verdict.  Never been on a grand jury, and I never served in the military.

**THE COURT:**  All right.  Thank you.

Is that everyone?  We've got everyone.  Okay.

**THE CLERK:**  Yes.

**THE COURT:**  All right.  Let me ask some general questions now.  You can raise your hand if you have something to say.

Other than what you've told us -- because there are some people, now, that I have learned have, for instance, taken classes or done some work -- are any of you familiar with or have any experience with the development disputes regarding or transactions involving intellectual property such as patents, trademarks or copyrights?

Anybody deal with those?

(Show of hands.)

**THE COURT:**  Okay.  And, again, if you could state your name.

**PROSPECTIVE JUROR VUONG:**  Priscilla Vuong.  Is this other than our studies?  Because I took two courses involving patents.

**THE COURT:**  Right.  Okay.  All right.  Anyone else?

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  My name is Veronica Perez-Sutherland.  And I have an uncle who developed some sort of equipment for -- for automobiles, and tried to get a patent.  Had a partner.  And the patent was -- was taken by the partner, and it became a legal issue.  So that's my experience with it.

**THE COURT:**  Okay.  Okay.  Were you involved directly in that dispute at all?

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  No, sir, I wasn't.

**THE COURT:**  That was actually one of my questions.  Do any of you, or anyone close to you, ever had a patent?  Looks like you had an uncle?

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  Right.

**THE COURT:**  It was in the field of something to do with auto?

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  Yes, he invented some sort of mechanism that would have not required an automobile to have as many oil changes.  And so he allowed his partner to go and apply for the patent in both of their names.  Partner applied for the patent in his own name.  And that was perfectly legal because he allowed him to do that.  However, you know, that was not their agreement.

**THE COURT:**  And did the partner get the patent?  Was there a patent approved?

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:** Yes. Not only that, he sold it and made tons of money off of it, and dearest uncle was left standing there with nothing. But it was all, you know, apparently legal.

**THE COURT:** Do you have any strong feelings or views about the patent system or the enforcement of patents that would make you bias either for or against the enforcement of patents?

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:** Well, yes. Because I would have thought that more requirements would be in place to make sure that patents are being issued to the correct people who are involved. Not knowing exactly how patent issuing works, it would just seem to me that there would be more questions asked, more documentation required. But then that's just me.

**THE COURT:** So your concern was that it being issued to -- not to the right people. To the right owner.

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:** Well, not enough investigation and enough documentation of who this patent really should be issued to.

**THE COURT:** Okay. Do you have any specific views about the technical aspects of when a patent -- regardless of who it issues to, about -- I don't know if you're familiar with it, but the process by which one gets a patent? Do you have any views about that, whether it's too easy, too hard or --

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  It would seem to me to be a little bit too easy to get a patent.  Again, without having someone really look into who deserves to get this patent.  Meaning, documentation.  Further documentation.

**THE COURT:**  As to who should get the patent, but not whether there should be a patent at all.

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  Exactly.

**THE COURT:**  If your uncle had applied and gotten the patent, this patent, would you have -- do you have any strong views about whether the patent --

**PROSPECTIVE JUROR PEREZ-SUTHERLAND:**  No, no.  Not the patent itself.  Just the process.

**THE COURT:**  All right.

Anybody else have any either -- experience with patents?  We have a hand in the back there.  If you'd state your name again please.

**PROSPECTIVE JUROR WITTMER:**  My name is Ken Wittmer.  My brother, actually, developed patent years ago, but it was never an issue.  But I do have a nephew who is a patent lawyer in Washington D.C. for the last 15 years.  But I only see him on occasion now.

**THE COURT:**  All right.  Does he talk shop with you about his work?

**PROSPECTIVE JUROR WITTMER:**  You know, we see so little of each other on holidays that honestly we talk more about

family stuff than we do about specifics of the jobs.

**THE COURT:**  You haven't learned about patent law in the process?

**PROSPECTIVE JUROR WITTMER:**  No.  More about his adventures and travels and some of his interesting cases.  But other than that, no.

**THE COURT:**  So you have talked about some of his cases?

**PROSPECTIVE JUROR WITTMER:**  Yeah.  Because I was in air traffic so everybody always wants to know if it's safe and what goes on.  So I always turn it around to somebody else and say, Okay, what about your business?  What do you have that's interesting?  Because everybody has something.

**THE COURT:**  So what do you say about -- No.  We can talk after.

**PROSPECTIVE JUROR WITTMER:**  I still fly.

**THE COURT:**  That's a good sign.  Your brother got a patent in what --

**PROSPECTIVE JUROR WITTMER:**  It was a mechanical patent.  He worked in a rental yard, and he patented something that they use as a piece of equipment.  But -- many years ago.  And it never went on past anything.  He never produced any of them.  Just other than the one.

**THE COURT:**  Do you have any specific or strong views about the patent system in the United States?

**VOIR DIRE**

**PROSPECTIVE JUROR WITTMER:**  Not really, no.

**THE COURT:**  Okay.  Thank you.  Anybody else with experience with patent system?

Okay, we have a hand up.  Ms. Wall, is it?

**PROSPECTIVE JUROR WALL:**  Yes.  Wall.  Not much experience, but my cousin had obtained patents before.

**THE COURT:**  And do you know what kind -- what was it about?

**PROSPECTIVE JUROR WALL:**  First was a universal patent for automobile -- like, an organizer for inside the car.  And more recently he's actually into body armor and -- yeah.  Not sure all the details.

**THE COURT:**  All right.  As a result of that, do you have any specific or strong views about the patent system in the United States?

**PROSPECTIVE JUROR WALL:**  No.

**THE COURT:**  Thank you.  Anybody else?

Okay.  In the front here.  Mr. Verplank.

**PROSPECTIVE JUROR VERPLANK:**  Yes.  William Jansen Verplank.  My father owns one or two patents on something related to computer music input devices.  I don't know very much about it.

**THE COURT:**  Okay.  So you weren't involved in that process of getting the patent.

**PROSPECTIVE JUROR VERPLANK:**  No.

**THE COURT:**  Have you talked to him much about the process of getting a patent?

**PROSPECTIVE JUROR VERPLANK:**  No.

**THE COURT:**  Any strong views about the patent system, for or against --

**PROSPECTIVE JUROR VERPLANK:**  No.

**THE COURT:**  -- as a result of that?

All right.  Anybody else?

Anybody else, other than what you've stated, is close or has a relative who's a patent attorney?

(No response.)

**THE COURT:**  All right.  Let me ask you this:  The plaintiff in this --

Oh.  I'm sorry.  Mr. Owen.

**PROSPECTIVE JUROR OWEN:**  My long-term girlfriend's cousin, which I meet regularly on family functions usually twice a year, she's a patent lawyer in St. Louis.

**THE COURT:**  Have you had much of a chance to talk shop with her or --

**PROSPECTIVE JUROR OWEN:**  Not intimately about her profession, no.

**THE COURT:**  So your knowledge of that area's not much greater than --

**PROSPECTIVE JUROR OWEN:**  I know she gets paid well.  That's about it.  She likes her job.

THE COURT:  Well, that's good.  I assume that's true of everybody at the counsel table here.

Let me ask you this.  The plaintiff in this lawsuit is the owner of a patent, as I mentioned, but doesn't make or sell a product.  Do any of you believe there's a reason that a plaintiff like that should not be compensated for defendant's infringement, if infringement is found?

(No response.)

THE COURT:  Okay.  Do any of you believe that only a market competitor of the defendant should be compensated for patent infringement by another company?

All right.  Mr. Aksomboon?  "Aksomboon"?

PROSPECTIVE JUROR AKSOMBOON:  Close enough.

THE COURT:  You can correct me if -- restate it if --

PROSPECTIVE JUROR AKSOMBOON:  "Aksomboon."  Yes.  Yeah, if someone holds a patent, and I guess if they're not doing anything with it or if they're not competing in the same sector, it seems to be a bit useless.

THE COURT:  Do you feel that somebody who got a patent, you know, a valid patent, but didn't make the device but holds a patent to license it to others --

PROSPECTIVE JUROR AKSOMBOON:  Yeah.  I have strong views against patent trolls where people just patent stuff to prevent -- I think it's just to protect the idea, but they're not doing anything with it.  It stifles innovation.

I have strong views about intellectual property as it relates to science and technology, medicine, just because it does stifle innovation in the field of, like, medicine.  It can prevent some medical advances that can save lives.

I think that as far as technology is concerned, I mean, it's really about humanity's brain trust and we should pool resources together so we can push it forward.

And patent trolls oftentimes will just prevent that from happening.  It's really sad.

THE COURT:  All right.  So in this case if the plaintiff is not actually engaged in making something with a patent but just owns it, you would feel biased against --

PROSPECTIVE JUROR AKSOMBOON:  Oh, definitely.

THE COURT:  Anybody else shares those views?

All right.  Mr. Bodnar?

PROSPECTIVE JUROR BODNAR:  Yes.  I just second what Mr. Owen -- sorry.  What was your name?  Oh, sorry.  Aksomboon.  I agree with what he said, pretty much.  I'm inclined to say it's unethical to merely hold on to a patent when you're not producing anything.

THE COURT:  All right.  So you would feel very strongly about that and would be biased against the --

PROSPECTIVE JUROR BODNAR:  Yes, definitely.

THE COURT:  Anybody else share that view?

Okay.

**PROSPECTIVE JUROR VARGAS:**  Yeah, I feel the same.  I mean, obviously depending on what the patent's on.  Particularly like if it is obviously like medicine or whatever that could save lives then, yes, I would be opposed to it.  Or if it's a technological advancement that could help people then, yes, I feel the same.

**THE COURT:**  I mentioned this case involves electronic circuit design, and you'll hear more about it if you're in this case.  But it does involve saving power.  Is this the kind of thing where your views about owners of patents who don't actually make something you feel strongly about that?

**PROSPECTIVE JUROR VARGAS:**  Yeah.  If we can improve something, and somebody's preventing it because they hold the patent but they're not doing anything with it, then yes.

**THE COURT:**  I'm just curious.  Would it matter to you if it was -- sometimes you have universities that come up with certain designs.  They don't actually manufacture stuff, but then they license it.  Do you feel the same way no matter who it is?

**PROSPECTIVE JUROR VARGAS:**  It doesn't really matter who it is.  If they're not using it and they're preventing other people from using it just because they have it --

**THE COURT:**  All right.  Anybody else share that view?

**PROSPECTIVE JUROR JOHNSTON:**  My name is Victoria Johnston.  I would look at it as the intent of the patent and

how they came about designing that patent.

THE COURT:  When you say "the intent," what are you thinking about?

PROSPECTIVE JUROR JOHNSTON:  Well, if the intent was just to hold on to it for future use of producing that certain product, or if the intent was just solely so nobody else could use that type of product, then I think I would have an issue with that if the intent was just to not do anything with it and just sit on that.

THE COURT:  Okay.  So if the intent was to try to just prevent anybody else from doing it, then you would be against -- you would feel strongly about that.

PROSPECTIVE JUROR JOHNSTON:  Yeah, I think I would.

THE COURT:  If the intent, for instance, were to try to improve something with the idea, that you couldn't do it yourself but maybe somebody else could make it, but you would get some money for that, how would you feel about that?

PROSPECTIVE JUROR JOHNSTON:  I think I would be okay with it as long as they held onto it and let other people, you know, either better it and start using -- to me if you're going to patent something, it's for somebody to use.  Or, you know, depending on the product and what it is.  There's a lot of things that can be patented.

THE COURT:  Okay.  Let me ask you, Mr. Vargas, since you were -- based on what Ms. Johnston just said.  If the

intent of the inventor, for instance, was to come up with something but they knew they couldn't produce it, but they would want to get paid if somebody else produced it, and they would give a license, or something like that, do you have a problem with that?  Or you still feel like --

PROSPECTIVE JUROR VARGAS:  I feel like the owner of the patent should definitely get it.  Being -- if they're allowing the patent to be used, but they want to get paid for it, then they should definitely get paid for it.

THE COURT:  Okay.  So even if they don't manufacture the thing?

PROSPECTIVE JUROR VARGAS:  Yeah, even if they don't manufacture it.

THE COURT:  It's more the idea of trying to squelch everybody else.

PROSPECTIVE JUROR VARGAS:  Yes.  Basically, trying to prevent anybody from using it and, you know, for -- simply inventing for the sake of inventing.

THE COURT:  Well, since you were the first one to raise the question, Mr. Aksomboon.  I think that's right.  If somebody invented it with the idea that they're going to hope to, for instance, license it to somebody else.  They wouldn't make it, but somebody else would.  They would make some money off of it.  How would you feel about that?

PROSPECTIVE JUROR AKSOMBOON:  Back to the issue of

patent trolls, I see a lot of so-called, you know, inventors coming up with big ideas and patenting them, not doing anything with them for years and years and years.  And then someone else comes along with similar idea and actually implements it.

I just feel that people that license these patents and don't do anything with it are just waiting for litigation.  They're just holding on to it hoping that somebody else comes along and does it, and you sue them.  And I'm strongly against that.

**THE COURT:**  So it's those who are looking for a legal --

**PROSPECTIVE JUROR AKSOMBOON:**  Opportunist.  Yeah.

**THE COURT:**  Which would be different from -- well, let's say a university develops a patent, but they --

**PROSPECTIVE JUROR AKSOMBOON:**  Well, the university is different because usually it's purely an academic sense.  It's clear from the get-go that it's an academic sense.  But we have a lot of so-called inventors that really aren't qualified, but they can still register these patents because they just have -- they just had a light bulb go off in their head and they think this is a great idea.

Patents are very vague.  They're frivolous.  And all it is, ends up with litigation and just trying to sue somebody to get some cut out of it after they've actually -- along those vague lines, but actually made it practical and put in the

effort and work to make it usable.

THE COURT:  All right.  Mr. Bodnar, you also expressed -- given this discussion we had about different intent.  If someone had developed something with the intent to improve something, but knew they didn't plan to necessarily do it themselves, but would have to either agree or do a license agreement or something to somebody else to actually manufacture it.  But they didn't manufacture it themselves.  Do you have any strong feelings about that kind of scenario?

PROSPECTIVE JUROR BODNAR:  No, no strong feelings.

THE COURT:  It's more the idea of trying to prevent having a patent just to prevent others?  Or use it as a --

PROSPECTIVE JUROR BODNAR:  Yeah.  Just holding on to a patent waiting for litigation for personal profit.

THE COURT:  Okay.  Anybody else have any strong views on the subject that hasn't already spoken?

Mr. Owen.

PROSPECTIVE JUROR OWEN:  My name is David Owen.  I don't have a lot to add except that I agree with the patent troll aspect.  If they're holding on to a patent and invented something with the intent to either do something with it later or they're waiting out for a good buyer or good person to do business with, that's one thing.  But when it's the kind of snake in the grass sort of aspect is what bothers me, and I would be bias against that kind of behavior.

**THE COURT:**  Okay.  All right.  Anybody else?

The back?

**PROSPECTIVE JUROR VUONG:**  Priscilla Vuong.  I do concur with the patent trolling.  I think it's on the rise where you have all these companies that will sit on these patents and just use them in order to litigate or to force other companies in order to get a license.

I do have strong feelings about that, especially because a lot of my friends are artists.  And within the same realm, there's a lot of trademark squatters recently that will also enforce those rights purely for monetary reasons or to quash the competition.

Especially recently, like, there's a lot of companies, especially I think some Chinese tech, that will get patents and then purposely sit on them just waiting to monetize on them by suing another company, setting cease and desist, or forcing them to buy a license.  And I do have strong feelings about that.

**THE COURT:**  Okay.  Anybody else?

(No response.)

**THE COURT:**  All right.  Do any of you, other than what you've stated -- let me ask about technical background -- have any engineering background in electrical or computer engineering other than what you've already mentioned?

Do any of you have experience in the design of electronic

circuitry?

(No response.)

THE COURT:  Do any of you have any education or experience relating to finance other than what you've said?  I know some people are involved.

(No response.)

THE COURT:  All right.  At this point I'm going to ask the attorneys, if they'd like, give you 20 minutes each to ask some follow-up questions.

MR. SUDER:  Can I get some more water first?

Thank you, Your Honor.  May I -- five minute warning, please?

Good morning again.  I'm John Suder.  I'm an attorney from Forth Worth, Texas.  Not originally, as you can tell.  From New Jersey.  But I'm honored to be here to represent Opticurrent, Mr Brunell and his company, and to aid you to decide this important case.  This case is about an invention and respecting other people's property.

Mr. Brunell is from San Francisco.  He worked with Microsoft.  He did licensing.  He now formed a business, and he partners with inventors to help them pursue their invention.  His partner in this case was the inventor of the patent, Jim Congdon, who was a lifelong engineer, went to Stanford, worked for a lot of companies, has over a dozen patents but didn't have the experience or the resources to do this alone and they

partnered together.

This case is about respect.  Respecting other people's property.

THE COURT:  All right.  I'm going to ask you to ask questions.  It's not -- I understand you want to give some openings, but this is not -- we're not in trial yet, so please ask questions.

MR. SUDER:  Ms. Johnston, I'm going to ask you because you have some grandchildren.  Do you remember when your grand children went off to kindergarten, what was the first thing you told them you wanted them to do?  You wanted them to respect other people's property, right?

PROSPECTIVE JUROR JOHNSTON:  Well, those are your words, but I was going to say respect their teacher, respect their -- you know, other people that are in the room.  Yeah.

MR. SUDER:  Yes.  And my question for you all is, do we all live by those rules?  Ma'am?

PROSPECTIVE JUROR JOHNSTON:  I would hope so.

MR. SUDER:  Yes.  Because I want to ask you, do any of you think that a different set of rules applies to corporations than in our day-to-day life?  Or do we all live by the same rules in business, personal, whatever?  Does anyone have any feelings about that?

Yes, sir.

PROSPECTIVE JUROR AKSOMBOON:  I definitely believe

corporations operate by a different set of rules.  You see corporations get away with a ton of things that a private citizen wouldn't because they have the clout, they have the connections, both political and, you know, they have a platform for it, they have the money to fund it.  So, yeah, there is definitely a difference between a private citizen and a corporation.

MR. SUDER:  Do you feel we should all live by the same set of rules?  Same set of rules apply to everybody.

PROSPECTIVE JUROR AKSOMBOON:  Not necessarily. Because corporations and people are definitely different, so there should be different sets of rules that apply in the specific context.  Some corporations actually maybe conform to rules in a much more stringent, more strict, type of nature. But it really all depends.

MR. SUDER:  Any of you on this side agree with what he said?

Yes, ma'am.

THE COURT:  If you could state your name and wait for the microphone.

PROSPECTIVE JUROR LINDSTROM:  My name's Amelia Lindstrom.  I believe, basically, with what Mr. Aksomboon said. Corporations generally get away with a lot more than private citizens are allowed to get away with, and I don't think that's right.  Corporations have the lives and livelihoods of

thousands of people in their hands and should be held to stricter rules than I believe an individual.

**MR. SUDER:**  Thank you.

Yes, ma'am?

**PROSPECTIVE JUROR JOHNSTON:**  Victoria Johnston.  I think the owner of the corporation -- I feel the owners of the corporation should live by the same standards of respecting property.  Not the corporation.  The corporation is an entity.  But the owners of that corporation need to live by the respect.

**MR. SUDER:**  Thank you.  Now, I'd like to talk to you about what I think is the most important aspect of our legal system.  It's called the burden of proof.  We've all heard of it.  In a criminal case -- some of you served on criminal juries -- beyond a reasonable doubt.  You watch TV.  You got to prove beyond a reasonable doubt.  In a civil case, it's different.  It's called a preponderance of the evidence.

How many of you ever heard that term?  It means more likely so than not so.  You just kind of tip the scales.  That's what the burden is that we have.

So my question for you all, if you make it onto the jury, and Judge Chen gives you the law that that is the burden that we have in bringing this case, will you hold me to that burden and not the higher burden that you may think of from maybe what you hear in the news or on TV?  Anyone have a problem with that?

(No response.)

**MR. SUDER:** Okay.  Thank you.  Related -- I want to talk to you about a thing called circumstantial evidence.  You all heard what circumstantial evidence is?  Give you an example.  You go to bed at night and the skies are clear.  You wake up at night (sic), the sun is shining, but there's snow on the ground.  Did you see it snow?  No, but you know it's snowing.  Right?

That is circumstantial evidence.  Judge Chen is going to tell you that it gives the same effect as direct evidence.  And the reason that's important is because I'm not Perry Mason, those that know Perry Mason.  I'm not going to get them to admit they infringed our patent.  But using your common sense, and what's more likely so than not so, you can draw on those experiences and inferences of circumstantial evidence.

You all understand that concept?  It's important concept.  Just want to make sure.

Now, there's been some discussions about patents.  And those of you that make it onto the jury will see a video about patents and what a patent does.  It gives you the right to enforce your property.  It's a piece of property that the government gives you.  It's a property right.  And that property right, it requires people to respect it.  If it's a valid patent, it must be respected.

So the point of my question is, if I have a patent --

let's say I have a patent on a chair.  It has four legs.  Seat, a back, and two arms.  And later on -- I'm going to pick on you, sir, since you know a lot about patents -- you get a patent on a swivel.  It still has four legs, seat, and back.  Do you have to respect my patent?

PROSPECTIVE JUROR AKSOMBOON:  In what specific respect?

MR. SUDER:  If my patent is still valid and still good, and you get a patent later that just adds to it or does other features to it, you have to respect my patent.

PROSPECTIVE JUROR AKSOMBOON:  It depends on the context.  If it's significantly different then I think that it has its own space.  Has its own right to exist.

You're talking about adding a specific feature, just the swivel on it.  But where we're talking about a swivel, reclining back, headrest, leg rest, lumbar support, we're talking about some significant additions to that.

Sure.  It's still a chair, but it's a significantly different chair.

MR. SUDER:  I'll tell you Power Integrations has patents on other aspects that relate to the products that our patent relates to.

And I want to ask you if any of you feel that because they have patents, if they still infringe our patent, that it somehow excuses their conduct or lessens what they have to do

in respecting our property?

And it's okay if you do, if you feel that way.  This just might not be the right case for you.  I just want to ask you if you feel patents that come later somehow lessen or excuse the respect that needs to be given to someone else's property.

Anyone have that feeling?

(No response.)

**MR. SUDER:**  Okay.  Thank you.  Now I was going to ask you, discuss with you, about the fact that Opticurrent doesn't make product.  We covered that issue.  But I will tell you Opticurrent does not make product.  All it has is this patent, because it partnered with a inventor who has been in this business his entire life, and it has patents, worked for companies that have patents of his -- have products made into commercial uses.  And now he's an elderly person.  And he partnered because he didn't have the experience.

And I know your views on patent trolls.  But in this situation, I want to tell you that did raise your hand that the right to patent comes from our Constitution.  The right to invent.  It doesn't say that whoever makes a product and invents gets a patent.

So does it bother any of you, other than what was already discussed, the fact that Mr. Brunell had the experience and partnered with Mr. Congdon to bring his patent?  Does that bother you that that may unfairly affect your ability to hear

the evidence and listen to the law as Judge Chen will give it to you?

If it does, again, that is okay. This just may not be the right case for you.

So other than those that have spoken their views -- I got it down -- I got you all down -- anyone else?

(No response.)

**MR. SUDER:** Okay. Thank you. Now I'd like to talk to you about infringement. This is a patent infringement case. An infringement can be done two ways. One is what's called literal infringement. It means just what it says. You literally do exactly what the patent teaches.

But there's another way. And I know you went and took patent courses, so bear with me. You may already know this. There's a doctrine called "infringement by equivalence." The law, as Judge Chen will tell you, will tell you that if something is slightly different, an insubstantial difference but still does substantially the same thing, you can still find infringement by equivalence.

And that's an important concept. The law allows you to find infringement even if there is some differences. And the reason I say that, is because some people are very literal.

I'm going to -- Mr. Bodnar, you're a chemist. My son's a chemist. He's a high school chemistry teacher. He's very literal. I don't know if you feel that way. But people that

are literal may not be able to see beyond the fact that you can have minor differences and still be infringement.

And so I want to make sure that that's okay. Because if anyone feels that it has to be exact and nothing else, again, there's nothing wrong with that. That's okay. But then this may not be the right case for you, because Judge Chen's going to tell you otherwise.

Do you all understand that concept? Anyone have any questions about it? Is anyone bothered by the fact that there can be minor differences; but if it still does substantially the same function it can be infringement.

Yes, ma'am.

**PROSPECTIVE JUROR WALL:** Donell Wall. I just had a question.

**MR. SUDER:** Sure.

**PROSPECTIVE JUROR WALL:** So if one person had a patent and the other person had a product that -- or, an idea that resembled the original patent, do they have to go through a process to make sure that it's legal that they proceed with what they're doing?

**MR. SUDER:** Maybe. Maybe they contact them. Maybe. But for purposes of this case, and the law that you will take an oath to follow, you are to look at the patent and the product and see how they line up. And if they're exactly the same -- which we think it is in this case -- it's literal. But

if they say "We do it differently," you can look at those differences, weigh those differences, and say, you know, That's not enough to take it out of infringement.

**PROSPECTIVE JUROR WALL:**  My question is, though, if they went and they followed everything that they needed to to proceed in a legal way -- and, you know, I don't know if they obtained their own patent of a similar product.  I don't understand a lot of that.  But I just would wonder if that's still allowed.

**MR. SUDER:**  Yes.  Under the right circumstances, it is.  That's a very good question.  Those facts aren't relevant here but that's -- I'd gladly have that legal discussion with you that you may understand about willful infringement and opinions of counsel and things of that sort where you can go and say:  Hey, I'm about to do this, is it okay?

That's not an issue.  We're not saying they did it, we're not saying they didn't do it.  We have a patent, it's good.  The government gave us the patent.  They have a product.  They have to respect our patent.  Because a patent, you all know, is only good for 20 years from the time we file.  Takes a few years to get it.

And the whole point of it is after the 20 years it is dedicated to the public.  Not like a trade secret, like a secret formula of Coca-Cola that's good forever.  You keep it secret.  You dedicate it to the public.  That's the whole

premise of our patent system.

Those of you who have views about patent owners and whether they make product, that's a debate that goes on all the time.  But that's a really good question.  It's not relevant to the facts of this case.

Does that help?

**PROSPECTIVE JUROR WALL:**  I understand you.  I won't know probably until the case started and I heard all the facts.

**MR. SUDER:**  Fair enough. that's very fair.  But do you understand the difference that you can still have infringement if you find the differences are minor?

**PROSPECTIVE JUROR WALL:**  Yeah.  I understand that.

**MR. SUDER:**  Thank you.

**THE COURT:**  You asked for five-minute warning, so I'm giving you your five-minute warning.

**MR. SUDER:**  Perfect.  Thank you, Your Honor.

I'd like to talk to you about damages.  The law says, as Judge Chen will tell you, that if there's infringement, if you find infringement, you must pay an amount in no less than a reasonable royalty.  That's the law.  And here, anyone who's accused of infringement has the right to challenge the validity of the patent.  It's not new, someone else did it.  They're not doing that here.  This is a valid patent.  The only question for you is, if you are on the jury, is do they infringe?  And if they do, then it's what kind of damages?  And the damages is

a reasonable royalty.  I forget who it was who mentioned about the artist and the record business -- yes.  Yes, ma'am.  But, you know, that's --

Do you know what a royalty is?

**PROSPECTIVE JUROR VUONG:**  My name is Priscilla Vuong.  Yes, I do.

**MR. SUDER:**  An artist, if you write a song, and so many records get sold, you get paid on each record that gets sold.  Right?

**PROSPECTIVE JUROR VUONG:**  Yes.

**MR. SUDER:**  That's called a license.  A royalty.  Because here the evidence is going to be that Power Integrations sold a lot of records.  The question is, if there's infringement, do we get a portion, a small portion of each record that they sold?

And the evidence is going to be that it's going to be a lot of records, and we're going to be asking in what amounts to several million dollars.  A lot of money.  No question about it.

And my question for the panel is this.  Make sure I say it right.

Without knowing the facts, if the evidence supports a finding of infringement in the amount of what a royalty should be, can you award that money?  Or just mention the word millions, several million dollars, that's just too much money?

Again, it's okay if you feel that way.  This may not be the right case for you.  I want to ask you if anyone has that view:  You're asking for how much money?  I just couldn't do that under any circumstances.  Does anyone have that view?

Ma'am, I'm looking at you.  I'm sorry.  You're right there in the front seat.

**PROSPECTIVE JUROR JOHNSTON:**  No, I do not.

**MR. SUDER:**  You do not.  You can, if the evidence support it, you don't have that view, you're answering me correctly.

**PROSPECTIVE JUROR JOHNSTON:**  Yeah.  I do not have that view.

**MR. SUDER:**  So if we put on our case, you can award whatever the law requires.

**PROSPECTIVE JUROR JOHNSTON:**  That is correct.

**MR. SUDER:**  Anyone feel differently?

Yes, sir.

**PROSPECTIVE JUROR VERPLANK:**  William Jansen Verplank.  How I would feel about it depends on how that amount is arrived at.  If it is decided in a process that seems like it would make sense, then it makes sense and that's fine.

**MR. SUDER:**  And that's your job if you are on the jury.  That's a very good point.  If you're on the jury, can you follow the law and listen to the evidence and apply the evidence even if it meets that kind of result?

**PROSPECTIVE JUROR VERPLANK:** (Nod affirmatively.)

**MR. SUDER:** You're saying yes.

**PROSPECTIVE JUROR VERPLANK:** Yes.

**MR. SUDER:** I'm about to sit down. They'll get to speak with you. If you can't tell yet, if you're chosen you'll have made a serious commitment and pledge to be open minded and follow the law.

So my last question to you. Is there any reason, whatever you have, whether it's because you don't like certain owners of patents, or you don't like -- whatever, that you cannot follow the law and you cannot give us a fair trial? Anyone feel like everything you've heard, I'm just not right for this case? Give you a chance out now, folks. This is your hold card. Any of you feel that way?

Because, after all, all we want is a fair trial

**PROSPECTIVE JUROR CRUSE:** My name's Tim Cruse. Real quick, I'm in -- I'm working for a company that we develop new product all the time. So if someone tries to build something that we -- I work with a lot of the lead designers, as well, in the headquarters there. If someone tries to steal an idea, in my view, and they get paid for that idea, and it was our patent, I definitely have a problem with it.

**MR. SUDER:** Fair enough. And, ma'am, I'm about to get called out of time, but you raised your hand so I want to make sure -- that's Ms. Nims.

**PROSPECTIVE JUROR NIMS:**  Yes.  I'm just being honest. It's a lot of legal jargon.  Yeah, it's a little hard to follow for me.  You asked if it was too much, so I'm just being honest.

**MR. SUDER:**  That's all I want is honesty.  Then I apologize.  It's my job is to keep it so you understand, because you're the judge of the facts.  And it is my job to present the facts to you in a way so you can make a decision.

Judge Chen is the judge of the law.  He will give you the law and you take an oath to follow that law, be open-minded, use common sense.  And if you can do all that, then if anyone doesn't think they can do it, raise your hand now.  Last chance.

(No response.)

**MR. SUDER:**  All right.  Thank you.

Thank you, Your Honor.

**THE COURT:**  All right.  Thank you.  Counsel.

**MR. SCHERKENBACH:**  Good morning, ladies and gentlemen. My name is Frank Scherkenbach.  And with my colleagues I represent Power Integrations who is the defendant in this case. Before I get to some of the more general issues, I have some specific follow-up questions for a few of you just based on your backgrounds.

If I could ask Ms. -- is it Vrbanac-Libby?  Yes.  You said you're married?

PROSPECTIVE JUROR VRBANAC-LIBBY:  I am.

MR. SCHERKENBACH:  Can you tell me your spouse's occupation?

PROSPECTIVE JUROR VRBANAC-LIBBY:  He's retired.

MR. SCHERKENBACH:  What did he do before he retired?

PROSPECTIVE JUROR VRBANAC-LIBBY:  He worked for Linear Technology Corporation.  He was a managing director of -- oh, my gosh -- yield and foundry management at the end of his career.

MR. SCHERKENBACH:  So he knows semiconductor --

PROSPECTIVE JUROR VRBANAC-LIBBY:  Oh, yeah.  Analog.

MR. SCHERKENBACH:  This case is about semiconductor devices, just so you know.  So --

Okay.  Good.  That was my question.

PROSPECTIVE JUROR VRBANAC-LIBBY:  I don't know anything about them.

MR. SCHERKENBACH:  That's perfect.  Okay.

Miss Johnston.  Just a little bit more about your background.  I think you said something about banking.  You worked for a bank or --

PROSPECTIVE JUROR JOHNSTON:  Yeah.  I worked in the banking industry as a private banker for 13 years.  And the last five years I managed a small community bank.

MR. SCHERKENBACH:  So do you have some financial training or -- either formal or by experience -- that you use

in your job?

**PROSPECTIVE JUROR JOHNSTON:** Yeah. I held a series 766. My insurance license. Certified to do lending.

**MR. SCHERKENBACH:** I see. Okay. Great. Great. Ms. Nimmo. You said you are a technology specialist for an elementary school. Can you just describe a little more what you do, what that means?

**PROSPECTIVE JUROR NIMMO:** Pretty much take care of anything that's technology related. When they get new things in, I get them set up for the kids and get them out to the classrooms. And then if things break, then it comes through me to get it fixed.

**MR. SCHERKENBACH:** So does it have some IT aspect to it? Computer related and so forth?

**PROSPECTIVE JUROR NIMMO:** Yeah. There's hardware and software. We do a lot of Google stuff, so there's Google console management. So behind the scenes on how the computers run and how they're set up for the testing.

**MR. SCHERKENBACH:** Great. Thank you very much. Ms. Vo. I didn't quite catch it. You said you do accounting for a medical device company.

**PROSPECTIVE JUROR VO:** Yes.

**MR. SCHERKENBACH:** Can you describe a little bit more what's involved in your job?

**PROSPECTIVE JUROR VO:** So I read contracts. Based on

the contract terms, I take revenue on it.  So just reading contracts and revenue recognition.

MR. SCHERKENBACH:  You don't get involved in the technological aspects?

PROSPECTIVE JUROR VO:  No.

MR. SCHERKENBACH:  Just at a high level, what's the business or the company.

PROSPECTIVE JUROR VO:  We into cancer treatment.  Yeah.  We have machines at Kaiser and Stanford for treating cancer patients.  Radiation therapy.  So instead of going traditional radiation, it's just a laser-guided beam that treat tumors, kill tumor cells, surrounding cells.  Actually, kills the tumor itself, but not the surrounding cell.

MR. SCHERKENBACH:  Okay.  And how long have you been there?

PROSPECTIVE JUROR VO:  I've been there for 12 years.

MR. SCHERKENBACH:  Thank you.  Ms. Vas?  I know you already told us a lot about your education.  I didn't quite catch your master's degree.  It related to energy.  But what specifically?

PROSPECTIVE JUROR VAS:  It's a masters of science in energy and resources management from UC Berkeley's energy and resources group.

MR. SCHERKENBACH:  Okay.  What does that entail generally?

**PROSPECTIVE JUROR VAS:**  It entails -- it's an environmentally-focused interdisciplinary degree.  It entails -- you can take it really in any direction.  My particular direction was in behavioral economics for changing behavior of folks to be more sustainable.  It includes -- well, it didn't really include the engineering background since I already had that in my undergrad.  So my masters is mostly on the sociology aspects of environmentalism.

**MR. SCHERKENBACH:**  Okay.  Great.  One follow-up question.  I think you said at one point part of your job involves reviewing electrical schematics for installations, make sure some of the things, like the batteries and controllers and inverters, are connected to that.

**PROSPECTIVE JUROR VAS:**  That's right.  That they are connected and metering properly.

**MR. SCHERKENBACH:**  Are those solar installations?

**PROSPECTIVE JUROR VAS:**  Solar, wind, batteries, CHP generators, fly wheels.

**MR. SCHERKENBACH:**  So you have some facility or ability to understand electrical circuitry?

**PROSPECTIVE JUROR VAS:**  Yeah.  Prior to working there I was a researcher at Lawrence Berkeley National Lab researching technologies for building systems.  Prior to that I was doing research for a facility in campus efficiency measures.  A lot of HVAC and technical performance of

buildings.

**MR. SCHERKENBACH:**  Okay.  Thank you very much.

Just a few general questions and I'll wrap up.

As you know, we're the defendant.  My client's the defendant.  We've been sued.  And so one thing I want to make sure of is everyone is comfortable waiting to hear both sides of the story and waiting to hear all the evidence before they make up their mind.

Is there anybody here who feels, Gee, because we've been sued we must have done something wrong?  That it's sort of our fault we're here?  Anyone feel that way or can you keep an open mind?

(No response.)

**MR. SCHERKENBACH:**  Okay.  Great.  And then last thing is -- and counsel -- Mr. Suder made a lot of references to Judge Chen instructing you on what the law actually is and the law that you're actually going to have to follow in the case.

Is there anybody here who has any problem waiting to hear those instructions as to what the law actually is before deciding, as opposed to attorney argument?  Anyone have any problem with that?

**PROSPECTIVE JUROR VAS:**  I don't know if this is what your question is getting at, but I felt like the attorney who spoke prior to you was taking advantage of his time to make -- to try to sway our decision-making at a time that wasn't the

time to do so.  And that did sort of already create a bias in my mind of the integrity of the representation.

**MR. SCHERKENBACH:**  Well, thank you for being candid about that honestly.  My question was really on one of the fundamental things about a trial that the judge will tell you; is there's a big difference between a lawyer's argument, and the actual evidence, and what the judge instructs you on the law.

And I just want to make sure everyone is comfortable following the law as provided by the judge and the evidence as you see it come in.  So if anyone has a problem with that, raise your hand.

Otherwise I'm done, Your Honor.

(No response.)

**THE COURT:**  All right.  Well, let me follow-up, Ms. Vas, with your comment.

So the way things have happened in this courtroom, it sounds like you're feeling maybe a bit biased against one party, the plaintiff, as opposed to defendants, because of what you've just heard.

**PROSPECTIVE JUROR VAS:**  A little bit.

**THE COURT:**  Would you be able to -- once we get the trial started -- set that aside and listen to the evidence as it comes in with an open mind, and then apply the law as I'm going to explain it to you, even though you might have felt a

little biased at the outset?

**PROSPECTIVE JUROR VAS:**  Yeah.  In just, like the technical personality that I have, I try to dismiss fluff in how people conversate in like sales-y type of talk.  So I will be very attentive to the evidence that's presented, rather than the feelings of people.

**THE COURT:**  All right.  Thank you.

All right.  Any last comments by anyone who feel that they could not really sit -- other than what you've said already -- could not really sit in fair judgment in a case like this?

(No response.)

**THE COURT:**  All right.  Then what I'm going to do is we're going to take a half hour break to then handle the selection process.  You can go down to the cafeteria or take a break.  If you can come back at about -- why don't we say come back at noon.  Give you a chance to grab something for lunch, if you want.  And then we'll have, hopefully, our final selection process and announce who our finalists are when you come back.

So we'll see you back here at noon.

(The jurors exiting the courtroom.)

(The following proceedings were held in open court, outside the presence of the jury:)

**THE COURT:**  All right.  Have a seat.  Let me just revisit the hardship questions.

I'm going to actually have my staff call Stanford to find out whether or not they really do or don't pay, because now I'm hearing sort of mixed messages from Mr. Albania.  So we'll -- I do want to get that information.

And with respect to Mr. Dilla who is the new parent we should revisit the question about his hardship now that we've got a little more information.  Sounds like the mother watches two children, and the concern is having to watch the children all day.  And that's where he says he feels like he has to relieve her at around noon.

(Off-the-record discussion with the deputy clerk.)

**THE COURT:**  Juror -- Prospective Juror Tiffani Vo wants to say something in private.  While she's coming in, any further comments on Mr. Dilla?

**MR. SUDER:**  Your Honor, I feel for him, but he's -- I don't think that's a sufficient hardship.  We had small children.  And I understand the hardship when I got home, what that meant.

**MR. SCHERKENBACH:**  It seemed to me that we have enough.  If you're on the fence and you want to let him go, that we have enough other people that are qualified.  It's hard to get a handle on, to be honest.

**THE COURT:**  All right.  Well, let's hear what Ms. Vo has to say if she's here.

(Prospective Juror Vo entering the courtroom.)

**THE COURT:** Okay. So, Ms. Vo, I do have to have the attorneys present if that's okay.

**PROSPECTIVE JUROR VO:** That's fine.

**THE COURT:** So you wanted to convey some information.

**PROSPECTIVE JUROR VO:** I just wanted to tell you that I have a short attention span so I don't feel I'm fit for the case.

**THE COURT:** Okay. So this is something -- this is something that you --

**PROSPECTIVE JUROR VO:** I get distracted easily. My focus is very short.

**THE COURT:** I see. I see. And I'm just curious. At work do you have ways around that?

**PROSPECTIVE JUROR VO:** Yeah. So I interact a lot with the people, so people come and distract me all the time. So I have to set time to do certain things to not be bothered so I can focus on -- yeah.

**THE COURT:** So if you sat here for -- it would be for about 80, 90 minutes at a time, you would not be able to do that?

**PROSPECTIVE JUROR VO:** (Nod negatively.)

**THE COURT:** All right. Thank you.

**PROSPECTIVE JUROR VO:** It's something I'm working on.

**THE COURT:** I appreciate your frankness with us. Thank you.

(Prospective Juror Vo exiting the courtroom.)

THE COURT:  All right.  Well, let's go over the ones -- well, let's talk about her now that she's indicated she can't sit and listen for 90 minutes at a time.

Any question about excusing her?

MR. SUDER:  It's a new one, Your Honor.  Might have to use it myself sometime.  I don't know.  That -- I mean, I don't know.  It's a tough one.

MR. SCHERKENBACH:  I'm in the same camp.  I mean, that's -- if that's cause, I think that might open the flood gates.  But on the other hand, if you think we have enough people, I wouldn't object.  But --

THE COURT:  Okay.  Well, let's do this.  Let's start talking about the cause challenges and I'm going to withhold judgment on her, as well.

So we have a number of people who have spoken up about the so-called troll problem.  Let's just go down the line.

Mr. Owen had kind of chimed in.  He used the term "snake in the grass" kind of thing, which is not dissimilar to what many of the others were indicating.  Not everyone said it the same way.  But sort of the difference between sort of legitimate holding of a license, and with intent, and the deliberate snake in the grass kind of thing.

So I want to get your views on certain things.  Mr. Owen is kind of representative of some of that.

**MR. SUDER:**  Yes.  I think Mr. Owen, Mr. Bodnar number 7, and obviously my favorite right here Mr. -- number 9.  I don't know how to pronounce his name.  They were very resolute in their views.  I believe number 11, the Court sufficiently rehabilitated him and he was open-minded where at least he could say "I need to hear the evidence."

I think 1, 7 and 9 clearly should be stricken for cause because they just -- they said "I have very strong views on this."

**THE COURT:**  And with respect to juror number 8, Ms. Johnston, she was the one who sort of raised the issue about, well, kind of depends on their intent.  If they're letting others practice it, that's okay.  But if they're holding on it --

**MR. SUDER:**  If I had my druthers, I would say anyone -- but, yes, I think Ms. Johnston and Mr. Vargas were willing to hear the evidence and decide.  But 1, 7 and 9 were I think across the line.

**THE COURT:**  Let's talk about that.  What's your view about that?

**MR. SCHERKENBACH:**  Well, I think there's some lines that can be drawn.  I actually thought Owen was fine, number 1. He drew a line between people who were purely trying to stop other people from doing things, on the one hand, versus -- either had used or were planning to use it themselves.

I mean, I thought -- I don't think he's any materially different in that respect than several of the others.  He didn't seem to be virulent about it.

I just -- I have to say, just at a high level, Your Honor, that it was the *voir dire* that brought this whole issue up and on.  And so, you know, I don't think it's -- I don't think it's appropriate to draw a hard line against people given the way in which this arose.

I think Aksomboon -- we should rank them, I think.  Aksomboon, number 9, he seems pretty dug in.

THE COURT:  You would agree that he's --

MR. SCHERKENBACH:  I would agree he should probably go.  I mean, I think he has to.  But I will say there was a very strong undertone of the people who were most opposed tied it to medicine and medical procedures.  He did, actually.  But then I thought his subsequent questions -- or, his subsequent comments took it beyond the medical context.

I did not feel that way about Bodnar, actually.  I mean, he initially said -- he's number 7 -- he initially said:  I share similar views.  But what he specifically said is he thought it was unethical in the medical context.

That was my take away.  This is not the medical context.  I don't know that would have any --

THE COURT:  Let me ask.  I mean, the three -- two or three -- who kind of mentioned sort of waiting in the grass,

waiting on it just for litigation purposes; I mean, I assume that's not going to be the evidence here.  Right?

**MR. SUDER:**  Not from me.  But we're advocates, Judge.  Look at the positions they've taken in all the briefing.  We're trolls.  We don't make anything.  We're no good.  We can't do it on our own.

**THE COURT:**  Well, in terms of eliciting testimony here, what do you foresee as testimony that could trigger those who talked about waiting in the -- snake in the grass kind of thing?

**MR. SUDER:**  Yes.  They plan (indicating), based on the deposition testimony and everything else, they plan to try that Mr. Brunell is an opportunist who goes out and seeks patents and promises the inventors, who don't know otherwise.  And he's an opportunist with his partner.

So it's not Mr. Congdon, the evidence; it's going to be who Opticurrent is and what their business is.  And that's going to play right into 1, 7 and 9.

I agree -- look, I'm the plaintiff, Judge.  I'd love to have them all removed for cause, but I'm not.  I'm trying to be honest here.  And I'm being honest here.  I think Ms. Johnston and Mr. Vargas sufficiently tempered their views where I wouldn't have to -- I'd have to burn a strike if I wanted to remove them.

But I think 1, 7 and 9 were very clear in their views.  I

start off with an immediate disadvantage.  And that's why.  I think I'm already, you know, in the loss column with them.

**THE COURT:**  Let's talk about Bodnar.  And anymore comments on Mr. Bodnar, number 7, and Mr. Owen, number 1.

**MR. SCHERKENBACH:**  Did you want to hear from Mr. Suder on that?

**MR. SUDER:**  I've made myself clear, I think.

**MR. SCHERKENBACH:**  Oh, okay.  So again -- well, I guess two comments.  You asked sort of what the evidence is going to be.

I actually don't think this is a lying-in-wait case at all, as I understand it.  Their inventor did try to commercialize the product for awhile, had some limited success, ran out of money, needed a partner.

This case does not fit the fact pattern that seems to be offensive to these jurors.

**THE COURT:**  What will the evidence be about the partnership and the business plan?

**MR. SCHERKENBACH:**  Well, that comes in as relevant to the hypothetical negotiation for damages.  But it's not -- it's not -- you know, it's not part of our story to say Mr. Brunell waited around for damages to mount before he filed the lawsuit. I don't think, actually, the facts even support that.  It's simply that he saw an opportunity and partnered with his partners to license this patent.  The fact he doesn't practice

it is relevant, of course, to damages, but it's not a --

THE COURT:  But it will come out that he didn't plan to practice the patent.  It was --

MR. SCHERKENBACH:  That's true.  That's true.

THE COURT:  So I think there's some risk that Owen and Bodnar might -- whether they view this as that prototypical snake in the grass or not, I think there is some risk here given their feelings.

And so under the facts of this case, I'm going to excuse Mr. Owen and Mr. Bodnar and Mr. Aksomboon, which is number 1, 7 and 9.  And plaintiff agrees, notwithstanding some of the earlier comments, Ms. Johnston and Mr. Vargas are not going to be challenged, correct?

MR. SUDER:  Yes.

THE COURT:  So they will remain.  So let me -- let's just go through them quickly, then.  So Mr. Owen will be out.

Any objection -- any cause challenge to Ms. Vrbanac-Libby, number 2?

MR. SCHERKENBACH:  No, Your Honor.

MR. SUDER:  No, Your Honor.

THE COURT:  Nims?

MR. SCHERKENBACH:  No, Your Honor.

MR. SUDER:  No.

THE COURT:  The pharmacist, Alkhairull.

MR. SUDER:  Yes, Your Honor, on two bases.  One, I

believe there is a relationship.  She doesn't know that she just lost a client, because he moved.

THE COURT:  She does now.

MR. SUDER:  She didn't hear Mr. Warren say that.  That was -- but, two, her husband works in this space.  He works for Hynix, which is a semiconductor company.  So it's another connection where this is the only witness that has any -- albeit remote, if the Court sees it -- but has some connection to the people and companies involved in this case.  Which takes it --

THE COURT:  Tell me.  What's the relationship between her husband's company and this case?

MR. SUDER:  They're a semiconductor hardware company, Hynix.  She may know very well who Power Integrations is and what their business is.  It just further -- it really is the relationship that she --

THE COURT:  What's the information -- first of all, she says she knows nothing about this.  It's her husband's stuff.  But even if she talked about it, they're not a party. They're not affiliated.  Right?

MR. SUDER:  No, no, no.  They're not.

THE COURT:  You're just saying he may buy components or parts from Power Integrations.

MR. SUDER:  They make chips, yes.

MR. SCHERKENBACH:  Well, there's no basis for that.

Hynix is a DRAM company.  They're not a customer of Power Integrations.  It's a completely different technology.

MR. SUDER:  That's not my basis, Judge.  She knows Mr. Warren.  And that's just troublesome to us.

THE COURT:  All right.  Well, I'm going to overrule that objection.  I think there's not enough of a relationship there and I'm convinced by the fact that I've informed her that he is moving and no longer going to be her customer.  And I take Mr. Warren's representation at face value.  And so the future -- the problem of the future interaction is gone.  And I have not heard enough to -- and she said she could be fair about this, so I'm going to take her at her word and I believe her.

So that objection's overruled.

Mr. Wall -- Ms. Wall -- Mr. Wall --

MR. SUDER:  Ms. Wall.  No objection, Your Honor.

MR. SCHERKENBACH:  No objection for cause, Your Honor.

THE COURT:  And Dilla?

(Pause.)

THE COURT:  All right.  So we have confirmed that Stanford does pay.  In fact, there's no limit.  They just need a certificate or need proof.  So he's -- that's a problem with hearsay and the game of telephone.

MR. SCHERKENBACH:  I'm relieved.  Personally, I'm relieved.

THE COURT:  Yes.  Being a Cal grad, I was ready to really pin it to Stanford.

So the guy hardship question, Mr. Dilla.

MR. SUDER:  Your Honor --

THE COURT:  Any thoughts?

MR. SUDER:  I don't think it's a hardship.  It's -- I know what it's like to have small children.  We all do.  That's just not a hardship.

THE COURT:  Comments?

MR. SCHERKENBACH:  I mean, I think it probably is.  I'm not going to go to the mat on it, but it seems to me we've let other people out for similar things.  But, again, it really has to do with how many others you think we have that are qualified.  It seems to me we have enough, so --

THE COURT:  All right.  Well, I think we do have enough so I'm going to let him off.  I think he's explained well enough why there's nobody else that can care for his child.

Victoria Johnston.  There's no objection now?

MR. SCHERKENBACH:  None.

THE COURT:  I've stricken Mr. Aksomboon.  Ms. Nimmo.  Any objection?

MR. SUDER:  No, Your Honor.

MR. SCHERKENBACH:  No objection.

THE COURT:  And Mr. Vargas, you've already indicated,

on the plaintiff's side, you're not going to object.

MR. SUDER:  Yes.

MR. SCHERKENBACH:  No objection.

THE COURT:  Now Ms. Vo, the one who has a short attention span.

MR. SUDER:  I -- that's just a hard one, Judge.

THE COURT:  I think, again, if this were a simpler case I would probably be less concerned.  But this is a case where there are documents.  There's going to be some technical testimony.  And if she, in fact, has attention span problem, I think it's going to be multiplied.  So I'm going to relieve her for cause.

Mr. Verplank?

MR. SUDER:  No, Your Honor.

MR. SCHERKENBACH:  No cause.

THE COURT:  Okay.  Ms. Vigil.

MR. SUDER:  No cause objection.

MR. SCHERKENBACH:  No cause.

THE COURT:  Mr. Cruse?

MR. SUDER:  No cause objection.

MR. SCHERKENBACH:  None.

THE COURT:  Okay.  Mr. Albania.

MR. SUDER:  No cause.

THE COURT:  Now that we know he's getting paid.

MR. SUDER:  He's going to get paid, yes.

MR. SCHERKENBACH:  No cause.

MR. SUDER:  No cause.

THE COURT:  And then Watson.  Ms. Watson.

MR. SUDER:  No cause objection.

MR. SCHERKENBACH:  No cause.

THE COURT:  And then Ms. Vas.

MR. SUDER:  She doesn't like me.

THE COURT:  Well, she did indicate that, I will admit.  But she then said she could put that aside.  And you can rehabilitate yourself if you do it right.

MR. SUDER:  Yes.  Yes.  No objection, Your Honor.

THE COURT:  Okay.

MR. SUDER:  As much as I'd like to make one.  But no objection.

MR SCHERKENBACH:  No objection.

MR. SUDER:  I think that was --

THE COURT:  Okay.  Mr. Pech?

MR. SUDER:  No objection.

THE COURT:  Ms. --

MR. SCHERKENBACH:  Well, actually, I would make an application on him.  I thought -- I mean, very, very poor English.  It just didn't seem to me he's going to be able to comprehend what's happened in this case.  I know we didn't ask a lot of followups, but he seemed to really struggle with the language.

THE COURT: Your observations?

MR. SUDER: He's a long time postal employee. He manages. He works. He's an assistant teacher part time. I mean, he's able to communicate. He didn't seem to have any problems. He speaks with an accent. That's not a basis to excuse him.

THE COURT: Yeah. I didn't see anything, at least in his background, other than his accented English, that would suggest he doesn't have the intellect or ability to follow. One might ask more about his educational background. That could have been asked. I did ask some questions. He had two years of college. True, no science. But he was there, and he's been with the postal service and he does work as an assistant teacher and teaches -- or, practices yoga, I guess. So to the extent there's a challenge to him I'm going to overrule that challenge if that's the only basis.

Amelia Lindstrom?

MR. SUDER: No objection for cause.

MR. SCHERKENBACH: I was a little troubled about her comment that corporations get away with things individuals don't, to be candid.

THE COURT: Except in this case we've got two -- essentially, two companies.

MR. SCHERKENBACH: Well, yes and no, in a way. Right?

THE COURT: One is bigger than the other.

**MR. SCHERKENBACH:** I mean, I'll just put that on the record. It probably doesn't rise to the level of cause.

**THE COURT:** All right. Then I'm not going to strike her for cause.

So we needed -- what did I say? 14?

**MR. SUDER:** She would be the 15th, Judge.

**THE COURT:** So if we have Vrbanac -- what is her name? Number 2. Yes. That's number 1.

**MR. SCHERKENBACH:** Sorry. Can we go over that number again? I missed that. So number 1 will now be who?

**THE COURT:** Vrbanac-Libby. Number 2, was Malia Nims. 3 is Ms. Alkhairull. Number 4 is Wall. Donell Wall. Number 5 is Victoria Johnston. Number 6 is Manuela Nimmo. Number 7 is Alejandro Vargas. Number 8 is William Verplank. Number 9 is Joy Vigil. Number 10 is Timothy Cruse. Number 11 is Martin Albania. Number 12 is Cheryl Watson. 13 is Ms. Vas. And 14 is Mr. Pech.

So those are your 14 from which you are entitled to exercise, each, three peremptories. So do you have the sheet?

**THE CLERK:** I do, Your Honor.

**THE COURT:** So why don't you -- I think it's plaintiff, then defendant, then defendant, then plaintiff, then plaintiff, then defendant.

**MR. SUDER:** One two, one --

**THE COURT:** One, two, three, four, and five and six.

MR. SCHERKENBACH:  Can we confer --

THE COURT:  You do one and pass the sheet.

MR. SUDER:  Can we have a short --

THE COURT:  Yeah, yeah, yeah.  I'm going to take my own break as you work.  As long as you do this in the next ten minutes, we'll bring them in and just call up the remaining last eight standing.

MR. SCHERKENBACH:  Great.  Thank you.

(Recess taken at 11:45 a.m.)

(Proceedings resumed at 11:57 a.m.)

THE CLERK:  Plaintiff strikes Nada Younis Alkhairill.

THE COURT:  That's number 3.  Ms. Alkhairill, right?

THE CLERK:  Yes.  Ms. Andrea Vas.

THE COURT:  Okay.

THE CLERK:  She's number 13.  Mr. Alejandro Vargas.

THE COURT:  Okay.  And defendants?

THE CLERK:  Defendants, William Verplank.

THE COURT:  Okay.

THE CLERK:  Steven Pech.

THE COURT:  Okay.

THE CLERK:  And Malia Nims.

THE COURT:  Oh.  Number 2.

Okay.  So that means juror number 1 will be -- this is the jury -- Angela Vrbanac-Libby.

THE CLERK:  "Vrbanac," Your Honor.

**THE COURT:**  Vrbanac.  I want to get her name right.  Number 2 is Donell Ward (sic).  Number 3 is Victoria Johnston.  Correct?  Number 4 is Manuela Nimmo.  And number 5 is Joy Vigil.  And number 6 is Timothy Cruse.  7 is Martin Albania.  And 8 is Cheryl Watson.

Correct?

**MR. SCHERKENBACH:**  I believe that's right.

**THE COURT:**  All right.  Is that correct on the plaintiff's side?

**MR. SUDER:**  Yes.  Yes, Your Honor.

**THE COURT:**  All right.  Why don't we go ahead and call the jurors back in.

Actually, have everybody -- Angie, just have everybody seated in the pews and then we'll call them up instead of having to shuffle them around.

(Prospective jurors entering the courtroom.)

**THE COURT:**  All right.  Thank you, everyone.  Appreciate your patience.  We have completed the selection process.  And as I mentioned earlier, the process by which each of the parties has gone through and made their decisions with respect to the jury.

And so what I'm going to do simply now is simply announce the winners, the lucky eight who will serve as our jury in this case.  And I'm going to call you up in order.  So if you take your seats in order on the top row, the first four; and then

the bottom row, the next four.  So one through four will be top row, five through eight will be the bottom row.

Juror number 1 will be Ms. Vrbanac-Libby.  I may be pronouncing your name wrong.  But you are number 1.  Juror number 2 is Ms. Donell Wall.  And number 3 is Ms. Victoria Johnston.  And 4 is Manuela Nimmo.  So you all are on the top row.

And then starting at the bottom row, first seat will be Ms. Joy Vigil.  And next to her, number 6, will be Timothy Cruse.  Mr. Cruse.  And number 7 will be Mr. Martin Albania.  And, Mr. Albania, we did confirm with Stanford that they do pay for jury service and we'll get you whatever documents you need to make sure you get paid.  And then juror number 8 is Cheryl Watson.  Last seat in the first row.

So let me ask the parties as Ms. Watson is taking her seat whether you're satisfied with this jury.

**MR. SUDER:**  Yes, Your Honor.

**MR. SCHERKENBACH:**  Yes, Your Honor.

**THE COURT:**  All right.  Thank you.

Angie, could you administer the oath, please?

(Oath administered to the jury.)

**THE COURT:**  All right.  Did everybody say "I do"?  Okay.  Thank you.  Make sure that's on the record.

Okay.  With that, ladies and gentlemen, for those of you who have participated, we appreciate your time and effort.  As

I mentioned before, it was essential that you participate in this because we just never know how many people we're going to need. Again, on behalf of the parties and the court, I thank you for your service.

You are directed to go back to the jury assembly room and report that you have been released from this courtroom. I don't know if there's anything else going on, but you should check with them. I think you also will get your certificate to prove that you were here which gives you immunity for the next year or so from further service.

So thank you for your service. Appreciate it.

Now let me just say a few things to you before we excuse you all, ladies and gentlemen of the jury. As I mentioned, trial will start Tuesday. Monday is a federal holiday. But we'll start Tuesday at 8:30. If you could be here early to make sure we can start right on time, that will help assure we can get through this and finish this case on schedule.

I will tell you that it is my practice to put the lawyers on a clock. I actually have kind of a chess clock, and I limit the number of hours. And that way I can help guarantee this case will be done. So I'm doing everything I can to make sure you get the case in time.

Now on Tuesday I will give you some preliminary instructions at the outset of the case. In the meanwhile, however, it's important that you obey the following

instructions with respect to the recesses and breaks.

First, do not discuss this case either amongst yourselves or with anyone else during the course of the trial. In fairness to the parties in this case, you should keep an open mind throughout the trial, reaching your conclusions only during your final deliberations after all the evidence is in and after you have heard the attorneys' summations and my instructions to you on the law.

And then, only after an exchange of views with other members of the jury, should you then discuss the case. But prior to that, you should not.

Second, do not permit any third person to discuss the case in your presence. And if anyone does so, despite your telling him or her not to, please report that fact to the Court as soon as possible. I don't anticipate any such approaches. But even if inadvertent statements concerning the trial in your presence are heard, you should report that to the Court.

You should not, however, discuss with your fellow jurors either the fact or any other fact that you feel necessary to bring to the attention of the Court.

Third, although it is a normal human tendency to converse with people with whom one is thrown into contact, please do not, during the time you serve on this jury, converse, whether in or out of the courtroom, with any of the parties or their attorneys or any of the witnesses. And in fact, with me,

either.  And so I will pass you in the hall occasionally, and don't take it personal if I don't respond and don't acknowledge, because I got to keep myself distant and not speak to you until this case is over.

By this, I mean not only converse about the case, but do not converse at all with any members of the participants in this case even to pass the time of day.  Because this is the only way that we can ensure that all the parties will be assured of absolute impartiality that is expected of jurors.

Fourth, until the trial is over, do not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else.  And do not allow others to discuss the case with you.  This includes discussing the case on the internet or in emails, text messages or through any digital app, or social media such as Facebook or Twitter.

If anyone tries to communicate with you about the case, please let me know about it immediately.  Do not read, watch or listen to any news reports or any accounts of the trial or anyone associated with it, including any online information.  And do not do any research, such as consulting dictionaries, searching the internet, or using reference materials.  And do not make any investigation about the case on your own.  You must base the verdict solely on what the parties bring out here in court.

Finally, please keep an open mind until all the evidence has been presented to you, and you've heard the arguments of counsel, my instructions on the law, and the views of your fellow jurors.  If you need to speak to me about anything simply give a signed note to my courtroom deputy, Angie Meullman, to give to me.

Angie will show you the jury room, your headquarters for the next couple of days, several days, and acquaint you with getting in and out, and logistics.  But other than that, we're going to adjourn and excuse you for the rest of the day and ask you to be back here promptly.  If you could get here early prior to the 8:30 hour on Tuesday so we can start right in on the case, we'd appreciate it.

So until then I hope you have a great weekend, and thank you for your service.

We do have a question here.

**A JUROR:**  Your Honor, you said something about next week there was going to be a half day one day.  Can you go over that again?  Because I'm working.

**THE COURT:**  I probably should have put that on the screen.  So Tuesday we'll be here all day the first day back. Wednesday, the second day, will be a half day.  You'll get out early.  I have hearings at 1:00.  Thursday you're not going to be here at all because I've got other matters.  Then you don't come back until Friday, and that will be a full day all day.

After that weekend, if necessary, we'll go Monday, and that would be all day.  And if we need to, Tuesday.  But I fully expect we will be able to give you the case no later than Monday and then you can start the deliberations process.

So that's the schedule.  And if we need to, Angie, you could write it down for folks.  But the main thing is be here on time Tuesday when we get started.  Okay?  So have a great weekend and we'll see you then.  Thank you.

(The jury exiting the courtroom.)

**THE COURT:**  Okay.  We have our jury.  I'd like to remind the parties that this is your last chance to see if you can -- see if you can resolve this case on your own without help of a jury.  But I'll give you time to think about that.

The one matter that I have to resolve are the objections to the slides for the openings.  But I have a birthday luncheon for staff that I need to attend to.  Plus, to be frank, I haven't had a chance to look at these papers very closely and I want to at least be able to look at it.  And what I'd like to do is come back here -- I also have a plane to catch, so I don't have a whole lot of time -- but to come back here at 1:45 and to discuss the slides that you're objecting to.

The objection -- the defense objection -- there are some slides that are mooted, right?  The plaintiff's slides?

**MR. SUDER:**  They'll need to be re-done in light of the Court's ruling on the damages.

THE COURT: Okay. So as far as -- I still have to -- well, I guess I'll figure that out when I look at the objections, see which ones are still on the table. But I think that's the last piece of business that we have. You either have or will exchange soon witness lists.

And who are you going to call? You've got -- you've got all day Monday. Maybe you can let me know.

MR. SUDER: Yes. We'll be calling, obviously, Mr. Congdon, Dr. Zane, Mr. Walker, possibly Mr. Kung. And if we get done, maybe Mr. Brunell. I'm hoping -- so it's a function of cross and how fast the evidence goes. I'm hoping we may be able to rest by 1 on Wednesday, subject to Mr. Sutherland coming back on Friday.

THE COURT: Right. Right. All right. Well, good. So we'll see you back here at 1:45.

MR. SUDER: Did you want those juror notebooks? I can't seem to --

THE COURT: Oh, yeah. What did we decide? You were going to meet and confer about the notebook question.

MR. SCHERKENBACH: Oh. I think the only dispute was whether the patent could go in. We're fine. They can put the patent in. Obviously, with your approval. It's up to you.

THE COURT: If you don't have a problem with it, obviously they're going to see it and it's major part of the case, so --

MR. SCHERKENBACH: And then the Court's claims constructions I think --

MR. SUDER: Yes. I sent that to Mike, yes.

THE COURT: Who's going to --

MR. SUDER: I have all eight. I brought them from Texas just in case.

THE COURT: Make sure you review it with counsel. And then we'll give it to him during their first break on Monday -- Tuesday.

MR. SCHERKENBACH: Tuesday.

MR. SUDER: Yes.

MR. SCHERKENBACH: Very good.

THE COURT: All right. Great. Thank you.

(Recess taken at 12:13 p.m.)

(Proceedings resumed at 1:46 p.m.)

THE COURT: All right. Welcome back. I do want to report to you that already one of the jurors has indicated to my courtroom deputy that he suffers from anxiety issues and wasn't sure if he was going to be able to make it.

Is that Mr. Albania?

THE CLERK: Yes, Mr. Albania.

THE COURT: There's nothing we can do about it at this point. That's why I chose eight, just in case.

MR. SUDER: Will he be here Tuesday?

THE COURT: I hope so. He was told to. I want to

give you the heads-up, if we are seven you will know why.

Why somebody doesn't say anything when we ask them if they have any issues five times and don't say anything until after they're sworn, I don't know.  Who knows.

Okay.  Let's talk about plaintiff's objections to defendant's slides.

And the slides -- the objections are to the various products and patents, PI's patents.  And I understand the argument that this is no longer coming in on an invalidity claim or an absolute defense to infringement.

The argument is, as I had addressed in my last pretrial order that to the extent it informs possible infringement issues in explaining the evolution of the three-pin/four-pin question and then the question as to whether or not there's other value in the accused products that are attributable to things other than the patent at issue, it may be relevant to the damages.

So what's wrong with that?

**MR. SUDER:**  Your Honor, I understand that.  But these demonstratives go beyond that.  And I believe in the transcript what you said is:  If it looks like some sort of showcasing going on from TinySwitch I, II, and III, I'm going to limit that under 403.

If you look at the timelines and the dates, what is the clear inferences of these demonstratives?  We invented this.

We have been doing this before his patent.

If they want to testify in a matter of background and context like the Court said, but the Court had some concerns.

And if you look at Judge Orrick's *Daubert* ruling, what they're trying to do is if you read these timelines and carefully try to say "our patented technology," "we're practicing our patented technology, look at the dates," the clear inference is they are practicing the prior art.

THE COURT:  Well --

MR. SUDER:  They didn't do it.

THE COURT:  There's two places where I thought using the word "first," claims the first, like slide 110, U.S. Patent '369 claims the first three-terminal power supply controller chip, slide 112, TopSwitch was the first commercially integrated power supply using the '369 -- I understand it's within the context of use of '369 -- I did warn against time references that are explicit.  But other than that, I take it what you're trying to explain is the sequencing and the iteration --

MR. SCHERKENBACH:  Right.

THE COURT:  -- of these products that led from a three to four pin.

MR. SCHERKENBACH:  Right.  We have to show our three was before the four.  That's the sequencing.  It has nothing to do with relative --

**THE COURT:**  Why do you need, for instance, slide 116 in a big box "Filed February 27th, 1990"?  Why does that matter?

**MR. SCHERKENBACH:**  We don't need the box.

Just to respond, what we can take out first, on slide 110, where it appears in two spots, it's that -- we put it there to make clear it was before our four-pin stuff.  But if that's a problem, we will take it out.

**THE COURT:**  What about there's the usual reference dates, 1998, PI releases --

**MR. SCHERKENBACH:**  The blowup box on 116, no problem, we can take that out.

**MR. SUDER:**  Your Honor, if you look at 118, for example, it's just a timeline with two patents.  It's suggestive.

**THE COURT:**  If we remove -- well, there's got to be come sequencing.

**MR. SCHERKENBACH:**  Right.  Right.

**THE COURT:**  That's fair.  Whether you need to keep reiterating these dates, at least for opening, I'm not so sure that you do need to do that.

**MR. SCHERKENBACH:**  We could take out the interim timelines and just keep the summary timeline, if that's helpful.

**THE COURT:**  Where's that?

MR. SCHERKENBACH:  Again, the summary timeline is 145. That's sort of the summary of the intervening mini timelines.

MR. SUDER:  145 is a completely separate objection I have as well.

THE COURT:  What's the objection to that?

MR. SUDER:  We're not allowed to talk about their company, all the other products they have, how big they are. And here they are showing, look at all the products we have. We're only accusing a couple of them.  And look at all the patents we have.

It's irrelevant, prejudicial.  And it's confusing, you know, on that page but, also, for example, D111, they are quoting from their patent and they show --

THE COURT:  Let's talk about 145.  Why is that relevant?  Who cares, at this point, how many other products are made?

MR. SCHERKENBACH:  Well, it goes, really, to apportionment, that their patent is only a piece of a piece of certain products.  It's not like our company is founded on their patent.  And they have --

THE COURT:  Are you saying everything that's in DD145, all of the -- I mean, I could see if you take an accused product and say, well, there's like -- it practices, actually, five or six patents, it's only one of five or six, we have our own patents on this aspect, blah blah blah.  But this doesn't

seem to do that.  It says, look at all we make.

MR. SCHERKENBACH:  Well, it does both.  We have our patents there as well.  That's one point.  But the other point is we have heard argument -- and their opening slides, I think, are right down the fairway on this -- they want to imply that our entire business, all of our parts that are energy efficient in some way use their patent.

THE COURT:  Well, I've already ruled on that today. They are only going to be able use the ones that were expressly identified --

MR. SCHERKENBACH:  That's helpful, certainly.  Thank you.

THE COURT:  So what's good for the goose is good for the gander.  I don't think 145 is appropriate.

MR. SCHERKENBACH:  That's fine.

THE COURT:  As far as timeline, I don't know why you need a timeline.  Again, this is opening.  I assume you're not going to show 170 slides.  You've got two hours of total argument, including your closing.  If you're going to burn it all on opening, that's up to you.

I am leery about dates unless it's absolutely necessary. You can explain things in sequence that start off with the three pin blah blah blah, here's what we did.

But, you know, sort of in 114 has got a timeline.  118 has got a timeline.  And saying we're the first to do this, I

just -- you can make the point without getting into emphasizing relative time frames.  Sequencing is okay.

MR. SUDER:  Your Honor, in addition --

THE COURT:  If you want to say, as a matter of statement, that in 1997, like in 115, they developed -- PI developed a new technology, that's okay.

MR. SCHERKENBACH:  I mean, the basic -- the basic chronology is obviously very important.  The basic dates are very important.  We can do it without a timeline in opening.  That's fine.

THE COURT:  I'm going to order that any timelines be stricken.  You don't really need that, especially in an opening.

MR. SUDER:  Your Honor, also, on 111, for example, which has the timeline, but it's also quoting from their 1992 patent.  That is -- that's what Judge Orrick limined.

MR. SCHERKENBACH:  No, it isn't, at all.

MR. SUDER:  This is suggesting that they're practicing the prior art.

THE COURT:  They're not making a prior art statement.

MR. SCHERKENBACH:  Not at all.

THE COURT:  And if they even suggest that in argument, I will shut that down.

MR. SUDER:  All right.  Thank you.

THE COURT:  So I'd like you to, quote, clean it up,

get rid of those things, show it to counsel, and see if there's still an objection.  If there still is -- I hope there isn't; I hope we can get past this -- we'll talk about it at 8 o'clock on --

MR. SUDER:  That's it, Your Honor.  That's why I couldn't say look at this one thing.  It was systemic.  That's really my whole point.

THE COURT:  Well, I'm adhering to my ruling that there is relevance.  It does go potentially to infringement. Assuming that all the things you are talking about are iterative --

MR. SCHERKENBACH:  They are.

THE COURT:  -- predecessors to what we're talking about, or if they involve technologies that are incorporated or practiced in the accused product, then it goes to the allocation.  It's not floating out there unrelated.

MR. SCHERKENBACH:  It's not.  That is the core theme.

THE COURT:  It has got to be anchored to the accused product.

So let's talk about defendant's objections to --

MR. SCHERKENBACH:  Very good.

THE COURT:  -- slide 12 -- well, all right.  So the '323 is -- I mean, that's --

MR. SUDER:  I think we agreed on slide 12, Your Honor. That's not an issue anymore.

MR. WARREN:  Well, Your Honor, the issue with slide 12 is what we wrote in our brief.  The '323 patent, if it comes in in the context of damages, maybe it's coming in in that context to put the qbar license into perspective.

What we are very worried about is inferences made that we infringe it, that we had notice of it --

THE COURT:  There's no such assertion; you're not going to argue that?

MR. SUDER:  I told him that, Judge.

MR. WARREN:  All we wanted was that representation made on the record.

THE COURT:  Okay.  That's good.

MR. WARREN:  And a specific that Mr. Congdon is not going to say he notified PI of it.

THE COURT:  Any inference of infringement of '323 will not be allowed.

MR. SUDER:  I told them that, Judge.

THE COURT:  Okay.

MR. WARREN:  So slide number 14, they clearly want to be able to argue that they should get some money for Mr. Congdon.

The relevance of what -- of the split -- and we're talking about the third bullet.  The split of the recovery between Opticurrent, Mr. Brunell, and Mr. Congdon is completely irrelevant.  It's completely prejudicial.

PROCEEDINGS

MR. SUDER:  We forgot the 50/50.  It's in evidence. It's on our exhibit list.  It's an agreement that's going to be in evidence.  And we're just showing them what the evidence is going to say.

MR. WARREN:  We don't think they should be able to make an express argument, whether in opening or otherwise, that Mr. Congdon shares in the recovery, because that's a pure sympathy play.

How much Mr. Congdon gets is irrelevant.  The plaintiff is Opticurrent.  And the fact that Opticurrent has a separate deal with Mr. Congdon --

THE COURT:  Well, will there be in evidence -- is this deal a -- remind me, when you say "partner" is that --

MR. SUDER:  It's a -- excuse me, a patent sale agreement --

THE COURT:  Yeah.

MR. SUDER:  -- that defines sharing of recoveries.

THE COURT:  And the jury will see that.

MR. SUDER:  Yes.

MR. WARREN:  I think we also dispute the accuracy here.  I think that if they -- you know, the deal -- whether or not it's coming in, who knows what Mr. Congdon is going to say. It's not in their opening.  They don't use that document in their opening.

I think, you know, the patent sale arrangement, the patent

arrangement, the deal Mr. Congdon has with Mr. Brunell, what that deal entails, it's actually quite complicated.  A lot of people get paid.  Mr. Suder gets paid before Mr. Congdon does.

And so unless they are going to go into all of the people who get paid, it's a pure sympathy play.  It's just trying to say --

THE COURT:  All right.  Tell me, what's the relevance other than sympathy?

MR. SUDER:  Well, he sold the patent to enforce it jointly with Opticurrent.

THE COURT:  All right.  That fact will be known and that's relevant.

MR. SUDER:  They're saying and their defense and Mr. Barnes' testimony is if you look at that agreement, only $15,000 changed hands; that's my opinion of the indication as the value of the patent.

We're saying, no, they were going to embark on this endeavor together.

If they want to cross-examine Mr. Congdon and Mr. Brunell that Mr. Suder gets paid and they get paid, that goes to the weight.

THE COURT:  Well, all right.  So it may come in to rebut an inference of how cheap this was sold, there was no consideration for it; and, therefore, not much value.  That seemed to be more in the nature of rebuttal.  It depends on

testimony.  In terms of opening, it's not obviously relevant for opening purposes.

MR. SUDER:  I understand -- okay.  I respect what the Court says.  Isn't opening to tell you what the evidence is going to show you?

THE COURT:  We don't know.  Depends what they say.

MR. SUDER:  Yes.  You're going to see a patent sale. And they're going to say that we only paid X amount, and you're going to see the agreement, and you will see that they're sharing in the recovery.

MR. SCHERKENBACH:  The purpose of this bullet is clearly to garner sympathy for Mr. Congdon.

THE COURT:  Well, that may be one of the incidental benefits.  The question is whether or not this is so far off the charts.  If it is likely to come in because there's going to be some discussion of what the terms were as may be relevant to the valuation of the '623, et cetera, et cetera, then his total consideration is relevant to that and is a factor.

Now, if they want to emphasize that for a sympathy play, I understand that, you know, there's a 403-like argument.  But as far as openings go, it is not beyond the pale since there is a relevance hook.

So I'm going to overrule that objection.  15.

MR. WARREN:  So I think that we would want a representation, you know, that they're going to introduce that

$15,000, because I don't know that we're going to.

And it sounds like Mr. Suder is saying this now, it's honestly probably not going to happen at trial. And so I'm surprised to see this.

I mean, what Mr. Congdon -- I mean, what Mr. Suder is going to say is that Mr. Congdon gets a share of this so that the jury wants to give him some money. And I don't hear a representation from him that he's going to do it, that he's actually going to elicit this.

THE COURT: I thought he said you were likely to elicit it.

MR. WARREN: Why would I? I'm --

THE COURT: No, I'm saying the question about the question of sort of minimal consideration given for -- under the agreement.

MR. WARREN: You know, the damages case in this trial, to be honest, is very up in the air. I don't see why -- at this point, why that would necessarily --

THE COURT: You're saying you might not elicit the foundation for this.

MR. WARREN: Absolutely. Because our case and this case is that we don't infringe and we owe them zero dollars. I really don't want to get into fighting over dollars and cents.

MR. SUDER: Your Honor, part of my burden is to show the chain of title.

**PROCEEDINGS**

**THE COURT:** You can show the chain of title by the second bullet --

**MR. SUDER:** Again, the evidence is going to be this agreement is evidence. Because I asked them to stipulate that we have to put on chain of title. This document is coming into evidence. Once it's in evidence, the jury can see it. It's in evidence.

**MR. WARREN:** I think we have stipulated that they own the patent. I'd have to check on that. But I think that's part of the stipulated -- I think we have said they own the patent. There is no chain of title dispute in this case.

**THE COURT:** Is that right? Is there a stipulation on that?

**MR. SUDER:** No, there was not. I offered it, and they said no.

**MR. WARREN:** Well, I don't believe that we are disputing the chain of title.

The fact that Mr. Brunell bought the patent and that he's the proper plaintiff and Mr. Congdon is not the proper plaintiff. That feeds into our theme; right? So, you know, so I don't know why we would make that a factual issue at trial --

**THE COURT:** Well, is there going to be an issue about how much consideration exchanged hands as might inform the value of the patent as well? I mean, isn't somebody going to raise that question?

**MR. WARREN:** Remember -- so, like I said, in the context of this trial damages is something that the defendant is not -- you know, that's not our case. Our case is, we don't infringe.

By the time we are talking about dollars and cents of what we have to pay if we infringe, that's the plaintiff's case. Our position is we owe them zero dollars, and we should have always owed them zero dollars.

If things evolve during the trial, I can't make a representation that that won't happen. Certainly, as I stand here today, I don't want to be talking about dollars and cents.

**MR. SUDER:** Your Honor, this is the problem. This document, the purchase patent sale agreement is coming into evidence. And the jury is going to take it back and look at it, and they're going to see $15,000 as the cash price and go, oh, that's all they paid for it, when there's so much more in the agreement that we're entitled to bring out.

**THE COURT:** Well, you can bring that out in trial.

**MR. SUDER:** That's what I'm trying to tell them what the evidence will show. The evidence will show you that we paid cash, we did this, we did this.

**THE COURT:** All right. My ruling overruling the objection stands.

Let's move on. 15, that's problematic because of what I ruled today; right?

**MR. SUDER:** I'm going to correct that. It's going to say over one-half billion.

**THE COURT:** You need to correct that and run that by counsel.

**MR. SUDER:** Absolutely. Going to do it this afternoon, yes.

**MR. WARREN:** So we're talking about -- yeah, we'll have to see. On that one specifically, it's just the number of units. We'll have to see what the issue is going to be. We'll have to see how that one evolves.

**THE COURT:** All right. And what about 37?

**MR. WARREN:** So 37 actually has a lot of problems. The first -- the top bullet, you know, we're talking about Opticurrent has the right to exclude. That's really talking about injunction.

**THE COURT:** I don't think so. Exclude, that is one of the rights inherent in property to exclude others. Whether you get an injunction for it, or damages, that is the right to exclude from use.

**MR. WARREN:** Well, I would say just merely getting damages is not a right to exclude. It sounds very much like they have a right to, you know, keep us from doing it.

Maybe after we heard the voir dire today Mr. Suder doesn't want to do that. But, you know, the bigger issue here, if we move down to the second bullet, we have the 1.2 billion.

THE COURT:  Yeah.

MR. WARREN:  But we also have the average sales price of 23 cents.  That's directly to our arguments on damages and EMVR and whether or not they are going to be able to lay a foundation to move in that total revenue.

Once you put the total units and the total revenue per chip next to each other, you've got total revenues and you've got an EMVR issue here.  Anytime you're talking about the unapportioned per chip or total sales revenue, you have an EMVR issue.

THE COURT:  Well, that's going to have to be adjusted; right?

MR. SUDER:  Well, the 23 cents is simply math, Judge. Summaries are coming in.  This is the number of units, this is the sales price.  You do the division, that's what it comes to.

MR. WARREN:  No, typically you can't use the total -- your royalty base cannot include the entire revenue for a product unless you're in EMVR.  That's black letter law.  Now we have the fight over EMVR in the context of the qbar license.

THE COURT:  Well, this is just the average price for, what, the device?

MR. WARREN:  Yes, per chip.

THE COURT:  And they're not saying, we're entitled to all 23 cents of it.

MR. WARREN:  No.  EMVR is not about being entitled to

all the revenue.  It's about using the revenue as the royalty base.  When you say the entire --

THE COURT:  Well, that may be the starting point. That may not be the base, depending on the allocation arguments and everything else.  You have to start somewhere.

MR. WARREN:  The whole point of the EMVR rule is they do not get to start, they don't get to tell the jury the full ASP unapportioned unless they are an EMVR.  And they have nothing here about apportionment.

THE COURT:  If they arrive at a royalty rate of 1 percent, based on various pieces of evidence, what's the jury supposed to do with that?

MR. WARREN:  It depends on how they arrive at that royalty of 1 percent.  If it's by applying that to a total base and that has inherent in it the type of special apportionment that can happen through a comparable license, but that's all predicated on the comparability.  And in this case you've deferred ruling on the comparability until they --

THE COURT:  This is opening statement.  I will warn -- I will have warned the jury that this is not evidence.  And it's relevant enough, it has enough facial relevance enough that I'm going to allow it in.  I'm overruling the objections to slide 37.

MR. SUDER:  I'll correct the number of billions, Your Honor.

**THE COURT:**  Yes, except for that.

Let's go to the next one, 39.

**MR. WARREN:**  So 39 has the same issues.  So this is doing the math.  This is doing, you know, you take the infringing sales.  This is the top-line number.  This is the math from the prior slide.  This $275 million, that is the royalty base that is so objectionable that Your Honor ruled that you would wait to hear the comparability evidence on qbar before you allowed it in.

What we've done in front of Judge Chesney in this district is that in opening plaintiff isn't allowed to put up the big number.  Because once you put up the big number, you can't unking ring the bell.

So if down the line in the trial Your Honor decides that the qbar license is not comparable, that they are not allowed to use this as a base, because their only hook to use --

**THE COURT:**  All right.  That's a fair point, because I have reserved and I have said that the sequencing of the evidence will be such that the total revenues will have to come in last, after I've had a chance to hear the comparability question.

So that does put into play putting in numbers in here that -- from which either expressly or implicitly the jury is going to hear a number.

**MR. SUDER:**  Your Honor, that's -- I will just do

infringing sales.  I'll just do this in bold and take out the smaller numbers, qbar.

THE COURT:  What are you going to do?

MR. SUDER:  I'll just say how to calculate infringing sales, royalty rate; infringing sales times royalty rate.

THE COURT:  You'll take out the number?

MR. SUDER:  Yeah.  What's under infringing sales, the 1.2, I'll take that out.  Under royalty rate, I'll take that out.  And under the infringing sales times royalty rate, I'll take that out.

THE COURT:  Okay.  I think that's appropriate.  I think under 37, though, now the problem with the average price that I see, once you have X million/billion devices, it's going to be easy to -- for the jury to figure out what the revenue is.

MR. SUDER:  I will take out "at an average price of 22 cents."  I'll take that out.

THE COURT:  And you'll just fix the 1.2 billion to whatever it is.

MR. SUDER:  Yes, yes.

MR. WARREN:  I assume, Your Honor, that along with these rulings Mr. Suder's concession that he'll take out the text out of the slides also means he's not just going to just say the words, you're going to hear evidence this is a 23-cent part.  You know, you do that math, 1.2 billion and it's going

to be 275 million.

**THE COURT:**  Right.  Because of my ruling on the merits, I'm not going to allow presentation of the sort of bottom line base number yet, until we get past the clearance.

**MR. SUDER:**  Yes.

**MR. WARREN:**  Thank you, Your Honor.

The last one is number 46.  What we have here are several issues.  So the heading says that evidence will show that Power Integrations infringes, and then what is the evidence he's quoting?  He's quoting out of the spec.  And he's quoting a quote that the way Mr. Suder wants to argue this directly contradicts the Court's construction.

So the Court's construction is very black and white.  It says that if you have a fourth terminal connected to a power supply, you don't infringe.

What Mr. Suder wants to say is, you know, you've heard that, and that's the construction, but look at what the patent says.  It says you can have a fourth terminal connected to a power supply and, therefore, it's within the scope of the claims.

But the claims define the invention and what infringes. The Court's construction defines the claims.  And this is a completely improper reargument of claim construction.

This is what they argued in front of Judge Gilstrap for claim construction, and that he expressly did not give them.

He expressly made his construction very black and white.

So to use this quote out of the patent as evidence of what Power Integrations does to infringe, this is claim construction. The scope of the claim is the scope of the claim as defined by the Court.

Using the words "the scope of the present invention also includes" is meant to convince the jury to ignore that or to believe that this somehow, you know, overrules the Court or changes the Court.

But, you know, the Court considered this language when it defined the term, and Mr. Suder should not be able to argue anything different.

THE COURT: All right. What's your response?

MR. SUDER: A couple of things, Your Honor.

First of all, I invite the Court to read Judge Gilstrap's claim construction order. They lost. They said "only three" is only three and can't mean anything but "only." And they lost that.

And Judge Gilstrap cited to this provision as an important aspect of his decision on the claim construction.

But, more importantly, Your Honor, this patent is in evidence. It will be discussed at length with the experts, what they mean, how they apply it. And I'm entitled to show the jury what the evidence says.

THE COURT: How is that consistent with Judge

Gilstrap's ruling that it means a noninverting switch with three terminals, that does not have a fourth terminal connected to a power supply?

I know you feel that's at odds with this specification, but explain to me how your quoted blowup is consistent with Judge Gilstrap's --

**MR. SUDER:**  That it's not only three; that the patent contemplates that you have situations where "only" is only --

**THE COURT:**  He says -- it could be a fourth terminal switch, but it can't be connected to a power supply.  And this says, use a fourth pin power supply for normal operation but can still operate without power being applied.

Is that the same as meaning it's not connected to a power supply?

**MR. SUDER:**  Yes, because -- in other words, it's not deriving its power here.  You can have a fourth pin that operates that way.  But if it's deriving power from that third pin power supply that we're accusing, it's still within the scope of the patent.

They want to point and say, you see this capacitor over here?  This is a power supply.  And it's connected here.

And we're saying, no it's not, because it derives its power from the third terminal.  And that's what our expert believes is consistent with the claim construction.

**THE COURT:**  Well, that seems a little different than

the quoted language, because this says it includes three-terminal noninverting transistor switches that use a fourth pin, paren, power supply for the normal operation.

MR. SUDER:  Yes, Your Honor.  And it's very simple. If you have a capacitor like they have, that is external to the chip, that is connected so it operates, as they say, as a power supply, they're saying that they have a fourth terminal that operates as a power supply.  And we say, no it doesn't because it doesn't derive its power --

THE COURT:  I understand that argument.  The argument is that relying on this quote from the specification arguably is --

MR. WARREN:  Your Honor, in front of Judge Gilstrap this is actually exactly --

THE COURT:  Although the Court says, "The Court finds the claims are consistent with this specification," after quoting that very specification.

MR. SUDER:  Yes, exactly.

THE COURT:  Hold on.

MR. WARREN:  So, during the claim construction, what Mr. Suder argued was that you could have a fourth pin for normal operation, but as long as it was disconnected or as long as it ran when the thing wasn't connected.  That's what they wanted.  And it was very clear that during the argument that's what they said.

And that didn't appear in the construction from Judge Gilstrap.  Judge Gilstrap's construction is very clear that if it has a fourth terminal it's outside the scope.

THE COURT:  It's not quite so clear to me, because he also states the very language was consistent with the claim. And he didn't necessarily disavow that.  He didn't say notwithstanding this, I find that the claim language is so clear that the specification, to the extent it's contrary, is not consistent with it.

I think the solution to this is I'm going to leave it in. If you want to quote from Judge Gilstrap, maybe you already -- in your slides and begin to present to the jury what this controversy may be, you can do that.

MR. WARREN:  We can present to the jury Judge Gilstrap's order?

THE COURT:  No, the actual claim construction language.

MR. WARREN:  Right.  Right.

So we have, you know, in *02 Micro* we have a major issue here.

If Mr. Suder is going to say that you can have a fourth pin connected to a power supply, and as long as it's not connected, or anything else -- so a fourth terminal connected to a power supply -- and he goes on to argue from there, he is contradicting the Court's claim construction.

**THE COURT:** What do I do with Judge Gilstrap's language where he quotes exactly that language from the specification and then says the claims are consistent with the specification?

**MR. WARREN:** The construction is what it is. The construction does not include this language.

**THE COURT:** Where does he disavow --

**MR. WARREN:** This was their entire oral argument. I was present at --

**THE COURT:** You want me to construe the construction, I guess.

**MR. WARREN:** No. Mr. Suder wants you to construe the construction.

**THE COURT:** Tell me where in Judge Gilstrap's claim construction order, which takes place at pages 12 and 13, does he disavow, in rendering his final construction essentially disavowing that quoted -- that he himself quoted, the specification?

**MR. WARREN:** All I can tell you -- my argument is that the construction stands notwithstanding. We don't construe the construction using what Mr. Suder wants to argue from the specification or the Court's language around it.

The construction is what it is. The construction says that if you have a fourth pin connected to a power supply, you're outside the scope.

**THE COURT:** At this point I told you already the jury is going to be forewarned that the statements of counsel are argument only.

If he wants to make this construction argument -- what this underscores is we may need further clarification, at some point, with respect to instructions to the jury.

But you are free to argue, at this point, I think it is, it's going to be you have one interpretation of Judge Gilstrap's rendering his claim construction, and he has a different take on it.

**MR. WARREN:** Okay. So we're --

**THE COURT:** I will say, looking at it, his take is not so off the charts, at this point, that I'm going to preclude him from at least making the assertion.

**MR. WARREN:** Just so I understand the ground rules, we're going to have -- just so I understand -- our expert's interpretation of the claim construction, their expert's interpretation of the claim construction, and we will have the jury decide what the ultimate scope of the claim is.

**THE COURT:** I don't know. That may be the Court's duty. That's why I say we have more work to do on this question.

But there's some degree of ambiguity here that I read into Judge Gilstrap's -- I get the gist of what he's saying, but whether or not there is a variant that could satisfy the "not

connected to a power supply" such that this specification language could satisfy the "not connected to a power supply, I'm not sure.  It's not so clear to me that that's totally off the table at this point.

MR. WARREN:  If we have the issue -- I mean, I think that the original "only three" means "only three" is -- just so the defendant's position is clear, our position has always been that "only three" means "only three."

The specification quote here doesn't use the word "only," and so it's quite different from the claim language.  The claim language limits it to "only three."  This does not use the word "only."

So this is simply not considered by the claim, necessarily.  And it's not inconsistent.  So if we're redoing -- I don't think -- you know, the construction -- we maintain all of our objections to the construction.  And under that I would say that "only three" should mean "only three," and we shouldn't have been doing this case.

THE COURT:  I'm not going to go back.  I accept Judge Gilstrap's basic construction of this term.

The question is, what does it mean to be -- to have a fourth terminal connected to a power supply?  If you have a fourth pin that is connected to a power supply but can still operate without power, does that constitute, quote, connected to a power supply?  That's the question.

**MR. WARREN:** That's fine. In this case that evidence -- there's no -- I mean, our parts run on four pins, and they need four pins. So maybe that is an academic question. But the evidence we're going to hear is that we don't have four pins because, you know, for -- because we like extra pins. We have four pins and the part only runs --

**THE COURT:** The bottom line is, we're only talking about opening statements as this point. The jury will have been forewarned that the statements of counsel are not evidence, that what's going to govern is the evidence they hear and see and which they believe to be true and the instructions on the law as given by the Court.

You are free to give a counter, what you think the evidence will show in that regard, whether you want to make the -- you know, that's up to you, as long as it's sort of within the realm.

I am suggesting that we might have to take a closer look at this question -- I don't know if it's a jury question or not -- to determine what is a terminal connected to a power supply, whether that's a legal question. It's something we should think about.

**MR. SUDER:** One last thing. On the juror notebooks we gave them to them, the patent that we put in the notebook includes the first page ribbon copy. When you get the copy it has the ribbon what we typically toss around. It has what you

saw today.  And it includes the first page ribbon, and they don't want it in there.

MR. WARREN:  Your Honor, the notebook actually has two copies of the patent.  And one of them is a color photocopy of the ribbon copy that has all the extra language on it.

And our understanding, when we agreed to this, was that it would just be the patent itself.  But there's actually two full copies of the patent in there.

MR. SUDER:  There is?

MR. WARREN:  Yes.

MR. SUDER:  There should only be one copy.  May I hand this to the Judge, the Court?

THE COURT:  Yes.

MR. WARREN:  There's two copies, as you'll see.  This is not what we agreed to.

THE COURT:  This is not necessary.  We don't need a ribbon copy.  There's another copy.  Just the patent itself.

MR. WARREN:  And it should just be that separate copy that doesn't have all the ribbon copy --

THE COURT:  I agree.  We don't need to do that.

MR. WARREN:  Okay.

THE COURT:  All right.  So we'll see you here at 8 o'clock Monday.  I would like you to work out, again, the revisions.  Hopefully, based on what I've ruled on, you can agree on what the format is going to look like.  I'll be here

at 8 o'clock if there's anything last minute.

MR. SUDER:  Thank you, Your Honor.

THE COURT:  Remember the time.  You're being clocked two hours total on argument.

MR. SUDER:  One question -- I think I know the answer, I just want to be clear -- when we get jury information sheets beforehand, you're allowed to look at their social media, their LinkedIn.

I assume there's no looking on the jurors' social media page to get information about them.  Or is that fair game?

THE COURT:  Wait a minute.  It's your intent to look at --

MR. SUDER:  It's just a thought I had.  They might, and I want to know.  If they might, I might.  I don't know.  But I would assume that's off limits.

THE COURT:  I want to be informed of that.

MR. SUDER:  I mean, not to communicate with them.  But if you go on someone's Facebook page you can learn an awful lot about them.  I didn't know if that was permitted.

MR. SCHERKENBACH:  I think it's inappropriate.  We would not do it.

MR. SUDER:  So do I.  I think it's inappropriate also.

THE COURT:  Then we have an agreement that that's not going to be done.  Okay.  Thank you.

(Court adjourned at 2:23 p.m.)

CERTIFICATE OF REPORTERS


       We certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:   Saturday, February 16, 2019




_____
        Vicki Eastvold, RMR, CRR
        Official Court Reporter




_____
   Katherine Powell Sullivan, CSR #5812, RMR, CRR
            Official Court Reporter