**Volume 2**

**Pages 177 - 465**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

OPTICURRENT, LLC ,                )
                                  )
            Plaintiff,            )
                                  )
   VS.                            )    **No. C 17-3597 EMC**
                                  )
POWER INTEGRATIONS, INC.,         )
                                  )
            Defendant.            )
_____  )    San Francisco, California
                                       Tuesday, February 19, 2019

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiff:          FRIEDMAN, SUDER & COOKE
                        604 East 4th Street, Suite 200
                        Fort Worth, Texas 76102
                   **BY: JONATHAN T. SUDER, ESQ.
                        DAVE R. GUNTER, ESQ.**

                        HUDNELL LAW GROUP PC
                        800 W. El Camino Real, Suite 180
                        Mountain View, California 94040
                   **BY: LEWIS E. HUDNELL, III, ESQ.**

                        Goldstein Faucett & Prebeg, LLP
                        1177 West Loop South, Suite 400
                        Houston, TX  77027
                   **BY: CORBY R. VOWELL, ESQ.**

 (Appearances continued on next page)

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

**APPEARANCES (CONTINUED):**


For Defendant:                    FISH & RICHARDSON PC
                                  500 Arguello Street, Suite 500
                                  Redwood City, California 94063
                             BY:  **MICHAEL R. HEADLEY, ESQ.**
                                  **NEIL A. WARREN, ESQ.**

                                  FISH AND RICHARDSON PC
                                  222 Delaware Avenue, 17th Floor
                                  Wilmington, Delaware 19899
                             BY:  **JOSEPH B. WARDEN, ESQ.**

For Defendant/                    FISH & RICHARDSON PC
Counter-Claimant:                 12390 El Camino Real
                                  San Diego, California 92130
                             BY:  **JOHN W. THORNBURGH, ESQ.**

**I N D E X**

Tuesday, February 19 - Volume 2

|                                              | PAGE | VOL. |
|----------------------------------------------|------|------|
| Preliminary Jury Instructions                | 199  | 2    |
| Opening Statement by Mr. Suder               | 216  | 2    |
| Opening Statement by Mr. Scherkenbach        | 240  | 2    |

| **PLAINTIFF'S WITNESSES**                    | PAGE | VOL. |
|----------------------------------------------|------|------|
| **ZANE, REGAN**                              |      |      |
| (SWORN)                                      | 264  | 2    |
| Direct Examination by Mr. Suder              | 264  | 2    |
| Cross-Examination by Mr. Warren              | 392  | 2    |
| Redirect Examination by Mr. Suder            | 408  | 2    |
|                                              |      |      |
| **BRUNELL, BRAD**                            |      |      |
| (SWORN)                                      | 412  | 2    |
| Direct Examination by Mr. Suder              | 412  | 2    |
| Cross-Examination by Mr. Scherkenbach        | 442  | 2    |
| Redirect Examination by Mr. Scherkenbach     | 459  | 2    |
| Recross-Examination by Mr. Scherkenbach      | 461  | 2    |

**E X H I B I T S**

| **TRIAL EXHIBITS** | IDEN | EVID | VOL. |
|--------------------|------|------|------|
| 1                  |      | 295  | 2    |
| 2                  |      | 431  | 2    |
| 4                  |      | 298  | 2    |
| 7                  |      | 431  | 2    |
| 11                 |      | 345  | 2    |
| 14                 |      | 365  | 2    |
| 16                 |      | 381  | 2    |
| 17                 |      | 372  | 2    |
| 18                 |      | 381  | 2    |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 20 | | 380 | 2 |
| 21 | | 372 | 2 |
| 24 | | 345 | 2 |
| 25 | | 365 | 2 |
| 32 | | 391 | 2 |
| 35 | | 432 | 2 |
| 36 | | 432 | 2 |
| 37 | | 433 | 2 |
| 211-A | | 338 | 2 |

**<u>Tuesday - February Tuesday, 2019</u>**                    **<u>8:12 a.m.</u>**

**P R O C E E D I N G S**

**---000---**

(The following proceedings were held in open court, outside the presence of the jury:)

        **THE CLERK:**  Calling Civil Action 17-3597, Opticurrent, LLC, versus Power Integrations, Inc.

     Counsel, please approach the podium and state your appearances for the record.

        **MR. SUDER:**  Good morning, Your Honor.  John Suder along with Corby Vowell and Dave Gunter for the plaintiff.

        **MR. SCHERKENBACH:**  Good morning.  Frank Scherkenbach of Fish & Richardson for the plaintiff, with Neil Warren, Michael Headley.  And we also have Joseph Warden who will be arguing some of the issues potentially this morning.

        **THE COURT:**  All right. Thank you.  Let me first welcome, we have some international visitors.  LLM students, is that right?  Do you want to introduce who they are?

     (Introductions made from gallery of the visiting group.)

        **THE COURT:**  Great.  Thank you.  Thank you for your interest.  And welcome, everyone.

     So, the first thing I have to deal with is the situation of Mr. Albania, the juror.  I mentioned to you that he had called and indicated to Angie anxiety problems.  And we said, Well, you're going to have to show up.  I can't just excuse

you.

Apparently, later that same day he went to Stanford Hospital complaining of chest pains and then procured a note from a Dr. Andrew Lai who says:  Martin Luigi Albania has a medical condition and may not participate in jury service due to severe chest pains and shortness of breath.  He will be fit for jury service in two weeks.

I said, nonetheless, I wanted him here so that in case we have any questions we can make some determination before we decide to excuse him.

And he is here.  He is here with his wife, and wants to be with her.  So I wanted to see if counsel wants to conduct any kind of *voir dire* examination or just let him go at this point.

**MR. SUDER:**  Your Honor, I think we let him go and tell him next time when he's in *voir dire* he says that my company pays me for jury duty and don't use that as an excuse.

**MR. SCHERKENBACH:**  I have no objection to excusing him given his medical situation.

**THE COURT:**  That still leaves us with room to spare. We'll have 7.  Hopefully nothing else will occur.  And hopefully you will move things along so we don't prolong --

All right.  Why don't we have him come on out and I'll excuse him.

(Juror Albania entering the courtroom.)

**THE COURT:**  All right.  Good morning, Mr. Albania.

**JUROR ALBANIA:**  Good morning.

**THE COURT:**  I received your doctor's note.  We're going to excuse you because of the note.  And I thank you for attending.

I do want to make sure you understand that in the future if your asked on jury service if you have any kind of condition, you should say so right away.  Because now we've already selected you and it's not like we can go back and get somebody else.  The rest of the people have been excused.

**JUROR ALBANIA:**  I'm sorry, Your Honor.

**THE COURT:**  Okay.  All right.  Well, in light of the -- unless you have a change of heart, unless you feel like you want to --

**JUROR ALBANIA:**  No, Your Honor.

**THE COURT:**  Then you'll be excused.  If you could report back to the jury assembly room.  Let them know that you've been excused from this jury.  Just let them know what the situation is.  Okay?

All right.  Thank you.

(Juror Albania exiting the courtroom.)

**THE COURT:**  I did receive your various objections to disclosures.  Now, these are in conjunction with trial testimony, right?  Not the demonstratives for openings.

**MR. SCHERKENBACH:**  Correct, Your Honor.

**MR. SUDER:**  Yes.

THE COURT:  And let me ask.  Who are you planning -- who's your first witness?

MR. SUDER:  Dr. Zane, then Mr. Brunell, and if time, Mr. Congdon.

THE COURT:  All right.  So you think we will reach all three today?

MR. SUDER:  I don't know about their cross, Your Honor.  I would hope so.  But it is the start of the case.  If not, that will -- I think we'll get at least through Mr. Brunell today.  That's my hope.

MR. SCHERKENBACH:  Your Honor, on that issue, I think we will get to them.  Our crosses are going to be reasonably short, so --

THE COURT:  So the witnesses and the objections with which I should be concerned are Dr. Zane and Mr. Brunell's right now, correct?  All right.

Let me take a five-minute break and let's come back and see how many of those we can address.  If we can't get through all of those by 8:30, we'll pick it up again before we start the examination.  I want to try to get through those so you know exactly what's coming in and what's not.

MR. SUDER:  Your Honor, we have the jury notebooks that we've agreed to.

THE COURT:  And you all have reviewed it?

MR. SCHERKENBACH:  We've approved it, yes, Your Honor.

THE COURT:  Why don't you give that to Angie and then during the jury instructions we can give those out in that process.

MR. SUDER:  Your Honor, could I ask a question of order?  Will you give the preliminary instructions, and the video, then opening?

THE COURT:  Yes.

MR. SUDER:  Okay.  Thank you.

THE COURT:  Is the video queued up, Angie?

THE CLERK:  It is, Your Honor.

MR. SCHERKENBACH:  On the video, Your Honor -- it's obviously up to you -- you might want to mention to the jurors that we weren't planning to hand out that sample patent.  The video refers to a sample patent.  Don't really need it.

THE COURT:  All right.  So I have, as you know -- I guess there are 15 instructions I intend to give this morning, the preliminary ones, that end with outline of the trial.  So once I get through those 15 we will start in with openings.  You know about how long your openings are -- have you timed yourselves?

MR. SUDER:  About 30 minutes, Your Honor, give or take.

MR. SCHERKENBACH:  Mine will be closer to 45.

THE COURT:  Okay.  All right.  I'll be back in a couple minutes.

(Recess taken at 8:20 a.m.)

(Proceedings resumed at 8:25 a.m.)

**THE COURT:** Okay. Let's discuss the Zane exhibits. I don't see reference to 10, 12, 62 and 221. So unless I'm factually missing something, maybe you can tell me why Dr. Zane should be able to use those.

**MR. SUDER:** 221, it wasn't in his report. We're not using. 10 and 12, his conception drawing, and the breadboard. He looked at that as part of his analysis to inform his --

(Off-the-record discussion between co-counsel.)

**MR. SUDER:** Oh. I'm sorry, Your Honor. I misspoke. 10 and 12 we don't care about, either.

**THE COURT:** Okay. Okay. So it's 62 is the issue?

**MR. SUDER:** Yes. Your Honor, 62 is the interrogatories. I don't think that's going to come to an issue because we now have a stipulation -- we entered into one yesterday -- on the documents that are the accused products. So the interrogatories was before the stipulation and related to their answer as to what documents can be relied upon for what products. In light of the stipulation, that ought not be an issue anymore.

**THE COURT:** Right. Later on it comes up in 63 as something he did refer to. But not 62, right?

**MR. SUDER:** Can I have Mr. Vowell --

**THE COURT:** Yeah, yeah, yeah.

**MR. VOWELL:** So, yes, Your Honor. For Exhibit 62, we'll withdraw that.

Exhibit 63 includes an interrogatory response that just confirms the representative products that we've talked about quite a bit with you. Now that we have the stipulation we don't think that will be necessary, but we just wanted to leave it on the exhibit list. To the extent that there is something that comes up during the trial contradictory to that representation, we wanted to make sure that that's still available in evidence.

And then if there are no issues, we would be okay with the Court not allowing it to go back to the jury.

**THE COURT:** All right. So 63 would only be used, really, for impeachment for inconsistent testimony.

**MR. VOWELL:** Yes, Your Honor.

**THE COURT:** And this is the response of Opti-Con, so I don't see hearsay problem in that regard.

**MR. VOWELL:** Power Integrations' response.

**THE COURT:** I'm sorry. Power Integrations.

**MR. WARDEN:** We're fine with that. Our objection was just for it going back to the jury.

**THE COURT:** The drawings. 32, 33, 38. I know they were discussed in the context of priority.

**MR. SUDER:** They're also discussed in the context of his infringement analysis, Judge. The patent talks about these

types of components, like a voltage stabilizer and others known in the art, informed him of the kind of products that Mr. Congdon was using that would be acceptable in understanding the invention.

THE COURT:  And I did say that -- I was going to permit some background.  So what's the problem with these three exhibits?

MR. WARDEN:  Your Honor, this is -- the issue is that the expert should not be allowed to.  Mr. Congdon, of course, can get up and he can tell his invention story.  We've already said we don't object to Mr. Congdon using these exhibits.  But Dr. Zane only spoke about these exhibits in his priority report.  It was not part of his infringement analysis.  He shouldn't be the one to get up there and tell Mr. Congdon's invention story.  That's not what Dr. Zane is here to do.  He's here to talk about infringement, which is comparing the Power Integrations products to the claims and the patents.

THE COURT:  Why can't Dr. --

MR. SUDER:  He's not going to talk about the invention story, Your Honor.  But he's going to say that as one skilled in the art, and reading this patent, this helped inform my decision in understanding the patent.

THE COURT:  Does he say that in his report?

MR. SUDER:  Yes.  It's all discussed in his report.

THE COURT:  Where does he make reference to the

original drawings, the breadboard, et cetera, et cetera?

**MR. SUDER:**  Yes, Your Honor.  His opening report on pages 80 and 81 and 82 are the very exhibits, or copies of, are discussed in the report.  It's not a rebuttal report.  It's in his opening report.

**THE COURT:**  So that drawing is number -- like on page 80, the schematic.  Hand-drawn schematic.  Is that 32?

**MR. SUDER:**  Yes.  And 33 is the next one.  And then the picture of the breadboard is the next one.

**THE COURT:**  I take it this is in the context of priority?

**MR. SUDER:**  No.  It was in the context of discussing the conception and understanding the invention.

**THE COURT:**  I see.  Well, conception reduction of practice --

**MR. SUDER:**  Yes.

**THE COURT:**  -- which pertains to priority.

**MR. WARDEN:**  Right, Your Honor.  This was not discussed in his infringement analysis, and priority's no longer an issue in the case.

**THE COURT:**  Where in the infringement analysis does this come into play?  This is at the very end on conception and reduction of practice.

**MR. SUDER:**  Your Honor, it's throughout, when he discusses his understanding of the patent and quotes certain

paragraphs in the patent.  This is part of the documents he considered to inform his opinion.

THE COURT:  So if you could just show me where in his application of either doctrine of equivalents or infringement analysis in the earlier part, prior to page 80, where he begins to talk about reduction of practice and conception, where does he make any reference -- it's a lot about figures from '632.

MR. SUDER:  I've been told paragraph 82, but I have to pull it out.

THE COURT:  Paragraph 82, okay.

MR. SUDER:  Yes.  In paragraph 82 under his equivalent analysis, he talks about the use of a capacitor.  And he references the capacitor listed in the inventor's drawing, Exhibit 32, that we're talking about.  It's right there on page 33 of his report:  Capacitor in the accused products performs the same function as the one microfarad capacitor listed in the inventor's drawing.  This particular document.

MR. WARDEN:  Your Honor, that issue isn't relevant to infringement.  Whether or not that capacitor performs the same function is what was in Mr. Congdon's drawing.  It's not something the jury needs to know or hear about in order to decide whether we infringed patent.

THE COURT:  I can't prejudge that, whether the capacitor's function is irrelevant or not.  Certainly, as I understand the accused products, the fourth terminal is

Case 3:17-cv-03597-EMC   Document 267   Filed 02/20/19   Page 15 of 289   191

PROCEEDINGS

connected to capacitor and the whole question relates to power supply connection or not.

I'm not going to make that judgment now.  Point is that there is some reference.  Is inventor's drawing OPTI810, is that the same as TX32?

**MR. SUDER:**  Yes.

**THE COURT:**  He makes reference to it.

**MR. WARDEN:**  He makes reference to it.

**THE COURT:**  What's the prejudice.  You don't want them to go in and, basically, habilitate Congdon's testimony. Right?

**MR. WARDEN:**  We don't want him telling the invention story.  That's not what he's here to do.  That's Mr. Congdon's story.

**THE COURT:**  I'm not going to disallow it.  I'm going to allow it so long as there's not a prolonged discussion designed to say, "And Mr. Congdon did this; and with his brilliance he came up with this and this."  That's not the purpose of it.  If he's going to refer to it in terms of his interpretation and his analysis and it comes up, I'm going to let it in.

**MR. WARDEN:**  Your Honor, that's limited just to 32.  I don't believe they've pointed to -- I think it's 35 or 38 -- being anywhere in the infringement analysis.

**THE COURT:**  33 you mean.

**MR. WARDEN:** Excuse me. 33, yes.

**MR. SUDER:** 33 is the same drawing that he references later in his report. It just has some annotations on it.

**THE COURT:** Well, but the later reference has to do with priority. So 32 performs the function, he references it. I don't know why you need 33 and 38. They actually see the breadboard and stuff. That doesn't help the analysis. That goes to reduction of practice.

So I'll allow 32 without prolonged discussion, but not 33 and 38. Okay?

So we probably should get going. We can talk about Mr. Brunell after we complete Dr. Zane's testimony.

I will say, I'm just looking at the papers, and I'm getting obviously different impressions from the various quotes but --

**MR. SUDER:** Your Honor --

Oh. Go ahead.

**MR. VOWELL:** One quick point on Dr. Zane's testimony. We had objections to defendant's cross exhibits of Dr. Zane. And the key objection was that they listed Exhibits 1 -- I apologize for taking up the Court's time here -- but Exhibits 153, 154 and 155 which are Power Integrations' patents that they plan to refer to in their opening and have Mr. Kung talk about, that Dr. Zane has never reviewed, and was not asked to review, and it's not part of his report or his direct

testimony.  So we don't know why they plan on cross-examining him with their patents.

THE COURT:  All right.

MR. WARREN:  This is Dr. Zane's cross-examination. And they should not be able to shield -- our expert talks about these things at length.  Dr. Zane is obviously here in response to our expert.  And they're going to talk about what each other talked about.  Dr. Zane read our expert's report.  They should not be able to shield what he can be cross-examined with by not including it in his expert report.

THE COURT:  What's the gist of the cross-examination purpose of PI's patents?

MR. WARREN:  Dr. Zane is going to give lengthy testimony about what he believes are the benefits solely attributable to Mr. Congdon's invention in these parts.  Part of our rebuttal to that is that we have our own patents on separate features.  This goes to the whole apportionment --

THE COURT:  But Dr. Zane touches on apportionment type issues?

MR. WARREN:  That's their only hook, to have somebody talk about what the technical benefits are and where that is. That's their sole -- they don't have anybody to talk about the economic benefits.  But he's their sole hook throughout this entire damages analysis for technical --

THE COURT:  Does he affirmatively state there's no

other value, no other inventions, that inform the value of the accused product?

MR. WARREN:  I don't think he makes a categorical statement, but certainly -- this is cross-examination.  So if he has -- I'm sure he has since read those documents.

MR. VOWELL:  Your Honor --

THE COURT:  Let him finish.

MR. WARREN:  The other issue here is that those documents have statements made in them that directly contradict his testimony.  And I don't want to -- I don't think I should have go into my cross-examination here, but they are directly relevant to rebut what he's going to say.

And whether or not -- he has to have considered them by now.  I mean, they're front and center in our expert's report. He certainly read our expert's report and he's prepared to respond on them.  The cross-examination of Dr. Zane should not be shielded by what the lawyers chose to withhold from him.  If they withheld it from him.

THE COURT:  Depends on the scope of his direct.

So what are you going to say?

MR. VOWELL:  Your Honor, the patents were mentioned in the portion of Mr. Bohannon's report that was struck.  And, basically, it was the subject of our *Daubert* challenge.  They were trying to get these patents in through Mr. Bohannon as a validity challenge.  And we challenged that through *Daubert*.

**MR. WARREN:**  This is not prior art.  This has nothing to do with validity.  This has nothing to do with the *Daubert*.  This is what Your Honor --

**THE COURT:**  Let's say it goes to apportionment.  And why not cross-examine to the extent Dr. Zane suggests that there's --

**MR. VOWELL:**  Because Dr. Zane has not reviewed these patents because they were not appropriately the subject of testimony here today.  They're not part of his reports.  He's not opined on them in any form yet.

**THE COURT:**  I take it he was deposed?

**MR. VOWELL:**  He was not deposed.

**THE COURT:**  Not deposed.

**MR. WARREN:**  We should be able to establish both what he considered and what he didn't consider.  And so if he affirmatively did not consider something that's in our expert's report, we should at least be able to elicit that fact.

**THE COURT:**  Frankly, it depends on what he says.  Depends on what he says on apportionment.  To the extent he implies or says that the '632 is responsible for the value of -- anything that goes along that line that opens the door go apportionment, he can be cross-examined whether he's seen it or not, whether in rendering any opinion he's considered other things.  So it depends on the scope of his direct.

**MR. VOWELL:**  It's also not clear that those patents

directly relate to their products.  Just because they say it is or it's on their opening slide, there's no testimony in the record to show that those patents directly read on the prior products.

**MR. WARREN:**  That's the subject of our expert's report.  He renders that opinion, he gives that analysis.

And like I said, Your Honor, the other issue here that I'm kind of guarded about, because I don't want to reveal my cross-examination, is these patents will directly refute an issue that he's going to raise that is the key issue in this case.  This is central.  And shielding him from this will dramatically prejudice our cross-examination.

**THE COURT:**  Well, it's not a shielding question, in my mind.  The question is what is the scope of direct, and is this relevant to cross-examination.  Like any other cross-examination.

**MR. WARREN:**  Then if I lay the foundation during cross-examination before the document is shown that it's relevant to something he said, then --

**THE COURT:**  Yeah, you'll have to lay that foundation so it's evident that it is.  And we may have to --

**MR. WARREN:**  I will --

**THE COURT:**  -- you know, yeah, do a *voir dire* or something before.  But that's how I view it.  So whether he's seen it or not is not as relevant as whether it's material to

his -- depending on the scope of his direct.  So broader the direct, the more he says, the more likely -- the higher the risk that stuff will come in.

That's all I can say.

MR. VOWELL:  Thank you, Your Honor.

THE COURT:  All right.  So if we're prepared to bring the jury in.

MR. SCHERKENBACH:  Can I ask one question for clarification?

THE COURT:  Yes.

MR. SCHERKENBACH:  Not about that.  We heard some comments from counsel during *voir dire* about validity and the fact that Power Integrations isn't challenging validity, things to that effect.  I think that's inappropriate and I want to get some guidance as to whether they're going to be allowed to repeat that in their opening statement today.

We simply chose not to pursue our validity challenges at trial.  We have certainly not conceded validity, by any means.  It's not an issue in the case and it's not something I think that should be being argued in effect to the jury to sort of bolster their infringement case.  You know, this is such a great patent that Power Integrations hasn't even challenged validity.

MR. SUDER:  Your Honor, they're prancing in other patents.  They're going to put in dates that pre-date the

patent that create the clear inference that they invented it first.  Whether they formally say it or not --

THE COURT:  The fact is, validity was raised and litigated in this case, and now it is not being raised.  And I think it is a fair statement that PI is not challenging the validity of this patent.

MR. SCHERKENBACH:  Well, then, I guess, is it appropriate for us to point out that they are not asserting infringement of 18 of the 19 claims of their patent?  Seems to me completely parallel.  Right?  I mean, that's a concession --

THE COURT:  I mean, you can emphasize that this case only involves one claim, claim 1 of the patent, because that's what it is.  Because when they get the patent they'll see there's 19 claims to it.  So that's a fair point, as well.

MR. SCHERKENBACH:  All right.  Fair enough.

MR. SUDER:  On that related note, Your Honor, we did file a motion for judgment based on their recognition on the record.

THE COURT:  I understand that.

MR. SCHERKENBACH:  And we'll oppose when we need to.

THE COURT:  I'm not going to rule on that.  I don't need to rule on that now.  But I assume you're going to file some kind of response.

MR. SCHERKENBACH:  We are, Your Honor.

THE COURT:  All right.

(Jurors entering the courtroom.)

**PRELIMINARY JURY INSTRUCTIONS**

**THE COURT:** Okay.  Thank you.  Good morning, ladies and gentlemen.  Appreciate your patience.  Hope you all had a great weekend.  As you know, one of your colleagues has been excused for medical reasons.  That's why there's seven of you.

So, Ms. Watson, I guess you are now juror number 7.  So welcome to your new seat.

And as you recall, I said that what we would do today is start off with some brief instructions that I will give you.  These are not the final instructions.  You'll also get more detailed instructions at the end of the case.  But these will be sort of preliminary instructions.

We will then hear from each of the parties their opening statements which -- as I will explain -- an opening statement is a statement by the attorney about what they think the evidence will show.  Kind of a road map what this case is going to be.  And as I will tell you, the statements of the attorneys' themselves are not evidence.  I think I may have already said that.  The evidence is what you will see in terms of exhibits that I admit and what you hear on the stand.  But it is intended to give you kind of a preview of the case.  And then we're actually going to start hearing from witnesses.

All right.  So let me say a word about the jury duty.  Members of the jury, you are now the jury in this case and it

is my duty to instruct you on the law. It is your duty to find the facts from all the evidence in the case and to those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not, and you must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy. That means you must decide the case solely upon the evidence before you. You recall that you took an oath to do so.

At the end of the trial I'll give you final instructions. It is the final instructions that will govern your duties. Please do not read into these instructions or anything I may say or do that I have an opinion regarding the evidence of what your verdict should be.

Burden of proof. Preponderance of the evidence. When a party has a burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true. You should base your evidence on all -- base your decision on all the evidence regardless of which party presented it.

What is evidence? The evidence you are to consider in deciding what facts are -- what the facts are -- consists of, number one, sworn testimony of any witness; the exhibits that are admitted into evidence; any facts which the lawyers have agreed; and any facts that I may instruct you to accept as proved.

What is not evidence?  In reaching your verdict you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence and you may not consider them in deciding what the facts are.  I will list them for you.

Number one, arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they may say in their opening statement, closing arguments, and at other times is intended to help you interpret the evidence but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory controls.

Number two, questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the Rules of Evidence.  You should not be influenced by the objection or the Court's ruling on it.

Three, testimony that is excluded or stricken or that you are instructed to disregard is not evidence and must not be considered.  In addition, some evidence may be received only for a limited purpose.  When I instruct you to consider evidence only for a limited purpose, you must do so and may not consider that evidence for any other purpose.

Four, anything you may see or hear when court is not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Direct and circumstantial evidence.  Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

So by way of example, if you wake up in the morning and you see the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence you must consider all the evidence in light of reason, experience and common sense.

Ruling on objections.  There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.  Whenever I sustain an objection to

a question, you must ignore the question and must not guess on what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence.  That means that when you are deciding the case you must not consider stricken evidence for any purpose.

Credibility of witnesses.  In the deciding the facts in this case you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.  In considering the testimony of any witness you may take into account, one, the opportunity and ability of the witness to see or hear or know the things testified to.  Number two, the witness's memory.  Number three, the witness's manner while testifying.  Four, the witness's interest in the outcome of the case, if any.  Five, the witness's bias or prejudice, if any.  Six, whether other evidence contradicted the witness's testimony.  Seven, the reasonableness of the witness's testimony in light of all the evidence.  And eight, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things and make mistakes in what they remember.  Also, two people may see the same event but

remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.  The weight of the evidence does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were and how much weight you think their testimony deserves.

Conduct of the jury.  Let me say a few words about your conduct as jurors.  First, keep an open mind throughout the trial.  Do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide the case based only on the evidence received in this case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.

Thus, until the end of the case, or unless I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the

merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or electronic means, via email, text messages, or any internet chat room, blog, website or application including, but not limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat or any other forms of social media.  This applies to communicating with your fellow jurors until I give you the case for deliberation.  And it applies to communicating with everyone else, including your family members, your employer, the media or press, and the people involved in the trial; although you may notify your family and your employer that you have been seated as a juror in the case and how long you expect the trial to last.

But if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and report the contact to the Court.

Because you will have received all the evidence and legal instruction you may -- because you will receive all the evidence and legal instruction you may properly consider to return a verdict, do not read, watch, listen to any news or media accounts or commentary about the case or anything to do with it.  Although I have no information that there will be news reports about this case, do not do any research such as consulting dictionaries, searching the internet or other

reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

Do not visit or view any place discussed in the case. Do not use any internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about the case, the law, or the people involved, including the parties, the witnesses, or the lawyers until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have the case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, and misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury. And if you decide the case based on information not presented in court, you will have denied that party or the parties a fair trial. Remember, you have taken an oath to follow the rules and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the Court immediately.

A word about transcripts.  I urge you to pay close attention to the trial testimony as it is given.  During deliberations you will not have a transcript of any trial testimony.

Taking notes.  If you wish, you may take notes to help you remember the evidence.  If you do take notes, please keep them to yourself until you go to the jury room to decide the case.  Do not let note-taking distract you.  When you leave, your notes will be left in the jury room and no one will read your notes.  Whether or not you take notes you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of other jurors.

We have prepared notebooks for you that has a lot of blank sheets, so if you do want to take notes you can write on that.  The notebook also has a copy of the patent, so you'll have that, since that's the subject of this case.

And Angie, if you want to just -- we can start to pass that out as I continue with my instructions.

A word about what we call bench conferences and recesses.

From time to time during the trial it may be necessary for me to talk with the attorneys out of the hearing of the jury either by way of having a conference at the bench when the jury is present in the courtroom, or by calling a recess.  Please understand that while you are waiting we are working.  The purpose of these conferences is not to keep relevant information from you but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we'll do what we can to keep the number and length of these conferences to a minimum.  I may not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

Patent video.  Now, at this time we are going to show you a 17-minute video as an introduction to the patent system.  It contains general background information to help you understand what patents are, why they are needed, and the role of the patent office, which is part of the U.S. government, and why disputes over patents arise.

Now, this was prepared by the government and not the parties and it is something that we've decided hopefully will be helpful to you.  I think there's reference in there about a patent or some materials.  We're not going to be distributing

anything to you, sample patents, that kind of thing.  We just ask you pay attention to this video.  After we show this video I will say a word about what a patent is and talk a little bit about this case and give you an outline on how we're going to proceed.  Right after that we'll hear from the parties.  So if you would pay attention to the video we can go ahead and role that.

(Video was played but not reported.)

THE COURT:  Pause it.

MR. SUDER:  They can't see the --

THE COURT:  Oh.  It's not on the screens.

(Video was played but not reported.)

THE COURT:  All right.  Sorry for the feedback.  It's all right.  Is it working properly?  I apologize that the audio wasn't ideal.  Let me now give you an instruction that sort of repeats what you just heard, but this is to make sure you did hear it.

Let me say what a patent is and how one is obtained.

This case involves a dispute, as you know, related to United States patent.  Before summarizing the positions of the parties and the legal issues involved in the dispute, let me take a moment to explain again what a patent is and how one is obtained.

Patents are granted by the United States Patent and Trademark Office, sometimes called the PTO.  A valid

United States patent gives the patent holder the right to prevent others from making, using, offering to sell, or selling the patent invention within the United States or from importing it into the United States during the term of the patent without the patent holder's permission.

A violation of a patent holder's rights is called infringement.  The patent holder may try to enforce a patent against persons believed to be infringers by means of a lawsuit filed in the federal court.  To obtain a patent one must file an application with the PTO.  The process of obtaining a patent is called patent prosecution.  The PTO is an agency of the federal government and employs trained patent examiners to review applications for patents.

The application includes what is called a "specification" which must contain a written description of the claimed invention telling what the invention is, how it works, how to make it work -- or, how to make it, and how to use it so others skilled in the field will know how to make or use it.

The specification concludes with one or more numbered sentences.  These are called "patent claims," quote-unquote. When a patent is eventually granted by the PTO, the claims define the boundaries of its protection and give notice to the public of those boundaries.

After an applicant files the application, a PTO patent examiner reviews the patent application to determine whether

the claims are patentable and whether the specification adequately describes the invention claimed.  In examining a patent application, the patent examiner reviews information about the state of technology at the time the application was filed.  As part of that effort, the patent examiner searches for and reviews information that is publicly available submitted by the applicant or both.  That information is called "prior art."

In general, prior art includes things that existed before the claimed invention that were publicly known or used in a publicly accessible way in this country, or that were patented or described in a publication in any country.  The patent examiner considers, among other things, whether each claim defines an invention that is new, useful, and not obvious in view of the prior art.

A patent lists the prior art that the examiner considered. This list is called the "cited references."  After the prior art search and examination of the application, the patent examiner then informs the applicant in writing what the examiner has found and whether any claim is patentable and thus will be allowed.

This writing from the patent examiner is called an office action.  If the examiner rejects the claims, the applicant has an opportunity to respond and sometimes changes the claims or submits new claims.  This process which takes place only

between the examiner and the patent applicant may go back and forth for some time until the examiner is satisfied that the application and claims meet the requirements for a patent. Sometimes patents are issued after appeals with the PTO or to a court.

The papers generated during this time of communicating back and forth between the patent examiner and the applicant make up what is called the "prosecution history." All of this material becomes available to the public no later than the date when the patent issues.

Summary of contentions. To help you follow the evidence I will now give you a summary of the positions of the parties.

The parties in this case are plaintiff Opticurrent, LLC, and defendant Power Integrations, Inc. The case involves United States patent number 6958623. And we'll often refer to it as the last three digits. We'll call it the '623. Obtained by inventor James S. Congdon, who transferred his ownership to Opticurrent. Opticurrent now owns the '623 patent. For convenience, the parties and I will often refer to this patent by the last three numbers, as I mentioned, of the patent number; namely, as the "'623 patent."

Opticurrent seeks money damages from Power Integrations for allegedly infringing the '623 patent by making, using, selling, offering for sale in the United States, products that Opticurrent argues are covered by claim 1 of the '623 patent.

Opticurrent also argues that Power Integrations has actively induced infringement of this claim of the '623 patent by others.  The products that are alleged to infringe are the LinkZero-AX, LinkSwitch-II, TinySwitch-LT, and TinySwitch-III product families.

Power Integrations denies that it has infringed claim 1 of the '623 patent.

Your job will be to decide whether claim 1 of the '623 patent has been infringed.  If you decide that the claim of the '623 patent has been infringed, you will then need to decide any money damages to be awarded to Opticurrent to compensate it for the infringement.

You may hear evidence that Power Integrations has its own patents.  While this evidence is relevant to some issues you will be asked to decide, a party can still infringe even if it has its own patents in the same area.  You will be instructed after trial -- after the presentation of evidence -- as to what, if any, relevance these facts have to the particular issues in this case.

Meanwhile, please keep an open mind.  Before you decide whether Power Integrations has infringed claim 1 of the patent, you will need to understand the patent claims.  As I mentioned, the patent claims are numbered sentences at the end of the patent that describe the boundaries of the patent's protections.

It is my job, as judge, to explain to you the meaning of any language in claim 1 that needs interpretation. I've already determined the meaning of certain terms of the claims of the '623 patent. You'll be given a document reflecting those meanings. For a claim term for which I have not provided definition, you should apply the ordinary meaning.

You are to apply my definitions to these terms throughout the case. However, my interpretation of the language of the claims should not be taken as any indication that I view -- that I have a view regarding issues such as infringement. Those issues are yours to decide. I'll provide you with more detailed instructions on the meaning of the claims before you retire to deliberate your verdict.

Outline of the trial. The trial will now begin. First, each side may make an opening statement. An opening statement is not evidence. It is simply an outline to help you understand what that party expects the evidence will show.

The presentation of evidence will then begin. Witnesses will take the witness stand and documents will be offered and admitted into evidence. After the opening statements, Opticurrent will present its evidence on its contention that claim 1 of the '623 patent has been and continues to be infringed by Power Integrations. Witnesses will be questioned by Opticurrent's counsel in what is called direct examination. After the direct examination of a witness is completed, the

opposing side has an opportunity to cross-examine that witness.

Finally, Opticurrent's current counsel has the opportunity to question the witness one more time in what is called redirect examination.  To prove infringement of claim 1, Opticurrent must persuade you that it is more likely than not that Power Integrations has infringed that claim.

After Opticurrent has presented its witnesses, Power Integrations will call its witnesses who will also be examined and subject to cross-examination and redirect.  Power Integrations will put on evidence responding to Opticurrent's infringement contention.

Finally, Opticurrent will have the option to put on what is called -- referred to as rebuttal evidence to any evidence offered by Power Integrations of non-infringement.

During the presentation of evidence attorneys may be allowed brief opportunities to explain what they believe the evidence has shown or what they believe upcoming evidence will show.  Such comments are not evidence and are not being allowed -- and are being allowed solely for the purpose of helping you understand the evidence.

Because the evidence is introduced piecemeal, you may need to keep an open mind as the evidence comes in and wait for all the evidence before you make any decisions.  In other words, you should keep an open mind throughout the entire trial.

The parties may present testimony of a witness by reading

from his or her deposition transcript, or playing a videotape of that witness's deposition testimony.  A deposition is sworn testimony of a witness taken before trial and is entitled to the same consideration as if the witness had testified here at trial.

After the evidence has been presented, the attorneys will make closing argument and I will give you final instructions on the law that applies to this case.  Actually, I will give you the final instructions first and then -- and you will see those instructions, and then the parties will give closing arguments.  And then I will give final, final instructions.

And I remind you that closing arguments are not evidence.  They are only statements by the attorneys.  After the closing arguments and instructions you will then decide the case.

All right.  So at this time we're going to start the trial.  I'm going to invite the parties to give their opening statements.

And counsel, Mr. Suder, you may --

**MR. SUDER:**  Yes, Your Honor.

**THE COURT:**  Showing on the screen now?  You have it?  Okay.

**MR. SUDER:**  Sorry about that, Your Honor.

**THE COURT:**  Nope.  Our problem, as well.  So I think things are working now and you may proceed, Mr. Suder.

**OPENING STATEMENT**

**MR. SUDER:**  Thank you, Your Honor.  May it please the Court, ladies and gentlemen.  Good morning.

As I told you on Friday, this case is about invention and respect.  I told you -- first thing said out of my mouth -- about how Power Integrations is not respecting invention and property of others.

Jim Congdon, the gentleman sitting right there (indicating), elderly gentleman, obtained the patent from the United States government for a new and efficient way to convert high energy voltage that comes out of your wall socket, AC, and convert it into low power DC that we use in all of our appliances in our daily lives.  Cell phones, laptops, chargers, washing machines, TVs.  That's what that patent is about.

As you heard from Judge Chen, this is my second chance to speak with you.  I gave you in voir dire, and now in opening statement.  This is my opportunity to tell you what I think the evidence will be.  It's sort of a preview.  You're going to hear all the pieces of evidence, I'm going to tell you what they're going to be, and then at the end after you hear it all you'll know the whole story.

And as you saw in the video, and as Judge Chen told you, remember the burden of proof.  A preponderance of the evidence; what is more likely so.  That's my burden.  Now, I also told you on Friday -- I believe I asked some of you questions --

it's about respect. About the same lesson we teach our children when they go off to kindergarten. You respect teachers, you respect other people, you respect their property. And it's about choices. We all make choices. And wrong choices have consequences.

And it's also about we all live by the same set of rules. Rules in this case that were established over 200 years ago in our Constitution to protect inventions. And that corporations live by the same set of rules as we live in our daily lives.

Now you've heard what a patent is, you saw the video, Judge Chen just told you, it's a contract with the government. If you have a new invention that's carefully scrutinized and examined by someone in that area, the government issues a patent. Then you have the exclusive right to decide who may practice it. And you can charge for it. Just like a piece of property.

And that patent right gives you the same right as any other property. And the bargain is it's good for a limited time and then it's dedicated to the public. That's our patent system and it's defined by the scope of the claims. Just like the deed to your property. May say 321 Main Street on the front of your deed, but the back, all those descriptions, is the scope and boundaries and protections of your invention.

On October 25 of 2005 Jim Congdon obtained this patent (indicating.) This is the original patent that you have a copy

of.  He got this patent after careful review.  The patent office said right there on the front page that this was a new, novel and useful information, and all the requirements of law have been met.  And issued the patent.

And, therefore, just like the one on the screen, until 2022 Jim had the exclusive right to control who could use or not use his patent, including Power Integrations.  As Judge Chen just told you, the owner of a patent who builds on and improves on other patents must still respect the patent until it expires.  That's important.  Because you're going to hear from Power Integrations that they have patents.  And they do. But they still must respect what came before.  That is important in this case.

Because what's interesting is you're going to hear about these patents.  What you're not going to hear Power Integrations tell you is that our patent is invalid.  You heard the judge on the video say they had the right to challenge the patent in this case.  And they haven't.  We translate legal speak for you.  They must respect our patent.  They cannot say the patent office got it wrong.  Could have.  It chose not to.

Now, how do you prove infringement?  There's two ways to prove infringement.

I told you a little bit about this on Friday, and Judge Chen's going to give you instructions.  The first is literal. You look at the claims.  And does it literally have all the

elements?  Which we're going to get to shortly.

But there's another way.  It can be by equivalents.  If Power Integrations practices the equivalent of each element, then there is still infringement if it performs substantially the same function, in substantially the same way, and achieves basically the same thing, then it's still infringed.  That was an interesting point that I made to you on Friday.

Your role as a jury is going to be not do they infringe a picture?  Not whether they -- anything to do with their prior patents.  But whether by equivalents literally they infringe.  We think it's literal.  They're going to point to some differences to say why they don't.  But when they do, remember equivalents.  It is a critical part of your role as a juror in this case.

Now, the technology at issue in this case is power electronics, which is controlling the flow of electrical energy.  That's what this has to deal with.  And it has to deal with power conversion, which is a nice technical term for saying how do you get that voltage when you plug something into the wall and you got -- it's called AC, alternating current it's a high voltage.  It's dangerous.  You tell your kids "stay away from the plug."  And you got to be careful because that high voltage can also fry equipment.  And the key is to take that high voltage from the wall and convert it to low voltage DC to operate electronics.

As I just said, high voltage is dangerous not just to humans but to equipment and electrical components. And so voltage has to be scaled down. When it comes out of the wall it's 120 volts. That may not seem -- it's just a number. That's a lot of volts. That's powerful. You've got to convert it down to DC, and then switch it to control the flow. That's what you do.

And that is -- think of this example right here. What's coming out of the fire hydrant is high voltage. How do you get it to that nice stream of water in a water fountain so you can drink it?

That is what power electronic engineers work on. People like Jim Congdon, like our expert in this case. There are colleges that are devoted to this field. And as technology has improved over the years, the challenge from these electrical engineers, these power electronic engineers, is how do you get it more efficient?

If you remember, those of you that used to have a computer and have the big black box that you plugged in from the wall to your computer, that was a power conversion device. How do you get it smaller? Ladies and gentlemen, your phone charger -- I bet you just like me has a phone charger sitting by your night table that's plugged into the wall right now. It is using current even though you're not using it. And it's a small little device. Phone chargers. Your television is plugged in

right now.  It is drawing current.

Engineers worry about that from a conservation, a consumption, but as we have cell phones and people have iWatches, or whatever, the trick is to get it smaller, cheaper and more efficient.

That's the technology we're talking about here today.  And before I get to that, there's an important concept that you may or may not appreciate.  And that's a terminal.  That's a term that's used in the patent.  A terminal.  And if you look here at the battery, that's the best way to understand what a terminal -- it's a connection point to the outside world.  It's how -- Semiconductor chips have lots of terminals.  I'm going to show you a picture of that.

And terminals are the way that they -- Semiconductor chips we take for granted, how they communicate, get information to the outside world.  And how information comes into the outside world, is through these semiconductor chips.

And what we're talking about are terminals that are dedicated to powering the device.  If you look here, a semiconductor device can have lots of terminals.  That's not what we're talking about in this trial.  I want to put that out there.  And if I'm going a little too fast on the technology, it's all going to make sense to you.  And when I stand up in closing argument and I go over this again you're going to go: Now I understand.

So I'm just giving you a preview. But the point is I want to just highlight some signposts that you can look at as you hear the evidence. So you may not fully appreciate now, but -- okay, that's what Mr. Suder was saying.

So when you have lots of these terminals, that's not what we're talking about. We are talking about dedicated terminals to turn it on, to turn off the power. To control the current, that high voltage AC that's coming from the plug, so it doesn't fry your equipment. And there are dedicated terminals to control that output of current. That's what this case is about.

And what you have is a concept of a switch. A switch, in the most basic terms, you turn it on, you turn it off. It's a switch. But in the engineering field it gets a little bit more sophisticated than that.

But the way you control this high voltage coming from the AC and you convert it to DC is you turn the switch on and off like this (indicating). Literally thousands of times a second. And by turning it on and off, it controls the flow of the current.

We have an expert that teaches this at a university. He has a Ph.D. He has written, he has patents in his field. And he's going to explain to you how he teaches, how he works. And he does it in the space of electric cars. Getting battery cars and electric energy that is rechargeable wirelessly all using

this technology. That's where this technology is going. And we'll get to him shortly.

But the three terminals for turning on are the three dedicated terminals, the ones I just showed you on the picture that operate the switch. And they are -- back in the day they were bigger. They had -- they were more complicated. And as technology has gotten smaller and smaller, like our phones and our laptops, our devices, our phone charges that we keep in our purses and our briefcases, we want them smaller.

So the trick is: Let's see if we can get these terminals and the on/off switch capabilities smaller and less circuits -- less circuits and parts in them. So a three-terminal switch, which is really what we're talking about because the name of the patent is a three-terminal switch, needs -- doesn't -- no longer needs separate power to drive. The old days you had four terminals. On/off, one to decide what to do and one to bring up power.

What Mr. Congdon said is there's already power in there that we can tap into. Let's harness the internal power and control it, and we have a better, smaller, cheaper switch. That is a three-terminal switch.

You're going to hear all about this. At the end of this trial you're going to be able to tell your friends: Hey, I know what a three-terminal switch is. Let me tell you how they work. When someone goes and plugs in, say, Be careful. That's

a three-terminal switch.

You're going to hear about that afterwards.  I'm just giving you a preview.

So the idea to go from bigger to smaller, from four components down to three, is a big deal.  It's more -- it's cheaper, it's more efficient.

So again, when you go back to the device as multiple terminals, three of these are dedicated to power.  And that's what we should do.  I just don't want you to be confused if you see all these terminals.  We're talking about three dedicated ones.

Now, Mr. Congdon had a second patent, an earlier patent, called the '323 patent, which was his patent on a three-terminal switch.  It is not an issue in this lawsuit.  He solved the problem of going from four to three and got a patent on it.  That is the '323 patent that you'll hear about.  That was the precursor for the patent that's in your book.

But let's talk about who is Jim Congdon.  Mr. Congdon's right there in the gray suit.  He raised his hand (indicating).  He's an electrical engineer with a degree from Stanford.  His entire career has been dedicated to improving power electronics.  This is his life.

He's a named inventor on over a dozen patents.  He worked for major companies that utilize his inventions.  Some of them are actually put in that you may have used in your life.  He is

a small business owner, and he lacked the resources and experience to protect his intellectual property.  Simply put, Jim's an inventor.  If he can spend all day in his lab, he's a happy man.  You'll hear from Mr. Congdon.

Now let me tell you about Opticurrent.  Judge Chen told you.  Who is Opticurrent?  Opticurrent is two individuals.  Mr. Brunell right here (indicating), and his partner Mr. Vachon, in the gray suit back here.  Mr. Brunell was at Microsoft, Mr. Vachon was at Oracle.  And they had experience in licensing intellectual property.  You're going to hear all about that from Mr. Brunell.

He also worked at British Broadcasting Company in charge of their R&D helping inventors getting their properties out on the market.

They partnered with Mr. Congdon to protect his intellectual property and provide the necessary resources and experience to take on Power Integrations and protect Mr. Congdon's invention.  And the deal is, after reimbursement of all their expenses that you'll hear about, they share equally in the recovery.  That's the deal they struck. Mr. Congdon, you got a patent; we'll help you enforce it and make sure people respect it.

Now, who is Power Integrations?  They're a manufacturer and seller of power integration semiconductor devices.  They make those little pieces that go in your phone chargers.  Those

little pieces that Samsung puts in their TV's or in their washing machines.  You can go down and buy them in the store, or they sell them to customers and show them exactly how to use this so you can use them in your daily lives.

They make those components for charging.  You may have one in your purse, your bag, your locker, your gym bag, your car. They provide the switches as part of their semiconductor power conversion devices for companies like Nokia and Samsung.

And as relates to this case, the four product families -- I'm sorry -- the four product families that they have sold just through March of last year, this with patent is good until 2022, but through March of last year they have sold over 700 million of these chips that are used in the United States that we contend practice Mr. Congdon's patent.

Now, let's talk about Mr. Congdon's patent.  You're going to have it.  You're going to see it in your book (indicating.) And I have some pages here that we'll discuss.  And you're going to get to read along when they're discussed, and you can read it on your own and discuss in your deliberations.

But in the very first page of Mr. Congdon's patent, he says -- he discusses his earlier patent.  Remember, I mentioned a '323 patent.  He discusses it.  And he says right here:  The '323 to J.S. Congdon disclosed a non-inverting transistor switch only having three terminals.

A switch having only three terminals.  He discloses it as

prior art. He's telling the patent office: I have an earlier patent. But then he goes to say in his patent, if you see here: That although well-known and widely used in commerce, the three-terminal switch suffers from notable drawbacks. Specifically, it has been found that upon application of high-input single voltage -- what's coming out of the plug -- the current leakage between this third terminal and the second terminal is significantly higher than zero.

Because what you all don't know is there's a condition called no-load. You may have heard of it. No-load. When your phone charging right now is sitting by your night table, it is drawing current and leaking. A very small amount. That's why you have government initiatives to make our products eco friendly. Because it's leaking.

And yours may not make a difference, and yours, but when you take the whole world, all our components, and our televisions are all leaking, it makes a difference. And Mr. Congdon is saying: I went smaller, but problem. When I tapped into that high voltage, I couldn't control it all and it leaks. So I fixed it.

And he says: My new patent right here is an improved switch. This is the object of the invention. Another object is that this improved switch as described above limits current leakage.

That's what this is about. He is trying to make a more

efficient, safer, uses less consumption.

And he also says:  That my invention can be mass produced and has a minimum number of parts and is limited in size.

They can be smaller.  Companies can use this and sell them by the hundreds of millions.  That's what he's telling the world in his patent.

But don't take his word for it.  He explains it, but you will see a document from Power Integrations' website called Standby No-Load and Energy Vampires.  And in this document they say the exact same thing.  Some devices consume power for no purpose at all, such as a charger left plugged into a wall, a condition called no-load.  These devices are known as energy vampires because they have two teeth and suck power out of the wall continuously.

That's the problem Jim Congdon set out to solve.

And Power Integrations also explains that a 2008 study found that 13 percent of electricity used in the average California home is products in standby or other low-power modes.  Just in California, having those TV's plugged in, those washing machines, those phone chargers, 13 percent of your energy is being used in those situations.  So that's what this patent is about.

And you will see in the patent that Mr. Congdon explained how this works.  And it's important.  He didn't explain it to folks like you and me.  Patents are written, as you saw in the

video, to people skilled in the art.  People that practice in this field, they go:  I know what you're talking about.  So patents are written to people of skill in the art.  That's why you're going to hear from experts in this field.  Dr. Zane.

And they will explain to you that the figure that Mr. Congdon wrote to one skilled in the art said:  Here's my prior art.  Here's my '323 patent.  And the red -- these are the three terminals instead of four.

And then he explains, if I add the green and the yellow, which you're going to learn all about voltage stabilizer and CMOS's.  For now he adds the green and the yellow.  And the current will significantly reduce the leakage.

He's telling the world:  This is how you can do it.  And you will also see, folks, because Mr. Congdon is an inventor, you're going to see his original notebook from 1997 (indicating.)  You'll be able to see how he worked as an inventor.  And you will see the very page on the screen of his invention (indicating) of what he came up with.  He signed it, he dated it, he had people witness it.

And it also refers to a breadboard.  He built a prototype to show people that it worked.  And you will see and hold carefully -- I have it here -- this is what Mr. Congdon built in his lab (indicating) to show his invention.  This, to you and me, it's a mouse trap.  But to people skilled in the art, this was a new way to conserve energy, have a more efficient

device, that the patent office said you could use.  This was over 20 years ago and it is still being used today.  You will see that and you will hear about it in evidence.

Now, as I told you, patents are not written to people like you and me.  They're written to people that are skilled in the art.  Someone who's knowledgeable.

In the '623 patent, this patent is written to people with experience in power electronics that do this.  And you're going to hear from Dr. Regan Zane, who is sitting right behind Mr. Congdon in the suit (indicating.)

Dr. Zane has a bachelor of science in electrical engineering.  He has a masters in electrical engineering.  He has a Ph.D. in electrical engineering.  He's a professor at the department of electrical and computer engineering at Utah State.  He was the founder and director of the power electronics lab.  And he'll explain to you his efforts and the track they have built and the foundation they have done to convert this technology.  So when you're driving your electric car down from San Francisco to LA, you don't have to stop as many times.  That's one of his life's passions.  And the patents he has in that area.

He has published digital control high-frequency switch mode power converters.  That's a technical term for what we're talking about.  He's written about that.  And he is a named inventor in over a dozen patents.

Dr. Zane will explain to you how he analyzed the accused devices of Power Integrations and concluded that they each infringe, in his professional opinion.

Ladies and gentlemen, this is the claim.  It's a lot of words.  That is the boundary of the invention on the back of the deed -- because it's the back of the patent -- that you're going to go through.  I'm not going to go through with you here today.  But the color coordinates with the pictures I showed you, and you will understand that.  That each of these elements are contained in the accused device.

That's our burden to show you that.  And we will.  And you will have certain meanings of what Judge Chen told you certain terms mean that you are to apply.  Like, when it says "only three terminals" doesn't mean only three and no more.  It means only three and you can't have a fourth connected to a separate power supply.  That's important.  And that's the key rub in this case that you're going to have to decide.

Now the accused products that we have, there's four of them.  LinkZero, LinkSwitch, TinySwitch, TinySwitch.  They're all switches.  That's why they're called TinySwitch.  Called LinkSwitch.  Called LinkZero because Nokia wanted Power Integrations and the others to try to get as low to zero leakage as possible.  You can never get to absolute zero unless you unplug the plug from the wall.  Because if it's sucking energy out of that wall, that vampire, there's always going to

be some.  Let's try to get it down.  So they have a LinkZero.

But these are the four products you're going to hear about.  And what Dr. Zane is going to tell you is that he looked at their material.  What did he look at?  He looked at a schematic.  A schematic is a blueprint for circuitry.  You built a house, got an architect to do drawings, they do blueprints.  That's what a schematic is.  And to one skilled in the art, like Dr. Zane, a schematic explains exactly how the components are designed to operate.  And they may include more detailed information as you go down, just like a set of blueprints you get from your architect.

And he will also look at data sheets.  You'll see those data sheets.  Think of them as instruction manuals.  That's what goes to the customer, that comes in the box when you buy something that tells you exactly how to use it.  And if you ever bought a product, it tells you how use it.  And if someone's coming to install it, it has the instructions for installation as well.  That's a data sheet.  You're going to see those because Power Integrations shows exactly how to use it and exactly how to install them in the washing machines and the phone chargers.

And this -- I'm not going to go over it -- is an example of a data sheet.  That's what one of them looks like.  You will see it in evidence of what is called -- this is for the TinySwitch-III.

And you will see a picture of a schematic.  And Dr. Zane is going to show you exactly where on this blueprint the three terminals are, which requires a transistor switch, voltage stabilizer, and the CMOS.  He's going to show you exactly, to him, where this is and why he knows that's the case.

You're also going to see in these data sheets the information where they tell their customers exactly how to use this.  You'll see all that.  That's what the evidence is going to show you.

So we believe there's infringement literally and also by equivalents.  And then the question is, because the law says that if there's infringement they must -- you must award a reasonable royalty.

So Opticurrent, as you heard on the video, has the right to exclude Power Integrations from making products through 2022 if there's infringement.  We can tell them to stop.  And they've sold over 700 million accused devices just through March of last year.  So we're entitled to a reasonable royalty for their infringement.

And what you will see is that Mr. Congdon licensed his prior '323 patent to a company called Qbar Tech.  And they paid him 2 to 3 percent of the net sales.  That was the royalty that he had gotten for what was a three-terminal switch, but it had problems of leakage.  So we think -- but that's a good baseline.

So when you're asked about damages, you look at the Qbar license, that's a good indicator of what this -- the royalty would be worth to use my property. And then you know that this is an improvement, because that had leakage. This stopped the leakage.

So the question becomes for y'all -- I'm sorry about the Texas in me -- it's up to you to decide the value of that improvement. So what you do is you take the infringing sales, you figure out what the rate is, per unit rate, whatever it is, and you do the math. That is how you calculate damages. How you do it -- I might have some suggestions on what it should be, but at the end of the day, it's up to you. That's your job as a jury.

Now what is -- what are they going to say? First, they're going to say we don't make product. So what's the big deal? The answer to that is right in the Constitution. Constitution is set up to protect inventors. To give inventors -- it doesn't say inventors who also make product. That's not our system. That's not the rules. So don't be misled by that.

They're also going to say, We don't infringe. But how do we know that's not true? Listen to the evidence. Look at the data sheets that Dr. Zane is going to take you through that has all the elements. If it has all of the elements, it infringes. That's plain and simple. If you have it, you infringe. And until the patent expires, you can't do it this way.

And they're going to tell you that they draw power from another source and have a fourth terminal.  Only have three.  Have a fourth.  But what they're not going to tell you is this fourth terminal -- which we don't even think is a terminal -- is connected to the inside drain.  It's connected to itself on the inside.  And that's what this slide shows you that their data sheet says that this upper right-hand terminal, which is one of the three, is the power MOSFET -- MOSFET is a switch -- drain connection.  It provides internal -- the key word is internal -- operation for start up and steady state operation.

All the power on their products comes from inside the chip.  They don't get it from another source.  Remember that.  That is critical to this case.  They want to say, Well, we can hook it up to something else and run it through there and bring it there.  It still derives from this drain pin.  You're going to hear all about a drain pin.  It's the terminal in the patent that makes it that you can tap into that internal energy that Mr. Congdon figured out in the early '90s.  So do not be fooled by that.

Then they're going to say that this third terminal drain pin energy goes to a fourth terminal bypass pin and it's connected to a capacitor outside the terminal.  That they don't even make.  This is something someone else does to it.  So when it leaves their shop it doesn't even have this.  But they're going to tell you.  But what is -- what is the data sheet going

to tell you?

The evidence is going to show you that what they hook it up to outside is a connection point from an external bypass capacitor for the internally-generated supply.  All of the energy comes from that third terminal that Mr. Congdon figured out, you tapped in so you don't need a separate fourth terminal supply.

That's what this case is really all about.  And you're going to learn all about that.

And they're going to point to the data sheet.  And this orange right here (indicating), is going to be the capacitor.  And they're going to say that the yellow is connected to the orange.  But the problem with them is that the orange is right back connected to the yellow.  Whether it's inside or outside, it's still part of this.  It's not a separate power supply.

And the other thing they're going to -- the evidence is going to show you is that if you turn off the power in that upper right-hand drain pin, what's in the orange will last less than one-thousandth of a second.  Yet they want to tell you that that is a fourth power supply.  That's what they're going to tell you.  But listen to the evidence.

That orange little capacitor that holds stuff, when it's used, for less than one-thousandth of a second, is a filter.  It's part of a filtration process that, engineers use capacitors all the time.  You may have heard of those terms.

They're what's known as "passive components."  They run things through them, but they are not a power supply.

And you will see that Mr. Congdon in his drawing contemplated that you can still use one of these and it doesn't change the nature of his invention.  Do not be misled by their evidence.  Because you should listen to what the evidence is and how it's understood by people skilled in the art.

You will see in the patent that Dr. -- that Mr. Congdon said it's okay to do their type of way, and it's still infringes.  We think that's still literal, but it can be equivalents.  But that's what the evidence is going to show you.  So when you listen to their evidence, remember that that little orange capacitor gets all of its power from that third internal power supply; the one that Mr. Congdon said you can tap into that he discovered in his first patent.

They're going to have some other non-infringement positions.  That it doesn't completely stop the leakage.  And we know that.  Mr. Congdon said it's not about eliminating leakage, because you can't.  You got to pull it out of the wall.  But short of that, you want to significantly reduce leakage.  That's what he discloses in his patent this is all about.  So don't be misled if there's still a little tiny drip.  Compared to what it was like without it, this is a substantial improvement.

Next, they will say that even if we infringe, their

damages are nominal.  Hardly any damages.

I don't know.  What you're going to hear from them, from their vice-president of legal affairs:  We don't license our patents to anybody, and we don't need a license from anybody.  We're fine just the way we are.

Problem with that, ladies and gentlemen, is that if you have a valid patent, you got to respect it.  You don't get to make those rules.

It's up to you.  You get to decide if rules need to be respected.

And lastly, ladies and gentlemen, they promote their products as the best way to battle an energy vampire.  And what they're going to do is, I suspect, you're going to hear about all their other products and all these patents that they have.  But as you saw in the video, they had the right to challenge the validity of this patent in this case and have you decide it, and they are not doing that here.  Yet they're going to show you all these other patents, all these other products, and you're going to have to ask yourself why.  What does it have to do with whether these products infringe Mr. Congdon's patent?

Do not be misled.  Listen to the evidence.  I gave you a lot.  Listen to it.  Hear both sides.  And when I stand up in closing argument, see if I am telling you the same thing I'm telling you now.

You are the judge of the facts.  I welcome you to judge

it.

THE COURT:  All right.  Thank you, Mr. Suder.

Before we hear opening statements from Power Integrations, we're at 10:00.  We've been at it for an hour and-a-half, so I'm going to take our first morning break for 15 minutes.  With a brief reminder of what I asked you:  To please keep an open mind, do not discuss this case with anyone including your fellow jurors, and do not attempt to do any research on your own.  And we'll see you in 15 minutes.

(Jury exiting the courtroom.)

THE COURT:  All right.  And you're going to take about 45 minutes, counsel?

MR. SCHERKENBACH:  Yes.

THE COURT:  Then we'll just start right in with their first witness.  And I think after that break, then maybe we'll talk about the questions with respect to exhibits for Mr. Brunell.  Because we're not going to get to Mr. Brunell.

MR. SUDER:  Not get to him before lunch, Judge.

THE COURT:  Okay.  See you shortly.

(Recess taken at 10:05 a.m.)

(Proceedings resumed at 10:19 a.m.)

THE COURT:  Okay.  Thank you.

Welcome back, ladies and gentlemen.

We will now hear from Power Integrations.

**OPENING STATEMENT**

**MR. SCHERKENBACH:**  Thank you, Your Honor.

Good morning, ladies and gentlemen.  Hello again.  My name is Frank Scherkenbach, and I represent Power Integrations, along with a few members of my team who will you will be meeting throughout the course of the trial.

I want to start by echoing something the judge said in his preliminary instructions.  And it is something I said during voir dire it's real important to me as a defendant going second, and that is that we ask you to keep an open mind until you've heard the evidence, until you've heard all the evidence.

As you know from your own daily experience, whether you have in your work life or with children, there's two sides to every story.  Sometimes there's more than two sides to every story.  You need to hear everybody's perspective before you make up your mind.  And I know you'll do that.

You're going to hear in this case that Power Integrations absolutely respects intellectual property.  Power Integrations has many patents of its own, some of which you're going to hear about in this case because they're directly relevant to the products that are at issue.

But you're also going to hear that Power Integrations doesn't use Mr. Congdon's patent.  It's that simple.  Power Integrations is fine with Mr. Congdon's patent.  We're not here to challenge the patent.  So you're not going to hear about

validity.  They have their patent; we have our patents.

The issue is whether Power Integrations is using Mr. Congdon's specific patented circuit in its devices.  And we believe the evidence will show we don't.

And the high-level reason -- and I'm going to talk about this in a little bit more detail, but the high-level reason is, as counsel described to you, Mr. Congdon's invention was going from a four-terminal device to a three-terminal device that was better and had advantages.  And he got a patent on that.

As you will hear, Power Integrations went from three-terminal devices, which it used to do, to four-terminal devices, the exact opposite.  The accused products in this case are all four-terminal devices.  The patent is about three-terminal devices.

The products in this case have a fourth terminal that must be connected to a power supply.  The chips will not work otherwise.  I'm going to come back to this.  And I'm going to actually show you one of these chips.  They're super tiny. I'll put them on the ELMO here.

But the chips that are accused in the case, they are electronic devices.  They need power to operate.  Your laptop needs power, for sure.  Your phone needs power, for sure.  This tiny chip, to do its job, it needs power too.

And it turns out that in this case one of the four terminals in all of the accused devices is connected to a power

supply.  It's called a capacitor.  All right.

And that is really, in a nutshell, the core issue in the case that you have to decide.  They dispute that.  And you're going to see evidence on both sides.  That's the core issue in the case.

And, also, again, harkening back to the video you saw, the Patent Office doesn't decide infringement at all.  So that's why we're here.  You'll be the first people to really hear the evidence on infringement on both sides, and you decide that issue.

All right.  Now, who is Power Integrations?

Is this coming up on your screen?

**JURORS:**  No.

**MR. SCHERKENBACH:**  Great.

**THE COURT:**  It's not working for the audience though.

There you go.

**MR. SCHERKENBACH:**  Great.

So Power Integrations, you know, it's a company sort of in your backyard.  You might never have heard of them.  They're based in San Jose, and founded by a solo inventor like Mr. Congdon back in 1988.

Our founder was named Klas Eklund, and he came up with an idea, and got a patent on it, for how to basically integrate -- hence, the number of the company, Integrations -- how to integrate into an incredibly tiny semiconductor device both the

controller circuitry -- which I'm going to talk about -- and a high-voltage switch. Put them both in the same device.

Had not been done before. Sort of a breakthrough technology. And that was the basis on which the company was founded by Mr. Eklund. And the company grew over time because this was -- the marketplace recognized breakthrough technology.

And over time Power Integrations, of course, added to that, improved on that, came up with other inventions. And so it has become today the acknowledged worldwide leader in the design and development of integrated circuits for power conversion.

Now, what does that mean? That means, for a device like what's shown on my slide as a cell phone charger, it could be a laptop power supply, like I'm holding, anything that runs off of AC, that you plug into a wall, that needs power to operate.

These devices, like a phone, like a laptop, they don't run off 120 volts coming from the wall. They need direct current at a much lower voltage. And so the question is: How do you convert the high energy -- the high-voltage energy from the wall to a low voltage DC?

That's what switching power supplies do. That Power Integrations' business, is making the chips that control these switching power supplies. So if you were to take one of these things apart, inside would be a chip that's the brains of the operation, if I can put it that way.

And Mr. Suder is quite right, they are pervasive. They're, you know, everywhere. They're probably everywhere in your home. And very, very many of those would have Power Integrations' chips in them.

And why would they have Power Integrations' chips in them? Because Power Integrations has created this market, has paved the way in this market, using its own innovations.

Now, you are going to hear -- you've already heard some references to efficiency and energy efficiency. And this is an important issue in the case.

When you hear about efficiency -- and Power Integrations has been recognized, as you see on the slide here and you'll hear from the witnesses, as a company that is -- that is primarily responsible for the increased efficiency power -- conversion efficiency of these power supplies.

And in that context and some of the documents Mr. Suder showed you, we're talking about the efficiency in converting the energy from the wall to the energy your device needs.

That is what the energy efficiency is about in this world. That's what matters. Do you waste a lot of energy in converting from the wall to the device?

It is -- and the evidence will show, it has nothing to do with current leakage of the type referred to in Mr. Congdon's patent. That is not about energy efficiency. It is not about what these power supplies do. They are unrelated.

The current leakage, as I'll show you, has to do with -- this is obviously a graphic -- has to do with how much, if any, current leaks between the terminals of the switch inside the chip.

Remember -- and the witnesses will explain this -- inside this tiny chip there are two pieces. They're the brains, what we call the brains of the operation, all of the circuitry that controls when and how to turn the switch off, and there's the switch itself.

And so when Mr. Congdon's patent talks about the switch and current leakage through the switch, it is talking about current leakage from one terminal to the other of just the switch part of this chip.

It is not -- I'm going back here now -- it is not talking at all about efficiency in converting the energy at the wall to the energy the device needs. Those are entirely unrelated.

All right. Now, so these chips that are at issue have the brains that control the switch and the switch itself. And this case is not about all of the technology in the chip that decides when and how to switch the switch off and on to accomplish this conversion.

It's actually quite complicated. It's an area of constant innovation for Power Integrations. They've been working at it now for almost 30 years. And they're still working on it. Okay.

Mr. Congdon's patent is about the switch piece, just the internal switch piece, and an alleged improvement on that switch.

So you're going to hear from Power Integrations' witnesses directly about the issues. And one of the people you're going to hear from is Mr. David Kung. He has actually been with the company longer, I believe, than any current employee at the company.

Mr. Kung -- I believe he's here.

Mr. Kung, would you stand up, please?

There's David Kung, with the company since 1989. And he has been the director of design engineering. He's an electrical engineer. He's the person who really oversees the development of all of Power Integrations' chips. That's his job.

So he'll talk to you about how Power Integrations moved from three-terminal devices to four-terminal devices and why, why did they do that. And you'll see how that's relevant to this case. And, again, it's the exact opposite of the way Mr. Congdon's invention was described to you as going from four to three.

You're also going to hear -- and it's going to be on Friday -- from Mr. Sutherland. He's the vice president of worldwide sales for Power Integrations, been with the company 19'ish years. Quite a while.

And he's going to talk to you about the accused products. There are these four different accused product families. What sorts of things are they used in. What sorts of features in the products do customers value, not value, and why.

He couldn't be with us today. I would introduce him, but, unfortunately, he's traveling, but he will be here on Friday.

All right. Now, on this issue of transitioning from three to four, what's the evidence you're going to see on that?

Well, Power Integrations, one of its early products was a product called the TOPSwitch. The TOPSwitch, you see it there on the screen. You can also see -- that's an actual picture of a TOPSwitch.

And you see those three pins sticking out. Those are terminals. Those are pins. It's a three-terminal device. And, in fact, the TOPSwitch was named in part for the fact it only had three pins. You can see three-terminal off-line PWM switch.

And so in the early days Power Integrations was all in on three-pin devices because they do have some advantages. Now, this is a complete power supply controller chip, okay. This is not just the switch part that switches off and on. It's the switch.

You can't see it, but in that package is both the switch and the brains, and all the controller circuitry that controls that switch.

And one of the reasons that TOPSwitch could have only three pins is that one of the pins combined what's called feedback, okay, and the power supply for the chip.  Mr. Congdon will explain this to you.

Again, these chips themselves need power.  Your cell phone needs power, your laptop needs power, the chip needs power to work.  How does the circuitry inside the chip -- how is it able to work?  It needs power itself.

Okay.  In TOPSwitch, in the three-pin devices, power and feedback were combined on one pin.  Now, you haven't heard this term, "feedback."

Bear with me, I'm going to skip back to this power supply slide, number 103.

What's feedback?  Feedback is the idea that the controller learns how much power your phone actually needs and takes that into account in controlling the switching of the switch.

If your phone is asleep, doesn't need much power.  And so the switch doesn't have to work as hard, and the controller knows that and will control the switch to provide less power, feedback.  Okay?

On the other hand, if you're on your phone and you're gaming or, you know, doing something that's sort of intensive, takes all the energy that the phone needs, that information is fed back to the brains inside that chip and the brain says, hey, we need to make as much power as we can make.

So that's feedback.  It's a fundamental part of these power supply controller chips.  They need feedback and they need power.

All right.  Now let me skip back ahead to our three-pin products where there was a way -- Power Integrations figured out a way that you could use only one pin for both of those functions, both power and feedback.  And that -- that was a good thing; it's smaller, it's a little simpler.

And, as you'll hear, Power Integrations actually got a patent that relates to aspects of this three-pin device.  It's the '369 patent.  And if you look at that patent, you can see we've highlighted in yellow there three pins.  Okay.

Power Integrations later transitioned to a different design in the late '80s.  They said, you know, there's a new way we've thought of to control the switch inside this chip.

TOPSwitch, in these early three-pin devices, did it one way, but they came up with a fundamentally different way of doing it -- and Mr. Kung will explain this to you -- called on/off control.  On/off control.

Now, we're not going to get into the details of on/off control.  That's a sort of new brain, it's a different way of controlling the switching of the chip, but it is a very different way of controlling the switch.

And it turns out -- and Mr. Congdon will explain this to you -- that control method requires the power pin to be

separate from the feedback.  You can't have them together as they were in our three-pin devices.  You have to separate them.

And that meant that the products using the on/off control had to be four-pin.  And so Power Integrations moved to four-pin devices where, as you'll see, one of the pins is specifically for powering the chip.

And Power Integrations -- as I mentioned, this was a significant innovation -- they thought, as did the Patent Office, Power Integrations got a patent on this new method of control, the '190 patent you'll hear about, for digital or on/off control.

And, again, if you look at that patent and you look at schematics for the accused products, all of which use on/off control, you will see four terminals.  You'll see them there on the screen.  One, two, three, four; not three, four.

And one of them in particular that's going to be a focus of the case is this one at the upper left called bypass.  And the witnesses will explain why it's called bypass, but that pin is connected to the power supply for the chip.  That's how you power the chip.

One of the early products that used this on/off control was called TinySwitch.  This is TinySwitch Plus.  And I wanted to introduce here a label that you might hear later in the case called EcoSmart.  EcoSmart.

I mentioned earlier that when you talk about energy

efficiency of power supplies -- of the overall power supply, the energy efficiency of these devices, Power Integrations has coined this term "EcoSmart" to describe to customers a collection of technologies that contribute to energy efficiency.  Okay?

It's not just one technology, it's not just one patent. But one of them that's included in EcoSmart, that's very important for this case, is this '190 patent on on/off control. It turns out that has a dramatic impact on the energy efficiency of the overall power supply.

And, again, just like the '190 patent, if you look at the data sheet -- and here you have an excerpt from the data sheet -- of a TinySwitch, four terminals, not three -- one, two, three, four -- upper left yellow one, bypass, is the power supply terminal.

You can see how it's been separated from the feedback terminal, different than how Power Integrations used to do it in its three-terminal devices.

Now, another witness you're going to be hearing from, from Power Integrations, is Mr. William Bohannon.  Mr. Bohannon is here.

Stand up.

Mr. Bohannon is our technical expert.  And when I say "our," I mean independent technical expert.  He doesn't work for Power Integrations.  He works separately in the power

supply design field, and has been doing that for a long time.

He'll explain his -- his credentials to you, but he has analyzed the products accused of infringement.  He has analyzed Mr. Congdon's patent.  And he's analyzed the relevant Power Integrations patents.

And he has two fundamental opinions.  Number one, no infringement, including because PI's accused products have four terminals, not three, where the fourth is connected to a power supply.  Okay.

And the other thing he says is, when you hear Opticurrent talking about the energy efficiency of Power Integrations' devices and you see documents flashed on the screen that talk about energy efficiency -- we can all agree that's a great thing and we want more of it -- well, that's due to PI's technology.  It's not due to Mr. Congdon's patent.

Okay.  So what are the specific products at issue in the case?

The first set, if I can put it that way, are some versions of TinySwitch, TinySwitch-III, TinySwitch-LT.  These suffixes, "III" and "LT," are not going to be of particular critical importance.  Just a way to keep the different families apart because, as you'll see, they're all different flavors.

Now, one other thing on terminals.  You see on this slide an actual picture of a TinySwitch-III.  Okay?  And if you look at the top of it and you start counting, you say, well, wait a

minute, you told me these are four, and both sides refer to them as four-terminal devices, and if I start counting, I get seven. What am I missing?

You aren't missing anything. You see terminals 5, 6, 7, 8 are all labeled in the same way. Electrically, they're all connected, they're all tied together so they function as a single terminal.

It can be confusing. It was confusing to me initially, but that's a four-pin device, a four-terminal device. Okay.

As I mentioned, there are -- we use these suffixes just to sort of tell the families apart. The two TinySwitch families accused in this case are some of the tiny switches that PI makes, not all of them.

There are multiple other families that are available. Why is that relevant? It's relevant for one -- one reason it's relevant, Mr. Sutherland will tell you, is that in the applications for which customers use the accused products, there are also available other Power Integrations products that will work in the same applications. And they're not accused of infringement.

And that may be relevant to you if and when you ever talk about or reach the damages issue in the case.

So there are an array of products out there. Some are accused, some are not.

The TinySwitch-III, like as I said, all of the accused

products uses this on/off control technology of Power Integrations that's patented and is part of EcoSmart.  And so you'll see EcoSmart referred to on the data sheets.

As I already said, Mr. Bohannon, one of his opinions will be that Power Integrations uses its own energy efficiency technologies like on/off control, not Mr. Congdon's patent.

So the patent, Mr. Congdon's patent, claim 1 is the only asserted claim.  Here it is.  There are -- and, again, so you're not confused, there are 19 claims in the patent.  If you actually look at it and flip to the back, where the numbered claims appear, there's 19.  Only one is asserted.  And that claim says only three terminals.

Now, there's a footnote, and it's a pretty important footnote.  The Court has construed that language "only three terminals."  Judge Chen actually told you in his preliminary instructions that certain words in the claim have been construed by the Court.

And that phrase "only three terminals" has been construed to mean a noninverting transistor switch with three terminals that does not have a fourth terminal connected to a power supply.

All right.  So if the accused products have a fourth terminal connected to a power supply, they don't infringe.  And that is Power Integrations' contention in this case, why Power Integrations does not infringe.

And what's the evidence you're going to see?  You're going to see schematics.  You're going to see this is actually a block diagram from the data sheet for a TinySwitch-III.

These data sheets, Mr. Suder described them accurately, I think.  They're sort of instruction manuals for these chips.  You know, if you buy a TinySwitch-III, they actually don't really come with a data sheet.  You download them from the website.  It's all available.

These are incredibly complex products.  These data sheets are many, many pages, 25, 30 pages long.  Lots of technical content.  Tell you how to use the part.

And the data sheets will explain how that fourth terminal there, the yellow one in the upper left, they will explain how it's connected to a capacitor.  They will explain how that capacitor functions as a power supply for the chip.

Here's another, on 126.  This is an application diagram for a TinySwitch-III that appears in one of the data sheets.  So, remember, I told you that these power supplies -- sort of the brains of the power supply is a chip like a Power Integrations chip.

And you can see that little box, that little rectangle oriented vertically there in about the middle, the lower middle?  That's the actual chip.  But the power supply has other things.  You can't have just the chip.

You have to have input circuitry.  You have to have those

double squiggly lines.  It's a transformer.  Okay?  You're not going to hear a lot, probably, about that, but the witnesses will give you a mini tutorial on how these overall power supplies work.

You have to have a transformer, you have to have output circuitry, and you have to have feedback circuitry.  Okay?

The feedback circuitry is in the upper right there where you have those sort of lightning bolts coming back.  It's called an opto-coupler, and that tells the chip what's going on in the output; do I need more power? less power?

So those are sort of the functional pieces of a power supply; input circuitry, transformer, output circuitry, feedback circuitry.  And there's the TinySwitch.  Okay?

Now, one other thing on here, and it's real important, is that that device in the lower right, the lower middle, two vertical lines stacked like this (indicating) -- it looks like a cookie, okay, an Oreo -- that's a capacitor.  No one is going to dispute it's a capacitor.

What's the capacitor doing?  The capacitor is the power supply for the chip.  That's why it's there.  That's what it's used for.  And, as you see, it is connected to the fourth terminal of the chip, the bypass, slash, M multifunction terminal.  It's connected to the capacitor.

So how does this work?  The capacitor is charged up by a current that is coming in.  And when it's charged up enough to

what's called an operating threshold, the capacitor powers the chip.  The chip turns on.

The chip won't do a thing without power from that capacitor.  Will not work.  No dispute about that.  The chip will not work if you disconnect the capacitor.  No dispute about that.  The capacitor is the power supply for the chip.

You can think of it in the same way as your -- put my phone down.  Your cell phone has a battery.  Battery has to be charged for your cell phone to work.  No battery, no cell phone.  Your battery goes dead, you can't use your phone.

Capacitor is the battery for that chip.  And when that capacitor or that battery dies, depletes, chip won't work.  Same thing.  That capacitor is the power supply for the chip.

Now, what is Opticurrent's theory, then, for why there's infringement?

They will point you to a different pin, the green one on this slide.  The drain pin it's called.  And they'll say, hey, actually, the current that the chip uses to power itself comes through the drain pin, through the drain pin.

And that is true but not the complete story, because where it goes is in the drain pin, out the bypass pin to charge the capacitor, the capacitor stores the energy to power the chip.  And that's going to be a disputed issue.  The experts are going to disagree on that.  You're going to hear that evidence and you're going to have to decide.

Our evidence -- I previewed some of this, but Mr. Bohannon will say that that fourth terminal and the capacitor applied to that fourth terminal -- or connected to the fourth terminal, excuse me, always supplies the power for the chip.

The chip doesn't run off the drain terminal. It can't. It won't. It will never do anything if -- if you only have the three terminals and you don't connect power to the fourth terminal, the chip won't work.

The third terminal is simply used in the path to charge the capacitor. And as I already said, the chip won't run without the fourth terminal connected.

Now, so that's the first family of products. And you'll be happy to hear -- I spent some time on that -- the other products work in the same way. They're all four-terminal devices. They all have a fourth terminal connected to a capacitor that serves as the power supply for the chip. It's the same story. But just so you have the identification down.

LinkSwitch-II is another group of products that are accused. There are, again, an array of LinkSwitch chips. You see on the slide here, there's seven of them, at least. And, again, that's relevant to whether other products can be swapped out for what's accused. And Mr. Sutherland will tell you, yes, they can.

One family of LinkSwitches is accused, the LinkSwitch-II. It also uses PI's patented on/off control, which is part of

EcoSmart, and that is a fundamental reason the chip -- the power supplies using the chip are energy efficient. It is a four-terminal device just like the TinySwitch.

There you see the terminals. And, again, it's going to be this one at the upper left that we have yellow, the bypass terminal that is connected to the capacitor, which is the power supply for the chip.

And, again, you're going to see the data sheet. The data sheet for LinkSwitch-II will describe this operation in just the same way; how the capacitor connected to that pin is the power supply for the chip.

LinkZero-AX is another accused product. Let me just flip here. And it is one of two families of LinkZero devices. One's accused, one's not.

It is a four-terminal device. Again, it looks like it has more, but all those ones labeled S are tied together electrically so they function as a single terminal.

If you look at the data sheet for LinkZero, it actually uses two relevant patents. One of them is this '190 patent on digital on/off control that I mentioned before. And I actually wanted to show you just one piece of that.

Can I have the document camera, please.

So this is a copy of PI's '190 patent, the on/off control patent. And it actually talks about how the capacitor connected to the fourth terminal works. And what does it say?

You can't see what this says, but, hopefully, we can get there.

So this is from the '190 patent.  This is Trial Exhibit 153, column 4, lines 54 to 56.  Regulation circuit power supply bypass capacitor 350 -- it's a label on the drawing -- is used to supply power to operate regulation circuit 240 when it is conducting.

So PI's own patent tells us what the capacitor is there for, how it's being used.  It's being used to power the chip.  Now, this is one example.  There are many examples where PI's documents and, in particular, this patent, says that.

So that's a piece of evidence you can take into account when you're making your decision.

All right.  Now, I was on -- thank you for switching.

I was on LinkZero AX.  And I mentioned this product implemented yet another PI-patented technology that's relevant because, again, it goes to what's really responsible for the energy efficiency benefits that the plaintiff points to.

Is it Mr. Congdon's patent?  And what's the evidence that it's Mr. Congdon's patent versus Power Integrations' own technology?

So this part, LinkZero AX, in addition to using PI's '190 patent, uses another PI patent, the '359 patent, called dormant mode.  It's dormant mode for zero standby consumption.

And this one has a somewhat interesting story behind it.  There's the patent -- the dormant mode patent, whatever that

means; right?

So this one, you'll hear a story from Mr. Sutherland about Nokia and how Nokia came to PI and said, you know, you guys, great technology, really efficient, love it, but we want to get to zero standby.  Not just low standby, zero standby.

What's standby?  So I'm holding -- this happens to be a cube charger for a phone.  You might know which phone.  It turns out even when your phone is not plugged in to this cube at all, this still uses power.

Why does it use power?  Because the chip in here, that is the brains of this power supply, needs power to operate.  It is operating off that capacitor all the time.  The chip is powered up.  I'm ready to go, okay?  Even when your phone is not plugged in.

And so this '359 patent, PI said, well, why don't we figure out a way to turn off most of the circuitry in our chip -- not all -- almost all of it, and leave just enough circuitry on so it can wake up when the phone is plugged in.

And that was a pretty interesting idea.  PI got a patent on it, and it was able to get to zero, literally zero, no-load consumption.

And so Mr. Bohannon looked at this patent, he looked at the technology, and said that the LinkZero AX is particularly energy efficient due to the use of this PI patent as well as on/off control, not from allegedly using Opticurrent's patent.

And, again, if you look at the block diagram from the data sheet for LinkZero AX, four terminals, not three.  Upper left, highlighted in yellow, again, that's the pin that connects to the power supply capacitor.

You can see it's separate from feedback.  Same story as all the other accused products, and doesn't infringe for the same reasons.

And so we will be asking you at the end of the case to make this decision on infringement and that PI doesn't infringe Mr. Congdon's patent.  And because PI doesn't infringe Mr. Congdon's patent, there are no damages owed.

PI, as I said at the outset -- and I'll finish with this -- PI respects intellectual property.  PI has a lot of its own intellectual property and believes strongly in it.

But if you don't use someone's property, you don't pay them.  If you don't trespass on somebody's land, you're not in trouble.  You don't owe them anything.

And so PI isn't going to talk about damages.  We're going to talk to you about why we don't infringe.

Thank you.

THE COURT:  All right.  Thank you, Mr. Scherkenbach.

Plaintiff may call its first witness.

MR. SUDER:  Thank you, Your Honor.  At this time we would call Dr. Regan Zane to the stand.

THE COURT:  All right.

THE CLERK:  Please approach the witness stand.

Please raise your right hand.

**REGAN ZANE**,

called as a witness for the Plaintiff, having been duly sworn, testified as follows:

THE CLERK:  Please have a seat.

State your full name and spell your last name for the record.

THE WITNESS:  My full name is Regan Andrew Zane.  And my last name is Zane, Z-a-n-e.

THE COURT:  All right.  Thank you, Dr. Zane.

You may proceed, Mr. Suder.

MR. SUDER:  Thank you, Your Honor.  May it please the court.

**DIRECT EXAMINATION**

BY MR. SUDER:

Q.  Dr. Zane, would you please state your full name for the record.

A.  My full name is Regan Andrew Zane.

Q.  Yes, Dr. Zane.  And if you can, can you tell the jury a little about yourself?

Where'd you go to school?

A.  I went to school at the University of Colorado at Boulder. It's actually where I got all three of my degrees; the bachelor's degree, the master's degree, and my Ph.D.

Q.   Can you speak a little louder, please.  You can bring the mic a little bit closer to you so everyone can hear you.

What was your undergraduate degree in, sir?

A.   All three of my degrees were in electrical engineering, my bachelor's, master's, and Ph.D.

Q.   Did you have a focus in your degrees?

A.   I did.  Of course, as you go further along, you have more of a focus and an emphasis.  My bachelor's degree, this was in electrical engineering, and at the time I did work in laboratories in power electronics.  But my master's degree and my Ph.D. were specifically in the field of power electronics.

Q.   What is power electronics?

A.   Well, it's been kind of fun to listen.  I think you've heard a lot about power electronics already.  It's a field that I'm passionate about and I've worked in for many years.

Power electronics is all about making power supplies better, as you've heard already, making power supplies more efficient, making them smaller, making them cheaper.  This is the field that I work in.

And as you've heard already, power supply, it's a complex circuit.  It's a circuit that sits between a power source and delivers power to a load.

And there's, of course, now power in so many things today.  You've already heard some good examples of that.  So power supplies, power electronics, this is about the industries that

you've seen from your cell phones, to your laptops, to your computers, to ships, to satellites, to aircraft.  So we do work in a wide range of fields tied to power supplies.

Q.   And did you have to write a dissertation for your Ph.D.?

A.   That was more of an opportunity than a have-to.  But, yes.

Q.   What was it in?

A.   Kidding.

So my Ph.D., as I mentioned, was in power electronics. And, specifically, the work that I did in my Ph.D. was looking at, as we've talked about already, the idea of taking power from the AC wall outlet and delivering DC power to a load.

In my Ph.D., I worked on an integrated circuit, a power-integrated circuit, and it was developing a new way of controlling, you know, a transistor switch and a switch mode power supply so we could get better power quality.  This is improving the quality of the power we draw from the -- from the wall.  That was the topic of my Ph.D.

Q.   How were your grades in school?

Brag on you a bit.  What was your GPA?

A.   My GPA was a 4.0 through college.

Q.   Both in undergrad and master's?

A.   My undergrad degree, my master's degree, and my Ph.D., I had a 4-point through.  Completed my Ph.D. in 1999.

Q.   And after your Ph.D., where'd you go to work?

A.   So since my Ph.D., I've worked with three institutions.

First I worked with General Electric, GE.  I worked at their corporate research and development center.  This was in upstate New York, Niskayuna, New York.

I worked -- while I was at GE, I worked with multiple GE businesses, working on power electronics, power supply design.

I've also worked as a professor at different levels at the University of Colorado and Utah State University.

Q.   And where are you currently employed today?

A.   I'm currently employed as a full professor at Utah State University.

Q.   Do you have a title or position that you're called at Utah State?

A.   I do.  I have an endowed position at Utah State University.  It's called a Sant, S-A-N-T, Endowment.  This means I have an endowment that helps support some of the research work I do and also supports some of the direct interaction I have with the students.

Q.   Have you taught power electronics to future engineers?

A.   I have.  I've been teaching the entire time I've been working as a professor both at the University of Colorado and at Utah State University.

Q.   Have you taught some of the concepts that we're going to be going over with the jury today?

A.   I've taught courses, you know, elementary courses in power electronics to early undergraduate students all the way through

early graduate students and advanced courses in power electronics to graduate students.

And these topics are certainly relevant to some of the topics that we are covering here today.  I've taught hundreds of students across dozens of courses.

Q.   Have you taught courses on integrated circuit design?

A.   I have.  Much of the research work that I have done is related to a combination of integrated circuit design and power electronics.  And I teach courses in both of those areas for my students.

Q.   Have you written any books, sir?

A.   I have.  I'm a coauthor on one book that's used as a reference guide, and there's a textbook.  It's titled "Digital Control of Switch to Mode Power Supplies."

Q.   And, Dr. Zane, does that book teach some of the concepts we'll be going over with today?

A.   That book is certainly relevant to power electronics.  It teaches, of course, a number of topics that go well beyond what we're covering here in these discussions, but it covers some of the basics of power electronics.

Q.   For example, do you teach your students how to use a capacitor in power design electronics?

A.   A capacitor is a common element used in power supplies. So we'll talk about conductors, capacitors, how they store energy.  But certainly capacitors are a key element in power

supplies.

**Q.** Sir, have you written any papers? Been published in any journals?

**A.** I have. I've published papers in both conference proceedings as well as journals. Both of these are what we call peer-reviewed, meaning you send these papers out, your peers review them and give you feedback and then make a decision as to whether this is new, publishable material or not.

At this point I've published over 175 conference or journal publications in the field.

**Q.** Have you published any papers on transistor switches and AC/DC power converters?

**A.** That's a mouthful. But, certainly, I've published papers in the area of power electronics, using integrated circuits, using switches as part of those power supplies.

I've done some work specifically in what we call gate drives, where the -- the drive circuit that's driving these transistors in a power supply.

**Q.** Sir, are you the named inventor on any patents?

**A.** I'm the named inventor on 17 patents currently. And I have multiple patents pending.

**Q.** Do they relate to the issue of power supply?

**A.** They do. All the work that I've done, both publications and the patents, are all in and around power electronics and

power supply design.

Q.   Sir, do you have any research interests?

A.   I do.

Q.   Can you tell the jury a little bit about them?

A.   Over my career I've had a wide range of research topics.

My interest is in power electronics and design of power

supplies and controls.  But I've worked on different

applications, you know, from energy-efficient lighting systems,

like LED lights and compact fluorescent lights, all the way to

power supplies for your cell phone, for your laptop.

My passion these days is largely around electrification.

Electrification of electric vehicles, aircraft, ships.  This is

an area that I do a significant amount of work in today.

Q.   Have you done any work and founded any organizations

relating to that topic?

A.   At Utah State University -- one of the reasons I went to

Utah State is I was recruited specifically to develop a

research center in and around electrification.  We call it the

Sustainable Electrified Transportation Center, or SELECT.

At that center we do a wide range of research in and

around the barriers to adoption, for example, of electric

vehicles.

Q.   Does it have a test track associated with it?

A.   We have great facilities.  That's one of the reasons I

moved to Utah State, was to develop and build out these

facilities.

We have a quarter-mile test track that goes around the facility.  We have an area where we can do retrofit of the various power supply components for electric vehicle.  And we evaluate these concepts at that facility.

Q.  And does your job involve travel related to these topics?

A.  I do travel, more than I would like sometimes.  I travel on the order of two times per month, two to three times per month.  I give courses.  I give lectures at -- invited lectures to conferences.  I've gone to universities internationally, to give short courses on power supply and electric vehicles.

I also work with many companies.  I have multiple projects, and I travel to review those projects with industry.

Q.  Now, Dr. Zane, what were you retained to do here in this case?  What was your charge?  No pun intended.

A.  I was retained in this case -- I was retained in this case to look at the technology at hand, the concept of a three-terminal transistor switch as well as the background and placement of that technology, you know, in the power supply industry and, more specifically, to look at the infringement considerations on the accused products.

Q.  And, sir, are you charging for your time here and your work in this case?

A.  I do.  I'm paid hourly for my time on this case.

Q.  How much are you paid?

**A.**   I'm paid $290 per hour.

**Q.**   Do you have any financial interest in the outcome of this case?

**A.**   I have no financial interest in the outcome of this case.

**Q.**   Okay.  Sir, have you served as an expert witness on areas where you are skilled in that field?

**A.**   I have.  I have.

I've served as an expert witness before on the order of ten cases through my career.

**Q.**   Now, sir, do you have an opinion as to whether Power Integrations infringes claim 1 of the '623 patent?

**A.**   Based on my analysis, it is my opinion that Power Integrations infringes claim 1 of the '623 patent for the four products that I've gone through the analysis.

**Q.**   Did you do both a literal and Doctrine of Equivalents analysis?

**A.**   I did.

**Q.**   Is your opinion the same for both?

**A.**   It is.

**Q.**   Now, Dr. Zane, before we get into the bases for your opinion, I would like to discuss with you and explain to the jury -- I've spoken about it, Mr. Scherkenbach has spoken about it, but you're the expert, you're the witness.  I'd like to discuss with you the general background of the technology that's the subject of the patent here relating to power supply.

So you told us what is power electronics, yes?

A.   Yes.

Q.   And why it's important.

What are everyday examples of devices needing power?

A.   I think we've given a few examples of those already. Everything from medical devices, hearing aids, to your cell phones, to your laptops.  Then, of course, to larger items like electric vehicles, aircraft.

Q.   Televisions?  Washing machines?

A.   Televisions, refrigerators, washing machines.  It's -- one reason our students are excited about this field is they're quite certain they will have jobs.  There's power in most things these days.

Q.   Now, Dr. Zane, would you explain the concept of AC, and what AC is, and how that is important, and how it relates to the use of DC in our everyday life?

A.   Sure.  I think we can be fairly brief on this.  We've heard some actually fairly good highlights of that in the opening statements.

AC distribution is something we're probably all generally familiar with.  We've been using AC, what we call 60 hertz, meaning it cycles 60 times per second, but we've been using this alternating current, AC, distribution in the United States for over a hundred years.  This dates back to Thomas Edison and Nikola Tesla and the war of currents.

Nikola Tesla was able to win that war with AC distribution in the U.S. because, simply, AC was easier to distribute.  And it turns out, because of that, it didn't require complex circuitry and power supplies.  You could distribute this very simply with devices that were available a hundred years ago.

And that worked for decades.  We had loads that would connect directly to the AC utility, such as the lights and fans and motors.  But now, with our modern loads that we've been looking at and talking about here today --

**Q.** Let me stop you.  What is a load?

**A.** Devices that would pull power from the utility.  So something to do a useful function like lighting, like moving, like our electronics.  So a load is something that will pull the energy from the grid.

And with our modern loads that we've been talking about, your electronics, your cell phone, et cetera, as has been already mentioned, these loads don't operate directly off that AC utility.

These now require power supplies, which interface between, for example, the AC utility and these new modern loads.  And so what we need then is a power supply to interface between those two.

For example, as you'd asked, many of these loads require what we call DC, meaning it doesn't alternate over time.  It's essentially constant.  And so a lower voltage DC is what many

of our loads require.

Q.   And is it the trick to get how to convert high-voltage AC to low-voltage D.C. to use in a particular product?

A.   If I understand the question properly, the question is what's the trick or is it a trick to --

Q.   Okay.  What is the trick of getting -- what comes out of your plug is high-voltage AC, yes?

A.   That's correct, yes.

Q.   And our little device would be a low-voltage DC.  So, as a trick, how do you get from that high-voltage AC to my low-voltage phone charger?

A.   So the trick is what we've already heard about in the number of cases here, a number of discussions, and that is the power supply.

So now you can't just connect directly to the AC the way, for decades, loads did, but, instead, we now have this complex circuit that sits between the AC utility and that DC load.

And it's not that much of a trick.  It's actually relatively simple, but it does require a number of components and controls as has been described.  The components we use are things we call conductors and capacitors and switches.  And this makes up what we call a switched mode power supply.

But the basic idea really is fairly simple.  The basic idea is we have this somewhat undesirable source, the 60 hertz AC utility, and we need to convert that now to a DC output.

The way we do it with a switched mode power supply is we break this up into pieces and we take little bits of energy from the input, we store that energy in an inductor or a capacitor, and then we transfer that energy to the output. That allows us to separate ourselves from this less desirable input source to regulating a nice DC output for the load.

So what happens then is we take the inductor and the capacitor, and these act much like buckets. You know, we take a little bit of energy from the input and put it in the bucket, then we transfer it now to the output, but we do so carefully so that we can control that output to be relatively constant, to be a constant voltage.

This transfer now is a function of, you know, how do we transfer between these two? We have inductors, we have capacitors. We're storing energy in magnetic fields and electric fields instead of a bucket, you know, for example, with water, but same principle.

The other thing that's fairly easy here to understand is, why do we switch and why do we switch fairly fast? Well, what's happening here, for example, if you take that bucket analogy, we're taking a little bit of energy from the input, putting it in the bucket, and then transferring it to the output.

Well, the faster you do this and the more often you do it, the smaller that bucket can be to transfer the same amount of

water, for example, in total.

So we do the same thing in power electronics with a switched mode power supply, but with conductors --

(Reporter interruption.)

**THE WITNESS:**  My students complain about the same thing.

**BY MR. SUDER:**

**Q.**   Doctor, they have to take down everything we say.  I think we're following, but if you can talk a little slower so the court reporter can get everything down.  I'm practicing, myself, because I tend to talk fast too.  So if we do that, then the Court will appreciate it.

**A.**   I do my very best.

So the concept there is quite similar.  And, now, as we do this very quickly, transferring the energy in these buckets or packets from input to output, if we do that more quickly, it allows that bucket to be smaller.

Same principle for the inductors and the capacitors.  The faster we do it, the smaller they can be.  And that really is the essence of this field of switched mode power supplies and power electronics.

It's taking inductors, capacitors, and switches, because that's what allows us to switch between these states of pulling energy from the input and putting it to the output, and we do this very fast.  Not 60 times per second, but we do it

thousands of times a second or even tens of thousands of times per second.

Q.   Is the process of going back and forth what's slowing the flow or controlling the flow with that high voltage to a usable -- like we saw on the slide, the fire hydrant with the sprinkler, with the water fountain, is it that same basic concept?

A.   The basic concept is that we control now through the switching and through the inductor and the capacitor how power flows between the input and the output.

THE COURT:  You know what, one thing -- you've been using the term "AC" and "DC."  I don't think anybody's defined it for the benefit of the Court and the jury.

BY MR. SUDER:

Q.   Yes.  What is -- other than the rock band, what is AC and what is DC?

A.   So AC, by the term, the acronym, is alternating current. But in more physical terms, AC means the voltage that's being distributed actually -- you know, actually varies with time.

And not only does it vary, it's positive for a portion of what we call a cycle, or the period, so it's positive for a portion, and then it's negative for a portion.

So AC is actually both positive and negative, and it keeps alternating -- positive, negative, positive, negative -- 60 times per second for a 60-hertz AC.  So alternating current, or

AC power, is a voltage that is positive and negative in the way I just described.

THE COURT:  What does it mean to be positive and negative?

THE WITNESS:  So to be positive and negative, what this really means is that -- you know, voltage is kind of like, you know, potential energy.  So, you know, the higher that we stand, the more energy you have, you know, standing up the stairs.  So as you climb stairs, you're building up, you know, some height.

Voltage is kind of like that height.  So as we -- if we call earth or the ground we're standing on zero, the higher we go, the higher that voltage.  And the higher that voltage is, you know, the more unsafe it is, but also the easier it is to transfer high power because it's relatively high voltage.

And negative voltage would be relative to this earth.  The zero on the ground, negative would mean we're actually going down, you know, below that earth reference point or that ground point.

So negative means you're going down below that level.  Positive means you're coming up above that level.  In both cases, you know, very high positive voltage could be a dangerous voltage to work with.  A very high negative voltage also means that could be a dangerous voltage to work with.

But whether it's positive or negative, that's all

referenced to, typically, earth, as an example.

THE COURT:  So what's DC?

THE WITNESS:  So direct current, or DC, means that we don't have these excursions, positive and negative.  Typically, DC would be either always positive or always negative.

And, also, with DC, you know, we talked about converting from the alternating current to AC and outputting just to DC voltage, that would mean that not only is it, for example, always positive, but it's also essentially constant.

You know, the desire of the DC voltage would be that it hold this constant voltage level.

If you look at the back of your cell phone or the back of your laptop, typically, it would designate -- it would tell you what is the DC voltage that it's expanding.  You know, 5 volts, 10 volts, et cetera.  That's telling you what is the DC voltage level that it can withstand.

Anything higher would damage it.  Anything lower would likely not allow it to operate.

BY MR. SUDER:

Q.  Doctor, when you say "constant," is that exactly the same?  No fluctuation, is that what you're talking about?

A.  So DC and having an output of a power supply that is DC, I say constant, because the goal is to have this to be a constant voltage.  Of course, it's not physically possible to have a perfectly constant voltage, you know, just like it's not

possible to drive at a perfectly constant speed.

You'll have some variation, but the point is to have that 5.6 volts that your cell phone required.  You will have some small variation around that.  And any power supply will designate what the variation is for that power supply, whether it's 1 percent or 2 percent or 5 percent.  But these would all be a constant voltage.

Q.   Dr. Zane, before cell phones and computers, how big were these power conversion devices?

A.   If we take one step back to just the 60 hertz distribution, as I mentioned, you know, the ease of working with the AC distribution that we have in the United States, the primary ease of that is you didn't need these power supplies to -- these complex circuits to make the conversion.

Turns out, for example, if you want to take an AC voltage and increase the voltage, or if you want to decrease the voltage, in either case you could use what's called a transformer.

And I think we've probably all seen transformers.  These are the big round objects you see up on the poles or they're in a cabinet you see on the front of your house.  These transformers, for example, take distribution voltage.  These would be in thousands of volts, and they convert it to the 120-volt signal that you get at the outlet in your home.

These transformers are big devices.  You've seen them,

they sit in the cabinet out front.  That's because they're operating at the 60 hertz, 60 times per second, relatively low frequency.

But they're very simple.  It's just an iron core, iron out of the ground, and just a bunch of wire wrapped around that core.  That's what you can do with AC.  That's how, typically, we would do power conversion, stepping voltage up and down with AC.

Now, with modern loads, we want to generate DC.  These are quite different.  We really can't have this big transformer in our cell phone.  That's, as I mentioned, why we look at switched mode power supplies, where we switch much, much, much faster.  That allows us to shrink this thing down significantly.

Q.  Now, as technology has advanced, is it the goal to get these conversion things smaller and smaller?

A.  Sure.  We all like things smaller.  We like them cheaper.  That's where this goes.  But what really drove that is the electronics explosion or revolution, essentially.

So in the '90s and into the 2000s, accelerating more today, there are more and more devices that -- where we would like to apply power and have electronic circuitry embedded in them.  But as these number of applications grow, there's also a need to make these things cheaper, simpler, smaller.  That way they can be integrated into your clothing, your phones,

et cetera. But to do so definitely requires further advancement.

Q. Now, Dr. Zane, you used a term I just want to make sure we all understand. You said "switched mode power supply."

Can you take us through exactly what you mean by that?

What is a switched mode power supply as it relates to the technology in the patent that we're going to be talking about?

A. A switched mode power supply is really just a term in the art. Kind of a strange term that we've chosen. But the term "switched mode power supply" simply means what I was describing earlier, that we have modes, and we're switching between those modes inside the power supply.

And this, for example, is switching between the mode of extracting energy from the source and then we switch to the mode of transferring that energy to the load. This is accomplished using a switch.

Typically, we use what we call a transistor switch. A transistor is what we call a semiconductor device, but it's made on a chip. It has output terminals. We'll talk a lot more about terminals here shortly.

But the transistor switch has a control terminal, allows you to turn that switch on and off. And it is able to switch now, for example, the location or the position of these inductors and capacitors to accomplish the goal of transferring the energy.

**Q.**    Do you know what MOSFET, M-O-S-F-E-T?  Is that an acronym?

**A.**    As with most fields, we bury ourselves in acronyms.

So, yes, a MOSFET is a type of transistor.  And, in fact, the T in MOSFET is transistor.  So it's a metal oxide semiconductor, and that's the MOS.  And then field effect transistor.  Or MOSFET.

In short, we simply call it a MOSFET, but this is a particular type of transistor integrated into a semiconductor device.  Again, the basic idea, it could be operated as a switch by controlling the input.

It's a terminal we call a gate terminal at the input of that transistor, but this is the control terminal.  If you deliver energy into that gate, it can turn on the device.  Then if you extract the energy out of that gate, it'll turn off the device.

**Q.**    So the MOSFET is what's turning it on and off thousands of times per second?

**A.**    In a switched mode power supply, the MOSFET is a very common transistor to use.  And when a MOSFET is used as the switch in a switched mode power supply, it is that MOSFET and the control of the MOSFET that's causing the fast switching between the modes.

And, yes, as I mentioned, this occurs tens of thousands of times per second.

**Q.**    Dr. Zane, does the switched mode power supply need power

to work?

A.    Well, as you've already heard as well from the opening remarks, this is an interesting aspect.  Really, what we're doing is we're breaking the problem down into pieces.  We've started with the big piece of the problem.

We're connecting to the outlet on the AC, and we need to generate DC at the output.  That's our primary power supply, AC input with the DC at the output.  And this includes conductors, capacitors, and transistors.  That's our main power supply.

And now if we break this down into the next stage, it turns out that the power supply needs a power supply, which seems kinds of strange, but it's true.

And I think it was a good description in the opening remark that this really makes sense.  The transistor that's inside of a switched mode power supply has a control terminal.  And that control input, the gate terminal of the transistor requires energy to be turned on and off.

And as you add more smarts, or more control functionality, to how and when you're going to turn that transistor on and off, all of that circuitry requires power.

So the main power supply, AC to DC, has a transistor.  That transistor and the circuit that drives the transistor requires a power supply.  And that would be an additional power supply.

Q.    And where does the switched mode power supply, how does it

get its power?

A.   So as you can imagine, when you have, you know, a charger for your cell phone that plugs into the wall and then plugs into your cell phone to charge it, that box, as was shown earlier, is the power supply.

Inside of that is the switched mode power supply.  As you can see, there's one input to the outlet and one out.  All of the power --

Q.   An input is what you plug in, the output is what you take from your cord and plug into your phone; so the input, output is that what you're saying?

A.   That's what I'm saying is, the input is the power we pull from the utility and the plug in.  The output is what's used, for example, to charge your phone.

The switched mode power supply is processing that power from the AC input to the DC output.  The control circuit that drives the switch or the transistor in that switched mode power supply needs a regulated supply to it -- let's say five volts, for example -- so it can turn the transistor on and off.

Q.   Dr. Zane, when I plug my charger into the wall, it's drawing AC; correct?

A.   That is correct.

Q.   And when I plug it into my phone, what it's giving the phone is DC?

A.   That is correct also.

Q.   So to get this -- you were talking about how to supply the power to start up the switch.  I think that's where we left off.  And how, traditionally, was that accomplished?

A.   Well, the traditional approach is we have a circuit that's going to be used to drive the transistor.  That circuit needs power, so there would be an additional set of circuitry, which is the power supply for the control circuit.

That additional circuitry could make up, additionally, inductors, transistors or diodes, resistors, but these are all circuit elements that would be part of that power supply that delivers the 5 volts, for example, to operate the control circuit that drives the transistors.

So you have the main power supply, AC to DC, to charge your phone.  That power supply has a control circuit and a drive circuit for its transistor.  That has another set of circuitry that would be termed the power supply for the control circuit.

Q.   So is the inductor and capacitor, are those output terminals that are generating you going back and forth and turning on when the switch tells it to go on and off?  How would you characterize those?

I'm sorry, that's a horrible question.  Let me start over.

THE COURT:  I don't understand that question.

MR. SUDER:  I don't either, Judge.  I apologize.  I'm sorry.

**BY MR. SUDER**

**Q.**   How -- where would the power come from to start up this MOSFET switch, traditionally?

There's talk of three terminals and four terminals by the lawyers in opening statements.   Well, let me back up.

What is a terminal in the context of what we're talking about?

**A.**   Well, so far we've been talking in fairly general terms about power supplies and circuits that are part of those power supplies.   "Terminal" is a general term that I think we would all understand in different examples.

I think when we get into the details of what is a terminal and how is that construed for the claim language for this patent, we really should move on to the claim language and talk about that in that context.

**Q.**   Let me ask you this, Dr. Zane.   How many terminals do you need to operate the transistor switch that you're just explaining?

**A.**   So if we break our way down to the transistor switch, how many connection points are there on that transistor switch -- they could be, in the general sense, considered terminals -- the transistor switch has three terminals.   Has its output terminals, where it acts as a switch, and then it has a control terminal that controls whether it's open or off or whether it's closed.

**Q.**   So you have three terminals that are working in conjunction with the switch, two to turn on and off, and one to tell it to turn on and off.  Is that a fair statement?

**A.**   There are three terminals associated with that switch.

**Q.**   And, traditionally, would you need a fourth terminal to get the power to power up the switch?

**A.**   The transistor itself -- probably this has already been made clear, and I apologize for elaborating, but the transistor is what we call an inverting device.  Of the three terminals we just talked about, when we want to turn the transistor on, we have to apply a signal to its gate.  I think that probably is clear.

So we apply a signal to its gate.  That requires some energy to turn the device on.  Once the device is turned on, that means that it's turned on and it's like the switch is closed.  When that switch is closed, it has essentially a zero at the output.

So when we apply the signal, we're applying, let's say, 5 volts, we're applying a voltage to the input, we actually get zero at the output because the switch turns on.  It requires some energy or some power to apply to that gate to force it to turn on.

I believe the question was, when you're operating this transistor do we need a power supply or what's now been called a fourth terminal to operate that.

Well, the circuit that drives the transistor that runs this control pin tells it to turn on and turn off.  That circuit needs some way of generating that 5 volts to turn that transistor on.

That energy has to come from somewhere, so the traditional approach is that that circuit has a power supply terminal.  That's where it gets its power.  So in this context this idea of a fourth terminal is the supply for that drive circuit.

Q.   How far back did that four-terminal power supply -- when did that start to be in the evolution of power electronics?

A.   Well, one thing that I think may be worth commenting is this whole concept of terminals and using the -- the framework of terminals as the need or not need for a power supply is actually somewhat unusual.  But we'll talk that through as we work through the case here.

But the concept of having a power supply, a switched mode power supply, and the need for the control circuit to have its own power supply, a fourth terminal to power that supply, of course, dates back to when power supplies were used.

This is in the '70s, '80s is really when power supplies became more prevalent.

Q.   What happened in the '90s and early 2000s in this area?

A.   As I think we mentioned earlier, in the '90s, 2000s and certainly continuing into today, there's been an explosion in the need for electronic devices -- or the use of electronic

devices, I should say.  And that, of course, drives a similar explosion in the need for power supplies.

Q.   Was there a need to make them less expensive and smaller?

A.   The more the power supplies are being used in a broader range of products, particularly, you know, relatively low-cost products, there's certainly a need to drive out costs, make them simpler, more cost effective, and smaller.

Q.   And if you remove certain circuits within it, that would make it less costly?

A.   The cost of a product is, you know, the combination of the cost of all of its components.  And, as we mentioned, power supplies can be complex.  They have many components in them.

The fewer the components, typically, the more cost effective that product may and be and/or the smaller it may be.

Q.   What was one of the ways to make this switch smaller, cheaper, and more efficient in the '90s?

Could you eliminate -- there was some talk about eliminating the fourth terminal power supply?

A.   So there are multiple ways to cost out and to make things smaller.  You know, operating at higher frequencies, meaning switching more quickly, is one way that we talked about to shrink the size of a switched mode power supply.

One thing that we'll talk significantly about, specific to this case, is this question of do we need an additional power supply to operate the control circuit driving the transistor

switch?

**Q.**   Do you know what a three-terminal transistor switch is, sir?

**A.**   I do.   And this is really a term specific to -- you know, that's used in this case.

**Q.**   Dr. Zane, does a three-terminal transistor switch need that fourth terminal to get its power to start up this switch?

**MR. WARREN:**   Objection, Your Honor.   Leading.

**THE COURT:**   Sustained.

**BY MR. SUDER**

**Q.**   In a three-terminal switch, Dr. Zane, where does the power come from if you do not have a fourth terminal power supply?

**A.**   The reason I've hesitated some on these questions is I do think it's important to separate ourselves some from terminals and the function of those terminals.   What's the purpose of those terminals?

A transistor, as I just mentioned, has three nodes, three terminals.   Its two outputs and its -- and its gate terminal. At the very least, you have to control that gate and you have the two output terminals.

The context here, in the general sense of terminals, how many terminals do you need, well, we need the basic functionality.   We need the output terminals to have the switch be on or off, and we need a control terminal.   We also need some way of powering the control circuitry.

I apologize for working my way around this, but one reason I've hesitated answering the question is, to fully understand the question, the -- the need for a terminal to supply power to the transistor switch is the conventional approach for doing this, as I mentioned previously.  That would typically have been done with an additional terminal, a fourth terminal.

A three-terminal transistor switch that doesn't have a terminal supplying power from an external supply has to find that -- a way to get that power in some other way.

Q.   And that's my question.  How does a three-terminal switch get its power when it no longer has a fourth terminal power supply?  Where is that power coming from?

A.   Okay.  So in this case we're a little more specific because now we're saying that none of -- we haven't added an additional terminal to provide power to control that transistor switch.

For a three-terminal transistor switch that does not have the additional power supply connected to a fourth terminal, it must derive its power from something that it has access to internally.

And in this case, if you look at it, you know, the control terminal, obviously this is not where we're getting power.  But the two output terminals, where the transistor switch is either on or off -- when the transistor is off, the external circuit, which is the switch mode power supply, that main power supply

we talked about, when the transistor is off, that external circuit forces the voltage to go high.

In fact, it suddenly runs quite high, and it'll be a relatively high voltage, high on the level of the peak voltage that comes out of the AC line.

When that voltage is high, it's possible -- and that's what's done in the three-terminal noninverting transistor switch --

(Reporter interrupts.)

A.   Noninverting transistor switch.

When the output terminals of the transistor are -- when the transistor is off, the voltage goes high.

Now, you can imagine, well, okay, so there is voltage there, it's probably possible to pull power from it.

And that's what's being done.  We're actually saying, okay, when that voltage runs high, we'll tap off of it, and that will be used to generate the power to run the control circuit instead of requiring a fourth terminal where we are powering the control circuit from that fourth terminal.

So bottom line is we pull the power directly from the output terminals from that transistor, called the drain terminal of the transistor.

Q.   Now, Dr. Zane, in your book are some exhibits.

Would you look at Exhibit 1, please, which I believe is Mr. Congdon's '323 patent.

Do you have that in front of you?

**A.**   I do you, yes.

**MR. SUDER:**   Your Honor, we would offer Exhibit 1 into evidence.

**THE COURT:**   No objection?

**MR. SCHERKENBACH:**   No objection, Your Honor.

**THE COURT:**   All right.   Exhibit 1 is admitted into evidence.

(Trial Exhibit 1 received in evidence.)

**BY MR. SUDER:**

**Q.**   Dr. Zane, is this Mr. Congdon's patent that deals with the concept you were just talking about?

**A.**   I apologize.   If you can repeat the question.

**Q.**   Does this patent relate to the issue of going from a four-terminal switch down to a three-terminal switch?

**A.**   This '323 patent, which you will see further as we go on -- the '323 patent is talking specifically about this concept that I was describing:   Can we avoid having a separate power supply for the control circuit and, instead, derive the power right off of those drain terminals?

Recognize this isn't the best place to pull power from, it's not the easiest thing to do, because when that transistor is on, that voltage collapses to zero.   And then when the transistor turns back off, the voltage jumps back up, let's say, to 100 volts.

That voltage is -- switches up and down.  So it's not something that we may like to pull power from, but we do have this advantage.  If, when the voltage is high, we tap off of that voltage and use it to power the drive or control circuit, that eliminates the need for having the additional power supply, this additional fourth terminal.  That's presented in the '323.

Q.    Did that solution, while solve the ability of having less circuits, did it create a different problem?

A.    The solution that was used in the '323 patent derived the power by tapping it off of that high voltage, as was mentioned.  But in doing so, it used a circuit that actually creates a current path from that high voltage down through the ground and back into the second terminal, you know, out to the output.

The solution in the '323 has this drawback.  There's a current path through that section, and because of that current path, it has what's being called now leakage current.  It leaks current from that high voltage when it's present.  That was a drawback.

Q.    What is "leakage current"?

A.    Leakage current, put simply, is an undesirable current that leaks from -- from the system.

So in this case when that voltage is high at the output terminals, leaking current off of that voltage means that we're pulling power from it.  And leakage typically refers to

undesirable pull of current from that node.

So in this case the leakage current has no useful function.  It is only leaking.  And in this case it goes all to heat, it's just power dissipation in the component.

Q.   When my set top box on my TV is hot, is that pulling current?

A.   Undesirable use of the power in general would be considered leakage current.

Your cable box is one example, one of the more famous examples because they've been quite poor.  When it's hot, that means it's continuing to run even when you're not running the TV or not using that device.  A portion of that heat would be due to the leakage of those devices.

Q.   When your phone charger is plugged into the wall or your nightstand when you're at work, is it drawing current?

A.   All circuits, when they are powered or they're connected, if they have voltage across them, they will draw some current. How much current depends on how much leakage they have in them.

Q.   During the 1990s, were there any government initiatives to control consumption -- unneeded consumption of current?

A.   Some of these have been brought up already.  The -- the more devices there are, the more things that are plugged in, the more important it becomes to limit how much leakage there is.

The Energy Star program is one example of a program that

the government has run to try to crack down on how many devices are operating and leaking and pulling power when they really should be off.

Energy Star is one example.  That includes both energy efficiency, which has been mentioned.  Energy efficiency associates how efficiently we're transferring power when we're actually transferring power from input to output.

But there's also consideration for, when things are off, how much power is pulled in those cases.

Q.   Dr. Zane, let me ask you to look in your binder at Exhibit 4, which is the '623 patent.

MR. SUDER:  And, Your Honor, it's in the binders that each of the jurors has one copy.

THE COURT:  All right.

MR. SUDER:  We would offer Exhibit 4 into evidence at this time.

THE COURT:  Any objection?

MR. WARREN:  No objection, Your Honor.

THE COURT:  All right.  Exhibit 4 is admitted.

(Trial Exhibit 4 received in evidence.)

BY MR. SUDER:

Q.   Dr. Zane, what is the relationship between Exhibit 4, Mr. Congdon's '623 patent, and his earlier '323 patent?

A.   The '623 patent is a later patent by the same inventor. The '623 patent specifically refers to the '323, includes a

figure from the '323 as what we call prior art, a previous example in the '623. And then it goes on with an improvement on the previous work.

So the '623 patent is an extension of or an improvement on the '323. It's also specifically focused on what is being called a three terminal transistor switch.

Again, it's focused on this concept of deriving the power from those output terminals and not requiring the additional connection to a power supply for that control circuit.

In this case there's a modification applied in the '623 which allows it to avoid the problem I mentioned earlier, not having that leakage path through the device.

Q. Now, looking at the first page of Exhibit 4, do you see -- it's right here. What is the title of this patent?

A. The patent is titled "A Three Terminal Noninverting Transistor Switch," as you can see here on the first page of the patent.

Q. Is Mr. Congdon listed as the inventor?

A. That is correct.

Q. And the date of the patent -- the number right there is '623. And what is the date of the patent?

A. The date that the patent issued --

Q. Yes.

A. The date that the patent issued is in the upper right-hand side. This is October 25th, 2005.

**Q.**   Now, Dr. Zane, if you go past the figures and you go to column 1 of the patent, do you see that?

**A.**   I do, yes.

**Q.**   And it says "Three terminal noninverting transistor switch."  And it says "Background of the invention."  Do you see that, sir?

**A.**   I do, yes.

**Q.**   And if you go -- it says, "The present invention relates generally to transistor switches and, more importantly, to a three terminal noninverting transistor switch."

Is that what we're talking about here?

**A.**   Yes, that is.

**Q.**   And in a three terminal noninverting switch, where does the switch derive its power to power up the switch?

**A.**   So as we were just describing, the language that's being used by the inventor here is referring to terminals as a way of emphasizing the purpose and the use of those terminals.

I think we'll talk about this multiple times, I hope.  In my opinion, this case has less to do with terminals than it does how those terminals are being used.

This was the inventor's language and the inventor's approach to emphasizing that he had a switch that had his three core operating terminals, and didn't require a fourth terminal connected to a power supply.

The questions --

**Q.**   Let -- oh, I'm sorry.

**A.**   I believe the question you asked was for a three terminal transistor switch.  I was just giving that background to emphasize this is what was meant by a three terminal noninverting transistor switch.  It derives its power from those terminals, from its output terminals.

**Q.**   Now, let me show you here, beginning on line 39, there's a paragraph that I'm going to highlight.  And this is in the background section, that says about -- can you read that, please, that I just highlighted?

It's on the screen, Dr. Zane, if you can follow.

**A.**   I have no screen, but I do --

**THE COURT:**  The screen is not working.

**THE WITNESS:**  Oh.  But I do have the patent here. That's fine.

**BY MR. SUDER:**

**Q.**   I'd ask you to read the paragraph that says "Noninverting transistor switches" at line 39.  Would you read that paragraph and then explain to the jury, as someone skilled in this art, what that is telling you?

**A.**   Sure.  So the paragraph here that's highlighted reads:

"Noninverting transistor switches typically comprise at least four terminals; one terminal being connected to an input signal, another terminal being connected to a load, another terminal being connected to ground, and the

last terminal being connected to a power supply in order

to provide a second inversion for the switch."

As I've been describing, this is the inventor's language

to emphasize the purpose of these terminals, not necessarily

that these products should be limited to a certain number of

terminals.

So we've described the three primary terminals.  The two

terminals at the output of that switch we talked about; called

the second and third terminal in this language.  The first

terminal, which is a terminal that says we're going to control

the switch.  There's a control action to tell the switch when

to turn off.

And then now this paragraph is describing that,

traditionally, a noninverting transistor switch -- what they

mean by noninverting really means there's at least one control

circuit here that allows us to have, for example, a low signal

at the input, which means that we need to turn on the

transistor.

That would be a high signal at the gate of the transistor.

That means we're turning the transistor on, there's a low

signal at its output.  Noninverting means a low signal at the

input causes a low signal to happen at the output.

And the reason I believe the inventor used this language

is to emphasize, now, wait a minute, if you have zero volts at

the input, zero volts at the output, and it takes 5 volts, for

example, to keep that transistor turned on, how do you go from zero and zero to a five?  Well, you need a power supply.  You need some way of generating that 5 volts.

So what I believe is being described here in this paragraph is the traditional solution for a noninverting three terminal transistor switch is to have a fourth terminal that provides the power to generate that 5 volts you need inside.

Q.    When it says here on line 43, "and the last terminal being connected to a power supply in order to provide a second inversion for the switch," is that a fourth terminal that's providing the power for the other three?

A.    What this is describing is what I was emphasizing.  It's a fourth terminal providing power to this control circuit.  And the only way it could be noninverting is if we have zero at the input, zero at the output.  That requires a high signal; let's say, five volts in the middle.

This fourth terminal is what's providing the power to generate that 5 volts.  The terminal down here at the bottom to provide a second inversion is just emphasizing that it's not just the one inversion of the transistor itself, but there's a second inversion.  That's how we're able to go from a low signal on the input to a low signal on the output.

There's one inversion when we go from the input signal low to the drive of that transistor, which is high, and another inversion when you go from the drive of that transistor that's

high to a low at the output.  These are the two inversions.

**Q.**  Dr. Zane, in what's being shown here is the fourth terminal -- is the fourth terminal power supply getting its power from any of the other three terminals?

**A.**  No.  What's being described here is that the fourth terminal would be the traditional solution.  It would be getting its power from a power supply, which was described here as being connected to a power supply.

That means it's being connected to additional circuitry to derive its power from an external connection point in the broader circuit, meaning it has to pull its power from something other than what was described here as the first three terminals.

**Q.**  So, just to be clear, the fourth terminal is not getting its power from any of the other three terminals; correct?

**A.**  That is correct.  I believe that that is the -- the read and the way that a skilled person would read this paragraph, because that's really the whole -- the gist or the essence of what is being described here.

And then if we go in the -- in the next paragraph, I believe, there's a highlight of --

**Q.**  Let me ask the questions, and you just answer my questions.  That way we'll get there.  Let me ask the questions because that's how we're supposed to do this.

So let me ask you, sir, in the next paragraph, it says

"Noninverting transistor switches comprise only three terminals widely known in the art."

And then I want to ask you, the next paragraph, 55, it discloses Mr. Congdon's earlier '323 patent.

What is Mr. Congdon telling people like you about noninverting transistors, three-terminal switches in his earlier patent, in this patent?

**A.** Of course, there's quite a bit of discussion about those points. The key discussion that's happening here is -- the description here that Mr. Congdon gives highlights that the '323 patent had the disadvantage we talked about earlier. It has this leakage path.

It did derive its power from this drain terminal, but it had this additional leakage path. And there was a need or a desire to eliminate that or significantly decrease that leakage path so that there could be the advantage that's presented in the '623 patent.

**Q.** Dr. Zane, in that regard, let me show you on the top, on column 2. And I'm going to highlight it, and ask you, in column 2, if you could read --

**THE COURT:** Can you enlarge that, counsel? Zoom in.

**MR. SUDER:** I'm afraid to press the wrong button.

Oh, there it is. Thank you. I was going to work on it at lunch.

**THE COURT:** Okay.

**MR. SUDER:**  Thank you.

**BY MR. SUDER:**

**Q.**  There it is at column 2, line 13.  Can you read what I highlighted and then explain to the jury what that is telling you as one skilled in the art?

**A.**  Okay.  If I understood the question right, you'd like me to read this section that's highlighted.

**Q.**  Yes, yes.

**A.**  Okay.  So the section that's highlighted states:

"Although well-known and widely used in commerce, the three terminal noninverting transistor switch, which is described above and which is disclosed in U.S. patent number 5,134,323 to J.S. Congdon, suffers from a notable drawback.  Specifically, it has been found that, upon the application of a high input signal voltage to the first terminal, the current leakage between the third terminal and second terminal is significantly higher than zero, which is highly undesirable."

**Q.**  What is that telling you, sir, as one skilled in this area?

**A.**  It's really just reiterating what we've talked about here. You know, the prior patent had this leakage path; it's desirable to reduce that leakage.

**Q.**  Now, here, under "summary of invention" section, Mr. Congdon discloses some objects or purposes of the

invention.

Is that something that's typically done in a patent based on your experience of having patents?

**A.**   My experience is that that is true, that you highlight the summary and what's the main object of the invention.

**Q.**   And what's the first object that Mr. Congdon says?

**A.**   It's to provide a new and improved transistor switch.

**Q.**   If you go down to the fifth one that I'm highlighting --

**THE COURT:**   You have to slide it up.  Can't see it.

**MR. SUDER:**   Oh, I'm sorry.

Thank you, Your Honor.  I apologize.  This screen is not working here.

**BY MR. SUDER:**

**Q.**   What is a further object of this invention that Mr. Congdon is disclosing?

**A.**   The one that's stated here is iterating what we had just talked about.  One of those improvements would be the reduction of the leakage that would be associated with this path when that transistor is off.

**Q.**   And, lastly, the last objective that Mr. Congdon states why he thinks his patent is helpful, what does he say there, beginning on line 53?

**A.**   So I'll go ahead and read this, then we can talk.

"It is yet another object of the present invention to provide a transistor switch as described above which can

be mass produced, has a minimal number of parts, is limited in size, operates quickly, is reliable, requires a limited amount of input power and can be very easily used."

I believe this is just additional language along the lines of what we've already been discussing, that one of the objects of this invention would be to reduce the amount of circuitry required in this overall circuit.

For example, one of those would be to eliminate much of that circuitry that you would need for the power supply that would be delivered to that fourth terminal.

**MR. SUDER:**  This would be a good stopping point.

**THE COURT:**  Yeah.  We're at the noon hour, so why don't we go ahead and take our 45-minute lunch break at this point.  We'll come back at 10 minutes to 1:00 o'clock.  Thank you.

**MR. SUDER:**  Thank you, Your Honor.

**THE CLERK:**  All rise for the jury.

(Jury out at 12:03 p.m.)

**THE COURT:**  All right.  You may step down for now, Doctor.

I do want to address the objections to the proposed exhibits.

**MR. SUDER:**  Yes, Your Honor.

**THE COURT:**  And, basically, the objections to the QBAR

license.

MR. SUDER:  Yes.

MR. SCHERKENBACH:  It is.

THE COURT:  And it appears, at least from the response, that Mr. Brunell has some familiarity with it and is going to testify about how that informed his valuation of the '623, or potential value of it.

   Is that right?

MR. SUDER:  It informed his decision to make the investment, and he did.

THE COURT:  So why isn't that enough?

MR. SCHERKENBACH:  Well, the fundamental reason is, how and why Mr. Brunell valued the '623 in 2012 has nothing to do with the damages issues the jury has to decide.

   We're talking about a hypothetical negotiation -- not involving Mr. Brunell -- in 2006 involving Mr. Congdon and PI. So what Mr. Brunell has to say six years later, when he's buying the portfolio to litigate it, is completely irrelevant.

   I'll just say it's never been suggested before that that has any role in their damages theory, even their new damages theory.  So I don't -- I don't see what the relevance --

THE COURT:  Are you launching an objection generally, then, to any discussion with respect to the damages valuation of the '323 licensing to QBAR?

MR. SCHERKENBACH:  No.  We agree, again, there's a

difference between, of course, whether the document can come in and whether a witness who doesn't know anything about the document can talk about it.

I mean, we pointed you to where in his deposition he said, "I don't know who QBAR is.  I don't even know if there was a license to the '323."

If Mr. Congdon, who is being called, wants to talk about his '323 and the fact he licensed it and under what terms, perfectly fine.  Perfectly fine.  Who he licensed, what was involved, that is, I think, what was intended by the prior rulings by Judge Orrick in letting this thing in.

But having Mr. Brunell, a fact witness who knows nothing more beyond what the agreement says, to come in and say, Well, gee, let me tell you what I thought in 2012, when I was investing my money to buy the portfolio, is not relevant.

And we're just more broadly, Your Honor, worried about him using that as a launching pad to be their damages expert.

**THE COURT:**  So why isn't Mr. Congdon the proper sponsor?

**MR. SUDER:**  It's both, Your Honor.  Mr. Brunell is not being offered to say this is how I value it, this is what I did.  It's something he looked at and it informed his decision to acquire the property.

He's not going to say, I think that it's worth -- he's not offering any expert advice.

**THE COURT:** It's something he looked at in --

**MR. SUDER:** 2012.

**THE COURT:** Looked at which property?

**MR. SUDER:** To acquire the patents and to form this agreement and purchase them. It informed his decision on whether this was a data point that he considered in deciding to invest and partner with Mr. Congdon. That's factual. He's allowed to talk about that aspect.

We're not going to be offering -- what Mr. Scherkenbach says -- well, I reviewed the QBAR, and I did an analysis, and I think it's X. We're not doing that.

**THE COURT:** So he's not going to put a value on it?

**MR. SUDER:** No. He's just going to say, I looked at it; it helped inform my decision to partner and acquire the patents.

**THE COURT:** All right. If that's the limit, that's a factual historic fact.

**MR. SCHERKENBACH:** Well, first of all, I don't know how he can say that given what he actually testified to in deposition, but I guess we can impeach him on that. That would be remarkable to me.

Number two, what's it relevant to? It has no bearing on the damages issues that the jury has to decide. I mean, again, what an investor, in buying patent portfolios, thought six years later, an investor who's not a party to the

hypothetical --

THE COURT: Well, it may have some probative value because it's related. It's a predecessor patent, it has the basic technology that's then improved upon.

So long as he doesn't seek to become an expert and try to opine as to its value is one data point. Admittedly, it's not the most probative in the world. It's likely probative, but I don't -- I think it's probative enough to satisfy 402. And as long as he doesn't start opining about value, I don't see a 403 problem.

MR. SCHERKENBACH: Our primary concern was to sensitize the Court to this potential for a quasi expert sort of testimony.

THE COURT: Well, my ears are attuned to that. That's not what you're going to do. It's more historic fact.

And so I'm going to, at least preliminarily, conditionally, say okay, but I may -- if there's objection to -- on a 402, 403 ground, my ears will be trained.

MR. SCHERKENBACH: All right. Fair enough. Thank you.

THE COURT: All right. This operating agreement --

MR. SCHERKENBACH: I think that's one, Your Honor, we maybe can save you some time.

THE COURT: All right.

MR. SCHERKENBACH: They've represented that he's

really not going to talk about it substantively.  We didn't see any foundation for Mr. Brunell to talk about this 2004 agreement.

Apparently, it's just going to be -- this was among the acquisition-related documents that, you know, he saw in connection with the transaction.

THE COURT:  All right.

MR. VOWELL:  And, Your Honor, really, the key point on this document is that it contains one of the assignments in the chain of title.

The parties have stipulated to the chain of title, but the plaintiff just wants to make sure the chain of title documents are exhibits in evidence just for the record.

So he's not going to talk about the substance of the Forfend agreement.

THE COURT:  All right.  So I take it then there's not an issue if he's not going to talk about it, but it's there for chain of title purposes.

MR. SCHERKENBACH:  With that representation, agreed.

THE COURT:  All right.  And then with respect to the stipulations, I appreciate the parties reaching stipulations as to facts.

Have you thought about at what point and how we should present this to the jury?

MR. SUDER:  Your Honor, with respect to the product

families, I was going to ask the Court, would the Court like me to read it, ask the Court to recognize it, state them into the record, but the ones that relate to Dr. Zane are the last ones relating to the product family documents?  The chain of title one will be with Mr. Brunell.

**MR. SCHERKENBACH:**  And we have no objection to -- I think it's appropriate for counsel to read the ones that he thinks are relevant at the relevant time, and that's fine.  I don't think the Court should be reading them.

**THE COURT:**  That's fine.

**MR. SUDER:**  Agreed.

**THE COURT:**  So I'll leave it to you when, during the course of your case, you want to read -- in which of these you will be able to read that.

I will -- let me know you're going to do that, so I can give the jury the general instruction about stipulations, which I may already have but I can redo that and let them know that these are to be facts to be taken as facts.

**MR. SCHERKENBACH:**  Yes.

**THE COURT:**  So I'm going to put -- I'm going to leave it in your court.  Let me know.  All right.

**MR. SUDER:**  12:45?

**THE COURT:**  I told them to come back at ten to, but we should come back a couple minutes early just in case.

**MR. SCHERKENBACH:**  Thank you, Your Honor.

**MR. SUDER:**  Thank you.

(Recess taken at 12:11 a.m.)

(Proceedings resumed at 12:47 p.m.)

(The following proceedings were held in open court, outside the presence of the jury:)

**THE COURT:**  All right.  Just housekeeping question.  I have a binder of various deposition transcripts.  So am I able to use these copies instead of having to unseal the original?  There's stipulation?

**MR. HEADLEY:**  Yes, Your Honor.  Pursuant to the court's rules we provided two copies, actually, in case you needed a reference set.  I'm not sure any of the originals.

**MR. VOWELL:**  Your Honor, we have the originals with us if you would like to have them.

**THE COURT:**  If there's a stipulation that these are accurate and -- I mean --

**MR. VOWELL:**  Yes.  I think the parties are in agreement.

**THE COURT:**  Don't have to go through the drama of opening the envelope and --

**MR. HEADLEY:**  Correct, Your Honor.  The witness binders will have transcripts in them, too.  But that was just so you have the whole set in one place.  Two copies.

(The jury entering the courtroom.)

**THE COURT:**  All right.  You may be seated, everyone.

Welcome back, ladies and gentlemen.  We're going to pick up where we left off, that's direct examination of Dr. Zane.

MR. SUDER:  Thank you, Your Honor.

BY MR. SUDER:

Q.   Dr. Zane, I'd like to show you Figure 1 in the patent.  It says "prior art."  Do you see that?

A.   I do.

Q.   And I have it blown up right here.

Do you understand this to be the earlier '323 patent?

A.   I do.  This is one of the figures from the earlier patent.

Q.   Can you tell me what the numbers are -- and it should be on your screen there, sir.  What the numbers are of the three terminals we're talking about?

A.   The three terminals are the output terminal, 17 and 15.  These are the two output terminals of the transistor.

Q.   17 and 15.

A.   17 and 15.  Then the input terminal, is terminal 13, which controls the switching of that transistor.

Q.   And where is the MOSFET transistor?

A.   The transistor is transistor 23.

Q.   I'm going to put that in blue.  So that's -- that's what you understand was the three-terminal switch.  And in this switch, where is the power coming from that you're tapping into to -- so you don't need that fourth power supply?

A.   It comes from the output terminals, terminals 17 and 15.

**Q.** Okay. So you can tap into this to turn this on (indicating)?

**A.** That's how this operates. That's correct.

**Q.** Now, let me show you the next figure in the patent, which is Figure 2. What did you understand Figure 2 of the patent is?

**A.** As we discussed before, Figure 2 -- not Figure 2 specifically, but the '623 patent is an improvement on the '323. Figure 2 is a preferred embodiment of the '623.

**Q.** Okay. What is preferred embodiment? An example?

**A.** A preferred embodiment does simply mean this is an example, implementation of the invention.

**Q.** Where -- you can identify the three terminals on this Figure 2?

**A.** They're in a similar location where they were shown in the previous. So, again, we have the output terminals of the transistor, 117 and 115. And then we have the control terminal, 113.

**Q.** Right here. And where is the MOSFET? What number is that?

**A.** It's also on the same location. And this is 1-2-5, or 125.

**Q.** Right here (indicating.)

**A.** Yup.

**Q.** Okay. So that's it. So what is it -- what is it that is

different on this one that's an improvement on the --

Mr. Congdon's prior patent, the '323?

**A.**   So the '623, if we work our way from the output terminals, particularly in the upper terminal, 117, and we work around our way to the left, we have a voltage stabilizer in transistor 123, and we have that now connected in this way with a CMOS inverter.

**Q.**   Let's go -- 123 is a voltage stabilizer?

**A.**   123 is termed in the patent as a voltage stabilizer.  It's also called a voltage regulator.  This is the tap.  This is how it pulls the voltage off of the drain terminal, which is terminal 117.

**Q.**   So the drain terminal, this is where the power's coming from?

**A.**   For this -- for the three-terminal non-inverting transistor switch --

**Q.**   This path to here (indicating)?

**A.**   That's correct.  So using the voltage stabilizer, it's able to tap off of that terminal 117, wherever the voltage goes high, and it uses that to supply the voltage to the CMOS inverter.

**Q.**   Okay.  Now let me direct your attention, sir, to column 6 of the patent.  And in particular, line 42, if I can zoom this in.  Right here.  Where it says the MOSFET functions as a voltage stabilizer -- stabilizer switch.  That paragraph I'm

just highlighting.

**A.**   Yup.

**Q.**   And I'd like you to -- they're talking about this MOSFET 123 that you labeled green, correct?

**A.**   That is correct, yes.

**Q.**   What -- would you explain for the jury what that tells you that I just highlighted about the voltage stabilizer?

**A.**   This paragraph that's been highlighted is describing in a few more words the concept that I explained.  And that is, that this voltage stabilizer is the element that taps off of that drain node, supplies the voltage now to the CMOS inverter.  So you can see here it says that MOSFET 123 uses stabilizer which is dedicated primarily to supply the voltage which is passed essentially to that CMOS inverter.

It says here, passed to the third terminal 117 to the CMOS inverter.  It also says that as a result it should be noted that MOSFET 123, which we see here in Figure 2, as one example of an embodiment, or one example of an implementation.  It says here that the MOSFET 123 could be replaced by alternative types of conventional voltage stabilizers.  Then it says:  Which are well known in the art, without departing from the spirit of the present invention.

And what's meant here is what's been described as how the voltage stabilizer operates.  The fact that it's connected to this terminal.  When the voltage goes high, it taps off of that

and delivers a voltage to the CMOS inverter.  And that this is one implementation.  The concept of a voltage stabilizer is well known, and that modifications to that could be implemented.

**Q.**  Now, sir, what is a -- could you use a capacitor with a voltage stabilizer?

**A.**  The voltage stabilizer, as we can see here, the primary purpose is to deliver the DC voltage, this delivered to the CMOS inverter.  You may note that the drain terminal, 117, this is a switching node, as I mentioned a couple times.  This isn't a constant voltage.  It's not a DC voltage.  It's a switching voltage that switches up and down.  So that's not suitable to connect to the CMOS inverter.  The voltage stabilizer stabilizes that voltage.  It's a voltage regulator.  It taps off of the switching voltage and generates the DC voltage for the CMOS inverter.

Along the lines of what's described here, regulating a voltage is well known in the art.  And there are ways you can improve on the regulation.  Adding a capacitor, for example, to that terminal is one thing that a skilled person would recognize as a way to help hold that voltage.  A capacitor, it's like a mass.  If you want something to set still, you put something heavy on it.  A capacitor acts like a mass.  You put it at that node and it helps it set still.  Helps filter that node.

Q.   It says here in the patent that while -- you can use alternative types of conventional voltage stabilizers which are well known in the art without departing from the spirit of the invention.

Is the use of a capacitor with a voltage stabilizer in this fashion well known in the art to you?

A.   Use of a capacitor at the output of a DC regulator at a point where you're trying to hold a stabilized voltage, or constant voltage, is well known in the art.  In fact, I'm not aware of probably any DC-regulated voltage that doesn't have a voltage -- a capacitor that's used to help smooth or filter that voltage.

Q.   You say filter.  Is a capacitor a filter?

A.   A capacitor, as I mentioned, it's like a mass.  You set it there and it helps the voltage hold still.  Another term we often use is "filter," meaning it kind of takes the edge off of things.  If you want a constant voltage, the more capacitors you put at that node, the more it will help hold that.

Capacitors resist change in voltage.  So if the voltage pushes up or down, capacitors help hold that constant.

Q.   Is a capacitor a passive component?

A.   Yeah, I apologize for throwing out two different terms.

Q.   What is a passive component, Dr. Zane?

A.   So capacitor is an element itself.  And capacitor has a value, has a behavior.  The capacitance would be the value of

that capacitor.  So they're really one and the same.  But capacitor is the element itself.

Q.   Let me show you Exhibit 32 in your book.  Do you recognize this drawing?

A.   I do, yes.

Q.   And did you look at this as part of your exercise here for this case?

A.   Yes.  I've reviewed this drawing.

Q.   And what did you understand this to be?

A.   My understanding is that this drawing is an excerpt from the inventor's notebook.

Q.   This is the invention of the '623?

A.   So I've looked at this drawing and I've analyzed the components, and I see each of the components that are described as elements in claim 1.  Each of the elements that we had just described.

So in my opinion, the elements of claim 1 are included in this schematic.

Q.   Where on this drawing is the -- is the voltage stabilizer?

A.   The voltage stabilizer is the transistor in the upper left-hand side.  It's labeled LND1E.

Q.   Right here (indicating)?

A.   That's correct.

Q.   And you see this right here?  This 1MF thing?  What is that?

**A.**    This is a capacitor, as was presented before.  A capacitor, a symbol for a capacitor, are these two plates. These two elements.  I kind of like the cookie example.

So a capacitor is the element that's sitting here.  As you can see, it's connected directly to the output of the voltage stabilizer.  Meaning the voltage stabilizer, as you can see just below it, that's feeding the power for the CMOS inverter.

The capacitor is added here.  Capacitor helps filter that voltage.  Helps keep it a bit more constant.  As you recall from the previous discussion, the voltage stabilizer operates whenever the switch is off.  That means the voltage is high. When the transistor is on, the voltage is low.  There's zero volts there, you can't get any power from it.  So the voltage stabilizer provides power whenever the transistor is off.

In this case, the capacitor makes the circuit more reliable.  It helps filter that energy that's coming from the voltage stabilizer.

**Q.**    So this capacitor here, this 1MF, is working with the voltage stabilizer.

**A.**    The 1 microfarad capacitor listed here is assisting.  It's helping stabilize that voltage.  It's a practical element that anyone skilled in the art would recognize that you would add to help improve the behavior of that circuit.

**Q.**    And 1MF, what is that?

**A.**    So the micro that you see there, it kind of looks like an

m, but it's actually a $\mu$ symbol, micro.  In the art, we use these when we're describing the size of an element.  So one micro means 1 times 10 to the minus 6.  But it's one millionth of a farad.

Q.    How long is the charge held in that size capacitor?

A.    This is a very typical size for a capacitor when you're what we call decoupling or filtering, or helping to hold up that voltage.  The capacitor in this case, if you were to remove the voltage stabilizer or stop supplying power from the voltage stabilizer, it has about enough energy to run for a small fraction of a second.  In this case, less than a thousandth of a second.

Q.    This -- and where is this capacitor getting the energy from?

A.    This capacitor operates with a voltage stabilizer.  It's only connected to the voltage stabilizer.  As we can see here, the voltage stabilizer is connected out to the output terminal, which is labeled here as "out."  That's this voltage that goes up and down, zero to let's say 100 volts.

All of the energy is derived from that output terminal.  The voltage stabilizer supplies that to the CMOS inverter, which is shown here as the element just to the right of the capacitor.  That capacitor just helps hold that voltage out.  So any charge, any energy, that's in that capacitor came directly from the voltage stabilizer, which means it came

directly from that output terminal.

Q.   Now, looking back at the patent, Exhibit 4, in the language we were talking about, Dr. Zane, is the use of the capacitor with the voltage stabilizer, like we just described in Exhibit 32, is that an alternative type of conventional voltage stabilizer which is well known in the art?

A.   It could be considered so, yes.  Although in this case in the diagram that was shown previously, the voltage stabilizer really is still the transistor I identified as a voltage stabilizer.  The capacitor is simply helping that voltage stabilizer be more reliable, more robust, because it helps filter that node.

Q.   So you mentioned a CMOS.  Was there -- where is this CMOS in the Figure 2?

A.   Well, I don't have it up here but the --

Q.   I'm sorry.  Let me put it here.  I apologize.

A.   So the CMOS inverter is listed as a dotted box.  So it's identified as box number 1-3-9, or 139.  So the CMOS inverter simply means -- CMOS is another acronym, but it's an acronym that stands for complementary metal oxide semiconductor.  And this simply means that there's at least two types of transistor, complimentary transistors inside.  So as we can see here in box 139, there's two different types of transistors.  The type as indicated by the direction of the arrow on one of those lines.  And so one arrow goes out, one arrow goes in.

This has two devices.  This is the CMOS inverter.

Q.   And that is something that was new to this the patent that was in the not in the prior patent.

A.   That is correct.  CMOS inverters themselves were well known.  The use of it together with this voltage stabilizer was new compared to the '323 patent.

Q.   Now, how does the voltage stabilizer and the CMOS that's introduced here stop or reduce leakage?

A.   As described in the '623 patent in some detail, what happens here -- you know, previously there was a transistor in a similar location to the voltage stabilizer and it had a path directly to the ground or to this terminal 115.

In the version you see here in Figure 2, because of the complimentary transistors now in the CMOS inverter, the upper transistor, which is the transistor labeled 1-2-1, or 121, in the CMOS inverter, this transistor completely turns off.  When that transistor is off, it blocks or interrupts current from any leakage current from flowing from that voltage stabilizer back down to the ground, or the terminal 115.

Q.   Dr. Zane, let me ask you to look at column 14 of the patent.  And in particular, I highlighted paragraphs 38 to 50. Do you see that?

A.   I do, yes.

Q.   Can you read that and then explain to the jury what that means to you as one skilled in the art about the teaching of

the '623 patent?

**A.**   Yes.   So reading that section it reads:   The embodiments of the present invention described above are intended to be merely exemplary, and those skilled in the art shall be able to make numerous variations and modifications to it without departing from the spirit of the present invention.

For example, the scope of the present invention also includes three-terminal non-inverting transistor switches that use a fourth terminal (power supply) for normal operation. (And potentially even for enhancement purposes) but still operate, for example, as a fail-safe feature without power applied to this fourth power pin.   All such variations and modifications are intended to be within the scope of the present invention as described in the appended claims.

What I would understand this and recognize this to mean is simply iterating and reiterating that this really isn't about how many terminals there are, it's really about how those terminals are used.   In this case it's emphasizing you can have a fourth terminal or a fifth terminal or a sixth terminal; but in this case is saying you can have a fourth terminal to the extent that fourth terminal is not connected to a power supply under all conditions or all modes.

In this case it is emphasizing, for example, you can have a fail-safe mode.   Fail-safe feature means, well, what if you lose the power from the power that's being supplied to that

fourth terminal?  If you lose that power, then this says you would have a fail-safe mode that would let it run in the three-terminal configuration where the power is coming from the drain terminal.

Q.    Dr. Zane, is a capacitor a power supply?

A.    In general terms, no.  A power supply is not realized with a single element like a capacitor.  The power supply has many components, as we've been talking about.  In general terms, a capacitor is almost a dead weight like we talked about.  It helps hold up that voltage.

Q.    Looking back at Mr. Congdon's invention drawing, Exhibit 32.  Where is the power in this capacitor coming from?

A.    So as we mentioned before the power, which really better related as the energy in that capacitor, has all come from the voltage stabilizer.  This capacitor is connected to nothing but the output of the voltage stabilizer.  It's across the output of the voltage stabilizer because it's filtering, it's helping to hold up, that voltage.  Any energy stored in that capacitor has come from the voltage stabilizer and the output terminal.

Q.    That was my question.  Where is the energy from the voltage stabilizer coming from?

A.    That is coming from the output terminal.

Q.    Now, Dr. Zane, let us talk about claim 1 of the patent. You understand that in order to find infringement a jury needs to find that claim 1 is met by the accused products.  Right?

**A.**   Yes.

**Q.**   Let's look at claim 1.  And for the record, I've blown up after what you just read on column 14, on Exhibit 4, what is claimed, is that what we have right there?  Claim 1?

**A.**   Yes.

**Q.**   Okay.  So let's go over it if we may.

The first -- do you have it in front of you?

**A.**   I don't.

**Q.**   Can you read that?

**A.**   I can read it, yes.

**Q.**   What is the first element?

**A.**   Reading the first element it reads:  A non-inverting transistor switch, having only three terminals, said three terminals being a first terminal, a second terminal, and a third terminal, said non-inverting transistor switch comprising.

**Q.**   And do you understand that Judge Chen has given a definition of "terminal"?

**A.**   I do, yes.

**Q.**   What was that definition?

**A.**   So the definition of a terminal -- again, I may paraphrase without these in front of me -- but I think I believe it's an external connection point.  And --

**Q.**   And did the judge also say -- and tell you how this should be construed when you're applying it to the accused products?

**A.**   Yes.   As I believe we've heard before, many of the terms -- a few terms have been construed by the Court.   So the term "terminal" was one of them, an external connection point, meaning a point external to the three-terminal non-inverting transistor switch.   It was determined to be something external from the nodes inside of that switch.

Then here the additional term that was construed is the term "having only three terminals."   So having only three terminals, as I mentioned earlier, in the description that the inventor gave, was intending to imply how those terminals are used.   So the Court construed it accordingly that having only three terminals isn't associated with how many terminals there are, but instead specifically that it cannot have a fourth terminal connected to a power supply.

**Q.**   Now it says "comprising."   What's the next element of the claim?

**A.**   The next element of the claim is about the transistor. This is that output transistor we talked about.   So the claim element is that --

Would you like me to read it?

**Q.**   Yes.

**A.**   So the claim element is that a transistor connected to the second and third terminals, said transistor having an on-switching state in which current is able to pass between the second and third terminals.   And that just means we have a

transistor on switching state it's on, current can pass through it.

Then continuing:  And an off-switching state in which current is interrupted from passing between the second and third terminals.  Now, the transistor is off, current doesn't pass through it.

**Q.**   Looking at Figure 2, Dr. Zane, in the three terminals you identified, what number terminal is 113?

**A.**   113 is the first terminal.

**Q.**   I'm going to put "first" here.

What is the second terminal?

**A.**   It's the ground reference over here.  The 115.

**Q.**   Here (indicating)?

**A.**   Yes.

**Q.**   Okay.  So this would be the third?

**A.**   That's correct.

**Q.**   Okay.  So one, two, three.  So looking back at the transistor between the second and third terminals, is that the blue?

**A.**   That is, yes.

**Q.**   And the second and third.  So it's in between them.

**A.**   It is, yes.

**Q.**   Having an on-state in which current is able to pass between the second and third terminals.  So when the transistor is on, how is the current flowing?

**A.**    When the transistor is on, current flows between the second -- between the third and the second terminals.  It goes through that transistor.  That's when the transistor is in an on-state.

**Q.**    Going from 117 down to 115, it's going in this direction (indicating)?

**A.**    Through the transistor itself.

**Q.**    Through the transistor and out here (indicating.)

**A.**    That's correct.

**Q.**    To the ground.

**A.**    Uh-huh.

**Q.**    When this is off, what happens?  Is this pass still going?

**A.**    That path is the one that's interrupted, according to that first claim element.  The path through the transistor is interrupted because the transistor's turned off.

**Q.**    So the transistor is turned off and the current no longer can go down this path.

**A.**    Correct.

**Q.**    So go this way (indicating)?

**A.**    That depends on the operation of the rest of the circuit.  But there is potential path that way.

**Q.**    So that's the transistor.  Let's go to the next element. A voltage stabilizer connected to the second and third terminals.  Is that the green in Figure 2?

**A.**    That is the green, yes.

**Q.**    And is that connected to the second and third terminals?

**A.**    It is.  As you can see on the top portion, it's connected to the third terminal.  And you can see what we call the gate terminal that's connected down to the second.

**Q.**    Just like this (indicating)?

**A.**    Correct.

**Q.**    So this is connected to these two (indicating)?

**A.**    That is correct.

**Q.**    And then the last element of the claim, a complementary metal oxide semiconductor CMOS inverter connected to the first terminal, the second terminal, said transistor, and said voltage stabilizer.

Let's stop there.  Is the CMOS here connected to the first terminal, second terminal, third terminal, the transistor, and the voltage stabilizer?

**A.**    As we can see here, yes, it is.

**Q.**    So the connection that links them all.

**A.**    That's correct.

**Q.**    And then if you go back to the last part of that claim, it says:  Said CMOS inverter interrupting the passing of current between the voltage stabilizer and the second terminal when the transistor is in an off state.

So when the transistor is off and it can't go down this path, does it go down this path through the voltage stabilizer into the CMOS (indicating)?

**A.**    Yes.   When the transistor is off, the voltage now is high. As I mentioned -- you may be wondering, why does that voltage go high?   That's because of the rest of the circuit, the rest of the system it's attached to.   For example, that power supply that's going from the AC outlet to the input is one example.

But there's an external circuit that when the transistor is off forces that voltage to go high.   So when the voltage is high on 117, now the voltage stabilizer, the one that is in green, is able to tap off of that voltage.   That's the path that I was just asked about.   Goes through the voltage stabilizer.   And that's what holds up the voltage.   So that creates the voltage that sits at the -- what is normally the power supply connection of the CMOS inverter.

So that voltage will sit there at the upper end of the first transistor in the CMOS inverter -- the top of the yellow -- and it will hold that voltage.   Let's say at the 5 volts we talked about before.

Then the PMOS, which is the term we use for that first transistor in the CMOS inverter, that one as I mentioned before is off when we're in that state.   So that is off and blocks any current from flowing, but the voltage will sit there ready to be used when needed to turn the transistor back on.

**Q.**    So it goes through the voltage stabilizer and stops right here when this is off.

**A.**    That's correct.

Q.    So the CMOS inverter is interrupting the passing of current from the voltage stabilizer in the second terminal when the transistor is off.

A.    Correct.  Yes.

Q.    Now, sir, when it says "interrupting," what do you understand "interrupting" to mean as one skilled in the art in this space?

A.    Interrupting means to -- typically, interrupting would mean to stop.  In this case, it's interrupting the current, it's blocking that current from flowing down that path.

      I'd also recognize that interrupting in this context would mean a significant reduction, at least.  There's always some leakage of any circuit, but now that leakage would be significantly lower than it would be without the PMOS.

Q.    Can you -- how is the only way that you can completely stop current in power conversion devices?  Is it by unplugging?

A.    The physical disconnect is the best way to stop all current.

Q.    Now, let me show you a reference in column 7 of the patent.  That is on column 7, line 55.  I highlighted a statement.  It says:  With the MOSFET both turned off the amount of current leakage which occurs between the third terminal and the second terminal is significantly reduced.

      Is that what's being shown here?

A.    That is, yes.

**Q.**   Is the idea of interrupting to be to significantly reduce the passing of current?

**A.**   Yes.  To block as best you can.  Uh-huh.

**Q.**   Thank you.  Now, Dr. Zane, you identified that you reviewed four different families of products.

**A.**   That is correct.

**Q.**   Yes.  I'd like to talk with you now about them.

        **MR. SUDER:**  And Your Honor, at this time I would like to read a stipulation into the record.

        **THE COURT:**  All right.  Let me just briefly explain to the jury about what a stipulation is.

        The parties have agreed to certain facts, and you must therefore treat those facts as having been proven.  And there are various agreements on what we call stipulated facts and they will be presented to you in the course of this.  And now we're going to -- counsel's going to present some of those stipulated facts.  So you are to take these facts as true.

        **MR. VOWELL:**  Plaintiff has accused the following four product families of infringement.  TinySwitch-III, TinySwitch-LT, LinkSwitch-II, LinkZero-AX.

        The products within the TinySwitch-III family that are accused of infringement are:  TNY274, TNY275, TYN276, TYN277, TNY278, TNY279, TNY280.  The TNY277 product is representative of this list of accused products for purposes of Opticurrent's infringement allegations in this case.

The products within the TinySwitch-LT family that are accused of infringement are TNY174, TNY175, TNY176, TNY177, TNY178, TNY179, TNY180.  The TNY179 product is representative of this list of accused products for purposes of Opticurrent's infringement allegations in this case.

THE COURT:  Before you go any -- let me tell the jury that you will get a copy of these stipulated facts as part of the package of materials you get when you deliberate.

So go ahead.

MR. VOWELL:  Number 9, the products within the LinkSwitch-II family that are accused of infringement are LNK603, LNK604, LNK605, LNK606, LNK613, LNK614, LNK615, LNK616, LNK632.  The LNK605 or LNK603 product is representative of this list of accused products for purposes of Opticurrent's infringement allegations in this case.

And then number 10.  The products within the LinkZero-AX family that are accused of infringement are:  LNK584, LNK585, LNK586.  The LNK585 product is representative of this list of accused products for purposes of Opticurrent's infringement allegations in this case.

THE COURT:  Thank you.

BY MR. SUDER:

Q.  Dr. Zane, let's start with the -- you reviewed information with regard to all these products.  Fair statement?

A.  Yes.

**Q.**   And this is --

        **MR. SUDER:**   Your Honor, this Exhibit 211-A.   I believe these are already in evidence.   But if not, I just moved for the entirety of 211-A into evidence at this time.

        **THE COURT:**   Any objection?

        **MR. WARREN:**   No objection.

        **THE COURT:**   All right.   211-A will be admitted.

        (Trial Exhibit 211-A received in evidence)

**BY MR. SUDER:**

**Q.**   Sir, what information did you look at with respect to the accused products to satisfy yourself that there's infringement?

**A.**   So I was provided with information on each of the products.   Predominantly the information that was relied on was the data sheet.   As we heard, the data sheet provides a significant amount of detail about the purpose of the product and its internal operation, as well as how to use the product.

        Additionally, I was provided with schematics which are the detailed -- detailed floor plan, essentially, the drawings for how exactly the chips were implemented.   Then I was provided with some additional information on the operation of the product.

**Q.**   We'll be looking at data sheets for each of the families.

**A.**   Correct.

**Q.**   Just so we're clear, what is a data sheet?

**A.**   A data sheet has already been presented I think quite

well.  A data sheet provides some high level information on the purpose and the operation and the benefits of a product, and it provides detailed information on how to use the product, and oftentimes includes some information on the operation of the product.  Where the product has been tested, and shows some results.  So you can get a feel for how this product would be used.

Q.  And Dr. Zane, and you also looked at schematics for these products, correct?

A.  That is correct.

Q.  And for purposes -- we're going to start with the TinySwitch-LT family.  So if you could get out in front of you Exhibits 11 and Exhibits 24.

And on Exhibit 11, sir, if I may, is this the TinySwitch-LT data sheet that you reviewed?

A.  This is, yes.

Q.  Do you see on here it lists all the products for which this data sheet applies?

A.  That is correct.  In the table here on the front page.

Q.  You understood they all operate the same way for purposes of your analysis.

A.  That is my understanding.

Q.  And you see here that it's an energy efficient offline switcher.  TinySwitch family offline switcher.  You see that in the title?

**A.**    I do.

**Q.**    And there's a picture on the right.  What is that?

**A.**    This is shown, as listed in the caption as Figure 1, is a typical application.  This is a typical application diagram. It shows how this product -- in this case the chip -- would be used in a broader AC to DC converter.

**Q.**    And is this the chip right here that we're talking about?

**A.**    That rectangle there is the chip.

**Q.**    And you see -- now, in it here under EcoSmart Extremely Energy Efficient.  Do you see that?

**A.**    I do.

**Q.**    And it says easily meets all global efficiency regulations, no-load, without bypass 1.  Do you see that?

**A.**    I see this, yes.

**Q.**    What does that mean?

**A.**    As listed here, it simply states first that this is a highly efficient product.  And secondly, that it has different modes.  And it's showing what the power is.  For example, at no-load -- it indicates here two conditions.  One is without a bypass winding, and also indicates a condition with a bypass winding.

      This version without the bypass winding is indicating how this chip would operate without particular circuitry.  And just to put this in context, there's an earlier comment that clarifies what they mean by self -- by a bypass winding.  Where

it says self --

MR. WARREN:  Objection, Your Honor.  This is beyond the scope.

THE COURT:  Sustained.  If you're going to ask him to comment, you have to ask questions.

BY MR. SUDER:

Q.  Dr. Zane, I just highlighted where it says self bypass, no bias winding, or bias components.  What does that mean to you as someone who lives, teaches and works in this space.

MR. WARREN:  Objection, Your Honor.  It's beyond the scope of his expert report.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  So you know these two statements tied together, the operation here where it says self bypass, it means it's self powered.  The chip powers itself from its own terminals.  We'll get to the details of how those terminals work, but this is the essence of the infringement question.

So self biased is self powered.  When it says no bypass winding or bypass components, these are precisely the type of components the '623 is talking about when it refers to a power supply connected to a fourth terminal.

Typically, that power supply, as I mentioned earlier, requires a number of components, inductors, diodes, resistors. Here it's talking about a bypass winding, which is a winding on an inductor.  This is exact circuitry that would typically be

required for that fourth terminal power supply.  And so it's indicating here that self biased means that is not required.

MR. WARREN:  The words "bypass winding" do not appear in his expert report.  We object as beyond the scope.

THE COURT:  Is there somewhere in his report that he discusses --

MR. SUDER:  The product, Your Honor.  I can't quote you --

I'll move on.  I can't -- I'll find it at a break if I can.  I believe he discusses --

It's paragraph 57, I've been told.

THE COURT:  57?

MR. SUDER:  Yes.

MR. WARREN:  Your Honor, paragraph 57 as I read it doesn't include any question, or any answer that's responsive to a question asked about the bypass winding.

THE COURT:  Does he describe what bypass winding is anywhere in this declaration or his report?

MR. SUDER:  No, Your Honor.  He just highlights that provision and talks about that.  That that's EcoSmart and --

THE COURT:  If that's all he does is quote it, doesn't explain it, then it is beyond the scope to go beyond that.

So objection's sustained.

MR. SUDER:  I'll move on, Your Honor.

**BY MR. SUDER:**

**Q.**   Dr. Zane, it says here applications.  Do you see that?
Does this tell you what these are being used for?

**A.**   It does.  It's typical for a data sheet to list out
applications.  Give those that would use the product an example
of how you could use this.  This lists examples such as
cordless -- we have cell phones, PDA's, digital cameras, et
cetera.  But your electronic devices.  AC to DC converters for
electronics.

**Q.**   Does this data sheet teach the customers at Power
Integrations how to utilize this product in their products?

**A.**   It does.  That's the purpose of the data sheet is to show
customers how to use the product.

**Q.**   Now, let me turn to the next page.  And did you look at
the second page and make some highlights on the second page to
assist in your testimony?  Second page of this exhibit?  Did
you mark up the drawing there on your copy?  Did you go through
that exercise?

**A.**   I have in the past.

**Q.**   Let me show you.  Is this consistent with the drawings
that you made of this exhibit identifying the different
elements on the data sheet that correspond to the claims?

        **MR. WARREN:**  Objection, Your Honor.  This was never
disclosed and the witness hasn't adopted it.

        **THE COURT:**  All right.  You have to lay a foundation.

**BY MR. SUDER:**

**Q.**   Did you mark on the schematics where the different components of the claim are located?

**A.**   I did, yes.

THE COURT:   In the course of a deposition?

MR. SUDER:   No.   In preparation for his testimony here today, consistent with your rules.

MR. WARREN:   Yes, Your Honor.   But these are not the schematics.   These are not what was disclosed.

THE COURT:   If you're going to use a demonstrative, it should have been disclosed.

MR. SUDER:   I don't understand -- it was my misunderstanding your local rules that we just needed to do it so he wouldn't be taking the time and labeling --

THE COURT:   Well, you can -- without putting it on -- without publicizing it, you can show it to him and ask him to essentially adopt it.   Rather than him going up and drawing it. So that would be --

MR. SUDER:   Fair enough.   Thank you, Your Honor.

   May I approach the witness?

THE COURT:   Yes.   By the way, I don't know if you intended to -- and we allowed publication of Exhibit 11 -- but you never moved it into evidence.

MR. SUDER:   Oh, I'm sorry.   Your Honor, we would offer Exhibit 11 and Exhibit 24 into evidence.

THE COURT:  Any objection?

MR. WARREN:  No objection, Your Honor.

THE COURT:  They will be admitted.

(Trial Exhibit 11 received in evidence)

(Trial Exhibit 24 received in evidence)

MR. SUDER:  May I approach the witness, Your Honor?

THE COURT:  Yes, you may.

BY MR. SUDER:

Q.   Dr. Zane, looking at the second page of Exhibit 11, this schematic, do you see the color markings on there?

A.   I do, yes.

Q.   Are those consistent with your understanding of what they represent?

A.   Yes.  To the extent that we're indicating that the color coding is similar to what we've shown earlier.

Q.   On Exhibit 11, do the three pink squares correspond to the three terminals that are called out in claim 1?

A.   So the pink squares here labeled as drain, source, and enable are the three that I've identified as being the terminals that correspond to the claim which we've been covering.

Q.   Let us talk about the drain pin which is the one up here on the corner (indicating.)  What does the data sheet say about what this drain pin is?

A.   So it says that the drain pin is, of course, the pin --

it's the drain of that MOSFET.  The pin is the power MOSFET drain connection.  It also states that it provides internal operating current for both startup and steady-state operation. Steady-state is a term of art meaning normal operation.  When that transistor is turning on and off.  Says that it's providing the internal operating current for both of these modes, startup and normal operation.

Q.    So this drain pin here is where the power is coming in.

A.    That is correct.

Q.    And if you go down on the bottom page here it says: Enable pin.  Which is the first pin.  Correct?

A.    That's sort of identified as the first terminal corresponding it to the language of the claim.

Q.    What does the data sheet say about what that first pin is?

A.    It says that the enable pin, which we've identified here as the first terminal, the switching of the power MOSFET is controlled by this pin.  It means that this pin is what determines whether that MOSFET is switching or not.

        MR. SUDER:  We just lost power.

    (Pause.)

        MR. SUDER:  Thank you.

Q.    And then let me direct your attention to the source pin which is the second terminal.  Correct?

A.    Yes.

Q.    What does the data sheet say about the source pin?

**A.**   Simply the same thing that we could see from that diagram. This is the second terminal of that transistor that's at the output.  So it says:  This pin is internally connected to the output MOSFET source for high voltage power return and control circuit common.  Really, just simple, this is the ground for that chip.

**Q.**   Now, sir, there is an indication here of a -- those which you say are the three terminals of this product.  Yes?

**A.**   These are the three terminals that I've associated with the claim language of the '623 patent.

**Q.**   There's a -- it says "bypass multifunction BPN."  Upper left corner.  What is that?

**A.**   This is what's termed as the bypass pin.  It says /M for multifunction because there are additional functions that can be provided for this product to that pin.  The primary function is as a bypass.  This is the pin that is used to connect to an external capacitor.

**Q.**   Okay.  If you look down here where it says "bypass multifunction pin," it says:  It is the connection point for an external bypass capacitor for the internally-generated 5.85 volt supply.

**A.**   That's correct.

**Q.**   What does that mean?

**A.**   That means that this capacitor connects into that node, this bypass node, and it connects to the internally-generated

5.85 supply.  Internally-generated supply is what I have identified as the voltage stabilizer.  Meaning, this capacitor connects directly to the voltage stabilizer.

Q.   So whatever capacitor may be there is getting its power from the drain pin.

A.   Power all comes from the drain pin, and it's regulated or controlled through the green element here, the 5.85 volt regulator.  So this is the voltage stabilizer.  It's taking the voltage from that switching node, it's tapping off of it, and it's delivering that voltage to the CMOS inverter as well as the rest of the chip.  That capacitor is connected directly at the output of the voltage stabilizer.

Q.   You heard the defendants say in opening statement that capacitor is a fourth terminal power supply.  Do you agree with that?

A.   I don't, for the same reasons that I've mentioned previously.

That capacitor is simply connected directly to the three-terminal non-inverting transistor switch itself.  It's connected at the output of the voltage stabilizer, and only to the voltage stabilizer.  Which is an internal node.  It's the internal voltage regulator.

That capacitor's being used to smooth the voltage at the output of the voltage stabilizer.  It is not being used in the context of the '623 patent as a power supply connected to a

fourth terminal, which is a power supply that would include the additional circuitry you would need to tap off and collect power from another node or another source.

Q.    Is that capacitor that they call for connected to anything else to derive power other than the switch?

A.    We go back up to Figure 1 in the data sheet.

Q.    Yes.  This figure (indicating)?

A.    This figure, correct.  What you can see here is that that capacitor is not connected to anything else.  This capacitor would behave exactly the same way whether it's in the package or out of the package.  In either way, that capacitor is simply connected to the output of the voltage stabilizer.  It's helping stabilize that voltage, the output of the regulation. This capacitor is not connected to any additional -- any external nodes, meaning as you can see here, that capacitor is not connected to any other nodes in the system.  As you can see, we have our AC input over on the left, our DC output over here on the right.

Q.    I'm not sure they can see.  We don't understand like you. You say this capacitor right here.  The two lines.

A.    Yes.

Q.    It's connected to a dot on the bottom.  What is that?

A.    Just means a connection.

Q.    To what?

A.    So as we can see here, this capacitor's connected on the

bottom end to the source terminal of the transistor.  In this case, the transistor inside.  The transistor switch.  So what's labeled here as "D" at the top and "S" at the bottom, these are the two output terminals of the transistor.  Those two terminals are either shorted when the transistor is on, or they're open when the transistor is off.

**Q.**    Dr. Zane -- I'm sorry.  Go ahead.

**A.**    So those would be -- the D is what we've identified as the third terminal.  The S is identified as the second terminal.  Then this capacitor connects at the voltage stabilizer.  And this S, the second terminal.

**Q.**    Dr. Zane, is their data sheet using a capacitor any different than what Mr. Congdon discloses in his invention drawing?

**A.**    This is what I described previously.  That capacitor that's in the product we were just looking at described in their application note is implemented in the same way as shown here in the invention drawing.  The capacitor, as we can see, is connected directly to the output of the voltage stabilizer.  This was just -- oh.  Looks like -- does everybody see that?  I don't know who's causing those.  I guess is that me?

        **THE COURT:**  Yeah.  If you touch the screen it will make an arrow.  You can clear it, if you want.

        **THE WITNESS:**  Okay.  Nice.

    Okay.  So we can see here that the capacitor, where I've

got three arrows, is connected at the output of the voltage stabilizer.  And then down at the bottom, where I've now added three arrows, as well, is connected to the -- what's labeled here as ground.  That's the second terminal.  So that capacitor is directly at the output of the voltage stabilizer, it's used to help hold up that -- help stabilize that voltage.

In the product we were just looking at, the capacitor's in the same location, performing the same function.  Again, I think it's important to emphasize here the '623 patent is not talking about integration in a package.  These terminals and the operation are according to their function.  This capacitor's connected to these internal nodes.  It's operating together with the voltage stabilizer.

**BY MR. SUDER:**

**Q.**  Thank you.  Now, Dr. Zane, so looking at the first element of transistor having only three terminals as that term is construed, is that literally present in the TinySwitch product in your opinion?

**A.**  In my opinion, yes.  That is literally true.

**Q.**  Now, what is the function of utilizing the filter or capacitor in the TinySwitch product?

**A.**  The capacitor attached to the BP node, or pin, on the TinySwitch product, the purpose is exactly as I just described.  It works with the voltage stabilizer.  It takes the power from the drain pin, through the voltage stabilizer, and it's used in

operating the product.  The function is to help smooth or filter that voltage.

**Q.**    What is the way that it is doing it?

**A.**    It's doing it by being attached to the voltage stabilizer and operating to help filter that node.

**Q.**    What is the result of connecting that filter capacitor to the voltage stabilizer?

**A.**    The result in this case is a filtered version of the stabilized voltage.

**Q.**    How would you characterize the differences between using and not using a capacitor in that particular application?

**MR. WARREN:**  Objection, Your Honor.  This is beyond the scope.  This is not the analysis in his expert report.

**MR. SUDER:**  That's exactly what it is, Your Honor.

**THE COURT:**  Overruled.  He can explain it.

**BY MR. SUDER:**

**Q.**    How would you characterize the difference, if any, between using a capacitor with the voltage stabilizer and not using the -- in that way?

**A.**    Well, as I believe I mentioned before, the voltage stabilizer taps off of this drain node when the voltage is high, delivers voltage to the CMOS inverter at its power supply.  Adding a capacitor is a way to improve the reliability of the circuit.  That way if there are small variations in the voltage, that capacitor helps clean them up or helps filter

them.

If you operate without the capacitor the circuit -- the core of the invention still operates, following the path that I had mentioned previously.  But with the capacitor it operates far more reliably.

Q.    Do you have an opinion as to whether this element is met by equivalents if not literally?

A.    So according to that analysis, there's concerting difference between operating with or without that capacitor or having that capacitor in or out of the package.  I would say it operates in equivalent way.

Q.    Thank you.  Now, Dr. Zane, let's go to the next element, the transistor.

If you look at the third page of Exhibit 11 under TinySwitch Description -- you see it says the TinySwitch-LT combines a high-voltage power MOSFET switch with a power supply controller in one device.  Is that the transistor?

A.    Yes.  Yes.  What it's describing here, a high-voltage power MOSFET, we're talking about the transistor.

Q.    And does it turn on and off?  Is that what a MOSFET does?

A.    Yes.  The transistor's key function is the switch, as we talked about in the switch mode power supply.  So it's turning on and off.  It's doing this many thousands of times per second.

Q.    Okay.  And by the way, I'm sorry, I want to go back to the

capacitor.

If you look at page 5 of Exhibit 11, sir.  There's a power up/down.  Do you see that?  On page 5 of the Exhibit 11?

A.    I do, yes.

Q.    Says:  The TinySwitch requires only .1MF capacitor on the bypass multifunction pin to operate with standard current. What is .1MF?

A.    So 0.1 microfarads, again, is the size of that capacitor. It indicates how much energy is stored in that capacitor.

Q.    And how much -- if you disconnected the capacitor from the drain pin, how long would that capacitor hold that energy?

A.    So this is a function of what are the operating currents of this chip.  And so 0.1 microfarads of capacitance -- again, this is a filter capacitance -- if you were to actually remove the voltage stabilizer it would run for a very small fraction of a second.  As I mentioned before, less than a thousandth of a second.

Q.    Now, looking at Mr. Congdon's invention, what size capacitor did he call for in his drawing?

A.    In his drawing he used a one microfarad capacitor.

Q.    Which is a bigger capacitor?

A.    It's ten times the size of the minimum required here.

Q.    Now, Dr. Zane, getting back to the second element of a transistor connected to the second and third terminals having an on switch where it can pass between the second and third

terminals, and an off switch through which current is interrupted from passing between the second and third terminals.

Looking at the second page of Exhibit 11, can you tell the jury where the -- is the transistor that's disclosed right there in blue?

A.    Yes.  I've identified the transistor identified here in blue as a transistor connected between the appropriate terminals.

Q.    So it's connected to the second and third terminals.

A.    That's right.

Q.    In the same manner as contemplated by the patent.

A.    That's my opinion, yes.

Q.    So would this element be present literally?

A.    Yes.

Q.    Need to do an equivalents analysis on this one?

A.    I don't see any need to, no.

Q.    Let's go to the next element.  A voltage stabilizer connected to the second and third terminals.  You understand that Judge Chen has construed a voltage stabilizer -- what did you understand that -- what -- how did you apply the definition?

A.    Well, a voltage stabilizer was construed as an element that -- again, I may be paraphrasing here -- an element that provides constant voltage.  It was also related to a voltage

regulator.

And so the voltage stabilizer performs the functions that I have just described.  Takes -- taps the voltage off of that switching high voltage node.  And it provides a constant voltage.  This was that DC voltage that we've talked about as needed for proper operation for the CMOS inverter.

So, for example, it takes the switching 100-volt signal, turns it to a nice regulated 5-volt signal.

Q.   On the third page of the data sheet where it says regulator and 6.4V shunt voltage clamp.

A.   Yes.

Q.   Can you read the first sentence that is highlighted?

A.   Yes.  So it describes the operation as the 5.85 volt regulator charges the bypass capacitor connected to the bypass pin to 5.85 volts by drawing current from the voltage on the drain pin whenever the MOSFET is off.

Q.   So when this is off (indicating), the energy is going from here to here (indicating.)

A.   That's right.  And as I described before, this is off repeatedly during normal operation.  Thousands of times a second this turns on and off.  Every time it turns off, this voltage stabilizer is providing power to the chip.

Q.   Now, there's a second sentence there that says:  Extremely low power.  Do you see what's highlighted?

A.   I do.

**Q.** Can you read that and explain what that means to you?

**A.** It reads: Extremely low power consumption of the internal circuitry allows TinySwitch-LT to operate continuously from current it takes from the drain pin.

**Q.** What is that telling you, sir?

**A.** That tells me along the same lines as what I just described. That when this product is operating, it operates continuously from the current that's pulling from the drain. Meaning it operates from -- it draws its power from the drain terminal itself through the voltage stabilizer, not from any other source.

**Q.** And going back to the second page, up on the green, it says: A regulator 5.8 volts. Is that the voltage regulator?

**A.** What is identified here as green, that is the voltage regulator that was being described in the data sheet. And that is what I'm equating here with the voltage stabilizer.

**Q.** Is that 5.8 volts in your -- 5.85 volts maintaining a constant voltage level?

**A.** Yes. For sure.

**Q.** So is that element met literally in the accused product?

**A.** Yes.

**Q.** Now, you understand that Power Integrations expert says that constant means it has to be exact. No fluctuation. Did you know that?

**A.** I've read that, yes.

**Q.**   Do you agree with that?

**A.**   I don't.  That's --

**Q.**   Why?

**A.**   I don't.  That's a strict interpretation.  As I'd mentioned earlier, there's no such thing as having a perfectly constant voltage.  But regulating within a reasonable window, that's a constant voltage.

**Q.**   Does the voltage stabilizer have a smoother fluctuation around that 5.85 volts?

**A.**   What was the question again?

**Q.**   How would you characterize the fluctuation of the -- along that 5.85 volts continuing?

**A.**   The fluctuation comes from the natural behavior as was described in the '623.  When the transistor is off, you have the high voltage, you can tap off of it.  When the transistor's on, zero volts.  There's nothing available.  You can't tap off. It goes back and forth between those two.

What happens is you get a little bit of variation on that voltage because while we're tapping off of it, you charge, while you're tapping off, you don't have it.  So there would be a small variation, a few percent would be likely in that scenario.

**Q.**   Can you have zero fluctuation of voltage?

**A.**   No.  As I think I just stated, it's simply not possible to have zero-zero fluctuation.

Q.   You have to have zero degree kelvin in deep space to accomplish that?

A.    It's a theoretical concept.  The only way to have no variation is to be at zero temperature.

Q.   Now, sir, did you perform an equivalents analysis just to satisfy what their expert says?  What is the function of the voltage stabilizer?

A.    The function of the voltage stabilizer is to generate a constant voltage and provide a constant voltage to the CMOS inverter.

Q.   How is that done what is the way that is done in this accused product?

A.    It's done through the voltage stabilizer.  It's done by tapping off of the drain terminal and providing the constant voltage at the output to the CMOS inverter.

Q.   If there's a slight fluctuation, what is the result of tapping off and running it through there?

A.    The end result is that the circuit operates.  The CMOS inverter has a proper voltage applied to it and it works as expected.

Q.   How would you characterize any difference, if you even could have a zero fluctuation and the type of variation that this voltage stabilizer has?

A.    Inconsequential.  As far as the CMOS converter is concerned, it sees no difference between a perfectly constant

voltage, which can't occur in a small variation.

Q.   Under your equivalents analysis, did you find this was present in this product?

A.   Yes.  For the same reason as direct -- or, literal.

Q.   Now let's go to the last element.  And I'd like to show you -- it says -- you have to have a CMOS inverter connected to the three terminals, the transistor, and the voltage stabilizer.  Does their product have that?

A.   Yes.  I've identified the CMOS inverter that is connected in this way.

Q.   And let me show you --

        MR. SUDER:  May I approach the witness, Your Honor?

        THE COURT:  Yes.

BY MR. SUDER:

Q.   Exhibit 24 is the schematic of this product.  Can you identify the elements on these schematics?

A.   These are my markings.

Q.   So on the second page of Exhibit 24, did you identify the markings of the schematic that shows the three terminals, the path of the voltage stabilizer, and the transistor?

A.   I did.  I did.  And the reason these are identified is so that we can work our way down.

    As you can see, the schematic has significantly more detail.  But to identify the CMOS inverter that drives the output transistor, I had to go into the schematic level detail.

That wasn't shown in detail in the data sheet.

Q.   And then two pages later, which is page 175 of this exhibit, is that your markings showing the path of the voltage stabilizer into the CMOS?

A.   It is.  And if you can see here what I've marked in green is the -- is the supply voltage.  This is the internal supply voltage.  It's output from the voltage stabilizer.  That goes directly to the CMOS inverter, the element I've identified in yellow, as you can probably recognize from the previous diagrams, are the two transistors, the complimentary transistors of the CMOS inverter.  This then drives to the far right-hand side, the out.  This goes directly to control the gate of that transistor.

Q.   And Dr. Zane, when the transistor is at an off state and the power is going from the third terminal through the voltage stabilizer into the CMOS, what happens to that path?  That current?

A.   The same circuitry that we went through previously.  The current is interrupted by the CMOS inverter.  When the transistor is off, that means the voltage is high on the output of that transistor.  Voltage stabilizer is providing the voltage to the supply of the CMOS inverter.  And that PMOS transistor is off.  It interrupts the current from flowing through the CMOS inverter.

Q.   How do you know that's what's happening?

**A.** That's the way the CMOS inverter operates.

**Q.** You have a CMOS there, that's what it does.

**A.** That's what it does. That's correct.

**Q.** And in interrupting, what did you -- I didn't cover this. But how do you know -- is there any possible current that's going through there that's seeping through?

**A.** So this is the path through that CMOS inverter. As I've mentioned, you can't completely eliminate leakage current. But the CMOS inverter will have very little leakage current.

**Q.** Literally, does the CMOS significantly reduce the amount of current that's passing when it's in an off state?

**A.** Yes, it does.

**Q.** Is this element literally present in the accused products?

**A.** In my opinion, yes.

**Q.** Did you do an equivalents analysis, as well, with regard to interrupting?

**A.** The only question on interrupting is whether we're insisting that interrupting means there's actually zero current. Which, again, is something that simply can't be possible in a semiconductor device.

**Q.** But what -- is the function of the CMOS to interrupt, stop, the flow there?

**A.** Yes. The function is to interrupt the current. Again, it's that path that we've talked about. The path through the voltage stabilizer, going through the CMOS inverter. So the

function is to interrupt any leakage when that voltage
stabilizer is providing the voltage.

Q.   And the way it's done?

A.   Is to use the CMOS inverter to block that and to interrupt
the current.

Q.   And the result?

A.   And result is there's very little leakage current that
flows through the CMOS inverter.

Q.   So in your opinion, is this element met by equivalents, as
well?

A.   Yes.

Q.   Dr. Zane, one other thing on this.  On page 7 of Exhibit
11 is an application example and a schematic for universal
input power supply.

        MR. WARREN:  Objection, Your Honor.  This is beyond
the scope.  And they also didn't disclose this.  This is not
what was disclosed with their disclosures last night, and this
is not --

        THE COURT:  All right.  It's not in the --

    Can you show me where in the expert report --

        MR. SUDER:  It goes to the issue of inducement, Your
Honor.

    Oh, oh, oh.  The markings were not disclosed.  I
apologize.  If that's what your reference is, I'll pull it off.

        MR. WARREN:  To begin, it's the markings.  I don't

think he considered this.  But for now, it's the markings.

**BY MR. SUDER:**

**Q.**    Does this data sheet teach the customers how to use it?

**A.**    As I mentioned previously, the purpose of a data sheet is to help customers understand how they could use the product. This data sheet's like others.  Does so, yes.

**Q.**    Does it give details for someone on how to use it?

**A.**    There are many details provided in the data sheet that are essential to implementing and using that product.

**Q.**    Let's go to the next family, Dr. Zane.  Let's talk about the TinySwitch-III family.  And for this we will be using Exhibits 14 and 25 in your book if you can get them out.

        **MR. SUDER:**  And, Your Honor, at this time we would offer Exhibits 14 and 25 into evidence.

        **THE COURT:**  All right.  Any objection?

        **MR. WARREN:**  There's no objection, Your Honor.  But we note for the record that the disclosures were all related to the schematics.  Dr. Zane introduced into evidence the schematics, but then he never talked about it.  And I thought we discussed that only documents that the witness actually discussed would be introduced into evidence.

    So there's no objection with the contention that they're going to do what they disclosed at this time.

        **THE COURT:**  All right.  Well, if appropriate, you can raise specific objection as we go along.

MR. SUDER:  Are these admitted, Your Honor?

THE COURT:  These are admitted, yes.

(Trial  Exhibit 14 received in evidence)

(Trial Exhibit 25 received in evidence)

BY MR. SUDER:

Q.   Now, Dr. Zane, Exhibit 25.  Exhibit 14.  Excuse me.  Is this the data sheet similar to what we just went over for the TinySwitch-III family?

A.   This is, yes.

Q.   And does this list the products on the exhibit that this applies to?

A.   It does.  In much the same way as the previous.

Q.   And we'll go over it for the record.  But is your analysis, basically, the same for this that we just went through?

A.   It does.  It does.  This operates in very much the same way.

Q.   Okay.  And on the top I've highlighted that this is the data sheet for the energy efficient offline switcher TinySwitch-III family.  Right?

A.   That's right.

Q.   There are listed the products.

MR. WARREN:  Objection, Your Honor.  Again, just to be clear, there were no data sheets with these disclosures made yesterday.  The only thing they disclosed were annotations with

the schematics, which now appears they're not even doing at all.

So this was never disclosed.  Same objection as the last time.

**THE COURT:**  Well, if it wasn't disclosed then I'm going to sustain the objection.

**BY MR. SUDER:**

**Q.**   Let me show you a clean copy of Exhibit 14.  And you see there -- does it list here the products for which this data sheet applies?

**A.**   Yes, it does.

**Q.**   Yes.  And again, does it have the same reference to EcoSmart energy efficient that we talked about earlier?

**A.**   Yes.

**Q.**   And the applications are disclosed?

**A.**   Yes.  In a similar way.

**Q.**   And what do they say?

**A.**   Once again, for applications, chargers, for a variety of electronic devices.

**Q.**   Now, looking at the data sheet, Dr. Zane, Exhibit 25 in your book --

**MR. SUDER:**  May I approach the witness, Your Honor?

**THE COURT:**  Yes.

**BY MR. SUDER:**

**Q.**   Did you make these markings on this schematic?

**A.**    I did, yes.

**Q.**    On Exhibit 25, does it identify the three terminals in pink that you say are present in this product family?

**A.**    Yes, it does.

**Q.**    And again, in the upper corner it says the drain pin. Right?

**A.**    It does, yes.

**Q.**    And if you look at Exhibit 14 where it says what the drain pin is, it has the same statement as on the other product. Doesn't it?

**A.**    It does.  Once again emphasizing the operating current is provided by the drain pin for startup and steady-state operation.

**Q.**    And it's the internal operating current.

**A.**    It is.  It's the internal operating current of the chip, meaning derives power from the drain.

**Q.**    And the second and third terminals, we don't have to go through, because the source and the enable are the same as we just went over.

**A.**    That is correct, yes.

**Q.**    And the discussion of the bypass multi-pin being the connection point for the bypass capacitor for the internally-generated 5.85 volt supply.  Is it the same way?

**A.**    It is, yes.

**Q.**    Is your view that this is not a power supply different for

this, or was it the same rationale you had earlier?

A.    It's the same rationale.  Once again, this is simply a capacitor that is connected directly across the voltage stabilizer.  It's been brought out as a pin so that the customer can adjust how much capacitance is there.

Q.    Again, is this capacitor connected to anything but the switch?

A.    The capacitor, as we could see in the diagram, is connected to only the three terminal non-inverting switch. It's directly across the output of the voltage stabilizer.

Q.    So it's only getting its power from that drain pin.

A.    It only gets it power from the drain pin.  And it acts as a filter.  Voltage is essentially constant.  It's just helping shave off the small variations in that voltage.

Q.    So, sir, is the first element of claim 1 met in regard to these products?

A.    Yes, I do believe so.

Q.    And if there is a capacitor used and you did an equivalents analysis, would it be the same analysis of the way it functions, the way it's done be the result for this one?

A.    Yes, it would be.

Q.    And how would you characterize difference between using and not using a capacitor in connection with a voltage stabilizer?

A.    The same way I did previously.  The capacitor simply, in

addition, to help stabilize the variations in that voltage.

Q.  Under the equivalents analysis, it would still be present?

A.  It really would.

Q.  Now, going back to the schematic, sir, you identified the blue as the transistor.

A.  I have, yup.

Q.  And according to the data sheet, it's the same language. It's a high voltage power MOSFET switch.

A.  That is correct. Again, this was that output transistor.

Q.  Is this -- does this product, TinySwitch family, have a transistor in accordance with this claim?

A.  Yes.  Yes.  Much in the same way.

Q.  And with regard to the voltage stabilizer, which you showed the green path on the schematic, and looking at Exhibit 14, is it the same green 5.85 volts?

A.  It is.  It is.  Same description.  Same drawing here for --

Q.  Okay.  And is, in fact, the discussion in the data sheet about the 5.85 volts regulator the exact same language that we discussed earlier?

A.  It is.  The same language is used for these two products.

Q.  So would your analysis be the same here?

A.  It is.

Q.  And does it provide a constant variable source?

A.  The voltage regulator supplies a constant voltage to the

CMOS inverter.

Q. If there's any difference because it slightly fluctuates, is your equivalents analysis the same here as it was for the TinySwitch-LT family?

A. Yes. Yes. I see no difference from the theoretical constant voltage and a small variation.

Q. So you'd find that, in your opinion, this element is met both literally and by equivalents.

A. Yes. That is correct.

Q. Now, looking at this data sheet, sir, were you able to find the CMOS?

A. The CMOS, similar to the previous product, the data sheet shows a high-level diagram. To actually show the CMOS transistors, I had to use the schematic.

Q. And putting the third page of the schematic, which for the record is Exhibit 25, is that the CMOS in yellow getting the voltage from the voltage stabilizer?

A. Yes. Yes. In the same way as before. Voltage stabilizer is -- output is connected always directly to the CMOS inverter as shown here.

Q. Does it interrupt the flow in the same way we discussed earlier?

A. Yes. In the same way. When the output transistor is off, voltage is high. Voltage stabilizer provides voltage to the green point here. The PMOS device is off.

Q.   By the way, when the voltage is going from the -- the current is going from the stabilizer into the CMOS, does it even go through the capacitor?

A.   When the output transistor is off.  As we said before output transistor off means voltage is high.  Voltage stabilizer then is active and is providing power.  Is providing power directly to this node that is highlighted in green. During that time, the capacitor is being charged by the voltage stabilizer.  Current is going out to the capacitor.  And the voltage stabilizer is directly providing the power to the CMOS inverter.

Q.   So when the transistor is off, and current is going from the third terminal to the voltage stabilizer, then into the CMOS.  It doesn't even go through the capacitor.

A.   There's no current going through the capacitor at that time that feeds the CMOS inverter.

Q.   Now, so, sir, is the -- based on the schematic the CMOS, the way it's placed here, literally present in the accused device?

A.   It is, yes.

Q.   And does it interrupt a flow the way the claim requires?

A.   It does.

Q.   And if it doesn't completely stop it, the equivalents analysis you've done would be the same?

A.   It would be, yes.  Very inconsequential difference between

zero current and very small current.

MR. SUDER:  Two more families, Your Honor.

BY MR. SUDER:

Q.   Let's go to the LinkSwitch-II family, if we can, please. Did you review the data sheet and the schematics for the LinkSwitch-II products?

A.   I did, yes.

MR. SUDER:  And for the record, Exhibit 211-A, Your Honor, which is already in evidence --

Can I get rid of the arrow?

Dr. Zane, are these all the products that operate the same way for purposes of your analysis in the LinkSwitch-II product family?

A.   That is what has been represented to me.

Q.   Would you take out Exhibits 17 and 21 in your book, please?

MR. SUDER:  And, Your Honor, we would offer Exhibit 17 and 21 into evidence at this time.

THE COURT:  Any objection?

MR. WARREN:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 17 received in evidence)

(Trial Exhibit 21 received in evidence)

BY MR. SUDER:

Q.   Dr. Zane, is Exhibit 17 the data sheet for these products?

**A.**   Yes, it is.

**Q.**   And if you look on Exhibit 17 it says LinkSwitch family. And here it lists the products.  Do you see that?

**A.**   I do, yes.

**Q.**   So these are all the products.  And there's a diagram in the upper corner here similar to the other ones.

**A.**   Yes, that is correct.

**Q.**   Okay.  And then the data sheet, Exhibit 21 --

          **MR. SUDER:**  May I approach the witness?

          **THE COURT:**  Yes.

**BY MR. SUDER:**

**Q.**   Does Exhibit 21 show your markings on the schematic where all the elements are present?

**A.**   Those are my markings, yes.

**Q.**   Your marking.  Okay.  So if we go to the data sheet and using the same colors you've identified the three terminals in the product.

**A.**   I have.  Again, in a similar way.

**Q.**   Yes.  And the blue would be the transistor, the green would be the voltage stabilizer path.

**A.**   I've used the same color coding that we've been using throughout.  So, yes, again, the green would be the voltage stabilizer.

**Q.**   And again, looking at the data sheet --

          Oh, by the way, on the LinkSwitch-III family, do they give

the same type of instructions to their customers like the TinySwitch-LT?

A.   All of the data sheets provide suitable information for using the products.

Q.   Thank you.  Now, here again it's EcoSmart energy -- EcoSmart energy efficient no-load consumption.  Do you see that?

A.   Similar terminology, if not the same, from previous.  Yes.

Q.   Yes.  Again, the applications it discloses are chargers, cell phones, PDA's, audio devices, et cetera.

A.   Correct.

Q.   This can be used in all those products.

Now, going back -- looking at the second page in your schematic you identify the three terminals.  Are they also called drain source and enable -- here.  Look at the schematic. The pin where it's getting all of its power from in the upper corner.  Is it called a "drain pin"?

A.   So again, the terminology is similar in this product family.  The one difference is that the enable is now called a "feedback pin."  But otherwise it's the three terminals as before.  Drain terminal, source terminal, and the feedback terminal as the input.

Q.   Got you.  And if you look at the data sheet under pin functional description.  Do you see that, sir?

A.   I do, yes.

**Q.** You see it says the drain pin is the power MOSFET -- it provides internal operating current for both startup and steady-state.

Is that the same description that you had before?

**A.** It is. It's the same description we had in the previous two products. The drain pin is used in this way.

**Q.** And the source pin is disclosed down here. Is that the same --

**A.** It is. It's the same as previous.

**Q.** This would be -- the source pin would be the second terminal in the patent, and the drain pin would be the third terminal.

**A.** That's correct. As I've labeled it.

**Q.** And then the feedback pin, instead of calling the enable, it's called the feedback. It controls the operation. That's the input first terminal pin.

**A.** That is correct. The feedback pin has the same terminology here for its operation. During normal operation, the feedback pin -- the switching of the power MOSFET is controlled by this pin.

**Q.** And again, the bypass pin up here is -- has multiple functions. It is the connection point for the external bypass connector for the internally-generated supply voltage. Right?

**A.** That is correct. So again --

**Q.** Where is this capacitor, however small, getting its power

from?

A.    Again, all of the power for the capacitor, the bypass pin, comes from the voltage stabilizer and the drain pin.  In the same way as the previous products.

Q.    Going back here, does the LinkSwitch-II family literally have this first element of only three terminals --

A.    Yes, in my opinion.

Q.    And if you were to do an equivalents analysis because it has this internally-charged capacitor, does it perform substantially the same function in substantially the same way to achieve substantially the same result?

A.    Yes.  In my opinion it does.

Q.    How would you characterize the difference of using a capacitor with voltage stabilizer and not using it?

A.    In the same way I described before.  Still, we're deriving the power from the drain pin, the voltage stabilizer.  The capacity is there to help improve the stability and reliability of that node.

Q.    Now, if you look on the second page of this -- next page here there is -- it says 6V regulator.  Did you see that?  This language was not in the earlier ones.  Do you see that?

A.    I do, yes.

Q.    It says:  The 6V regulator charges the bypass capacitor connected to the bypass pin joined voltage whenever the MOSFET is off.  Bypass pin is the internal supply voltage node.

What does that mean?

**A.**    This is very similar language to what we had before.  Just a slightly different voltage.  So once again, simply stating that the internal supply voltage node is this node.  There's an internal regulator which is the voltage.  The stabilizer.  And it draws its current from the drain node any time that that MOSFET is off.

**Q.**    And it says here that extremely low power consumption internal circuit allows the LinkSwitch to operate continuously from the current of the drain pin.

What does that mean?

**A.**    Well, first, it means that when we're in normal operation, when we're operating this switch repeatedly, when it turns on and off many thousands of times a second, we are operating continuously from the current drawn from that drain pin.

As mentioned before, the capacitor's acting as a filter and is helping stabilize that voltage during that time.  It also indicates that the very low power consumption of the chip is what allows us to work from the drain pin to draw our power.  If there were significantly higher power demand in the chip, it may be necessary to use a connection to an external power supply.

**Q.**    Now, Dr. Zane, look on to the next elements.  You identified in blue on the schematic a transistor.  Does the LinkSwitch-II family products have a transistor connected to

the second and third terminals?

**A.**   They do in the same way.

**Q.**   The same one as the other ones.

**A.**   That is correct.

**Q.**   So this element is present here.  Does it have a voltage stabilizer connected to the second and third terminals?

**A.**   It does.  This was shown in the data sheet and operates much in the same way.

**Q.**   Is that what's right here?

**A.**   The voltage stabilizer is this green path.  A portion of that is shown here.

**Q.**   And if you look at the data sheet up here, is that the voltage stabilizer?

**A.**   That is.  This was the voltage stabilizer.  It's the regulator.  Sits at the switching node of that drain pin.

**Q.**   Is it connected to the second and third terminals?

**A.**   It is.

**Q.**   So is that literally present in this product?

**A.**   It is, yes.

**Q.**   And again, if the constant requires -- even though it's not possible -- a straight line without fluctuation, does this element meet it under the equivalents analysis we did for the other products?

**A.**   Yes.  For the same reasons.

**Q.**   Now looking back to the schematic, is there a CMOS on this

one?

A.    There is.  There is.  Once again having to go to the schematic to show.

Q.    Okay.  Go to the last page of these blueprints.  You identify the schematic on page 693 of this document.

A.    Yes.  Yes.  These are my drawings, again similar to what you saw previously.  The green is connected to the output of the voltage stabilizer.  The yellow is indicating the CMOS inverter that drives the power switch transistor.

Q.    Is the CMOS getting current from the voltage stabilizer?

A.    It is.  The voltage stabilizer output is connected directly to this node.

Q.    Does it go through the capacitor when the switch is turned off?

A.    When the switch is turned off, that is when the voltage stabilizer is active, is providing power to the CMOS inverter, to the rest of the chip, and to the capacitor.

Q.    So is the CMOS in this one interrupting the current between the stabilizer and the second terminal when it's in an off state?

A.    It is, yes.

Q.    And when it's in off state it does not even go through the capacitor.

A.    That's correct.  In the off state, the voltage stabilizer is holding this voltage and the current is interrupted.

There's very little current flowing there.

Q.   Under the equivalents analysis, does the -- does the interrupting the flow have to be -- does the effect of this substantially interrupt the flow?

A.   Yes.

Q.   Does it achieve that purpose?

A.   Yes.  As I've stated before, for the same reasons.

Q.   Would your equivalents analysis be the same if I asked you the identical questions for this element?

A.   Yes, I believe that's what I've said.  That's correct.

**MR. SUDER:**  Your Honor, I would also offer Exhibit 20 into evidence at this time relating to this family of products.

**THE COURT:**  Any objection?

**MR. WARREN:**  No objection, Your Honor.

**THE COURT:**  20's admitted.

(Trial Exhibit 20 received in evidence)

**BY MR. SUDER:**

Q.   Did you make drawings on this schematic as well?

A.   Yes, I did.

Q.   And also, if I could publicize them, show the exact same configuration as we just discussed?

A.   Yes.  That is correct.  You can see very similar to before.

Q.   And does the LinkSwitch-II data sheet teach customers the same way as the other ones?

**A.**   Yes.   Each of the data sheets help customers know how to use the part.

**Q.**   Let's go to the last family, which is the LinkZero-AP. And you understand that we're talking about three products here that all operate the same way.  Right?

**A.**   That's how it was presented to me, yes.

**Q.**   And for this one, Dr. Zane, would you get out Exhibits 18 and 16?

         **MR. SUDER:**  Your Honor, we would offer 18 and 16 into evidence at this time.

         **THE COURT:**  All right.  You said "LinkZero-AP."  Did you mean "AX"?

         **MR. SUDER:**  Yes, I apologize.  Yes.  LinkZero-AX.  I'm sorry.

         **THE COURT:**  And Exhibits 18 --

         **MR. SUDER:**  And 16.

         **THE COURT:**  -- and 16?

         **MR. SUDER:**  Yes.

         **THE COURT:**  Any objection?

         **MR. WARREN:**  No objection, Your Honor.

         **THE COURT:**  Admitted.

     (Trial Exhibit 16 received in evidence)

     (Trial Exhibit 18 received in evidence)

**BY MR. SUDER:**

**Q.**   All right.  Dr. Zane, is Exhibit 18 the data sheet for

this product family?

**A.** Yes, it is.

**Q.** And Exhibit 16 is a schematic similar to the other ones we've been looking at?

**A.** Yes, it is.

**Q.** And did you perform markings on Exhibit 16?

**A.** Yes, I did.

**Q.** And in the same color as we've been talking about?

**A.** Yes.

**Q.** Okay. Thank you. Now, Exhibit 18 is a LinkZero-AX on offline switcher. Correct?

**A.** That's correct.

**Q.** And it has the EcoSmart efficient statement that it easily meets all global regulations with no added components. Right?

**A.** It does. Has the same language.

**Q.** And it lists the products here for which this applies?

**A.** It does, yes.

**Q.** For which this applies.

Now, Dr. Zane, looking at the schematic, Exhibit 16, you identify the same three terminals.

**A.** I did. Again, very similar schematic. And again, I drew this with the same colors.

**Q.** And, again, the drain pin is up in the upper right (indicating), the ground second terminal is down here (indicating), and the enable or first terminal is on the left

(indicating.)  Would that be a fair statement?

**A.**   That's correct.  Except that this is the feedback pin.  But the same function.

**Q.**   Sure.  And on the data sheet, again, the pin function descriptions, it talks about the drain pin provides the internal operating current for both startup.  Same statement.  Right?

**A.**   That is correct. Uses the same statement.  It's hard to read from here, but I believe that statement is the same.

**Q.**   I'm sorry.  I should blow it up.  My apologies.  And then the second terminal, the source, is the power MOSFET source connection also is the ground reference.  That's the second terminal that goes to ground.  Right?

**A.**   That is correct.  Source works in the same way here.

**Q.**   And the feedback pin is the switching -- is the -- controls the pin.  That's the first terminal, right?

**A.**   That's correct.  Again, the feedback pin is stated as controlling the switching of the transistor.

**Q.**   Again, the bypass pin that we talked about is a .1MF or greater for the internally-generated voltage supply connected to this pin.  Right?

**A.**   That is correct.  This was a 0.1 microfarad capacitor.

**Q.**   That's one-tenth the size of what Dr. Congdon disclosed in his invention drawing, right?

**A.**   That's right.  Well, the data sheet here is showing you

what the minimum capacitance would be.

Q.   Again, sir, based on your review of these pins, what they do, how they're described, does this meet -- does this product family meet the first element literally?

A.   Yes.  In the same way that the previous products have.

Q.   Is the capacitor being used in this product as a power supply?

A.   No, it is not.  Not in the context of the '623 patent is a power supply connected to the -- to a fourth terminal.  The capacitor's simply in parallel with the voltage stabilizer acting in the way I've described.

Q.   And under the equivalents, does the use of a capacitor change the way it functions, the way it's done, or the result it achieved?

A.   It does not.

        MR. WARREN:  Objection, Your Honor.  Again, I'm -- just for the record.  Equivalent analysis is -- and we'll cover it on cross -- completely different than what's in his report.

        THE COURT:  Overruled.  You can cover it in cross.

BY MR. SUDER:

Q.   Is there a transistor in this product?

A.   There is, yes.

Q.   The same MOSFET transistor?

A.   It's the transistor we identified earlier operating in the way that's described.

Q.   And looking at Exhibit 16, is the blue the transistor?

A.   Yes.  I've identified the transistor in blue.

Q.   And does the data sheet tell you that that's a MOSFET?

A.   Yes, it does.

Q.   Any doubt in your mind that this element is present in this product family?

A.   No, there is not.

Q.   Let's go to the voltage stabilizer.  Looking at the second page of the data sheet, do you see in the upper right-hand corner a regulator at 5.85 volts?

A.   Yes, I do.  As before.

Q.   Is that connected to the third terminal?

A.   It is, yes.

Q.   And the second terminal?

A.   As shown in the schematic, yes.

Q.   And, sir, if you look at the third page of the data sheet it says right here:  5.85 regulator, the bypass voltage pin is regulated by drawing current from the drain whenever the MOSFET is off.

     Do you see that?

A.   That is correct.  It's the same language as we had before.

Q.   So when this is off, the current from here (indicating) goes to here (indicating.)

A.   When the transistor is off, there's a high voltage present now at that terminal.  The voltage stabilizer is now able to

tap off of that voltage and provide voltage to the CMOS inverter.

Q.   Does it provide a constant voltage?

A.   It does.

Q.   Is that element literally present in the LinkZero family?

A.   It is, yes.

Q.   And same discussion about if it has to be completely -- couldn't have -- completely constant, no fluctuation.  Is it met by equivalents?

A.   It is, yes.

Q.   Why is that?

A.   As I've said before, as far as the CMOS inverter is concerned it would see an absolutely constant voltage and a small variation and a DC voltage has the same.

Q.   Now, going to the schematic of this family, Dr. Zane.  I will show you the page from the schematic.

       MR. SUDER:   May I approach, Your Honor?

       THE COURT:   Yes.

BY MR. SUDER:

Q.   Did you make these markings on this schematic?

A.   I did, yes.

Q.   Looking at the schematic that's page 72 of this document, does it show in yellow with a CMOS?

A.   Yes.   I've identified the CMOS inverter in yellow showing, as before, in green the connection point to the voltage

stabilizer.

**Q.** And what is happening with the current going from the voltage stabilizer to the CMOS when the MOSFET switch is in an off state?

**A.** That current is interrupted as before when the CMOS, the PMOS transistor, the upper transistor, is turned off.

**Q.** And is the effect to substantially reduce the leakage?

**A.** It is, yes.

**Q.** Is your equivalents analysis the same here as it had been for the other families?

**A.** It is, whether it's absolutely zero current or very small current, they're the same.

**Q.** And does this data sheet teach customers how to use and install and operate the switch?

**A.** The data sheet provides sufficient information to use the product.

**Q.** Now, Dr. Zane, how would you compare the technology of Mr. Congdon's earlier '323 patent with the teachings of the '623 patent?

**A.** I gave an introduction and a highlight before. The '623 patent references the '323 as part of the introduction. It presents itself as an improvement on the '323. The two are in comparable areas. They're both looking at three-terminal non-inverting transistor switches.

**Q.** Same inventor?

**A.**   That's right.  They're the same inventor.

**Q.**   And does the '623 discuss the '323 and its drawbacks?

**A.**   It does, yes.

**Q.**   How would you -- would you characterize the '623 as an improvement on the '323?

**A.**   I would.  And that's how the '623 presents itself; as an improvement on the '323.

**Q.**   How important is the '623 to the accused products?

        **MR. WARREN:**  Objection, Your Honor.  Beyond the scope.

        **MR. SUDER:**  It's in his report.

        **THE COURT:**  Well, show me where that's in his report.

        **MR. SUDER:**  Paragraph 47, Your Honor.

        **MR. WARREN:**  I don't see anything about that in paragraph 47, Your Honor.

        **THE COURT:**  Well, qualitative description.  Very general.  I'm going to allow that.  Attempt to go beyond that would be beyond the scope.

        **THE WITNESS:**  If you could repeat the question, please.

**BY MR. SUDER:**

**Q.**   How important is the '623 to the accused products?

**A.**   Well, as we've gone through in my opinion, the accused products include each of the elements of claim 1.  It's my opinion that this is an important feature that's included in the products.

Q.   Called it essential functionality in your report.  Do you still stand by that?

A.   In my report I believe I said that the transistor is an essential function in the accused products.  I think it's clear that the accused products are built around a transistor. That's an essential feature.  An essential component.

Now, the '623 is related to essentially how we're deriving the power and to do so with low leakage.  I believe this is an important or significant feature that is a portion of a product.

Q.   Dr. Zane, based on everything you've seen and everything you've reviewed and your experience, is it your opinion that the accused products each infringe claim 1 of the '623 patent?

A.   That is my opinion.  That each of these products that I've gone through have each of the elements of claim 1 of the '623.

          MR. SUDER:  Your Honor, time for break?  Or I'm just about done.

          THE COURT:  Why don't you -- if you're almost finished, why don't you finish.

          MR. SUDER:  Okay.

       (Pause.)

          MR. SUDER:  I'll pass the witness.

          THE COURT:  All right.  All right.  We will go ahead and take our break before commencing cross-examination.  Let's take a 15-minute break at this point.

(Recess taken at 2:37 p.m.)

(Proceedings resumed at 2:38 p.m.)

**THE COURT:**  Yes.

**MR. WARREN:**  Your Honor, at the commencement of the break I observed the witness exit the courtroom.  He was immediately grabbed by Mr. Suder while he was apparently hung up on cross.

And it appeared that -- I observed that Mr. Suder was coaching him and discussing with him at length, which, you know, because we have this issue that I raised during our objections that there was something specific I want to discuss with him on cross, I believe it's very likely that Mr. Suder was improperly coaching the witness.

I observed that he was talking to the witness.  They were huddled about what they were going to do.  And I'd like to hear from the witness what was discussed because I don't think that it's proper to assert a privilege when a witness is on cross-examination.  He was hung up.

**THE COURT:**  Your response?

**MR. SUDER:**  Well, that's absurd.  I -- you can ask him what we talked about.  Not even 30 seconds.  I was in the bathroom talking to my people and just said if you could answer the questions and I'll ask you a few questions afterwards.

We did not discuss anything substantive or that he wants to ask him about his DOE analysis.

THE COURT:  Well, all right.  If you want to cross-examine him briefly about what they talked about, you get a preview of what he's going to say, but I think that's a proper source of cross-examination.  Be brief.

MR. SUDER:  Your Honor, two housekeeping matters?

I did not offer Trial Exhibit 32 into evidence.  It was discussed at length in the drawing with Dr. Zane.  I didn't do it in front of the jury.  I thought I did, but I was told I didn't.

THE COURT:  All right.  Any objection?

MR. SCHERKENBACH:  No objection, Your Honor.

THE COURT:  All right.  32 will be admitted.

(Trial Exhibit 32 received in evidence.)

MR. SUDER:  Also, Your Honor, I note your local rule requires that we exchange our cross-examination exhibits by 4:30 on the day before.  I just got theirs.  We're all here.  I didn't do it.

I'm asking if I may have until 7 o'clock tonight to give them the cross-examination exhibits because I just physically am not able to do that.  And I asked them and they said --

THE COURT:  Which exhibits now are you talking about?

MR. SUDER:  They're identifying their exhibits for the witnesses tomorrow.  And I said I just got it --

THE COURT:  You want more time identifying your cross in view of the fact you just got the direct exhibits.

MR. SUDER: And I'm right here with you, yes.

MR. WARREN: Well, Your Honor, they've known the schedule. We had to conform to the schedule. We had to have people specifically do it while we were here.

I don't think they should have extra time. Mr. Suder knew he was going to be in court. We all knew that this was an issue that was coming up. The schedule has been public for a long time. We had to take special preparations for it.

THE COURT: I'll give you until 6 o'clock.

MR. SUDER: Thank you, Your Honor.

THE COURT: All right. Let's have Dr. Zane resume the stand.

And bring the jury in.

Are you going to be able to go the rest of the afternoon?

MR. WARREN: With Dr. Zane? No, Your Honor, I don't think that we will.

THE CLERK: All rise for the jury.

(Jury enters at 2:55 p.m.)

THE COURT: Okay. Thank you, ladies and gentlemen. We are now going to commence with the cross-examination of Dr. Zane.

**CROSS-EXAMINATION**

BY MR. WARREN:

Q. Good afternoon, Dr. Zane. My name is Neil Warren. I'm one of the lawyers for Power Integrations. You and I haven't

met.  It's nice to meet you.

A.   Great to meet you.  Thank you.

Q.   Now, Dr. Zane, during your testimony you discussed the '623 patent at some length; right?

A.   That is correct.

Q.   And, in particular, I know you discussed Mr. Congdon's hand drawing and you discussed a capacitor in that drawing.  Do you recall that?

A.   I do recall, yes.

Q.   You understand that this case and the scope of this case is defined by the claims of the patent; right?

A.   Absolutely.

Q.   Not the drawing; right?

A.   That is correct.  Analyzing the case and performing my infringement analysis was based on the claim elements and the patent specification.

Q.   Right.  And, now, would you be surprised to know that I word searched this entire patent, the '623 patent, and the word "capacitor" doesn't appear even once in here?

A.   No, no, that wouldn't surprise me at all.

Q.   And that's because when Dr. Congdon -- or Mr. Congdon, excuse me, actually wrote his patent he didn't write anything about the capacitor that you discussed, did he?

A.   In the patent specification, capacitor is not there.  As I stated earlier, he simply stated that a voltage stabilizer is

something that is well-known in the art.  And adding capacitors is something I'm sure he felt was unnecessary.

Q.   Okay.  But when he drew his drawing, that was before the patent; right?

He did that before he filed for his patent?

A.   Based on the dates listed, that was my understanding, yes.

Q.   Fair to say he knew about capacitors if he wanted to add that into his patent; right?  He knew about capacitors?

A.   Absolutely.  Like I said before, the capacitors on an outlook like this would be well-known in the art.  It's a practical detail.

Q.   So I'd like to ask you some questions on a few areas about things that you didn't show the jury.

MR. WARREN:  Mr. Sayres, can we bring up the '623 patent?  I think we need to switch to --

(Document displayed.)

MR. WARREN:  Mr. Sayres, why don't we go to column 1 of the patent.

BY MR. WARREN:

Q.   And, now, you recall you discussed some pieces of column 1?  You recall that; right?

A.   I do recall, yes.

Q.   Okay.

MR. WARREN:  Mr. Sayres, can we zoom in first on lines 39 to 44, please.

**BY MR. WARREN:**

Q.   And, now, this is a portion that you showed the jury; right?

A.   I believe so.  I believe it's correct.

MR. WARREN:  Now, I'd like to scroll down a little bit, Mr. Sayres, and why don't we go to lines 50 to 55, please.

And if we could limit this to just 50 and 55, Mr. Sayres.

**BY MR. WARREN**

Q.   And I'd like to focus --

MR. WARREN:  And, Mr. Sayres, if you would highlight along for me.

**BY MR. WARREN**

Q.   The patent in this area, you discussed some portions above, you discussed some portions below, but I want to talk about what's right here in the middle.

The patent says that "noninverting transistor switches which comprise only three terminals" -- I want to stop there.

You see those words, right, sir?

A.   I do, yes.

Q.   And I'm actually going to use your board.  Appreciate it.

This is the claim language, right, on your board?

A.   That is correct.

Q.   And those words "having only three terminals," that's the same words we just read out of the spec; right?

A.   That is correct.

Q.   And if we go on in this area here, it says those do not require a fourth terminal connected to a power supply.

Do you see those words?

A.   I do, yes.

Q.   And you understand the Court has construed the claim language in this claim -- in this case to mean a switch that does not have a fourth terminal connected to a power supply.

You know that; right?

A.   As I described earlier, the Court's construction of having only three terminals is having -- not having a fourth terminal connected to a power supply.

Q.   And so if we continue with what Mr. Congdon wrote, he wrote, "Thereby rendering noninverting transistor switches which comprise only three terminals more desirable than noninverting transistor switches which comprise at least four terminals"; right?  That's what the patent says?

A.   That is correct.  That's what the patent says and --

Q.   And so I'd like to next --

        THE COURT:  Hold on.  Let him ask the question.

BY MR. WARREN:

Q.   Right.  It's helpful if you -- your counsel is actually going to get up and ask you more questions, and so it's helpful just during this process if I can ask a question and you can give an answer.  Can you do that for me?

A.   Well, that is certainly fine.  I just wasn't complete with

my answer.

THE COURT: I'll let you give a complete answer to the question, but that was a very limited question. You can explain things later on redirect.

MR. WARREN: So I'd like to bring up, Mr. Sayres, with this in mind --

BY MR. WARREN:

Q. So my question was very simple, and it's that the words appear here that Mr. Congdon believed his switch was, quote, more desirable than noninverting transistor switches which comprise at least four terminals.

Those were his words in his patent; right?

A. Absolutely, yes.

MR. WARREN: So, Mr. Sayres, can we please go ahead and bring up TX 14? This is already in evidence.

(Document displayed.)

BY MR. WARREN:

Q. And this is the TinySwitch data sheet that you looked at; right?

A. That is correct, yes.

MR. WARREN: And, Mr. Sayres, can we zoom in, please, on the top right.

BY MR. WARREN:

Q. I'm not sure it was ever discussed, but what this is showing is basically a schematic, a simplified schematic of a

power supply; right?

**A.**   That is correct.  This is showing an application schematic using this product.

**MR. WARREN:**  And, Mr. Sayres, can we highlight the TinySwitch-III there.

**BY MR. WARREN**

**Q.**   Now, I know there's a dispute in this case about what the terminals do, but fair to say, as far as this data sheet is concerned, it shows one, two, three, four terminals; right?

**A.**   So here the data sheet shows how many pins there are on the product.  There are four pins on this product as shown.

**Q.**   And the Court has construed the word "terminal" to be an external connection; right?

**A.**   That's right.  So a terminal would be an external connection point.

**Q.**   So this data sheet shows that there are four pins which are the external connection points inside this power supply. That's what the data sheet here shows.

We can at least agree on that; right?

**A.**   We can absolutely agree there's four pins on this product. Three of these are connecting to external points in the rest of the circuit, in my opinion.

**MR. WARREN:**  If I may have the ELMO.  Sorry to switch back and forth.

**BY MR. WARREN:**

**Q.**   What I'd like to, again, do here is I'd like to show something that you didn't show to the jury.  I thought this was very interesting.  This was part -- I've re-created it, but when Mr. Suder had pre-highlighted some documents?  Do you recall that in the beginning?

**A.**   I do, yes.

**Q.**   He showed this highlighting here, and so I re-created what he showed the jury.  Do you recall this?

**A.**   Yes, I do.

**Q.**   Okay.  Now, what I'd like to focus on here, just for a moment, is what you didn't show the jury and what you didn't talk about.  And it's very conspicuous here.  We see here -- let me just grab my pen.

We see that there is a highlighted portion at the top and a highlighted portion at the bottom; right?

**A.**   I see that, yes.

**Q.**   And the words in the middle are "The BYPASS/multi-function pin is the internal supply voltage node."

Those are the words; right?

**A.**   That's correct, yes.

**Q.**   And the next sentence that you didn't show the jury is, and I quote, "When the MOSFET is on, the device operates from the energy stored in the bypass capacitor."

That's what the data sheet says there; right?

A.   Absolutely, yes.

Q.   Okay.

         MR. WARREN:  Now, Mr. Sayres, can we go ahead and bring up the next data sheet, TX 17.

BY MR. WARREN

Q.   And TX 17 is the data sheet for the LinkSwitch-II family; right?

A.   That is correct.

Q.   And you discussed this on your direct; right?

A.   That is correct also.

         MR. WARREN:  Mr. Sayres, can we zoom in again on the simplified power supply schematic there.

         And, Mr. Sayres, can we highlight the chip with its four terminals?  Okay.

BY MR. WARREN:

Q.   Now, we can agree -- and, again, I know there's a dispute in this case, it's the key issue in the case.

         We can agree that, as its shown in the data sheet, it shows four terminals; right?

A.   Four pins of the product, correct, uh-huh.

Q.   And now let's go to page 3 of this data sheet --

         (Document displayed.)

Q.   -- because we have a similar issue.

         MR. WARREN:  Mr. Sayres, can we zoom in on the 6-volt regulator language.

BY MR. WARREN:

Q.   And I think on this version this is where Mr. Suder actually highlighted it in front of the ELMO in front of everybody.  Do you recall that?

A.   I do, yes.

Q.   But, again, there was a gap in the middle, and that's what I would like to talk about.

MR. WARREN:  So, Mr. Sayres, if you would, highlight along with me as I read, it's in the middle here, "The bypass pin is the internal supply voltage node."

BY MR. WARREN:

Q.   Do you see those words, and we've highlighted them?

A.   I do, yes.

Q.   And the next sentence is, "When the MOSFET is on, the device runs off the energy stored in the bypass capacitor."

You see those words; right?

A.   I do, yes.

Q.   So one more data sheet I think we should look at.  It is TX 18.

(Document displayed.)

Q.   This is the LinkZero-AX data sheet.  Do you recall discussing that on your direct?

A.   I do, yes.

Q.   Let's do the same exercise.

MR. WARREN:  Mr. Sayres, can we see the diagram here?

**BY MR. WARREN:**

**Q.**   Same caveats.   I understand there's a dispute in this case over what the terminals do, but we can agree that at least looking at the diagram there's four terminals; right?

**A.**   Four pins in the product, yes.

         **MR. WARREN:**   And, now, Mr. Sayres, same exercise. Let's go to, if we may, page 3.   And it's the section labeled 5.8-volt regulator.

         And, again, I'd like to highlight something.

**BY MR. WARREN:**

**Q.**   You recall you did the same exercise here?   Mr. Suder highlighted a portion at the top, he highlighted a portion at the bottom.

         Just because we're in court and there's a court reporter, you have to give an oral answer so she can take it down.

**A.**   Just waiting for the end of the question.   Yes.

**Q.**   Okay.   So, again, I'd like to discuss what you didn't talk about.

         **MR. WARREN:**   And, Mr. Sayres, if you would highlight along with me, "When the MOSFET is on, LinkZero-AX runs off the energy stored in the bypass capacitor."

**BY MR. WARREN:**

**Q.**   That's what the data sheet says; right?

**A.**   Yes.

**Q.**   Okay.   Next I'd like to ask you some questions about your

Doctrine of Equivalents analysis.  And just want to make sure the records is clear.

Can you tell me -- well, first of all, let's just establish -- I think you only did your function-way-result test on the first product, and then you said each one was the same?

A.    Correct.

Q.    Okay.  So we don't have to go through each one individually; right?

We can assume that what we're going to discuss now is also the same for all of them?

A.    That is correct.

Q.    Okay.  Now, can you remind us -- and I'll break the rule on cross here, but what is the function -- I'm going to ask you an open-ended question.  Okay?

A.    Okay.

Q.    Now, you performed a function-way-result test; right?

A.    Yes.

Q.    And can you remind us, what is the function-way-result test?  What did you apply in your analysis?  Just tell us what the test is.

A.    In concept, what is function-way --

Q.    No, I mean what is the legal test?  What did you do in your analysis?  How did you apply that?

A.    Okay.  I'm not sure if the question is asking in general.

Q.    Yes, generally speaking.

When we say the words -- I think it's been said several times --

A.    Oh, I see.

Q.    -- "function-way-result," everyone says those words, and I think everyone assumes, but I don't think it's right to assume.

So can you just briefly say what the function-way-result test is.

A.    Just as a basic concept here is we went through literal infringement saying these items are literally there, the Doctrine of Equivalents, as was mentioned saying, well, if there's a difference, then that could be inconsequential.

But to go through a Doctrine of Equivalents, a couple of ways to do this.  One is to go through this function-way-result test, meaning what's the function that is under dispute or in terms of the element?  What's the way that that was implemented?  And then, what's the result?

The question is, you know, is the function, the way, and the result the same as described as shown in the claim, in the patent specification.

Q.    And so what we're describing here, what we're comparing is the functionality, the way in which it works, and the result of the accused product and the functionality, way and result of the claim language; fair?

A.    That's correct, yes.

Q.    Okay.  What is the function that you applied for the very

first element, the preamble, the only three terminals element? Can you please state for the record, what is the function?

**A.** So the function from the preamble is -- as you can see, as required in the preamble, is that we have the three terminals; the first terminal, the second terminal, and the third terminal. I don't think there's any question on that one.

Then there was also the requirement that having only three terminals. If you recall, that one is having not -- excuse me, not having a fourth terminal connected to a power supply.

And so the function of the preamble that I was applying is the function of operating from those first three terminals and not operating from a fourth terminal that has a power supply.

**Q.** Okay. And what is the result?

**A.** The result is that, according to the preamble, we would have operation from these first three terminals ultimately capable of meeting the remaining claim elements.

But a noninverting transistor switch that functions in a way that I just described, the result is operating from those three terminals.

**Q.** And you've read the report of Power Integrations' expert; right?

**A.** I have, yes.

**Q.** And you understand that he disagrees, respectfully disagrees with your opinion on the function-way-result analysis; right?

**A.**   I do, yes.

**Q.**   So we'll hear from him on that, but I appreciate you taking the time to spell out for us the function and the result, because I wasn't quite clear on what they were.  So I appreciate that.

Now, again, I'd like to discuss something, what you didn't consider in your analysis.

Now, you read Mr. Bohannon -- you wrote an expert report in this case, you know he wrote an expert report in this case; fair?

**A.**   That is correct.  That's fair.

**Q.**   Now, Power Integrations has its own patents; right?

**A.**   As I understand it, yes.

**Q.**   And, now, as part of your analysis in this case and your expert report, you didn't consider Power Integrations' 6,226,190 patent; right?

   **MR. SUDER:**  Objection, Your Honor, on the grounds of relevance.  Another patent has nothing to do with his infringement analysis.

   **THE COURT:**  Sustained.

**BY MR. WARREN:**

**Q.**   In the context of these -- of your analysis, did you consider any -- well, you read Mr. Bohannon's report; right?

**A.**   Which report are we speaking of?

**Q.**   You read his -- well, I guess we can orient everybody.

You wrote an initial report on infringement; right?
Correct?

A.   That is correct.

Q.   Again, you have to give an oral answer so that it can be transcribed.  Okay?

A.   Yes.

Q.   And then Mr. Bohannon wrote a noninfringement report; fair?

A.   Fair.

Q.   And you read Mr. Bohannon's noninfringement report; right?

A.   I have read Mr. Bohannon's noninfringement report.  That is correct.

Q.   And in that report he discusses some of Power Integrations' patents; right?

A.   He does, yes.

Q.   And in your report you did not discuss Power Integrations' patents; right?

A.   Keeping in mind, my report preceded his report, that is correct.

Q.   Fair enough.

     And so, in particular, the patents that we saw in the opening, the '190 patent, for example, fair to say that was not considered in your expert report; right?

A.   Fair to say, yes, I did not consider that patent as part of my infringement analysis.

MR. WARREN:  Thank you, Dr. Zane.

THE COURT:  All right.  Thank you.

#### REDIRECT EXAMINATION

BY MR. SUDER:

Q.   Dr. Zane, I just have a few questions.

MR. SUDER:  Can I get the ELMO on, please, Angie?

BY MR. SUDER:

Q.   Dr. Zane, in column 6 of the patent, we discussed this a little --

A.   Yes.

Q.   -- but in light of Mr. Warren's questions, it says that it should be -- that the MOSFET 123 is the voltage stabilizer; correct?

A.   That is correct, yes.

Q.   "Could be replaced by an alternative types of conventional voltage stabilizers which are well-known in the art."  You say there are some?

A.   Absolutely.

Q.   "Without departing from the spirit of the present invention."

A.   Correct.

Q.   What does that mean to you?

A.   As we stated before, what is recognized here is that the voltage stabilizer function deriving -- you know, tapping power off of the voltage, the switching voltage, and applying it to

the Cmos inverter, after described here, I believe what the inventor is explaining is, okay, now that I've shown you how this works, now any voltage stabilizer, voltage regulator that you're familiar with can be applied here.

Q.   Without departing from the spirit of the invention?

A.   Correct, uh-huh.

Q.   Okay.  Now, Mr. Warren asked you about this capacitor right here; right?

A.   Yes.

Q.   What is this line right here?

     Is that the second terminal?

A.   This is the second terminal, correct.

Q.   So the capacitor is connected only to the switch itself?

A.   That is correct.  As I stated previously, this capacitor is connected to the voltage stabilizer.  It's acting together with it.

Q.   So it's not connected to an external circuit of any sort?

A.   You can see the rest of the external circuit here.  It's not connected to any other node but that internal to the three terminal noninverting transistor switch.

Q.   And when this says that the bypass pin is connected to an internal node, what does that mean?

A.   It means that it's connected to a node that is internal, meaning internal to that product; in this case, inside the three-terminal switch.

The capacitor is connected to the internal node that's the voltage stabilizer.  It's connected there, and it's being used to help filter that voltage.

Q.   Does it make a difference, the way this is connected to all the circuits, whether it's inside or physically outside electronically?

A.   No.  In this case you could package this capacitor into the main package.  And, as you can see, if you were to move that capacitor to the package, there would be no other connections to anything else.

So you could have this capacitor inside or out.  Of course, it would behave exactly the same way.  I think this was a matter of convenience to have it available for the customer to place.

Q.   Because the customer can maybe use one depending if it's a washing machine or a television or a phone charger, given that flexibility?

A.   The data sheets in the products are slightly different across the floor, but each of them explained that you need some minimum capacitance for a stable, good operation of the product.  And they also use the value of the capacitance for different reasons.

And so the customer can select different capacitors, get different functions from the chip which are not tied to the invention we're talking about.  But as far as just operating

relative to filtering the voltage stabilizer, it's all the same, and the customer can select the value of capacitance.

Q.   Dr. Zane, does the language that Mr. Warren showed you on the data sheets in the patents in any way change your opinion in this case?

A.   Absolutely not.

And the section that was highlighted and the section that wasn't, it was my understanding that we covered the basic features there, that, you know, when the voltage is high, the voltage stabilizer pulls current and can operate.  When the voltage is low, there's no -- no power available.  And so that was the section that was highlighted.

Q.   And Mr. Warren wouldn't let you explain anything.

Is there anything else you want to explain before he cut you off?

A.   That was the main feature that I was looking to explain, just highlighting that I believe we had explained this behavior.  Voltage stabilizer pulls the power when it's available and has no power to supply when it's not.

        MR. SUDER:  That's all I have.  Thank you, Dr. Zane.  Thank you, Your Honor.

        THE COURT:  Anything else on recross?

        MR. WARREN:  No.  Thank you, Your Honor.

        THE COURT:  All right.  Dr. Zane, you may step down.  Thank you.

Plaintiff may call its next witness.

MR. SUDER:  Yes, Your Honor.  We would called Brad Brunell to the stand.

If I may just have a moment to clean up a little.

THE CLERK:  Please raise your right hand.

**BRAD BRUNELL**,

called as a witness for the Plaintiff, having been duly sworn, testified as follows:

THE CLERK:  Please be seated.

State your full name and spell your last name for the record.

THE WITNESS:  My name is Brad Brunell.  A little bit louder than the professor.  Sorry.

I'm Brad Brunell.  Last name is B-r-u-n-e-l-l.

THE COURT:  Thank you, Mr. Brunell.  You may proceed.

MR. SUDER:  Thank you.  Your Honor, I have a notebook. May I approach the witness?

THE COURT:  Yes.

MR. SUDER:  Here you go.

**DIRECT EXAMINATION**

BY MR. SUDER:

Q.   Mr. Brunell, good afternoon.

A.   Good afternoon.

Q.   What is your role at Opticurrent?

A.   I'm the managing member of Opticurrent.

**Q.** And I told the jury a little in opening.

Who is Opticurrent?

**A.** Opticurrent is the company that owns the Congdon patent portfolio.

**Q.** And what does Opticurrent do?

**A.** Opticurrent's goal is to license the Congdon patent portfolio to companies that are utilizing the technology with the invented inventions.

**Q.** And, Mr. Brunell, tell me a little about yourself. Where'd you grow up?

**A.** I grew up here in the San Francisco Bay Area, in the East Bay.

**Q.** And did you go to college?

**A.** I did.  I went to one year to UC Berkeley, and then I graduated from UCLA.

**Q.** And after you graduated from UCLA -- by the way, are you married?

**A.** I am married.

**Q.** Have kids?

**A.** I have five children.

**Q.** Okay.  What did you do after college?

**A.** Uhm, well, I guess I should probably go back.  I got a computer -- when I was in junior high, my father bought me a computer and I learned how to program.

And so while I was in college, I started a business using

personal computers to do essentially database merges to print projects.  Something like my father's business did.  I kind of took it on smaller scale, and I did that business for a few years after college.

Q.   And what happened after that?

A.   I sold that business in late 1990, and I joined Microsoft in 1991.

Q.   Okay.  And what did you do at Microsoft?

A.   I started off in corporate account sales, and then I moved to corporate headquarters in 1994.  And the company was growing very quickly.  I had a different job every year or two.

Relative to intellectual property, my key role, where I learned a lot, was I was in the Windows product group working on audio and video technologies and streaming -- like, NetFlix streaming, the underlying technology for that.

Q.   You said related to intellectual property.

What did you do relating to intellectual property?

A.   Well, I was what's called a product manager, responsible for the business aspects of these audio and video technologies.

And Microsoft was accused of infringing patents held by Sony, Philips, RCA, Technicolor, a range of companies.  So, in order to have my products fill the ship, we had to get permission, the rights to be able to utilize those patented inventions.

Q.   And were you later promoted from that group, from the

Windows product group?

A.   So I guess I did a good job, and there were a lot of problems to solve, and I solved them all.  I ended up getting promoted to run intellectual property licensing for all of Microsoft, all products across the company.

Q.   How many people did you have working for you in that capacity?

A.   Fourteen.

Q.   And how many patents, at the time you were there, did Microsoft have?

A.   Microsoft had a little over 3,000 patents -- sorry, 30,000 patents in its portfolio and was producing about 3,000 patents a year.  Three thousand a year, 30,000 total.

Q.   When you were there at Microsoft, in this job, was Microsoft utilizing all of its patents?

A.   No.  You can't possibly -- when you have a large portfolio, it's unlikely you'd use them all.

Q.   What'd you do with them?

A.   In some cases we would sell them to other corporations or we would license them to other companies that would make products based on those, like hardware products or things that Microsoft may not make.

Q.   Did Microsoft consider their patents their property?

A.   Absolutely.  It was a key asset of the company.

Q.   And what types of activities did you do in your job as

head of licensing at Microsoft?

**A.**    Well, so I was responsible for, really, two things: inbound and outbound patent licensing.

**Q.**    Let's take one at a time.

**A.**    Sure.

**Q.**    Wherever you want to go.

**A.**    So inbound, at the time I was in that role, Microsoft had 30 patent litigations against it.  It's not unusual for a large corporation to end up utilizing inventions from other places, and so litigations are part of a large business.

And so I would work on -- work with the lawyers on negotiating the license agreements or settlements or deciding to fight through trial, depending on what made sense.

And then there were other cases where there was no litigation, but we knew strategically it made sense to buy or license patents.  And so myself or my team would negotiate either the acquisition of small companies, or sometimes bigger companies, to get intellectual property rights, or it would license technologies from third parties.

**Q.**    So that's inbound.  You said also outbound.

What is outbound?

**A.**    So outbound would be one where competitors or third parties were making product based on -- that we thought they infringed our technology.  And so occasionally we would litigate or, more likely, would negotiate what was called a

patent cross-license where two parties would agree to license each other.

And then sometimes we would spin out or sell patents to third parties or we would license them to third parties if they were going to manufacture a product utilizing our invention so they would have the rights to do so.

Q. What kind of companies did you work with in this regard?

A. Ranging anywhere from large multinational companies down to individual inventors or small companies.

Q. And how many licenses were you involved with, would you say, negotiating licenses while you were in your role at Microsoft?

A. Hundreds.

Q. And when did you leave Microsoft?

A. I left Microsoft in late 2007, after 16 years.

Q. And then what'd you do?

A. I went to a publicly-traded company that did patent licensing and partnered with inventors to do licensing of portfolios.

Q. How long were you there for?

A. I stayed there for one year.

Q. All right. And then what'd you do?

A. I had an opportunity to run the research and development department for the British Broadcasting Corporation in London, the BBC. They have a 140-person R&D group.

And I love the invention part, so it was fun to not only do the licensing but also to work on the new inventions, so I went there.

Q.   Did you work with inventors?

A.   Yes.  As I mentioned, there was 140 inventors in the R&D department.

Q.   And what did you do with them?

You said you liked working with them.  Explain.

A.   Well, I would work with the inventors to go through their areas of research prioritizing what they were going to file patents on, what areas we would invest resources, people, to do work on, what partnerships we would have with third parties. Really just a broad level of allocation of resources.

Q.   And did BBC make products with their patents?

A.   No.  The BBC is a broadcaster.  And in the initial charter, when the British government set up a broadcasting entity, they put in the charter having an R&D function to advance the technology of broadcast; first radio and then later television.

And so the BBC didn't make radio transmission towers or broadcast video equipment.  But because they were such heavy users, they had a lot of brain power about things to improve, and so they would create inventions and then license those to third-party hardware manufacturers or third-party equipment manufacturers.

Q.   And how would BBC get paid for licensing this technology to manufacturers and other parties?

A.   The agreements were all a per-unit royalty.

Q.   What does that mean?

A.   That means that for every -- every widget or every unit that the manufacturer sold, a percentage of royalty would come back to the British Broadcasting Corporation.

Q.   And would that help fund future research and development?

A.   Yes.  We did it that way because the income that came back into the R&D department would be used to fund hiring people or to pay for projects.

Q.   If the BBC had all these inventors, what did they need you for, with all due respect?

A.   Well, they needed me to prioritize what things to do because things were changing and had to be somewhat future-looking, and I had been on the cutting edge of audio and video, where it was going in terms of transmission via Internet protocols.

     But then they also needed the business expertise, to help clean up their licensing programs and to think about what patents to keep, which ones to file new, and then also which ones to let go into the public domain.

Q.   Did you assist the inventors in helping them get the patents?

A.   There was legal resources that would do that, but I did

work with them on honing their ideas and making sure that they were commercial in the way they were executed.

Q.   By the way, sir, are you the inventor on any -- excuse me.

Are you the named inventor on any patents?

A.   I'm either a lead inventor or coinventor on -- there were 14 patents.  I think some of them have lapsed, but Microsoft owns all these patents.

Q.   These were inventions that you contributed to when you were at Microsoft?

A.   That's correct.

Q.   Now, when did you leave the BBC?

A.   So I was brought in as an outside consultant to fix an area that was having problems.  I spent the first year and a half leading the group and making changes, and then I spent the second year and a half advising and coaching the new leader that I helped hire.  So three years total.

Q.   Why did you leave?  Were you ready to get out there?

A.   I really enjoyed the process, and it was fun, but I came in to fix a problem.

Also, I had partnered with Mr. Vachon while I was doing that project and decided that I knew enough that we could do patent licensing better than anyone else in the marketplace, and we thought there was a need for small and medium-sized inventors to have our skill set.

Q.   How did you finance this new venture?

**A.**   We self-financed.  We paid for it out of our own pocket.

**Q.**   You put in your own money?

**A.**   That's correct.

**Q.**   How did you meet Mr. Vachon?

**A.**   Mr. Vachon had been an executive at Oracle, and he spun out and was the president of a set top box company called Liberate, here in Redwood City.

And the CTO of Liberate at the time was an executive who's been a repeated successful entrepreneur in Silicon Valley, who's a great friend of mine.  And so he said that Mr. Vachon and I should talk.

And so through that introduction we grew to be friends over a couple years and decided to do this business together.

**Q.**   Did you form a company?

**A.**   We did.

**Q.**   Did it have a mission?

**A.**   Our goal was to partner with inventors and get quality inventions and run licensing programs to generate research -- develop income for the inventors and for us to support that cycle of research and development.

**Q.**   What did the inventors contribute when you partnered with inventors?

**A.**   Well, so when we would go to an inventor, they would typically already have the patent portfolio.  They had done the research and they had filed the patents.

And so when we were coming in, we were basically working with them to be their business partner on the -- you know, the thing about it, they created the product or the property and getting the patents issued, and we would basically help take those into the marketplace and deal with complexities associated, the special skills, the special network of people that we knew to be able to license those products, those patents.

Q.   They contributed the property.  What did you and Mr. Vachon contribute?

A.   So we contributed the skills and expertise.  We had a network of people that we knew that could do the necessary functions you need to successfully license.  And we had capital, so we supplied the money.  A lot of small inventors don't have money.

Q.   When you say "capital," you had money?

A.   That's correct.  We supplied the money needed to take the product or the property to the point of successfully getting money for it.

Q.   When you made this partnership, did you share with the inventors the proceeds?

A.   Our initial deal was usually offering to pay all the expenses and then do a net 50/50 split after those expenses were recovered.

Q.   Now let's talk about Jim Congdon.

How did you hear of Mr. Congdon?

**A.**   I received a call from a lawyer we were working with on another portfolio, and he said he had met Mr. Congdon and thought it was an interesting invention, but they didn't have the capability to do the due diligence to prove the infringement.  In later answers, I can get into how we did that and why it's pretty intensive.

Basically, he needed a business partner that could do the technical work and that had the business skills.  So Mr. Congdon really wasn't going to be able to successfully connect to a law firm without having those other business pieces.

**Q.**   And at the time, what experience did you have in the semiconductor space?

**A.**   Pretty extensive.  So when I was at Microsoft, I worked on Windows security technology, so I worked closely with Intel and A&D.  And then also we worked with what are called TPM chips. So if you ever see a fingerprint reader on a device, like a laptop, so Windows actually had specific drivers and security architecture, so worked closely with those manufacturers.

At the time they were about a dollar semiconductor piece part for the fingerprint readers to store the secret information.

And then I'd had -- I'd set up a joint venture with a company called Sandisk, that makes flash storage.  Flash

storage is essentially semiconductors.

And then I had also -- literally, at the time that I met Mr. Congdon, I was consulting to a audio/video semiconductor company in Israel, and I helped them come up with their whole licensing strategy. So I was pretty familiar with semiconductor activity by the time I met Mr. Congdon.

Q. So what was the first thing you did when you heard about Mr. Congdon's patent?

A. Well, you always start with reading the claims that defines the property lines, what the property is. And so we read the claims.

Q. Did you understand them?

A. Reasonably well. As I mentioned, I'd been in the computer industry since I was a early teenage boy in the late '70s, early '80s. And from that, I had a lot of knowledge. Like, I built PCs with power supplies and I worked a lot. So, yes, I understood them reasonably well.

And then we also have a general counsel by the name of Ron Moore inside of our company who had extensive experience in Silicon Valley with hardware and was also familiar with this technology area.

And so he and I worked together on the diligence, and we actually brought in other people to do work as well.

Q. What else did you do?

Did you look into Mr. Congdon's background?

**A.** Yeah. So I could give a very long answer of all the diligence steps that we do, but one of the things you do is you want to see what the inventor's background was to make sure that they were --

**Q.** Let's -- it's late, tired. Just slow down so the court reporter can get everything and make sure we can hear everything you're saying. Try to slow down a bit.

**A.** So with an inventor, you want to look at their background. So Mr. Congdon had a strong educational background. He'd had a graduate degree from Stanford in electrical engineering. He'd worked for four or five companies that were cutting edge in the space. He'd done multiple inventions that had been productized at those companies.

And then he -- when we acquired the portfolio -- so there'd been issued patents in the U.S. on the '323 and the '623 and some other patents in the U.S., Canada, and Europe. So that means multiple countries verified that these were quality inventions.

And so we thought, okay -- and then talking to him and meeting him and being exposed to people that have the skill set, he is a real quality inventor and has the pedigree that you would look for.

**Q.** And did you meet with him?

**A.** Yes, I did.

**Q.** Where'd you meet him?

**A.** We met halfway, in the middle, in Dallas, Texas. He's in Boston, I --

**Q.** What was your observation of him?

**A.** My observation is, brilliant person at his chosen field. Obviously, his knowledge in the field exceeded mine by a lot.

But the things I would do to triangulate an inventor and understand what they do and the special capability he had. But he was all about living in the lab and his art and what he does, and he wasn't particularly strong in other areas of human interaction.

He's a little bit clumsy and not -- not well-spoken on business aspects, but when you get into the technology, he shines, and that's what he's about.

**Q.** Did you have -- did you work with people like Mr. Congdon when you were at BBC?

**A.** Throughout my career, I've worked with inventors and have a pretty good sense of the style that works -- obviously, people are unique and you have to adapt to every person.

**Q.** Did you check the ownership aspects of the patent?

**A.** Yes. It's common you'll get the chain of title. It's like when you buy a car, you want to make sure the title is clean.

So if Opticurrent was going to own these patents, it had to have the ability -- to license them to other people, you need what's called "all substantial rights." And so we

verified the ownership title and made sure it was clean.

**Q.** Did you investigate into whether he had tried to commercialize or license his technology?

**A.** Yes, we did.

**Q.** Is that important?

**A.** It is.

**Q.** How would you characterize it?

**A.** Well, if there's a license agreement for the patent -- a patent or patents, that means that there's commercial activity that might set a marketplace rate or be a consideration that you would look at relative to, sort of, market conditions and how the patent gets valued or set up for licensing. So it was an important thing to consider as a precedent.

**Q.** Did you look at the economic conditions surrounding the license?

**A.** Yes. So you look at -- you look at -- in this case, Mr. Congdon was an individual inventor, you know, which companies did he license the patent to or patents or individual patents or groups of patents? Under what terms?

Those are things that you would actually consider because they are impactful.

**Q.** Was it important to you that it was licensed so a product could be made?

**A.** Yes. So in the case of the one patent license that we did find, Mr. Congdon had licensed the '323 patent to a silicon

manufacturer in Canada.  So that was an important thing.

You had a manufacturer that wanted to make a chip that incorporated claims from the '323 patent, and they needed permission, and so they took a license from Mr. Congdon to get the permission to do so on a per-unit royalty basis.

Q.   Did you talk to Mr. Congdon's brother?

A.   Yes.  So Mr. Congdon has an older brother who's kind of a business partner and had helped fund some of the activity to keep the patents alive and pay the patent maintenance fees until they could find other help, which we ended up being.

Q.   Did you talk to Mr. Congdon's patent attorney?

A.   Yes.  I talked to the patent attorney who had done the prosecution of the patents and had worked on them.  That -- that's a standard part of diligence.

Q.   Were you able to observe Mr. Congdon's financial condition?

A.   Yes.  So it was clear that -- and we also reviewed the company documents.  So Mr. Congdon had a manufacturing company called Bit Parts, that manufactured '323 parts and had an inventory of them.  And that company was in significant debt.  And so we knew that he had some financial challenges.

Q.   Did you talk to anyone in the industry as part of your investigation/diligence on this possible deal with Mr. Congdon?

A.   Yes.  Both Mr. Moore and I called people that we knew in the silicon space, or that had expertise, that we could bounce

ideas off of.

Q.   And did you decide to pursue this opportunity?

A.   Yes, we ended up doing a transaction with Mr. Congdon to acquire the patent portfolio and Bit Parts.  And there's a bunch of other considerations we could go through if you like.

Q.   Was what you did with Mr. Congdon consistent with the type of things you did at Microsoft and the BBC?

A.   Yes.

Q.   Now, when was Opticurrent formed?

A.   I believe September 2012.

Q.   Okay.  And what was its purpose?

A.   So we put the patents -- the patent portfolio that we got from Mr. Congdon into Opticurrent, LLC.  So its purpose was to license those patents.

Q.   And you acquired the patents.  What else did you acquire?

A.   So we also acquired all the assets and liabilities of Bit Parts.  So we took the manufacturing company on and fulfilled inventory for a couple customers that he had sold parts to that wanted parts, still, of the '323 design patent.

     And we paid off his debts --

Q.   You paid off Bit Parts' debts?

A.   So we paid off Bit Parts' debt, we actually --

Q.   Slow down a little bit, Mr. Brunell.

A.   Yeah.  So we paid off Bit Parts' debt.  We also advanced money to Mr. Congdon personally to pay off some personal debts.

And so, as I mentioned, the structure is that we do a revenue share, but any money that we put out of pocket gets recovered first.  So we advanced money against his revenue share to pay off all the debts.

We bought some new equipment for his lab.  Like, he needed a new oscilloscope and a new laptop.  We did a range of things to get -- to get him, basically, caught up to where you want him to be.

Q.   Did you give him a consulting agreement?

A.   Yes.  We agreed to -- in order to give him money to live on while we learned and did some of the due diligence we needed to do on the infringement research, we gave him a consulting agreement that paid him -- I think it was 3,000 a month.

Q.   Did both sides have an attorney to work on the project?

A.   Yes, we used Mr. Moore, and he used the firm Rich May that he had also the patent prosecution.

Q.   Mr. Brunell, would you look in your binder at Exhibit Number 7.

A.   Seven.

Q.   And is this the package of materials of the agreement that you acquired; the patents, the stock, the consulting agreement, and all the like?

A.   That's correct.  It is the overall purchase and sale package.

        MR. SUDER:  Your Honor, we would offer Trial Exhibit 7

into evidence.

THE COURT:  Any objection?

MR. SCHERKENBACH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 7 received in evidence.)

BY MR. SUDER:

Q.  And would you look at Exhibit Number 2.

Is this a copy of the license agreement you talked about that you reviewed?

A.  Yes, this is the QBAR license, by which QBAR, Inc., in Canada, took a license to the '323 patent.

MR. SUDER:  Your Honor, we would offer Trial Exhibit 2 into evidence.

THE COURT:  Any objection?

MR. SCHERKENBACH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 2 received in evidence.)

BY MR. SUDER:

Q.  And then would you look at Exhibit 35, please.

Is this an agreement that relates to the assignment of the patents?

A.  Yes.  This is a -- so Mr. Congdon's brother and other family and friend members invested to help Mr. Congdon keep the patents alive by paying patent maintenance fees to the U.S., Canada, and Europe, and so they own about 20 percent.  So

whatever interest they have got assigned to Opticurrent as well.

MR. SUDER:  We would offer Exhibit 35 into evidence, Your Honor.

THE COURT:  Any objection?

MR. SCHERKENBACH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 35 received in evidence.)

BY MR. SUDER:

Q.   Exhibit 36, Mr. Brunell, what is that?

A.   This is the patent assignment from James Congdon personally.  So what rights he had.  We had to get all substantial rights so anybody that possibly had rights, we got assignments from them to have the patent rights come in to Opticurrent, LLC.

MR. SUDER:  Your Honor, we offer Exhibit 36 into evidence.

THE COURT:  Any objection?

MR. SCHERKENBACH:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 36 received in evidence.)

BY MR. SUDER:

Q.   Lastly, Exhibit 37, what is that, sir?

A.   This is also an assignment from Forfend.  I guess, was the previous one an assignment?

Hang on one second.  Sorry.  The first one was an operating agreement.  Sorry, go back to 35.  It's actually the operating agreement between Forfend and Congdon, which sort of defined their investments and such.

37 is the actual assignment from Forfend, the family and friends group, into Opticurrent.

**MR. SUDER:**  We would offer Trial Exhibit 37 into evidence, Your Honor.

**THE COURT:**  Any objection?

**MR. SCHERKENBACH:**  No objection.

**THE COURT:**  Admitted.

(Trial Exhibit 37 received in evidence.)

**MR. SUDER:**  Your Honor, at this time we would ask to read from the stipulated facts.

**THE COURT:**  Which one?

**MR. SUDER:**  1, 2, 3, and 5.

**THE COURT:**  All right.  Go ahead.

**MR. SUDER:**  "One, Plaintiff Opticurrent is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Marshall, Texas;

"Two, Defendant Power Integrations is a corporation organized and existing under the laws of the State of Delaware with, its principal place of business in San Jose, California;

"Number 3, plaintiff is the owner of all rights, title,

and interest in the '623 patent;

"And Number 5, plaintiff filed its complaint in this litigation on April 1, 2016."

THE COURT: All right. Again, the jury is supposed to take those facts as true. Thank you.

BY MR. SUDER:

Q.   Now, Mr. Brunell, after you acquired the patents and formed Opticurrent, what patents did you focus on?

A.   Well, when we initially acquired the portfolio we looked at the '323 patent because it looked like it was pretty heavily in use. But there was only about a year and a half left, so we decided -- it's very expensive to do what are called teardown, so we decided to put all of our effort into focusing on the '623 patent.

Q.   And did you -- what else did you do -- what's the first thing you did in terms of your due diligence?

A.   Well, after we acquired the portfolio, we talked to Mr. Congdon about which parts he believed might be infringed by which parties. And Power Integrations was one.

We went and hired an engineering firm to do what are called teardowns, where they remove the epoxy off the chip and they follow the electrical paths to look at, essentially, like the equivalent of looking after the fact at specifications, does the chip actually infringe.

It's basically an engineering firm looking at the

electrical paths and the elements on the chip to be able to assess do they believe that the chip infringes the claims.

Q.   Now, did you -- you said you reviewed the license agreement, Exhibit 2.

A.   The QBAR license?

Q.   Yes.

A.   Yes.

Q.   And I believe you said that was only for the '323 patent?

A.   Yes.

Q.   And if I may show you on the ELMO the definitions.

It says, this license -- This license agreement is effective March 1, 1994, between James Congdon, individual, Massachusetts, the licensor, and QBAR Tech 8, a Canada corporation, the licensee.

Do you see that?

A.   I do.

Q.   It says the licensor is the inventor and owner of an invention disclosed in the U.S. patent 5,134,323.

Is that the '323 patent.

A.   That's correct.

Q.   And below here it says, in definitions, QBAR switch means a three terminal noninverting transistor switch claimed and covered by the '323, period.  QBAR is a trademark of licensee.

Do you see that?

A.   I do.

**Q.**   And then it defines net sales to mean the sum of licensee's and sub-licensee's invoiced sales of QBAR switches, less discounts and allowance in accordance with accepted industry norms.

When were you analyzing this investment opportunity, what importance did you place on that?

**A.**   Well, it was an example where the individual inventor did a license agreement to a manufacturer that was going to license and got permission from him on a per-unit royalty.  So it's an important precedent.

Because QBAR was essentially basing their chip design on Mr. Congdon's invention.  I viewed that actually he got paid 3 percent, which you'll see later in the agreement, plus some equity in the company.

So I actually viewed that it was a pretty valuable precedent given it was -- it was the only precedent of a license agreement that Mr. Congdon had entered into.

**Q.**   Now, Mr. Brunell, it says, the next paragraph 3, the license grant.  The licensor grants to the licensee a worldwide exclusive license to make, have made, to use, and to sell QBAR switches under any patent or patent rights hereinafter owned by licensor.

Is that similar to the type of licenses you would negotiate at Microsoft and BBC?

**A.**   It is, but it's scoped only to the '323 and not to the

other patents in this portfolio.  So I knew there was no impairments on those.

Q.   Now, it says here, under royalty payments that, The licensee agrees to pay licensor a royalty of 3 percent of net sales.  The licensee shall, within the quarterly report Section 4 of this agreement, pay to the licensor all accrued royalties.

Is this the per-unit royalty concept you were talking about earlier?

A.   Yes, it is.

Q.   And was this for an exclusive license?

A.   It was, although there was an option for it to become nonexclusive.

Q.   And that's down here.  If someone else wanted to also use it, they would lower their royalty so someone else could use it?

A.   That's correct.

Q.   What significance did you place on the royalty rate at the time you were evaluating this investment opportunity?

A.   Based on my industry experience, I knew it was -- I looked for a range between 2 and 5 percent, and so I thought it was in range.

And, again, I valued that some of Mr. Congdon's contribution was paid for in equity in addition to the per-unit royalty.

Q.   Is that based on your experience in the semiconductor

industry?

**A.**   That's correct.

**Q.**   Now, sir, as part of your investment in the -- in investigation, what happened to the QBAR Tech, the Canadian company?

**A.**   The business founder of QBAR Tech left after a couple of years.  And Mr. Congdon created a new company, Bit Parts, that acquired the inventory and sort of took over the efforts.

**Q.**   And did you know who that partner was and what his experience was in the QBAR-Congdon relationship?

**A.**   So the partner's name was Dave Travathan, and he had been an executive at a silicon company that had worked with Mr. Congdon at a previous job, as a vendor.  And his company had gone public.  And so he was an experienced operator in the semiconductor business.

**Q.**   Do you know how the license agreement came about between QBAR Tech and Mr. Travathan and Mr. Congdon?

        **MR. SCHERKENBACH:**  Objection, Your Honor.  Lacks foundation.  Calls for speculation.

        **THE COURT:**  Sustained unless you lay a foundation.

**BY MR. SUDER:**

**Q.**   As part of your investigation did you have an opportunity to question Mr. Congdon and valuate for yourself so it informed what type of decision you would do, information you might have acted upon in evaluating this opportunity?

MR. SCHERKENBACH:  Objection.  That calls for -- it's leading and it still calls for speculation.

THE COURT:  Well, calls for hearsay unless you can establish a relevant exception here.  Sustained.

BY MR. SUDER:

Q.   Mr. Brunell, did you want to know the circumstances behind the QBAR license as part of your investigation into the acquisition?

A.   Yes.  I asked Mr. Congdon about how they had arrived at the numbers.

Q.   And was that information that was important to you in making your decision?

MR. SCHERKENBACH:  Objection, Your Honor.  This is all hearsay.  It's calling for hearsay.

MR. SUDER:  I'm not offering it for the hearsay purposes.

THE COURT:  Well, what's the purpose of asking him this level of detail about his diligence at this point?

We've established chain of title.  There's no doubt that the plaintiff has chain of title at this point.

I allowed some of this background information, but now we're getting far afield.

MR. SUDER:  I'll move on, Your Honor.

BY MR. SUDER:

Q.   Mr. Brunell, so do you know how much you paid of

Mr. Congdon's business debts, approximately?

**A.**   I think, all in, we were somewhere between 80 and a hundred thousand dollars on the initial transaction.

**Q.**   And then how much did Mr. Congdon -- did he receive for his personal debts?

**A.**   15,000.  Again, as an advance.

**Q.**   Yes.  And you gave him a consulting agreement?

**A.**   That's correct.

**Q.**   And you purchased the inventory and tried to sell it off?

**A.**   And to keep it operational so that those customers weren't abandoned.

**Q.**   And you bought him a new lab and laptop equipment?

**A.**   Yeah, we updated his lab equipment.

**Q.**   Yes.  And how much did you spend in this reverse engineering in evaluating the products that might -- you would want to pursue in a licensing campaign?

        **MR. SCHERKENBACH:**  Objection, Your Honor.  Relevance.

        **THE COURT:**  I don't see the relevance.  Sustained.

**BY MR. SUDER:**

**Q.**   How long did it take you to evaluate product before you can make any type of decision?

    You acquired this in 2012; correct?

**A.**   Right.  We engaged a engineering firm called Teos [phonetic], and they did work throughout 2013 and into 2014.

**Q.**   And what did you do next?

**A.**   We took the reports that they generated, that we felt proved infringement, and we investigated, basically, more sort of business research about Power Integrations.

**Q.**   And did you have attorneys at the time to bring this case?

**A.**   No.   There had been recent law changes that made it even more expensive to bring a patent litigation, and so we had to wait until we saved up enough money to afford what this fight would cost.

**Q.**   How long did that take you?

**A.**   Well, we filed in 2016, so I think it took us about a year, year and a half to save up enough money.

**Q.**   How much have you and Mr. Vachon spent on this portfolio?

          **MR. SCHERKENBACH:**  Objection, Your Honor.  It's irrelevant.

          **THE COURT:**  Sustained.

**BY MR. SUDER:**

**Q.**   Mr. Brunell, based on your experience at BBC and Microsoft and knowing what you know of Mr. Congdon, could he undertake enforcing this patent on his own?

          **MR. SCHERKENBACH:**  Objection, Your Honor.  That calls for speculation.

          **THE COURT:**  Overruled.  He can answer that one.

          **THE WITNESS:**  No, it would be very difficult if he didn't have, firstly, the financial resources.  It takes a significant amount.

Second, you have to have the understanding of the process. There's a lot of complication.  And to be as special as Jim was at semiconductor design makes it difficult to get the skills and the knowledge you need to do the business parts.  So I didn't think he could do it.

MR. SUDER:  I'll pass the witness, Your Honor.

THE COURT:  All right.  Thank you.

Cross?

MR. SCHERKENBACH:  Yes, Your Honor.

Hello again, Ladies and gentlemen.

**CROSS-EXAMINATION**

BY MR. SCHERKENBACH:

Q.   Mr. Brunell, we haven't met.  My name is Frank Scherkenbach.  I'm the lead lawyer for Power Integrations. Nice to meet you.

A.   Nice to see you again.

Q.   I want to start, first of all, with the revenue share you testified to on direct.

I believe you said that the net revenues recovered from this case will be split 50/50 between Opticurrent and Mr. Congdon; is that right?

A.   After expenses are recovered, yes.

Q.   After expenses are recovered.

In fact, though, Mr. Brunell, it isn't just Opticurrent and Mr. Congdon who will share in any recovery; isn't that

correct?

A.   Opticurrent has a line of credit with a financing organization.

Q.   You have a personal financial interest in this case; right?

A.   I do.

Q.   And there are companies other than Opticurrent in which you have a financial interest that could get a piece of the recovery in this case; right?

A.   Yes.

Q.   One is called IPMG; right?

A.   Yes.

Q.   That's an offshore company that provides financing for several IP licensing companies, including Opticurrent; right?

A.   I am a shareholder of that company, yes.

Q.   So if Opticurrent recovers any money, IPMG gets some of it; right?

A.   Inside of the Opticurrent 50 percent split, there is -- there's a spreadsheet between IPMG for the money it lent.

Q.   In fact, IPMG could get upwards of 60 to 70 percent of Opticurrent's share of the recovery; right?

A.   Depending on two variables; the amount of money drawn on the credit, and the amount of time that the money is out.  Very similar to a loan.

Q.   Is the answer to my question yes?

**A.**   Yes.

**Q.**   All right.  And you and your family collectively own 31 and a half percent of IPMG; true?

**A.**   Yes.

**Q.**   Now, there's another company called Longhorn Asset Group; right?

**A.**   Yes.

**Q.**   You're a shareholder in Longhorn Asset Group; true?

**A.**   Yes.

**Q.**   Some of the money that Opticurrent recovers could also be distributed up to Longhorn Asset Group; right?

**A.**   Yes.  Longhorn Asset Group is the parent company of Opticurrent.

**Q.**   And you personally receive a share of money from Longhorn Asset Group also; true?

**A.**   Yes.

**Q.**   So, to sum up, if Opticurrent were to recover money in this litigation, you and your family stand to recover a portion through IPMG and through Longhorn Asset Group; right?

**A.**   Yes.

**Q.**   Okay.  Now, there's actually one more group that gets a share of any recovery in this litigation, isn't there?

**A.**   Can you clarify your question, please?

**Q.**   Opticurrent's law firm gets a share of the litigation proceeds also, don't they?

**A.** Uhm, they are compensated for their work on the litigation, yes.

**Q.** Yeah. You've talked -- just on direct, toward the end, you said something about saving up to pay the lawyers. Did I hear that right?

**A.** No, the legal expenses.

**Q.** Legal expenses. Okay.

But, in fact, the lawyers are being paid out of the recovery from the litigation, aren't they?

**A.** They're engaged on a contingent basis, meaning they do share in the revenue. So if they win, they get paid. If they lose, they don't.

**Q.** Okay. Now, Opticurrent's business -- so you agreed, I believe, that Opticurrent's only business is licensing Mr. Congdon's patents; true?

**A.** Yes. It was set up that way on purpose.

**Q.** Okay. So Opticurrent doesn't create any products; true?

**A.** No, Opticurrent does not.

**Q.** Doesn't manufacture any products; right?

**A.** No, it does not.

**Q.** It doesn't do any research and development; right?

**A.** No, it does not.

**Q.** Okay. And as to licensing, Opticurrent has never actually entered a license with anyone for the Congdon patents; true?

**A.** Not yet.

**Q.**   And since Opticurrent was created in 2012, it hasn't received any licensing revenue; right?

**A.**   No, not yet.

**Q.**   Okay.  So we can agree no other company has licensed the '623 patent; right?

**A.**   No.

**Q.**   Okay.  Well, actually, my question was:  We can agree no other company has licensed the '623 patent; true?

**A.**   The '623 patent has not been licensed to any other companies.

**Q.**   Okay.  In fact, Opticurrent hasn't received any offers to license the '623 patent; true?

**A.**   No, it has not.

**Q.**   Well, you've had discussions with Fairchild about a potential license to the '623 patent; right?

**A.**   Yes.  I have a relationship and have talked to Fairchild now on semiconductor.

**Q.**   Fairchild and On are now related parties; right?

**A.**   On Semiconductor acquired Fairchild last year.

**Q.**   Neither Fairchild nor On made an offer to license the '623 patent; true?

**A.**   No.  I mean, no, they have not.

**Q.**   Okay.  We're backwards again.

They have not made an offer to license the '623 patent; true?

**A.**   There has been no license agreement between On and Opticurrent.

**Q.**   Okay.  Now, one license you did talk about on direct was this license that involved QBAR Tech.  Do you recall that?

**A.**   I do.

**Q.**   Now, the QBAR license -- this is TX 2 -- that doesn't involve the '623 patent; right?

**A.**   No, it does not.

**Q.**   That was just about the '323 patent; correct?

**A.**   Right.  The agreement predated the existence of the '623 patent by quite some time.

**Q.**   Right.  So, in other words, the QBAR license was about the prior art patent, the '323 patent; true?

**A.**   Yes, that's correct.

**Q.**   Okay.  Now, you gave some testimony about the QBAR license in your deposition.  Do you recall that?

**A.**   I do.

**Q.**   It was back in May of 2017; right?

**A.**   Yes.

**Q.**   Okay.  And at that time you couldn't recall whether Mr. Congdon had even entered into a license with QBAR; isn't that right?

**A.**   No.  The question was asked about Bit Parts first, and I got confused the way your lawyer positioned the questions.

**Q.**   Okay.  I'm going to hand you a copy of your deposition

transcript.  Can we --

MR. SCHERKENBACH:  Your Honor, may I approach the witness?

THE COURT:  Yeah.

MR. SCHERKENBACH:  Thank you.

Your Honor, I have a binder if you'd like one, but you have the depo transcript.

THE COURT:  I will work off of this.

Which volume, et cetera.

MR. SCHERKENBACH:  Yes.

BY MR. SCHERKENBACH

Q.   So let me direct you, it's the May 18, 2017, deposition.

A.   Is that section 1?

Q.   It's what's called volume 1 in your binder, yes.

Page 201, lines 12 through 14.  Just let me know when you're there.  So 201, 12 through 14.

MR. SCHERKENBACH:  And, Your Honor, with your permission, I'd like to read that.

THE COURT:  Go ahead.

MR. SCHERKENBACH:  I'm sorry, I didn't --

THE COURT:  Go ahead.

MR. SCHERKENBACH:  Thank you.  Okay.

"Q.  Did Mr. Congdon enter into an agreement with QBAR Tech?

"A.  I don't recall."

BY MR. SCHERKENBACH:

Q.   Now, also in your deposition, you couldn't recall whether Mr. Congdon had ever licensed the '323 patent --

MR. SUDER:  Your Honor, under the rule of optional completeness, I'd like to read the next question and answer.

THE COURT:  He's about to read the next.

Line 15?  Is that what you're talking about, 15 through 17?

MR. SCHERKENBACH:  That's exactly where I'm going.

MR. SUDER:  I'm sorry, Your Honor.  I apologize.

THE COURT:  He's about to do that.

BY MR. SCHERKENBACH:

Q.   So let me repeat my question.

Also at your deposition, you couldn't recall whether Mr. Congdon had ever licensed the '323 patent; right?

A.   When I saw the agreement, I was refreshed.

MR. SCHERKENBACH:  Your Honor, I'd like to read from the witness's deposition at 201, 15 to 17.

THE COURT:  All right.

MR. SCHERKENBACH:  (As read:)

"Q.   Do you know whether Mr. Congdon ever licensed the '323 patent?

"A.   I don't recall."

And you weren't even sure --

MR. SUDER:  Your Honor, I would like the next question

and answer read for optional completeness purposes.

THE COURT:  All right.  Then up til which point?

MR. SUDER:  Up to the top of page 2 to line 5.

THE COURT:  Okay.

MR. SUDER:  Right after the question -- Deposition Exhibit Number 7 is marked, and Mr. Wang, at their firm, asked:

"You've been handed what has been marked as Deposition Exhibit Number 7.  It's a document starting OPTI172 and ending on OPTI176.  Have you ever seen this document before?"

The answer is:

"Yes, I recall it from the diligence period.

"Q.  What is it?

"It is a license from Congdon to a Canadian company called QBAR Tech."

THE COURT:  All right.  Thank you.

BY MR. SCHERKENBACH:

Q.  So until you were handed the agreement in deposition, you didn't recall whether Mr. Congdon had entered a license with QBAR, and you couldn't recall whether he had ever licensed his '323 patent; true?

A.  Uhm, I was getting warmed up.  I have a lot of investments and documents.  When I saw it, I recalled it immediately, but with no context in your questioning I didn't respond particularly well, but.

Q.   You also weren't even sure what products QBAR Tech made; correct?

A.   Well, this deposition was in 2018, and my diligence was in 2012.   And so a lot of water has gone under the bridge, so I had to refresh.

          MR. SCHERKENBACH:   Your Honor, I would like to read from Mr. Brunell's deposition at 202, lines 6 through 8.

          THE COURT:   Okay.

          MR. SCHERKENBACH:   (As read:)

     "Q.   What is QBAR Tech?

     "A.   I don't remember.   I think it -- they may have made switch products."

BY MR. SCHERKENBACH:

Q.   Now, you also said on direct something about Mr. Congdon -- you knew something about Mr. Congdon's partner in QBAR Tech.   Do you recall that?

A.   I don't.

Q.   You don't?

A.   I don't recall the specifics of this deposition, and I don't recall -- please refresh my memory.

Q.   Okay.   Well, is it fair to say you don't know whether the agreement between Mr. Congdon and QBAR was arm's length?

A.   Uhm, I believe it was arm's length enough, based on the conditions.

          MR. SCHERKENBACH:   Your Honor, I'd like to read from

the witness's deposition at 204, lines 11 through 13.

204 -- actually 11 and 13.  12 is objection.

THE COURT:  Okay.

MR. SCHERKENBACH:  (As read:)

"Q.  Was this arm's length?

"A.  I don't know."

BY MR. SCHERKENBACH:

Q.  Okay.  Now, let's turn to the '623 patent.

MR. SUDER:  Your Honor, optional completeness, I again would like the next question and answer read to the jury.

THE COURT:  Lines 15 through, what, 21?

MR. SUDER:  No, this is 204.  The question is -- at the bottom of page 203, line 24 the question is:  "Do you know what arm's length means?"  And that starts on the top of the next page.

MR. SCHERKENBACH:  I don't think that relates, Your Honor.

THE COURT:  I don't --

MR. SCHERKENBACH:  Doesn't make any sense.

THE COURT:  I don't think that really -- you can bring something else out on redirect.  I don't see that as needed for completeness at this point.

MR. SUDER:  Okay.

BY MR. SCHERKENBACH:

Q.  Okay.  Now, so moving from the '323 prior art patent to

the '623 patent, I believe I heard you say on direct that, as part of your diligence, you read the claims of the '623 patent; is that right?

A.   In 2012, Mr. Moore did more work on that than I did.

Q.   And you said you understood them reasonably well.  Is that what I heard you say?

A.   At the time, yeah.

Q.   Okay.  But in your deposition you agreed you don't actually have any knowledge about the technology behind the '623 patent; correct?

A.   I did not reread the claims in advance of the deposition.

MR. SCHERKENBACH:  Your Honor, I would like to read from the witness's deposition at page 208, lines 12 through 15. 208, 12 to 15.

THE COURT:  Okay.

MR. SCHERKENBACH:  (As read:)

"Q.   And you don't have any current knowledge of the technology behind the '623 patent; is that right?

"A.   Nope, it's not necessary for my role."

BY MR. SCHERKENBACH:

Q.   Now, at the time of your deposition in the case, again, it was May of 2017, you hadn't looked at the '623 patent for years prior; correct?

A.   That's correct.

Q.   Okay.  You don't know how, if at all, the '623 patent

improves on the '323 patent; true?

A.   Oh, I've sat here today.  But, also, at the time we did the acquisition I was more deep in the subject.  But I cover a lot of ground, so I wasn't focused on it at that time.

MR. SCHERKENBACH:  Your Honor, I'd like to read from the witness's deposition at page 197, lines 16 through 21.

THE COURT:  All right.

MR. SCHERKENBACH:  (As read:)

"Q.   So the '623 patent is an improvement on the '323 patent; is that right?

"A.   I think that there are aspects that are improvements and there are aspects that are standalone.  I don't know. I can't say it to that level of technical specificity."

BY MR. SCHERKENBACH:

Q.   The bottom line, Mr. Brunell, is you are not the person to say whether the '623 patent is fundamental technology; is that fair?

A.   No.

THE COURT:  Not fair or you agree?

THE WITNESS:  I disagree with that statement.  I know enough to judge value.

MR. SCHERKENBACH:  All right.  Your Honor, I'd like to read from the witness's deposition at page 142.  142, 4 through 10.

THE COURT:  Okay.

**MR. SCHERKENBACH:**  (As read:)

"**Q.**  How is the Congdon invention fundamental?

"**A.**  I think that's argued in the legal documents and will be argued in other venues.  I'm not the person to argue that or to state that."

**BY MR. SCHERKENBACH:**

**Q.**  Nor, Mr. Brunell, are you qualified to say whether the '623 patent covers the entirety of the accused products?  True?

**A.**  I'm not opining on the technical aspects.  You just heard from Dr. Zane on this.

**Q.**  All right.  But you're also not qualified to say whether the '623 patent drives customer demands in the market; correct?

**MR. SUDER:**  Objection, Your Honor.  That's a legal principle that's not relevant in this case.

**THE COURT:**  Overruled.

You can answer the question.

**THE WITNESS:**  I am qualified to read the marketing documents and see which bullet points are at the top of the Power Integrations materials.

**MR. SCHERKENBACH:**  Your Honor, I'd like to read from the witness's deposition page 42, lines 21 through 25.

**THE COURT:**  Okay.

**MR. SCHERKENBACH:**  (As read:)

"**Q.**  Does Opticurrent believe the '623 patent drives customer demand in the market?

"A.   I'm not qualified to make a judgment one way or the other on that."

BY MR. SCHERKENBACH:

Q.   Mr. Brunell, you don't know how valuable the --

THE COURT:  Well, you've got to finish.  There's three more lines.  Finish the whole --

MR. SCHERKENBACH:  Oh, I'm sorry.  I'm sorry.  Let me start over.

"Q.   Does Opticurrent believe that the '623 patent drives customer demand in the market?

"A.   I'm not qualified to make a judgment one way or the other on that.  Our expert will look at the overall marketing and make that, you know, the way it's positioned, et cetera, and assess that."

BY MR. SCHERKENBACH

Q.   Okay.  You don't know how valuable the '623 patent is; right?

A.   The only people that know are the jurors when they decide.

Q.   So you don't know?

A.   I have opinions.

MR. SCHERKENBACH:  Your Honor, I'd like to read from the witness's deposition at page 81, lines 2 through 6.

THE COURT:  Okay.

MR. SCHERKENBACH:  (As read:)

"Q.   How valuable do you think the '623 patent is?

"A.   It's of value.  I don't know how valuable it is.

That will be determined in the marketplace."

MR. SUDER:  Your Honor, object.  That's not impeachment.  That's entirely consistent with what the witness just said beforehand.  So I'm not sure it's proper impeachment.

THE COURT:  Overruled.

BY MR. SCHERKENBACH:

Q.   The value of the '623 patent will be determined in the marketplace; right?

A.   That's apparently what I said.

Q.   All right.  But as we sit here today, no company in the marketplace has licensed the '623 patent; right?

A.   Not yet.

Q.   And, again, at least as of the time of your deposition, no one had even made an offer to Opticurrent for the Congdon patent portfolio; true?

A.   No, not yet.  Not as of the time of 2017.

Q.   All right.  Let me turn, finally, to Power Integrations. You talked about them a little bit on direct.

Opticurrent never offered Power Integrations a license before filing this lawsuit; true?

A.   Correct.

Q.   In fact, Opticurrent never reached out to Power Integrations at all before filing the lawsuit; right?

A.   That is correct.

Q.   It seemed like a better idea to you to file the litigation first; right?

A.   Given Power Integrations' reputation, historical behaviors, yes.

MR. SCHERKENBACH:  Your Honor, I'd like to read from the witness's deposition at 179, lines 2 through 4.

THE COURT:  He's already testified.  It's not inconsistent.

MR. SCHERKENBACH:  All right.

BY MR. SCHERKENBACH:

Q.   So you never told Power Integrations that you believed it was infringing the '623 patent before suing; true?

MR. SUDER:  Objection.  Asked and answered, Your Honor.

THE COURT:  Well, I'll allow it.

He can answer it one more time.

THE WITNESS:  The filing of litigation was the initial notice.

BY MR. SCHERKENBACH:

Q.   Was the initial notice.  Okay.

And the litigation was filed in 2016; right?

A.   I believe that was stipulated.  Was it April 2016?

Q.   All right.  And you understand that Power Integrations first started selling the products accused of infringement in this case in 2006?

**A.**   Yes, I think that's correct.

**Q.**   Now, just one last thing.  I believe you said on direct -- you were at Microsoft a long time; right?

**A.**   Sixteen years.

**Q.**   Sixteen years.

But Microsoft wasn't always successful, as you said on direct, licensing IP, either in or out; correct?

**A.**   Can you define "successful"?

**Q.**   Occasionally Microsoft took a case to trial, didn't it?

**A.**   Sure.  Yes.

**Q.**   And they did that when they believed they didn't infringe; right?

**A.**   There might be a variety of motivations depending on each specific case.

**Q.**   You wouldn't say a company doesn't respect intellectual property just because it takes a case to trial, would you?

**A.**   No.  I would have to look at the aggregate of that company's behaviors.

**MR. SCHERKENBACH:**  That's all I have.

**THE COURT:**  Thank you.

Anything on redirect?

**MR. SUDER:**  Yes.  Very short, Your Honor.

**REDIRECT EXAMINATION**

BY MR. SUDER:

**Q.**   Mr. Brunell, are you in discussion with On Semiconductor?

**A.**   I have a relationship with people at On.

**Q.**   And On and Power Integrations are like the Hatfields and the McCoys, aren't they?

**A.**   I think they have seven or eight U.S. litigations going on over 10 to 12 years.

**Q.**   Between them?

**A.**   That's correct.

**Q.**   Now, when you're talking about Longhorn Capital and IMPG, the money that they might receive, does that come out of the total pie or just Opticurrent's share?

**A.**   All those monies were inside the 50 percent pie that Opticurrent would get.

**Q.**   So that has nothing to do with what Mr. Congdon would recover --

**A.**   No.

**Q.**   -- under the agreement?

**A.**   No, it has nothing to do with it.

**Q.**   So if there's a recovery, Mr. Congdon gets his 50 percent, he and his family, and Opticurrent gets its?

**A.**   Opticurrent and its other companies that Mr. Scherkenbach went through, yeah.

**Q.**   But just so the jury is not left with the wrong impression, those other companies have nothing to do with what Mr. Congdon might recover in enforcing his patent?

**A.**   Not at all.  That was all sort of smokescreen.  No, no,

nothing.

MR. SUDER:  Thank you.  That's all I have, Your Honor.

THE COURT:  All right.

Anything further?

### RECROSS-EXAMINATION

BY MR. SCHERKENBACH:

Q.   Mr. Congdon doesn't get any money until the lawyers get paid, too; right?

A.   None of us collect money until there's a license agreement or a settlement, that's correct.

Q.   And until the lawyers get their piece?

A.   We're all paid at the same time.

MR. SCHERKENBACH:  That's all I have.

THE COURT:  All right.  Anything further?

MR. SUDER:  No, Your Honor.

THE COURT:  All right.  Thank you, Mr. Brunell.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  We're close to the 4:30 hour, and so rather than try and start something new, I'm going to adjourn for today with a reminder that we will reconvene tomorrow morning at 8:30.  If you could get here a little bit early, appreciate it, so we can start on time.

And we will hear from the plaintiff's next witness.

MR. SUDER:  That will be Mr. Congdon, Your Honor.

THE COURT:  All right.  Great.

So just a reminder, please do not form any opinions.  Do not talk to anybody, including amongst yourselves, about this case.  And do not attempt to conduct any research or obtain any information outside of the presentation of evidence in this matter.  Thank you.

THE CLERK:  All rise for the jury.

(Jury out at 4:23 p.m.)

THE COURT:  Before you leave, let's see, this is going to come up.  Did we discuss objections to TX 57 for use with Mr. Walker?

MR. SCHERKENBACH:  Yes, Your Honor.

THE COURT:  I forget now.  There have been so many things.  Have I already --

MR. SUDER:  You haven't --

MR. SCHERKENBACH:  Our position is you've already ruled on this.  In fact, it's already been ruled on twice.

I would direct to you Judge Orrick's --

THE COURT:  I've already said this is not relevant.

MR. SCHERKENBACH:  You've already said it's not relevant.  Judge Orrick said it's not relevant.

THE COURT:  So is there an issue here?

MR. SUDER:  Yes, Your Honor.  If you recall, you said it could be the subject of cross-examination and if it finds its way in in cross-examination --

THE COURT: Oh, for impeachment purposes.

MR. SUDER: Yes. That's right.

THE COURT: But on its face, there's nothing relevant about it now. Somehow, if somebody starts to say something on direct and gets themselves in some hot water here, I didn't foreclose anything to be used for impeachment.

But as an initial matter, I don't see any relevance to it. So it seems unlikely that direct testimony is going to come up in that regard either.

MR. SCHERKENBACH: Fair enough. Thank you.

THE COURT: All right.

By the way, there was -- on the cross, there's some reference to DD400 slides. What is that?

MR. VOWELL: Your Honor, the defendants are seeking to introduce the slides that they plan on using with Mr. Kung on direct.

They want to use those to -- those slides, which are not evidence, they're not exhibits, they may have snippets from the exhibits, they want to use their slides from Mr. Kung to cross-examine Mr. Kung. And Mr. Kung won't even have testified. The slides won't even have been presented to the jury. And they want to use those to cross.

THE COURT: I don't even know what these slides are because I don't have --

MR. WARREN: No. Your Honor, I think there's some

kind of a miscommunication here.  We sent over what the slide was.  The slides Mr. Vowell is referring to are the 200 series. We're absolutely not doing that.

The 400 series is a single slide that has the Court's claim construction on it.

MR. VOWELL:  Okay.

MR. WARREN:  They didn't meet and confer with us before filing this.  We would have informed them of this.  I think they just mistook the 200 series slides, which are Mr. Kung's slides, for this single slide that we sent over to them that are the 400.

THE COURT:  So it's just a claim construction.

MR. VOWELL:  That's fine, Your Honor.

THE COURT:  All right.  Yeah.  All right.

And so you are presenting -- who are you calling tomorrow? Mr. --

MR. VOWELL:  Mr. Congdon first, Your Honor.

THE COURT:  And then --

MR. VOWELL:  Then Mr. Walker.

MR. SUDER:  And then we will rest subject to Mr. Sutherland on Friday morning.

THE COURT:  Okay.  So you're ready, if necessary, to start your case-in-chief?

MR. WARREN:  Absolutely.

THE COURT:  Okay.  Good.  I think we're moving along

PROCEEDINGS

here.

MR. SUDER:  We should be done with all the evidence, I think, by midday Friday.

THE COURT:  I hope so.  That would be great.  Don't want to lose another juror over the weekend.

MR. SUDER:  No.

THE COURT:  All right.  Good.  Thank you.

MR. SUDER:  We stop at 1:00 tomorrow, right, Judge?

THE COURT:  Yeah.  We do have to stop at 1:00.

(At 4:27 p.m. the proceedings were adjourned.)


-   -   -   -

CERTIFICATE OF REPORTERS

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, February 20, 2019


_____
Vicki Eastvold, RMR, CRR
Official Court Reporter


_____
Katherine Powell Sullivan, CSR #5812, RMR, CRR
Official Court Reporter