Frank E. Scherkenbach (CA #142549)
scherkenbach@fr.com
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA  02210-1878
Telephone: (617) 542-5070
Facsimile:  (617) 542-8906

Michael R. Headley (CA SBN 220834)
headley@fr.com
Neil A. Warren (CA SBN 272770)
warren@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
Telephone: (650) 839-5070
Facsimile:  (650) 839-5071

John W. Thornburgh (CA SBN 154627)
thornburgh@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile:  (858) 678-5099

Attorneys for Defendant
POWER INTEGRATIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| OPTICURRENT, LLC,<br><br>          Plaintiff,<br><br>     v.<br><br>POWER INTEGRATIONS, INC.,<br><br>          Defendants. | Case No. 3:17-cv-03597-EMC<br><br>**POWER INTEGRATIONS' RENEWED OBJECTION TO DISCLOSURE OF ITS REVENUES TO THE JURY**<br><br>JUDGE:     Hon. Edward M. Chen |

At the Pretrial Conference, the Court ruled that Opticurrent would be required to lay a foundation for the economic comparability of the QBar license before the Court would permit Opticurrent to introduce evidence of PI's total accused revenue or average selling price. (2/11/2019 Tr. at 56:18-58:2; 2/15/2019 Tr. at 164:17-166:4.)  PI hereby renews its objections because Opticurrent has failed to lay the required foundation.

*(1) Opticurrent has failed to introduce economic evidence comparing QBar's licensed product to the accused products*.  The undisputed evidence shows that the QBar product licensed to practice Mr. Congdon's prior art '323 patent was a three-terminal switch with a specific configuration.  (TX-2 at ¶¶ 2, 3 ("'QBAR Switch' means Three-Terminal Noninverting Transistor Switch as disclosed, claimed, and covered by U.S. Patent #5,134,323"; "The Licensor grants to the Licensee a worldwide exclusive license to make, to have made, to use, and to sell QBAR Switches….").)  By contrast, PI's accused products combine a switch with the "brains" of a power supply.  (*E.g.*, TX-11 ("TinySwitch-LT combines a high voltage power MOSFET switch with a power supply controller in one device.").)

No Opticurrent witness addressed the economic comparability of a 2-3% royalty on a simple switch with a similar royalty on a much more complex product, or how such a royalty should be apportioned.  Mr. Brunell admitted he was not qualified to answer whether the '623 patent covers the entirety of the accused products (Tr. at 455:7-10), and Dr. Zane (to whom Mr. Brunell deferred) did not discuss this topic.  For example, Dr. Zane said nothing about the value of the controller portion of the accused products.

*(2) Opticurrent failed to introduce economic evidence comparing QBar to PI.*  The undisputed evidence shows that QBar was not commercially successful.  It sold some products but eventually shut down and was absorbed into Mr. Congdon's subsequent "Bit Parts" company, which ended up in debt.  (Tr. at 428:15-21, 429:2-5, 429:15-22, 438:3-8 (Brunell).)  By contrast, Opticurrent's proposed exhibit TX-210A shows that PI had revenues of over $600 million for the accused products.

1    No Opticurrent witness addressed the economic comparability of QBar and PI, or how 2%-3% of QBar's revenue should be apportioned to account for PI's much greater volume. For example, Opticurrent's principal Mr. Brunell was unable to give such testimony and did not.

*(3) **Opticurrent failed to introduce economic evidence of the value of the '623 patent's alleged "improvement" over the '323 patent***: Opticurrent's only benchmark license is for the prior art '323 patent rather than the '623 patent-in-suit. Opticurrent argues that the '623 patent must be more valuable than the '323 patent because the '623 patent is an alleged "improvement." (*E.g.*, Dkt. No. 206 at 5 (Opticurrent arguing that it may seek a higher royalty for the '623 patent because it is an improvement of the '323 patent); Tr. at 298:22-299:12 (Zane testifying that the '623 patent is an improvement of the '323 patent).) Yet this gets the law exactly backwards. "Improvement patents" are generally recognized as *less valuable* than fundamental patents. As the Supreme Court explained in the seminal case on apportionment, "[w]hen a patent is for an *improvement*, and not for an entirely new machine or contrivance, the *patentee must show* in what particulars his improvement has added to the usefulness of the machine or contrivance. He *must separate* its results distinctly from those of the other parts, so that the benefits derived from it may be distinctly seen and appreciated." *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (emphasis added). The Federal Circuit, sitting *en banc*, has also recognized the importance of apportionment in the case of improvement patents: "Early cases invoking the entire market value rule required that for a patentee owning an 'improvement patent' to recover damages calculated on sales of a larger machine incorporating that improvement, the patentee was required to show that the entire value of the whole machine, as a marketable article, was 'properly and legally attributable' to the patented feature." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (1995) (*en banc*).

Opticurrent's technical expert Dr. Zane even admitted at trial that, in his opinion, the prior art '323 patent has more fundamental value in PI's products than the asserted '623 patent. He testified: "In my report I believe I said that the transistor is an essential function in the accused products. I think it's clear that the accused products are built around a transistor. That's an essential feature. An essential component." (Tr. at 389:1-6.) But the transistor switch of the '623 patent was already disclosed in the '323 patent – the '623 patent just adds a standard CMOS

inverter to the transistor switch disclosed in the '323 patent. (*See* TX-4 ('623 patent) at 1:45-46 ("Noninverting transistor switches which comprise only three terminals are well known and widely used in the art."); *id.* at 2:67 – 3:5 (identifying the addition of the CMOS inverter to the "well known and widely used" transistor switch of the '323 patent). And as for the '623 patent, Dr. Zane testified it "is related to essentially how we're deriving the power and to do so with low leakage. I believe this is an important or significant feature that is a portion of a product." (Tr. at 389:7-10.) In other words, Dr. Zane opined that the '323 technology is "essential" whereas the '623 technology is merely "important or significant."

During trial today, the inventor Mr. Congdon amplified this point: he testified that the '323 patent is "the core" of the '623 patent, and also admitted that the '323 patent is in the public domain.

Yet Opticurrent has offered no evidence regarding how to separate or apportion the value of the alleged '623 improvement over the invention of the prior art '323 patent, which is in the public domain. It has thus failed to satisfy the Supreme Court's directive in *Garretson*.

**(4) Opticurrent has failed to introduce the type of evidence required to permit use of total accused revenues in connection with a benchmark license.** *VirnetX* found reliance on the defendant's entire accused revenue reversible error despite the fact that benchmark licenses had been admitted into evidence. *VirnetX, Inc., v. Cisco Systems, Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) ("After determining the royalty base, Weinstein applied a 1% royalty rate, based on six allegedly comparable licenses…."). At the Pretrial Conference, Opticurrent argued that *VirnetX* is distinguishable because VirnetX accused the entire iPhone, whereas Opticurrent accuses the "small[est] saleable unit." (2/11/2019 Tr. at 54:10-16.) Opticurrent misunderstands the holding of *VirnetX*. The Federal Circuit actually held "[w]here the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature (as VirnetX claims it was here), the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology. To hold otherwise would permit the entire market value exception to swallow the rule of apportionment." 767 F.3d at 1327-28. In other words, even if PI's multi-function chips are the "smallest saleable unit," Opticurrent must

1  still apportion between the value of the accused switch and the non-accused controller circuitry, or
2  "brains."

3    *Commonwealth Sci. & Indus. Research Organization v. Cisco Sys.*, 809 F.3d 1295 (Fed.
4  Cir. 2015) does not help Opticurrent because the alleged benchmark there was the actual licensing
5  history between the *same* parties regarding the *same* patent. *Id.* at 1302-1303. Opticurrent's QBar
6  benchmark does not involve PI, the patent-in-suit, or the same products.

7    *Minks v. Polaris Industries*, 2009 U.S. Dist. LEXIS 92865 (M.D. Fla. Sep. 17, 2009) (Dkt.
8  No. 218-1) says nothing about the admission of a defendant's accused revenue over objection.

9    And *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201 (Fed. Cir. 2014) amplifies Opticurrent's
10 lack of foundational evidence by showing what is actually needed when a party seeks to use a
11 benchmark license to justify consideration of total revenues. In that case, the critical factor that
12 tipped the scales in plaintiff's favor was "expert testimony" that "explain[ed] to the jury the need
13 to discount reliance on a given license to account only for the value attributed to the licensed
14 technology." *Id.* at 1228; *see also id.* at 1226 ("According to Ericsson, its expert conducted a
15 rigorous analysis, which separated the value of the patents at issue from any other patents covered
16 by the licenses he referenced."). By contrast, Opticurrent has no damages expert, and no other
17 witness who even attempted a "rigorous analysis" that attempted to "explain[] to the jury the need
18 to discount reliance on a given license to account only for the value attributed to the licensed
19 technology." Moreover, in *Ericsson*, the defendant *waived* any objection to the admission of total
20 revenue. *Id.* at 1226 ("any objection to counsel's references to the cost of items incorporating the
21 allegedly infringing chips was waived"). By contrast, PI preserves its objection to the admission
22 of total revenues.

23    ***Conclusion:*** PI respectfully requests that the Court exclude evidence of PI's total accused
24 revenues or average selling price. However, PI does not believe that this requires nonsuit. There
25 is evidence in the record, such as Mr. Brunell's testimony, that would permit the Court or Jury to
26 award nominal damages in the event infringement is found. Thus, trial may continue regarding
27 infringement so that the Court or Jury may decide that issue.

28

| | |
|---|---|
| Dated: February 20, 2019 | FISH & RICHARDSON P.C.<br><br>By: */s/ Michael R. Headley*<br>    Michael R. Headley<br><br>Attorneys for Defendant<br>POWER INTEGRATIONS, INC. |