**Volume 3**

**Pages 466 - 654**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | |
|---|---|
| OPTICURRENT, LLC , ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | **No. C 17-3597 EMC** |
| ) | |
| POWER INTEGRATIONS, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | San Francisco, California |
| | Wednesday, February 20, 2019 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          FRIEDMAN, SUDER & COOKE
                        604 East 4th Street, Suite 200
                        Fort Worth, Texas 76102
                   BY:  **JONATHAN T. SUDER, ESQ.**
                        **DAVE R. GUNTER, ESQ.**

                        HUDNELL LAW GROUP P.C.
                        800 W. El Camino Real, Suite 180
                        Mountain View, California 94040
                   BY:  **LEWIS E. HUDNELL, III, ESQ.**

                        Goldstein Faucett & Prebeg, LLP
                        1177 West Loop South, Suite 400
                        Houston, TX  77027
                   BY:  **CORBY R. VOWELL, ESQ.**

 (Appearances continued on next page)

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

**APPEARANCES (CONTINUED):**


For Defendant:              FISH & RICHARDSON P.C.
                            500 Arguello Street, Suite 500
                            Redwood City, California 94063
                       BY:  **MICHAEL R. HEADLEY, ESQ.**
                            **NEIL A. WARREN, ESQ.**

                            FISH AND RICHARDSON PC
                            222 Delaware Avenue, 17th Floor
                            Wilmington, Delaware 19899
                       BY:  **JOSEPH B. WARDEN, ESQ.**

For Defendant/              FISH & RICHARDSON P.C.
Counter-Claimant:           12390 El Camino Real
                            San Diego, California 92130
                       BY:  **JOHN W. THORNBURGH, ESQ.**

**I N D E X**

Wednesday, February 20, 2019 - Volume 3

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **CONGDON, JAMES** | | |
| (SWORN) | 488 | 3 |
| Direct Examination by Mr. Suder | 489 | 3 |
| Cross-Examination by Mr. Warren | 510 | 3 |
| **WALKER, CLIFFORD** | | |
| (SWORN) | 517 | 3 |
| Direct Examination by Mr. Suder | 517 | 3 |
| Cross-Examination by Mr. Warden | 527 | 3 |
| Redirect Examination by Mr. Suder | 531 | 3 |
| Recross-Examination by Mr. Warden | 536 | 3 |
| Plaintiff Rests | 537 | 3 |

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **KUNG, DAVID** | | |
| (SWORN) | 538 | 3 |
| Direct Examination by Mr. Warren | 538 | 3 |
| Cross-Examination by Mr. Suder | 597 | 3 |
| Redirect Examination by Mr. Warren | 628 | 3 |
| **BOHANNON, WILLIAM KEITH** | | |
| (SWORN) | 637 | 3 |
| Direct Examination by Mr. Warren | 638 | 3 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 31 | | 495 | 3 |
| 38 | | 498 | 3 |
| 39 | | 497 | 3 |
| 153 | | 548 | 3 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 164 | | 552 | 3 |
| 198 | | 544 | 3 |
| 221 | | 626 | 3 |

**Wednesday - February 20, 2019**                    **8:19 a.m.**

                    **P R O C E E D I N G S**

                         **---000---**

     (The following proceedings were held in open court,
outside the presence of the jury:)

          **THE COURT:**  Good morning, everyone.

          **THE CLERK:**  Please be seated.

     Calling civil action 17-3597, Opticurrent LLC versus Power
Integrations, Inc., et al.

     Counsel, please approach the podium and state your
appearances for the record.

          **MR. SUDER:**  Yes.  Good morning, Your Honor.  John
Suder, Corby Vowell, and Dave Gunter on behalf of plaintiff.

          **THE COURT:**  All right.  Good morning, Counsel.

          **MR. WARREN:**  Good morning, Your Honor.  Neil Warren
for Power Integrations.  Also with me is James Huguenin-Love,
Joseph Warden, and Michael Headley on behalf of Power
Integrations.

          **THE COURT:**  All right.  Good morning, Counsel.

     Let's address this last series -- latest series of
objections to defendant's Exhibits 153 and 155.  These are
patents?

          **MR. VOWELL:**  Yes, Your Honor.  So those are exhibits
that defendant plans to use with their expert, William
Bohannon.

They are Power Integrations' patents.  And they were only listed in his non-infringement report -- the portion of his non-infringement report that Judge Orrick struck on our *Daubert* motion as impermissibly attempting to bring in the practicing the prior art defense.

And he also stated in there that the prior products and prior patents of Power Integrations go to the value of the technology.  But that was not in any way mentioned by their damages expert, Mr. Barnes.

So, ultimately, Judge Oracle, in his ruling, said that they were not allowed -- that Mr. Bohannon was not allowed to talk about the prior products.

While Judge Orrick did not specifically address the patents, he struck the portion of the expert report that Mr. Bohannon referenced those patents.  And they were not referenced for invalidity.  They were only referenced for practicing the prior art defense.

**MR. WARREN:**  Your Honor, these patents are different patents.  These are not the prior art patents.  They're not prior art.  One is from, like, 2010.  The other is after Mr. Congdon came up with his invention.  And we are not challenging that.  So neither one of them is prior art.

**THE COURT:**  What's the relevance then?

**MR. WARREN:**  The relevance -- well, I can show you. If you look at -- and it's in a different portion of the

report, say page 111 of the expert report.

THE COURT:  Mr. Bohannon's report?

MR. WARREN:  Yes, his rebuttal report.

These are the patents that you heard about in opening. And Your Honor actually already ruled on this issue, in the context of opening, that these patents were relevant to apportionment.

This is our '190 patent, using on/off control, which is not prior art.  We've never contended that's prior art.  That's why it's not on the invalidity report.

THE COURT:  But does he discuss it in terms of the apportionment issue?

MR. WARREN:  Yes.  So that's bullet number 4 on page 111.  That's direct -- this is in his portion of his report that goes to damages.

He's only going to talk about it in the context of energy efficiency and that the energy efficiency of our products is due to Power Integrations' patented technology.  This is directly the apportionment issue that you already ruled upon.

THE COURT:  All right.  So why not?

MR. VOWELL:  Well, Your Honor, again, this is in the portion of the report that Judge Orrick struck.  He struck the entire portion of the report.

THE COURT:  Yeah, but I had ruled pretrial that these could be relevant to apportionment.  If it was disclosed, then

you don't have an argument about prejudice.  And he does expressly talk about opinions regarding technical value of the alleged invention claim.

In paragraph four, he says the efficient -- energy efficiency and low consumption is attributable to the use of the proprietary on/off control technology, which was already referred to in the opening.  That's not necessarily dispositive, but it seems perfectly relevant to the apportionment issue.

**MR. VOWELL:**  Fair enough, Your Honor.  We'll concede.

**THE COURT:**  All right.  Then what about these slides?

**MR. VOWELL:**  So on --

**THE COURT:**  Leading with the titles, is that the --

**MR. VOWELL:**  Yes, leading with the titles.  And some of them in particular have whole -- so just to be clear, right now we're talking about Mr. Bohannon's.

We still do have a couple of objections to exhibits for other witnesses that are going to be earlier, but I'm happy to address that now.

**THE COURT:**  Oh.  Well, then maybe -- are we -- we're not going to get to Bohannon today?

**MR. WARREN:**  We are going to get to Bohannan today.

**THE COURT:**  Okay.  So let's finish that.

**MR. VOWELL:**  So, Your Honor, as I attached, for example, slide 313, these are statements that, basically, if

the witness has his opinions, he can state those opinions.

But 313 and, I would say, the other probably most egregious would be 353, these are leading.  Statements are going to be put up to the jury.  They're going to presume this is his testimony.

This is not his testimony.  This is, in fact, argument by the attorneys on the other side.

If these are his opinions, just have him state --

**THE COURT:**  Why do we need slides?  Why do we need slides to memorialize or emphasize testimony?

**MR. WARREN:**  Well --

**THE COURT:**  I can understand putting up a schematic and he's going to talk about it and point to various things as a demonstrative.

What do you need slides for?

**MR. WARREN:**  Well, so the slides -- so let's -- if we take, say, 313 first, 313 has -- this is just a portion of the data sheet that he's highlighted and put it on a slide.  And we do that just for --

**THE COURT:**  And that's fine.

**MR. VOWELL:**  We have no objection to the graphics.

**MR. WARREN:**  So the title -- these are basically words that are very similar to what's in his report.

**THE COURT:**  He can state that on the stand.  You don't need to put it on a slide.

**MR. WARREN:** I mean, I think that -- I mean, this is, you know, pretty fair for an expert, you know, putting stuff on the slides --

**THE COURT:** I don't think so. You're going to have to remove the editorial comment.

You've got a problem with the actual schematic?

**MR. VOWELL:** No. We don't have any problem with the graphics. Those are fine. That's proper demonstratives.

It's really just the text that would appear to the jury as statements or testimony of the witness.

**THE COURT:** So it sounds like the issue is the titles? Well, certainly --

**MR. VOWELL:** It's also -- it's also --

**THE COURT:** -- the titles, but then when you start bullet-pointing his conclusions and things.

**MR. WARREN:** I mean, this is how an expert -- I mean, generally speaking, this is how an expert always testifies. He looks --

**THE COURT:** Orally.

**MR. WARREN:** Well, I mean, this is how I've done it in the past.

**THE COURT:** I don't. I've never seen it where you put his bullet point -- summarize his testimony on the stand with a slide. I've never seen that.

**MR. WARREN:** I mean, usually an expert, you know, gets

a little bit of leeway because he's testifying to a lot of things. He's not a percipient witness. He's not supposed to have had to have memorized his expert report.

He's an expert that was hired to do this. Because he's not a percipient witness, he's testifying based on what's in his report. He puts it on slides.

I mean, it's just like an expert on the stand reading from the report. They can glance at their report if they need help remembering something.

THE COURT: He can do that if he needs to refresh in the usual way. His recollection can be refreshed if he doesn't remember. The jury can assess the fact that he doesn't remember.

And if he needs to refresh recollection, he can do it in the usual way. But he can't do it with slides and putting them up and publicizing to the jury.

MR. WARREN: Okay. We will -- we will make edits to the slides to -- well, given that he's testifying today, what procedure would you like us to use to verify --

THE COURT: I think you use slides like they did yesterday. I mean, having the schematic and things that he can explain --

MR. WARREN: Okay.

THE COURT: -- and sort of premarked, we allowed that. You know, with the yellow and the pink and all that, so you

don't have to get up there with a marker.  That's okay.

But summarizing his testimony, characterizing it, highlighting, you know, that's -- it's got to come from him, not the slide.

MR. WARREN:  Okay.  And so certain of the elements in this case, like the claim constructions, are really word for word.  He's got to say them.  I assume it's fine to have the claim construction on the slide.

THE COURT:  So the actual -- you mean the claim construction -- his claim construction or the claim construction that was rendered by --

MR. WARREN:  By the Court.

THE COURT:  Yeah.

MR. VOWELL:  We would have no objection to that.

THE COURT:  Yeah.  I think you guys did that.

MR. VOWELL:  Yes.

MR. WARREN:  Let me ask a couple of particular questions just so I know.

On slide 343 --

THE COURT:  Yeah.

MR. WARREN:  -- this is the claim construction, and it just says cannot be equivalent to.  And so this is just -- so if I remove -- the top part is the claim construction verbatim.

If I remove the title, is this really -- he's just juxtaposing the claim construction and what their argument

actually is.

**MR. VOWELL:** And the "cannot be equivalent to" is also argumentative.

**THE COURT:** Yeah. If you take out the "cannot be equivalent to" and the title, you can sort of contrast -- the first sentence is from the claim construction, that's fair. The second one, I mean, that's a fair summary of what he's going to say, and you can do that.

It's the editorial --

**MR. WARREN:** So "cannot be equivalent to."

**THE COURT:** Yeah. And the title.

**MR. WARREN:** All right. We'll remove "cannot be equivalent to" and the title.

**MR. VOWELL:** And, Your Honor, these were just exemplary that we presented to the Court. This is throughout their slides, so we would expect that they would make the same changes.

**THE COURT:** I would urge you to make the proper edits; otherwise, there'll be an objection and I'll sustain it, and then you won't be able to use the slide at all.

**MR. WARREN:** The one other issue is that Dr. Zane -- when he presents, he's going to counter Dr. Zane's DOE analysis, the function-way-result.

Is there any objection to him putting up a slide that has Dr. Zane's function-way-result out of his report?

**THE COURT:**  That's a fair -- that's the kind of exhibit that you could --

**MR. VOWELL:**  If it's directly out of his report, I think we're okay with that.

**THE COURT:**  Yeah.

**MR. WARREN:**  So the text that's on -- well, I'll verify that.  So the text that's on here was copy and pasted directly out of his report.

**MR. VOWELL:**  Okay.  Fair enough.

**THE COURT:**  That's fine.  Okay.

**MR. VOWELL:**  Your Honor, the same issue applies to their fact witness, Mr. Kung.

**THE COURT:**  Yeah.

**MR. VOWELL:**  They have slides for him.  And we would object to those as well.  It has the similar issues with text.  And he's not an expert either.  So he's just a fact witness.

And we can put those slides up for Your Honor.  I don't know if we attached them to our --

**THE COURT:**  Yeah, I didn't see those.

**MR. VOWELL:**  Okay.

**THE COURT:**  But I would have a similar view.

**MR. VOWELL:**  Okay.  Could we switch to the --

**THE COURT:**  Is that it?

**MR. VOWELL:**  I'll just give you an example.  210 is a good example of text that's leading, argumentative.  And it's

just -- the jury would think this is the witness's testimony, or he may just read from it.

THE COURT:  Yeah.  You know, testimony comes from a witness, from the witness's mouth.  We don't need to summarize.

You can summarize it in your closing argument.  I mean, your demonstratives can say Mr. Kung or Dr. Kung said X, Y, and Z, but not in the course of testimony.

MR. WARREN:  Okay.  Again, just so I know, I don't want to have an objection sustained, so I want to know beforehand.

Are you objecting to 206?

MR. VOWELL:  Yes.

MR. WARREN:  So 206, I assume the objection is to the bulleted text.

MR. VOWELL:  Yes.  We're fine with the title.  That's fine.

MR. WARREN:  All right.

MR. VOWELL:  The bulleted text.

MR. WARREN:  All right.  We'll remove the bulleted text.

So the slide 210 --

MR. VOWELL:  We object to the whole slide.

THE COURT:  That's summarizing testimony.

MR. WARREN:  Your Honor, there's nothing really disputed here.  You know, I mean, he's got a lot to remember.

He's an older guy.  I --

THE COURT:  If they did that with Mr. Congdon, you'd probably have a similar objection.

MR. WARREN:  I would -- okay.  Well, this raises an interesting issue because, you know, they're going to put Mr. Congdon's notebook in front of him and he's going to read out of it.

THE COURT:  Well, they can't just put the notebook in front of him.

MR. VOWELL:  It's a schematic, Your Honor, a one-page schematic.

THE COURT:  If you want him to explain something or if you need it to refresh his recollection, you can do it that way.  If it's an exhibit that comes in and that has a schematic that you want to put in evidence, it can come in that way.

But you can't refresh recollection on a slide.

MR. WARREN:  Okay.  So the notebook page has lots of writing on it.  It has all of his notes --

MR. VOWELL:  It's already in evidence.  You didn't object to it.

MR. WARREN:  We don't object -- we don't object to the evidence.

MR. SUDER:  Judge, we're speculating on things that haven't happened, that they're assuming we're going to do things that the Court's made perfectly clear what we can and

can't do.  These are advisory opinions.

THE COURT:  Well, I'm going to have my ears tuned to how you -- how you conduct your direct of Mr. Congdon.  You can't just have him read out of it.

MR. SUDER:  I have no --

THE COURT:  You can ask him questions if you're going to use it to refresh or if, in fact, as an exhibit you want him to explain something, that's different.  And they may expose how his memory, you know, is totally dependent -- you know, there's other ways of doing it --

MR. WARREN:  Okay.

THE COURT:  -- but it's not on a slide.

MR. WARREN:  Okay.

THE COURT:  Okay.

MR. VOWELL:  -- and then one remaining objection --

THE COURT:  Yeah.

MR. VOWELL:  -- to an exhibit that defendant plans on using on cross-examination with Mr. Congdon.

THE COURT:  Yeah.

MR. VOWELL:  So it's Exhibit 87.

MR. WARREN:  I can hand up a copy if it's easier.

THE COURT:  I've got it here.

MR. VOWELL:  And so this was an exhibit to his deposition.  It's completely irrelevant to liability issues and damages issues in the case.  It was a document that Mr. Congdon

sent to Mr. Brunell basically reporting his time for consulting services.  And, again, it doesn't relate to liability or damages.

The only reason they want to introduce it is because, in Mr. Congdon's first deposition, they introduced this document.  Mr. Congdon didn't remember that he had sent it, and so he denied that he'd ever sent it.

And then in his second deposition, he basically had remembered something was sent, and there's an issue about how you characterize whether this is an invoice or not.

But the only reason they want to offer this is to try to show that Mr. Congdon lied in his deposition.  That's the only purpose.

**THE COURT:**  This is a bill -- this is a consulting service bill?

**MR. VOWELL:**  Yes.  It doesn't have any mention of what the time was for.  There's no relationship to the case.  They only want to introduce it to try to show that Mr. --

**THE COURT:**  Right.  What's the relevance issue?

**MR. WARREN:**  There's two things.  This invoice has a storied history.  This is time that Mr. Congdon billed to Opticurrent for work on this case.  He testified to that.

They put into issue directly his compensation, and the way this -- this actually didn't unfold quite the way Mr. Vowell said.

So, first, we took Mr. Brunell's deposition, and he told me a story about how Jim had sent him an invoice and he was very angry, and so he called Jim -- or Mr. Congdon, excuse me -- and he said, "Why did you send me this invoice?  I'm not paying you anything.  I've told you I'm not going to pay you anything."

And so then, you know, during Mr. Congdon's deposition I asked him about that.  He swore to me that he had never sent an invoice to Mr. Brunell and that what Mr. Brunell said was untrue.

So we demanded the invoice be produced from Mr. Brunell. Congdon said it didn't exist.  Mr. Brunell emailed -- produced it.  He said, yeah, it does exist, I wasn't lying in my deposition.

And then we deposed Mr. Congdon, and his explanation was this -- he said these words to me:  "Do you mean the invoice that wasn't an invoice?"  That was his testimony.

So it goes directly both to the compensation he's received in this case and to lack of credibility because he knew this document exists.  He says "Invoice Page 1" on the cover.

He told me under oath that he had never --

**THE COURT:**  In a later deposition, he says he does recall it; is that right?

**MR. WARREN:**  No.  He still denies this is an invoice.

**MR. VOWELL:**  He denies the characterization of it.

**THE COURT:** Characterization of the invoice.

Number one, let me tell you this. This is not -- although the issue of compensation was raised, this has no probative value. Whether he gets paid 30,000, 10,000, 40,000, I don't see how that has any probative value to the issues in this case. Doesn't go to damages.

The fact that he shared in it, the jury already knows he's getting money or consideration for consultation. I think they even were told the hourly rate. So I don't see this having much probative value in that regard.

As to impeachment, just the story you've told, how complicated it is, how many twists and turns, and the characterizations, this is on such a subsidiary issue -- if he was caught with an inconsistency on something that's core to this case, that would have more probative value.

But justifying a statement on, I think, an irrelevant piece in which he may have been inconsistent raises 403 questions. And to try to point out whether he was being truthful or untruthful is going to involve more time and expense and potential confusion than it's worth.

So under 403, I'm going to exclude it.

**MR. WARREN:** Understood, Your Honor.

**MR. VOWELL:** That's all.

**THE COURT:** All right. So let's -- the jury is waiting, I assume?

**MR. WARREN:**  We do have one more issue.

**MR. WARDEN:**  I'll be brief, Your Honor.  This came up in the context of Mr. Brunell's testimony yesterday.

As the Court may recall, on redirect Mr. Suder asked Brunell about Power Integrations and ON Semiconductor being like the Hatfields and the McCoys, and Mr. Brunell responded about there having been seven litigations between the parties.

We have filed a motion in limine to exclude any reference to prior litigation.  Judge Orrick granted that motion in limine.  We think both the question and the answer were clearly out of bounds in light of that motion in limine.

And we want to make sure this is not going to come up again, particularly in the context of the testimony of Mr. Walker, who oversees the litigation for Power Integrations.

**THE COURT:**  All right.

**MR. SUDER:**  They opened the door with Mr. Brunell about discussions with Fairchild and ON Semiconductor.  It was in responses to questions by Mr. Scherkenbach.  Had nothing to do with my direct examination.  They opened the door on that, Judge.

**THE COURT:**  Well, all right.  But they didn't open the door so much that you're going to bring it up again.

**MR. SUDER:**  It may be relevant with Mr. Walker, but I will not just blurt it out.  I will not just --

**THE COURT:**  Well, you have to establish the relevancy.

**MR. SUDER:** Yes. That's my intent, Your Honor.

**MR. WARDEN:** And, Your Honor, if I may say it, we didn't open the door. The questions Mr. Scherkenbach asked were in response to --

**THE COURT:** Whether the door was open or not, the barn door has already been opened, that's water under the bridge. There was no objection to the point. I assume you're not asking me to strike the testimony and tell the jury to disregard that.

**MR. WARDEN:** No, no, Your Honor. We're just asking about going forward to make sure --

**THE COURT:** Going forward. So whether they open a door or not, it's not open enough -- what I'm saying is they didn't open it enough to make a big issue out of this. You're going to have to prove, on its own merit, any relevance.

**MR. SUDER:** Absolutely. Yes, sir.

**THE COURT:** So as far as opening the door, I am concluding that, for future purposes, the door has not been opened.

**MR. WARDEN:** Thank you.

**MR. VOWELL:** One quick thing, Your Honor, an agreement between the parties.

There was an exhibit that we objected to related to Mr. Congdon's other notebooks. And we've agreed that that's Exhibit 80, that they want to cross-examine him on that. And,

likewise, plaintiff will not bring up any of the other notebooks to reference to the jury or to Mr. Congdon.

**MR. WARREN:**  Thank you.

**THE COURT:**  All right.  Well, I assume you all are going to abide by the stipulation.  And we'll proceed.

Ready to go.

**THE CLERK:**  All rise for the jury.

(Jury enters at 8:39 a.m.)

**THE COURT:**  Okay.  Please be seated.

Good morning again, ladies and gentlemen.  Thank you for your promptness.  Sorry for the bit of a delay.  We had a couple of legal matters we had to straighten out.  But we have straightened those out and are ready to proceed.

So we are still in the plaintiff's case.

And you may call your next witness, Mr. Suder.

**MR. SUDER:**  Thank you, Your Honor.

At this time we would call Jim Congdon to the stand.

**THE COURT:**  All right.

**THE CLERK:**  Please raise your right hand.

**JAMES CONGDON**,

called as a witness for the Plaintiff, having been duly sworn, testified as follows:

**THE CLERK:**  Please be seated.

State your full name and spell your last name for the record.

THE WITNESS:  My full name is James Stuart Congdon. And the last name is C-o-n-g-d-o-n.  Middle name is S-t-u-a-r-t.

THE COURT:  Thank you, Mr. Congdon.

You may proceed.

MR. SUDER:  Your Honor, may I hand the witness a notebook?

THE COURT:  Yes.

## DIRECT EXAMINATION

BY MR. SUDER:

Q.  Good morning, Mr. Congdon.  How are you today?

A.  Pretty good.  Thanks.

Q.  Have you ever testified before a jury before?

A.  No, I haven't.

Q.  Little nervous?

A.  A little bit.

Q.  Mr. Congdon, tell the jury a little bit about your education and how it is that you got interested in electronics.

A.  I mean, junior high school, I played around with transistors a lot and was interested in figuring out how they work.

I went to Northeastern University for undergraduate, got a full year advanced placement, graduated with B.S.E.E. in '71.

Q.  What is a B.S.E.E?

A.  Bachelor of science in electrical engineering.

Q.    And then did you work while you were at Northeastern getting your degree?

A.    Yes, I did.  I worked in a co-op program with -- mostly with Raytheon Corporation.

Q.    And did you do any electronic work?

Did you design anything while you were working at Northeastern?

A.    Yes.  One of the things I designed when I was there was a switching power amplifier.

Q.    And then after you graduated from Northeastern, what did you do?

A.    After I -- well, I worked as a full-time employee at Raytheon for a year, and then after that I went to Stanford University in Palo Alto.

Q.    And did you get a degree there?

A.    Yes, I got my master's in circuits and -- in integrated circuits.

Q.    So you have a master's and a bachelor in electrical engineering?

A.    Correct.

Q.    And after you graduated from Stanford, what did you do, sir?

A.    I worked for a little while with a medical startup company, building medical instruments.  And then after that I ended up working for Fairchild Semiconductor.

Q.   And what did you do for them?

A.   At Fairchild?

Q.   Yes.

A.   I helped them set up their first fabrication facility -- I'm sorry, a new fabrication facility, they had earlier ones, in Maine.  It was a 3-inch wafer fab, which at the time was very large.

Q.   And after Fairchild, can you give the jury a little bit of some of the other companies you worked for.

A.   Worked for Analog Devices.  Worked for Cherry Semiconductor.  Worked for National Semiconductor for several years back out here again.  Worked for Data General.  Worked for GenRad.  And GenRad built the power drivers for the driver sensors which is part of the test equipment.

Q.   And GenRad is General Radio?

A.   Yeah, formerly General Radio, yes.

Q.   All of these companies, basically, what were you doing for them?

A.   Mostly, the applications I was working with were -- tended to be power devices.  And I designed power ICs, and I designed the power driver for the GenRad testers.

Q.   And this is all using your technology as you learned at Northeastern and Stanford?

A.   Yes.  And stuff that I'd learned, figured out on my own.

Q.   And while you were working for these companies, did you

come up with any inventions that were patented?

A.    Yes, I did.

Q.    Approximately how many?

A.    I -- well, at the companies, probably around eight.  And I think all of them have been put into -- into commercial products.  So they're significant inventions.

Q.    And after GenRad, did -- when did you leave GenRad, about?

A.    About 1987.

Q.    And what did you do then?

A.    I was trying to figure out what to do next, and I -- do you want me to go into my lunch in Maynard?

Q.    Well, if it has to do with how you came up with -- the jury has heard about your '323 patent three transistor switch.  I'd like you to explain for the jury how it is that you came up with that idea.

A.    Well, I went to lunch in Maynard, Massachusetts, which is where Digital Equipment Corporation is located.  I had a list in a notebook of six things that I thought I could do, and I was trying to figure out which one to work on.

       And I looked down the street and all the people were pouring out of the doors, and I didn't know what was happening.  And a friend of mine came down the street, I said, "Hey, Steve, what's going on?"

       He said, "They've evacuated the place.  All the power supplies are burning up."

**Q.** And what did you do at that point?

**A.** What I did at that point -- one of the items on my list was a thing that I thought might possibly solve that problem. So I threw away the other five for the next while and went back home and studied the schematics, because I knew what they were using for power supplies. They were the same ones we used at GenRad.

**Q.** And that led to the idea of a three-terminal switch?

**A.** Yeah. That told me that there was an application for the three-terminal switch because the prior art switch was a four-terminal switch.

**Q.** So the prior art was a four-terminal switch, and you went to a three-terminal switch?

**A.** Yeah. I mean, you provide the -- you can -- you can reduce the chance of having a catastrophic failure if you can build a reliable three-terminal switch.

**Q.** And did your work on three-terminal switches stop with the '323 patent?

**A.** No, it didn't.

**Q.** Did you realize it needed more work?

**A.** The '323 patent and the -- the products have a -- it's called in the patent a leakage current. Really, it's standby energy waste.

**Q.** I'm sorry, standby energy waste?

**A.** Yeah, I mean, it translates into that.

So, I mean, if you use such a switch for, like, a power adaptor and you leave it plugged into the wall, it's going to burn power all the time that it's plugged in.

Q.   And is that what the idea was, to stop that energy waste with your '623 patent?

A.   Yes.  That's the main reason for the '623 improvement on the '323.

Q.   Now, Mr. Congdon --

MR. SUDER:  May I approach the witness, Your Honor?

Your Honor, may I approach the witness?

THE COURT:  Yes.

BY MR. SUDER:

Q.   Mr. Congdon, I would like to hand you what's been marked as Exhibit 31.  And could you tell the jury what that is?

A.   It's a notebook that I took notes in a long time ago.

Q.   And was it your practice at the time to carry notebooks with you?

A.   Yes.  And it was probably an earlier version of this notebook that I had in Maynard with me.  I mean, earlier.

Q.   Approximately how many notebooks do you have, that you may still have?

A.   Probably hundreds.

Q.   Now, this notebook, is this notebook the one that contains the invention drawing of your patent, the '623?

A.   I believe it is.

Q.   And there's a tagged page.

A.   Which we're looking for -- okay.  Okay.  Sorry.

Q.   Do you have that in front of you?

        MR. SUDER:  Your Honor, we would offer Plaintiff's Exhibit 31 into evidence.

        THE COURT:  Any objection?

        MR. WARREN:  No, Your Honor.

        THE COURT:  Admitted.

     (Trial Exhibit 31 received in evidence.)

BY MR. SUDER:

Q.   And can you hold up the page you have open, to the jury?

A.   Sure.

     (Witness complies.)

     Can you see it okay?

Q.   I'm going to put up here, Mr. Congdon, Exhibit 32 on the screen.

     Is this a copy of what you just held up?

A.   Yes, it is.

        MR. SUDER:  Your Honor, may I circulate Exhibit 31 to the jury?

        THE COURT:  No objection, I assume?

        MR. WARREN:  Sure.

        THE COURT:  All right.  You may.

BY MR. SUDER:

Q.   Now, Mr. Congdon, this is -- is that your signature up

there?

**A.**   It is.  That's my signature.

**Q.**   And there are signatures down on the bottom?

**A.**   There are the witnessed down below.  And I signed up at the top on the 23rd of February.

**Q.**   And why did you sign it?

**A.**   Because I felt it was an important invention, and I wanted to record the -- the invention because it did certain new things that I felt would likely be needed.

**Q.**   And you had three people on the bottom sign it too?

**A.**   Yes.

**Q.**   Why did you do that?

**A.**   Because I wanted to have recorded and witnessed the fact that this invention was -- was working.

**Q.**   Now, in the upper left-hand corner it says "Circuit of simple breadboard of QBAR."  Do you see that?

**A.**   Yes.

**Q.**   What is a breadboard, sir?

**A.**   Breadboard, the term comes from the old days when people would actually use a breadboard and drive nails in it and solder.  But it's sort of a quick and simple way of building a circuit.

**Q.**   And did you make a breadboard to show that this invention works?

**A.**   Yes, I did.

MR. SUDER:  May I approach the witness, Your Honor?

THE COURT:  Yes, you may.

BY MR. SUDER:

Q.   I'm going to hand you what has been marked as Exhibit 39, Mr. Congdon.  And can you -- if you can take that out of the bag.  If you can, take that out of the bag and tell me what that is.

A.   That is the breadboard that I showed to the witnesses that signed on this page.

Q.   And you made that?

A.   Yes, I did.

Q.   Where did you buy the parts for that?

A.   Well, I bought some of them from Radio Shack.  I had some lying around on the floor for ten years.

MR. SUDER:  Your Honor, we would offer Exhibit 39 into evidence.

THE COURT:  Any objection?

MR. WARREN:  No objection, Your Honor.

THE COURT:  Thank you.

(Trial Exhibit 39 received in evidence.)

MR. SUDER:  May I circulate that to the jury?

THE COURT:  Yes, you may.

BY MR. SUDER:

Q.   Now, Mr. Congdon, were you able, on February 23rd, to hook that up and show that this works?

**A.**   Yes, I did.  Was able to, yes.

**Q.**   How did you know it worked?

**A.**   Well, when I showed it to Ken, I fed a signal into the high and low logic to the input.  And I looked at the output with an oscilloscope and used ways to show that the output current was extremely low when it was in the high state.

**Q.**   Now, Mr. Congdon, in your book is Exhibit 39.

In the book in front breadboard, sir.

**A.**   Oh, yes.

**Q.**   Can you open that and confirm?  And there's a tab number.  I'm sorry, number 38.

And if you can confirm, do you see breadboard, sir?

**A.**   Yes.

**Q.**   Are these photos of the breadboard that the jury is looking at now?

**A.**   Yes.  That's a photo of the breadboard exhibit.

**MR. SUDER:**  Your Honor, we would offer Exhibit 38 into evidence.

**THE COURT:**  Any objection?

**MR. WARREN:**  No objection.

**THE COURT:**  Admitted.

(Trial Exhibit 38 received in evidence.)

**BY MR. SUDER:**

**Q.**   Now, Mr. Congdon, going back to the drawing in your notebook, what we've heard is -- what is what I put my finger

to on the screen?

**A.**   Oh, that's a capacitor.

**Q.**   And it says "1MF" underneath.  What does that mean?

**A.**   1 microfarad.

**Q.**   You designed this to work with a capacitor?

**A.**   Yeah, but it works without a capacitor.

**Q.**   It works without a capacitor as well?

**A.**   Excuse me?

**Q.**   Did you say it works without a capacitor as well?

**A.**   Yes.

**Q.**   Now, in your breadboard -- don't know where it is.

Is there a capacitor on that breadboard?

**A.**   I believe there is.

**Q.**   And what color is the capacitor on that breadboard?

**A.**   It's a big orange capacitor on the left-hand side.

**Q.**   So the orange thing is a capacitor?

**A.**   Yeah.

**Q.**   And what does a capacitor do?

**MR. WARREN:**  Objection, Your Honor.  This is getting into expert testimony.

**THE COURT:**  Overruled.

BY MR. SUDER:

**Q.**   What does that capacitor do?

**A.**   It filters the voltage on the voltage stabilizer.

**Q.**   Now, let me ask you this, Mr. Congdon, before the '623

patent, when you came up with this idea and you had the '323, was a product ever made practicing the '323 patent?

A.   Yes.

Q.   By whom?

A.   We formed a company, QBAR, Tech, Inc.  A friend of mine, David Tralevin, in Canada, formed a company, and we incorporated and starting selling -- we call them QBAR switches.  We had QB104s and QB210s we started selling.

Q.   Can you tell the jury what -- the name QBAR, why QBAR?

A.   Okay.  The reference designator on this schematic -- if you look at a schematic circuit core, a transistor is usually shown as a Q.  And we called this a QBAR switch because the sense of the input is backward from a regular transistor.

    It's a three-terminal device, where if you put a high on the input the output also goes high; whereas, a regular transistor, when you put a high on the input, the output goes low.

Q.   And how did you meet Mr. Tralevin?

A.   We had worked -- he was with a subcontractor for GenRad when I worked at GenRad.  And they were building a lot of ICs for GenRad.  And Ken MacKillop also worked with Mr. Tralevin.

Q.   And what was your arrangement with Mr. Tralevin?

    What was his job at QBAR Tech?

A.   Okay.  QBAR Tech, he was more the sales and marketing guy. He had done electronic representation business in the past.

And he also provided the -- a lot of the corporate -- well, most of the corporate functions.

Q.   Was he the president?

A.   Yes.

Q.   And did QBAR Tech make product?

A.   Yes, we did.

Q.   For who?

A.   We manufactured and sold parts for Ford Motor Company, for IBM, for MIT, and several other customers, mostly power supply people.

Q.   Okay.  And did QBAR Tech need permission from you to practice the '323?

A.   Yes.

Q.   Why?

A.   Because it was my patent.  And we arranged -- when we incorporated as QBAR Tech, the attorney suggested to us that -- that QBAR Tech Inc. should pay me a royalty.  And he'd taken several semiconductor companies public successfully in the past, and he said that was a reasonable organization for the agreement.

Q.   And you were satisfied with that?

A.   Yes.

Q.   And did QBAR Tech pay you royalties under that agreement?

A.   Yes.  QBAR Tech did pay me royalties.

Q.   Now, Mr. Congdon, I'd like to go back to your drawing here

in the '623 patent.

And after 1997, did you file -- what were you doing at the time?

A.   After 1997, I was trying very hard to sell our QBAR switches with some amount of success.  You know, bringing up assembly in the Philippines or in -- or, subsequently, in Malaysia with several different assembly houses.

Q.   And were you still selling product under the '323?

A.   Yes.

Q.   And, sir, at the time did you file a patent immediately after this invention and you showed it at work?

A.   No.

Q.   Why not?

A.   Because I was struggling, didn't have the money to file patents.  Had to buy groceries too.

Q.   And at some point in time you were able to file a patent. What happened?

A.   What happened was we got a major customer, Welch Allyn, a medical equipment manufacturer, who started buying these things in significant quantities.  And we ended up making a certain amount of money that enabled filing the patent.

Q.   So you filed the patent and then it issued?

A.   Yes.

Q.   And, sir, at the time when the patent issued, which I believe was around 2005, were you still selling products under

the '323 patent?

A.   Yes.

Q.   Were you selling them as QBAR Tech?

A.   No.   The QBAR Tech Inc. corporation that I founded with David Traleven was -- the assets were acquired by my corporation, or a Massachusetts corporation, Bit Parts, Inc., in, oh, 1997, '8, somewhere in there.

Q.   Why did your company, Bit Parts, buy the assets from QBAR Tech?

A.   Uhm, because they were valuable.  Well, they -- Dave wasn't able -- Dave had a full-time job, and he was -- you know, we amicably agreed to transfer the assets of QBAR Tech to Bit Parts.  And so I carried on from there.

Q.   Were you able to manufacture a product practicing your new '623 patent?

A.   Not at that point, no.

Q.   Why not?

A.   Well, I didn't have a foundry.  I didn't have -- and the parts that we were trying to build, which is really Figure 6, didn't have the right voltage level capability to be useful to sell to anybody.  So we didn't try to sell.

Q.   And at that time were you evaluating possible infringers of your patents?

A.   I was looking at some possible infringers of '323.  I was speculating somewhat about some that might be doing '323 simply

because they had very low standby drain and I -- but I couldn't make the measurements because the reverse engineering costs are very high.

Q.   What is reverse engineering?

A.   You tear a chip down and you find out exactly how the connections are made.

Q.   And did you have the funds to do that?

A.   The -- I mean, I ran out of funds.  I had a little bit of money to just barely get started, but I couldn't finish the job, so I couldn't show infringement.

Q.   Who is Forfend?

A.   Okay.  Forfend was an organization that my brother Richard and I and then a friend formed to hold the patents and bring a little bit more money into Bit Parts so that Bit Parts could do -- try to begin to do the infringer investigation, which we weren't able to complete.  At least we were able to show some, I felt, probability.

Q.   Why weren't you able to complete the investigation?

A.   Didn't have the funds.

        MR. WARREN:  Objection, Your Honor.  All this discussion is -- goes to something you already ruled on and the stipulation that it wouldn't happen.

        THE COURT:  Let's have a sidebar.

    (The following proceedings were heard at the sidebar:)

        THE COURT:  What's the issue?

MR. WARREN:  So Mr. Congdon already said that he did an analysis that included the '323 and to try to determine infringement.  He's now not specifying and he's saying that he did this infringement analysis and that there was a probability of infringement.

So he's now implied that the '323 was what he had probability of infringement on, which is the truth.  He never did any analysis.  And so this is exactly what Mr. Suder swore wouldn't happen, what you said shouldn't happen, and now it's happened.

THE COURT:  You mean about your client infringing on the '323?

MR. WARREN:  Yes.

THE COURT:  I don't think he said that.

MR. WARREN:  Well, he's clearly said infringement analysis, and we know from Mr. Brunell that we were the only target.

THE COURT:  Well, are you going to elicit --

MR. SUDER:  No.

MR. WARREN:  This entire time we've been the only target.

THE COURT:  The jury doesn't know that.  I didn't know that.

MR. SUDER:  I didn't know that either.

MR. WARREN:  Mr. Brunell said it.  The clear

implication --

THE COURT:  I don't get that implication.

As long as you stay away from any implication that they infringed.  I will sustain an objection if you get into that area.  But right now he's making a general statement.

MR. WARREN:  About infringement.  We're in court defending infringement.  I don't see how the conclusion can be --

THE COURT:  What more are you going to ask him about the '323?

MR. SUDER:  Nothing.

THE COURT:  Well, then it's moot.

MR. WARREN:  Or about the presuit infringement analysis, has no relevance to anything.  It's just his speculation.  He's not an expert.  That was never --

THE COURT:  Why can't he testify as to what he actually did?

I understand your point about the '323 because there's a 403 problem.  But if he gets into '623, I don't know if he's going to say that.  I don't see a 403 problem.

MR. WARREN:  It's also a sword-and-shield issue.  They claimed privilege over this analysis stuff, so they shouldn't now be able to, you know, use it to say that, oh, I did do a presuit infringement analysis and this is what I concluded.

THE COURT:  Well, that's a new issue to me.

MR. SUDER:  I'm not going to elicit that testimony, Judge.

MR. WARREN:  It already has been elicited.

THE COURT:  At this point there's been nothing said about Power Integrations, so the jury doesn't know anything. And if you're not going to go in that area, then that's fine. If you do, then we've got a problem.

MR. SUDER:  I understand, Your Honor.

THE COURT:  Okay.

(Sidebar concluded.)

BY MR. SUDER:

Q.   Mr. Congdon, did there come a point in time that you needed a financial partner?

A.   Yes, very much.

Q.   And what efforts did you do to try to find a financial partner?

A.   We -- well, we presented our -- sort of three arguments to numerous law firms, and we eventually spoke -- one of the people that we contacted was a mutual contact with Brad Brunell.

Q.   You met Brad Brunell?

A.   Yes.

Q.   Did you meet him personally in Dallas?

A.   Yes, I did.

Q.   And what was your -- what is your arrangement with

Mr. Brunell?

**A.** The arrangement that I have with Mr. Brunell and Opticurrent is I get half of the proceeds. I think it's a very generous arrangement.

**Q.** And at the time that you entered into an arrangement with Mr. Brunell, did Bit Parts have debt?

**A.** Yes.

**Q.** Did Mr. Brunell help pay off that debt?

**A.** Yes, he paid Bit Parts' corporation debt.

**Q.** And was there money owed to the patent attorney?

**A.** Yes, I believe so.

**Q.** Did Mr. Brunell give you money to do that as well?

**A.** Yes.

**Q.** And did you enter into a consulting agreement with Mr. Brunell?

**A.** Yes.

**Q.** And did he buy you new lab equipment?

**A.** Yes.

**Q.** Did you like that?

**A.** Yes.

**Q.** Did you need that?

**A.** Very much, yes.

**Q.** How much time do you spend in your lab?

**A.** Oh, most of my time.

**Q.** Bought you a new laptop computer -- desktop computer?

**A.**   Yes, a new desktop.

**Q.**   Could you have done this on your own, this lawsuit?

**A.**   No.  Absolutely not.  And the early reverse engineering attempts that I made had all been directed at '323 and not '623.

**Q.**   Now, do you believe your '623 patent is more valuable than your '323 patent?

**A.**   I believe it is.

        **MR. WARREN:**  Objection, Your Honor.  This goes to expert testimony as to the issue that we've discussed previously.

        **THE COURT:**  Overruled.

**BY MR. SUDER:**

**Q.**   You can go ahead and answer.

        Do you believe the '623 is more valuable than your '323?

**A.**   I believe it is.

**Q.**   Why?

**A.**   It's an improvement.  It provides a very important reduction in standby power when it's used.

        **MR. SUDER:**  Thank you, Mr. Congdon.  That's all I have.

        I'll pass the witness you, Your Honor.

        **THE COURT:**  All right.

        Cross?

        **MR. WARREN:**  Yes, Your Honor.  Thank you.

### CROSS-EXAMINATION

**BY MR. WARREN:**

**Q.**   Good morning, Mr. Congdon.  It's nice to see you again. My name is Neil Warren.  I'm one of the attorneys for Power Integrations.

**A.**   Good morning.

**Q.**   We heard some discussion today about your '323 patent.  Do you recall that?

**A.**   Yes.

**Q.**   And you're aware that your '323 patent is actually expired; right?

**A.**   Yes.

**Q.**   And that means, in the context that we've heard, that after a patent is expired it's dedicated to the public; right?

**A.**   Yes.

**Q.**   So it would be free for anybody to use, and that's perfectly fair; right?

**A.**   True.

**Q.**   And the '323 patent is a three-terminal switch, it's the fundamental core of your invention; right?

**A.**   The '323 is the core of the '623 invention, yes.

**Q.**   The '323 patent is the core of the '623 patent?

**A.**   Yeah.  Yes.

**Q.**   So the '623 patent, I think, swaps out the component for the Cmos inverter and builds on top of the '323 invention;

fair?  Sorry.

A.   Yeah, you -- sorry.  You're not making it clear to me.

Q.   The '623 -- sorry.

The '623 builds on top of the '323; correct?

It's okay.  I'll move on.

A.   I agree -- I don't know what you mean by "on top of."

It's an improvement on the '323 patent, correct.

Q.   Okay.  Thank you.

Now, there was some discussion of QBAR switches during your testimony.

You never made or tried to sell a QBAR switch of the '623 patent at issue in this case; right?

A.   Correct.  We did not.

Q.   There was also some discussion about a QBAR license agreement.  Do you recall that?

A.   Yes.

Q.   And the QBAR license agreement was entered into between you, on the one hand, and QBAR, on the other hand; right?

A.   Yeah, QBAR Tech Inc. corporation, yes.

Q.   Sure.  QBAR Tech Inc.

And when you entered into that agreement, you owned 50 percent of QBAR Tech Inc.; right?

A.   Correct.

Q.   And your friend, David Tralevin -- how do you pronounce that?

A.    Tralevin.

Q.    Tralevin.

Your friend, David Tralevin, owned the other 50 percent of QBAR; right?

A.    That's correct.

Q.    And there's a royalty rate inside of that QBAR license; right?

A.    Yes.

Q.    But you don't remember how the royalty rate came to be in the license; right?

A.    We -- David and I met with the corporate attorney, who had taken semiconductor companies public in the past, and he advised us that such a royalty was a normal and proper thing to do.

Q.    Let me hand you a binder.

MR. WARREN:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. WARREN:

Q.    Inside of your binder you're going to see a tab that's labeled your deposition.  It's the very first tab.  Do you see that tab?

A.    Yes.

MR. WARREN:  Your Honor, I'd like to read from Mr. Congdon's deposition, page 255, lines 6 to 10.

THE COURT:  Volume 1?

MR. WARREN:  Yes.

THE COURT:  255.

MR. WARREN:  Lines 6 to 10.

THE COURT:  All right.  Any objection?

MR. SUDER:  No, Your Honor.

THE COURT:  All right.  Go ahead.

MR. WARREN:  (As read:)

"Q.  When it comes time for trial, we're not going to hear a story about how you came up with that 3 percent number, because you don't remember; right?

"A.  Yeah."

BY MR. WARREN:

Q.  So next, Mr. Congdon, I'd like to ask you about the patent that is at issue in this case, the '623 patent, okay?

A.  Yes.

MR. WARREN:  Mr. Sayres, can we put up DD401?

(Document displayed.)

BY MR. WARREN:

Q.  And, now, do you have that on your screen?

A.  No.

THE COURT:  Okay.  Do you need to reset it?

THE WITNESS:  Excuse me.  There's something just showed up here.

THE COURT:  Oh, so it does show?  You're seeing something?

THE WITNESS:  Okay.  I see DD401.  Okay.

THE COURT:  All right.  Thank you.

BY MR. WARREN:

Q.   Now, you understand, for the purposes of this case, claim 1 of your '623 patent defines your invention; right?

A.   I believe so.  I'm not sure that I understand the question.  Go ahead.

Q.   Well, you know claim 1 is the claim that is at issue in this case?

A.   Yes.

Q.   And in this case the claim, claim 1, is what actually defines the scope of your invention for purposes of the case. You understand that?

A.   Yes.

Q.   So fair to say that something that's not covered by claim 1 of the '623 patent is not your invention, at least for issues in this case; right?

A.   Yes.

Q.   And what we have here on the left-hand side on the slide is the first element of your claim, claim 1.

And it reads, "A noninverting transistor switch having only three terminals."  Do you see that?

A.   Yes.

Q.   And you understand the Court has defined that to mean a noninverting transistor switch with three terminals that does

not have a fourth terminal connected to a power supply; right?

MR. SUDER:  Your Honor, I'm going to object to this line of questioning with this witness.  He is not an expert.  He hasn't seen this.  He hasn't --

THE COURT:  Well, I don't know what the question is.  He's just simply asking him whether he understands that that's what the Court has done.  He can say yes or no on that.

MR. SUDER:  Okay.

THE COURT:  Is that your understanding of how the Court has interpreted that term?

THE WITNESS:  I believe it is.

BY MR. WARREN:

Q.   Have you seen the Court's claim construction before you came into court today?

A.   No.  I'm not aware of having seen it, no.

Q.   Okay.  So let me just step back a second, and let's just do it this way.

So fair to say that in this case before this jury, if a product is outside of the scope of claim 1 of your invention, it's perfectly fair that we wouldn't have to pay damages on that; right?

MR. SUDER:  Objection in terms of relevance, Your Honor, with this witness.

THE COURT:  Sustained.

**BY MR. WARREN:**

**Q.**   Fair to say in this case if any product or -- if a product is outside of the scope of claim 1 that defines your invention, it's different from your invention.  That's fair; right?

        **MR. SUDER:**  Same objection, Your Honor.

        **THE COURT:**  Sustained.

    You've already made the point that we're talking about claim 1.  He's conceded it's claim 1.  You don't have to ask him about the legal consequences of it.  He's not a legal expert.

        **MR. WARREN:**  Okay.

    Thank you for your time, Mr. Congdon.

        **THE WITNESS:**  I'm not a patent expert.

        **MR. WARREN:**  Okay.

        **MR. SUDER:**  I have nothing further, Your Honor.

        **THE COURT:**  All right.  Thank you.

    Thank you, Mr. Congdon.  You may step down.

    Plaintiff's next witness.

        **MR. SUDER:**  We will call Cliff Walker to the stand.

        **THE COURT:**  Okay.

        **MR. SUDER:**  Your Honor, now that Mr. Congdon has testified, will he be allowed to remain in court?

        **THE COURT:**  He's not going to be recalled by anyone?

    Is there any chance that Mr. Congdon would be called by you?

**MR. WARREN:**  No, Your Honor.

**THE COURT:**  And you're not going to call him on rebuttal?

**MR. SUDER:**  No.

**THE COURT:**  All right.  Then he may stay in the courtroom.

**THE CLERK:**  Please raise your right hand.

### CLIFFORD WALKER,

called as a witness for the Plaintiff, having been duly sworn, testified as follows:

**THE CLERK:**  Please be seated.

State your full name and spell your last name for the record.

**THE WITNESS:**  My name is Clifford James Walker.  Last name is W-a-l-k-e-r.

**THE COURT:**  Thank you, Mr. Walker.

You may proceed, Mr. Suder.

**MR. SUDER:**  Thank you.

Your Honor, may I approach the witness?

**THE COURT:**  Yes.

### DIRECT EXAMINATION

BY MR. SUDER:

Q.   Good morning, Mr. Walker.  How are you?

A.   I'm fine.

Q.   My name is John Suder.  We've never formally met before,

have we?

**A.**   I don't believe so.

**Q.**   You are the vice president of corporate development for Power Integrations?

**A.**   Correct.

**Q.**   You are in charge of intellectual property?

**A.**   Yes, I am.

**Q.**   Legal affairs?

**A.**   Yes.

**Q.**   And corporate policy?

**A.**   To some extent.

**Q.**   So as part of in charge of legal affairs, you're not an attorney?

**A.**   No, I'm not.

**Q.**   You have no legal training?

**A.**   No formal legal training, no.

**Q.**   And by the same token, you're not a engineer?

You don't have a formal license in engineering?

**A.**   No, I do not.

**Q.**   You don't have a degree in engineering?

**A.**   No, I do not.

**Q.**   You don't even have a degree; you didn't finish college?

**A.**   No, I did not.

**Q.**   Does Power Integrations have a legal department?

**A.**   No formal legal department except there are people that

work for me that we do legal work for the company.

**Q.** You are the de facto general counsel of the company?

**A.** No, I don't operate as a general counsel.  I just am responsible for legal affairs in the company.

**Q.** Okay.  And Power Integrations is a public company?

**A.** Yes, it is.

**Q.** And it was traded on the stock -- which stock exchange is it on?

**A.** I believe it's on the NASDAQ stock exchange.

**Q.** NASDAQ.  Okay.  So it has SEC-compliance work?  You have to report to the Securities and Exchange Commission and do corporate filings and quarterly filings?

**A.** Yes.

**Q.** Do you get involved in that?

**A.** I review those.

**Q.** Okay.  Is there anyone above you within the company that reviews those types of filings?

**A.** Well, the president of the company does.

**Q.** And who is the president?

**A.** Mr. Balu Balakrishnan.

**Q.** And you work closely with him?

**A.** Yes.

**Q.** Okay.  And, sir, you have been designated here as the corporate spokesperson for Power Integrations on certain matters; correct?

**A.**    Correct.

**Q.**    And, in fact, you are the corporate representative that's been sitting here watching the whole trial?

**A.**    Yes, I have.

**Q.**    And you worked with Fish & Richardson before?

**A.**    Yes.

**Q.**    In fact, you worked with this team of lawyers very closely before, haven't you?

**A.**    On occasion, yes.

**Q.**    Yes.  Sir, as a matter of -- you've been designated to speak on behalf of Power Integrations on its policy regarding intellectual property and licensing; isn't that correct?

**A.**    I'm sorry, could you repeat that.

**Q.**    You have been designated by Power Integrations to be the spokesperson for the company in this case on the issue of intellectual property and licensing?

**A.**    I believe so, yes.

**Q.**    Yes.  And Power Integrations has a policy that it does not license its own technology to others; right?

**A.**    Correct.

**Q.**    So if someone else wants a license to any of Power Integrations' patents, to try to make a product, you don't do it?

**A.**    Could you repeat the question.

**Q.**    If anyone says, hey, Power Integrations, I have an idea,

I'd like to use your patent and get permission to use it to build on it and do something, you won't let them do it?

A.   Not as a competitor, no.

Q.   Your policy isn't about a competitor.  You just have a policy that you don't license?

A.   Well, yes.

Q.   Okay.  Sir, I believe you also said that you do not license any third-party technology for use in your products?

A.   Correct.

Q.   So if someone else has a patent that you could or might need to use in your products, you don't take a license?

A.   Well, we have our own technology, so, yes, we don't license anyone else's.

Q.   But if someone came first, don't you have to respect that property?

A.   We feel it's very important to respect other people's property.

Q.   But by the same token, sir, as a matter of company policy you do not license any third-party technology for use in your products; correct?

A.   Yes.  It's not necessary, yes.

Q.   So I take it then that if Mr. Congdon had come to you and said, hey, you may need a license to my patent for your products, you'd say, no, we don't want one, we don't need one because it's against our policy; right?

**A.**   Well, not -- that's sort of hypothetical.  I guess it depends on what was offered.  But we've never offered -- been offered anything that we thought we needed.

**Q.**   But, sir, just so we're clear, as a matter of company policy you don't license your products and you don't take a license from anyone else's products?

**A.**   Correct.

**Q.**   Sir, I take it then that you have no licensing experience?  You've never licensed out; you've never licensed in; you've never licensed.  Right?

**A.**   Well, we have internal licenses.

**Q.**   Internal.  We'll get to those.

But you've never negotiated a license, have you?

**A.**   Well, we have a license that we negotiated with the founder of the company.

**Q.**   Okay.  My question, sir, as head of intellectual property who sets the policy, you have no experience in licensing because you don't license; correct?

**A.**   I don't believe that's correct.

**Q.**   Now, who is it at Power Integrations that makes the determination of whether or not maybe, you know, we may need a license and we should take a license?

Does anyone have that job to look out there and say maybe someone else may have invented this somewhere else at some other time and we need to take a license?

Do you have someone within Power Integrations with -- that has that job responsibility?

A.    There's no specific job like that.

Q.    Okay.  Is there anyone at Power Integrations whose job it is is to make sure to see what technology is out there and see whether or not we need to respect it, we need to license it? Do you have someone at the company that does that?

A.    Not specifically.

Q.    Okay.  Now, sir, this case is not the first time someone has asserted a patent against Power Integrations?

        MR. WARDEN:  Objection, Your Honor.  This goes into issues that the Court has already ruled on.

        THE COURT:  Sustained.

BY MR. SUDER:

Q.    Mr. Walker, you're familiar with the procedure to challenge a patent?

A.    Yes.

        MR. WARDEN:  Objection, Your Honor.  Same objection.

        THE COURT:  Sustained.

BY MR. SUDER:

Q.    Mr. Walker, you're sitting here today.  You're not challenging the validity of Mr. Congdon's patent, are you?

A.    No, we're not.

Q.    And you know there's procedures available to you to challenge them if you wanted to?

**A.**   There are procedures, yes.

**Q.**   You can go back to the Patent Office, for example; right?

**A.**   You can.

**Q.**   In fact, you've done that before?  I don't want to know any specifics, but you know that procedure is available because you've availed yourself to that procedure; haven't you?

        **MR. WARDEN:**  Objection, Your Honor.  Same objection.

        **THE COURT:**  Sustained.

**BY MR. SUDER:**

**Q.**   Now, Mr. Walker, you have done a license agreement where Power Integrations has licensed its technology.  Even though you don't have a policy, you have done it; haven't you?

**A.**   Yes.

**Q.**   You did it to a subsidiary company?

**A.**   Yes.

**Q.**   And it was called a patent license agreement?

**A.**   It was called a license agreement, I believe.

**Q.**   Yes.  And it was a license that Power Integrations gave to its subsidiary to practice its patents outside the United States?

**A.**   Correct.

**Q.**   And that subsidiary paid money to Power Integrations?

**A.**   Yes.

**Q.**   And, in fact, they paid a per unit?  For all the sales they made, they've paid a percentage of the sales?

MR. WARDEN: Objection, Your Honor. This is irrelevant, and the Court has already ruled on it.

THE COURT: Well, I'll allow that question.

THE WITNESS: If you will repeat the question.

BY MR. SUDER:

Q. The license agreement that you identified included that the subsidiary paid a percentage of its sales to Power Integrations?

A. Yes.

Q. And you had to report that -- that revenue that they paid you as income and pay taxes on it, didn't you?

A. Yes.

Q. And that was a commercial arm's length transaction, wasn't it?

A. Well, the contract is really not arm's length, but the financial terms are considered to be arm's length.

Q. And you told the government that it was an arm's length commercial transaction, didn't you?

A. The financial terms were to be considered arm's length, yes.

Q. So it was an agreement equivalent to what two arm's length or independent parties would agree to; right?

A. The financial terms, yes.

Q. Right. And there's nothing wrong with an agreement between Power Integrations and its subsidiary?

**A.**   No.

**Q.**   Okay.  And is that the only license that you're aware of, of where Power Integrations licensed its technology to a third party?

**A.**   No.  The company has licensed its manufacturing partners in the past.

**Q.**   But that was years ago, wasn't it?

**A.**   Yes, when it was a very young company.

**Q.**   And this license that you did was based on the net revenues that they made.  Whatever they sold, they paid you a percentage?

**A.**   Could you clarify "they."

**Q.**   "They" is the subsidiary.

**A.**   Oh, the subsidiary, yes.

**Q.**   They paid you a percentage.  That's the structure of a license based on your experience; right?

**A.**   That is one structure.

**Q.**   Okay.  And that's the structure that you -- and you signed that agreement, that license agreement on behalf of Power Integrations with the subsidiary?

**A.**   I believe I did.

**Q.**   And you knew what you were signing when you signed it?

**A.**   Yes.

**Q.**   And you've known about the existence of that agreement?

**A.**   Yes.

Q.   Okay.  Do you remember me asking you -- do you remember being asked about the existence of license agreements in your deposition?

MR. WARDEN:  Objection, Your Honor.  This is an issue the Court specifically addressed at the pretrial conference.

THE COURT:  Sustained.

MR. SUDER:  That's all I have, Mr. Walker.  Thank you.

THE COURT:  All right.  Thank you.

Cross.

**CROSS-EXAMINATION**

BY MR. WARDEN:

Q.   Good morning, Mr. Walker.

A.   Good morning.

Q.   As you know, my name is Joseph Warden.  I am one of the attorneys who represents Power Integrations.

I want to ask you some follow-up questions about the licensing discussion you had with Mr. Suder.  Okay?

A.   Sure.

Q.   You mentioned that Power Integrations has a policy of not taking licenses from third parties; is that right?

A.   Correct.

Q.   Can you tell the jury why that's your policy?

A.   Well, the company was founded on innovating its own technology.  And we have over 500 U.S. patents covering all our products.  So we are highly motivated to develop our own

technology so we can own it.

Q.   Does Power Integrations use third parties' technology in their products?

A.   No.

Q.   Let's talk about how that relates specifically to this case.

Now, before Opticurrent filed a lawsuit in this case did they ever ask Power Integrations for a license?

A.   No.

Q.   Before Opticurrent filed this lawsuit did they ever contact Power Integrations to suggest that Power Integrations was infringing the '623 patent?

A.   Not to my knowledge.

Q.   Before Opticurrent filed this lawsuit, did you know about the '623 patent?

A.   No.  I was not aware of it.

Q.   How did you learn about the '623 patent?

A.   When the lawsuit was filed against Power Integrations.

Q.   What year was that?

A.   I believe it was 2016.

Q.   And at that point, how long had Power Integrations been selling the products that are accused of infringement in this case?

A.   For at least ten years.

Q.   Once you learned about the '623 patent from this lawsuit,

what did you do?

**A.**   Well, naturally I read it.

**Q.**   And when you read the patent, what did you think?

**A.**   Well, I think it --

   **MR. SUDER:**  Objection, Your Honor.  He's not qualified.  He's not an engineer.

   **THE COURT:**  Sustained.

   **MR. WARDEN:**  Your Honor, if I may.  One of the issues in this case is inducement.  One of the elements of inducement is whether Power Integrations knew about the patent and whether they knew they infringed the patent.

   Mr. Walker's subjective opinion is directly relevant to whether Power Integrations knew they were infringing or causing others to infringe the patent.

   **THE COURT:**  Response.

   **MR. SUDER:**  We're not claiming damages for inducement prior to filing suit.  What they knew beforehand is irrelevant.

   **MR. WARDEN:**  Your Honor, that's actually the first we're hearing.

   But, actually, it's directly relevant whether even after they filed suit whether Power Integrations believed they were causing others to infringe the patent.  That's an element of inducement.

   **THE COURT:**  All right.  Objection overruled.  You can answer the question.

THE WITNESS:  Could you repeat the question.

BY MR. WARDEN:

Q.   Sure.  When you read the '623 patent, what did you think?

A.   Well, after I read the patent and the claims I realized it was -- the claim was to a three-terminal device and that we were --

MR. SUDER:  Objection, Your Honor.  He's giving testimony what his views are of the patent when he's not qualified to do so.

MR. WARDEN:  Again, Your Honor, his subjective belief on whether Power Integrations was causing infringement of the --

THE COURT:  He is testifying to subjective belief. He's not testifying as an expert.  So he can go ahead.

BY MR. WARDEN:

Q.   Continue your answer.

A.   So after I read the patent I looked at the claims and realized that it was describing only a three-terminal device. And our products from 2006 had gone to four-terminal devices because it was necessary to supply power to the architecture that we had developed for low standby at the time.

Q.   And did you later become aware that the Court had construed the term "only three terminals" in the patent to mean a three-terminal switch that does not have a fourth terminal connected to a power supply?

**A.**   Yes, I did.

**Q.**   And once you became aware of that construction, did your view of the patent change?

        **MR. SUDER:**  Objection, Your Honor.  This is tantamount to expert testimony from someone who is not qualified to give such testimony.

        **THE COURT:**  Overruled.  He's not testifying as an expert.  He's testifying as to his own subjective understanding.

**BY MR. WARDEN:**

**Q.**   Let me repeat the question.

        After learning of the Court's claim construction, did your view of the '623 patent change?

**A.**   No, because it still said a three-terminal device that didn't have a fourth terminal connected to a power supply, which our parts have.

        **MR. WARDEN:**  No more questions, Your Honor.

        **THE COURT:**  Thank you.  Redirect.

        **MR. SUDER:**  Yes.

                        **REDIRECT EXAMINATION**

**BY MR. SUDER:**

**Q.**   Mr. Walker, you're not an engineer; right?

**A.**   I already said that, yes.

**Q.**   Okay.  And you're not skilled in the art, one of skill in the art to read this patent and understand what it means;

correct?

A.   Well, I'm speaking on behalf of the company.  And the company surely is, and we --

Q.   That's not my --

A.   -- determined immediately that we didn't believe this patent applied to our products.

Q.   Mr. Walker, your lawyer asked you what your personal belief was when you read the patent.  Not what the company thinks; what you think.

And you are not one skilled in the art to read and understand this patent because you don't have the technical expertise or education; correct?

A.   I don't agree.

Q.   And you're not a lawyer, so you don't know the legal aspects of what terms mean, do you?

A.   I agree I'm not a lawyer.

Q.   And, sir, when you got this patent and read it, did you go down and ask, for example, David Kung to read the patent?

A.   There were many people who had read the patent at the time.

MR. SUDER:  Objection, Your Honor.  Nonresponsive.

BY MR. SUDER:

Q.   Did you ask David Kung, who's ahead of design engineering for these products, to read the patent?

A.   I don't recall if I asked David Kung or not.

**Q.** Wouldn't you want to know what he thinks of the patent, since he is a licensed engineer and knows the design and technological aspect of the products?  Wouldn't you want his opinion?

**A.** Well, I didn't need his opinion.  I asked for other opinions.

**Q.** Who did you ask?

**A.** For example, Michael Matthews, the vice president of product development.

**Q.** Is he an engineer?

**A.** I believe so.

**Q.** Okay.  And he's not on your witness list, is he?

**A.** I don't think so.

**Q.** Okay.  And you don't have any memos or notes or anything of him that tells you, hey, we don't infringe, do you?

**A.** I don't know.

**Q.** And you didn't say, hey, I read this patent.  And memo to the team, memo mow to the president, I read this patent and it's my opinion that we don't infringe, so let's not respect it.  Did you do that, sir?

     **MR. WARDEN:**  Objection, Your Honor.  This is argumentative.

     **THE COURT:**  Sustained.  Rephrase the question.

**BY MR. SUDER:**

**Q.** When you read this patent, I assume you immediately went

into the president's office, Mr. Balakrishnan, and told him,
hey, we have this patent here, but I don't think it infringes,
for the reasons you just said.  Did you do that?

A.   Yes.

Q.   And I assume you wrote a memo or an email to
Mr. Balakrishnan, so it's in the record, that says, I read this
patent and I don't think it infringes for these reasons?  Did
you do that?

A.   No, instead I actually consulted with our attorneys
regarding this, because it was a lawsuit.

Q.   That's not what you told this jury.  What you just told
this jury is that, I read it and I immediately came to the
conclusion that we don't infringe because we have a
four-terminal switch.  That's what you told the jury; right?
Isn't that what you just told this jury?

A.   Yes.  And that's what I believe.

Q.   And I'm saying, is there anything in writing that you can
show this jury, whether it's a note, an email, chicken scratch,
anything to support what you just told this jury?  Do you have
anything, sir?

        MR. WARDEN:  Objection, Your Honor.  Again,
argumentative.

        THE COURT:  Overruled.

        THE WITNESS:  Can you ask the question again, please.

**BY MR. SUDER:**

**Q.**   Do you have anything in writing from when you read this patent and said we don't infringe, for the reasons you just said in your nice rehearsed answer, do you have anything in writing that you can show this jury to support that statement?

**A.**   I don't have anything with me, no.

**Q.**   You never did it, did you, sir?

You never bothered to write down, in an email or memo, or handwrite anything that you can later show this jury, hey, I read this, and I don't think we infringe because of this?  You didn't do that, did you, sir?

**A.**   Not that I can recall.

**Q.**   And you are a company man, aren't you, sir?

**A.**   I'm not sure what that means.

       **MR. WARDEN:**  Objection again, Your Honor. Argumentative.

       **THE COURT:**  Sustained.

**BY MR. SUDER:**

**Q.**   You're an executive at Power Integrations?

**A.**   Yes.

**Q.**   And you make a lot of money at Power Integrations?

**A.**   I hope I'm paid well.

**Q.**   You're paid almost a million dollars a year, aren't you?

       **MR. WARDEN:**  Objection, Your Honor.  Again --

       **THE COURT:**  Overruled.

BY MR. SUDER:

Q.   Your base salary, sir, according to the SEC filings, is $950,000 a year, isn't it?

A.   I don't believe so.

Q.   Is it more?

A.   I think it's much less base salary.

Q.   Well, your total compensation is over a million dollars a year, isn't it?

A.   Well, we get compensated, sometimes, with stock, and depends if the company does well.  That may be the paper value, but that's surely not what I'm paid as a salary.  I would love to be.

Q.   Mr. Walker, the fact is, when this lawsuit got filed and you read this patent you didn't treat this patent different than any other intellectual property by a third party; you were never going to respect it, were you?

A.   I don't understand the question.

        MR. SUDER:  I pass the witness.

        THE COURT:  Cross?

                    RECROSS-EXAMINATION

BY MR. WARDEN:

Q.   Mr. Walker, does Power Integrations respect the intellectual property rights of others?

A.   Absolutely.

Q.   And why is that?

**A.**   Well, because we want others to respect our intellectual property.  So we think it has to go both ways.

**MR. WARDEN:**  No more questions, Your Honor.

**THE COURT:**  All right.  Anything further?

**MR. SUDER:**  No, Your Honor.

**THE COURT:**  All right.  Thank you, Mr. Walker.  You may step down.

**THE WITNESS:**  Thank you.

**THE COURT:**  You may call your next witness.

**MR. SUDER:**  Your Honor, at this time, subject to Mr. Sutherland on Friday, the plaintiff rests.

**THE COURT:**  All right.

Hear from defense.

**MR. WARDEN:**  Yes, Your Honor.  We're ready to open our case.  Our first witness will be Mr. David Kung.  It might make sense to go ahead and take our break.

**THE COURT:**  All right.  I will do that.

It's a little bit early, but since there's a natural break in the proceedings, defendant is now going to present its case, so we'll go ahead and take a 15-minute break.

Thank you.

**THE CLERK:**  All rise for the jury.

(Jury out at 9:44 a.m.)

**THE COURT:**  All right.  We'll see you in 15.

(Recess taken at 9:44 a.m.)

(Proceedings resumed at 9:58 a.m.)

THE COURT:  All right.  You may be seated.  Welcome back, ladies and gentlemen.  We're going to proceed with the next phase of the case.

And you may call your first witness, counsel.

MR. WARREN:  Thank you, Your Honor.  Power Integrations calls David Kung.

**DAVID KUNG**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE CLERK:  Please be seated.  State your full name and spell your last name for the record.

THE WITNESS:  David Kung.  K-U-N-G.

MR. WARREN:  Your Honor, I have a binder.  May I approach?

THE COURT:  Yes, you may.

**DIRECT EXAMINATION**

BY MR. WARREN:

Q.   Morning, Mr. Kung.

A.   Good morning.

Q.   Would you please introduce yourself to the jury?

A.   My name's David Kung.  I work for Power Integrations as the director of design engineering, and I joined the company in 1989 about one year after the company was founded.  And I have been on that duty since then.

**Q.**   What are your responsibilities as director of design engineering?

**A.**   I am overseeing all product development, design development.  And that includes power supply controller products.

**Q.**   And where do you live?

**A.**   I live in Foster City, California.

**Q.**   And where do you typically sit for work?

**A.**   San Jose.  That's the headquarter of Power Integrations.

**Q.**   And now we're looking at slide DD202.  Do you have the slides on your screen?

**A.**   No.  I don't see anything here.

Oh.  It's here now.

**THE COURT:**  Okay.  Thank you.

**THE WITNESS:**  Yeah, I can see it.

BY MR. WARREN:

**Q.**   Okay.  Can you tell us a little bit about Power Integrations?

**A.**   Power Integrations is a Silicon Valley company headquartered in San Jose.  The company was founded in 1988, as I said.  And it is -- it has been recognized as the leader in power conversion.  IC's.

**Q.**   And what are you showing here on slide DD203?

**MR. SUDER:**  Judge, leading nature of this.  He's putting on slides and asking him to read the slides.  Not

listening to --

THE COURT:  Sustained.

MR. WARREN:  This is evidence, Your Honor.  This wasn't ever objected to by the plaintiff.

THE COURT:  Well --

It's not on the screen.

In any event, I'm going to sustain the objection.  It's not a proper method of examination.  You can ask him questions but not lead him with slides.

MR. WARREN:  Yes, Your Honor.

BY MR. WARREN:

Q.   Has Power Integrations been recognized as a leader in energy efficiency?

A.   Yes.  What we see here are, basically, the evidence of that.  We have been recognized by being a member of many stock indexes.  And we have been named twice as the top 20 sustainable stock.  And we have received Energy Star Award and the Star Of Energy Efficiency Award.

Q.   And I think you mentioned this earlier, but when did you join Power Integrations?

A.   I joined the company one year -- roughly one year after it was founded.

Q.   And what year was that?

A.   That is 1989.

Q.   How long have you worked at Power Integrations now?

**A.**   Approaching 30.

**Q.**   When you first joined Power Integrations in 1989, how large of a company was it?

**A.**   The company was fairly small.  The total number of employees were less than 20.  Yeah.  That's just a startup.

**Q.**   And back in 1989, how many engineers were in the design group that you oversaw?

**A.**   I think it was about a total of three.

**Q.**   And what was your first role when you first joined Power Integrations?

**A.**   The same role as what I'm doing today.

**Q.**   So have you been in charge of overseeing the design of Power Integrations power supply controller products since 1989?

**A.**   Yes.

**Q.**   Do you also personally participate in the design and development of Power Integrations' products?

**A.**   Yes.

**Q.**   Can you tell us about your role in designing and developing products?

**A.**   Well, at early stage I actually were involved at the hands-on level.  I actually do the circuit design myself, run the simulation, doing layout, everything.  And later when we grew, my responsibility shifts a little bit so I became more overseeing than doing hands-on work.  But I stay technical.  I got involved all the way through till today.

Case 3:17-cv-03597-EMC   Document 269   Filed 02/20/19   Page 77 of 190   542
KUNG - DIRECT / WARREN

**Q.**   Do you have any patents on your work?

**A.**   Yes.   I have 14 U.S. patents.   And one of them is the earliest -- one of the earliest patent of the company on pulse width modulation control circuit.

**Q.**   And I'd like you to think back in time, if you would, back to the earliest products of Power Integrations.   Can you tell us about the product TopSwitch?

**A.**   Yes.   TopSwitch is such an important product in our life. It was the first highly successful product that we brought to the market.   It was so successful so it was launched in 1994, and by 1997 it was the product that took the company to public.

         **THE COURT:**   Hold on just a second.

     (The court reporter working with the judge's realtime.)

         **THE WITNESS:**   Can I continue?   So this product is very special to me because we really surprised the world with this product.   The level of innovation was unprecedented.   Back then, the part supply controller typically has a pin count of about 14.   So with our innovation, we're able to bring the pin count from 14 down to 3, which is the theoretical minimum of the number of pin counts for this function.

**BY MR. WARREN:**

**Q.**   And when did this product come out?

**A.**   1994.

**Q.**   And did you personally oversee the design of TopSwitch?

**A.**   Yes.   I personally was involved in the actual design,

simulation and layout of this product.

Q.   And can you explain for us what allowed TopSwitch to become compacted down to only three terminals?

A.   Yes.  What we were able to do with innovation was that we, basically, integrated a lot of -- actually, all the -- all the features a power supply controller needs on chip through the integration.  Then -- and because of that, we eliminated a lot of external components.  And with the removal of those external components, there goes the pins that's needed to connect to the components.  Then we also combined functions, like power supply and feedback into a single pin.  And through that, we reduced the number of pin count from 14 to 3.

Q.   Okay.  I want to step back just a second and focus on something you said.  You said that you combined power supply and feedback into a single pin.  Can you explain what you mean?

A.   For power supply controller to work, you have to have power so the chip can operate.  You also have to receive the information from the power supply output so you know what to do with the switch when, and how to turn on and turn off the switch.  So those two are basic functions you have to have. And usually requires two pins, and we found a way to combine into a single pin.

Q.   Would you please turn in your binder to the tab labeled TX-198?

A.   TX-198.  Okay.

**Q.**   What is TX-198?

**A.**   This is TopSwitch data sheet.

          **MR. WARREN:**  Your Honor, I move the admission of TX-198.

          **MR. SUDER:**  No objection, Your Honor.

          **THE COURT:**  All right.  198's admitted.

     (Trial Exhibit 198 received in evidence)

**BY MR. WARREN:**

**Q.**   Now, here you've, on the slide, blown up the top right portion of the TopSwitch data sheet.  Do you see that on your screen?

**A.**   Yes.  Yes, I do.

**Q.**   And you've highlighted the TopSwitch in the middle.

**A.**   Yes.

**Q.**   How many terminals does the TopSwitch show here?

**A.**   As we can see, it has only three pins.  Three terminals.

**Q.**   And at the top of this slide there is actually highlighted the words "three-terminal offline PWM switch."  Do you see that?

**A.**   Yes.

**Q.**   Is that a blow-up of what's actually shown right on the top of the data sheet there?

**A.**   Yes.

**Q.**   Now next to the TopSwitch we see a highlighted -- sort of looks like an Oreo cookie.  Two parallel lines.  Do you see

that?

A.   Yes.

Q.   What is that?

A.   That is external capacitor connected to the control pin to provide power to the product.

Q.   And so how does that relate to what you told us earlier about how the TopSwitch was powered?

A.   TopSwitch is powered through this capacitor by taking current from this capacitor to run its control circuit.

Q.   Is there a name for this type of capacitor?

A.   We usually call this "bypass capacitor."

Q.   Did Power Integrations receive any patents covering the TopSwitch product?

A.   Yes.  Several.

Q.   Would you please turn in your binder to TX-154?

A.   TX-154.  Okay.

Q.   What is TX-154?

A.   This is one of the TopSwitch patent.  It's the U.S. patent number 5285369.

Q.   Are you personally familiar with this patent?

A.   Yes.

     MR. WARREN:  Your Honor, I move the admission of TX-154.

     THE COURT:  Any objection?

     MR. SUDER:  Yes, Your Honor.  They can talk about it.

But to bring it in, under 403, would be improper.

**MR. WARREN:**  Your Honor, this was disclosed.  There was no objection made.  This is the first we're ever hearing of it.  This was already --

**THE COURT:**  Okay.  Overruled.

**BY MR. WARREN:**

**Q.**  Do you see on your slide the patent, sir?

**A.**  Yes.

**Q.**  And on the left side we have the face of the patent.

**A.**  Yes.

**Q.**  And you've blown up the figure that appears on that cover. What is that figure?

**A.**  That figure is showing a power supply schematic with a product like TopSwitch connected, and that shows the three pins of the TopSwitch.

**Q.**  And now we see indicated element 110 highlighted.  Do you see that?

**A.**  Yes.

**Q.**  What is element 110?

**A.**  That is a bypass capacitor connected there to provide power to the device.

**Q.**  Next, I have some excerpts from the patent.  And this patent discusses that as a rule of thumb the fewer necessary pins on an IC package, the lower will be the cost.

Can you explain to us what is that's describing?

**A.**   Yes.   As word says here, that the fewer the pins the better the cost.   The reason is that when you have a pin, you bring it out for a reason.   Usually that means you have to connect something there.   And once you connect something there, that thing cost you money, so the cost goes up.   And you have more pins, that means you have a bigger package, that costs money.   So everything is related to cost.

So the fewer the pins that means the fewer the components you need, and the smaller the package, the smaller the chip, and the result is just a lower cost power supply.

**Q.**   So all else being equal, is it best to have as few pins as possible?

**A.**   Yes.

**Q.**   So we've talked about TopSwitch.   And back in the early and mid '90s, was Power Integrations making its TopSwitch products with only three pins?

**A.**   Yes.

**Q.**   At some point, did there come a time when Power Integrations transitioned from using three terminals to four terminals?

**A.**   Yes.

**Q.**   And can you tell us about that?

**A.**   Yeah.   The TopSwitch, the three terminal thing, was very successful.   But by late 1990 we came up with another revolutionary idea and we filed a patent at that point.   We

used that idea, you know, to make new products.

And that is the on/off control.  On/off control has a lot of good things, but there's one thing it couldn't do.  Is that because of the way the signal is, we are not able to combine the feedback and the power supply into one pin anymore.  So we went from three back up to four at that time.

Q.   So on/off control, does that require four pins?

A.   Yes.

Q.   And I think you mentioned this, but did Power Integrations receive a patent on its on/off control invention?

A.   Yes.

Q.   Can you turn in your binder to TX-153?

A.   153.  Okay.

Q.   What is TX-153?

A.   This is U.S. patent 6226190.  This is the on/off control patent.

MR. WARREN:  Your Honor, I move the admission of TX-153.

THE COURT:  Any objection?

MR. SUDER:  No objection.

THE COURT:  Admitted.

(Trial Exhibit 153 received in evidence)

BY MR. WARREN:

Q.   Mr. Sayres, can we bring up on the screen TX-153?

Is this Power Integrations '190 patent?

**A.**    Yes, it is.

**Q.**    Mr. Sayres, can we zoom in on the left-hand side -- sure.

What is the title of '190 patent?

**A.**    The title is Offline Converter with Digital Control.

**Q.**    And what is "digital control" referring to?

**A.**    Digital means two states.  That means either zero or 1.
Or, say, on or off.  There are only two choices.

**Q.**    And is this related to Power Integrations naming the
on/off control "on/off control"?

**A.**    That's exactly why it's named on/off.  It's, basically,
two stage, only it's digital.

**Q.**    And directly below the title we see the inventors.  Do you
see that?

**A.**    Yes.

**Q.**    The first inventor listed is Mr. Balu Balakrishnan.  Who
is that?

**A.**    He is the CEO of Power Integrations today.

**Q.**    And how long has Mr. Balakrishnan worked for Power
Integrations?

**A.**    He joined Power Integrations in February 1989.  The reason
I know that so well is because I worked for him before this in
National Semiconductor.  So he make the move in February, and
he called me so I followed him.  So I know exactly when he
moved.  Okay.  So it's about 30 years.

**Q.**    And the second inventor is Mr. Alex Djenguerian.  Who is

Alex Djenguerian?

**A.** Alex is a senior member in my group. And he also -- the relationship with Alex was also the -- going even before Power Integrations.

**Q.** And does Alex still work in your group today?

**A.** Yes.

**Q.** And do you recall when Alex joined your group?

**A.** Yes. He joined a few months after I did, so it's somewhere 1989. And that's because, you know, after I joined I contacted him so he followed me.

**Q.** So all three of you have worked at Power Integrations for nearly 30 years now?

**A.** Yes.

**Q.** And down at the bottom, when was this patent filed?

**A.** The patent was filed February 27, 1998.

**Q.** And is that when you were working on this technology yourself?

**A.** I did not do the circuit design myself, but I overseeing the design.

**Q.** Did you oversee the design of products in this time frame that used the '190 patent invention?

**A.** Yes.

    **MR. SUDER:** Your Honor, objection to the issue of the timing and dates. That's been a matter of a pre-trial ruling.

        **THE COURT:** All right. Well, unless there's some

relevance, we don't need to mention the dates.

MR. WARREN:  That's fine, Your Honor.

MR. SUDER:  Can we take it off the screen, Your Honor?

MR. WARREN:  Certainly.  Let's go back to the slides.

BY MR. WARREN:

Q.   Did you personally oversee the design of products using the '190 patent?

A.   Yes.  All of them.

Q.   And were there any drawbacks to using on/off control?

A.   Yes.  As great an idea of on/off control, it does have one issue that is what I said; we are no longer able to combine the feedback and the power supply into a single pin, so we had to go to four pins.

Q.   So on the screen we have Figure 6 from the '190 patent blown up and you've added some annotations.  Do you have that on your screen?

A.   Yes.

Q.   What are you showing here?

A.   This shows the four pin that we just talked about.  So on the right-hand side it is the drain and the source pins, then on the left-hand side now we have two pins instead of one.  The bypass pin is the power supply pin, and the feedback pin is the feedback pin receiving the information from power supply output.

Q.   And so which pin here would be the power supply pin?

**A.**   The bypass pin.

**Q.**   And can you remind us, what does the feedback pin do that's distinct from the power supply pin?

**A.**   Feedback pin is the pin that we use to receive information about what's happening at the power supply output.  Based on that information, we can decide how to control the switch. Meaning, the timing, when, and how to turn on and turn off the switch.

**Q.**   And using on/off control, is it possible to still combine those like you did in the TopSwitch?

**A.**   No.

**Q.**   Would you turn in your binder to TX-164?

**A.**   164.  Okay.

**Q.**   What is TX-164?

**A.**   That is Tiny-256.

**Q.**   Did you personally oversee the design of the TinySwitch-Plus?

**A.**   Yes.

     **MR. WARREN:**  Your Honor, I move the admission of TX-164.

     **THE COURT:**  Any objection?

     **MR. SUDER:**  No objection, Your Honor.

     **THE COURT:**  Admitted.

   (Trial Exhibit 164 received in evidence)

BY MR. WARREN:

Q.   And here on the screen on the left-hand side we have the cover page of the data sheet.  Do you see that?

A.   Yes.

Q.   And you've blown out the highlighted text there.  Do you see that?

A.   Yes.

Q.   What is -- what are you showing from the data sheet here?

A.   This is, basically, showing Tiny-256 uses on/off control. And because of that, it has very good energy efficiency.

Q.   And does the TinySwitch-256 show a blocked diagram of the circuit?

A.   Yes.

Q.   Why don't we look at that.

     This is a blow-up of the block diagram from the data sheet.  Do you see that?

A.   Yes.

Q.   And you've highlighted four terminals.

A.   Yes.

Q.   And you have two arrows here.  Can you explain what the arrows are pointing to?

A.   That's what -- the single pin that we used to see with TopSwitch split into two.  The bypass pin for power supply, and the feedback pin for receiving the signal from the power supply output.

**Q.** And after the original TinySwitch product, did Power Integrations continue to introduce new products using the '190 patent's on/off control?

**A.** Yes. We have been developing products using on/off control since then till today. And continuing as we speak, we are working on new products using this on/off control.

**Q.** I'd like to ask you about the products that are issue in this case, okay?

**A.** Yes.

**Q.** We have them on the screen. What are the products that are at issue in this case?

**A.** They are four product families here. That's TinySwitch-III, TinySwitch-Light -- or, TinySwitch-LT -- LinkSwitch-II, and LinkZero-AX.

**Q.** And did you personally oversee the design of every single one of these products?

**A.** Yes. All of them.

**Q.** And do the four products that are at issue in this case all use Power Integrations' '190 patent on/off control?

**A.** Yes, they do.

**Q.** I'd like to discuss the products. On the screen here we have TX-14 which is already in evidence. Do you see on the left-hand side the cover of the data sheet?

**A.** Yes.

**Q.** And you've blown out a portion of the data sheet that's

discussing EcoSmart.  What is this showing?

**A.**    It says that the product TinySwitch-III uses on/off control, the '190 patent.  And in the on/off control, that technology is part of what we call EcoSmart Technology. EcoSmart is a collection of many energy efficient technologies that we developed over time.  And on/off control is the most important one among them.

**Q.**    And this is the cover of the TinySwitch-LT data sheet. And you've blown out the same portion that also appears on this data sheet.  What are you showing here?

**A.**    Similarly, this shows that TinySwitch-LT uses on/off control.  And because of that, and because of the EcoSmart technology, the energy efficiency of this product is very good.

**Q.**    And I think you mentioned this briefly.  You mentioned that the LT stands for light?

**A.**    Yes.

**Q.**    Is the TinySwitch-III related to the TinySwitch-Light?

**A.**    Yes.  TinySwitch-LT is, basically, a lighter version of the Tiny-III.  It's the same function, just lower cost.

**Q.**    And so as we go through and we discuss some specifics from the TinySwitch-III, will that apply equally to LT?

**A.**    Yes.

**Q.**    So on the screen here you've blown out the block diagram from the TinySwitch-III family.  What are you showing here?

**A.**    What I try to show here is, again, this is a family --

uses on/off control.  And because of that, we have to have two pins -- one for power supply, one for feedback -- which is called "enable" here, I think.

Q.   So just to be clear, which pin is the power supply pin?

A.   Power supply pin here is the bypass pin.  It's called BP/M here.

Q.   And which is the feedback pin?

A.   That is the enable pin, and it's labeled as EN/UV, I think.  Yeah.

Q.   And were those separated because it was required by using on/off control?

A.   Yes.  That's the reason.

Q.   And here you've highlighted what's in the upper right-hand corner of the face of the data sheet.  Is this a simplified power supply schematic?

A.   It is a power supply schematic showing the power supply uses TinySwitch-III family with four pins connected.

Q.   And on the screen you've highlighted again the sort of Oreo shape -- what are you showing there?

A.   That is the bypass capacitor as we mentioned earlier. This is connected to the BP/M pin to provide power to this controller.

Q.   So on this screen this is a graphic you made that shows a brain and a light switch.  Can you explain what you're showing here?

A.   Okay.  What I try to show here is that all the power supply controller products we make consists of intelligent circuit and a switch.  And the intelligent circuit works as a brain that determines when and how the switch is supposed to be turned on and off, which is very important because that is what dominates the energy efficiency in power conversion.  If you turn on or off the switch a little bit too early, a little bit too late, too fast or too slow, either way it could cause unnecessary energy loss.  So it is the dominant thing in power conversion energy efficiency.

Without the brain, the switch itself cannot do anything.

Q.   Does Power Integrations have patents covering the circuitry of the brain?

A.   Yes.

Q.   And does Power Integrations develop and have patents covering its switch technology?

A.   Yes.

Q.   And now you mentioned this briefly.  You said the energy efficiency of the chip is mainly determined by the brains and not the switch.  Can you explain a little bit more of what you mean by that?

A.   As I said, you know, for the entire power conversion industry, the challenge for everybody is how to control the switch.  You know, if you don't control the switch properly, you can waste a lot of energy.  Okay.  So the brain is what we

have been working hard on.  And we are continuing working hard on the brain.

Q.    And do you also continue working hard on the design of the switch?

A.    The switch itself is done, so we are not doing much at all with the switch.

Q.    When was Power Integrations' switch developed?

A.    Well, that's what the company was founded for.  I mean, it was the technology that the founder came up with.  And the switch was developed at very beginning.

Q.    And I'd like you to explain to the jury what we have here as a blow-up of that same block diagram we've seen before.  And I'd like to -- you to explain to the jury just very -- at a high level some of the circuitry of the brain.  Okay?

A.    Sure.

Q.    And so you've highlighted a portion here.  What have you highlighted here?

A.    Well, what we see here is the on/off control.  On the left it is the pin that receives the signal, the information from power supply output.  So based on that information, the on/off control can determine when and how to turn off and turn on the switch.  So this is what this highlighted portion is about.

Q.    So this portion relates to Power Integrations '190 patent on on/off control?

A.    Yes.  Exactly.

Q.   And does this portion of the circuitry relate to requiring four terminals?

A.   Yes.  Because there's no way that the two pin can be connected -- can be combined together now.

Q.   And let me move on to another piece of it.  This is the same figure, but we've highlighted a different portion.  What are you highlighting here?

A.   This is the current control circuit that we have.  And it's also part of the brain.

Q.   Was this also a Power Integrations innovation that it received patents on?

A.   Yes.  This circuit involves the use of a current limit state machine.  And we have a patent on that.

Q.   So I'd like you to explain in a little bit more detail.  We've discussed it from a high level.  But more specifically, how the product is powered and why exactly it requires power pins, okay?

A.   Okay.

Q.   So here you've highlighted the bypass connection pin.  Can you tell us a little bit about what is that?

A.   The bypass connection pin is the power supply pin.  For the chip to work, it has to receive power from somewhere.  And this is the place that it takes power from.

Q.   And does the data sheet itself describe that in its text?

A.   Yes.

Q.   And so here you've pulled out a portion of the text.  This is off of page 3 of the data sheet.  What is this portion of the data sheet describing?

A.   This is describing how we use the bypass capacitor as a power supply.  And this phrase here describes how we charge the capacitor and store energy in that capacitor to use it as a battery.

Q.   And so just so we're clear, you just described it as a battery.

A.   Yes.

Q.   How does the bypass capacitor function as a battery for the chip?

MR. SUDER:  Objection, Your Honor.  We're getting into matters of expert testimony about how things are, as opposed to identifying facts.  That hasn't been disclosed, and he's not been designated.  He can talk about what these products have; but to explain their function, how they do, is more a matter of expert testimony.  Because under 702, it's not within the regular knowledge of any witness.

MR. WARREN:  He's the designer of the chip.  The question was simply how the capacitor acts as a battery.

THE COURT:  He can explain that.  Overruled.

THE WITNESS:  Okay.  For everybody in our field, we all know that a capacitor stores energy, okay?  It's just like battery.  In fact, battery itself, if you go to the extreme,

battery is just an enlarged capacitor.  So nature -- they have the same nature.  They store energy, they provide energy, to whatever connects to it when it's needed.

So for us to use the bypass capacitor as the source of the energy we have to store the energy there first.  And this paragraph describes how that is done.

**BY MR. WARREN:**

**Q.**   And so where does the energy come from that initially gets stored to charge up that battery?

**A.**   Okay.  What we see here is that it says the 5.85-volt regulator charges the bypass capacitor connected to the bypass pin to 5.85-volt by drawing a current from the voltage on the drain pin whenever the MOSFET is off.

So this means that when MOSFET is off, we take current from the drain.  So current flows into the drain, then goes out straight from the bypass pin to the capacitor.  So now energy is stored in the bypass capacitor.

**Q.**   And just as in the data sheet, is that -- when we look at the -- let me go back a slide.

When we look at the data sheet and we see the block diagram, that 5.85 regulator, can you describe to the jury where that is on this diagram?

**A.**   That's on the upper right corner.

**Q.**   And so the upper right corner, that's the 5.85-volt regulator that's described in this portion of the data sheet?

**A.** Yes.

**Q.** And does that 5.85 regulator -- is what it's doing, as said in the data sheet, charging that bypass capacitor?

**A.** Yes.  It is the charger for that capacitor.

**Q.** And so what I'd like to do is ask you about the next two sentences.  So we'll highlight those.

And the next two sentences describe that the bypass multifunction pin is the internal supply voltage node.  What does that mean?

**A.** That means the control -- the controller of this product takes current from that node.  That's why it's the power supply node.

**Q.** So is this sentence, basically, saying that the bypass capacitor's functioning as the power supply?

**A.** Yes.

**MR. SUDER:** Your Honor, that would call for a legal conclusion in this matter -- in this case.

**THE COURT:** Sustained.  That answer will be disregarded.

**BY MR. WARREN:**

**Q.** Well, the data sheet says in its own words that it's the supply voltage, right?

**A.** Yes.

**Q.** The next sentence -- and just so we're clear, so everyone's clear, that's being drawn from the battery bypass

capacitor that's attached to that pin that was charged by the regulator you described a minute ago?

A.   Yes.

Q.   The next sentence states:  When the MOSFET is on, the device operates from the energy stored in the bypass capacitor.

What is that describing?

A.   That, basically, says what I just said.  The controller, when it works, it takes current from that bypass capacitor to operate.

Q.   So we have a switch in the device that's turning off and on.  That's what we call the MOSFET?

A.   Yes.

Q.   And when that switch is off, that 5.85-volt regulator is charging the battery?

A.   Yes.

Q.   And then when the switch is on, the product is drawing power and powering itself from the battery?

A.   Yes.

MR. SUDER:  Objection, Your Honor, the use of the term "battery."  It's not a battery.

THE COURT:  Use the term "capacitor."

BY MR. WARREN:

Q.   I'll use "bypass capacitor."  When the MOSFET is on, its drawing out of that bypass capacitor and it's functioning as the -- operates from energy stored in the bypass capacitor.

Right?

A.    That's correct.

Q.    Have you prepared some graphics to visually show what this -- what's happening?

A.    Yes.

Q.    So first let's zoom back out.  And this is that simplified diagram of a power supply from the cover of the data sheet?

A.    Yes.

Q.    And what have you first highlighted here?

A.    Well, the only highlight we have here is the bypass capacitor connected to the bypass pin.

Q.    Okay.  Now you've added some red dashed lines.  What are you showing there?

A.    Okay.  This is saying that at startup when the power supply is first plugged into the wall, the input from PG&E comes in through a rectifier as a high-voltage input that rises.  At that point, current starts flowing from that input voltage into the drain pin.  Then straight -- straight out of the bypass pin going into the bypass capacitor.  So energy is getting stored into the bypass capacitor.

Q.    And so right below the figure -- it will become more obvious, I think, in the later graphics.  But what are you showing there?  That rectangle.

A.    This is, basically, showing the energy storage in the capacitor.  What's going on within the capacitor.  So the black

line on the top is the threshold that when we -- again, I have to reference this to a battery.  When you charge a battery, there is a target voltage that the battery will be charged to.  That's the threshold.  So the red is how much energy we have put into the cap.  The capacitor.  So here we're just starting.  So the red is very little, far below the black.

Q.   Okay.  And now we filled it a little bit more.  What are you showing here?

A.   This is now in the middle of the charging process now.  So we have -- we have started and continued charging the capacitor for awhile.  So now we have more energy in the capacitor.  So it's now getting closer to the threshold, but not there yet.

Q.   And now we see the red line.  We've crossed that black line.  What are you showing here?

A.   Well, this is saying that now we have put into the bat -- not "battery" -- the bypass capacitor, enough energy.  So now the voltage of the bypass capacitor is now exceeding the threshold, so we know that we have enough energy stored.  And this is a time that we can start operating.  And until then, until the energy reaches the black line, we cannot operate.  And we do not operate.

Q.   So let's go back.  So right here at the beginning is the switch operating?  Or, is the TinySwitch-III operating?

A.   No.

Q.   And right here as we're charging it up, is it operating?

**A.**   No.   It's gated by that black line.   Until it reaches that black line, nothing happens.

**Q.**   Okay.   So it doesn't start actually operating until it crosses that threshold?

**A.**   Yes.

**Q.**   Are you familiar with testing the Power Integrations did around this issue?

**A.**   Yes.

**Q.**   So this is an excerpt out of the data sheet.   This testing is actually shown in the TinySwitch-III data sheet, right?

**A.**   Yes.

**Q.**   And so we've excerpted -- and by the way, this was real world testing that's shown in there.

**A.**   Yes.   It's taken from a scope.   Oscilloscope.

**Q.**   What is this testing showing?

**A.**   This shows three voltage wave forms here.   At the top it is the DC voltage, which I mentioned earlier.   When the power supply gets plugged into the wall, the PG&E energy comes in after rectifier as a high-voltage voltage.   But that has to start from zero.   So it starts from zero going up after you plug in.   That's the top wave form.

The one in the middle is the bypass pin -- bypass capacitor voltage.   So when the input voltage is connected, current starts flowing into drain out of bypass pin, putting energy into bypass capacitor.   And that makes the bypass

capacitor voltage to rise.  And that's what we see here.

At the bottom is the drain voltage wave form which shows the activity of the controller.  If there's any switching activity you will see it here.

So what you see here is that there is vertical red dotted line, okay?  Before that dotted line, on the left, the charging is happening but there's no operation until the bypass voltage reaches 5.85 which is the threshold that I indicated with the black line earlier.

Okay.  When that line is reached, then the switching activity starts.  That means the controller starts working.

Q.   So where in this drawing can we see energy being charged into the bypass capacitor?

A.   That's the area to the left of the vertical dash red line.

Q.   Where can we see on this graphic the bypass capacitor actually functioning as the power supply?

A.   That is to the right --

MR. SUDER:  Objection, Your Honor.  Again, function and power supply is a term of art in this case.  This is not an expert witness.

THE COURT:  Overruled.  He doesn't mean it necessarily in the exact terms of the patent.

THE WITNESS:  So can you rephrase the question?

BY MR. WARREN:

Q.   Sure.  So where on this graphic do we see the bypass

capacitor actually functioning as a power supply for the chip?

**A.**    This is shown in the area right to the vertical red dash line.  That's when you see the switching activity, and that's when the power supply controller is working.  And as you can see, the bypass pin -- the bypass capacitor voltage stays around 5.85-volt continuously from there.

**Q.**    And so I just want to connect that up with something we looked at earlier.  I'm going to go back a couple of slides.  And we discussed 5.85 volts in this excerpt from the data sheet.  Do you recall that?

**A.**    Yes.

**Q.**    Is this describing charging that bypass capacitor up to 5.85 volts?

**A.**    Yes.

**Q.**    Just so we're all clear, which element in this block diagram is doing it?

**A.**    That is the -- sorry -- the 5.85-volt regulator on the upper right corner.

**Q.**    So when we look at this -- sorry.

When we look at this portion of the graph, is it being maintained at that 5.85-volt level by that 5.85-volt regulator?

**A.**    Yes.  As you can see from looking at the V bypass, the wave form in the middle, it starts rising at the beginning and it reach 5.85-volt.  And at that point, switching activity starts.

But you also notice that from the same time point on, the wave form becomes a little bit fuzzier.  That's because if you zoom in you will see the voltage actually goes up and down continuously.  And the reason it goes up and down continuously is because when the controller takes current from the bypass capacitor to operate, it basically makes the voltage to go down.  Okay.  Then when the switch goes off, the charge -- or, the regulator, 5.85 regulator, is now charging the bypass capacitor.  And that makes the voltage to go up.

So these two actions continues throughout normal operation.  That's why you see the line become thicker because of this up and down of the voltage.

Q.   And so we've heard a description of the drain current being used by the regulator to charge the bypass capacitor, right?

A.   That's right.

Q.   In real world power supplies, do the power supplies also have a bias winding that can charge that capacitor?

        MR. SUDER:  Objection, Your Honor.

        THE WITNESS:  Yes.

        MR. SUDER:  Excuse me.  Your Honor, objection.  That's -- objection's on the grounds of relevance.  What's happening with other products outside is not an issue in this case.

        THE COURT:  Sustained.

        MR. WARREN:  Your Honor, Dr. Zane's theory is that

there's no external components.  That the drain is the only thing that charges that bypass capacitor.  That's not true. I'd like Dr. -- or, Mr. Kung to actually explain what charges the capacitor in addition to the drain.

THE COURT:  You're talking about it in this circuit. Within the --

MR. WARREN:  In this circuit that we're looking at, yes, sir.  Yes, Your Honor.  In this circuit that is what would be charging this in a real world power supply.

THE COURT:  We're talking about this circuit.

MR. WARREN:  Yes.

THE COURT:  So to that extent, overruled.

BY MR. WARREN:

Q.   In a real world power supply -- and what I mean by that just so that we're all very clear here.  When we look at this figure, this is a simplified figure of a power supply.  Right?

A.   Yes.

Q.   In real world power supplies, there are additional components that aren't shown specifically in this simplified figure, right?

A.   Yes.

Q.   Does one of those additional components, the bias winding, contribute to charging that bypass capacitor?

A.   Yes.  Most power supplies design using this product actually uses a bias winding.  And the bias winding is the one,

once we are into normal operation, the bias winding is the one that recharge the bypass capacitor, not the drain.

Q.   So why don't we make this specific.

Mr. Sayres, can you bring up TX-14, this document?  The TinySwitch-III data sheet?  Can we please turn to page 8?  And Mr. Sayres, can you zoom in on the top half, this kind of schematic?  The whole thing.

So you mentioned earlier that a real world power supply has additional components.  Is this an example of that?

A.   Yeah.  This is one power supply design, yeah.

Q.   So here we see a lot more components than are on that simplified design?

A.   Yes.

Q.   And in this specific power supply that's referenced in the TinySwitch-III data sheet, are there components other than the drain pin that charged that bypass capacitor?

A.   Yes.  In the middle we see a transformer.  This is the two vertical line with the coils, which is like -- I don't know how to describe that.  So it's labeled as "T1."  Okay.  That is the transformer.  And there's a winding of the transformer which is on the lower right side of those two vertical line.  That is the bias winding.  And that is what charges the bypass capacitor in this case.

Q.   So it isn't always the drain pin that charges the bypass capacitor?

**A.**   Well, drain pin certainly is available if we want to use it, but most people don't use it.  The reason is very simple that --

**MR. SUDER:**  Objection, Your Honor.  What most people do will be hearsay.  And improper for this witness to talk about what other people are doing.  It's what this product does.

**THE COURT:**  You can talk about what the practice is in the field if he's familiar with it.

**THE WITNESS:**  The reason that bias winding is used most of the time is because it makes the design a lot more energy efficient.

**BY MR. WARREN:**

**Q.**   Mr. Sayres, can we go back to the slides?

Now, is there circuitry -- we discussed that operating threshold earlier.

**A.**   Yes.

**Q.**   Is there circuitry inside of the product that checks to make sure you're at that operating threshold?

**A.**   Yes.  We have this bypass pin on the voltage comparator. That circuit watches the voltage.

**Q.**   Can you explain in a little -- you know, minor detail -- what is being highlighted on this screen?  What does this circuit do?

**A.**   Okay.  As you can see on the upper right corner, there is

a triangle which is what I was talking about.  This is a circuit that watches the voltage of the bypass capacitor.  And you can see this rectangle has two inputs to the left of the rectangle.  The one labeled as minus has two numbers there.  It says 5.85-volt and 4.9-volt.  Basically, it means two thresholds.

So this circuit is watching the voltage.  When the voltage reaches 5.85-volt, that's when we know the energy reaches the black bar, the capacitor is fully charged.  So we know that from here.  And if the controller is taking too much energy out of bypass capacitor, the voltage drops.  When it drops to 4.9 volt, which is the second number that we see there, the circuit also detects that.  Once that is detected, meaning drops to 4.9 volt or below, the switching activity will be prohibited.

**Q.**    And so is it possible for this chip to run without a bypass capacitor connected?

**A.**    No.  There's no possibility.

**Q.**    And does Power Integrations' on/off control patent describe that bypass capacitor?

**A.**    Yes.

**Q.**    Mr. Sayres, can we bring up TX-153?  This is already in evidence.

Okay.  So just to orient us.  Let's go to -- we're looking at Figure 3 right now.  This is a figure that's in that patent?

**A.**    Yes.

**Q.**   And at a very high level, what is Figure 3 showing?

**A.**   This is, basically, a power supply design using a product like what we have been talking about.

**Q.**   Mr. Sayres, can we zoom in on the -- there you go.  Okay.

Do you see the element, it's a very small rectangle in this figure labeled U1?

**A.**   Yes, I do.

**Q.**   What's U1?

**A.**   U1 is a product like Tiny-III.

**Q.**   And is this a four-terminal device?  Is that what we're looking at?

**A.**   Yes.

**Q.**   And is there a bypass capacitor shown here?

**A.**   Yes.

        **MR. SUDER:**  Excuse me, Your Honor.  I'm going to object.  Renew my objection under 403, the use of this patent, to try to -- it has no relevance.  It's just confusing.  It goes to the *Daubert* issue that's been addressed before.

        **MR. WARREN:**  It's not --

        **THE COURT:**  This is the patent that's practiced by the accused product?

        **MR. WARREN:**  Yes, Your Honor.  And it's not prior art.

        **THE COURT:**  Overruled.

        **MR. WARREN:**  Thank you.

BY MR. WARREN:

Q.   So 350.  Is that the bypass capacitor?

A.   Yes.

Q.   Mr. Sayres, can we go to column 4, lines 54 to 59?

And would you highlight for me the first words: Regulation Circuit Power Supply Bypass Capacitor 350.

What is this patent describing as -- or, how is this patent describing the bypass capacitor?

A.   It is the power supply bypass capacitor.

Q.   And so when Power Integrations filed its patent with the U.S. government long before this lawsuit, how did they describe the bypass capacitor?

A.   We said it here as:  It is used to supply power to operate the circuit.

Q.   And Mr. Sayres, can we go to column 5, lines 29 to 31?

MR. SUDER:  Your Honor, may we approach the bench?

THE COURT:  All right.

(The following proceedings were heard at the sidebar:)

MR. SUDER:  In light of the use of this patent, I think we're asking if the Court can give an instruction that this patent is not being asserted as prior art to invalidate the patent.  Because right now they're thinking -- it's confusing.  They're saying this patent is here.  And the dates show it's before the patent.  And I think it's -- we ask the Court that the jury be instructed this is not a patent that

they're claiming is prior art to our patent.

MR. WARREN:  I have no objection, Your Honor.

THE COURT:  I think that was the point.  But in case you think that is the point, I will --

MR. SUDER:  Thank you, Judge.

(End of bench conference.)

THE COURT:  I just want to make clear for the jury that this discussion of the '190 patent is not for the purpose of asserting that it is prior art or that the Opticurrent's patent, the '623, is invalid.  That's not the purpose of this discussion.  All right?

BY MR. WARREN:

Q.   Just to be clear, this is a patent that's used in Power Integrations' accused products, right?

A.   Question for me, right?

Q.   Yes.

A.   Yes.  The answer is yes.

Q.   Yes.  Mr. Sayres, can we bring that back up?

And just for the record, what we're looking at here is column 5, lines 29 to 31.  And the text here, if we can, Mr. Sayres, let's highlight the text:  A regulation circuit power supply bypass capacitor 350 is coupled to and supplies power to regulation 240 when the regulation circuit is in the on state.

Do you see that?

**A.**   Yes.

**Q.**   Is this describing, in very similar words, exactly what we saw on the data sheet?

**A.**   That's precisely what we tried to say in the data sheet.

**Q.**   And can you explain what this is saying?

**A.**   This is saying that the bypass capacitor provides power to operate the controller when the switch is on.

**Q.**   Mr. Sayres, let's go back to the slides.  So in the Link -- sorry.  In the TinySwitch-III, is the bypass capacitor required?

**A.**   Yes.

**Q.**   And why is that?

**A.**   Because without it, the chip cannot work.

**Q.**   Why not?

**A.**   Because it doesn't have power.  Without power, no chip can work.

**Q.**   So I'd like to move on to the second product family at issue in this case.  The LinkSwitch-II.  And here again, we see TX-17, already in evidence, and you've blown up a portion of the LinkSwitch-II family data sheet.  What are you showing here?

**A.**   Similar to what we saw before, what I'm trying to say here is that the Link-II uses on/off control, which is part of the EcoSmart technology.  And because of that, it is very energy efficient.

Q.   So the LinkSwitch-II also uses Power Integrations '190 patent on/off control.

A.   Correct.

Q.   And because LinkSwitch-II uses on/off control, does it also require four terminals?

A.   Yes.

Q.   And so you have two arrows on the screen here pointing to two terminals.  What are you showing?

A.   That is the result of splitting the single terminal in TopSwitch into two, which is the bypass, or BP/M, the power supply pin.  NT, enable pin, which is the feedback pin.

Q.   And in this product, similar to before we talked about a 5.85 volt regulator in the TinySwitch-III, do you recall that?

A.   Yes.

Q.   And at the top right here we see regulator 5 volt.  Is that doing the same thing?

A.   Exactly.

Q.   And where does the power come for this chip to operate?

A.   Around the bypass capacitor connected to the BP/M pin externally.

Q.   And so the graphics we looked at earlier where current comes in at startup to charge that bypass capacitor, and then it operates off the bypass capacitor, could we make similar graphics for this chip?

A.   It applies directly.

Q.   And does the LinkSwitch-II also typically -- here's a simplified graphic.  Well, does the LinkSwitch-II also typically operate with a bias winding?

A.   Yes.

Q.   Just so the record's clear, why don't we go to TX-17, Mr. Sayres.  And would you go to page 4 for me?  And at the very top can we zoom in on that schematic at the top?

     And so just like we saw on the TinySwitch-III, are we here looking at an equivalent LinkSwitch-II real world power supply?

A.   Yes.

Q.   And can you -- can we highlight the bypass capacitor?  Or can you describe where it is so Mr. Sayres can highlight it?

A.   This is the C4.  Let me look at this.  This is the C4. Hold on a second.  Yeah.  This is the C4.

Q.   Okay.  And we see other external components coupled to that C4 bypass capacitor?

A.   Yes.

Q.   And these would be used in operation to charge that bypass capacitor?

A.   Yes.

Q.   Can you identify for us -- and I know it's hard because we don't have a laser pointer -- but can you describe for Mr. Sayres so that he can highlight it, which components, external components, are used to charge that bypass capacitor?

A.   The bias winding that you can see from the things in the

middle labeled as T1, that's the transformer.  And to the right of those two vertical lines you see a label 1.  That's the bias winding output.  Okay.  And that is what charges the bypass capacitor.

Q.   And so we -- let's highlight it.  We see a line that goes from that 1 down to there (indicating) and then it goes into that C4.  Can we highlight that path into that C4?  It's actually the line below there.  The one connected to BP.  There we go.

So is this actually the path that's used in a real world power supply to charge that bypass capacitor?

A.   Yes.

Q.   So at startup, just so we're all clear, based on what the data sheet says about the drain pin, that drain pin is still used to charge up the bypass capacitor?

A.   That's correct.  That's because at that time when you just plug in the power supply into the wall, at the beginning there's no voltage available at the bias winding.  So drain is still used.

Q.   And then during operation what's -- what's being used to charge that bypass capacitor once the chip begins operating?

A.   Once the chip becomes operating, we started delivering energy to the output of the power supply.  So as the output of the power supply voltage goes up, the bias winding goes up with it.  So once we get into normal operation, bias winding voltage

is available and we take energy from there from that point on.

Q.   And are there benefits associated with using a bias winding?

A.   Yes.   Because bias winding is something that through the trans-ratio of the transformer, through the design of the transformer, we can, basically, set the voltage very close to the bypass voltage that we need.  So the energy wasted there is very little compared to if we take the energy from drain, drain is at hundreds of loads.  So the waste of the energy is tremendous.  So this is a lot more energy efficient.

Q.   So based on that energy efficiency benefit, from your personal experience in this field, do real world power supplies function like we see in this schematic with a bias winding to charge the bypass capacitor?

A.   Yes.  And most people does it that way.

Q.   Mr. Sayres, let's go back to the slides.  And -- okay. Here we're looking at a similar portion of text.  This is from the description of the 6 volt regulator.  Do you see that?

A.   Yes.

Q.   I think I said it -- I'm going to go back just to make sure we're clear.  I think earlier I said 5 volts, because I couldn't see it.  But the description in the data sheet of the 6-volt regulator, that's the box that's there at the top right?

A.   Yeah.  Actually, it's really difficult for me to see.  The font is so small.  5 or 6.

Yeah, it is 6.

Q. And so that's the element, just so we're clear -- when we talk about in the data sheet -- that's the element that's used to charge that bypass capacitor at startup?

A. Yeah. That's the charging circuit.

Q. Okay. Let's go back to the data sheet and let's look at the text.

Oh, sorry. Sorry, Mr. Sayres. Can I have the slides?

Okay. So here this is the description in the data sheet of that 6-volt regulator element, is that right?

A. Yes.

Q. Okay. And you've highlighted here text that's similar to what we saw on the TinySwitch-III data sheet. What is this text describing from the data sheet?

A. This, basically, says that the bypass pin is the internal supply voltage node, and the MOSFET -- when the MOSFET is on, the device runs off the energy stored in that capacitor.

Q. And so internal supply voltage node, in layman's terms, what does that mean?

A. That means the supply current flows to the circuit from that node.

Q. When you say "the circuit," you mean the other elements, the brains of the power supply?

A. Yes.

Q. And this data sheet also says, like we saw on the patent

and in the TinySwitch-III data sheet, that when the MOSFET is on, the device runs off the energy stored in the bypass capacitor?

A.    Yes.

Q.    And now we discussed the circuitry in the TinySwitch-III that guarantees that that bypass capacitor is connected and charged.  Do you recall that?

A.    Yes.

Q.    Is there also similar circuitry inside the LinkSwitch-II that guarantees that the bypass capacitor is connected and charged?

A.    Yes.

Q.    And what are we looking at here?

A.    This is the highlighted -- the circuit we see here, you see the rectangle on the upper right corner.  This is the circuit that watch the voltage of the bypass capacitor.  At the beginning when you -- when we charge it, it has to reach 6 volt to be considered fully charged.  And when that happens, controller starts working.

      And if for some reason the voltage drops because too much energy is taken out of it and the voltage drops to, I think 5 volt again -- it's too small.  I can't see.  Drop to 5 volt. If that happens at 5 and below, switching activity would be prohibited.  So the controller stops working.

Q.    So is it possible for the LinkSwitch-II to run without a

bypass capacitor connected?

**A.**   No, there's no possibility.

**Q.**   Why don't we go on to the last product family, the LinkZero-AX.  Did you also personally oversee the design of the LinkZero-AX?

**A.**   Yes.

**Q.**   And just briefly can you tell us why is it called zero?

**A.**   Zero means that this product, compared to all the other power supply controller products we have, has even lower standby power consumption.  And it's approaching zero.

**Q.**   And here we have similarly blown up text off of the cover of the LinkZero-AX data sheet, TX-18.  What is this describing?

**A.**   This similarly, like what we've seen before, is saying that this product uses on/off control, which is part of the EcoSmart technology.  And because of that, it is very energy efficient.  And even more energy efficient.

**Q.**   And does the LinkZero-AX, because it uses on/off control, also require four terminals?

**A.**   Yes.

**Q.**   And you have arrows on the block diagram here.  What are you showing here?

**A.**   Well, this is pointing to the two pins that was the result of using on/off control that we had to split.  The single pin in TopSwitch case, into two pins, which is the supply pin and the feedback pin.

Q.   And which is the power supply pin in this product?

A.   That's on the upper left corner highlighted in yellow. This is a BP/M pin.

Q.   And just so we're all clear, on the upper right-hand side we see a box that is labeled "5.85 volts regulator."  Do you see that?

A.   Yes.

Q.   And is that -- does that do the same function that we've discussed for the other products of charging that bypass capacitor at startup?

A.   Yes.  That is the charging circuit for the bypass capacitor.

Q.   Okay.  Let's look at the data sheet's description of that block, the 5.85 volt regulator.  And here you've blown up the text.  And we have highlighted:  When the MOSFET is on, LinkZero-AX runs off the energy stored in the bypass capacitor.
     Do you see that?

A.   Yes.

Q.   What is this describing?

A.   This is, basically, saying that the controller operates using the energy taken from the bypass capacitor when the MOSFET is on.

Q.   Those graphics we looked at earlier with the charge coming in, charging it at startup, and then running off the bypass capacitor as the power supply, would those apply equally to the

LinkZero-AX?

A.    That's exactly the case.

Q.    And in the LinkZero-AX in real world power supplies, are there also external components?

A.    Yes.  Most definitely.

Q.    Okay.  Just for completeness, why don't we look at that.

Mr. Sayres, would you please bring up the LinkZero data sheet?  It's TX-18.

And so on the cover of the data sheet in the upper right we see a simplified diagram.  I want to pause here.  On the simplified diagram we see external components connected to that bypass pin in this schematic?

A.    Yes.

Q.    So let's go to the detailed schematic.  I think it's on page 4, Mr. Sayres.  And can you zoom in on the bottom?

And so just like we've seen before, this also has more components in it than the simplified diagram?

A.    Yes.

Q.    And so what is this figure that we're looking at, at a high level?

A.    This is the power supply design using the LinkZero-AX.

Q.    And does this power supply design also have external components that are used to charge that bypass capacitor?

A.    This is -- hold on a second.  Let me look at this.

No.  This case is different.  What we do here is that --

remember that we set this as a standby condition.  The standby consumption actually approaches zero.  So even with bias winding, that cannot be accomplished.

So what we're doing here is beyond everything else, that all other power supply controller does, we actually do one thing in addition.  Okay?  That is, we introduce an extra feature called "power download."  And we have a patent for that.  And that patent is called the "dormant mode."

What that does is that when the power supply output load is going very, very low, okay?  We watch the situation.  And when it's low to a certain point, we actually take the entire controller, just power it down, okay?  So we, basically, shut off the entire controller.  With one small exception.

That is, we have a small circuit, which is just a watcher. It watches the situation, okay?  So the entire controller now is off, okay?  With a very small circuit just watching the situation.

When the power supply output has all of a sudden been demanded with load increase, this circuit will detect and wakes up the controller.  Okay.  That's the extra thing we do with this product.  Okay.

So that's what you see here.  And that's what makes this standby power consumption approaching zero.

Q.   What is the power supply?  What supplies power for the LinkZero-AX in this -- well, first, let's highlight the bypass

capacitor.

Is the bypass capacitor for this product the power supply for the product?

A.   Yes.

Q.   And is what we described earlier, with charge coming in through the drain to charge that bypass capacitor at startup, would that function the same way?

A.   Yes.

Q.   And then during operation is the product pulling power out to operate?

A.   Yes.

Q.   Mr. Sayres, can you go on to page 5?  And can you zoom in on the portion here it says:  LinkZero-AX power down mode design considerations.

Okay.  Can you shorten that by about half?  We'll just look at the top half and see if we can blow that up a little bit.  Bigger.  That's fine.  The text --

And it looks like it starts the third sentence, the word "the value."  There we go.  Can you highlight that sentence all the way through?

So here on page 5 I've highlighted the language:  The value of the bypass pin capacitor must be high enough to sustain enough current through the R16 for more than a period of 160 switching cycles to successfully trigger the power down mode.

Is this describing running the chip off of the bypass capacitor during that power down mode you described?

A.   Yes.

Q.   And just so we're -- put it into context.

A.   This is actually before the power down.  Yeah.  Because we have to detect.  The load is so light, so we can go in to the power download.  This is the detection.  So the controller is working off the bypass capacitor to make this detection.

Q.   Just so we're clear.  When this detects, let's say, a no-load condition, the switching will be skipped for a little while?

A.   The controller circuit will be powered down.  So we don't take any current other than the circuit that's watching the situation.

Q.   But -- and during that situation before you power down the chip, but while you're monitoring the situation, you're running off the bypass capacitor.  Is that --

A.   Yes.

Q.   Is that what this portion is describing?

A.   That's exactly what this is describing.

Q.   And there's a reference here to 160 cycles, switching cycles.  What is that a reference to?

A.   That means we are watching the drain switching activity.  Because if there is -- there is a demand at the power supply output, we have to provide the energy that's demanded.  And you

will see switching cycle.  If there's no demand, then we don't need to deliver any energy, then you will not see switching cycle.

So if you don't see any switching cycle for 160 cycles -- not switching cycles -- cycles -- but no switching activity -- that means the load required is so light.  And that's the condition we would take to go into power download.

Q.   Is that actually what's described in -- I think you mentioned this -- one of Power Integrations patents, the dormant mode patent?

A.   Yes.

Q.   And if we go back, Mr. Sayres, to the prior page that has the schematic on it.

What is functioning as the power supply for this chip?

A.   That is the bypass capacitor which is connected to BP/M.

Q.   Let's go back to the slides, if we could, Mr. Sayres.

And just to connect all the dots, just like we've looked at in the other products, does this -- does the LinkZero-AX also have circuitry that ensures that that bypass capacitor's connected and charged up?

A.   Yes.

Q.   And what are you showing highlighted on the screen here?

A.   Similarly, we can find a rectangle on the upper right corner, which is the circuit that watched -- watches the voltage of the bypass capacitor.  When the voltage goes up to

5.85 volt, it's considered fully charged.  The controller kicks in at that point.

And during operation, if too much energy is taken out of the capacitor, the voltage will drop.  And when it drops to 4.85-volt -- so at 4.85-volt, or below, again the controller will be -- stop working.  No switching activity would be allowed.

Q.   And so is it possible for this chip to run the LinkZero-AX without a bypass capacitor connected to supply power?

A.   Not possible.

Q.   Why don't we take down the slides if we could, Mr. Sayres. We'll just blank the screen.

I'd like to change gears a little bit here.

Have you, Mr. Kung, have you read the '623 patent that's at issue in this case?

A.   Sorry?

Q.   The '623 patent.

A.   Yes.  Yes, I did.

Q.   The patent that's at issue in this case.

A.   Yes.

Q.   And when did you first see the '623 patent?

A.   You know, I had to go through a deposition quite some time ago.  Probably like one half -- or years ago.  Or two.  So just before that deposition I saw that patent.  I read it.

Q.   Just so everyone knows, can you describe for us what was

the process?  What is a deposition?

**A.**   A deposition is a meeting arranged for, I think, the attorney representing the Opticurrent to have a chance to question me so I can provide answers to their questions.

**Q.**   And were you the representative provided on behalf of Power Integrations to describe the functionality of our circuits?

**A.**   If that's what they asked.

**Q.**   Do you recall being asked questions about the circuits and the schematics?

**A.**   Yes.

**Q.**   And when did you first see the '623 patent that's at issue in this case?

**A.**   A few weeks before the deposition.

**Q.**   And had you ever heard of the '623 patent before your deposition in this case?

**A.**   Never until that point.

**Q.**   And when you read the '623 patent, what did you think?

        **MR. SUDER:**  Objection, Your Honor.  That's not relevant at all to this case.  The issues.  And he didn't read it until the suit was filed a year later.  And I don't see any relevance.

        **THE COURT:**  And whose state of mind is relevant?  Are you going to the inducement question?

        **MR. WARREN:**  Yes, this is inducement.

THE COURT:  State of mind?  You going to ask every corporate representative what their individual -- I thought there was one representative.

MR. WARREN:  No, Your Honor.  So even counsel said that what we should do is ask Mr. Kung.  That was their complaint when we were asking Mr. Walker.

THE COURT:  Is that your complaint?

MR. SUDER:  Your Honor, said he read it for the first time a year after suit was filed.  So the relevant evidence of intent at the time the suit was filed is irrelevant.

MR. WARREN:  Inducement has to be proven throughout the entire period, Your Honor.

THE COURT:  You're claiming inducement post-complaint, right?

MR. SUDER:  Since they were on notice of the patent, yes.

MR. WARREN:  Then his subjective belief is perfectly an issue.  He's the designer of the part.  Who could be more relevant?

THE COURT:  I'm going to overrule the objection.

BY MR. WARREN:

Q.   Mr. Kung, when you read the '623 patent, what did you think?

A.   Well, that patent has nothing to do with what we do.

Q.   And did you read the asserted claim 1 of the patent?

**A.**   Yes, I did.

**Q.**   And at the time you first read it, what did you think of the asserted claim 1?

**A.**   We do not infringe.

        **MR. SUDER:**   Your Honor, now we're asking for expert testimony, what he thinks about claim 1 of the patent.

        **THE COURT:**   So this raises the question why his subjective intent is relevant to the question of inducement.

        **MR. SUDER:**   I don't believe --

        **MR. WARREN:**   It's relevant because he's the designer of the parts.   The buck stops here.   And it's not --

        **THE COURT:**   Wait.   But whose intent is it when you're talking about --

        **MR. WARREN:**   So Power Integrations is anybody who has been designated to speak on behalf of Power Integrations.   He's here.   It's, actually, the company's subjective belief.   But the only way we can introduce evidence about the company's subjective belief --

        **THE COURT:**   I thought the last witness was the one who was designated as the company spokesman with regard to --

        **MR. WARREN:**   No.   That was Mr. Suder's characterization.   Mr. Walker is the corporate representative for purposes of the trial.   But Mr. Kung is a senior executive at the company, and his subjective belief is just as relevant.   He's the technical person.

And if you'll recall, when Mr. Suder said --

THE COURT:  But I don't know if he has the final decision-making authority to make his intent relevant.

MR. WARREN:  He has the final decision-making authority on the design of all products.  Who could be --

THE COURT:  Does he have the final decision-making authority with respect to whether they continue with the particular product in light of a lawsuit.  That's the question.

MR. WARREN:  Whether they change their design.  He's the design -- he's the senior executive in charge of all product design.  Has been for 30 years.

THE COURT:  You'll have to lay the foundation that he has the authority to determine for the company how to react in response to a lawsuit with respect to design changes or not.  Not just general design change responsibility, but whether he has that authority.  As opposed to someone else in the corporation.  You can't go about asking every single person who has some role in design what their intent was and what their belief was.  It's got to be somebody who had control over the decision to continue with the product in the face of the claim.

So if you want to elicit that, you can elicit that as foundation.

BY MR. WARREN:

Q.   Mr. Kung, do you have final design authority to determine design changes in the light of anything that could come up?

A.   Yes, I do.

Q.   In terms of the design of the products for this company, does the buck stop here with you?

A.   Yes.

THE COURT:  All right.  You may proceed.

BY MR. WARREN:

Q.   What did you think when you read claim 1?

A.   We do not infringe.  Claim 1 says four terminals.  We use only three -- I mean, they claim three terminals.  We use four.

Q.   And did you have that belief at the time of your deposition?

A.   It's clearly that way from the beginning.

Q.   And have you since become aware of the Court's claim construction that defines the claim --

Well, why don't we put that up.  Can we look at DD400? There we go.  This is the Court's claim construction.

At some point after your deposition did you become aware of the court's claim construction when it was rendered?

A.   Yes.  I'm aware of this.

Q.   And what did you think when you learned of the claim construction?

A.   Well, we have the power supply terminal and that is very different from claim 1.

MR. WARREN:  Thank you, Mr. Kung.

THE COURT:  All right.  We should probably take our

break at this point, then you can commence with your cross.

Ladies and gentlemen, normally we'd -- as you know, we'd take time for lunch.  But because we're ending early today we're going to do a 20-minute break.  We get back a little after quarter to, give you a chance to get some refreshments or something.  But since we're ending early, we're not going to take a full lunch break today.  Thank you.

(Recess taken at 11:30 a.m.)

(Proceedings resumed at 11:49 a.m.)

THE COURT:  All right.  Please be seated, everybody. Welcome back, ladies and gentlemen.  We will now take up with the cross-examination of Mr. Kung.

**CROSS-EXAMINATION**

BY MR. SUDER:

Q.   Mr. Kung, my name is John Suder.  We've never met, have we?

A.   I believe that's the case.

Q.   Yes.  I'm going to ask you some questions.  If you don't understand my question, would you please tell me and I'll try to rephrase it for you, okay?

A.   Thank you.

Q.   Okay.  Sir, you have worked with these lawyers (indicating) before, haven't you?

A.   Some.  Not -- many people I actually didn't -- never had a chance to meet until this time.

**Q.**   You work with -- like the gentleman in the back, Joseph. You work with him.  In the way back, haven't you?

**A.**   Who?

**Q.**   The person in the back row?  John Thornburgh?  You've worked with several of these Fish & Richardson lawyers, haven't you?  Or Howard Pollack (sp)?

**A.**   Yes.

**Q.**   And Mr. Scherkenbach, he's not here today. Mr. Scherkenbach you've worked with?

**A.**   To make my answer really short, only Michael is the person that I've worked with.

**Q.**   Mr. Headley?

**A.**   Yeah.

**Q.**   You've worked with Mr. Warren, haven't you?

**A.**   No.

**Q.**   The person who asked you questions this morning?

**A.**   You're talking about before this case or --

**Q.**   No.  I'm sorry.  Just in general.  I apologize.

**A.**   Yeah, yeah, yeah, of course.

**Q.**   Yeah.  You've worked with them.  And you've worked with Mr. Warren on this case.

**A.**   Okay.

**Q.**   Right?

**A.**   Yeah.

**Q.**   I mean you went over your testimony with him before you

testified here today.

**A.**   Yeah.

**Q.**   In fact, you were given the questions to review beforehand, didn't you?

**A.**   Yeah.

**Q.**   And you read those questions and practiced them with Mr. Warren, didn't you?

**A.**   Yeah, to some extent, yes.

**Q.**   Not just to some extent.  You practiced because you wanted to get it right for the jury.  Yes, sir?

**A.**   That's your call.  I mean, your judgment.

**Q.**   How much time did you spend practicing and rehearsing your testimony?

**A.**   We spent how much time together?  Maybe -- you know a few hours.

**Q.**   And you also had time by yourself to go over the questions?

**A.**   Of course.

**Q.**   Of course.  Okay.  Of course.  I did not know that.  I'm asking.

**A.**   Yeah.

**Q.**   And you are trying to review them and edit them to make sure the questions were asked just right so you could get it right?

**A.**   Okay.

**Q.**   Okay.  And the slides that you went over, you didn't prepare those, did you?

**A.**   Well, I was involved.

**Q.**   But who originally wrote them out.  The lawyers.

**A.**   They made the draft and I went through everything.

**Q.**   Did you practice cross-examination of someone asking you questions pretending to be me?

**A.**   Not really.

**Q.**   "Not really"?  Is that "yes"?

**A.**   No.

**Q.**   "Yes"?  "No"?  Okay.

**A.**   Well, I like to, but it didn't happen.

**Q.**   Okay.  Thank you.  Also, Mr. Kung, you have served as an expert witness for -- on behalf of Power Integrations before, haven't you?

**A.**   Actually, can I ask Michael?

        **THE COURT:**  It's what you can remember.

        **THE WITNESS:**  Because it's not clear to me.  Well, I got involved in some cases not in the U.S., okay?  In the U.S. the answer is no, never.

**BY MR. SUDER:**

**Q.**   But for Power Integrations you have served as an expert witness and prepared a written expert report, haven't you?

**A.**   Well, if the fact that I went through deposition fits that, then the answer is "yes."  Other than that -- you know,

I'm not familiar with the terms of -- those legal terms.  So when you say "expert witness," I don't know, you know, what I did and what I didn't.

Q.   Fair enough, Mr. Kung.

Mr. Kung, do you remember my partner David Gunter taking your deposition?

A.   I guess so.  It's a long time ago, sorry.

Q.   Do you remember him asking you if you provided a written report concerning technical issues in a case, and you said "yes"?

A.   Yes.

Q.   So you did serve as an expert witness --

A.   If that's called expert witness?

Q.   Yes.

A.   If there was a report I prepared?

Q.   Yes.

A.   Yes.

Q.   The reason I say that, sir, is you're pretty knowledgeable of these four product families, right?

A.   Yes.

Q.   And you could have served as an expert witness in this case and prepared a detailed written report, but you were not asked to do that, were you?

MR. WARREN:  Objection, Your Honor.  This is really getting into matters that are covered by privilege, and just

the general trial strategy of who's going to be our expert.

THE COURT:  That goes to credibility.  I'll allow that question.

BY MR. SUDER:

Q.   Despite your qualifications.  Because you know this product, don't you, sir?

A.   I know those product, but there are people who knows even better.

Q.   But you were not asked to be an expert witness to give expert testimony in this case to this jury, were you?

A.   I don't understand.  I mean, are you telling me the fact or are you asking me?

Q.   No.  I'm asking you.  Were you asked --

A.   No, I was not.

Q.   You were not.  But if you were, you could have, because you know the technology, correct?

A.   I don't know the answer here.  I mean, it's not me making a decision.

Q.   And, sir, just so we understand, you know that -- you say you reviewed the deposition right -- reviewed the patent right before your deposition.

A.   Yes.

Q.   Okay.  You didn't read it, though, did you?

A.   What does that mean?

Q.   Did you read it and go page by page and study the figures

and the claims and the specifications?

A.   Review and read?  What's the difference?

Q.   Well, the difference here is at your deposition you said you glanced through it.

A.   Yeah.

Q.   So I'm trying to see is there a difference to you between glancing through it and actually reading it and studying it.

A.   It's just a level of attention.

Q.   Okay.  So glancing is just a low-level of attention.

A.   It's lower level, yes.

Q.   And all you did was glance through the patent.  You didn't give it a lot of attention.  You just glanced through it.

A.   Yes.  Okay.

Q.   And you did that right before your deposition.

A.   As I said, you know, it's before.  But it's not immediately before.

Q.   Sure.  Well, I'll represent to you that your deposition was taken on May 23 of last year.

A.   Last year?

Q.   Yes.  In 2017.

A.   That's the year -- before last year.

Q.   Wow.  Yes.  May 3 of -- two years ago.  Yes?

A.   Yes.

Q.   So -- and do you know this lawsuit was filed in April of 2016?

**A.**   I pay no attention to that.

**Q.**   I'll represent to you, sir, that it's a stipulated fact in this case that the lawsuit was filed in -- 15 months before your deposition, okay?

**A.**   Okay.  You're just telling me the facts.

**Q.**   Yes.  And my question for you, sir, is from the time the lawsuit was filed until just before your deposition, no one went to you and asked you, as the father of these products, to review this patent to see if it had any merit, did they?

**A.**   No.

**Q.**   And Cliff Walker could have asked you -- y'all work in the same building?

**A.**   Yes.

**Q.**   Same floor?

**A.**   Yes.

**Q.**   You see each other every day?

**A.**   Well, not really.

**Q.**   Okay.  But Mr. Walker, he ever walk into your office?

**A.**   Hardly.

**Q.**   But the point is you're in the same building on the same floor, and Mr. Walker never went to you and said:  Hey, David, I've got this patent that was asserted against us.  Do you mind reading it and tell us if there's anything to it?  Whether we should respect this patent?

Did he do anything like that?

**A.**   No.

**Q.**   And, sir, no one else asked you to review the patent.  Not just glance through it; but no one asked you to actually read the patent, did they?

**A.**   Again, you know, glance through, read, the difference to me isn't that much.

**Q.**   Now, Mr. Kung, you know -- you have patents you're a named inventor on.

**A.**   Yes.

**Q.**   You expect people to respect those patents.

**A.**   Absolutely.

**Q.**   That's right.  And until they expire they are to be respected.  Right?

**A.**   Yeah.

**Q.**   And you know that if a patent is still valid it must be respected.  Right?

**A.**   Yes.

**Q.**   And if you want to try to not respect it earlier, you can go and try to invalidate the patent, right?  You know that procedure.

**A.**   You know, I'm not a lawyer.  You're asking the wrong person.

**Q.**   Well, sir, you gave testimony last year before the patent office in defense of one of your patents that someone else was trying to invalidate, right?

MR. WARREN:  Objection, Your Honor.

THE WITNESS:  I'm really confused what is going on here.

THE COURT:  You've already asked that question of the other witness.

MR. SUDER:  He was also a participant, Your Honor.

MR. WARREN:  I think --

THE COURT:  The point has already been made. Sustained.  Move on.

BY MR. SUDER:

Q.   And Mr. Kung, you know that as long as a patent is valid, if you want to do things in addition you still have to have permission of the owner of that patent to practice it.  You're not excused from respecting a patent because you also have a patent.

A.   You're not asking me legal questions?  Because I don't know enough to answer.

THE COURT:  Well, you can answer it if you understand. But I don't understand the question.  You'll have to rephrase that.

BY MR. SUDER:

Q.   Now, sir, you know that your products are made -- all of your products are made and sold to third parties.  Power Integrations' products.

A.   Yes.

Q.   Some are sold to companies like Samsung, some are sold to Nokia for phone chargers, right?

A.   I guess so.  But I'm not marketing.  I'm not sales.  So I don't know who goes where and what goes where.

Q.   But you've been with the company for 30 years, right, sir?

A.   Yes.

Q.   So you know things like -- for example, you know that Power Integrations knows that one-third of the products it makes and sells find their way back into the United States. You know that, sir, don't you?

A.   Not really.

Q.   Never heard of that?

A.   It's not -- it's not my business.

Q.   Okay.  I'm just asking you as someone who's been there as an executive with the company that works on the same floor as Mr. Walker, you didn't know that?

A.   You see, I'm a technical guy.  My job is to, basically, develop the product, you know, per the technical requirement that's specified by somebody else.  So anything beyond that is really not my business.

Q.   I was just asking you if you knew it, sir.

A.   No.

Q.   Now, sir, let me ask you about your products.  And you were shown a slide here about the TopSwitch.  Do you see this?

A.   Yes.

Q.   Okay.   And this TopSwitch is a three-terminal switch, according to you, right?

A.   Yeah.

Q.   And it has a capacitor connected to one of the three terminals, right?

A.   Yes.

Q.   But even though it has a capacitor, it's still a three-terminal switch.

A.   Yes.

Q.   The capacitor there is serving as a filter, isn't it, sir?

A.   It is a filter, but it is also a power supply source.

Q.   Well, if it's a power supply, then why isn't this a four-terminal switch?   If this is a terminal, and these other three, why is this not a -- why is this not a four-terminal switch, sir?

A.   You're asking me --

Q.   Capacitor is a power supply.   I'm asking you.

A.   Explain to me.   Where's the fourth terminal?

Q.   Well, you're telling this jury that the capacitor is connected to a fourth terminal.   That it's the power supply.

A.   It's connecting to a fourth terminal?   I don't know. Where's the fourth terminal?

Q.   I don't know either, sir.   My question, Mr. Kung, just let me ask you, sir.

A.   When did I say this capacitor connects to a fourth

terminal?

THE COURT:  Hold on.  You are all talking over each other.

He didn't say it was connected to a fourth terminal, unless you're referring to his prior testimony about other products.  So you should be clear and specific.

MR. SUDER:  Yes.  Thank you, Your Honor.

THE COURT:  Otherwise, you're going to cross over each other and confuse all of us.

BY MR. SUDER:

Q.  Mr. Kung, that's why I asked you if you don't understand, tell me.  I'm not trying to trip you up.  I'm just trying to understand.

This drawing here on the screen has a capacitor.  Is this capacitor, as you said, is a filter in this application.

A.  It's a filter.  It's also a power supply.

Q.  If this is a power supply, why isn't this, then, a four-terminal switch?

A.  You really got me.  I don't understand the question at all.  The device has only three terminals.  So how can you -- how can you talk about fourth terminal?  You know, help me out. I don't understand.

Q.  Well, Mr. Kung, this TinySwitch-III also has a capacitor. Is that capacitor serving in the same way that this capacitor is serving?

THE COURT:  "This" being, for the record, the TopSwitch.

MR. SUDER:  Thank you.  Yes.

BY MR. SUDER:

Q.   Are they doing the same thing?

A.   Yeah.  Similarly, yeah.

Q.   Now, in this drawing that Mr. Warren showed you where you -- this demonstrative -- you see the red line.

A.   Yes.

Q.   Where is this red line coming from?  You said this is the wall here where my finger is (indicating)?

A.   After rectification stage.

Q.   Yes.  Okay.  So after the AC is converted or rectified to DC, that's what this red path is.

A.   Yes.

Q.   And it comes in to the switch, follows down this path, and enters right here at the D, right?

A.   Yes.

Q.   The D is the drain pin.  Right?

A.   That's correct.

Q.   That is one of the three terminals.

A.   Yes.

Q.   Now, Mr. Kung, in your book there you have a number of exhibits.  Can you look at Exhibit 11, please?

A.   11?

Q.   Yes.

A.   Okay.

Q.   And I'll represent to you that that is the data sheet for the TinySwitch-LT.  Is that correct?

A.   That's correct.

Q.   Okay.  Let me put it back on the Elmo if I can, please, Angie.

And you see that I have highlighted there on the first page:  No self bias, no bias winding or bias components.  Right?

A.   Yes.

Q.   Okay.  The TinySwitch-LT doesn't -- isn't made and sold by Power Integrations with bias winding, is it?

A.   Can you rephrase what you just said?

Q.   Does Power Integrations make or sell products that contain bias winding?

A.   I'm having a hard time to understand when you say "contain."  What are you really referring to?  We're not selling bias winding.

Q.   Thank you.  That's my point.  You don't sell bias windings.

A.   No.

Q.   And this product -- and all your products in this lawsuit -- can work without a bias winding.  Isn't that correct?

A.   Yes, it can.  But it doesn't have to.

Q.    Exactly.  But when Mr. Warren was asking you questions that the customers add something to it, they don't have to.  It works without a bias winding, doesn't it?

A.    If they want high efficiency, they have to.

Q.    My point is, sir, this is made and sold to work without bias winding.  Would you agree with that?

A.    It's made and sold to work with and without.  Either way.

Q.    So then, again, it is made -- it can work without bias winding.  It could be self powered, if you will, right?

A.    Yes.

Q.    Let us look to the third page of this document.  Do you see what I have on there about the voltage regulator?

A.    Yes.

Q.    Okay.  The voltage regulator, where does it get its current from?

A.    From drain.

Q.    From the drain pin, right?  Doesn't get it from anywhere else.

A.    Correct.

Q.    Okay.  So it says here that the voltage regulator is drawing current from the voltage of the drain pin.  Just want to make sure that we are clear about that.

Now if you turn two pages later, sir.  If you go to page 5, page 6, of this document.  Do you have that --

I'll just do it this way.  And if you remember, this graph

was shown to you by Mr. Warren, right?

**A.**   Right.

**Q.**   To show that -- and what you were showing there is not in a bias winding state.  It doesn't have bias winding when you were testing it in this data, correct?

**A.**   Even if there is one, it's not -- it's not working at this stage.

**Q.**   I appreciate that, Mr. Kung.  I'm just asking you to answer my question.  Mr. Warren can ask you questions.

What is shown in this picture that Mr. Warren was asking you to talk about is a testing of the equipment without a bias winding.

**A.**   Let's be precise.  Okay.  The bias winding may present, but under that condition the bias winding is not working yet.

**Q.**   Okay.  That's my question.  So what was shown to you here, is it working in a self-powered state?

**A.**   Are we talking about the power-up portion here?

**Q.**   The bypass portion.

**A.**   What do you mean by "bypass portion"?

**Q.**   The middle signal.

**A.**   Yeah.  Okay.  The answer is "yes."

**Q.**   Yes.  It is self-powered state.

**A.**   Yes.

**Q.**   Now, if you go here, what Mr. -- Mr. Warren did not ask you about this language on the same page that's highlighted,

did he?

A.   Well, which portion are you -- there are two sections highlighted.

Q.   Did he ask you about either section?

A.   Sorry?

Q.   I'm sorry.  Did he ask you about either section?

A.   Let me read it, okay?

Q.   Okay.

     (Pause.)

A.   No, he didn't.

Q.   And the first highlight says:  No bias winding is needed to provide power to the chip because it draws the power supply directly from the drain pin, see functional description above.

     Did I read that correctly?  That correctly?

A.   Yeah.

Q.   So what this tells the customers is that this can be self powered and get all of its power from the third terminal drain pin, correct?

A.   Correct.

Q.   And then it says:  This has two main benefits.  First, for a nominal application this eliminates the cost of bias winding and associated components.

     So it would be cheaper to use this in a self biased way, self propelled, without the winding attached to it.  Correct?

A.   Correct.

**Q.** Okay. And then it goes on to say: TinySwitch-LT accomplishes this without a forward bias winding and its many associated components.

And this is your way -- Power Integrations way -- of telling its customers that it can do it either way because all the power can be drawn from within the chip itself. Correct?

**A.** Can be originated through the drain. I think that's what you're saying.

**Q.** Yes. Now, if you turn to the next page, this is another thing that Mr. Warren did not ask you about. What's highlighted here. And just for point of reference, you talked about this schematic with Mr. Warren, correct? That was one of your slides.

**A.** Okay.

**Q.** And on that very same page it has this statement there. And this was not in your slide, was it, sir?

**A.** Your question again?

**Q.** This highlighted portion was not in your slide for your presentation, was it?

**A.** No, it wasn't.

**Q.** And this highlighted portion says: As the TinySwitch-LT devices are completely self powered, there is no requirement for an auxiliary or bias winding on the transformer. Right? Did I read that correctly?

**A.** That's correct.

Q.   So when the customer buys this chip, whether it's me or Samsung or Nokia or anybody, it has the option of either hooking it up where all the power comes through the drain pin, or they could hook something else that's more expensive. Right?

A.   You mean bias winding.

Q.   Yeah.

A.   Yeah.  But if they want efficiency, they have to go with the bias winding.

Q.   Other than that time you glanced at the patent, did you read it again?

A.   This time -- yeah.

Q.   You read it a second time?  The patent?

A.   Just, again, glance through.

Q.   Was that in preparation for today?

A.   Yeah.

Q.   So before you were going to be questioned under oath, you glanced at it; and again, when you were about to be questioned under oath, you glanced at it a second time.

A.   Yes.

Q.   Other than those two times, you never studied it?

A.   Never.

Q.   So I take it, then, when you glanced at it and made the conclusions that you told the jury when Mr. Warren asked you, did you make any notes?

**A.** No.

**Q.** Did you go to Mr. Walker's office and say: Hey, Cliff, there's nothing to this patent.

Did you do that?

**A.** I don't know if Cliff ever asked me. But certainly, you know, my opinion was well known.

**Q.** So the person who's head of intellectual property licensing and legal affairs never asked you your opinion.

**A.** Not directly.

**Q.** Okay. And I take it, sir, did you write an email to the other powers-that-be at Integrations to tell them your opinions?

**A.** I'm confused. Who do I write my email to?

**Q.** Mr. Balakrishnan?

**A.** No.

**Q.** Did you walk to his office and say: Hey, there's nothing to this patent.

**A.** No. I typically do not communicate directly to Mr. Balakrishnan.

**Q.** Do you have anything in writing whatsoever, Mr. Kung, that you can show this jury that supports your views of what your reaction was when you read the patent? Do you have anything in writing to that effect?

**A.** The patent was provided me for the deposition. So Howard, the attorney, worked with me. And certainly, he knows my

conclusion.

Q.   And so, sir, the first time you read this patent, glanced at it, read it, scanned it, whatever, you already knew that Power Integrations was taking the position:  We don't infringe.

Right?  You knew that was the position at the start of your deposition.

A.   Well, you see, I don't think anybody comes to me and tell me that.  Okay?  I was only told that there is this thing going on and I need to go for deposition.  And I was provided with material.

Q.   So --

A.   I don't think anybody actually tell me exactly what they have been, you know, concluding.

Q.   So -- and as you said, you are the senior-most person at Power Integrations on how these products operate and designed, right?

A.   No.  Again, let's be precise.  I am responsible for making the chips, okay.  So the implementation, okay, of a product concept, okay, is my responsibility.

Q.   And as you said in response to Mr. Warren, the buck stops with you, right?

A.   As far as how we implement the concept into a product.

Q.   And even though the buck stops with you, no one at Power Integrations asked you what your opinion was about Mr. Congdon's patent and how it relates to your products.  Did

they?

**A.**   No.

**Q.**   I want to show you Exhibit 14 in your book which is the data sheet for the TinySwitch family.  Do you see this?

        **THE COURT:**  TinySwitch-III.

        **MR. SUDER:**  Thank you, Your Honor.  TinySwitch-III family.  My apologies.

**BY MR. SUDER:**

**Q.**   And, sir, as we know, all the power that goes into this switch is derived through the drain pin.

**A.**   Are we reading?

**Q.**   I want to ask you about this.

**A.**   Go through that again.

**Q.**   All of the power that is derived for this -- to operate this switch is derived through the drain pin.

**A.**   Well, again, depends on if you have bias winding or not. So it could be either.

**Q.**   In a self-bias situation, all the energy is derived through the drain pin, right?

**A.**   Through the drain pin, yes.

**Q.**   Just so we're clear, the drain pin, which is described right here -- let me just highlight it here -- you see that statement.  That's what you tell the world is the drain pin. Right?

**A.**   Yes.

**Q.**   And that is the connection for the power supply for this chip.  Correct?

**A.**   It's one of the connection.  It's the connection connecting to the -- through the transformer to the input.

**Q.**   Sir, in your deposition when you were asked to describe the function of the drain pin, you said:  It is the connection for the power supply to this chip.  Correct?

**A.**   Okay.

**Q.**   So this is the drain pin that supplies the power for this chip.

        **MR. WARREN:**  Objection, Your Honor.  Can I please have a cite to what he just read and represented to the witness?

        **THE COURT:**  Sure.

        **MR. WARREN:**  If he's going to read from the deposition I think he should provide a cite so we can all look at it.

        **THE COURT:**  Well, he asked him whether he recalls whether he said.  He can refer him.  If he doesn't recall, then you can cite and you can quote it.

        **MR. WARREN:**  The testimony was that he didn't recall.  Then Mr. Suder just represented what it was.  But -- and so because Mr. Suder represented what it was in a question, I'd like to know the --

        **THE COURT:**  Well, why don't you rephrase the question.

        **MR. SUDER:**  Okay.

**BY MR. SUDER:**

**Q.**   Sir, the function of the drain pin right here in this diagram, right here (indicating), is the connection point for the power supply design to this chip.  Correct?

**A.**   Okay.  Are you reading off my deposition?

**Q.**   I'm just asking you if that's a correct statement.

**A.**   Did I make that statement in that --

**Q.**   I'll represent to you --

**THE COURT:**  He's asking you now as you sit here now, do you agree with that statement.

**THE WITNESS:**  Oh, I agree with that statement.  But if it's word for word, then I want to see it.  Because I just can't --

**THE COURT:**  The question was not about your deposition.  He's just asking you -- forget the deposition for a moment.  He's asking if you agree with that statement.

**THE WITNESS:**  Okay.  Thank you.

**BY MR. SUDER:**

**Q.**   You agree with that statement?

**A.**   Can you go through that one more time?

**Q.**   The function of the drain pin in this diagram right here is the connection for the power supply design to this chip.

**A.**   Is the connection to the power supply for this chip.

**Q.**   No.  It's the connection for the power supply.

**A.**   Connection for the power supply.  Is that a word in

deposition?

Q.   I'll represent to you that's what you said in your deposition.

A.   Can I see it?

Q.   Sure.  And this is page -- the bottom of page 110.

MR. SUDER:  May I approach the witness, Your Honor?

THE COURT:  Yes.

MR. SUDER:  I'm just trying to refresh his recollection, Your Honor.

Highlighted right here.  Sir, the question and the answer right there.

THE WITNESS:  Okay.

THE COURT:  What lines of that?

MR. SUDER:  It's the last question on the bottom of page 110, and the answer goes to the top of page 111.

THE WITNESS:  So the wording is it is the connection for the power supply design to this chip.

BY MR. SUDER:

Q.   Okay.  Thank you.

A.   So what it means is that this is --

Q.   I didn't ask you what it means, sir.  That's what you say it is.  Right?

A.   Okay.

Q.   Lastly, sir, do you know what an energy vampire is?

A.   Yeah.

Q.   That is a term you use to promote the Power Integrations products to fight off or ward off --

A.   I believe so.

Q.   You do?

A.   Yeah.  I believe I've heard this term before.

Q.   And you've used it before.

A.   Personally, no.

Q.   But you understand that's part of Power Integrations' marketing literature that when you stick a plug in, those two teeth suck current out like a vampire.

A.   I believe so.

Q.   Let me show you Exhibit 221.  It's in your book.

A.   221.  Okay.

Q.   Have you seen this page before?  On your website?

A.   Can you give me some time?

Q.   Sure.

A.   No.

        MR. SUDER:  Your Honor, I would offer Exhibit 221 into evidence at this time.  It's a page from the Power Integrations web page.

        THE COURT:  Any objection?

        MR. WARREN:  He just said he had never seen it before.

        THE WITNESS:  I have never seen this before.  This is a marketing thing and has nothing to do with my responsibilities.

THE COURT:  So based on what you've presented so far, I'm going to --

I assume you're objecting --

I'm going to sustain the objection.

MR. SUDER:  There's no authenticity objection to it, Your Honor.  It's their document.  I can offer --

THE COURT:  Well, do we have a stipulation as to authenticity?

MR. WARREN:  This is an evidentiary admissibility issue.

MR. SUDER:  It's not hearsay.  It's their document.  Came from them.  They produced it.

MR. WARREN:  He said he had never seen it, so there's no foundation to move this into evidence with him.  If they want to show it to someone who's seen it, and this is actually the area they work in, that's fine.  But he has no foundation.

THE COURT:  I don't see what it has to do with this witness, frankly.

MR. SUDER:  I just want to offer it now so I know it's in because he said he knows about energy vampires.  I'm not going to ask him about it, but --

THE COURT:  Is there a stipulation this is from the Power Integrations website?  Is that in dispute?

MR. SUDER:  No.

MR. WARREN:  I don't -- well, actually, Mr. Suder

didn't give me a copy here, but I don't think -- I can look at this and see a web page.  The issue is that the content here, and moving it into evidence with this witness, there's no foundation because he said he had never seen it and this isn't the area he works in.

So it seems irrelevant.  I also object on relevance grounds.

**THE COURT:**  So there's a relevance question, then.  At least foundationally, I'm not hearing any objection or dispute that this is from the website.  Correct?

**MR. WARREN:**  The document itself is from the website.  The foundation objection is this witness already said he hadn't seen it.  So --

**THE COURT:**  Foundation to relevance.  What's the relevance of this?  Since I don't see the relevance with this witness.

**MR. SUDER:**  I'm not going to question him about it.  I can offer it at any time.

**THE COURT:**  But I need to know what the relevance is.  It's still got to pass relevance test.

**MR. SUDER:**  The relevance is that they promote energy saving and protecting from leakage and current from coming out of the wall in their marketing material.

**THE COURT:**  I thought that was already made clear, but --

MR. SUDER:  I know.  I showed this to the jury in opening statement.

THE COURT:  Is there a 403 problem with that?

MR. WARREN:  Well, I guess, more broadly, why is he just moving this in with a witness?  He's not just a conduit for documents.

THE COURT:  It's not tied to this witness.  So the question is, is this relevant?  Authenticity is not being disputed.  Is it relevant?  And he's made a case of relevance.  Do you have a counter to that?

MR. WARREN:  If he wants to ask the witness about it, be my guest.

THE COURT:  Well -- all right.  I will admit it independent of this witness.

(Trial Exhibit 221 received in evidence)

MR. SUDER:  Thank you.

BY MR. SUDER:

Q.   One last question.  What's 1 microfarad?

A.   How do I answer this question?  I mean --

Q.   When you see a designation next to a capacitor of 1NF, what does that mean?

A.   Well, if it says 1 microfarad, it says 1 microfarad.  But I don't think it says 1MF.  Right?  It's $1\mu F$.  Right?

Q.   Okay.  So it's like a squiggly M.  And the design of the capacitor in the accused products calls for a .1 microfarad.

Right?

A.    Okay.  If you say so.

            THE COURT:  Well, why don't you show him something.

BY MR. SUDER:

Q.    Yes.

      Let me ask you this way because I can't get my hands on it.  In the product that you designed, the TinySwitch-III, how long does that capacitor hold its charge?

A.    You know, I can't tell you offhand.  This is an area of using the product, okay?  My responsibility is designing the product.  So when the chip is made, when it comes back, there are people using the chip, okay.  In applications, okay.  There are other people doing that.  I am not the one doing that.

      So how long it holds the charge is not something I really pay attention to.  Okay.  But for what we do, as we said, during the off time we recharge.  Okay.  So during the on time, we take current.  Okay.

Q.    Would you look at Exhibit 14, please, sir.  And would you look at the second page.  I've got it on the screen.

A.    Okay.  Second page.

Q.    Under "bypass multifunction."  And I have it on the screen if that would help.  You say the value of the capacitance is use of a .1 microfarad capacitor.  Do you see that?

A.    Yeah.  Yeah, I do.

Q.    So my question is:  How long will the charge hold at a

.1-microfarad capacity?

**A.**    Again, I cannot answer that question offhand, okay?  But, you know, it's certainly long enough.

         **MR. SUDER:**  Mr. Kung, thank you.  That's all I have.

         **THE WITNESS:**  Okay.

         **THE COURT:**  All right.  Redirect.

         **MR. WARREN:**  Yes, Your Honor.  Thank you.

                    **REDIRECT EXAMINATION**

**BY MR. WARREN:**

**Q.**    Mr. Kung, you were asked some questions about your --

**A.**    I'm sorry.  I thought --

         **THE COURT:**  You're not done yet.  He's got some more questions.

**BY MR. WARREN:**

**Q.**    Mr. Kung, you were asked some questions about your deposition testimony, and some statements were made to you representing what you had said.  Do you recall that?

**A.**    Uh-huh.  Yes.

**Q.**    Can you look in your binder at page 111?

**A.**    Page 111?

**Q.**    Of your deposition.  Of your deposition.

**A.**    My deposition?  I don't have that binder here.

**Q.**    So when you were being questioned about your deposition you didn't have it in front of you?

**A.**    Oh, the deposition binder?  I'm confused now.  Am I

supposed to have a binder?

Q.   Did Mr. Suder not give you the deposition when he was asking you about it?

A.   No.  This is the only thing here.  I don't have anything.

MR. WARREN:  Do you mind if I just -- this is --

THE COURT:  Page 110 or 111?

MR. WARREN:  It's a mini script, so it's got 109 to 112.  I just want to show it to the witness to refresh him.  May I approach?

MR. SUDER:  This lacks foundation.  Did you show it to him to refresh his recollection.

THE COURT:  Well, ask the question.  Then -- you have to lay a foundation.

BY MR. WARREN:

Q.   Well, when Mr. Suder was questioning you, do you recall that he made certain statements representing to you what your testimony was?

A.   (Nods head.)

Q.   At your deposition did you, in fact, testify that the --

MR. SUDER:  Excuse me, Your Honor.  Reading what he said in his deposition is not a proper foundation.  And I would object to trying to tell him what --

THE COURT:  I thought he was about to ask what you had asked, not read from the deposition.

MR. SUDER:  Read something else from the deposition.

He can ask the witness.  He could have done optional completeness.

MR. WARREN:  I couldn't have done optional completeness because he didn't actually read from the deposition, give me a cite.

I mean, if I can do optional completeness, can I read it now?

MR. SUDER:  I'm not -- I didn't impeach the witness with his deposition.  He agreed.  So if you want --

THE COURT:  That's right.

MR. WARREN:  Okay.

BY MR. WARREN:

Q.   Now, I want to ask you some questions that you were asked about the TinySwitch-LT data sheet.

MR. WARREN:  Can we have that up, Mr. Sayres?  It's TX 11.  Actually, I'll use the ELMO.

(Document displayed.)

BY MR. WARREN:

Q.   So do you recall Mr. Suder approached the ELMO and showed you this figure?

A.   Yes.

Q.   And do you recall him representing to you that the TinySwitch-LT doesn't use a bias winding?

A.   So say that again.

Q.   My question is about the -- I'm just laying the foundation

here.  Mr. Suder represented to you that in this figure there isn't a bias winding because of the language in the data sheet.

A.   Yes, yes.

Q.   So why don't we actually look at the actual schematic in this data sheet.  Okay.

Now, looking at this, Mr. Suder didn't actually show it to you, but is what Mr. Suder represented to you about there being no bias winding here, is that true?

A.   Well, he didn't show me this.  So he was trying to say that waveform please there's no bias winding.  And I disagree because that waveform doesn't say it has bias winding or not.

Q.   But when Mr. Suder represented to you affirmatively there was no bias winding, I'm asking you your -- looking at this drawing right now, is there a bias winding?

A.   Yeah, it is there.

Q.   And can you describe it for us?

A.   It is part of the transformer which is labeled as T1 with two long virtual lines.  The bias winding is the wiggles --

THE COURT:  If you put your finger on the screen, there will be a little arrow.

Does that work, Angie?

THE CLERK:  Yes, it does.

THE COURT:  You can actually touch the screen.

THE WITNESS:  I can touch the screen?  Oh, okay.  I didn't know this is touched screen.

THE COURT:  High tech.  There you go.

THE WITNESS:  Sorry --

THE CLERK:  Do you want to undo?

THE WITNESS:  Yeah.

THE CLERK:  Undo.

THE WITNESS:  Oh, undo.  Okay.  What's going on here?

THE COURT:  If you say "next to the arrow," I think the jury can see it.

Is the screen on for the jurors?

THE CLERK:  It is.

THE WITNESS:  I want this arrow to point to the wiggle.

THE COURT:  It's hard to get it precise.  Describe it generally.

BY MR. WARREN:

Q.   Why don't I ask you a question.  I can point with my pen. Or, actually, I can highlight.

A.   Well, we have some green -- it's gone.  Okay.  Yeah, yeah, yeah, yeah.  That is the bias winding.

Q.   Is what I've highlighted here the charging path for charging that bypass capacitor with a bias winding?

A.   Yes.

Q.   So the TinySwitch-LT does function with a bias winding? It can?

A.   Yes.

Q.   And I think you mentioned that it's optional; right?

A.   Yes, it is optional.

Q.   And I want to ask you about is a bit of the tradeoff that you discussed.

So here we see the data sheet says there's no requirement for an auxiliary or a bias winding?

A.   Uh-huh, yes.

Q.   It's optional.  And it's the user who builds the power supply who decides whether or not to put it in there; right?

A.   Yes, yes.  We made our product so customer can have the choice.

Q.   And what -- the next sentence discusses that tradeoff.  So the first sentence says that it's optional, you don't need one. But are there advantages associated with using a bias winding?

A.   Yes, that's one of the advantage.

Q.   And you said another advantage is energy efficiency?

A.   That's actually -- in my mind, that's actually the main advantage.

Q.   And so is there a tradeoff here between cost, so that -- on the one hand, when you don't use a bias winding, on and energy efficiency on the other hand?

A.   Yes.

Q.   And --

A.   So people who want high efficiency, they pay a lot of extra money to get high efficiency.  The extra money goes

towards bias winding.

People who really don't want to pay extra cost, and they don't care so much about efficiency, they go without the bias winding.

Q.   And so from your knowledge in the field in real-world power supplies that really get made, on which side of that tradeoff do the majority of them fall?

A.   Personally, I have never seen one without bias winding.

Q.   Because most people want the energy efficiency?

A.   That's the whole -- for the whole world is asking for right now.

Q.   You were asked some questions --

MR. WARREN:   Mr. Sayres, can we bring up DD229, one of the slides.

(Document displayed.)

BY MR. WARREN:

Q.   Now, Mr. Suder questioned you at length about how the power at startup can come from the drain pin; do you recall that?

A.   Yes.

Q.   And that's perfectly consistent with what you explained on your direct, isn't it?

A.   Yeah, that's why I said it originates from drain.

Q.   And that's what you were describing throughout these graphics; right?

**A.**   I believe so.

**MR. WARREN:**  And so if we go two slides forward, Mr. Sayres.  One slide back.

**BY MR. WARREN:**

**Q.**   Does that change the fact that the element providing power during operation for the chip is the bypass capacitor?

**MR. SUDER:**  Objection.  Leading.

**THE COURT:**  Overruled.

**THE WITNESS:**  The question again?

**BY MR. WARREN:**

**Q.**   Does that change the fact that the element providing power during operation is the bypass capacitor?

**A.**   No.

**MR. WARREN:**  Mr. Sayres, can I have the -- oh, okay.

**BY MR. WARREN:**

**Q.**   So I want to go back to the beginning, where you're -- Mr. Suder's questioning started, because I found it very confusing.  It sounded like he was implying that the TOPSwitch had a fourth terminal.

**MR. SUDER:**  Objection, Your Honor.

**THE COURT:**  Sustained.  Ask questions.  This is not the time for argument.

**BY MR. WARREN:**

**Q.**   Does the TOPSwitch have three terminals or four terminals?

**A.**   Three.

**Q.**   And when we look at this functional diagram, can you remind us, why was the TOPSwitch able to have three terminals?

**A.**   Because we combined feedback and power supply into one terminal, one pin.

**Q.**   And, now, when we look at a device with four terminals, that uses on/off control, can you remind us one more time what's different from TOPSwitch?

**A.**   The difference is that we are no longer able to combine the two functions into one pin.  So power supply pin and feedback pin now each exists as a separate pin.

**Q.**   Now, lastly --

        **MR. WARREN:**  Mr. Sayres, we can blank the screen.

**BY MR. WARREN:**

**Q.**   You were asked some questions about the importance of respecting intellectual property.  Do you recall that?

**A.**   Yes.

**Q.**   Do you respect other people's intellectual property?

**A.**   Absolutely, because I want other people to respect my intellectual property.

**Q.**   Do you use Mr. Congdon's intellectual property in your products?

**A.**   No.

        **MR. SUDER:**  Objection, Your Honor.  Lacks foundation.  Calls for an expert opinion.  And this witness said he never really read the patent.

THE COURT:  Sustained.  The jury is to disregard that answer.

MR. WARREN:  Okay.  Thank you, Mr. Kung.

THE COURT:  All right.

MR. SUDER:  Nothing else, Your Honor.

THE COURT:  All right.  Thank you, Mr. Kung.  You may step down now.

THE WITNESS:  Thank you.

(Witness steps down.)

THE COURT:  Defense may call its next witness.

MR. WARREN:  Your Honor, Power Integrations calls William Bohannon.

THE CLERK:  Please raise your right hand.

**KEITH BOHANNON**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE CLERK:  Please be seated.

State your full name and spell your last name for the record.

THE WITNESS:  William Keith Bohannon, B-o-h-a-n-n-o-n.

THE COURT:  Thank you, Mr. Bohannon.

You may proceed.

MR. WARREN:  Thank you, Your Honor.

I have a binder for the witness.  May I approach?

THE COURT:  Yes, you may.

## DIRECT EXAMINATION

**BY MR. WARREN:**

**Q.**   Good afternoon, Mr. Bohannon.

**A.**   Good afternoon, Mr. Warren.

**Q.**   Would you please introduce yourself?

**A.**   Yes, my name is William Bohannon.

**Q.**   And what do you do for a living, Mr. Bohannon?

**A.**   I'm a consultant for the electronics industry.

**Q.**   And how long have you been working in the electronics field?

**A.**   For more than 40 years.

**Q.**   Have you always worked as a consultant?

**A.**   No.  I've worked for various companies along the way.

**Q.**   Do you have industry experience working with and developing power supplies?

**A.**   Yes, I worked with power supplies throughout my entire career.

**Q.**   Do you have experience working with and designing integrated circuits for power supplies?

**A.**   Yes, I've worked with integrated circuits for analog and mixed signals for more than 25 years.  And I was a founder of the company that made -- designed and made and developed analog power ICs.

**Q.**   I'm sorry, you personally were a founder of a company that made integrated circuits?

**A.**   That's correct.

**Q.**   Can you briefly summarize how you got started with integrated circuits for power supplies?

**A.**   Back sometime in the '80s, I worked for several companies, and was a consultant for a company called Brooktree that had two divisions the mixed signal division and an analog division. When they spun off the analog division, which was called Edge Semiconductor, in around 1994, I worked with them developing -- developing power analog ICs along with comparators and drivers and active loads.

**Q.**   So you've been developing power supply ICs since 1994?

**A.**   That's correct.

**Q.**   Would you please summarize your educational background after high school for me.

**A.**   Yes.  I'd be happy to.

I graduated from high school in 1967.  I went to college for a while before I joined the Navy, and served in the Navy until 1971.  I was honorably discharged.

I worked with the Navy as a civilian afterwards, until about 1974 when I went back to college with the GI Bill. Graduated from San Diego State in 1977, with a degree in mathematics.

**Q.**   And so after you graduated from your undergraduate studies, did you do any graduate work?

**A.**   Yes, I did.  I did some studies on Japanese.  And I was

accepted in a graduate program at San Diego State University, and I left when I got an engineering job that I couldn't turn down.

Q.   And, now, working at your engineering job, what type of engineering were you doing?

A.   I was doing design and manufacturing of a variety of products, including power supplies.

Q.   Were you working as an electrical engineer?

A.   I was working as an electrical engineer.

Q.   And do you have any U.S. patents in your name as an inventor?

A.   Yes, I do, about seven.

Q.   And do you actually have patents related to power supply technology?

A.   Yes, I do.

Q.   How many?

A.   Three or four probably.

Q.   Do you have any publications?

A.   Yes, I have over 140 different publications, starting from a -- first published in a journal in probably about 1978, in nuclear instrumentation.

Then I had various publications in magazines like *Society for Information Display*, *Electronic Design*.  And United's *Horizon* magazine republished one of my articles.

Q.   Have you ever taught any classes?

A.   Yes, I've taught several classes and tutorials along the way, starting with how to maintain and operate complex electrical equipment.  And tutorials on how to design in analog ICs for power supplies.

A lot of these classes were done with a live demonstrations of ICs.  And a lot of them were done in Japanese.

Q.   Did you ever teach classes for the military?

A.   Yes, I did.

Q.   Would you please tell us a little bit more about the kind of work you do nowadays as an independent consultant.

A.   I help people with -- I consult with people who need help with designs on things like LED lighting, and power supplies for lighting, that sort of thing.

Q.   And have you ever acted as an expert witness before?

A.   Yes.  I've been an expert witness for various Patent Office proceedings and arbitrations.

Q.   Fair to say your day job, though, is working as an electrical engineer?

A.   That's correct.

Q.   And have you been retained in this case to provide testimony on behalf of Power Integrations?

A.   Yes, that's correct.

Q.   Can you describe for the jury the universe of the documents that you reviewed to prepare for your testimony?

**A.** Yes. I've looked at the '623 patent, the '323 patent, the infringement contentions, and sorted documents that went along with that. The expert report that Zane did and the documents that he referred to. I looked at my own expert report again, and all the documents I referred to. I looked at all the data sheets, the TinySwitch-III, the Tiny-LT, and the Link-II and LinkZero-AX.

And I looked for all the schematics for all those parts, which was a couple hundred pages because each part has several -- something over a thousand transistors, I would imagine.

**Q.** Let's break that down just a little bit.

So you reviewed the patents in this case?

**A.** That's correct.

**Q.** And you actually prepared an expert report in this case?

**A.** That's correct.

**Q.** Just for a high level, for the jury, can you describe that expert report?

**A.** Yes. The expert report consisted of analyzing the patent and analyzing the products and comparing them.

**Q.** And Dr. Zane also prepared an expert report?

**A.** That's true.

**Q.** And you -- you reviewed and responded to Dr. Zane's expert report?

**A.** Yes, I provided a rebuttal infringement report.

Q.   And you also reviewed the Court's claim construction order in this case?

A.   Yes, I did.

Q.   And just from a very high level, can you briefly summarize for us what were the conclusions that you reached after reviewing all of those documents?

A.   That Power Integrations' products do not infringe because they have a fourth pin with a power supply.

MR. WARREN:  Mr. Sayres, may I have the slides.

(Document displayed.)

BY MR. WARREN:

Q.   I'd like you to begin, if you would, with a short technical tutorial on how power supplies work, okay.

A.   Okay.

Q.   So let's start at the very top level.  What are you showing here?

A.   You can see up on the upper left a typical wall socket everybody has at home.  In the middle is a black box power supply with one of Power Integrations' chips mounted on a heatsink.  And then down in the lower right is a laptop computer that needs a safe source of power.

Q.   Okay.  Let's zoom in a little bit on this.  What are you showing here?

A.   You can see here the power source up on the left, which is 110 volts to 240 volts.  Most of the power in our country is

110 to 120.  So the other countries use up to 240 volts, and you have to be able to operate worldwide with your power supplies these days.

In the middle we're not showing the black box, just the words "power supply."

And on the right we're showing the load, which is in this case a 12-volt DC load to a laptop computer.

Q.   Okay.  So let's show an example of what types of circuitry we would find in that black box.

What are you showing here?

A.   This is that simplified schematic of a power supply we showed before.

Q.   And I'd like you to zoom in a little bit.  And just from a high level can you explain, what are we showing here?

A.   So here we're showing that simplified schematic kind of magnified and grayed out so that we can look at it piece by piece and try to understand a little bit better.

And on this we're showing the high voltage input side of the input/output circuitry, showing the capacitor and the transformer.  That will -- capacitor will store the charge; transformer will transform the voltage.

Q.   So I want to ask you specifically about this element.  And I think you actually already briefly mentioned it, but you said that it stores charge?

A.   Yes.  This is the input capacitor which stores the charge

that will provide the energy to the transformer.

Q.   Okay.  Let's un-gray the top right portion.  What are you showing here?

A.   Here you see the output side, the DC output, the low voltage DC output side which also has a capacitor.  And that capacitor provides the power to the output.

Q.   Okay.  Let's go ahead and reveal the rest.

What is the functionality of the circuit elements that we revealed last?

A.   So we finally show the Tiny TOPSwitch III, which is a four-pin controller which is doing -- which it's controlling the transformation of the high voltage to the low voltage as well as the feedback functions.

Q.   Okay.  So I heard there "feedback functions."

Can you explain, in the context of this drawing, what exactly does feedback mean and where is it coming from?

A.   Well, in this case, so like when your laptop wakes up and needs more power, the TinySwitch-III will sense that need through the enable under-voltage pin and then correspondingly control the input/output circuit to provide more power to the output.

And when the laptop goes back to sleep, the TinySwitch-III enabled under-voltage pin will then sense that need, as well, and reduce the power.

Q.   Okay.  You have a functional block diagram here.  What are

you showing here?

A.   Here we've just replaced the schematic with two blocks that show input/output circuitry on top, and the Power Integrations' TinySwitch-III on the bottom, with feedback and control arrows accordingly.

Q.   Next I'd like to ask you about how the TinySwitch-III actually gets its power during operation.  Can you explain that?

A.   Yes.  The TinySwitch-III gets its power from that capacitor on the BP/M pin, the bypass pin.

Q.   And in this graphic we show a path.  What are you showing here?

A.   This is showing the charging path for the power that comes through that input high voltage down through the drain pin and through the chip to the -- and out the bypass/M pin, and then will charge up that capacitor.

Q.   And so does the charge that the capacitor use always come in through the drain pin?

A.   Not always.  It can come in through a bias winding as well.

Q.   And so you've prepared a slide on this.  What are you showing here?

A.   Well, this is the -- highlighted in yellow.  This is the larger schematic that almost everyone uses.  So highlighted in yellow is a bias winding on a transformer that has circuitry

that goes down and charges a bypass capacitor.

And a bias winding is just kind of an extra loop of wire around the transform that will pick up electricity.  And you can tune that to be very energy efficient.

Q.   And does all of the power that gets flowed into the bypass capacitor, does it come from both the drain and from the bias winding?

A.   Well, I think in this case when the bias winding is recharging the capacitor it's only coming from the bias winding.

Q.   So this path here we looked at, this would only be at startup before the part is operating?

A.   Yes, before the part is operating, before the switching is occurring, then there's no energy transferred from the high voltage to the low voltage, so there could be no bias winding involved.

Q.   And then once the part is operating, and so current is actually going to the bias winding, then the bias winding is used to charge the bypass capacitor?

A.   That's correct.  Once the part is operating, then the bias winding will pick up that charge from the transformer and supply it to the bypass capacitor and recharge it.

MR. WARREN:  Mr. Sayres, can we bring up, please, this data sheet.  It's TX 14.  Okay.  And let's go to page 8.  Okay.  That's the right page.

(Document displayed.)

**BY MR. WARREN:**

Q.   And now I'd like you to describe some of the text related to that bias winding.

MR. WARREN:  Mr. Sayres, can we highlight that first sentence, the very first sentence?

**BY MR. WARREN:**

Q.   And so what is the data sheet describing about the bias winding?

A.   It says that for lower no-load input power consumption, the bias winding may also be used to supply the Tiny III device.

Q.   Okay.  Let's continue.

Can you explain what the next sentence means?  We will take these one at a time.

A.   That just explaining the circuit that we were looking at.

If you look at the circuit, the bias winding feeds down into that resister R8 which then feeds currents into the BP/M pin.  And that, in fact, inhibits the internal high voltage current source that normally maintains the BP/M pin capacitor voltage during the internal MOSFET off time.  So it replaces that function.

Q.   Okay.  So I just want to break this down to make sure we're clear.

So when it's referring to the internal high voltage

current source that normally maintains BP/M, what is that?

**A.**   I think they're referring to that 5.85-volt regulator off the drain pin.

**Q.**   So this is saying the bias winding actually replaces that during operation?

**A.**   That's what it says here.

**Q.**   So can we go back to the schematic, just real quick, so we can see.  I'd like you to -- can we zoom in.  Okay.

Can you explain to us, what is the resistor that is being referred to?

**A.**   So if you can see in the middle it's surrounded by a little dashed block.  There's a resistor which looks like kind of an up and down mountain sawtooth figure.  And inside, right below that, it says R8.  So that was the resistor R8 that they were talking about.

The bias winding is up there -- you know, there's a resistor R7 up there, right above the bias winding.  And that's this kind of an indication of where the bias winding is.

So those are the external components, resistor diode and other resistor, and then down to resistor R8, which eventually leads into that bypass capacitor labeled C7 on this schematic.

**Q.**   So during operation what's actually being used to charge that bypass capacitor?

**A.**   The bias winding.

**Q.**   And what is then actually functioning as the power supply

for the chip?

A.   The bypass capacitor.

Q.   When you reviewed Dr. Zane's analysis, did he consider the bias winding at all?

A.   No, he did not.

Q.   And you were here for Dr. Zane's testimony?

A.   Yes, I was.

Q.   And did he discuss the bias winding's functionality with the jury at all?

A.   Not at all.  He made some statement like there was never anything attached to the BP/M pin besides the capacitor.

Q.   And is that true?

A.   That is not correct.

          MR. WARREN:  Mr. Sayres -- okay.

BY MR. WARREN:

Q.   I'd like you to -- did you reach a conclusion in your analysis about whether or not these parts can function without the bypass capacitor?

A.   Yes, I did.

Q.   And what was that conclusion?

A.   That they need a bypass capacitor in order to operate.  If you remove that bypass capacitor, if you didn't have it the part would not function.

Q.   And does the data sheet actually say that the bypass pastor is necessary to power the chip?

**A.**   Yes, it does.

**Q.**   And so I think we've seen this before, but can you briefly just tell us, how did this information from the data sheet factor into your analysis?

**A.**   Well, it's key.  It says right there, when the MOSFET is on the device operates from the energy stored in the bypass capacitor.  If there was no bypass capacitor, it would not work.

**Q.**   And so this also referred to an internal supply node.  Can you explain to the jury, as a technical matter, what is an internal supply node?

**A.**   This is telling where -- the internal supply node is the voltage that goes to power the internal parts of the chip.

**Q.**   And so what is the data sheet saying about that, and how did that factor into your analysis?

**A.**   It says that the bypass, slash, multi-function pin is that internal supply voltage node.  That's where the power comes for the chip, the bypass, slash, M pin and the bypass capacitor.

**Q.**   And in your analysis did you analyze whether or not there's actual internal circuitry that ensures that the bypass capacitor is connected?

**A.**   Yes, I did.

**Q.**   And can you explain, briefly, what is the circuitry that you found through your independent analysis that does that function?

**A.**   Well, the key component is that triangle device which we call a comparator.  And it's labeled on this drawing here as a bypass pin under-voltage.  You can call it the bypass pin under-voltage comparator.

And it looks at the energy.  It watches the fuel gauge, so to speak, in that bypass capacitor so that when the fuel gauge is above 5.85 volts, when there's more than 5.85 volts stored in that capacitor, it will then allow the switching to begin and let the chip operate.

It also shows that when the voltage drops below 4.9 volts, that the device stops operating.

**THE COURT:**  We're at the 1:00 o'clock break, so I'll let you go another question or two.

**MR. WARREN:**  Actually, we're at a stopping point.  We can come back to here.

**THE COURT:**  All right.  Ladies and gentlemen, as I mentioned, we are going to adjourn early today, at 1:00 o'clock.  We don't have court tomorrow, Thursday.  But we will have court Friday, and we will commence at 8:30 sharp on Friday.  And we'll run the full day or however long it takes. I think right now we're -- are we optimistic that we'll be able to complete testimony?

**MR. WARREN:**  I think we'll be done with closings on Friday.

**THE COURT:**  On Friday.  So we're hoping -- no

promises, but we're hoping to get you the case by Friday.

MR. WARREN:  Yes.

THE COURT:  We'll see.  We're still on time, in other words.

MR. SUDER:  Making good time, Judge.

THE COURT:  So, again, just a reminder, please do not make any decisions at this point.  Keep an open mind.  Do not discuss this case or anything about it with anybody, including amongst yourselves.  Do not attempt to do any research on your own.  And we will see you back here on Friday morning.

Thank you.

THE CLERK:  All rise for the jury.

(Jury out at 1:02 p.m.)

THE COURT:  Okay.  So I've got a matter at 1:00.

MR. WARREN:  Okay.

THE COURT:  After this witness you are going to call?

MR. WARREN:  Mr. Sutherland.

THE COURT:  Sutherland.

MR. SUDER:  We're going to call him, Judge, as part of our case.  Very short.

MR. WARREN:  But we're going to question him first as part of our --

THE COURT:  That's fine.  But he's going to only be up on the stand once.

MR. WARREN:  Yes, he's only going to be on the stand

**PROCEEDINGS**

once.  We'll question him first, and then they can question beyond the scope.

MR. SUDER:  No, Your Honor.  He was part of our case-in-chief, and it's important that I question him first.

THE COURT:  All right.  So we did reserve -- so since it's your case, you can examine him first.

MR. SUDER:  Thank you.

THE COURT:  And then who's after that?

MR. WARREN:  I don't believe there's any witnesses after that.

MR. HEADLEY:  Your Honor, we have no more witnesses after that, so we'll be doing closings.

MR. SUDER:  So Mr. Barnes is not testifying, then, because he was on their list.  We might have some short rebuttal.  If we will, it will be very short.

THE COURT:  All right.  Then for sure we're going to have closings and get to the jury.  Good.  Excellent.

MR. SUDER:  All right.

THE COURT:  Thank you.

MR. WARREN:  Thank you, Your Honor.

MR. HEADLEY:  Thank you.

THE COURT:  All right.  Thanks.

(Court adjourned at 1:03 p.m.)

- - - -

CERTIFICATE OF REPORTERS

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, February 20, 2019

_____
Vicki Eastvold, RMR, CRR
Official Court Reporter

_____
Katherine Powell Sullivan, CSR #5812, RMR, CRR
Official Court Reporter