**Volume 4**

**Pages 655 - 905**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | |
|---|---|
| OPTICURRENT, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | **No. C 17-3597 EMC** |
| ) | |
| POWER INTEGRATIONS, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | San Francisco, California |
| | Friday, February 22, 2019 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          FRIEDMAN, SUDER & COOKE
                        604 East 4th Street, Suite 200
                        Fort Worth, Texas 76102
                   BY:  **JONATHAN T. SUDER, ESQ.**
                        **DAVE R. GUNTER, ESQ.**

                        HUDNELL LAW GROUP P.C.
                        800 W. El Camino Real, Suite 180
                        Mountain View, California 94040
                   BY:  **LEWIS E. HUDNELL, III, ESQ.**

                        Goldstein Faucett & Prebeg, LLP
                        1177 West Loop South, Suite 400
                        Houston, TX  77027
                   BY:  **CORBY R. VOWELL, ESQ.**

(Appearances continued on next page)

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

**APPEARANCES (CONTINUED):**

For Defendant:              FISH & RICHARDSON P.C.
                            500 Arguello Street, Suite 500
                            Redwood City, California 94063
                       BY:  **MICHAEL R. HEADLEY, ESQ.**
                            **NEIL A. WARREN, ESQ.**

                            FISH AND RICHARDSON PC
                            222 Delaware Avenue, 17th Floor
                            Wilmington, Delaware 19899
                       BY:  **JOSEPH B. WARDEN, ESQ.**

For Defendant/              FISH & RICHARDSON P.C.
Counter-Claimant:           12390 El Camino Real
                            San Diego, California 92130
                       BY:  **JOHN W. THORNBURGH, ESQ.**

**I N D E X**

Friday, February 22, 2019 - Volume 4

|                                                  | **PAGE** | **VOL.** |
|--------------------------------------------------|----------|----------|
| Charge Conference                                | 658      | 4        |
| Defendant Rests                                  | 783      | 4        |
| Plaintiff Rests                                  | 803      | 4        |
| Jury Instructions                                | 811      | 4        |
| Closing Argument by Mr. Suder                    | 833      | 4        |
| Closing Argument by Mr. Scherkenbach             | 860      | 4        |
| Rebuttal Closing Argument by Mr. Suder           | 886      | 4        |
| Jury Instructions                                | 900      | 4        |

| **DEFENDANT'S WITNESSES**                        | **PAGE** | **VOL.** |
|--------------------------------------------------|----------|----------|
| **BOHANNON, WILLIAM KEITH**                      |          |          |
| (RECALLED)                                       | 678      | 4        |
| Direct Examination resumed by Mr. Warren         | 678      | 4        |
| Cross-Examination by Mr. Suder                   | 697      | 4        |
| Redirect Examination by Mr. Warren               | 740      | 4        |
| Recross-Examination by Mr. Suder                 | 753      | 4        |

| **PLAINTIFF'S WITNESSES**                        | **PAGE** | **VOL.** |
|--------------------------------------------------|----------|----------|
| **SUTHERLAND, BENJAMIN**                         |          |          |
| (SWORN)                                          | 761      | 4        |
| Direct Examination by Mr. Suder                  | 762      | 4        |
| Cross-Examination by Mr. Warden                  | 776      | 4        |
| Redirect Examination by Mr. Suder               | 781      | 4        |
| **ZANE, REGAN (RECALLED IN REBUTTAL)**           |          |          |
| (PREVIOUSLY SWORN)                               | 784      | 4        |
| Direct Examination by Mr. Suder                  | 784      | 4        |
| Cross-Examination by Mr. Warren                  | 799      | 4        |

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|--------------------|----------|----------|----------|
| 19                 |          | 773      | 4        |
| 155                |          | 696      | 4        |
| 210A               |          | 665      | 4        |

<u>**Friday - February 22, 2019**</u>                          **8:15 a.m.**

**P R O C E E D I N G S**

**---oOo---**

(The following proceedings were held in open court, outside the presence of the jury:)

**THE CLERK:** Calling civil action 17-3597, Opticurrent LLC versus Power Integrations.

Counsel, please state your appearances for the record.

**MR. SUDER:** Yes. Good morning. John Suder, Corby Vowell, and Dave Gunter for the plaintiff.

**THE COURT:** All right. Mr. Suder.

**MR. SCHERKENBACH:** Good morning, Your Honor. Frank Scherkenbach, Neil Warren, Joseph Warden, Michael Headley, John Thornburgh for Power Integrations.

**THE COURT:** All right. Good morning, everyone.

I just want to go over the final jury instructions because I think we're going to get to that point today; right?

**MR. SCHERKENBACH:** Yes, sir.

**THE COURT:** So here are the changes that have been made and that I want to alert you to and give you your chance to say something about.

One is the -- I have incorporated the stipulations into an instruction. I've listed all ten stipulated facts.

Number two, there is a question about the direct infringement. And, by the way, that's going to be Number 23,

the ten facts.

And then we have the direct infringement, the insertion of the paragraph:

"You have heard evidence about the breadboard and the accompanying drawing in PI's accused products; however, in deciding the issue of infringement, you may not compare PI's accused products to Mr. Congdon's breadboard product or the company drawing.  Rather, you must compare PI's accused products to claim 1 of the '623 when making your decision regarding infringement."

That is derived from the model instruction, our model instruction on that point.  And I intend to give it.

I don't know if you have any comments on that, but it does seem appropriate that they are to measure it against the claim 1 and not against the breadboard.

**MR. SUDER:**  Your Honor, the only point I'd make is -- we made it in our response -- is that you already told the jury that.  You told them they're directed to the claims, and that's -- I don't know if that's unnecessary inappropriate comment on the evidence as opposed to telling them this is the law, you look at the claims, and you say that in that instruction.

**THE COURT:**  Comment?

**MR. THORNBURGH:**  Your Honor, it's in the model.  We think it's appropriate.  It's not a comment.  It's just a

direction to the jury that they're not supposed to compare products.

THE COURT:  All right.  Well, I mean, it's an accurate statement and it is in the model instruction.  And I'm going to give it because it does apply here.

Then there is the reasonable royalty instruction, to which PI objected.  And I said I would wait to see whether there was a basis for it.  And I think there is a basis for it because there was testimony about QBAR.

True, not much more testimony in terms of comparing and how much more valuable it is and how you quantify that, but that is, it seems to me, a province of the jury.  They can make that determination.

MR. THORNBURGH:  Is Your Honor ruling on the jury instruction or on our continued objection to the revenue?

THE COURT:  Well, on the jury instruction, I'm -- to the extent you object to even giving it, I'm going to give it.

There was two things also about that.  One is there was a typo.  It should say, "In this case, '623 patent covers less than all," not "only less than all."  So I'm going to strike "only."

There is a dispute about whether -- or I think Opticurrent doesn't want to give the paragraph about a one-time lump sum as an alternative.  But it does seem to me that that is a way that the jury can award damages.

You can announce to the jury in your closing that that's not your preference.

**MR. SUDER:** Yes, Your Honor. I understand. And, normally, I would agree with that when there's some evidence or any evidence that can guide the jury.

They haven't offered any testimony that a license could be done that way, so it's really just attorney argument at this point. The only evidence the jury heard was that the QBAR license and the license that Power Integrations, and they were both a running royalty.

So to inject that here, without any evidence whatsoever, would be improper in our view.

**THE COURT:** All right. What's your view then?

**MR. THORNBURGH:** Your Honor, in our view there is actually no foundation for a running royalty. They have completely failed to show the comparability of the QBAR license to our situation, most notably because, as the evidence has come in from trial, the QBAR license was for a switch, and the accused products are a switch plus the brains, the controller. And so it's apples and oranges.

If they had had a damages expert that could do that economic adjustment between 2 percent on a switch versus 2 percent on a much more complicated product, they would be able to apportion.

But since they don't have an expert like that, and didn't

offer any kind of testimony like that, we actually think there's no possibility that they could get a percentage royalty.

And so the jury is left -- the only kind of damages that could be justified would be a lump sum based on Mr. Brunell's testimony about what he paid for the patent.

THE COURT:  Would there be any evidence to support a lump sum if the jury were to do that?

His argument is that there was no testimony about the lump sum.

MR. THORNBURGH:  There was testimony about what Mr. Brunell paid.  And so we think the jury could use that to award nominal damages in the form of a lump sum.

THE COURT:  Paid for acquiring the portfolio?

MR. THORNBURGH:  Yes.

THE COURT:  Was there a dollar figure attached to that?  I don't remember.

MR. SUDER:  No, Your Honor.  Just different circumstances: we did this; we did this; we did all of these.

THE COURT:  Well, was there a dollar figure -- is there evidence of the amount actually paid for the portfolio?

MR. SUDER:  There was categories.  There wasn't a tabulation.  But, yes, there was an advance to split -- an advance of payment and payment of debts that -- against a split proceeds.

THE COURT: Well, I see. So the consideration included some specific numbers in terms of the pay-down of the -- Mr. Congdon's company, the debt on that, the advancement for the 15,000 on --

MR. SUDER: And it was all an advance.

THE COURT: But there were some numbers and there was announcement of 50/50 split, so to the extent -- and there was a number on the royalty.

So in that case, that is one measure they could look at what was paid for it and say, well, that kind of reflects something. So I think there is some basis for it.

And, therefore, I think it's an appropriate instruction to give. Obviously, you can argue that that's not appropriate and you can -- that they should only do it on a royalty rate.

So I'm going to leave that paragraph in.

MR. SUDER: Okay.

THE COURT: Now, there's still an objection to -- well, you state there's no basis for a royalty rate at all. And I find -- because I found that I'm going to give this instruction, I have found there is enough. Even though the QBAR is a different product, there was -- the differences were explained.

And as far as apportionment goes, there's been testimony and -- I don't know if there's going to be more testimony, but there's been testimony about other patents.

That's why I allowed the testimony about the '190 or whatever it was, the other PI patents, and why it was so valuable -- the other stuff was so valuable; you know, the on/off switch, which was not attributable.

So even though there's not been a quantification by an expert, there's been enough qualitative evidence so the jury can see what role, if any, the '623 played.  So there's enough there.

And then there was an original objection, pretrial motion, about whether we could give -- I think you mentioned the basis, the sales basis.  And I said I would entertain an objection or, you know, withhold final judgment on that because of what I just said, that there's enough there to make a plausible case of a running royalty rate.  Then the summaries can come in that includes those sales numbers.

Now, I don't remember whether those were -- have been admitted conditionally or where we're at on that.

**MR. SUDER:**  Your Honor, there's no evidence subject to that, so at this time we would offer Exhibit 210-A into evidence.

**THE COURT:**  That's the summary?

**MR. SUDER:**  Yes, the summaries.  And they've reviewed --

**THE COURT:**  The corrected summaries?

**MR. SUDER:**  Yes.  Yes.  That's why they're 210-A.  So

we would offer them into evidence at this time.

MR. THORNBURGH:  And we maintain our objections, Your Honor, but we understand the Court's ruling.

THE COURT:  All right.  Then 210-A will be admitted.And I will give this instruction.

(Trial Exhibit 210-A received in evidence.)

THE COURT:  And I think those were all the comments that were received on these instructions.

MR. SUDER:  Yes.  Yes, Your Honor.

There are some issues on the verdict form.

THE COURT:  Okay.  Better talk about that.

So before the break I will run this -- what my practice is, is to read the substantive instructions after close of evidence.  I also put up on the screen so visual learners can see it.

And then I'll reserve the final filed sort of procedural instructions until after you've given your closings.  I like to have the last last word.

And all the admitted exhibits will go in with the jury. So you want to make doubly sure with Angie that -- what's been admitted and what's not.  You should double-check.  Because we've had -- I haven't, but some of my colleagues have had an incident where things went in accidentally, and that created some problems.

MR. SUDER:  Your Honor, I believe the verdict form was

somewhat -- I wouldn't say semantical, but there are some differences in our forms.  But I think we can take that up later at the break if you want to get started with the evidence.

THE COURT:  Yes.  That's true.  I have not addressed the two different forms.  They are quite similar, but I guess -- I will want to do that, because I will want to give the verdict form to the jury, and you'll want that for your closings.

MR. SUDER:  And there are some nuanced differences that -- but I think the Court will see them side by side and can figure out what we're talking --

THE COURT:  Let me get a quick peek right now.

MR. SUDER:  Judge, I believe it's the two that were filed last night were the most recent.  They filed theirs and we filed a more --

THE COURT:  Oh.

MR. SUDER:  That eliminates the validity.  So I don't know if you have the latest ones.  That might be easier for the Court because the ones pretrial had validity and those questions.

THE COURT:  Oh, the ones you just filed are the ones you're working off.

MR. SUDER:  Yes.

MR. THORNBURGH:  Yes.  So, Your Honor, if I may

comment, what we submitted was basically the Northern District model from the very end of the model instructions --

THE COURT:  Okay.

MR. THORNBURGH:  -- with very small changes.  And there's more changes in theirs.  But that's why they're similar.  We took the model and they changed it more.

THE COURT:  All right.  Let me look at that then.  So I won't talk about it now.  Let' talk about it at the break.

MR. SUDER:  And I think when you see it side by side, Judge, you'll figure it out pretty quick.

THE COURT:  All right.

MR. THORNBURGH:  And, Your Honor, one last comment.  The law -- I think I don't have to say this, but just to the extent that it's necessary for preservation, one part of the jury instructions is the claim construction.  And we have expressed disagreements with it the past and want to preserve those.

THE COURT:  Sure.

MR. SUDER:  One other thing, they did file a motion last night about me personally, about --

THE COURT:  All right.  I haven't seen that.

MR. SUDER:  That I continue to violate a motion in limine in discussing the Fairchild litigation.  And I believe we took care of that at the bench, but they insisted on getting something --

**THE COURT:**  We didn't really have much discussion about the Fairchild litigation, as I recall.

**MR. SUDER:**  They said I was opening the door when I was going into the '323 with Mr. Congdon.  At the sidebar --

**THE COURT:**  We closed that door.

**MR. SUDER:**  Yes.  And they raised it.

**MR. SCHERKENBACH:**  Well, there have been two violations of that motion in limine relating to litigation, and we just want to make sure it doesn't happen again and, in particular, it doesn't happen in the closing.

There's not going to be reference to PI having -- you know, being litigious and having had, you know, discussions with people, and refused to license its IP but chosen to litigate instead, and that sort of thing.  Just don't want it to come up again.

**THE COURT:**  Well, the refusal to license, I take it that's relevant as sort of a counter to your point that they didn't -- that Opticurrent made no effort to give you notice, give your client notice, to try to resolve it, to try to do a license.  So that's why I allowed some of that.

**MR. SCHERKENBACH:**  The fact PI has a policy of not licensing, totally fair game.  They have elicited that.

Then to go to the next step and say, in fact, isn't it true you've been involved in multiple litigations where you've chosen to litigate rather than to license, that's inappropriate

and clearly over the line for the MIL, which, by the way, was mutually agreed to when it was ordered by Judge Orrick.

And that's what we're concerned about, any implication of other litigation.

**THE COURT:**  All right.  Is that a problem?

**MR. SUDER:**  Your Honor, to that extent, I will not say that.  But out of fairness to the Court, for impeachment, Mr. Bohannon, their expert, has worked with this firm and these -- for Power Integrations and these lawyers on a matter, and I should be able to discuss that relationship with him.

I'm not going to be talk about litigation with Fairchild, but I don't want to be accused --

**THE COURT:**  Oh, so it's a matter of degree.

**MR. SUDER:**  Yes, yes.

**THE COURT:**  In terms of his credibility, you can bring out the fact that he worked for the firm in other matters --

**MR. SUDER:**  Other patent matters, Your Honor.

**THE COURT:**  Other patent matters.

**MR. SUDER:**  Yes.

**THE COURT:**  But I'm not going to allow you to go into, you know, who's sued --

**MR. SUDER:**  No, I'm not.  I represented to the Court at the sidebar I was not going to do that, and I'll reiterate that right here.

**THE COURT:**  Okay.

**MR. SCHERKENBACH:** We do have, Your Honor -- I don't know if you want to take them up now or at a first break, but we have one issue for each of the other two witnesses.

There's one issue for Mr. Sutherland as to what documents they can use with him. And then there's one issue for Mr. Zane -- they're going to call him back -- Dr. Zane, excuse me, in rebuttal as to the scope of his rebuttal testimony.

**THE COURT:** Well, what's the first one? What's the issue?

**MR. SCHERKENBACH:** Mr. Warden will address it.

**THE COURT:** Okay.

**MR. WARDEN:** Your Honor, for Mr. Sutherland, we object -- they disclosed, for use with Mr. Sutherland, a large number of spreadsheets. And they're sort of grouped into two categories.

And the first category, which is particularly troublesome, are spreadsheets that include summaries of revenue that encompass the products this Court excluded in our argument last week where we had an argument about whether certain products had or had not been accused. This Court ruled they had not been accused, they are not part of this case.

**THE COURT:** All right.

**MR. WARDEN:** And now they've disclosed, for use with Mr. Sutherland, the summaries that suggest that the revenue for those products are part of this case. We have very serious

concerns about those coming into the case.

And to just give a very specific concrete example, Your Honor, it would say in 2010, for example, that the revenue for the TinySwitch-III product is -- or the T3 product is $10 million more than what the parties have agreed is actually the accused revenue for TinySwitch-III in the revenue summary that the Court ruled this morning is admissible.

It would be very confusing for the jury to see one number in one document and a different number in a different document and wonder which one is correct.

**MR. SUDER:** Your Honor, I can moot all this. We're talking about the underlying data that they produced for the 1006 summaries.

Now that the 1006 summaries are in evidence, there's no need for those. They were here because 1006 required us to have them available.

**THE COURT:** So you're not going to --

**MR. SUDER:** No. Absolutely not.

**MR. WARDEN:** And just to be clear, I think there were eight different spreadsheets.

Is it all eight that are --

**MR. SUDER:** 210-A is in evidence. The underlying data that has all the other products, we have no intention of using that.

**THE COURT:** All right.

**MR. WARDEN:** And, Your Honor, I just want to make it clear that all of our objections to Mr. Sutherland, then those documents are not coming in. And if that's the case, we're fine. 210-A can come in. We have no problem with that in light of the Court's ruling.

**THE COURT:** Good. We have an understanding then. 210-A, and that's it. Okay.

**MR. SCHERKENBACH:** The issue with Dr. Zane is very simple as well, Your Honor. You already resolved it.

This has to do with whether Dr. Zane can offer an opinion he's never before offered on the bias winding and the role of the bias winding with regard to these chips and the capacitor.

This came up during his direct exam. They tried to elicit the testimony. We objected. You sustained the objection. We wanted to confirm with them that now we're not going to hear it when Dr. Zane comes back in rebuttal. And they said, Oh, yes, you are.

And it's sort of hard to understand that. You know, our -- our expert offering his opinion on that issue, which he fully disclosed in his expert report, doesn't open the door to them to have Dr. Zane come back and say, well, now I get to talk about it. He never offered the opinion.

Indeed, Dr. -- or Mr. Bohannon, excuse me, in his report, his expert report, commented. He said, Here's my opinion on the bias winding, and I note Dr. Zane has no opinions on that

and hasn't said anything about it.  That was back in July.

Dr. Zane never subsequently modified his report, supplemented his report.  Never added any analysis on this bias winding issue.  And so he can't come back in rebuttal now and offer a new opinion that's never before been disclosed.

THE COURT:  Well, okay.  What is your response?

MR. SUDER:  Your Honor, I think you -- you know my response.  It's rebuttal.  They -- Mr. Bohannon was there to rebut what Dr. Zane said.  And if he offers things to say why he's wrong, then, in proper rebuttal, we should be able to address why he disagrees with what Mr. Bohannon is telling him.

MR. SCHERKENBACH:  That's the exception that swallows the rule.  By that logic, Your Honor, if they have somebody sitting in the gallery of the Court, who hears a witness testify, they can say, hey, why don't you come on up in rebuttal and tell us all what you think about what you heard.  That is not the way it works.

They failed to disclose these opinions in the original report of Dr. Zane.  They never supplemented.  They had a duty to supplement under Rule 26(e) if they thought they needed to.  They didn't.

We're going to close this case today.  And how can we possibly hear for the first time what Dr. Zane thinks of the bias winding?  There's no disclosure whatsoever.

MR. SUDER:  Exactly why experts are excluded from the

rule, Your Honor, so they can hear the testimony.

**THE COURT:** Well -- well, there is a duty to supplement under 26(e)(2), in particular, deals with expert witnesses for an expert whose report must be disclosed.

Under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and any information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the parties' pretrial disclosures under Rule 26(a)(3) are due.

So it extends to information included in the report, the duty to supplement, and any information given. So if you say something and you want to supplement that, there is a continuing duty to supplement, as we know, under Rule 26.

So why isn't it a fair point that if, upon receiving the opposing expert's report, which you think opens up a new area --

**MR. SUDER:** Your Honor, he's not going to offer any further opinions. But he may, depending on what Mr. Bohannon says this morning -- and Dr. Zane is here -- comment on why he disagrees on the characterization of a document.

If Mr. Bohannon points to this in a document that Dr. Zane relied on, Dr. Zane should be able to say, I see that, I disagree with what Mr. Bohannon says this document says. That's not an opinion -- he's not going to say, well, I have an

opinion about bias winding, because on that I would absolutely agree with Your Honor, we would have had to supplement.

If they're going to point to the very same documents that Dr. Zane talked about and say, well, this says something different, Dr. Zane should be able to say, well, I didn't consider --

THE COURT:  Well, so it's matter of degree.

MR. SUDER:  Exactly.

THE COURT:  You know, what constitutes an opinion that needs to be disclosed in advance and what constitutes, for instance, a factual clarification about some point.  And so I'm going to reserve that question until I hear it.

I will say that, generally, if it's the kind of thing that should have been disclosed in an expert report, there is a continuing duty under 26(e)(2).

The question is whether this rises to the degree of an opinion that had to be disclosed as opposed to rebuttal of some fact or corrective point.

MR. SUDER:  And that's all -- that was all we -- even if we were -- I'm not saying we were.  That's the extent of what we would be using Dr. Zane for.

MR. SCHERKENBACH:  Your Honor, just as a reminder -- I understand your guidance -- I remain highly sceptical that's all we're going to hear.

Just to remind you, when this came up during Dr. Zane's

direct, we handed you the relevant portion of his expert report where he quoted from one of the data sheets, sort of a whole bunch of information from the data sheet, one piece of which referred to the bias winding with no analysis, no discussion, no comment.

And you looked at that and said, well, if that's all he's got, he can't talk about it.

So that's -- that's -- that's the background and the context. And so I guess --

THE COURT: Well, that's why I didn't allow him to testify on direct --

MR. SCHERKENBACH: Right.

THE COURT: -- on that. Rebuttal is a little different because it does -- can open some doors, but it doesn't open the barn door. Let's put it that way.

MR. SUDER: All right. Well, we're aware of that, Your Honor. Thank you for your guidance. I believe that's it for now.

THE COURT: All right. So let's --

MR. SUDER: Oh, Your Honor, one question about procedure. We finished the evidence. I think we should be done by, you know, 11 o'clock, would be my hope.

THE COURT: Okay.

MR. SUDER: I don't know. Does the Court have a formal charge conference where we get the final charge, make

our objections on the record?

**THE COURT:**  This is a charge conference.

**MR. SUDER:**  Oh.

**THE COURT:**  I've given you a chance, I've heard your objections, I'm now going to finalize these instructions.

**MR. SUDER:**  Fair enough, Your Honor.

**THE COURT:**  So before you start your closings, I intend to hand out these final instructions.  If you want to use them in some way, you can use them.  I'm going to have them available for the jury, but we'll put them up on the screen so they can read.

**MR. SUDER:**  All right.  Thank you.

**THE COURT:**  All right.

(Recess taken at 8:38 a.m.)

(Proceedings resumed at 8:41 a.m.)

**THE COURT:**  Okay.  The jury is all here.

**THE CLERK:**  All rise for the jury.

(Jury enters at 8:42 a.m.)

**THE COURT:**  All right.  Everyone may be seated.

Good morning again, ladies and gentlemen of the jury.  As you will recall, I think we were in the middle of the testimony -- direct testimony of Mr. Bohannon.

Right?

**MR. WARREN:**  Yes.  We'll continue with the testimony of Mr. Bohannon.

**THE COURT:**  All right.  If he can resume the stand, appreciate it.

**WILLIAM KEITH BOHANNON,**

called as a witness for the Defendant, having been duly sworn, testified as follows:

**THE COURT:**  All right.  Thank you, Mr. Bohannon.  Just a reminder that you are still under oath.

**THE WITNESS:**  Thank you.

**THE COURT:**  Counsel, you may proceed.

**DIRECT EXAMINATION (resumed)**

BY MR. WARREN:

**Q.**   Mr. Bohannon, when we left off on Wednesday we were discussing your opinions regarding whether the bypass capacitor is required.  Do you recall that?

**A.**   Yes, I do.

**Q.**   And just to orient us, can you remind us, from a high level, what is your opinion on that matter?

**A.**   That the bypass capacitor is a power supply for the controller chip.

**Q.**   And is the bypass capacitor actually required for the controller chip to operate?

**A.**   Yes, it is.

**Q.**   Okay.  I'd like to refer you to --

**MR. WARREN:**  Can we have the screens?

(Document displayed.)

BY MR. WARREN:

Q.   This is TX 14, the TinySwitch data sheet.  Do you see that?

A.   Yes, I do.  Thank you.

Q.   I'd like to -- and just to orient us, what have I highlighted here?

A.   You have highlighted the TinySwitch-III, which is a four-terminal controller chip.  And you've also highlighted the capacitor that's connected to the BP/M pin.

Q.   And did you find in your analysis circuitry that ensures that that bypass capacitor is connected during operation?

A.   Yes, I did.

Q.   And have I correctly highlighted that circuitry?

A.   Yes, yes, you have.  You have highlighted the bypass pin under-voltage comparator, which looks at the voltage that's on the bypass multifunction pin and won't allow the chip to start to operate until the threshold has been reached.

     And the threshold in this part is 5.58 volts, so it won't turn on the -- won't let the chip start to transfer energy until it sees at least 5.85 volts.  And it turns off that -- that transfer of energy if the bypass pin voltage drops below 4.9 volts.

Q.   And Dr. Zane in his opinion and his expert report, is that the products do not require a fourth pin connected to the bypass capacitor for operation.  Do you recall that?

**A.**   Yes, I do.

**Q.**   In your opinion, do you agree?

**A.**   I do not.  The bypass pin capacitor is absolutely necessary for this part to operate.

**Q.**   Now, did Dr. Zane, either at this trial or in his expert report, present any testing of any sort where he attempted to run the chip without a bypass capacitor?

**A.**   No, he did not.

**Q.**   I'd like to -- we're looking at page 6 of the TinySwitch data sheet.  Do you see that?

**A.**   Yes, I do.

**Q.**   And on page 6, we see a figure.

Can you explain to the jury, what is this figure showing?

**A.**   Yes.  With this figure you can imagine that the power supply that uses the TinySwitch-III chip has just initially been plugged in.

And once it's been plugged in, you see the DC input voltage start to rise.  And as that DC input starts to rise, you also see the bypass pin voltage start to rise as the capacitor is charged up.

And once it's reached its threshold, which is 5.85 volts for this chip, you can see that the switch starts to work down on the V drain trays.

**Q.**   And so when you refer to 5.85, is this the point that you're referring to?

**A.**   Yes.  It's not marked, but that's approximately the point.  That's about 6 volts.

**Q.**   And we see here V bypass.  What is that?

**A.**   That's the voltage on the bypass pin.  So that's representing the charge that's building up in the bypass capacitor.

**Q.**   And we see this initial ramp-up period here.

Is this the startup while the bypass capacitor is being charged?

**A.**   Yeah, that's a characteristic charge curve.

**Q.**   And during this portion we see here -- well, we see down here a large black area of more squiggles.  What is that showing?

**A.**   That looks like the switch is switching, so energy is being transferred across the transformer at that point.

**Q.**   And so if we're talking before that happens, what's going on in the chip at that point?

**A.**   Before that happens, nothing.  It's basically happening -- it's quiescent.

**Q.**   And we see this line has -- is a little bit fuzzy.  We see, say, over here it's very flat.  It's exactly zero.  Up here, it's little fuzzy.

Can you explain to the jury, why is that line a little bit fuzzy?

**A.**   Well, it's probably picked up some noise.  On a lot of

chips, there's internal noise.  So it's probably picked up some noise from the switching.  But it's also being recharged, either by the bias winding or by the switching action.

Q.   Okay.  So you mentioned two things there.

Can you explain in a little bit more detail what -- why you mentioned two things that can recharge that bypass capacitor?

A.   Well, because thee controller chips are generally used with the bias winding.  And as the energy is being transferred across the transformer by the switch, it will come back. That's also a pulse-type situation.  It will come back into the bypass capacitor and charge it up.

So there's a lot of that noise in spiking and it's going to be from the -- just the energy being tapped in from the bias winding.

Q.   So when you say a lot of that energy can be tapped in just from the bias winding, can you explain in layman's terms, what does that mean?

A.   Well, there's -- when you connect this to a bias winding, the bias winding is like an extra loop around the transformer, which would then come back through a resistor and a diode and come into the bypass pin on the -- where the capacitor is connected and charge that capacitor.

So when that voltage gets transferred across the transformer, it's going to go in pulses because the switch is

pulsing so the voltage that comes in will be pulsing.  So you'll see a little bit of noise coming in that way.

Q.   And, now, Dr. Zane's opinion that he expressed to this jury is that all of the power needed to run the accused products comes from only the second and third terminals and not the bypass capacitor.  Do you recall that?

A.   Yes, I do.

Q.   Do you agree?

A.   I do not.

Q.   Why not?

A.   Because the bypass capacitor is what is powering this part.

Q.   I'd like to turn, if we could, to page 8 of the data sheet.  And what are we looking at here on page 8?

A.   This is what I just described a minute ago.  This is a real-world application which shows how the bias winding is used to recharge that bypass pin capacitor.

Q.   So if we look down here, what have I highlighted here?

A.   You've highlighted the same things that you highlighted on the simplified chart, which is the TinySwitch-III four-pin controller and the bypass capacitor.

Q.   And what have I highlighted here?

A.   You've highlighted there approximately the circuit that's connected to the bias winding that would power it; although, I would probably, you know, go down and go through that resistor

because that diode is going to block it that way.  But come down through that resistor and then charge up the bypass capacitor and keep the chip going.

Q.   And just so we're clear, the charge will initially come from this bias winding to this point?

A.   Yes.

Q.   It will follow this line, go through this first resistor?

A.   Yes.

Q.   And then it will drop down, go through -- I think you mentioned this resistor is the path it will follow?

A.   Yes, the R8 resistor.

Q.   And then once it gets to right here, what's going to happen?

A.   It's going to charge up that capacitor.

Q.   And so during operation of the part, where does the actual power come from that operates the part?

A.   Well, it's coming from that bypass capacitor, but it's being -- also coming from the bias winding, which can't start to function until energy is transferred from the primary to the secondary across the transformer.

Q.   And at startup, is there also current coming in in this direction to charge that bypass capacitor?

A.   Yes, it is.  That's what we saw in those three charts.  So it's those three voltage currents where you see the voltage in -- coming in from the initial plug-in of the power supply to

the wall socket.  You'll see the voltage come in and then come down through the chip and charge up that capacitor.

Q.   And if we were to look at the data sheets for each one of the accused products, would we see similar circuitry for charging that bypass capacitor during operation?

A.   Yes, you would.  I think every single part that's been accused can allow similar circuitry.

Q.   Is the bias winding absolutely required?

A.   Not absolutely required.  But if you want to reach all the energy savings, all the energy savings -- the Energy Star stuff and the Smart Energy things that come from these chips, you have to use the bias winding.

Q.   So I'd like to -- this is the most bottom right paragraph on page 8.  And let's just start with the first sentence.

Can you explain what I've highlighted here?

A.   This is exactly what I was talking about a few minutes ago, where, for low or no-load input power consumption, the bias winding may also be used to supply the TinySwitch-III device.  This is what I meant when I said the original savings.

Q.   And the next sentence, can you explain what that's discussing?

A.   Yes.  That's that circuit path that we just described a minute ago, where resistor R8 is the last resistor in line before it gets into the bypass capacitor C7.  So this is just describing that path that we showed a minute ago.

Q.   And I want to direct your attention to the discussion of inhibiting the internal high-voltage source that normally maintains the BP/M pin.

What is that referring to?

A.   What that means is that when -- when the controller chip sees a voltage coming into the part through the BP/M pin, when it sees a current coming into the part through the BP/M pin, there's an internal shunt that cuts off any current that would come from the drain pin.

So it's shutting off the drain pin and only using the current from the bias winding and the bypass capacitor.

Q.   So if this inhibiting occurs during operation, does the drain pin provide any power to the chip at all?

A.   None.  It's shunted.

Q.   When you reviewed Dr. Zane's analysis in his expert report, did he analyze the operation of the bias winding at all?

A.   The report didn't have anything in there about a bias winding.

Q.   In fact, during his testimony here in court, do you recall him saying that there were no external components of any sort?

A.   Yes, I heard that.  That's what he said.

Q.   Is that correct?

A.   That is not correct.  I mean, you can see right here in the data sheet where we're talking about how the bias winding

is used to supply the power and to reduce the no-load power consumption.  People use that.

Q.   So I'd like to talk about your expert opinions regarding noninfringement.  Can you summarize your opinions for us?

A.   There is no infringement.  These are four-pin controllers where the fourth pin is connected to a power supply.

Q.   And in forming your opinions, did you consider the data sheets and the schematics in their entirety?

A.   Yes, I did.

MR. WARREN:  Mr. Sayres, can we please bring up DD-318.

(Document displayed.)

BY MR. WARREN:

Q.   And on DD-318, we have the claim language.

How did this language factor into your analysis of noninfringement?

A.   Well, this is the claim.  All of the claim elements have to be met in order for there to be infringement.  Highlighted in yellow is the first part of that claim language, which says, "having only three terminals."

MR. WARREN:  Mr. Sayres, can we go on to 319.

(Document displayed.)

BY MR. WARREN:

Q.   And in performing your analysis in this case, did you apply the Court's claim constructions?

**A.**   Yes, I did.

**Q.**   Let's start with the top one.  We're looking at the Court's provided definition of the word "terminal."

Can you explain that?

**A.**   Well, for the word -- for the claim term "terminal," which we just saw a minute ago, terminal has been defined by the Court to mean an external connection point.

**Q.**   And in the context of the infringement analysis in this case, what are the terminals that we're discussing?

**A.**   The terminals that we're discussing are the pins that come out from the -- from the accused products.

**Q.**   And so in every single one of the accused products, how many terminals are there?

**A.**   Every single one of these products, there are only four terminals.

**Q.**   So I'd like -- the next construction from the Court construes the phrase "a noninverting transistor switch having only three terminals."  Do you see that?

**A.**   Yes, I do.

        **MR. WARREN:**  And, Mr. Sayres, can we go back one slide.

    (Document displayed.)

**BY MR. WARREN:**

**Q.**   And are those the words that appear at the very top of the claim right after the numeral 1?

**A.**    Yes.  Yes, there is.  Where the numeral 1, which is for claim 1, it says, "The noninverting transistor switch having only three terminals."

And in the Figure 2 next to it, those three terminals are illustrated and clearly seen.

**MR. WARREN:**  Okay.  Mr. Sayres, let's go back to the constructions.

(Document displayed.)

**BY MR. WARREN:**

**Q.**    How did the Court define "a noninverting transistor switch having only three terminals"?

**A.**    The Court's claim construction, the Court defined a noninverting transistor switch with three terminals that does not have a fourth terminal connected to a power supply.

**Q.**    Okay.

**MR. WARREN:**  And may I have the document camera again.

(Document displayed.)

**BY MR. WARREN:**

**Q.**    Let's apply that construction.

What is the fourth terminal at issue in this case?

**A.**    Well, here the fourth terminal is the BP/M pin for the bypass multifunction terminal.

**Q.**    Do all of the products -- all of the accused products include a bypass pin as the fourth terminal?

**A.**    Yes, they do.

Q.   And in the words of the Court's construction, what is -- is the fourth terminal connected to a power supply?

A.   Yes, it is.  In each and every case, a fourth pin is connected to a power supply, which is the bypass capacitor and/or the bias winding.

Q.   And so because these products -- each of the accused products have a fourth terminal connected to a power supply, what is your conclusion regarding infringement?

A.   None of these products infringe because they all have a fourth pin connected to a power supply.

         MR. WARREN:  Mr. Sayres, can we go on to 320.

         (Document displayed.)

BY MR. WARREN:

Q.   Did you also analyze in this case the issue of the doctrine of equivalents?

A.   Yes, I did.

Q.   And just to summarize --

         MR. WARREN:  Mr. Sayres, actually, can we go to DD-321.

         (Document displayed.)

BY MR. WARREN:

Q.   Can you explain to the jury what your analysis of the doctrine of equivalents was in this case?

A.   Well, I think it's way-function-result where each one has to be substantially the same.  In this case, I guess you would

call the way, perhaps.

But in this case it's where the noninverting transistor switch with three terminals, that does not have a fourth terminal connected to the power supply, which is the claim language -- the construed claim language.

Q.   And can you explain to the jury your conclusion as to the doctrine of equivalents, referring to this language?

A.   Well, they're trying to make "does not" equal to "does," and "does not" is not equivalent to "does."

Q.   Can you explain to the jury, what do you mean that they are trying to make "does not" have -- "does not have" equivalent to "does have"?

A.   Well, all the Power Integrations' products have a fourth terminal connected to a power supply, which means it does have a fourth terminal connected to a power supply.

In order for these to be equivalent under doctrine of equivalents, "does not have a fourth terminal" would have to be equivalent to "does have a fourth terminal," and that's impossible.

Q.   Would that completely eliminate one of the claim elements?

A.   Yes, it would.

MR. WARREN:  Mr. Sayres, can we go on to slide 322.

(Document displayed.)

BY MR. WARREN:

Q.   And I think you mentioned this just a minute ago with what

we've referred to as the function-way-result test?

A.   Yes, I did.

Q.   In your analysis did you apply this test?

A.   Yes, I did.

Q.   Do the accused products have the same function as the claim?

A.   They do not.

Q.   Can you explain that briefly?

A.   Because the claim requires the three-terminal switch for the fourth terminal is not connected to a power supply.  In each one of these products, the fourth terminal is connected to a power supply.

Q.   And does that mean that it also couldn't achieve the same result, which would be, as the claim requires, a chip that does not have a fourth terminal connected to a power supply?

A.   Yes.  That's what I said earlier.  They're trying to equate "does" to "does not."

    The Power Integrations' products have a power supply connected to a fourth pin.

Q.   And so as to both literal infringement and the infringement under the doctrine of equivalents, what is your opinion?

A.   The parts do not infringe.  Power Integrations' products do not infringe.

Q.   And is that analysis that we just went through for DOE,

would that be the same for the TinySwitch-LT, the LinkSwitch-II, and the LinkZero-AX?

A.    Yes, that's correct.  It covers all four products.

Q.    Now, as part of your analysis did you consider where the technical benefits of the accused products come from?

A.    Yes, I did.

Q.    And can you briefly explain to the jury what your analysis showed?

A.    My analysis shows that the technical benefits of these parts comes from Power Integrations' own patents; in particular, the on/off control function or the dormant mode function.

Q.    And so, in your opinion, what is the primary benefit of using Power Integrations' on/off control in its '190 patent?

A.    Well, if you use the on/off control function, you get very low power consumption during standby.  It's not zero, but it's very low, much lower than other products.

Q.    And so do all of the accused products, in your opinion, use the Power Integrations' on/off control technology?

A.    Yes.  All four products use the on/off control technology, which means the switch gets turned off when the power is low.

Q.    And do the energy efficiency benefits of the accused products come from using that on/off control technology?

A.    Yes, it does.

Q.    And did you actually analyze --

MR. WARREN:  Can we go back to the document camera, please.

(Document displayed.)

BY MR. WARREN:

Q.   Here we're looking at TX 153 on the document camera.

Did you read and apply this patent in your analysis?

A.   Yes, I read this patent and, yes, I applied it in my analysis.

Q.   And if we turn in the patent to where the text begins, is there text in this patent that actually describes the energy efficiency benefits of using Power Integrations' on/off control?

A.   Yes, there is.  Even though you haven't seen it, I know there is because I've read it before.

Q.   I'm going to do my best.

So I'm looking at line 54, and I'm going to highlight down to line 59.  And we're in column 4 of the '190 patent.

Do you see that?

A.   Yes, I do.

Q.   Can you explain to the jury what this portion, column 4, lines 54 to 59, are describing?

A.   Well, first off, it's describing the regulation circuit which is the chip itself.  So the regulation circuit and its power supply, the bypass capacitor 350, is used to supply power to operate the regulation circuit 240, which means what we were

just talking about before; the bypass capacitor is the power supply for the chip.

And when it's conducting -- and then it goes on to say -- it's describing how the on/off control function works there, and it's talking about threshold voltages and stuff.

But when the thresholds are reached, the chip stops switching, and virtually no power is supplied to the load and a minimum amount of power is being consumed by the DC-DC converter shown as element 200 in a figure.

Q.   And is that description of "virtually no power is supplied to the load and a minimum amount of power is being consumed by the DC to DC converter," is that describing energy efficiency?

A.   Yes, it is.

Q.   Did you consider any additional Power Integrations patents related to energy efficiency in this case?

A.   Yes, I did.

Q.   Would you turn in your binder to the tab labeled TX 155.

A.   Yes.  I'm looking at what we call the 7,995,359 patent.

Q.   And is this Power Integrations' '359 patent?

A.   Yes.  Power Integrations is the assignee.

Q.   And did you read and analyze this patent in your analysis in this case?

A.   Yes, I did.

MR. WARREN:   Your Honor, I move the admission of TX 155.

THE COURT:  Any objection?

MR. SUDER:  No objection, Your Honor.

THE COURT:  Admitted.

(Trial Exhibit 155 received in evidence.)

(Document displayed.)

BY MR. WARREN:

Q.   And is this another one of Power Integrations' patents related to energy efficiency?

A.   Yes, it is.  The '359 patent, the dormant mode patent, is directly related to energy efficiency.

Q.   I'm going to zoom in on the title here.  And you just said the words "dormant mode."

Can you explain to the jury, what is this patent?  What does it discuss?  What kind of technology is at issue in this patent?

A.   Okay.  What this patent does is, as I described before with on/off control, so when there's a very low load requirement on the power supply, the switch only switches once every so often.  Goes on, and then it waits several off cycles and then it goes back on.

And what this does is, after several skipped cycles -- so after no requirement for a load whatsoever, it powers down the controller so that there is zero standby power consumption.

Q.   And so which of the products at issue in this case, in your opinion, use the '359 patent?

**A.**   The LinkZero-AX uses the '359 patent because it uses this dormant mode and completely powers down the controller chip after 160 skipped cycles.

**Q.**   And does this allow even more energy efficiency even in addition to Power Integrations' on/off control '190 patent?

**A.**   Yes, it does.   This builds on the on/off control, so it counts those skipped cycles, and when it reaches the maximum of 160 skipped cycles, it powers down the chip.

**Q.**   And so, ultimately, what conclusion did you draw in this case as to where the technical benefits in the accused products come from?

**A.**   My conclusion is that the technical benefits come from Power Integrations' own patents.

**MR. WARREN:**   Thank you, Mr. Bohannon.

I will pass the witness.

**THE COURT:**   All right.   Thank you.

Cross?

**MR. SUDER:**   Your Honor, may I hand the witness a binder?

**THE COURT:**   All right.

### CROSS-EXAMINATION

BY MR. SUDER:

**Q.**   Mr. Bohannon, good morning.

**A.**   Good morning.

**Q.**   My name is John Suder.   We've never met, have we?

**A.**    No.

**Q.**    In fact, we didn't take your deposition, did we?

**A.**    There was no deposition.

**Q.**    We did not take your deposition, sir; correct?

**A.**    You did not take my deposition, correct.

**Q.**    So this is the first time I had a chance to hear what you were going to say; correct?

**A.**    First time you've heard my direct testimony, yes.

**Q.**    Yes.  And, sir, but you did produce a couple of reports in this case, didn't you?

**A.**    Yes, I did.  I did several reports.

**Q.**    Yes.  One on noninfringement and one on validity?

**A.**    Yes.  I opined on validity and I opined on noninfringement.

**Q.**    Yes.  And, sir, you know, under Rule 26 of the federal rules of procedure, the requirements that you have to give when you provide a report as an expert witness in a case; right?

**A.**    I'm not familiar with whatever rule you just discussed.

**Q.**    Well, you've been an expert witness before, haven't you?

**A.**    Yes, I have.

**Q.**    In a lot of cases, haven't you?

**A.**    Yes, I have.

**Q.**    And you know under the rules you're required to tell me everything you considered; right?

**A.**    Well, I know that I have to list the documents that I've

considered when I do a report.

Q.   Who you talked to; right?

A.   I'm waiting for a question.

Q.   You had to tell me who you talked to.

You have to tell me everything you've done to support the opinions in your reports; right?

A.   Are you listing -- in each and every one of those reports, I listed documents considered.

Q.   Okay.  And you have to give me your resume; right?

A.   My resume was attached.

Q.   Okay.  And I take it everything you said in your reports was truthful?

A.   Yes, it is.

Q.   I was allowed to rely on what you say in your report; right?

A.   Yes, that's correct.

Q.   Now, sir, you told the jury in response to questions from -- by the way, you prepared for your testimony here today, didn't you?

A.   We prepared once upon a time, but then you got all the slides thrown out, so today was completely unrehearsed.

Q.   But you had all the questions written out, didn't you?

And you went through the questions and your answers with counsel before you testified, didn't you?

A.   No, we didn't, this morning.  We may have practiced for a

situation that never happened because you got all the slides thrown out.  So everything was unrehearsed.

Q.  Now, sir, you told the jury that you had experience -- let me make sure I wrote it down right -- in Patent Office proceedings?

A.  That's correct.

Q.  And what are those?

A.  Well, I've applied my own patents and I've worked through Office actions with all the attorneys that worked on the prosecution of the patents.  That's the Patent Office proceedings.

Q.  But you didn't tell -- but you also worked with lawyers in IPR proceedings, didn't you?

A.  Yes, I have.

Q.  Tell the jury what an IPR proceeding is.

A.  An IPR is called an interparty review, so if somebody disputes a patent.  So once you get a patent, whether an opposing party of whatever case it is wants to take issue with your patent claims, they're able to file what's called an interparty review at the Patent Office.

And then the Patent Office goes back to the patent owner and says, all right, these people are petitioning against your patent and you have to prepare a response.

Or you can be the petitioner in a case, in which case you would then petition the patent owner and tell the patent owner

that they need to respond to your questions of validity.

**Q.** Mr. Bohannon, an IPR proceeding is a way to challenge the validity of a patent, isn't it?

**A.** Well, I worked both sides of that, so I --

**Q.** That's the proceeding, sir. Just answer my question, please.

An IPR proceeding is a way to challenge the validity of a patent; correct?

**A.** It's a way to challenge or to defend.

**Q.** The validity of the patent is at issue in those cases, isn't it?

**A.** The validity of the patent is at issue, and you can either defend or petition for it.

**Q.** And you, in fact, have worked on lots of those types of cases, haven't you?

**A.** Yes, I have.

**Q.** In fact, you've worked with Fish & Richardson.

They've used you as an expert to challenge and defend the validity of patents, haven't they?

**A.** Yes, I think we've both challenged and defended invalidity.

**Q.** Okay. And you've also worked with Power Integrations in proceedings before the Patent Office?

**MR. WARREN:** Objection, Your Honor. This is exactly what we --

THE COURT:  Overruled.

You can answer that question.

BY MR. SUDER:

Q.   You've worked with Power Integrations regarding the validity of patents in proceedings before the Patent Office?

A.   I've worked --

Q.   Yes or no, sir.

A.   So Power Integrations' attorneys are Fish & Richardson. So I worked for Power Integrations' attorney Fish & Richardson.

Q.   In a case for Power Integrations; correct?

A.   For their attorneys.  So they hire the attorneys.  The attorneys hire me.  I am not hired by Power Integrations.

Q.   Who is the client?

A.   Power Integrations was the client.

Q.   Thank you.

Now, sir, so you've worked with Mr. Scherkenbach before?

A.   No, I have not.

Q.   Worked with Mr. Warren?

A.   Yes, I have.

Q.   Mr. Headley?

A.   No, I have not.

Q.   How about Mr. Warden back there?

A.   No, I have not.

Q.   How about Mr. Thornburgh, have you worked with him?

A.   No, I have not.

Q.   You've worked with other lawyers at Fish & Richardson; right?

A.   Yes, I have.

Q.   And so they know about you; right?

They know about your qualifications and experience?

A.   Yes.

Q.   Okay.  You were here for opening statements; right?

A.   Yes.

Q.   Remember the slide they put on about you?

A.   Yes.

Q.   Okay.  Is this correct?

A.   I have a B.A. in mathematics.

Q.   Oh, so you do not have a B.S. in physics and mathematics? That's not true?

A.   I have a B.A. in mathematics.

Q.   So this is not true, sir, is it?

A.   I'm telling you right now I have a B.A. in mathematics.

Q.   Can you also just answer my question?

That would make this an incorrect statement; correct?

A.   Yeah, that's incorrect.

Q.   So do you know why Mr. Scherkenbach would tell the jury in opening statement that you had a B.S. in physics and mathematics when that wasn't true?

A.   Excuse me?

Q.   Do you know why Mr. Scherkenbach would tell this jury --

put this slide up in opening statement and misrepresent your qualifications?  Do you know why he would do that?

A.   I don't know.  I didn't prepare the slide.  I can't take responsibility for it.

Q.   So I take it, sir, after Mr. Scherkenbach showed this to the jury, you went back and said, hey, Frank, this isn't right, we need to fix this?  Did you do that?

A.   I did not see this slide before.  I was sitting there.  I cannot see the slides.  My vision is not good enough for me to see that far.  I did not see that.  I was not aware of that.

Q.   The point is, sir, you do not have a bachelor of science in anything, do you?

A.   I have a B.A. degree in mathematics.

Q.   A B.A. is a bachelor of arts; correct?

A.   That's correct.

Q.   Thank you, sir.

Now, you're not an engineer; correct?

A.   That's correct.

Q.   You do not have a bachelor of science?

A.   That's correct.

Q.   You do not have a master's?

A.   That's correct.

Q.   You do not have a Ph.D.?

A.   That's correct.

Q.   And I believe you told the jury yesterday that you worked

as an electrical engineer?

A.   That's correct.

Q.   How can you work as an electrical engineer if you don't have a degree in electrical engineering?

A.   Because I have a B.A. in mathematics and 40-plus years of experience.  I've worked as an engineer for many companies on many different projects.

Q.   Now, sir, in your resume you list specific areas of expertise, don't you?

A.   Yes, I do.

Q.   And you list the first one, automated test equipment and electronics for IC test?

A.   That's correct.

Q.   And the other specific area of interest is LCD, plasma, CRT, and large-screen display equipment?

A.   That's correct.

Q.   Okay.  You don't list power electronics as one of your specific areas of expertise, do you?

A.   Well, the --

Q.   Do you, sir?

A.   It's subsumed in the stuff that you read.

Q.   Do you have any patents on power electronics?

A.   I have patents on products that use power circuits.

Q.   Anything electrical uses circuits, doesn't it?

A.   That's correct.

**Q.** Do you have any patents on the design of power electronics and how power electronics are designed to work?

**A.** Not specifically, but my patents include circuits.

**Q.** Have you written any articles in journals or taught any classes about how power electronics are designed to work? Have you done that, sir?

**A.** I have taught classes on how to maintain and operate equipment that has power supplies and power electronics.

**Q.** Have you taught students how you convert AC from a voltage to DC in a power electronics device?

**A.** No. The levels that I was working was higher level, so we're talking about how to operate complex electrical equipment. It was assumed that everyone knew how to do the basic things.

**Q.** Now, you also knew, Mr. Bohannon, that you're required to tell me all the cases you've worked on, right, in the last four years?

**A.** Last how many years?

**Q.** Last four years.

**A.** Four years, yes. I think I've listed them.

**Q.** And, sir, when you told Mr. Warren that you did Patent Office proceedings in arbitration, that's not entirely correct, is it?

You also did lots of litigation, haven't you?

**A.** I'm not sure which cases you're referring to.

**Q.**   Well, you did a case for Cascade Projection versus Epson?

**A.**   That's true.

**Q.**   That was a lawsuit, wasn't it?

**A.**   That was an IPR proceeding.  It was -- lawsuits were filed and IPRs were thrashed through.  I don't think it ever went to trial.  I think they're still waiting for an appeal in a Patent Office proceedings.

**Q.**   How about Suppress versus Sharp and versus Samsung regarding LCD displays?  You worked on that lawsuit?

**A.**   So that was a similar situation, where the lawsuit was issued and everybody went into IPRs.  And I was involved in the IPR proceedings, but so far it hasn't gone to trial.

**Q.**   Is this your first case where you're an expert in a trial?

**A.**   I've been an expert in trials before.  Usually they've settled.  This is my first time testifying in court.

**Q.**   So if you were an expert in a case, whether it went to trial or not, why didn't you tell that to the jury on Wednesday, that other than patent proceedings and arbitration, that you were experts in litigation?

Did you not think I would look at your report and confirm whether what you were telling the jury was true?

        **MR. WARREN:**  Objection, Your Honor.  This is getting argumentative.

        **THE COURT:**  Sustained.

        Rephrase the question.

BY MR. SUDER:

Q.   Sir, I counted 15 litigation lawsuits that you listed in your resume.  Would that be correct?

A.   I don't know.  I'd have to look at it again.  But probably something like that.

Q.   Okay.  Now, Mr. Bohannon, you also had to tell me what you looked at, right, in coming to your opinions; correct?

A.   What do you mean, what I looked at?

Q.   All the materials that you considered?

A.   Yes, the materials that I considered was listed in the expert report.

Q.   That's right.

     And one of them was Opticurrent's infringement contentions back in June of 2016; right?

A.   That's correct.

Q.   So in June of 2016, right after the lawsuit was filed, Opticurrent disclosed exactly why it believed Power Integrations infringed; correct?

A.   I suppose.

Q.   That's right.

     Your report is dated July 30th, 2018; right?

A.   I suppose.  You have it in your hands.

Q.   Yes.  So you knew -- or Power Integrations knew for two years Opticurrent's theory of the case, but you didn't issue your report until two years later, disagreeing with Dr. Zane on

just about everything; right?

MR. WARREN:  Objection, Your Honor.  This is getting argumentative, and it's completely irrelevant.

THE COURT:  Sustained.

BY MR. SUDER:

Q.   My point is, Mr. Bohannon, you were hired to tell this jury that Dr. Zane is wrong.  That's your job, wasn't it?

A.   When I was hired, my first job was to do the validity analysis.

Q.   Okay.  And you're not giving any validity analysis to this jury, are you?

A.   I am not.

Q.   And on infringement, your job was to tell this jury or any jury at the time that whatever Dr. Zane said, he's wrong; right?

A.   Well, my job was to analyze the documents, to analyze the patent, the '623, the '323.  Analyzed all of Power Integrations' data sheets, schematics.

I analyzed a large amount of information and wrote a report that contains my opinion that the parts do not infringe because they have a fourth pin connected to a power supply.

Q.   Now, and you were hired by Fish & Richardson, weren't you?

A.   I was hired by Fish & Richardson, yes.

Q.   And at the time Fish & Richardson was defending this case, and you knew exactly what they wanted you to say, didn't you?

**A.**   How can I know what they want me to say until I read the documents?  I read all the documents first.  I read the complaint.  I read the infringement contentions.  I wrote a validity report.  And I read the modified infringement contentions.

I read those, then I read the data sheets, and I read all the other documents that were attached.  Then I produced a report that listed all the documents I considered.

**Q.**   Did they ask you if you agreed with Dr. Zane?

Is that what they were asking you to do?

**A.**   Nobody asked me to do something like that.

**Q.**   You knew, sir -- the point is, you knew what you were hired to do.  You were hired to disagree with Dr. Zane.  Simple yes or no.

**A.**   I was hired to read the information -- to read the infringement --

**THE COURT:**   Answer the question first, then I'll let you explain.  Yes or no, and then you can explain.

**THE WITNESS:**   Say the question again, please.

**BY MR. SUDER:**

**Q.**   You were hired by Fish & Richardson to say, in your opinion, Dr. Zane is wrong?

**A.**   No.

**Q.**   Now, in your list of what you reviewed, Mr. Bohannon -- first of all, let me ask you this.

You sat here and listened to Mr. Kung testify; right?

A.   Yes, I did.

Q.   You listened to Dr. Zane testify?

A.   Yes, I did.

Q.   And you never sat down with Mr. Kung, before you wrote your report, to get his views on whether he thought there was infringement of the patent, did you?

A.   Well, if you look at my expert report, you'll see that I included some statements from his deposition.  I did not attend his deposition.  I did not meet with Mr. Kung before.  But I read his deposition transcript and extracted some of that and put it into my expert report.

Q.   Did you meet with any engineer at Power Integrations?

A.   I have never met with any engineers at Power Integrations. I met with some -- I met with, I think, the president of the company, the only person I can remember meeting with.

Q.   So, just to be clear, you're not an engineer; correct?

A.   I consider myself an engineer.  I've done many engineering projects.

Q.   But you did not take the time -- you know Power Integrations has lots of engineers; right?

A.   I'm not aware of how many engineers they have.

Q.   They have a lot though, don't they?

A.   I'll take it from you.

Q.   Wouldn't it be prudent on your part, given that you don't

have any formal education in power electronics, to sit down with an engineer at Power Integrations -- take the patent, sit; down with them, and say help me understand what you think so we can come out with an opinion together?

Why didn't you do that, sir?

A.   I have an education in math and physics and over 40 years of experience.  I've worked with companies that do power integration -- power integrated circuits.  I was the founder of a company that made integrated circuits used for power supplies.

I am well aware of the technology, and it wasn't considered necessary to talk to anyone else.  I formed the opinions on my own.

Q.   Now, sir, all the power to start the chip comes from the drain pin, doesn't it?

A.   I'm not sure I can agree with that.

Q.   You heard Mr. Kung testify.  You were in court, you heard him say that the function of the drain pin is the connection to the power supply for the chip.  You heard him say that; right?

A.   I don't know if you're characterizing that properly.

Q.   That's what he said, isn't it?

You heard him say that?

A.   I'm not going to necessarily take your word.

Do you have the transcript that you want to go over?

Q.   And, sir, you know that, in the '623 patent, the

equivalent of the drain pin in the accused products is the third terminal; right?

A.   I'm not sure I would characterize it like that.

Q.   This would be the drain pin in the accused products; right?

MR. WARREN:   Objection, Your Honor.  I'd request counsel not put up the board right in front of us.

MR. SUDER:   I'm sorry -- so sorry.

THE COURT:   You can use the easel if you want.

MR. SUDER:   I'm sorry.

THE COURT:   And you should describe for the record, what is this exhibit?

BY MR. SUDER:

Q.   This is Figure 2 of the patent that you studied; right?

A.   It appears to be so.

Q.   And what -- the patent, 117, the third terminal is what Dr. Zane says is the drain pin in the accused products; isn't it?

A.   It perhaps could be.

Q.   Now let me show you -- make sure I've got the right one -- Exhibit 11, sir.

And this is the TinySwitch-LT III data sheet.  You reviewed these; right?

A.   Yes, I did.

Q.   Okay.  And it says right there "self-biased, no bias

winding or bias components"; right?

A.   The data sheet discusses that.

Q.   It doesn't discuss it.  It says it, doesn't it, sir?

A.   Those words are there, that's right.

Q.   That's right.  Because Power Integrations does not sell any products with a bias winding, do they?

A.   Power Integrations sells the chips, to my knowledge.

     MR. SUDER:  Your Honor, I would ask for a yes or no to my questions --

     THE COURT:  Answer yes or no, and then you can explain.  All right?

     THE WITNESS:  Yes.  Sorry.

BY MR. SUDER:

Q.   Power Integrations does not sell any of the accused products with a bias winding, do they?

A.   Not to my knowledge.

Q.   And, sir, while we're at it, on Exhibit 18, which is the LinkZero-AX, Mr. Warren was asking you about these.

     Show the jury where the bias winding is in there.

A.   So the words are hard to read.  I don't think it's in focus.  But, actually, somewhere in this data sheet --

Q.   That's not my question, sir.

     You went through these schematics and were saying there's a bias winding.  Show the jury where on this exhibit there's a bias winding.

**A.** Well, there is no bias winding in that particular schematic that you're showing, but the words are there in the data sheet that say "bias winding or a direct line to a power rail."

**Q.** And the LinkZero device is self-biased, isn't it?

It doesn't have bias winding, does it?

**A.** The chip does not have a bias winding, but you can connect it to the bias winding --

**MR. SUDER:** Your Honor, I'd ask for a yes or no to my question.

**THE COURT:** Again, you can answer yes or no and then explain.

**THE WITNESS:** Sorry, Your Honor.

Say it again, please.

**BY MR. SUDER:**

**Q.** The LinkZero does not even have a bias winding capability, does it?

**A.** The LinkZero can use a bias winding.

**MR. SUDER:** Your Honor, again, I believe my question calls for a yes or no answer.

**THE COURT:** Start off with a yes or no, then you can answer. Then you can explain.

**THE WITNESS:** Sorry, your Honor.

**BY MR. SUDER:**

**Q.** The LinkZero device is self-biased through the drain pin,

isn't it?

**A.**   That's what it says on that part, but the schematic also says that it can use a bias winding or a direct connection to a power supply rail in non-isolated conditions.

**Q.**   Now, we'll get back to these, Mr. Bohannon.

In your analysis, you looked at Mr. Congdon's invention drawing; right?

**A.**   I saw it.

**Q.**   You saw it.  Did you study it?

**A.**   Yes, I did.

**Q.**   Okay.  And when you studied it, then you knew that Mr. Congdon called for -- showed a capacitor there; right?

**A.**   This is a drawing that looks like the '323 patent, not the '623 patent.

**Q.**   Do you know, sir, when the '323 patent was issued?

**A.**   I think you can put it up and show that.

**Q.**   We looked at it.  You said you considered it; right?

**A.**   I read it.

**Q.**   You read it, sir.  And then if you read it, you would know it was issued in 1992; right?

**A.**   I didn't memorize it.  Why don't you put it on the screen.

**Q.**   Okay.  The '323 was in 1992, wasn't it?

**A.**   I can't read that.

**Q.**   How's that, sir?  Is that better?

**A.**   That's the issue date, 1992, yes.

Q.   Okay.  And what's the date of this conception drawing?

A.   So this date here, it looks like either 23 or 28 -- I can't tell -- of February.

Q.   What's the year?

A.   1997.

But there's writing over there that says '95, and there's writing on it that says Q- -- breadboard layout of QBAR switch.

Q.   If this was done after the '323 patent issued, how can you tell this jury that this has to do with the '323 patent?

A.   This looks like the '323 patent.  In fact, it looks like the QBAR product, which was covered by the '323 patent, allegedly.

Q.   Mr. Bohannon, you sat here and listened to Mr. Congdon, didn't you?

A.   I was in court while he testified, yes.

Q.   Yeah.  And he testified that this is the -- came from the notebook in 1997, and that's his invention of the '623.

You heard him say that; right?

A.   I don't have the transcript in front of me.  I can't remember precisely what he said.

Q.   So you don't know if this is even his invention drawing? Is that what you're telling this jury?

A.   Excuse me.  What's the question?

Q.   Do you understand that this is the invention drawing for the '623 patent?  Yes or no.

A.    I'm not sure what it's showing other than it says QBAR simple breadboard circuit of simple breadboard --

THE COURT:  Again, answer the question --

THE WITNESS:  Oh, sorry.

THE COURT:  Please answer the question yes or no, and then you can explain.

THE WITNESS:  All right, Your Honor.

THE COURT:  Ask it again, Counsel.

BY MR. SUDER:

Q.    Mr. Bohannon, do you -- you can't even tell this jury if this is the invention drawing of the '623 patent?

A.    I'm not sure how I'm supposed to answer that.

THE COURT:  As you sit here right now, looking at that screen, do you have an understanding as to whether or not that's the invention drawing for the '623 patent?  Yes or no.

MR. WARREN:  Your Honor --

THE COURT:  No, he can answer the question, then he can explain.

THE WITNESS:  No.

THE COURT:  No.  Okay.  There's your answer.

BY MR. SUDER:

Q.    Mr. Congdon, you knew that there was a breadboard, but you didn't look at it, did you?

A.    I'm not Mr. Congdon.

Q.    I'm sorry, Mr. Bohannon.  You're right.  I apologize.  No

you're not.

You did not look at the breadboard as part of your analysis, did you?

**A.**   It was not provided.  I did not look at it.

**Q.**   And did you bother to ask your lawyers, hey, I looked at this drawing, though I don't know what it is, and I saw pictures of a breadboard, but I'd like you to get me the original so I can examine it?  Did you do that?

**A.**   No, I did not.

**Q.**   Wouldn't you want to know if Mr. Congdon had made a prototype of his invention that you'd want to look at and study it so you can fully understand the scope of your charge here?

Was it not that important to you?

**A.**   I don't know which question I'm supposed to answer.

**Q.**   The first one, sir.

**A.**   Say it again, please.

**Q.**   Wouldn't it be important for you, as part of your reports, to thoroughly investigate the matter and review the breadboard so you can fully understand the scope of the patent?

**A.**   I'm looking for something I can answer yes or no to.

        **THE COURT:**  The question's:  Would it have been important to you to look at the breadboard?

        **THE WITNESS:**  Well, I was considering the '623 patent, Your Honor, and I'm not sure what this has in relation to the '623 patent.

BY MR. SUDER:

Q.   Do you even know if this is the breadboard?

You heard Mr. Congdon testify that this is the prototype that he built for the '623 invention.  You heard that, didn't you?

A.   I heard his testimony.  I don't have the transcript of it. I heard his testimony, yes.

Q.   Sir, have you ever built something like this?

A.   I have built all kinds of stuff.  I've soldered stuff together for people in the middle of the night.

Q.   You know, sir, this is a capacitor, what I'm pointing to that's orange?

A.   I'd have to see it in front of me before I could verify that.

        MR. SUDER:  May I?

        THE COURT:  Yeah, you may approach.

        THE WITNESS:  That's probably a capacitor.

BY MR. SUDER:

Q.   Now, going back to this drawing in February of 1997, you did look at this drawing, though, as part of your report, didn't you?

A.   So I think that this drawing was used in the validity arguments.

Q.   My question was:  You looked at this document in connection with your reports in this case?

**A.**   Yes, I looked at this in connection with both reports.

**Q.**   What is 1 with the squiggly F?

**A.**   I can't see it.  So that's that says 1 microfarad.

**Q.**   And that's a measurement for a capacitor, isn't it?

**A.**   Those are measurements for capacitance.

**Q.**   Yes.  And how long will a 1 microfarad capacitor hold its charge?

**A.**   So if you're talking about Power Integrations' products, I can answer you.  I don't know if I can answer you here.  If it's just, like, sitting there in isolation, it could probably hold it until the electrolyte degraded.

**Q.**   How long do they hold in Power Integrations' products?
     Less than one-thousandths of a second, correct?

**A.**   So in Power Integrations' products, a good example is, if you look at the LinkZero-AX data sheet, it talks about how the capacitor -- the bypass capacitor has to hold up for 160 cycles.

**Q.**   That's less -- you make it sounds like 160 is a lot.  It's less than one one-thousandth of a second, isn't it?

**A.**   If you -- if each -- if each cycle is --

**Q.**   Yes or no, the total of the charge is less than one one-thousandth of a second, isn't it?

**A.**   I don't want to assume your calculations are correct.  I will give you my own calculations if you don't mind.

**Q.**   I'm just asking you to answer my question, sir.

Is the capacitor that's used in the accused products, does it hold a charge for more than one one-thousandth of a second? Yes or no.

A.   I can't agree with you.

Q.   So the answer would be no then?

A.   No, the answer would be, if I look at, like, the LinkZero-AX data sheet, where it says it holds the charge -- the capacitor has to hold up for at least 160 skipped cycles, each cycle is on the order of, like, 6 microseconds.

So 160 times 6, then that is just for that voltage range from 5.85 to 4.85.  So it will hold that one-volt charge that will power the chip through that one-volt range for over 160 skipped cycles.  That's pretty significant, in my opinion.

Q.   Mr. Bohannon, the capacitor in the accused products, as made by Power Integrations, that we're talking about, is not connected to anything but the chip itself; correct?

A.   I'm not sure I understand what you mean.

Q.   The product that is designed to be built, like, for example, the TinySwitch-III, that capacitor in a self-biased situation is only connected to the chip.  It's not connected to anything else external, is it?

A.   I don't know if I understand your question.

Can you show the schematic to me --

Q.   Sure.

A.   -- and maybe I can explain it to you.

**Q.** I just want you to answer my question.

This capacitor here, it's connected to the pin up here -- well, in the accused product, it will be connected to the bypass pin and also connected to the source pin; right?

**A.** Well, it shows it going to what I would call the ground or the negative.

**Q.** It goes to ground. That's the second terminal, that's the source pin, isn't it?

**A.** That's the way it's --

**Q.** Yes or no, sir. That's the source pin?

**A.** You are not pointing at the source pin, sir.

**Q.** What's that dot right there?

**A.** That dot shows it connected to the ground plane or the minus rail.

**Q.** And that rail is where the ground goes through the second terminal, doesn't it?

**A.** So I can agree with you that that's the ground rail. And the source pin is also connected to that.

**Q.** My point is, sir, the capacitor in this diagram, as it's designed to be built, is only connected to the chip.

It's connected to the pin and then it's connected to the ground rail of the source pin; correct?

**A.** So I don't like to answer correct -- directly. I would like to say that the bypass capacitor is connected between the ground plane and the chip so that it can hold the charge.

THE COURT:  That wasn't the question.

BY MR. SUDER:

Q.   It's not connected to anything external to the chip, is it?

A.   No.  It's connected to other things external to the chip.

Q.   Now, sir, the drain pin -- which is up here, isn't it?
That's the drain pin; right?

A.   Yes.  It says drain.

Q.   And it goes through the voltage regulator; correct?

A.   Yes.  That's what's shown on the block diagram.

Q.   And it says the drain pin is the power MOSFET chip
connection, it provides internal operating power for both
startup and steady-state operation.

The power for the chip comes through the drain pin,
doesn't it?

A.   Comes through the drain pin from the input of the power
supply.

Q.   Yes.

THE COURT:  State for the record what you're reading
from.

MR. SUDER:  Oh, I'm sorry, Your Honor.  It is
Exhibit 14.

BY MR. SUDER:

Q.   Now, Mr. Bohannon, I just want to make sure we understand
something.

Dr. Zane refers to the capacitor as a filter, and you disagree?

A.   Yes, I do.

Q.   Okay.   And you heard Mr. Congdon refer to a capacitor as a filter, and you disagree?

A.   I'm not sure what context I heard Dr. -- or Mr. Congdon say what he said.

Q.   And, sir, you heard Mr. Kung, on Wednesday, say that a capacitor operates as a filter.

Do you disagree with Mr. Kung?

A.   I think you're mischaracterizing his testimony.

Q.   Okay.   So -- but, so if -- but, in your testimony, so we're clear, a capacitor is not a filter?

A.   A capacitor can be a filter.   In some circumstances it's also a power supply.

Q.   But in this case it's not a filter?

A.   In this case the issue here is whether or not the bypass capacitor is a power supply, which it is.

Q.   But my point is, Dr. Zane said it's a filter and you disagree?

A.   I disagree --

Q.   Right?

A.   I disagree with Dr. Zane's expert report.

Q.   Yes.

Now, sir, I have a question for you.   And let's look at

Exhibit Number 14.  I'm going to go to page 8 here.

I think Mr. Warren asked you about this figure; remember?

A.   Yes, I do.

Q.   Do you see this right here?

A.   Yes, I see.

Q.   That's a capacitor, isn't it?  C1; right?

A.   That's an input capacitor.

Q.   Is that a filter or is that a power supply?

A.   So those two capacitors on either side of the coil are what's called a pie filter.

Q.   Okay.  My question:  Are they a filter -- I take it to you they're a power supply?

A.   They are both.  They are storing energy.  Those are fairly significant.  I have to get closer to see it, actually.

Those are fairly large capacitors, so they're storing the input power.  And so they're performing a function similar to what Mr. Kung testified, where he said they're filtering and they're storing energy.  They are storing that input energy.

Q.   What about this one up here?  Is that a power supply?

THE COURT:  Why don't you state the number.

MR. SUDER:  Okay.  It is C9 on the top of the page.

BY MR. SUDER

Q.   Is that -- where my finger is, is that a power supply?

A.   It's hard to read the capacitance in it, but all capacitors are both power supplies and filters at times,

depending upon how the circuit is designed.

**Q.**   Is this one, C4, a filter or a power supply?

**A.**   Again, it's hard to see the exact capacitance there.  I can't really read your diagram, but --

> **THE COURT:**  Why don't you blow it up.

> **MR. SUDER:**  Sorry.

> **THE WITNESS:**  Okay.  Now I can see that.

That's 10 nanofarads.  That's fairly small.  You know, it will hold 10 nanofarads of electrical energy, but it also will perform a filtering function.

**BY MR. SUDER:**

**Q.**   Again, just so we're clear, is -- the C5, is that a power supply?

**A.**   Well, all capacitors will store electrical energy.  That's their function.  But that one's probably doing a filtering function as well.  The C4 looks like it's part of the clamp circuit used to damp down any surges or spikes.

**Q.**   Now let's look at this one down here that you talked about, the C7.  You say that's not a filter, that's a power supply there?

**A.**   That is providing power to the chip to operate.

**Q.**   So it's not a filter?  That's why you disagree with Dr. Zane?

**A.**   It probably does some filtering function, but its main purpose is as a power supply for the chip.  That's clear.

**Q.** And would you expect Power Integrations to tell its customers and the people that review its data sheets what these parts are?

**A.** What do you mean by "are"?

**Q.** What they are. That this chip here, whether it's a filter or a power supply, would you expect Power Integrations to disclose and characterize these?

Because they would know what they are, right?

**A.** Well, some of them, if you read the data sheet carefully, they will describe -- like, the ones that you were talking about, C4, R2, and those diodes and capacitors around that resistor there, I think they described that as a clamp.

The other ones that you talk about, I think they describe as either power or filtering. They clearly describe the bypass capacitor as a power supply for the chip.

**Q.** It doesn't describe it as a filter?

**A.** Describes it as a power supply for the chip.

**Q.** So it does not describe it as a filter, then.

**A.** I don't think so. If there's a part in the data sheet where you want to point me to, I'll go with you.

**Q.** Let's start with on page 10 of Exhibit 14 where it says "Y capacitor." Do you know what a Y capacitor is, sir?

**A.** So it's talking about one of the capacitors that are used for a filter? So it says right there: Such a placement will route the high in magnitude common mode surge currents away

from the TinySwitch.  Then it talks about the input pi filter which we were talking about earlier.

Q.    It says:  The placement of the Y capacitor should be directly from the primary input filter capacitor positive terminal.

It's telling you that the capacitor is a filter in this situation, isn't it?

A.    I see the words there, yes.

Q.    You'd agree with me, since you're skilled in the art and you've done this and you know all this, they're telling the world that this capacitor is a filter, aren't they?

A.    It also stores energy.

Q.    "Yes" or "no," sir?

A.    They're telling it's a filter, yes.

Q.    If we go back to the picture, you know that this one up here, the C5, 2.2 nanofarad, they're saying -- they're calling that a filter.  Right?

A.    Probably.

Q.    Okay.  Now, let's go to the C7.  Do you want to look up -- did you personally look up how Power Integrations, what they call this C7 in this diagram, in the data sheet?  Did you do that?

A.    Yes, I did.

Q.    And what did it say about it?

A.    I'm sure you're going to show me here.

Q.   I'm going to ask you first.

A.   That's the power supply for the chip.  It's a bypass filter.  Or the --

Q.   Bypass filter?

A.   Excuse me.  It's the bypass capacitor.

Q.   Let's go to page 9 of this.  Says, over Voltage Protection.  Read along with me:  In addition to an internal filter, the bypass pin pin capacitor forms an external filter providing noise immunity.

Power Integrations in their data sheet, sir, calls what you say is a power supply, they call it a filter, don't they?

A.   Yes, in that part of the data sheet you were reading from.  But in other parts it describes it as a power supply for the chip.

Q.   Tell me where they use the words that this -- wait a minute.

Did you tell Power Integrations when you were studying this and doing the report that "I'm going to give an opinion that's completely contrary to what is said in the data sheets"?

MR. WARREN:  Objection, Your Honor.  Argumentative.

THE COURT:  Sustained.

BY MR. SUDER:

Q.   Did you even read this paragraph when you did your report?  Or is this the first time you're seeing it?

A.   No, I read the data sheet in its entirety.

Q.   Then how can you tell this jury that it's a power supply when the data sheet calls it an internal filter that can also form an external filter?  How can you do that, sir?

A.   Because it's also a power supply.  It says that in several other places in the data sheet.

Q.   I'll tell you, sir.  I went through the data sheet and I looked for anywhere where it said that the bypass capacitor is a power supply, and I couldn't find it.  Can you point to this document, or any document, and show the jury where it says that it's not a filter, it's a power supply?  Go right ahead, sir.

        THE COURT:  Why don't you give him a copy of the documents so he can look at it.

        MR. SUDER:  It's in his book, Your Honor.

        THE COURT:  Why don't you go ahead and look at it. Which is the exhibit number?

BY MR. SUDER:

Q.   Exhibit 14, sir.  Right in your book.  I want you to show the jury where it says that the bypass pin capacitor is a power supply and not a filter.

A.   So if you just look at page 2 where it talks about the bypass multifunction BP/M where it says:  This pin has multiple functions.  Number one, it is the connection point for an external bypass capacitor for the internally-generated 5.85 voltage supply.

     So right there it's saying it's a connection point that

powers the chip.

Q.   Okay.  Sir, and what's it say?  It says it's the bypass capacitor for the internally-generated voltage, doesn't it?

A.   It says it's a bypass capacitor for the internally-generated 5.85-volt supply.

Q.   And where is that 5.85 volt supply from?

A.   If you go to -- since I have the data sheet -- so if you go over and if you look on page 6 you can see those -- on Figure 11.  You can see how the -- when you plug the power supply into the wall, the DC input rises and the bypass capacitor gets charged.  Until the bypass capacitor is charged above its 5.85 volt threshold, the chip does not begin to function.

Q.   Mr. Bohannon, if you look on page 2 -- and this is a chart right here.  You see that the 5.85 volt regulator -- I'm pointing to it on the screen, sir -- is inside the chip, isn't it?  It's inside the chip, isn't it?

A.   Yes, it's inside the chip.

Q.   And it's getting its power from the drain pin, isn't it?

A.   It's connected to the drain pin.  Yes, it is.

Q.   That's where it gets its power from.  Yes?

A.   The drain pin needs to be connected to that DC input for any power to flow through the chip.

Q.   But the power that's coming into the chip is coming through that drain pin.

**A.**   Power comes through that drain pin initially to charge up the bypass capacitor, which is what's shown on that page I was just talking about.

**Q.**   So again, I don't see the words in what you showed me that the capacitor is a power supply in what you said.  Are there other places you wanted to point to where it tells the world that the capacitor is a power supply and not a filter?

**A.**   Give me a minute to look through here.  I think that the words I just read to you earlier are good.  And I think that the figure that I showed are good.  But --

So I'd like to point you to some parts on page 3.  And I think these were highlighted and passed around previously; or perhaps you had those slides thrown out.  But it's talking about the 5.8 regulator and the 6.4 volt shunt voltage clamp. And in there where it says the 5.85 volt regulator charges the bypass capacitor connected to the drain pin by drawing a voltage whenever it's off.  And it says that when the MOSFET is on, the device operates from the energy stored in the bypass capacitor.

Having the device operating from the energy stored in the bypass capacitor tells me directly that the bypass capacitor is the power supply for the chip.

And the other thing that you need to remember is that this chip has an on/off mode.  What on/off mode means is when it's not switching, there are many cases where it's operating purely

from the charge that's in there.  And so it will operate from the charge stored in the bypass capacitor until it hits that 4.9 volt lower threshold, when it shuts off.

This shows you directly that that bypass capacitor -- bypass capacitor is the power supply for the chip.  So turn to page 3.

Q.   That's how you read it, right, sir?  It doesn't say the capacitor is a power supply.  That's how you're interpreting it.

A.   But whenever it says that the device operates from the energy stored in the bypass capacitor, I don't think it could be any clearer than that.  The device operates from the energy stored in the bypass capacitor.

Should put those words up on the screen so everybody can see.  The bypass capacitor is the power supply.

Q.   Okay.

THE COURT:  Exhibit 14, page 3.

BY MR. SUDER:

Q.   Yes.  Now, going back to Exhibit 14, page 9, you'd agree with me that it says right here (indicating) that the bypass pin capacitor is both an internal filter and also can form an external filter.  Right?

A.   Give me a minute to study the section, please.

Q.   Sure.

A.   So the section that you're looking at is Over Voltage

Protection.  And I think what they're worried about in this section of the data sheet is that when you've got it connected to a bias winding, if there's surges that come through that bias winding -- because the bias winding is going to be attached to the BP/M pin.  If there's surges that come through the bias winding that would damage the chip, it wants to shut it down.

Q.   Mr. Bohannon, the data sheet calls the bypass pin capacitor a filter.  It calls the Y capacitor a filter.  In fact every time a filter is shown in those diagrams, they call it a filter.  Right?

A.   The data sheet discusses those capacitors.

Q.   As filters.

A.   It discusses those capacitors.

Q.   As filters.  "Yes," sir?

A.   It says -- the data sheet says "filter" in some places.

Q.   Now, Mr. Bohannon, in your report where you criticize -- you have a lot more criticisms of Dr. Zane, don't you?  Not just about this.

A.   I don't recall ever criticizing him personally.  I wrote a report.

Q.   Not personally.  His opinions.

A.   I don't recall ever criticizing him personally.  I wrote a report.

Q.   In fact, you also say in your report -- but you're not

telling the jury now -- that the products don't even have a voltage stabilizer.  Right?

A.   What was your question precisely, sir?

Q.   Did you abandon your opinion that there's no voltage stabilizer in these products?

A.   No, I did not.

Q.   Okay.  You didn't tell the jury about it in your direct, though, did you?

A.   No, I did not.

Q.   Okay.  And you also had opinions about the CMOS inverter and about interrupting.  Did you abandon that one, too?

A.   None of my opinions have been abandoned.  All of my opinions hold.  The opinions that I express in the expert report are as valid today as they were the day I wrote them.

Q.   Sir, I have a question for you.  In the TopSwitch-III product that you reviewed, do you see the capacitor?

        THE COURT:  What exhibit is this?

        MR. SUDER:  This is a demonstrative that was used by the other side.  It's DD207.

BY MR. SUDER:

Q.   This is one of the slides you saw, right, Mr. Bohannon?

A.   Excuse me.  I was taking a drink of water.

Q.   Sure.  I'm sorry.

A.   I think that --

Q.   Is that capacitor a power supply?

**A.**   I think that this was used in David Kung's direct testimony.  Am I correct?

**Q.**   I believe so.  You've reviewed the TopSwitch product, didn't you?

**A.**   I think I have.  I'm not sure if it was listed in my report or not.  I reviewed the accused products.

**Q.**   Let me ask you this, sir.  In DD207, is that a power supply?

**A.**   Can I see --

**Q.**   "Yes" or "no"?

**A.**   Can I see the whole data sheet you're pointing at?

**Q.**   No, I'm just asking you on this document.  If you don't know that's fine, too.  Tell the jury you don't know.

**A.**   It appears to be a similar bypass capacitor like all the other bypass capacitors.  I think this was described as the three-pin device that's covered by the '369 patent.  If you look at the '369 patent, I think it gives a clear description.

**Q.**   This is a power supply?

**A.**   If that's the bypass capacitor, it is a power supply powering the chip.

**Q.**   You're holding yourself out as the expert.  Not me.  Is this a power supply?  "Yes" or "no"?

**A.**   The pins are not labeled, but it appears to be a bypass -- it looks like a combination of a bypass/feedback pin.  And if this is the part that I'm thinking of, it's a bypass capacitor

used to power the chip.

Q.   Is it a power supply or a filter?

A.   It will provide power supply function if that was hooked to bias winding.  There's no bias winding there, so it's taking its feedback through the optocoupler.  So it probably needs to worry about any surges coming through that pin.  So if there's a potential for surge, then it would act as a filter.  But its main job is probably to provide power for the chip.

Q.   So your testimony is, it's a power supply.

A.   I think that's a power supply for the chip.

Q.   And just so we're clear, you're telling the jury that this bypass capacitor is not a filter, it's a power supply.

A.   No, that bypass capacitor there is absolutely the power supply for the chip.

        THE COURT:  What exhibit is that that you've just --

        MR. SUDER:  DD135.

        THE COURT:  DD -- 315.

        MR. SUDER:  I'm sorry.  315.  I apologize, Your Honor. DD315.

BY MR. SUDER:

Q.   Now, Mr. Bohannon, in reaching your opinions in this case, just to be clear, you did not confer with any engineer at Power Integrations about their views of the data sheet or the patent, did you?

A.   No, I did not.

Q.   And you are the only person here on behalf of Power Integrations that's telling this jury that Dr. Zane is wrong and that you don't -- and that Power Integrations doesn't infringe.  Right?

A.   No.  Power Integrations does not infringe.  I don't recall writing something that says Dr. Zane is wrong.  I wrote a report.  He wrote a report, I wrote a report.  People can decide.

Q.   But no one else from Power Integrations has come -- you haven't -- you've sat through this whole trial?

A.   Excuse me?

Q.   You've sat through this whole trial?

A.   I didn't hear the word you said.

Q.   I'm sorry.  You have sat through this whole trial?

A.   Yes.  I sat through the trial.

Q.   And you have not heard from anyone from Power Integrations that's giving the same opinions as you are, did you?

A.   Excuse me.  I think if you read David Kung's transcript you'll see that he calls the bypass capacitor a power supply, too.

Q.   He calls it -- he didn't read the patent, did he?

A.   I don't wish to characterize his -- if you want to get his transcripts out, we can go through it.

Q.   You never talked to Mr. Kung and shared views and traded notes so to speak, did you?

A.   You're asking me if I conferred with him before I wrote my opinion?  No, I did not.

MR. SUDER:  Excuse me one second, Your Honor.

Thank you, Mr. Bohannon.

That's all I have, Your Honor.

THE COURT:  All right.  Anything on redirect?

**REDIRECT EXAMINATION**

BY MR. WARREN:

Q.   Mr. Bohannon, you were here for David Kung's testimony weren't you?

A.   Yes, I was.

Q.   Is everything he said exactly consistent with the testimony that you've given?

A.   I think so.

Q.   Did you find it necessary in performing your analysis to consult with David Kung before you reached your conclusions?

A.   No, I did not.

Q.   Why not?

A.   It wasn't necessary.

Q.   And at the beginning of your testimony you were beat up a little bit, I think, about your formal education.  Do you recall that?

A.   Yes, I do.

Q.   In this field do you need a quote-unquote "formal education" to understand circuits and be an electrical

engineer?

**A.**   I don't think so.

**Q.**   Can you explain to the jury why not?

**A.**   Well, I've had over 40 years of experience.  I've worked with circuits for my entire life.  When I started out as a small child, my father was a radio engineer and I had to solder things together.  So circuits have always been a part of my career.

**Q.**   For your 40-year career, for the entire time, have other people hired you as an electrical engineer?

**A.**   Yes, they have.

**Q.**   And have you worked for those other people as an electrical engineer?

**A.**   Yes, I have.

**Q.**   So you were asked a lot of questions about whether or not you had ever seen any document that called the bypass capacitor a power supply.  Do you recall that?

**A.**   Yes, I do.

**Q.**   And I want to start with a document that you actually discussed on your direct testimony, the '190 patent.  The on/off control patent.  Do you recall that?

**A.**   Yes, I do.

**Q.**   Does this patent literally use the words "power supply" to describe the bypass capacitor?

**A.**   Yes, it does.

Q.   And this is Power Integrations -- you know, the purpose of a patent is to describe your invention?

A.   Yes.   That's correct.

Q.   And so when Power Integrations was describing its invention to the world in the public form of a patent, it used the exact words?   "Power supply"?

A.   Yes, it did.

Q.   Let's look at that.   Okay.   We're looking at column 4 of the patent.   And I've highlighted just lines 54 to 57.   Can you point out where this document literally uses the word "power supply" to describe the bypass capacitor?

A.   Yes.   On line 54 it reads regulation circuit -- which is referring to the chip itself.   So the regulation circuit power supply bypass capacitor -- and then it says 350, which is a call-out number to one of the figures -- is used to supply the power for the chip.

Q.   Why don't we look at that just so that we're all on the same page about what 350 is.   So let me zoom out first so everyone can see what the -- the full figure.   What is Figure 3 of the '190 patent showing?

A.   I think Figure 3 is showing one of the preferred embodiments.

Q.   And so if we zoom in on this rectangle here, I'm going to highlight 350.

So first what is U1?

**A.**   U1 is the chip.  It would be like the TinySwitch-III or the TinySwitch-LT or one of those associated accused products.

**Q.**   So we see the same configuration of four terminals.  Do you see that?

**A.**   Yes, we do.  Four terminals.

**Q.**   And so we have one terminal here (indicating), the bypass terminal?

**A.**   Yes.  Although it doesn't say "bypass terminal" there.  It probably does somewhere along the way.

**Q.**   So here this is connected to power supply bypass capacitor 350?

**A.**   Yes, it is.  That was the call out that that line of text I read referred to.  You can see the 240 as the regulation circuit and 350 as the bypass capacitor power supply.

**Q.**   So just so -- let me highlight that.  So 240 is the chip?

**A.**   Yup.

**Q.**   And 350 is the bypass capacitor?

**A.**   Yup.

**Q.**   So 240 and 350 are the numbers we're looking at.  Let's go back to the text.

So 350 is power supply bypass capacitor?

**A.**   Yes.  That's correct.  It says:  Power supply bypass capacitor 350 is used to supply power to operate the regulation circuit 240.

That's the power supply.

Q.   And 240 was the chip.

A.   240 was the chip.

Q.   So here we have a document that literally says that the bypass capacitor is the power supply for the chip.

A.   Yes, it does.  And it says it several other places in that patent description.

Q.   Okay.  So why don't we look at column 5, lines 29 to 31.

        MR. SUDER:  Excuse me, Your Honor.  This is beyond the scope of his report.  It's not disclosed in his report.  It's discussion in these references, so what's good for the goose --

     We would object.

        MR. WARREN:  This patent is discussed.  And the questioning on direct was:  You haven't seen any document anywhere that calls the bypass capacitor a power supply.

     He asked him to show him.

        THE COURT:  I'm going to allow some limited discussion as rebuttal.  But limited.

        MR. WARREN:  Sure.

BY MR. WARREN:

Q.   So I know there's multiple places.  We'll just look at one more.  One more.

A.   Okay.

Q.   Here again, do we see the patent describing in literal terms, using the word "power supply," that the bypass capacitor is the power supply for the chip?

**A.** Yes. It reads: Regulation power supply bypass capacitor 350 is coupled to and supplies power to regulation circuit 240.

**Q.** 240 is the chip?

**A.** 240 is the chip.

**Q.** Do all of the data sheets also discuss the bypass capacitor being the power supply?

**A.** Yes, they do.

**Q.** When the data sheet describes that the, quote, "device operates from the energy stored in the bypass capacitor." Is that describing the bypass capacitor as a power supply?

**A.** Yes, it does.

**Q.** Is there any other reasonable interpretation of that language?

**A.** No, there isn't.

**Q.** You were also asked some questions about the TinySwitch-LT data sheet. Do you recall that?

**A.** Yes.

**Q.** And Mr. Suder directed you to this language here where it says: Self-biased, no bias winding or bias components. Do you see that?

**A.** Yes, I do.

**Q.** Is the bias winding always optional?

**A.** Bias winding is always optional.

**Q.** If we look at the actual power supply diagram in this data sheet for an actual real world power supply, when Power

Integrations shows how to actually build one of these in a configuration in the real world, do they show a bias winding?

A.   Yes, they do.  It's clear in this figure.

Q.   And just for the record we're looking at page -- this is page 7 of the TinySwitch-III LT data sheet, which is TX-11.  Do you see that?

A.   Yes, I do.

Q.   Can you describe for the jury where the bias winding is?  I've highlighted it here.

A.   The bias winding is off to the right on the other side of the transformer.  So you can see it as a part of the secondary windings, perhaps.  It will be an extra coil around the secondary winding so it can pick up energy once it's been transferred from primary to secondary.  And it goes down through a diode and a resistor and then -- resistor which looks like R8 resistor, before it goes into the BP/M pin and the bypass capacitor.

Q.   In connection with the TinySwitch-III, you discussed this resistor here as being -- feeding current down to this point.  Do you recall that?

A.   Yes, I do.

Q.   Does this part work exactly the same way?

A.   Exactly the same way.

Q.   Now, you were also asked some questions about the LinkZero-AX data sheet.  Do you recall that?

**A.** Yes, I do.

**Q.** And just to remind everyone, Mr. Suder put up this figure and he asked you to show him the bias winding. Do you recall that?

**A.** Yes, I do.

**Q.** And you wanted to explain something. Now is your chance.

**A.** Well, you can see that on this figure here that there is a part of the circuit that directly touches the DC -- the positive DC rail. So this is showing how that bypass capacitor has a connection to the positive side of the DC output.

**Q.** So is this powering the chip directly from the output capacitor's energy?

**A.** That's what it looks like here.

**Q.** And so does this change the fact -- the fact that this particular diagram doesn't show a bias winding, does this change the fact that the drain pin will not always be the power supply or the source of power for the bypass capacitor?

**A.** Yes, it does.

**Q.** And in this configuration that we're looking at, where does the power come from that the chip runs off of?

**A.** Oh, the power is coming -- looks like it's coming from the positive rail, and it will go into the bypass capacitor as well.

**Q.** So when we look up here where that line is connected, these two dots here (indicating), what is that?

**A.**    That's the DC output, or the low voltage output, that would go to whatever product is being powered.

**Q.**    So these two terminals here would be connected, say, to your cell phone?

**A.**    Although I think they describe it going to some kind of an appliance in the data sheet.

**Q.**    Right.  So something like a washing machine?

**A.**    Yes, that's correct.

**Q.**    And so this is the same -- so the output here that would be powering the washing machine is fed back and also is what's powering the chip?

        **MR. SUDER:**  Objection, Your Honor.  This is leading.

        **THE COURT:**  Rephrase the question, please.

**BY MR. WARREN:**

**Q.**    Can you explain to the jury how this chip is powered?

**A.**    The circuit is showing a direct connection to the positive output rail of the input/output transfer element.  It's showing that the chip is connected to that positive output power supply rail.

**Q.**    And you kept mentioning the data sheet says that it can use a bias winding, the data sheet says you can use a bias winding.  And Mr. Suder wouldn't actually show you.  I want to zoom in here on this language.  This is from page 3.  And for the record we're looking at page 3 of Exhibit 18, the LinkZero data sheet.

Can you describe for us what is this language describing?

A.   Now, this is exactly the language I was referring to when he was questioning me.  So it says there that:  In addition, there's a shunt regulator that helps maintain the bypass pin at 6 and-a-half volts when current is provided to the bypass pin externally.

What this means is that it cuts off the drain so the drain -- no way has anything to do with powering the chip at this point when you're providing current to the bypass pin externally.  And it says that:  This facilitates powering the device externally through a resistor from the bias winding or power supply output in non-isolated designs.

The other circuit that you showed me was a non-isolated because there was no optocoupler between the chip and the output.  So this is showing how the device can be powered from bias winding or the actual power supply output.

Q.   Let me underline that.  So we have an "or" here.

A.   Right.

Q.   So it can be bias winding or the power supply output?

A.   That's correct.

Q.   And Mr. Suder chose to show you the figure that had the power supply output?

A.   That's correct.

Q.   But the data sheet expressly says that it can use a bias winding?

MR. SUDER:  Objection, Your Honor.  This is argumentative and leading.

THE COURT:  Sustained.

BY MR. WARREN:

Q.   Does the data sheet say expressly that you can use a bias winding?

A.   Yes, it does.

Q.   Does the LinkZero-AX use the bypass capacitor, a bias winding, or the external circuitry coupled to the output to power the chip?

A.   Yes, it does.

Q.   You were asked a lot of questions about whether or not you considered Mr. Congdon's drawing.  Do you recall that?

A.   Yes, I do.

Q.   In your opinions in your expert report did you consider Mr. Congdon's drawing?

A.   I think it's in the report, yes.

Q.   Did you render an opinion on whether or not you think this drawing has anything to do with the '623 patent?

A.   I think I did.

Q.   What's your opinion?

A.   That it does not.

MR. SUDER:  Objection, Your Honor.  Irrelevant.  That goes --

THE COURT:  Overruled.

**THE WITNESS:**  My opinion, it has nothing to do with the '623 patent.

**BY MR. WARREN:**

Q.   And you kept mentioning the language in the upper right-hand corner during your direct -- or, during your cross, and you weren't really able to explain it.

How did this language inform your opinion?

A.   This says quite clearly that the circuit of simple breadboard of QBAR, with an appended ™-- I guess QBAR is trying to be a trademark name.  So simple breadboard of QBAR switch that comes up for air, which was built and evaluated back in April 12, 1995.

So this tells me that it's more like the '323 patent. Which when the QBAR produced their product, and they actually passed around a data sheet, there was a marking on the bottom that said:  '323 patent covers this.

Not the '623, although there was some discussion about that.

Q.   So this language right here says that this circuit was actually developed in 1995?

A.   That's what it says.

Q.   And did Mr. Congdon testify anything about having come up with the '623 seven years before he filed his patent?

A.   Not to my recollection.

Q.   Now, QBAR switch, has there ever, to your knowledge, been

a QBAR switch that uses the '623 patent?

MR. SUDER: Objection, Your Honor. That would be outside the scope of his report.

THE COURT: Sustained.

BY MR. WARREN:

Q. In the materials that you reviewed in this case, did you render an opinion about whether or not this diagram shows the '623 patent invention?

A. I think so.

Q. And in that analysis, was there any discussion of a QBAR switch that has ever used the '623 patent?

A. Not to my knowledge.

Q. As you look at this diagram here, does this look anything like anything in the '623 patent?

A. No.

Q. Does this drawing have the elements of the '623 patent invention?

A. No.

Q. For example? Can you give an example to the jury just so, you know, a little meat on the bones?

A. The '623 patent was quite clear about a three-terminal non-inverting switch when it had functions of -- for example, of a CMOS inverter connected between the pins to minimize leakage current. And there's a -- looks like a Schmitt trigger there that has exceptionally high leakage, as far as I can

tell.  So it doesn't even embody anything that would produce the merits that were described in the '623.  In the '623 patent.

Q.   And you were asked some questions about this capacitor. Do you recall that?

A.   Yes, I do.

Q.   Does the word "capacitor" appear anywhere in the '623 patent?

A.   No, it does not.

Q.   I think you were referred to this big orange thing hanging off the breadboard?

A.   Yes.

Q.   Could you put that big orange thing inside of a chip?

A.   No.

Q.   So just to close this out, does this drawing have any relevance at all to the infringement issues at issue in this case?

A.   None whatsoever.

        MR. WARREN:  Thank you, Mr. Bohannon.

        THE COURT:  Anything on re-cross?

        MR. SUDER:  Yes.  Very brief.

                    **RECROSS-EXAMINATION**

BY MR. SUDER:

Q.   Just so we're clear, Mr. Bohannon, you disagree with Dr. Zane's opinions, right?

**A.**   I wrote a report.

**Q.**   Mr. Bohannon, you can answer his questions very easily. Afford me the same courtesy, please.

Dr. Zane gave opinions in this case and you disagree with them.  "Yes" or "no"?

**A.**   Yes, I disagree with his opinion.

**Q.**   And if Mr. Congdon told this jury that this is his invention of the '623 patent, you're telling this jury that Mr. Congdon is a liar (indicating), right?

**A.**   Never used those words.

**Q.**   You disagree with him, don't you?

**A.**   If he's characterizing that as representing the '623 invention, I disagree with him.

         **MR. SUDER:**  Nothing further.

         **THE COURT:**  All right.  Thank you.

Anything further?

         **MR. WARREN:**  No, thank you, Your Honor.

         **THE COURT:**  All right.  You may step down.  And we will take our morning break at this point for 15 minutes. Thank you, ladies and gentlemen.

(The jury exiting the courtroom.)

(The following proceedings were held in open court, outside the presence of the jury:)

         **THE COURT:**  All right.  You going to call Mr. Sutherland next?

**MR. SCHERKENBACH:**  We are.  He's our last witness.

**MR. SUDER:**  I get to call Mr. Sutherland.

**THE COURT:**  You're going to call him.  And is that the last --

**MR. SCHERKENBACH:**  I was just going to say I think you might need to explain that to the jury.

**THE COURT:**  I'll remind them.

**MR. SCHERKENBACH:**  We've already said he can go first. That's fine.

**THE COURT:**  That's going to be your last witness?

**MR. SCHERKENBACH:**  Last witness.

**THE COURT:**  Then on rebuttal you're going to call Dr. Zane?

**MR. SUDER:**  Dr. Zane.  Very briefly.

**THE COURT:**  And that's it?

**MR. SUDER:**  That's it.

**THE COURT:**  We should get to the jury before lunch.

**MR. SCHERKENBACH:**  May we have a minute or two to just indicate that we filed our JMOL motion?  I just want to make sure we state that on the record.  After Dr. Zane.

**MR. SUDER:**  We're going to have a JMOL motion on validity, as well.

**THE COURT:**  You make your motions accordingly.

Let's talk about the jury instructions -- I mean, the verdict form.

My reaction is that there's too much language in Power Integrations' form.  It restates -- it essentially attempts to restate much of the instruction and all the elements.  We don't need that.  I got the instructions.  Simple, better.

And right now, Opticurrent's is simpler.  So tell me what's wrong with it.

MR. THORNBURGH:  So the language we had in there, Your Honor, was from the model.  But I understand your ruling.

The version that Opticurrent has submitted has -- does not directly ask doctrine of equivalents and literal the way the model does.  We think the way -- they've restructured the questions in a way that's quite different from the model.  And, Your Honor, I would suggest that you simply copy the model and take out the language that Your Honor has said you don't think is necessary.  Rather than --

THE COURT:  The way the model, in your proposal, is first there's a question on direct infringement.  That's sort of independent.  And if it's "yes," you skip it.  And if it's "no," then you go to doctrine of equivalents.  So there's a logical sequence to that.

MR. THORNBURGH:  That's correct, Your Honor.

THE COURT:  Whereas here, theirs just say, Well, which one are you choosing?

MR. THORNBURGH:  Right.  So I would say go back to scratch.  Start with the model and take out the language Your

Honor doesn't believe is necessary. The only thing that I think both parties agree that should be added to the model is the explanation that a "yes" is a finding in favor of Opticurrent and a "no" is a finding in favor of Power Integrations. So I think we both added that to the model. But otherwise, I would say just use the model.

THE COURT: Okay.

MR. SUDER: Ours is simple, Your Honor. The model doesn't mean it's right. Did they infringe? Yes. Inducement, and damages.

THE COURT: Well, why not take the structure they directly infringe. And if not, did they infringe under the doctrine of equivalents? And then the inducing question, and then damages. We take out -- it's essentially a blend of these two. The structure of the model. But a cleaner, simpler question along more the lines that you've suggested.

MR. SUDER: But shouldn't be direct. It should be literal or equivalence. Not direct. It should be literal infringement --

THE COURT: You mean literal --

MR. SUDER: That's fine. That's just another question. That's fine.

THE COURT: Is there something wrong with the word "direct"?

MR. SUDER: Well, they're both direct.

**THE COURT:** Oh. As opposed to induce or indirect.

**MR. SUDER:** Yes.

**THE COURT:** So literal versus doctrine of equivalents.

**MR. SUDER:** Yes.

**THE COURT:** All right.

**MR. THORNBURGH:** Your Honor, again, I think the model does this very well and it would be safest just to start with that and take out the language.

But, you know, that is the logical sequence to ask for direct. And then -- the model has direct, and then doctrine of equivalents, and then it has contrib -- which is not in this case -- and then it has inducing.

**THE COURT:** All right. Then the language -- the intro language -- that's pretty much the same, right?

**MR. SUDER:** We have no issue with that, Your Honor.

**THE COURT:** All right. Okay. Let me tweak that and then get that ready to go, too.

**MR. SUDER:** Will arguments be before lunch, too?

**THE COURT:** Depends how long you take with the next two witnesses. I will give you a break after the witnesses. I'm not going to make you go -- we'll take a short break after completion of the testimony. But if it starts -- depending where we are, I would like to get going.

**MR. SUDER:** Can I make a suggestion? Maybe we read the instructions, then we go to lunch and come back and do our

arguments.  That would be a nice cessation.  That would be a good cutting point.

THE COURT:  Well, it depends.  I see the point about -- I'd rather have the arguments consecutive and not broken up. So I will try to do that.  But if we're really, really early --

MR. SUDER:  I understand.  I understand.

THE COURT:  Yes.  I will try to make that -- that's one of my goals here.

MR. THORNBURGH:  Thank you.

(Recess taken at 10:31 a.m.)

(Proceedings resumed at 10:44 a.m.)

THE COURT:  Let me just ask a quick question.  I notice on the Opticurrent's form there was a through date -- through March 2018 -- on the damages question.  I wasn't sure where that came from.

MR. SUDER:  The figures they've given us for the summaries are only through that date.

THE COURT:  That's if they decide to award a lump sum.

MR. SUDER:  Well, just -- or even for -- no.  Even for a royalty amount it -- because if we get a royalty, then the Court's going to have to fashion a judgment going forward. From April 1 going forward.  The data that was produced -- the sales figures were only through the first quarter of last year.

THE COURT:  All right.  Do you have any comments on that?

MR. THORNBURGH:  It wouldn't affect lump sum, for sure.  We don't disagree that that's what the sales data covers.  But since plaintiff didn't ask to extend it or project what would happen after that, it's not clear to me that they haven't waived any sales after that.  So I'm not sure that they're correct that they can put this limitation on the verdict form.

MR. SUDER:  Your Honor, we asked for updated sales.  This is all we have.  I mean, please.

THE COURT:  I don't think there's a way -- if you're suggesting there's a waiver of future -- if a verdict is rendered in favor of the plaintiff, I don't think there's been a waiver of any future claims should the jury find a running royalty applies.

MR. SUDER:  And really, the point is -- it's more for a judgment if we were to get a finding.  Is that the judgment would only be through that date.

THE COURT:  But, basically, that's because of the data limitations.

MR. SUDER:  Yes.  Yes.

THE COURT:  I wasn't sure whether you all reached some other kind of stipulation or something.

All right.  Well, I'll have to tweak that accordingly.  All right.  So, ready to bring the jury in?

MR. SUDER:  Yes, Your Honor.

(The jury entering the courtroom.)

**THE COURT:** All right.  You can all be seated.  Welcome back, ladies and gentlemen of the jury.  We are now going to hear from the next witness.

And just as a reminder, the next witness is somebody who was going to be called by the plaintiffs as part of their case, but wasn't available until today.  And so when that witness is called, things are a little bit out of order in the sense that the plaintiff will do the first questioning.  Opticurrent will question Mr. Sutherland and then Power Integrations will have it's chance.  So if you're wondering why Mr. Suder is standing up, that's because we had sort of reserved time based on the availability of this witness.

So you may call your next witness.

**MR. SUDER:** Thank you, Your Honor.  We would call Ben Sutherland to the stand.

**BENJAMIN SUTHERLAND**,

called as a witness for the Plaintiff, having been duly sworn, testified as follows:

**THE CLERK:** Please be seated.  State your full name and spell your last name for the record.

**THE WITNESS:** Okay.  My full name is Benjamin Charles Sutherland.  My family name is spelled S-U-T-H-E-R-L-A-N-D.

**DIRECT EXAMINATION**

**BY MR. SUDER:**

**Q.**   Morning Mr. Sutherland.  How are you today?

**A.**   Very good.  Thank you.

**Q.**   My name is John Suder.  We've never met, have we?

**A.**   No.

**Q.**   I have a few questions for you.  Sir, you are vice-president of worldwide sales for Power Integrations.

**A.**   Yes.

**Q.**   And you've been designated by the company in this litigation to talk about number of sales and number of units sold of the accused products.  You understand that?

**A.**   Yes.

**Q.**   And you gave a deposition in that capacity.

**A.**   Yes.  Yes, I did.

**Q.**   And one of your tasks was to prepare a spreadsheet of all the units and revenues of the four accused product families.

**A.**   I didn't personally prepare the spreadsheet, but I know the data was there.

**Q.**   I'm sorry?

**A.**   I didn't personally prepare that spreadsheet.

**Q.**   But you had it done.  You were the one that knew it and made sure it was accurate and were -- asked questions about it of you.

**A.**   That's correct.

Q.    Okay.  And I'd like to show you a spreadsheet of accused product revenue.  And this is Exhibit 210-A.  I don't believe it's in your binder.  It may be.  It's 210-A.  I'm going to put it on the screen so we can both look at it.  This is the accused product revenue summary of the four families.  Do you see that?

A.    Yes, I do.

Q.    And it has LinkSwitch-II, LinkZero-AX, TinySwitch-LT and TinySwitch-III.  Do you see that?

A.    Yes.

Q.    It has the amounts of dollars for each year, right?

A.    Yes.

Q.    And then it has a total for all four.  If you go back -- you only produced this from 2010 because you knew you could go back six years from the time suit was filed, right?

A.    Yes.

Q.    So -- so the total amount -- and this only goes through March 31 of last year.  Right?

A.    Yes.

Q.    Which is -- you keep information quarterly?

A.    We actually prepare it monthly.

Q.    Monthly.  But all you've given us is through March of 2018.

A.    I have no reason to doubt that.

Q.    Okay.  So just through March of last year.  So it's over

-- there's another year's worth of revenue that's been received on these products.  Right?

A.    March would be eleven months, I think.  But roughly, yes.

Q.    Eleven -- okay.  Thank you.  But through March of 2018 worldwide Power Integrations has sold approximately $6 -- actually, $666,648,477 worth of chips that have been accused of infringement in this case.  Right?

A.    That's correct.

Q.    And you also keep track of it based on how many actual switches you sold.  Right?

A.    Do you mean the quantity?

Q.    Yes.

A.    Yes, we do.

Q.    If you look at the next page, sir, this is a summary that accurately summarizes the data from that big spreadsheet you had prepared.  Right?

A.    Yes.

Q.    Yes.  And if you want to see how many total of the LinkSwitch was sold, and how many of the LinkZero, and how many of the TinySwitch and TinySwitch-III, this summary will tell you.  Right?

A.    That's right.

Q.    And again, this is only through March of 2018.  Right?

A.    Correct.

Q.    So through March of 2018 Power Integrations has sold

worldwide 2,368,603,171 of these four products.  Right?

**A.**   Of the accused products within these families, yes.

**Q.**   I'm sorry.  Yes.  Thank you.  Thank you.  And, sir, you know if you wanted to figure out what each one of these little ones cost, how much you get on each one, you divide the units into the dollars.  Right?

**A.**   Divide the value by the quantity, yes.

**Q.**   So if -- I did the math, and it came out to just a little bit over 28 cents per unit.  28.15 cents per unit.  Does that sound about right?

**A.**   Yes.

**Q.**   So the average price equals 28.15 cents.  Correct?

**A.**   I don't have a calculator, but I have no reason to doubt your calculation.

**Q.**   And if you look right here in this exhibit, if you take the revenues and you divide by the units, you get an average selling price.

**A.**   Yes.

**Q.**   It's actually a little bit more.  It's actually .2815, isn't it?

**A.**   Again, I don't have a calculator in front of me, so I'll have to go with your number.

**Q.**   Okay.  And, sir, did you review the summaries, all the summaries in that binder, Exhibit 210?

**A.**   I've seen this, yes.

Q.   Like, for example, the backup for the totals are within there.   You can take each year for each of the accused products in each family as backup that eventually gets you to the 2 billion number, right?

A.   Yes.

Q.   And it's all contained within Exhibit 210-A, right?

Now, sir, that is worldwide sales, right?

A.   Yes.

Q.   And as you know, that one-third of all the electronic products are consumed by the United States.   Right?

A.   There's a general rule of thumb that roughly for the global volumes of electronic products made, like washing machines, TV's, stuff like, that roughly 30 percent is consumed in the U.S.

Q.   Well, you testified that it was a third.   Do you remember you testified in a case where Mr. Warren was asking you questions as a plaintiff?   And you testified that it's a third. Right?

A.   I remember saying somewhere in the region between 20 and 30 percent, but --

        MR. SUDER:   Can I approach the witness, Your Honor?

        THE COURT:   Yes.

BY MR. SUDER:

Q.   Let me show you your testimony where Mr. Warren's asking you questions in another matter in November and see if that

doesn't refresh your recollection that in another case you told the jury it was a third.

A.   Yeah.  30 percent.  One-third.

Q.   Well, no.  30 percent is less than a third.  When you were the plaintiff asking for money, you told the jury it was a third, didn't you?

A.   In that case that's exactly what I said.

Q.   Okay.  So if you want to know how much of these products were -- of these 2 billion -- almost 2.4 billion were sold into the United States, you divide it by 3 and you get a little less than 800 million units, right?

A.   I don't have the POS data in front of me that would indicate the country, but that sounds like a reasonable number.

Q.   Okay.  So if you take the accused product revenue summary, and the 2,368 million number and you divide it by 3, you get 789,534,390 units are made by Power Integrations that make their way back into the United States.  Correct?

A.   You're math looks correct.

Q.   And if you want to see what the dollars are, you take the accused revenue summary of $666 million, divide it by 3, and you get 222,216,159.  Right?

A.   Again, your math looks correct.

Q.   Now, Mr. Sutherland, you are involved in marketing of these products, right?

A.   No, I'm involved in sales.

Q.   Oh, in sales.  Okay.  And you know -- you're familiar with the Nokia challenge on the LinkZero product?

A.   I'm not aware of a challenge, but I remember Nokia as a customer.

Q.   And Nokia wanted Power Integrations to make a product that would get the leakage to what they could say was zero.

A.   That's not correct.

Q.   What was it?

A.   The power consumption that Nokia was concerned about was the no-load power consumption of the charger when there's no cell phone attached to it.

Q.   So when your cell phone is plugged by your bed, but you're at work, that's what we're talking about with no-load.

A.   That's correct.  When there's no phone connected.

Q.   And they wanted to get it down where they could say it's zero?

A.   If I remember rightly, what they wanted was less than the IEC definition of zero, which was 5 milliwatts or lower.

Q.   And so LinkZero got it down to less than 5 milliwatts?

A.   Yes, it did.

Q.   But it didn't get it down to zero, did it?

A.   Actually, I personally measured adapters with that chip inside it.  And at some input voltages, our power meters couldn't register any power consumption.

Q.   But you know there's at least some power consumption.

**A.**   At some input voltages.

**Q.**   But you don't call it Link almost-zero product.  You call it LinkZero.  Right?

**A.**   That's correct.

**Q.**   And, sir, are you familiar with the term "energy vampire"?

**A.**   Yes, I am.

**Q.**   In fact, Power Integrations uses that name to -- as part of its promotions to sell its products.

**A.**   We used to.  Not so much anymore.

**Q.**   But the whole point of the energy vampire is that when you stick those two prongs in the wall in a no-load, it's still pulling current.  Like a vampire sucking blood.  Right?

**A.**   That's a good analogy.

**Q.**   And you're aware the study that found in California in 2008 that 13 percent of electricity used in the average California home for products in standby or other low modes is that level?

Horrible question.  Let me rephrase that.  I apologize.

You've seen this page from your website, haven't you? This is Exhibit 221.

**A.**   Yes.  This looks familiar.

**Q.**   In fact, it talks about -- it says here:  Small amount of electricity --

**MR. WARDEN:**  Objection, Your Honor.  I don't believe this document actually is 221.  I'm not sure what this document

is.

THE COURT:  Okay.  Why don't you pull up 221?

MR. SUDER:  Your Honor, this is 221 and it was admitted during Mr. Kung's testimony.

THE COURT:  Why don't you both look at it and confer.  Maybe you have a version of 221 you think is more accurate.

BY MR. SUDER:

Q.  Using a different version, Mr. Sutherland.  I apologize.

Do you see this document?  This is the same thing, isn't it?

A.  Are you referring to same as the one that's in my binder?

Q.  One -- yes.  The one I just had in the binder.

A.  Yes, this looks the same.

Q.  Okay.  And it says here that some devices -- let me highlight it first:  Some devices consume power for no purpose at all, such as a charger left plugged into a wall outlet, a condition called no-load.  These devices are known as energy vampires because they have two teeth and suck power out of the wall continuously.

That's what we're talking about when we said energy vampires in our questions.  Right?  This concept?

A.  Yes.

Q.  Yes.  And it says on the next paragraph:  The average home contains dozens of devices that spend the vast majority of time in standby or no-load conditions so the waste adds up.  A 2008

study found that 13 percent of electricity used in the average California home is for products in standby or other low-power modes.

My question for you, sir, is were you aware of that study?

A.   Possibly.  I don't remember it, but I remember in that time frame that this was important.

Q.   And so controlling the current that comes out of a wall when you're not using your charger or your television or your washing machine is an important issue for Power Integrations, isn't it?

A.   I wouldn't characterize it like that.  I think what's important is not to consume more power than is needed.  I don't know how you control the current coming out of the wall. That's beyond our product's scope.

Q.   By the way, you're not an engineer.

A.   That's correct.

Q.   You don't hold yourself out as an engineer.

A.   No.

Q.   Now, sir --

        MR. SUDER:  Your Honor, I would offer Exhibit 19 into evidence.

        THE COURT:  19?

        MR. SUDER:  Yes.

        MR. WARDEN:  Objection, Your Honor.  I don't believe this exhibit was disclosed for use with Mr. Sutherland.

THE COURT:  If it was not disclosed, it's not appropriate.

MR. SUDER:  Your Honor, I'm just -- I'm not going to use it with this witness.  Just want to make sure I get it into evidence.  If there's no objection to it, just want to have it in the record.

THE COURT:  Was there an objection during the pre-trial --

MR. SUDER:  No.

MR. WARDEN:  Your Honor, we had no idea they were going to use it.  I'm not actually sure standing here what the exhibit is.

THE COURT:  Is there a pre-trial exhibit objection on that table?

MR. WARDEN:  No, Your Honor.  But we would at least like to have a copy of the exhibit.

THE COURT:  Why don't you --

MR. SUDER:  Here.

MR. WARDEN:  Your Honor, again, with the understanding, Your Honor, that -- just moving into evidence, that's fine.  Again, maintain objections with the use of Mr. Sutherland because it was not disclosed for use with Mr. Sutherland.

THE COURT:  Then I'm going to admit it without objection.  Use with this witness, you're going to get an

objection.

MR. SUDER:  Well aware, Your Honor.

(Trial Exhibit 19 received in evidence)

BY MR. SUDER:

Q.   My question for you, Mr. Sutherland, is in addition to what we're talking about here with energy vampire, as vice-president of sales are you aware of any efforts by Power Integrations to talk about the LinkZero product as a way to combat energy vampires?

A.   That's a good question.  The original LinkSwitch was named as a linear killer for LinkZero specifically maybe.  I just don't remember.

Q.   Now, Mr. Sutherland, you -- as part of being vice-president of sales, Power Integrations does not keep track of how it values the specific features of its products, does it?

A.   I wouldn't know how to do that.  Maybe you have an example.

Q.   So you don't know how to do that.

A.   No.

Q.   As vice-president of sales, you don't know how to do that.

A.   Right.

Q.   But what you do know is you want to make sure the customer is taken care of.  Right?

A.   Yes.

Q.   That's your job.

A.   Yes.

Q.   Customers are happy, they'll buy more product.  Right?

A.   Yes.

Q.   And the biggest issue for customers is price, isn't it?

A.   Not always, no.

Q.   Do you remember asking you about that in your deposition?

A.    If I think about what customers tell me is most important to them, usually quality is the first thing they're concerned about.  Price is extremely important.  But more important than price is value or the cost of the power supply.

Q.   Do you remember telling me that the first thing that comes to a customer's mind is price and cost?

A.   It can be, yes.

Q.   No.  That's what you said.  That the first thing that comes to mind to the customer is price and cost.  Is that true?

A.   I don't remember saying that, but if you have the deposition --

Q.   Let me show you and see if this refreshes your recollection.  At page 123 right there.  I want you to read it. I want to know if that refreshes your recollection that what you said was the first thing that comes to a customer's mind is price and cost.

A.   Okay.  Question:  Or for any -- are there any particular features for which -- that you're aware of that Power

Integrations has either quantified or done studies or somehow determined the value of that particular feature within the product?

Answer:  No, I don't think it's relevant.

Question:  Well, I'm just asking if Power Integrations has done that.

Is this the paragraph you wanted me to read?

**Q.**   I don't want you to really read it.

**A.**   You asked me to read it.

**THE COURT:**  He meant read it to yourself.

**BY MR. SUDER:**

**Q.**   Read this question and your answer on line 8.  And just read it and see if that refreshes your recollection that what you told me under oath was the first thing -- or, you told Mr. Gunter under oath -- the first thing that comes to the customer's mind is price and cost.

**A.**   This is exactly what I said.

**Q.**   Thank you.  I just wanted to make sure.  And when you said that, you were under oath.  Correct?

**A.**   That's correct.

**Q.**   And it was correct at this time?

**A.**   That's correct.

**Q.**   And your data sheets that you have in your book go to the customer, right?

**A.**   They're published on our website.

Q.   But when you sell a product to Nokia, it's kind of like an instruction manual, isn't it?  A data sheet.

A.   Yes.

Q.   It tells them how to use their product -- you teach them how to use your product in their components.

A.   It's many things, but it can show illustrations of how to use the product, yes.

Q.   Yes.  And it's used for marketing, isn't it?

A.   Yes.

Q.   Okay.  And the target engineer -- the target customer -- the target person at Nokia is the engineers at Nokia?

A.   The designers, yes.

Q.   So the people that can read this and understand it.

A.   Yes.

Q.   Is that right?

        MR. SUDER:  Mr. Sutherland?  That's all I have.  Thank you.

        THE WITNESS:  Okay.  Thank you.

        THE COURT:  All right.  Thank you.  I guess combination of direct and cross.

        MR. WARDEN:  Yes, Your Honor.

                    CROSS-EXAMINATION

BY MR. WARDEN:

Q.   Good morning, Mr. Sutherland.

A.   Good morning.

Q.   I know you already introduced yourself a little bit to the jury, but can you remind the jury of what your role is at Power Integrations?

A.   I'm vice-president of worldwide sales.

Q.   How long have you been in that position?

A.   Since July 2011.

Q.   And when did you first join Power Integrations?

A.   Just under 19 years ago.

Q.   Could you tell the jury what your responsibilities are in the role of vice-president of worldwide sales?

A.   Many things.  But the most important, I guess, is helping customers get the chip they need for their power supply and then with my team help them get it in production.

Q.   So as part of that job, do you meet directly with Power Integrations customers?

A.   Yes, I do.

Q.   Who are those customers?

A.   So we have many different types.  We have companies, large companies, that focus on only making power supplies for other large entities that don't want to make them themselves.  Then we have other companies like -- I don't know -- Samsung, for example, that also buy our chips.

Q.   And how much of your time do you spend meeting with Power Integrations customers?

A.   It varies from month to month, but sometimes between 30

and 50 percent of my time.

Q.   Where do you travel for those meetings?

A.   Most of my travel is to Asia.

Q.   Why is that?

A.   That's where most of the power supplies are made.

Q.   Let's talk a little bit about that process of how the power supplies are made.  And I want to focus your testimony just on the accused products in this case, okay?  Do you have an understanding of what the accused products in this case are?

A.   Yes.

Q.   And what's that understanding?

A.   It is TinySwitch-III, TinySwitch-LT, LinkSwitch-II and LinkSwitch Zero AX.

Q.   So focusing just on those products, can you tell the jury where those chips were designed?

A.   They were designed in San Jose in California.

Q.   And are the accused products manufactured in San Jose?

A.   No.

Q.   Where are they?

A.   Mostly in China, Malaysia, Thailand and the Philippines.

Q.   Various facilities in Asia?

A.   Yes.

Q.   After those products are manufactured at your facilities in Asia, what happens to them next?

A.   Then they get shipped to whichever customer wants to buy

them.

Q.   And where are most of those products sold?

A.   China.

Q.   Are any of them sold in the United States?

A.   Yes.

Q.   Approximately what percentage of the accused chips are sold in the United States?

A.   If I look at our total revenue, approximately 5 or 6 percent of what we ship is sold in the U.S.

Q.   Let's focus just on the majority of the chips that are sold outside the U.S., okay?  For those products sold outside of the U.S., does any part of the sales process take place in the U.S.?

A.   No.

Q.   And after the chips are sold outside the U.S., what do your customers use those chips for?

A.   Well, all of our chips are used -- they're high voltage, so they're used in power supplies.  It can be cellphone chargers we've talked about before.  Could be a laptop adapter. It could go into washing machine or dishwasher, for example.

Q.   And what happens to those power supplies or those products with power supplies after they're made?

A.   Well, I guess those companies sell them to their customers who could be users like you and me.

Q.   And will some portion of those products that start outside

the United States, will some portion be imported into the United States?

A.   Yes.

Q.   And I believe during Mr. Suder's examination you said that a reasonable estimate is about a third of the products will eventually make their way into the United States, is that right?

A.   Yes.

Q.   And who is it that is importing that third into the United States?

A.   That's a good question.  We're kind of disconnected from that part of the process because we're not involved in it.  But I could imagine it's companies like Dell or Samsung themselves would move their goods around the world and bring them into the U.S.

Q.   I want to change topics now and talk about energy efficiency.  And you were asked a few questions about energy efficiency by Mr. Suder.  Do you recall that?

A.   Yes, I do.

Q.   And I believe you testified that energy efficiency is something that is important to Power Integrations' customers.

A.   Yes.

Q.   Do you know whether Power Integrations has its own energy efficiency technologies?

A.   Yes, we do.

Q.   Are there any of them that are particularly notable?

A.   Yes.

Q.   Which would be particularly notable?

A.   I think the real game-changing technology, if you like, was our on/off control which is in all of the accused products and also some others.  When we had on/off control available, customers really didn't have an alternative easy way to meet some of the new energy efficiency standards at all.

        MR. WARDEN:  No more questions, Your Honor.

        THE COURT:  All right.  Thank you.

    Anything on redirect?

        MR. SUDER:  Yes, Your Honor.  Very brief.

                    **REDIRECT EXAMINATION**

BY MR. SUDER:

Q.   Mr. Sutherland, I want to show you Exhibit 18.

    Can I have the screen on, please?

    Which is in your book.  But I'll do it this way.  I think it will be quicker.

    This is the front page of the LinkZero switch.  And it says right there (indicating):  Easily meets all global --

A.   It's not on my screen.  Let me just find it.  Which number is this?  Sorry.

Q.   Exhibit 18.

        THE COURT:  Trying to get it on the screen.

        THE WITNESS:  I found it.

**BY MR. SUDER:**

**Q.** Okay. It says under EcoSmart: Easily meets all global energy efficiency regulations with no added components.

When Power Integrations is designing its products here in northern California, it's making sure that every one of those products, wherever it's sold, meets the standards of the United States.

**A.** Yes.

**Q.** You're not distinguishing saying, Okay, we're going to design this product for this part of the world and this product for this part of the world. You make all the products so they can go anywhere?

**A.** There are some subtleties to that, where China may have its own specification. But at the time this data sheet was done, your statement is correct.

**Q.** But for the purposes of U.S., anything you design, no matter where it's made, has the ability to come back into the United States.

**A.** Yes.

**Q.** You don't distinguish.

**A.** No.

**Q.** Okay. And so you know when designing these chips that one-third of those are going to make their way back into the United States.

**A.** We don't know that. As I mentioned, only 5 or 6 percent

of our revenue is U.S.

Q.   That's not my question, sir.  You just told me it's foreseeable that one-third of the world -- of all that you sell makes its way back into the United States.

A.   For the accused products, we did say that earlier, yes.

Q.   Okay.  That's all I wanted to make sure.  All right.

MR. SUDER:  Nothing further, Your Honor.

THE COURT:  All right.  Anything further.

MR. WARDEN:  Nothing else, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Sutherland.  You may step down.

(Witness excused.)

THE COURT:  Any further witnesses for the defense?

MR. SCHERKENBACH:  No, Your Honor.  Power Integrations would rest its case at this point.

THE COURT:  All right.  Thank you.

MR. SUDER:  At this time we have a motion under Rule 50 on Power Integrations' case.

THE COURT:  All right.  So noted.  Thank you.

Rebuttal case.

MR. SUDER:  Yes, Your Honor.  We would call Dr. Zane to the stand.

THE COURT:  Okay.

**REGAN ZANE**,

called in rebuttal as a witness for the Plaintiff, having been previously duly sworn, testified further as follows:

　　　　MR. SUDER:  May I approach the witness?

**DIRECT EXAMINATION**

BY MR. SUDER:

Q.   Dr. Zane, good morning.

A.   Good morning.

Q.   Couple follow-up questions for you.

　　　How do you teach the use of a capacitor in a power supply to your students?

A.   As I mentioned previously I teach --

　　　　MR. WARREN:  Objection, Your Honor.  This is not proper rebuttal.  Just a re-do of the direct examination.  He could have said that in the beginning.

　　　　THE COURT:  Overruled.  You can answer the question.

　　　　THE WITNESS:  I teach courses, as I mentioned before in power electronics.  Undergraduate, graduate students, industry courses.

　　　Specifically -- this has been discussed here in this case -- is the role of a capacitor, particularly in the DC power supply.  I teach, when I cover courses on power supplies, there are elements in a power supply; inductors, capacitors, transistors, diodes, et cetera.  These components are used to operate a power supply.

A capacitor is an element, particularly in a DC power supply, that I teach as a use as a filter.  The capacitor is used as a filter to smooth the output voltage.  This is what I described previously.  There's no question a capacitor is an energy storage element, as is an inductor.  This is how they're able to perform their function as a filter.

When you put a capacitor on a node, for example, the input of a power supply or the output of a power supply, that capacitor can reject disturbances in that node.  That's how it helps smooth that node.  If there are disturbances, currents that come in and out of the node, the capacitor can absorb some of that energy and then release it.  In doing so, it helps hold that voltage steady.  I teach the capacitor as a filter.

**BY MR. SUDER:**

**Q.**    Does voltage fluctuate?  All voltage fluctuates?

**A.**    Within a circuit, particularly within a power circuit, the reason voltages fluctuate is because there are fluctuations of current that are feeding into that node.

When I'm discussing this and I teach how a capacitor operates, we show that if you would like to limit how much the voltage fluctuates you can place a capacitor at that node.  And we can calculate.  And we perform this.  We developed the calculations and show for a given disturbance, meaning how much the current varies going into that node, how should you size the capacitor so that when it receives and releases that small

amount of energy, it holds the voltage within a band.

For example, typical requirements would be you want that voltage to stay within, let's say, 1 to a few percent of the nominal voltage.

Q.   Have you ever heard the word of "ripple"?

A.   I have.

Q.   Is that what you call the fluctuation?

A.   Ripple is often the term used to describe that 1 to 3 percent.  The variation you see on top of the nominal voltage.

Q.   Have you ever heard the expression that a capacitor smooths the ripple?

A.   I believe that's the expression that I just used.  Again, the capacitor takes the disturbances in currents and helps hold the voltage more steady.  That would be a smoothing of the voltage.

Q.   Now, Dr. Zane, would you look at Exhibit 14 in your book? I'm going to put this on the screen.  And in particular, on page 8.  It is figure 14.  There was a lot of discussion with Mr. Bohannon about.  Do you see this?

A.   Could you repeat the page?  I'm sorry.

Q.   It is page 8 of Exhibit 14.

A.   I am there.

Q.   Okay.  Sir, you see the figure?

A.   I do.

Q.   And how many different capacitors are referenced here?

A.   There are multiple capacitors on this figure.

Q.   And I have some of them highlighted with my finger.  I'm going through.  Do you see that on the screen?  Like C10 up here in the upper right, and C11?

A.   Not on my screen.

Q.   Oh, it's not on your screen.  If you look on the diagram, do you see C10 and C11 in the upper right-hand corner?

THE COURT:  It's on your screen now.

THE WITNESS:  I do see them here.  And I see it on the screen now, yes.

BY MR. SUDER:

Q.   Are those all capacitors?

A.   All of the components you've highlighted -- excuse me -- the C10 and C11 we were just discussing, these are capacitors.

Q.   Do all capacitors work the same way?

A.   All capacitors are energy storage elements, as I described.  And all of them, as shown here, would act as filters.

Q.   All of these operate the same way as filters.

A.   Capacitors act as filters.

Q.   Yes.  Now, Dr. Zane, you sat here and observed the testimony of David Kung and Mr. Bohannon?

A.   Yes, I did.

Q.   Why did you want to watch their testimony?

A.    I was here to observe and to see if there were descriptions were any different from what I had seen previously, anything that would convince me to change my opinion on the operation, particularly of the bypass capacitor.

Q.    And what was your reaction when you heard their testimony?

A.    There are a couple of things that I feel were mischaracterized.  In particular, the function and operation of the bypass capacitor as used on the BP pin.  I think this is one thing that was mischaracterized.

Q.    Would you turn to Exhibit 11, please.  I'm going to put it on the screen.  This is actually page 6 of Figure 11.  Do you remember Mr. Kung and Mr. Bohannon discussing this figure number -- Figure 10 in this exhibit.

A.    Yes, I do.  This is the -- this is the figure that was discussed in terms of the start up behavior of this chip.

Q.    And was this one -- was there a mischaracterization with regard to this figure?

A.    I think this is a good figure to use to walk through really how the operation is working and where I see the mischaracterization in the way they described it.

Q.    Could you explain to the jury why you felt they were incorrect?

A.    Yes.  The characterization that I'm speaking of, and they spoke of when they looked at this figure, and I'd like to show, is with regard to the concept of the capacitor being referred

to as being like a battery that we charge up, and then is being used as the power supply for the chip after it's charged up.

So, for example, if we look at this figure -- and you've heard it described to you multiple times -- this figure is showing what happens when you first take the overall product, plug it into the wall, and the thing powers up and gets started.

It's been presented that this capacitor is being charged up with energy, then it's going to power the chip. And so I think we can see this quite easily. I can indicate to you that, as you've already heard, the bypass voltage, this visa (phonetic) bypass, this is the voltage on that capacitor. It's the internal supply voltage from the chip.

The voltage on a capacitor is a direct indicator of the energy stored in the capacitor. So when you look at the voltage, we can see that the voltage starts at zero, as everyone has agreed on, before you plug the device in. That means that there's zero energy stored in that capacitor. And when that voltage goes up, that means that the capacitor's been charged up.

So during the startup, what happens is we start at zero, power first comes on, the voltage stabilizer -- or the internal voltage regulator in that chip -- then provides power to everything connected to that node. The entire chip. All the circuitry in that chip and this capacitor. It brings

everything up to a appropriate voltage for operation.

When we hit that upper threshold of the 5.85 volts, what happens next, as has been described, what happens next is that voltage is held constant.  The voltage is held at 5.85 volts with that small amount of noise.

And so what I'd like to point out and emphasize is you're looking at this wave form with the characterization that the capacitor is like a battery.  It was charged up, then it supplied the power to the chip.  You would expect it to charge up, as voltage is an indicator of that charge, and then as soon as the chip turns on you'd expect it to be providing the power for the chip.  Meaning, you'd expect that voltage to come back down.

And then they say that it would come down to that 4.9 volt threshold, and then the chip would turn off.  Then it would recharge, and then do this again.

Well, that's not the way the product operates.  It's not what you would expect, either.  You expect to plug this in and it just runs continuously.  And that's what the data sheet describes.  And that's exactly what we can see in this measured startup wave form.  The chip is powered, it's then held at 5.85 volts, and then it runs continuously right around that 5.85 because the internal regulator is maintaining it at 5.85.

And so the question I asked in terms of this characterization is:  Well, what's happening with the energy in

the capacitor? As I mentioned, the voltage is indicating the energy in the capacitor. If you hold that voltage essentially constant, what's happening with the energy? The energy in the capacitor is essentially constant. That means we're not using the capacitor as a power supply to power the chip. Instead what we do see, we do has been emphasized, we do see that little bit of noise on top of that voltage. That's that 1 to 3 percent that I talked about.

This capacitor is acting as a filter. It's helping to smooth that voltage. And what it's filtering is, as we mention down here in the bottom side, we can see the drain voltage. Once we start switching, that drain voltage is the one I talked quite a bit about in my direct. The drain voltage is zero volts, a few hundred volts, zero volts, few hundred volts. Every time that voltage goes high, we're pulling power off the drain pin operating the chip. That's what's holding it at 5.85 volts. Every time the drain voltage goes low, we're not providing power. The bypass capacitor is acting as a filter to take care of these disturbances, the current coming in and being supplied from the voltage stabilizer.

That's the main point that I wanted to clarify.

The last question I'd like to highlight on this, as you can see the voltage rises. That's when you charged up the capacitor. It was argued that that is now going to be used to power the chip. I think I've shown it does not.

Then what does happen with that energy?  Well, it just sits in the capacitor.  So long as that voltage is constant, that energy goes nowhere because it's sitting at a constant voltage.

Eventually you unplug the device where it's done charging your laptop.  When you unplug the device, the thing shuts down.  Once it's unplugged, everything shuts down, the energy that you'd built up in the beginning is finally just dissipated to leakage in the chip.  That energy is wasted.

Q.   This acted as a power supply, you would expect to see the voltage go up and down as it's being used like a battery.

A.   That's right.  The diagrams that were shown before with this little indicator of the battery indicator being charged up and then back and forth, you'd expect this to charge up, drop back down.

That's not what happens in this chip.  The chip powers up to 5.85 volts and operates continuously that the level.  It's powered from the internal regulator.

Q.   Were there any other examples that you felt were mischaracterizations or misleading by Mr. Kung or Mr. Bohannon?

A.   All around, the same thing.  But in describing this wave form here, and then we've also gone back and forth in different sections in the description of the regulator itself.  So here I'm talking about the 5.85 volt regulator.  I just want to make sure it's clear how this is operating, how it's operating from

the drain pin.

I'd like to just read that full paragraph all the way through.

Q.   Let me put on the screen page 3 of this data sheet.

THE COURT:   What exhibit is that?

MR. SUDER:   This is Exhibit 14, I believe.  11, Your Honor.  I apologize.  Exhibit 11, page 3.

BY MR. SUDER:

Q.   The language about the 5.85 voltage regulator.  What is it about this section that you want to explain to the jury?

A.   I would just like to put each of -- each of the lines, each of the sentences here, all in perspective so we just have a holistic view how this regulator is working, how it fits the descriptions I've given.  I think we can go through this very quickly.

So here as we see described.  So we have two regulators here.  I'm going to start with the first one.  Says 5.85 Volt Regulator and 6.4 Volt Shunt Voltage Clamps; the title of this section.  We'll start with the first one:

The 5.85 volt regulator charges the bypass capacitor connected to the bypass pin to 5.85 volts by drawing a current from the voltage on the drain pin whenever the MOSFET is off.  The bypass multifunction pin is the internal supply voltage node.

So just to summarize that, going back to -- its both

according to startup as well as normal operation.  The internal regulator, the 5.85 volt regulator, draws its power from the drain.  Every time the switch is off, the output switch is off, it's providing power to the entire internal node of the chip.  Everything -- the CMOS inverter, everything, all the circuitry in the chip -- is powered directly from that node.  And, it supplies some energy back to the capacitor.  Okay?  So that's the operation when we went through the startup.  It's also the operation every time the switch turns off.

Okay.  So the next sentence:  When the MOSFET is on, the device operates from the energy stored in the bypass capacitor.  Okay?

As was mentioned, every time we're operating, we turn the switch on and we turn the switch off.  Okay?  Off, we just talked about.  When the switch is turned on, this was that time where the voltage drops to zero.  Now the voltage stabilizer, the internal regulator, doesn't supply any power instantaneously.  The capacitor is now providing current to the chip during that time.

This is that filtering function.  You go back to that wave form.  Voltage is held essentially at 5.85 volts with the small noise on top of it.  That small noise is exactly this operation.  It's happening very fast.  It's happening in -- microseconds is the term that we used.  This is millionths of a second.  So every few millionths of a second, the switch turns

on, the switch turns off, during normal operation at a heavy load.  At these lighter load conditions, the switch is off most the time, meaning it's almost always powered from the drain pin.  But each time it turns on, its only on for a very short time.  If you were actually to leave the switch on for very long, it could cause the whole power supply to blow up.  Because that's the switch that's controlling the current through the power supply.

Okay.  So that's the operation.  On/off of the output switch.

As we're going on and off, that capacitor's acting as a filter accepting and releasing very small amounts of energy to stabilize and smooth that voltage.  But the voltage is staying at that 5.85 volts.  Okay.

Then finally I'll just conclude with this section:

Extremely low power consumption of the internal circuitry allows TinySwitch-LT to operate continuously from the current it takes from the drain pin.  A bypass capacitor value 0.1 microfarads is sufficient.

Okay?  So this is explaining, because the switch has such low leakage internally, because it operates on such low power, it's suitable to use this drain pin to continuously supply the power.  That's why it's held at the 5.85 volts.  If it consumed a lot more power, this may not be the best way to power the chip.  But it's such a low-power operating chip, it works this

way.  0.1 microfarad is a very small amount of a capacitance. Big red capacitors, because that capacitor was overrated.  It was the one that I think Mr. Congdon had the floor, he said, at the time.

But the capacitor of this value that's actually used in these chips, these are actually in your cell phone and they're used.  You know that doesn't fit in your cell phone.  Actual capacitor they're using with these products is smaller than the tip of your finger.

And it says:  It's sufficient for both high frequency decoupling and energy storage.  The high frequency decoupling is a noise filter for any noise that's caused by switching inside of the device.  And energy storage, this is describing that filtering function of being able to pass energy back and forth as we're holding it right at 5.85 volts as that voltage stabilizer turns on and off.

Finally, and I won't spend time emphasizing the next paragraph but I'll just highlight.  The next paragraph, I'll read the first sentence in, is describing the other regulator. Okay?  So the actual regulator, 5.85 volt regulator, is what we've just described.  That's when the chip is self-powered, self-biased, and operating directly from the drain pin.

The next paragraph describes the other option:  In addition, there is a 6.4 volt shunt regulator clamping the bypass multifunction pin at 6.4 volts when current is provided

to the pin through an external resistor.  This facilitates powering the chip externally through a bias winding to decrease no-load consumption to well below 50 milliwatts.

This paragraph is describing an alternative, which is instead of using the --

MR. WARREN:  Objection, Your Honor.  The objection is that it's beyond the scope, as we've discussed.  His report has no analysis of the operation of the bias winding.

THE COURT:  All right.  Sustained.

MR. SUDER:  I'll move on.

BY MR. SUDER:

Q.  Dr. Zane, looking at what we talked about earlier, the Figure 12 on this exhibit.  Do you remember that?  And we identified the different capacitors.  This capacitor I'm pointing up here is C5.  What is that capacitor?

A.  This capacitor is a filter capacitor.

Q.  And if you go to the data sheet, in particular -- excuse me.  Let me find it this way so I can move quickly.

MR. WARREN:  Your Honor, I also object to this line of questioning.  This operation is not discussed in his expert report, either.  I don't know what he's going to say.

THE COURT:  Overruled at this point.

BY MR. SUDER:

Q.  This capacitor is referred to as a Y capacitor.  What is a Y capacitor, according to the data sheet?

**A.**   The Y capacitor used here is a filter capacitor.  It's used, as shown here, to reject common mode currents.

**Q.**   What is it about the language here that tells you it's a filter capacitor?

What is a primary input filter capacitor positive terminal?

**MR. WARREN:**  Objection.  Leading.  He was not even --

**THE COURT:**  Sustained.  You asked him a question.  You're not supposed to lead.

**MR. SUDER:**  Fair enough.  Sorry, Your Honor.

**BY MR. SUDER:**

**Q.**   Is there anything in this statement that tells you that the capacitor is a filter?

**A.**   Well, this whole section is describing the filter function of that capacitor.  The section that you were just reading is referring to a different set of capacitors; the input filter capacitors.  But this capacitor's placed between those input capacitors and the transformer.

**Q.**   And as you look at the previous page, there is a discussion of the bypass pin capacitor.  What does this tell you, Doctor, about whether the capacitor is a filter?

**A.**   I think the statements here are just consistent with what I stated before.  It refers to the capacitor as having a function, anyway, as -- in addition to the internal filter.  Meaning that it does provide internal filtering the way I was

just describing.

**Q.**   Now, Dr. Zane, having listened to Mr. Kung and Mr. Bohannon, how did their testimony impact your opinions in this case?

**A.**   Having heard the inputs in the case and reading the reports that I've heard previously, I have no change in my opinions.

**Q.**   And what is that opinion?

**A.**   Specifically with regard to the operation of this capacitor that we're talking about here, my opinion is that this capacitor is not acting as a power supply connected to a fourth terminal in the context of claim 1 of the '623 patent.

        **MR. SUDER:**  Pass the witness.

        **THE COURT:**  All right.  Cross?

**CROSS-EXAMINATION**

**BY MR. WARREN:**

**Q.**   This will be very briefly, Dr. Zane.

I take it from your testimony it's your opinion that you understand the circuits better than Mr. Kung who designed the circuits and has been working on them for 30 years.  Right?

**A.**   I don't believe I've said that, no.

**Q.**   I believe your actual words were that he mischaracterized the operation of the circuitry.  That was your exact word that you told this jury.  Right?

**A.**   Yes.  I've stated that the characterization of the

capacitor in the way that I described is incorrect.

Q.   So this jury can decide whether or not, after watching you and Mr. Kung, whether or not Mr. Kung mischaracterized the operation of the circuit.  Right?

A.   The mischaracterization was in the description of how the capacitor was used.  And I believe I've shown that, yes.

Q.   Now, you discussed this figure.  Do you recall that?

A.   Yes, I do.

Q.   And you said, Well, gee, wow, we would expect this to drop down to 4.9 volts and then the part would go to sleep, and that's just not what we see.

That was basically what you explained.  Right?

A.   Those weren't my words but, yes, I would expect this capacitor voltage would now drop down, not be held at 5.85. And Mr. Kung also said that this is held continuously at 5.85. As does the data sheet, as I just read.

Q.   Right.  Now, if we were to zoom in -- and this is what Mr. Kung explained -- if we were to zoom in at a higher resolution, would this noise that we're seeing right here -- everyone can see what it looks like -- this actually would show a charging and a discharging, and a charging and a discharging. That's exactly why we see that kind of blurred line, right?

A.   Absolutely.  That's exactly what I was describing.  That's the filter function of the capacitor.

Q.   I understand we -- I don't want to get hooked up on

semantics here.  I understand you call it a filter function and we call it a power supply function.

But what's actually happening here is that this pin, this node, because we see this fuzz if we were to zoom in, we would see a mountain of charging and discharging of that capacitor, right?

A.   Absolutely we would.  And the characterization, as I've stated here, you can see that the voltages come up to this point.  It was characterized that this voltage is brought up because all that energy was put in the capacitor and that energy was going to be used to power the chip.  All that energy that was described as being built up with a little energy indicator, is not used to power the chip.

When you talk about these mountains, this is very small. This is that 1 to 3 percent variation.  It's a very small amount of energy that's part of this filtering function.

I just want to be clear.  Mischaracterization I was talking about was how the energy from that startup was used.  I think Mr. Kung and I very much agree with the noise and what's happening here in the noise section.

Q.   So Mr. Kung said, as I recall, that when the DC input voltage was first attached, say, right here (indicating), this is when we're plugging the device in.  Right?  That's where it goes from zero and it starts ramping up in that input?

A.   That's correct, yes.

Q.   And at that point we're charging that bypass capacitor up, right?

A.   Absolutely, yes.

Q.   Okay.  I believe that's what Mr. Kung described.  But you believe that was a mischaracterization?

A.   Oh, no.  What I said was a mischaracterization was putting this little battery indicator next to that and then flipping back and forth between the slides and saying, Look, during the startup you see the battery charging up.  Then the slides went back and forth a couple times saying charging up, discharging down.

     The idea that you're charging up this capacitor to get it to a certain amount of energy, what the indication was, the mischaracterization -- which I think came more from the lawyers than Mr. Kung -- was that the idea that we're charging this up, and then the reason we're charging it up to hit this threshold, was because now that energy is going to be used to power the chip.  And then the chip is powered from that capacitor?

     That, I think, was a mischaracterization.

Q.   So this case there's a fundamental disagreement between yourself on the one side and Mr. Kung and Mr. Bohannon about whether or not that bypass capacitor is acting as a power supply.  Fair?

A.   Yes.

     MR. WARREN:  Thank you.

THE WITNESS:  Thank you.

THE COURT:  All right.  Anything further on redirect?

MR. SUDER:  No, Your Honor.  The plaintiff would rest.

THE COURT:  All right.  And no further witnesses, then, at this point.

MR. SCHERKENBACH:  No further witnesses.  We make a motion at then point, as well.

THE COURT:  All right.  That's so noted.

And Dr. Zane, thank you.  You may step down.

(Witness excused.)

THE COURT:  No further exhibits to be admitted, right?

MR. SUDER:  None on the plaintiff's side, Your Honor.

THE COURT:  So both sides have rested.

MR. SCHERKENBACH:  Yes.

THE COURT:  All right.  Ladies and gentlemen, this is an appropriate time for us to go ahead and take sort of -- bit of an early lunch break, and I'm going to prepare the instructions for you so when you come back I'm going to give you instructions on the law.  We'll also have hard copies to give to you to bring back to the jury room.  And we'll also, hopefully, have it up on the screen so those of you who prefer to read along with me or can see it, you'll see it, too.

And after those instructions, each side will have a chance to make their closing arguments and then I will give you some final-final instructions, and then we will direct you to begin

your deliberations.

So we'll see you back here, let's say, 12:30.

(The jury exiting the courtroom.)

THE COURT:  All right.  If you want to hang tight for a minute, let me try to get the instructions so I can give you hard copies so you can look at it if you want to use it, as well as the verdict.

(Recess taken at 11:44 a.m.)

(Proceedings resumed at 12:33 p.m.)

(The following proceedings were held in open court, outside the presence of the jury:)

THE COURT:  All right.  You all have the verdict form?

MR. SUDER:  Yes, Judge.  I have a question regarding the damages question.

THE COURT:  Yeah.

MR. SUDER:  It's a little confusing.

THE COURT:  Okay.

MR. SUDER:  On ongoing royalty of blank per unit or percent of sales, then it says of blank dollars in total sales.

THE COURT:  I thought that was from your form.  Wasn't it?

MR. SUDER:  No, that's from their form.  And it's not giving them -- if they're just asking for what the royalty rate is, the way it reads is just a little awkward.

THE COURT:  Okay.

**MR. SUDER:**  This is their form.  Our form just says answer and a dollar amount through March.  And then if you use the rate, what's your rate.

**MR. SCHERKENBACH:**  I don't think it's confusing at all.  I don't see what the issue is.  You either award a dollar per unit -- a dollar amount per unit or a percentage of a total number of dollars.  It seems clear to me.

**THE COURT:**  Well, one thing we can do is just say ongoing royalty payment of -- well, there's a 1 there -- per units sold or 2 --

**MR. SCHERKENBACH:**  You could have 2.

**THE COURT:**  -- percentage and just say of total sales through March 21st, and then say for a total of.

**MR. SUDER:**  Yes --

**THE COURT:**  So they do the math.

**MR. SUDER:**  -- yes, yes.  Yes.

**THE COURT:**  Rather than break it down, just say or --

**MR. SCHERKENBACH:**  Well, actually we object to that, Your Honor, because they shouldn't be writing down any number that includes pre-suit numbers, in our view.

So they need to pick the base and the rate, in our view.

**THE COURT:**  So when you say pre-suit numbers, you mean anything even within the statute of limitations?

**MR. SUDER:**  No.

**MR. SCHERKENBACH:**  Absolutely.  Their whole case is

inducement.  There's no knowledge of the patent pre-suit.  In our view, their pre-suit damages are essentially zero.  They'll disagree.  That's fine.  We'll sort it out.

But we can't be prejudging for the jury what that -- that it is, in fact, on total sales through March 31, 2018.

**THE COURT:**  Well, is your -- your inducement claim -- you did state your inducement claim.

**MR. SUDER:**  Yes.  Your Honor, and the summaries have total sales going back six years and have a separate number of total sales from the date we filed suit through this, so they can use both of them.  Which, really, that's why, if it's just a percentage, the Court can easily fashion a judgment.

**MR. SCHERKENBACH:**  Yeah, I think it would be more appropriate, if you're going to take anything out, Judge, take out the phrase "in total sales through March 31, 2018."

**THE COURT:**  Just say a blank percentage?

**MR. SCHERKENBACH:**  Percentage of some dollar amount.  They should pick the dollar amount as well.  Because, again, we don't know when they're going to start.  We don't dispute the data goes through --

**THE COURT:**  And there is an instruction, so they can know when to start, if they follow the instruction, correct?

**MR. SUDER:**  Yes.

**THE COURT:**  If they find just inducement, they can start only at the time of the lawsuit.

MR. SCHERKENBACH:  Yes.  Yes.

THE COURT:  So if we just struck "in total sales through March," we just say percentage of and then a dollar amount.

MR. SUDER:  Which would be a percentage of sales for a dollar amount of.  It's --

THE COURT:  Okay.  Yeah, otherwise, the dollar amount is ambiguous.

MR. SUDER:  Exactly.  They said, 1, dollar amount per unit or, 2, blank percentage of total sales for a total blank.

Then you're telling the jury, this is what you do.

MR. SCHERKENBACH:  Well, it shouldn't be total sales.  That's the problem.

THE COURT:  Well, we can just say sales.

MR. SUDER:  Yes.

THE COURT:  Percentage of sales --

MR. SCHERKENBACH:  And then a dollar.

THE COURT:  -- of March 31st of blank.

MR. SCHERKENBACH:  That's fine.

THE COURT:  All right.  Let's do it that way.  All right.  And then we can do the math.  Once they have -- can we stipulate to that?

MR. SUDER:  Yes.

THE COURT:  Whatever number they choose, total sales, the percentage, we can do the math.

MR. SUDER:  So, Judge, it would say ongoing royalty of, 1, dollars blank per unit sold or, 2, percentage of sales through March 21, 2018, of dollar sign blank.

THE COURT:  Yeah.

MR. SUDER:  Or the lump-sum payment.

THE COURT:  Yeah, the lump sum is B.

MR. SUDER:  Yeah.  I'm okay with that, Judge.

MR. SCHERKENBACH:  Sorry.  So I missed something.  So percentage of sales through -- we're going to leave in through March 31, 2018.

THE COURT:  Right, because we need to put an end date since there's no -- actually, we should say either units or dollars, because if they choose number 1, then it's the number of units sold.  If it's percentage of royalty, it's of the revenues.

MR. SUDER:  Yes.

THE COURT:  It actually should be of, you know, blank units or blank dollars, I mean, technically, because if they choose 1, per unit, then you need to know how many units there are --

MR. SCHERKENBACH:  Right.  They should have to specify units as well.

THE COURT:  Yeah.

MR. SCHERKENBACH:  Yes.

MR. SUDER:  May have to give a little bit more line to

write in, Judge, a big number.

THE COURT:  So it would say "or, 2, blank percentage of sales through March 31st of blank units or dollar blank."

MR. SUDER:  Yes.

MR. SCHERKENBACH:  It might be clearer to put the unit part up in the 1, honestly, Your Honor.

THE COURT:  Yeah.  I could repeat the 1 in parentheses.

MR. SCHERKENBACH:  Something like that.

THE COURT:  Yeah, so then there's a clear correlation.

MR. SCHERKENBACH:  Units go with one option only, dollars go with the other.

THE COURT:  Or units, I can say, "If 1, in paren, or blank dollars if 2, in paren.  How's that?

MR. SCHERKENBACH:  I'm sorry.  Can you say that again?

THE COURT:  I can say, sales of units, then paren if number 1, or dollars blank if number 2.

And 1 and 2 refer to the per unit or the percentage.

MR. SUDER:  Yes.

MR. SCHERKENBACH:  That'll work.

THE COURT:  Okay.  If they can't figure this out, they're not going to be able to figure out this case, so...

(Laughter)

THE COURT:  All right.

MR. SUDER:  Your Honor, do you want to make the space

to write in the number for the units, because it's a big number if they do that?

THE COURT:  Yeah, I'm going to put blank.

MR. SCHERKENBACH:  Give them a lot of space.

THE COURT:  Give some space.

So, I think, while we do that, why don't I start giving them the final instructions.

MR. SUDER:  That's fine, Your Honor.

THE COURT:  And then before you start, we'll maybe take a very short break and give you the verdict forms, because you may want to use that in your closings.

So I'm going to start with number 16 and go through -- I will go through the last substantive instruction, which is number 37, and then not give the duty to deliberate until after you have finished.  Okay?

MR. SCHERKENBACH:  Yes, Your Honor.

THE COURT:  All right.  Bring them in.

THE CLERK:  All rise for the jury.

(Jury enters at 12:41 p.m.)

THE COURT:  All right.  Take a seat and let me welcome the jury back.  Again, thank you for your attentiveness throughout this process.

So we're now in the home stretch here, so I'm going to give you some instructions.  And they'll be up on the screen.

Angie?

All right.  Do you see instructions on the screen?  Is it working?  No?  Oh, there it goes.  Okay.

All right.  Let me say something about the duty of the jury.

Members of the jury:  You are now the jury in this case.  It is my duty to instruct you on the law.  It is your duty to find the facts from all the evidence in the case.  To those facts, you will apply the law as I give it to you.

You must follow the law as I give it to you whether you agree with it or not, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

Please do not read into these instructions, or anything I may say or do, that I have any -- that I have an opinion regarding the evidence or what your verdict should be.

Again, what is evidence?  The evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witnesses; the exhibits that have been admitted into evidence; any facts to which the lawyers have agreed; and any facts that I may instruct you to accept as proved.

What is not evidence?  In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence and you may not consider them in deciding what the facts are.

I will list them for you.  For some reason it's starting with 5.  Assume I meant number 1.

Arguments and statements by the lawyers are not evidence.  The lawyers are not witnesses.  What they say -- what they may say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.

If the facts as you remember them differ from the way the lawyers have stated them, your memory controls.

Questions and objections by lawyers are not evidence.

Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or the Court's ruling on it.

Testimony that has been excluded or stricken or that you are instructed to disregard is not evidence and must not be considered.

In addition, some evidence may be received only for a limited purpose.  When I instruct you to consider certain evidence only for a limited purpose, you must do so and may not consider the evidence for any other purpose.

Anything you may see or hear when court is not in session is not evidence.  You are to decide the case solely on the evidence received at trial.

Direct and circumstantial evidence.  Evidence may be

direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose may provide a different explanation for the presence of water on the sidewalk.

Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense.

Ruling on objections.  There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and the lawyer on the other side thinks it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and must not guess at what the answer might have been.

Sometimes I may have ordered that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purposes.

Credibility of witnesses.  In deciding the facts in this case, you may have to decide which testimony to believe or which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

Number one, the opportunity and the ability of the witness to see or hear or know the things testified to;

Two, the witness's memory;

Three, the witness's manner while testifying;

Four, the witness's interest in the outcome of the case, if any;

Five, the witness's bias or prejudice, if any;

Six, whether other evidence contradicted the witness's testimony;

Seven, the reasonableness of the witness's testimony in light of all the evidence; and

Eight, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.

People often forget things or make mistakes in what they remember.  Also, two people may see the same thing -- same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.

On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

Impeachment evidence.  The evidence that a witness lied under oath or gave different testimony on a prior occasion may be considered along with other evidence in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness and for no other purpose.

Stipulations of fact.  The parties have agreed to certain

facts.  You must, therefore, treat these facts as having been approved.  And these are the ten facts:

1, Plaintiff Opticurrent is a corporation organized and existing under the laws of the State of Texas with its principal place of business in Marshall, Texas, 75670;

Two, Defendant Power Integrations is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in San Jose, California.

Three, plaintiff is the owner of all rights, title, and interest to the '623 patent;

Four, the '623 patent was issued on October 25th 2005;

Five, plaintiff filed its complaint in this litigation on April 1st, 2016;

Six, the plaintiff has accused the following four products of infringement:  TinySwitch-III, TinySwitch-LT, LinkSwitch-II, and LinkZero-AX;

The products within the TinySwitch-III family that are accused of infringement are TNY274, 275, 276, 277; 278; 279, 280.  The TNY277 product is representative of this list of accused products for the purposes of Opticurrent's infringement allegations in this case;

Eight, the products within the TinySwitch-LT family that are accused of infringement are TNY numbers 174, 175, 176, 177, 178, 179, and 180.  The TNY179 product is representative of this list of accused products for purposes of Opticurrent's

infringement allegations in this case;

Number nine, the products within the LinkSwitch-II family that are accused of infringement are:  LNK numbers 603, 604, 605, 606, 613, 614, 615, 616, and 632.  The LNK605 or LNK603 product is representative of this list of accused products for the purposes of Opticurrent's infringement allegations in this case;

Ten, the products within the LinkZero-AX family that are accused of infringement are:  LNK numbers 584, 585, and 586.

The LNK585 product is representative of this list of accused products for purposes of Opticurrent's infringement allegations in this case.

A word about expert opinion.  You have heard testimony from witnesses who testified to opinions and the reasons for his or her opinions.  This testimony -- this opinion testimony is allowed because of the education or experience of this witness.

Such opinion testimony should be judged like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Burden of proof.  When a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more likely true

than not true.  You should base your decision on all of the evidence regardless of which party presented it.

Summary of contentions.  I will now give you a summary of each party's -- each side's contentions in this case.  I will then tell you what Opticurrent must prove to win on each of its contentions.

As I previously told you, Opticurrent seeks money damages from Power Integrations for allegedly infringing the '623 patent by making, importing, using, selling, or offering for sale in the United States products that Opticurrent argues are covered by claim 1 of the patent.

Claim 1 is the asserted claim of the '623 patent. Opticurrent also argues that Power Integrations has actively induced infringement of this claim of the '623 patent by others.

The products that are alleged to be -- are alleged to infringe are:  The LinkZero-AX, LinkSwitch-II, TinySwitch-LT, and TinySwitch-III product families.

Power Integrations denies that it has infringed on the asserted claim of the patent.

Your job is to decide whether the asserted claim of the '623 patent has been infringed.  If you decide that any claim of the patent has been infringed, you will then need to decide any money damages to be awarded to Opticurrent to compensate it for the infringement.

Interpretation of claims.  Before you decide whether Power Integrations has infringed on claim 1 of the '623 patent, you will need to understand the patent claim.

As I mentioned at the beginning of the case, the patent claims are numbered sentences at the end of the patent that describes the boundaries of the patent's protection.

It is my job as judge to explain to you the meaning of any language in the claim that needs interpretation.  I have interpreted the meaning of some of the language in the patent claim involved in this case.  You must accept those interpretations as correct.

My interpretation of the language should not be taken as an indication that I have a view regarding the issues of infringement.  The decisions regarding infringement is yours to make.

Now I will read the claim terms and their respective meanings.

"Terminal" in claim 1 means "an external connection point."

A "noninverting transistor switch having only three terminals" in claim 1 means "a noninverting transistor switch with three terminals that does not have a fourth terminal connected to a power supply."

"Voltage stabilizer" in claim 1 means "a circuit that maintains a constant voltage level."

"Connected to" in claim 1 means "joined together to."

Finally, "Said CMOS inverter interrupting the passing of current between said voltage stabilizer and the second terminal when said transistor is in its off switching state" in claim 1 shall have its plain and ordinary meaning.

For the claim terms for which I have not provided you with any meaning, you should apply the claim term's plain and ordinary meaning to a person of ordinary skill in the art.

Infringement, burden of proof. I will now instruct you on the rules you must follow in deciding whether Opticurrent has proven that Power Integrations has infringed claim 1 of the '623 patent.

To prove infringement of this claim, Opticurrent must persuade you by a preponderance of the evidence; that is, more likely than not, that Power Integrations has infringed this claim.

Direct infringement. A patent's claims define what is covered by the patent. A product directly infringes a patent if it is covered by at least one claim of the patent.

Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision, and I have already instructed you as to the meaning of the asserted patent claim.

The second step is to decide whether Power Integrations

has made, used, sold, offered for sale, or imported within the United States a product covered by a claim of the '623 patent. If it has, it infringes.  You, the jury, make this decision.

You have heard evidence about both Mr. Congdon's breadboard product and the accompanying drawing and Power Integrations' accused products.

However, in deciding the issue of infringement, you may not compare Power Integrations' accused products to Mr. Congdon's breadboard product or the accompanying drawing.

Rather, you must compare PI's accused products to claim 1 of the '623 patent when you are making your decision regarding infringement.

Whether or not Power Integrations knew its product infringed or even knew of the patent does not matter in determining direct infringement.

There are two ways in which a patent claim may be directly infringed.  A claim may be literally infringed, quote-unquote, or it may be infringed under the "doctrine of equivalents." The following instructions will provide you more detail on these two types of direct infringement.

Direct infringement.  To decide whether Power Integrations' products literally infringes on claim 1 of the '623 patent, you must compare the product with the patent claim and determine whether every requirement of the patent is included in that product.  If so, Power Integrations' products

literally infringe that claim.

If, however, Power Integrations' products do not have every requirement in the patent claim, its products do not literally infringe the claim -- that claim.  You must decide literal infringement for each asserted claim separately.

Infringement under the doctrine of equivalents.  If you decide that the alleged infringer's product does not literally infringe on an asserted patent claim, you must then decide whether the patent infringes on the asserted claim under what is called the "doctrine of equivalents."

Under the doctrine of equivalents, the product infringes an asserted patent claim if it includes parts that are identical or equivalent to each and every requirement of the claim.

If the product is missing an identical or equivalent part to even one requirement of the asserted patent claim, the product cannot infringe the claim under the doctrine of equivalents.

Thus, in making your decision under the doctrine of equivalents, you must look at each individual requirement of the asserted patent claim and decide whether the product has either an identical or equivalent part to that individual claim requirement.

A part of a product is equivalent to a requirement of an asserted claim if a person of ordinary skill in the field of

technology would think that the differences between the part and the requirement were not substantial as of the time of the alleged infringement.

Changes in technique or improvements made possible by technology developed after the patent application is filed may still be equivalent for purposes of the doctrine of equivalents if they still meet the other requirements of the doctrine of equivalents set forth in this instruction.

You may find that an element is equivalent to a requirement of a claim that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the difference between them to be, quote, insubstantial, closed quote, or would have found that the structure, number one, performed substantially the same function; and, number two, works in substantially the same way; and, three, to achieve substantially the same result as the requirement of the claim.

Two structures may be equivalent if they are interchangeable.  In order to prove infringement by equivalents, a patent holder must prove the equivalency of the structure to a claim element by a preponderance of the evidence.

You may not use the doctrine of equivalents to find infringement if a finding of infringement under the doctrine of equivalents would effectively eliminate or ignore an otherwise

unmet element or requirement of the claim.

Indirect infringement.  In addition to stopping infringement by those who are directly infringing, a patent owner also has a right to stop those who are known as indirect infringers.  I will explain to you in a moment the precise requirements for finding someone has induced infringement by another person.

Keep in mind that there can be no indirect infringement unless someone is directly infringing the patent.  Thus, to prove that someone is inducing another person to infringe, the patent owner must prove by a preponderance of the evidence that someone is directly infringing a claim of the patent.  Such proof may be based on circumstantial evidence you have heard in this case, rather than direct evidence of infringement.

Inducing patent infringement.

Opticurrent argues that Power Integrations has actively induced another to infringe the '623 patent.  In order for Power Integrations to have induced infringement, Power Integrations must have induced another to directly infringe a claim of the patent.  If there is no direct infringement by anyone, there can be no induced infringement.

In order to be liable for inducing infringement, Power Integrations must:

Number one, have intentionally taken action that actually induced direct infringement;

Number two, have been aware of the '623 patent; and

Number three, have known that the acts it was causing would infringe the patent.

Power Integrations may be considered to have known that the acts it was causing would infringe the '623 patent if it subjectively believed there was a high probability that the direct infringer's product infringed the patent; in other words, willfully blinded itself to the infringing nature of the direct infringer's act.

Damages, burden of proof.

I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win on any issue.

If you find that Power Integrations infringed the asserted claim, you must then determine the amount of money damages to be awarded to compensate for that infringement. The amount of those damages must be adequate to compensate Opticurrent for the infringement.

A damages award should put Opticurrent in approximately the financial position it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty.

You should keep in mind that damages you award are meant to compensate Opticurrent and not to punish Power Integrations.

Opticurrent has the burden to persuade you by

preponderance of the evidence of the amount of its damages. You should award only those damages that Opticurrent more likely than not suffered.

While Opticurrent is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty. Opticurrent is not entitled to damages that are remote or speculative.

Mere difficulty in ascertaining damages is not fatal to Opticurrent. You may base your evaluation of reasonable certainty on opinion evidence. Any doubts regarding the computation of the amount of damages should be resolved against Power Integrations and in favor of Opticurrent.

Reasonable royalty. Opticurrent is seeking damages in the amount of a reasonable royalty. A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.

This right is called a "license." A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the alleged infringer taking place at the time when the infringing activity first began.

In considering the nature of this negotiation, you must assume both parties would have acted reasonably and would have entered into a license agreement. You must also assume that both parties believed the patent was valid and infringed.

Your role is to determine what the result of that negotiation would have been.  The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

Royalty can be calculated in several different ways, and it is for you to determine which way is the most appropriate based on the evidence you've heard.  You should consider all the facts known and available to the parties at the time the infringement began.

Some of the factors you may consider in making your determinations are:

One, the value that the claimed invention contributes to the accused products;

Two, the value that factors other than the claimed invention contribute -- the value that factors other than the claimed invention contribute to the accused products;

Three, comparable license agreements, such as those covering the use of the claimed invention or similar technology.

One way to calculate a royalty is to determine what is called -- what is called an "ongoing royalty."  To calculate an ongoing royalty, you must first determine the base; that is, the product on which the alleged infringer is to pay.

You will then need to multiply the revenue the defendant obtained from that base by the rate or the percentage that you

find would have resulted from the hypothetical negotiation.

For example, if a patent covers a nail, and that nail sells for $1 and the licensee sold 200 nails, the base revenues would be $200.  If the rate you find would have resulted from the hypothetical negotiation is 1 percent, then the royalty would be $2 or the rate of .01 times the base revenue of $200.

By contrast, if you find the rate to be 5 percent, the royalty would be $10, or the rate of .05 times the base revenue of $200.  These numbers are only examples and are not intended to suggest the appropriate royalty rate.

Instead of applying a percentage royalty, you may decide that the appropriate royalty would have resulted -- that the appropriate royalty that would have resulted from a hypothetical negotiation is a fixed number of dollars per unit sold.  If you do, the royalty would be that fixed number of dollars times the number of units sold.

If a patent covers only part of a product that the infringer sells, then the base would normally be only that feature -- would normally be only that feature or component.

For instance, if you find that, for a $100 car, the patented feature is the tires, which sell for $5, the base revenue would be $5.

In this case, the '623 patent covers less than all the components of the products that Power Integrations uses or sells.  It is Opticurrent's burden to demonstrate what value

the components covered in the '623 patent have added to the desirability of the products as a whole and to separate the value of the patented contribution from the value of other product parts that are not attributable to the patented invention.

In this case, Opticurrent and Power Integrations have introduced evidence of licenses between licensees and licensors.  The royalty rate in one or more of those may be considered if it helps to establish the value that is attributable to the patented invention as distinct from the value of other features of Power Integrations' products.

The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.  When the accused infringing products have both patented and unpatented features, measuring this value requires you to identify and award only the value of the patented features.

Another way to calculate royalty is to determine a one-time lump-sum payment that the alleged infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product, both past and future.  This differs from payment of an ongoing royalty because, with an ongoing royalty, the licensee pays on the revenue of actual licensed products it sells.

When a one-time lump sum is paid, the alleged infringer

pays a single price for a license covering both past and future infringing sales.

It is up to you, based on the evidence, to decide which type of royalty is appropriate in the case for the life of the patent.

Reasonable royalty-relevant factors.

In determining the reasonable royalty, you should consider all the facts known or available to the parties at the time the infringement began.

Some of the kinds of factors that you may consider in making your determination, in addition to those mentioned in the prior instructions, are:

Number one, the royalties received by the patentee for the licensing of the patent-in-suit proving or tending to prove and establish royalty;

Two, the rates paid by licensees for the use of other patents comparable to the patent-in-suit;

Three, the nature and scope of the license, as exclusive or nonexclusive or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold;

Four, the licensor's established policy of marketing -- and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that

monopoly;

Five, the commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business or whether they are inventor and promoter;

Six, the effect of selling the patent specialty in promoting sales of his nonpatented items or the extent of such derivative or convoyed sales;

Seven, the duration of the patent and the term of the license;

Eight, the established profitability of the product made under the patents, its commercial success, and its current popularity;

Nine, the utility advantages of the patented property over old modes or devices, if any, that had been used for working out similar results;

Ten, the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention;

Eleven, the extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

Twelve, the portion of the profit or of the selling price that may be customarily -- that may be customary in the particular business or in comparable business to allow for the

use of the invention or analogous inventions;

Thirteen, the portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

Fourteen, the opinion and testimony of qualified experts;

Fifteen, the amount that a licensor, such as the patentee, and the licensee, such as the infringer, would have agreed upon at the time the infringement began if both had been reasonably and voluntarily been trying to reach an agreement; that is, the amount which a prudent licensee, who desired as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors.

You may also consider other -- any other factors which, in your mind, would have increased or decreased the royalty Power Integrations would have been willing to pay -- would have been willing to pay and that Opticurrent would have been willing to accept, acting as normally prudent business people.

The framework you should use in determining a reasonable royalty is the payment that would have resulted from a negotiation between Opticurrent and Power Integrations taking place at a time prior to when the infringement began.

Date of commencement, products.

Under the law, a patent owner can recover damages for infringements committed up to six years prior to the date an action was filed.

Thus, if you find that an asserted claim is infringed, Opticurrent can recover damages for infringement committed on or after April 1, 2010, but not before that date.

All right.  So at this point, those are the preliminary instructions, and it is now the plaintiff's opportunity to present its closing argument.

MR. SUDER:  Thank you, Your Honor.

May I have a moment to set up?

THE COURT:  Yeah.

MR. SUDER:  Thank you.

**CLOSING ARGUMENT**

MR. SUDER:  This is the third time I've gotten to speak with you.  Remember I told you in voir dire -- the first time was in jury selection and then in opening, and now I'll get to tell you for the third time and tell you what I think the evidence did show you.

The last time I spoke to you, I said I was going to make a

promise to you. I'm going to ask you to judge me and see if what I was telling you then is what the evidence was. I made that promise to you because you were entitled to hear evidence.

And the reason is because you are taking time out of your lives to resolve our dispute. So thank you for that. That is the essence of our system. And I made that promise, and I believe I've kept my promise.

I want to tell you something because I believe in the jury system, and it's not just words. I'm sure you can tell, even though I've dropped a couple of "y'alls," I'm not from Texas. I'm from back east in New Jersey. Went to law school in Washington D.C.

When I got out of law school, I got an opportunity, like Robert, to work for a federal judge like Judge Chen, Eldon Mahon, Fort Worth, Texas. For two years I was his law clerk. And he was my mentor, my hero, my guide, my moral compass on the importance of our legal system.

And I saw it for two years. I sat there and watched jurors and learned from a great jurist, like Judge Mahon, the importance of our legal system, the importance of a jury.

So when I say thank you, it's because I mean it. It's what we're about. It's what sets us apart. It's the essence of our life. In fact, it's so important that my daughter became a lawyer. Went down to San Diego, and she too worked for a federal judge, and she shares those values, because we

believe in the jury system.

So, again, you took time out of your lives.  Didn't know me, didn't know anyone in this room, and you listened to the evidence.  And that's what makes us a great country.

Like I said in opening, remember I had some slides, I have them right here, and I told you that they may not make total sense to you then.  And I was showing you data sheets and about terminals and capacitors.  But I said listen to the evidence, and you will.  It was just a preview.

I'm going to go over those, because what I did tell you in jury selection and what I did tell you in opening is the same thing I'm telling you now.

What is this case about?  It's about respect.  It's what we teach our children, that you respect other people's property.  You shall treat them with dignity and you answer questions and you treat people with respect.  And it's about choices, because wrong choices have consequences.

It's no different here in this case.  Power Integrations could have bothered to take the time to even read the patent.  They didn't.  They made that choice.  Now they have to accept those consequences.

I also said this case is about how we all live by the same set of rules.  These are my rules.  I keep them right here.  You saw me use them a couple of times.  The rules we're talking about here were set out in our Constitution over 200 years ago.

Angie, can I get the screen up, please.

The right to an invention. It was put in our Constitution. And we all live by the same rules. And there's a quote, because Thomas Jefferson wrote this document. He wrote the Declaration of Independence.

You know, he was the very first commissioner of the Patent Office. He established our patent system and our Patent Office because he was a great inventor. He made dumbwaiters. Benjamin Franklin made the stove. They were inventors and knew the importance of a strong patent system to protect an invention when we were getting this country up and running.

And what he said about a jury trial -- and you'll understand when I say this, because this is one of my favorite quotes. I learned this from Judge Mahon. "I consider the trial by jury as the only anchor ever yet imagined by which the government may be held to the principles of its Constitution."

Think about that. That's you. You're the only one that can hold Power Integrations to the same rules that we all live by. The same issues of respect, protecting the invention. You are that anchor.

And that's important because that was important to Thomas Jefferson and Benjamin Franklin. Benjamin Franklin didn't make stoves. You've heard of Franklin Stove. He wasn't a stove maker, but he was an inventor.

Thomas Edison, our greatest inventor, was probably the

worst businessman.  He couldn't make it as a businessman, but he had a student that idolized him and knew the importance of what it is to protect and promote invention.

And that student went on to become a powerful businessman and always was helping him out.  And his name was Henry Ford.  And you go to the Henry Ford museum in Dearborn, Michigan, and you'll see Thomas Edison's original lab, because invention is important.  Maybe some day Jim Congdon's lab will be somewhere.

It doesn't say you have to make product to be an inventor and get the protections.  But that's what they want to say did you make product did you do this?  That's not what we're about.

Because Jim Congdon is a true inventor.  If he could spend all of his time in his lab, he's a happy man.  That's all he wants to do.  He's the type of inventor that our system was designed to protect.

And Brad Brunell learned at Microsoft and then took it to the BBC as a way to help inventors.  And a mutual friend put them together, and they formed a partnership.  And when Brad interviewed me and I heard the story and I spoke to Corbin, who's a computer science engineer, and Dave, my young partner who's an electrical engineer, we looked at it, we studied it, and we found out that Mr. Brunell had already hired an expert to tear these apart and study them.  We said, yeah, we believe in you too, Jim.  We want to partner with you too.  And here we are.

You know why?  Because we knew Jim could not do this on his own.  You saw him.  A lovely man, an honest man.  Unless you ask Mr. Bohannon, who thinks he lied about his invention, because that diagram, according to Mr. Bohannon, is not his invention.  We'll get to that in a little bit.

But the first thing I told you when I stood up here was that I was proud to represent Jim Congdon and Opticurrent and have the seven of you decide this important case, because Power Integrations, as I said, does not respect other people's property.

Mr. Walker told you that they don't have a policy -- their policy is, we don't ever license.  We don't license ours to share.  And if you've got a patent, we don't care.  If it's valid, doesn't matter, we'll fight you.  That's their policy.

And it's interesting that they're not challenging the validity of our patent.  You heard a lot of evidence how you can go back to the Patent Office -- in fact, Mr. Bohannon makes a nice living telling the Patent Office that all these patents that everyone else has are invalid.  But they didn't do it here.

They hired Mr. Bohannon in all these other cases, these lawyers, but they're not doing it here.  And you have to ask yourself why?  You have to ask yourself, if they're not doing it, what do I care about all these other patents?

Because the impression was, hmm, I don't know if you had

the impression, I'm watching those patents, I'm thinking, wow, they must think they invented this first.  Well, if they invented it first, guess what, our patent's invalid.  But they're not doing that.

Mr. Bohannon had an expert opinion on that.  He had a whole report on it.  But he didn't give it to you.  Why?  Ask yourself why.  Think about that.

So when Mr. Congdon's patent is valid and must be respected, it must be respected until 2022, that's the deal he made with the government under our system.

And until 2022, if you want to practice that invention, you have to get his permission.  That's just the law.

Remember I told you in jury selection about if I have a patent on a chair?  Remember I used that example?  If I have a patent on a chair until 2022, and you want to make a chair and put a swivel on it and get a patent on the swivel, go for it.  But you must respect my patent on the chair.

If they didn't want to, they could have tried to invalidate.  So the whole point of all their patents, I submit to you, is just a distraction, like everything else you've heard from them, because we were first with the chair.

We were first with using a three-terminal switch.  Their own documents call it a filter.  I'll get to that in a little bit.  But you saw it with Mr. Bohannon.  We didn't think it was necessary to show you that because we had Dr. Zane.

Is there anyone more qualified in this particular space than Dr. Zane?  We were very fortunate to find him.  His entire professional career is teaching engineers these very principles.

He works with car manufacturers on electric cars and these techniques in battery charges for electric cars.  Ph.D, patents, books.  He taught you all.  He says it's a filter.

And, finally, we had to say -- he wanted to hear what they said.  Remember Mr. Congdon didn't say it's not a filter. We'll get to that in a second also.  It was just Mr. Bohannon who said it's not a filter.

Mr. -- you were told he had a B.S. in math and physics. Kind of wasn't true.  I don't know why they had to tell you that, because he only has a bachelor of art in mathematics.

Nothing against Mr. Bohannon.  He's very good in his field.  It just so happens this is not his field.

And don't you know that Power Integrations, with all their lawyers and all their engineers, they couldn't find someone in this field to tell you something different?  They couldn't get Mr. Kung to even read the patent, other than to glance at it, and study it, or any of the other engineers that they had there?  Isn't that odd?

They have all these engineers, they say they're the biggest, greatest, win all the awards, sell billions and billions of products, and they didn't bring you an engineer

that does power electronics.

What does that say about respect for you and Judge Chen and the system of justice?  That they are trying to fool you. Is that respect?  Is that respect of our legal system and our Constitution?  Do not be fooled.

Because remember one thing, I remember telling you -- I don't know if it was jury selection or opening, I said when this case is over, you're going to go back and impress your friends.  And when you show them your charge, you go, "You know there's a LinkSwitch Zero in there that converts the AC?"  And you can tell your friends, and they go, "Ooh."

One thing you cannot tell your friends, you can't say, "Oh, by the way, that's a power supply."  Don't ever tell someone that the capacitor is a power supply, because anyone who's an engineer, that studies it, went to school, will tell you it's not a power supply, it's a filter.

And their own data sheets that they tell the customers, they tell everyone in the world that a capacitor is a filter. The only people they tell different are the seven of you.

Those data sheets went to everyone.  And they called a bypass pin a filter, a capacitor filter.  They called the Y capacitor a filter.  A capacitor is a capacitor.  It has nothing else.  It's just a passive element.

Now, I also -- if you remember, I asked you, do we all live by the same set of rules?  Remember there was a whole

discussion?

I said, Do companies live by the same set of rules as we do in our individual lives? And someone said, "Yes, they do." And then someone else said, "Well, they should, but they don't."

I don't know if you remember that discussion. And that they are too powerful and they feel like the rules don't apply to them because they have all the power and the money.

That's what Thomas Jefferson was talking about when he said, the jury system, you are the anchor. You are that anchor that can make them play by the same set of rules that we live by.

Now, I showed you in opening a bunch of slides of what Judge Chen was going to tell you, the instructions. And one of them was how you prove infringement. Remember I said there can be two ways, literally or equivalency. That's what Judge Chen just read to you. And he told you that you could have either way.

And we think it's meant literally. But even if it's not, remember the analysis that I went through with Dr. Zane? I said, even if the capacitor, if you want to call it a power supply, what's the function? It's to take stabilized voltage that comes from the drain pin and get it to go to the CMOS.

And what's the way it does? It comes down, goes through to that 5.75, and goes back down. And what's the result? You

get a regulated voltage that interrupts the flow.

And he said that it is literal because it's absolutely just a filter, it's not connected to a power supply.  But he said, even if it's not, the differences are insubstantial.  It performs substantially the same function.  It takes the same voltage that's coming from that drain pin and does the same way.

And all Mr. Bohannon can say is, didn't do it, doesn't meet the test.  Did he tell you why?  Did he go through the analysis that Dr. Zane went through?  Think about that when you answer the questions.

Because it really doesn't matter.  It's infringement.  We think it is absolutely literal infringement.  But even if you thought that for that one one-thousandth of a second it was supplying energy, it still performs the basic function and does the same thing.

And Mr. Kung didn't even know how long his capacitor, that he designed, lasts.  Remember he couldn't tell you.  I asked Mr. Kung, I said, How long does a -- do these capacitors hold a charge?  He says, I don't know.

Wait a minute, you're the father of these products.  I don't know.  Wait a minute, the buck stops with me.  The buck stops here.  I don't know.  He didn't know because he didn't bother to find out.

And one of the reasons is probably because if a capacitor

is just a filter, just like Mr. Congdon said -- Jim said, When I was building this breadboard right here, this breadboard, I just took some capacitors off the floor to use, because just to make my point.

Now, the data sheets that I showed you, that we went through, are how the customers practice. As you heard Mr. Sutherland say, those data sheets are designed to tell the world exactly how to build these.

They are our products. That's where they call them filters and everything, and they say this is the drain pin. And we'll get to those.

But the question is, for purposes of inducement -- and I'm going to go through the charge a little bit more carefully -- it's, are they -- once they got notice of the patent, in April of 2016, they -- they then didn't do anything to tell their customers different. But that is why it's inducement.

They're telling Nokia, build it this way, even though I now know the patent and I know what Opticurrent is saying, build it this way anyway.

And there's a very interesting instruction on that, that's very relevant here on inducement. It says -- let me find it for you. It says: When you know the patent and you knew your acts were causing infringement, you cannot willfully blind yourself to the infringing nature of the act. You cannot willfully blind yourself.

What does that mean?  And you'll understand why I'm pointing it out.  You cannot stick your head in the sand.

What's interesting is that David Kung told you that it was his decision.  If there were any changes that needed to be made in the product, if anything needed to be done with respect to the products as a result of this patent, it's his call.  Remember the buck stops here.  That's what he said.

But how can the buck stop here if he doesn't even read the patent?  Think about that.  I make the decision about whether this patent may be implicated.  Don't you think you ought to first read the patent?  Makes sense, doesn't it?

But, under oath, he told you he glanced at it.  He tried to tell you, in questions from Mr. Warren -- I read it.  And then I said, wait a minute, you glanced at it right before your deposition.  Did you talk to anyone else about it?  No.

And then Cliff Walker:  Oh, I read it, yeah, I studied it. Cliff Walker, who is not an engineer, not a lawyer, and didn't go to anyone else.  If he's not an engineer and he's not a lawyer, why not walk down the hall and ask an engineer and say, hey, we just heard about this patent, what do you think?  Have we got a problem?  Let me know.

All Cliff Walker tells you is, I did it, I studied it. But let me say something about that because I asked Mr. Walker, You got a note?  Surely you've got a memo.  You've got something that you can show this jury to support what you're

saying.

Because if you read it, first of all, you're not an engineer or lawyer, how do I know you even know what it is? Have you got anything? And he said no. And neither did Mr. Kung.

And let me say -- you see all these (indicating)? Look, this is what we do. It's how we're wired. Lawyers write down everything. It's the way we are.

But you know who's just as bad as lawyers, probably worse, about writing down everything? Are engineers. They're taught that they better write down everything. Because they build things and they want get it exactly right, so they write down everything.

So these engineers and teams of lawyers, when they heard about this patent and made all these determinations, don't have a single writing to show you.

Did you ever hear the expression, "Never put bad news in writing"? Think about that. Never put bad news in writing.

Why didn't Mr. Walker or Mr. Kung or anyone give Mr. Congdon and Opticurrent the respect that the Patent Office and the government gave them and said you have a patent. We believe you infringe. And they don't even read it.

And they come here years later and tell you they did, but can't even show you anything to support it. And they take positions that are belied and contradicted by their very own

documents.

The data sheets call it a filter, but that's the story we'll get with the lawyers.  And what we'll do is we'll get Mr. Bohannon, who's not an expert in this field, and he'll give the opinions.  Got lots of opinions.  But the thing is -- did you catch this? -- he got hired by the lawyers.  Why?  Because he's worked with the lawyers.

And the lawyers knew exactly who to get to say what we need him to say.  And you know what else we're going to do? We're going to put a shield around him.  We're not going to let him talk to anyone at the company.

Wouldn't it make sense to hear what the father of these products thinks about the claims?  Wouldn't it make sense, if the father of the products is too busy, to go to one of the other engineers?  Talk to somebody.  But they didn't.

You have to ask yourself why.  Are they being honest with you?  Forget us.  I get it.  We picked this fight, I can take it.  But why are they not being honest with you?  Is that respect?

Is that saying, oh, we respect intellectual property? They can say that all they want, but do you think they really mean it?  Your verdict is going to tell them whether they need to pay attention and truly respect other people's property.

Now, Mr. Kung gave two admissions.  And it's interesting. Did you notice how their witnesses answered the questions when

they asked them the questions and how they answered when I asked them the questions?  Did you notice that?

Mr. Kung, who had all the answers written out before, remember he said he studied, all the answers were written out. And Mr. Bohannon, Mr. Wong could ask him anything, oh, yes, sir, yes, sir.

When I asked him anything, no.  I couldn't even get Mr. Kung to agree with me that he served as an expert in another case.  He fought me on that, when he told me under oath that he did.  Why couldn't they afford me the courtesy as a witness to answer my questions the way they did it when they practiced it with Mr. Kung?

Think about that.  But what we do know is that Mr. Kung was very careful.  Mr. Warren did not ask him, Does this capacitor serve as the power supply to the device?  All he would say is it's hooked up here, it's hooked up there, it does this.  He never asked Mr. Kung.  He was very careful.

But, finally, when I got to ask him, when Mr. Kung -- when I finally get him to answer my question, he said two things that were interesting.  One, he admitted it's a filter.  A capacitor serves as a filter.  He has to.  He's the father of these products.  And they told the world in all their data sheets that it's a filter.  So he had to.

But what else is interesting is he told me -- I asked him under oath, from his deposition, "What is the function of the

drain pin in this diagram?"  And he said, "It is the connection for the power supply to this chip."

He said it.  The connection to the power supply.  He didn't say, well, that's not the power supply.  He admitted it in his deposition over a year ago.

And they can try to run from it, but maybe back then he wasn't paying attention.  He didn't realize he was going to be in front of a jury.  He told me the truth, that the power supply is the drain pin.

But what else you have to ask yourself is, why wasn't Mr. Kung an expert?  He did it for them before.  He worked with these lawyers and served as an expert witness and issued a report.  So why didn't he do it here?

I think that speaks volumes of their sincerity.  It speaks volumes that Mr. Kung was not asked a question.  And I'll give him the credit he deserves; he knew he couldn't put his name on the dotted line and tell the truth and give an opinion that they don't infringe.

Because he could have read, studied this (indicating), so why didn't he even give the courtesy of reading it?  Or if he's too busy, get one of the other hundreds of engineers at his company to read it.  All they want to do is get someone who is not an engineer to give an opinion that was bought for by the lawyers after they got notice of the lawsuit.

Think about that.  Is that respect?  Is that how you want

to send the message to people this is how you treat each other in our society?  Is that what you do with patents?

So we do know that Dr. Zane said a capacitor is not a filter.  We also know that Mr. Congdon said it's a filter.  And we know that Mr. Zane said -- Mr. Kung said it's a filter.  The only person who said it's not a filter is Mr. Bohannon. (sic)

And you could stop right there.  But then we showed you that the data sheets call it a filter.  So the entire world, except for U7, they tell is a filter.  It is undisputed, ladies and gentlemen, that this first element is infringed literally and by equivalence.  Either way, it doesn't matter.

But the other most important thing is in the instructions about what this is; what they want to tell you is that they don't have it connected to a power supply.  But they ignore the external connection point.  You have to read these together if you're one skilled in the art like Dr. Zane.  That's what the instructions say; that the meaning should be understood by one skilled in the art.

The capacitor is not connected to anything outside of the chip.  It goes to the chip and right back.  Whether it's inside or outside, it doesn't make a difference.  It does the exact same thing.  And, in fact -- so that's why it's not connected to a fourth terminal that's external to the chip.  It's made to work, as we saw, as a self-biased -- and you don't need -- all by itself.

What's interesting is Mr. Congdon had a capacitor there (indicating) which is no different than what they have.  And the only way Mr. Bohannon can refute that point, because he knows that if their products don't infringe because they have a capacitor, then he has to admit that this also wouldn't infringe.  And the only way he can do that is to tell you:  I don't even know this is his invention.  That's his story.  Because he knows that a capacitor is just a passive element to assist the voltage stabilizer.

That's why Mr. Congdon -- excuse me -- Mr. Bohannon had to tell you:  I don't know even know if he invented it.  Mr. Bohannon has lots of opinions.  He had an opinion about this element, he had an opinion about this element, this element, this element (indicating.)  He didn't tell you he had an opinion about the validity.  Didn't tell you.  And he also had the opinion that Jim Congdon was a liar.  And I found that -- I didn't like that one.  To say that Jim Congdon, this is not his invention when Mr. Congdon explained that to you, is just downright bad.  You don't do that.  But he had to because he put himself in a corner and knew that because this has a capacitor it doesn't change anything.  That is his story.

It's the same thing -- again, what we teach our children:  You don't tell the truth, what happens?  You tell another lie, and another lie, and you can't help it.  And it's -- you just need to tell truth because nothing good can come of not being

truthful.

This is not his invention.  That's -- that's what Mr. Bohannon told you.  This is not his invention.  And maybe it's not to someone who's not an engineer.  I don't know.  I don't know about you, but I believe Jim Congdon when he says this is his invention.  It's dated right there, it's witnessed right there (indicating).

They don't dispute these other elements.  We carefully went through why they're all here.  When you get to the question number 1 about infringement, do we infringe?  The answer is yes.  They infringe literally.  You don't even have to get to equivalence.  But either way, it doesn't matter.  If you're going to -- it was our burden.

That's another thing I meant to tell you.  I told you in the beginning of *voir dire*, the most important aspect of our legal system is the burden of proof.  We have to prove our case, but it's by a preponderance of the evidence; more likely so than not so.  Is it more likely so what Dr. Zane told you?  Or is it more likely so what Mr. Bohannon told you?  That's our burden.

So remember that.  That that's the burden of proof.  I think we go beyond a reasonable doubt.  Don't get me wrong here.  But that's our burden.  Just tip that scale.

So when you get to question number 1, the answer is yes.  They infringe and they know it.  That's why they never bothered

to read the patent.

And do they induce?  Again, the question to number 2 is yes.  Because once they got notice of the patent and they stuck their head in the sand, they didn't stop others from practicing this invention that they were selling.  So again, we don't think there's an issue on liability on this issue.

Let me talk to you a second about damages.  Now, I'm going to get a little more into this later.  I told you in opening -- I have some slides here from opening -- about how it works.  How you calculate damages.  And it's exactly what Judge Chen just told you.  You take the infringing sales and you take the royalty rate and you do the math.

It's in the instructions.  Going to go over them with you when I get back.  It's in the instructions.  You see how much they sold, and then how much, and then that's your rate.  And what you can look at, and what I told you in opening -- you probably didn't know this, but now, like I said, now you get it -- the QBAR license is a data point.  It was the earlier patent, and this is an improvement.  And the improvement, it's up to you what the value of that improvement is.

But what's interesting, and what Mr. Sutherland told you, is that they sell this, and they sell a lot of it.  And how much they sell is relevant to the issue of damages.  Because if you go to the calculation and you look at how much have they sold, they have sold -- right there (indicating), It's Exhibit

210-A -- they have sold almost 2.4 billion units worldwide.

And what Mr. Kung -- Mr. Sutherland told you is that one-third -- they make these all to work in the United States. They offer them to sell, they import them, they do everything knowing that a third of them are here.

So you divide that number by 3, and you have almost 790 million units just through March of last year that it's foreseeable that they sell here.

And what's interesting is that when you do this calculation, remember that we're only asking for damages on a third.  The other two-thirds -- the other 1.6 billion units -- have at it, Power Integrations.  You can sell those for free. They're not burdened with this patent.  It's just the third that make their way back into the U.S.

And in dollars, you saw that number was right here (indicating.)  $666 million of these four products.  And a third of them is 222 million.  So just a third is what you use in your calculation.  They get a free pass on the other $450 million.

But they're practicing Jim -- because they're doing it abroad.  Good for them.  If they want to do it abroad, and keep it abroad, our system doesn't allow for that.  But what comes into the United States you got to respect.  Think about what they're already getting for using the invention and not having to pay for it.

So that's the royalty base that Judge Chen was telling you about. The royalty rate is the QBAR license. It was 3 percent. And Mr. Congdon -- I mean, remember they told you that it was just a company? That was just Mr. Congdon's company? This was a Canadian company that sold to the likes of MIT, IBM, Ford Motor Company, Welch Allyn. You go to a doctor's office, there's a lot of Welch Allyn medical equipment that you don't realize you use every day. These are real companies, and they were selling it to them and paying a royalty to Mr. Congdon for the use just like them. But this is an improvement.

So you take the 3 percent and you figure out what it is. Because their average price was 28 cents -- 28.15 cents a unit. That's what they sold them for. 28 cents. .15 is not a lot, but when you add that .15 times billions, it makes a difference.

So 28.15 cents per unit. And what is it, portion of that, do they need to pay Mr. Congdon to show their respect that they're using his invention here in the United States? And that's up to you. That's a decision that you have to make.

But what's interesting is that they're going to tell you: We have all these other products in the patents and all these other patented features. Mr. Sutherland told you: We do not keep track and have no way of calculating what the on/off switch does or what the dormant thing is.

They don't know how to keep track of that.  Because why?  All the customer cares about is price.  And they sell this as a price point in the cheapest way possible, which means self-biased, don't add anything to it.  And we'll get to that.  But they tell you in their data sheets right here (indicating) it is self-biased.  No bias winding or bias components.  You care about price?  This -- here it is.  It works just like we built it, you don't have to add anything to it.  That's how they sell it, that's how they make it, and that's how it infringes.

So you're going to see the QBAR license.  And you go, Okay, that's a data point.  Mr. Congdon, for a lesser quality product, got 3 percent.  And what about them?  They had a license between a parent and a subsidiary.  It was an arm's length deal.  Remember Mr. Walker?  It was a commercial deal.  It was arm's length.  And it was between Power Integrations and its subsidiary where the subsidiary needed to use the patents and paid money for it.  And they paid taxes on it.  So they also had a license.  It's the only one they ever did because they don't respect anyone else's property.  And they paid a per unit royalty; based on the sales, we'll give you a percentage.

Don't know what that is.  Nice to know what they pay within their companies.  But what's interesting is we noticed they're not challenging their sales, they're not challenging the rate of the QBAR.  Which makes me wonder -- do you ever go

in and buy a car, or you buy something, and they say "We'll take it."  And you go, "Oh, I should have asked for a higher price."

Maybe they think it's too low and that 3 percent's not enough.  And maybe 4 percent or 5 percent is not enough. Because don't you know with this team of lawyers and all these engineers and all their capabilities, if what we're telling you was wrong or too low or not right, you don't think you would have heard of it?  You would have heard about it?

These are good lawyers.  All of them.  All eight of them are good lawyers.  And you don't think if we were wrong, or we were underselling, they would come in here, and if we thought it was too much they'd say, "Here look.  Here's an expert." They could have brought you an expert to tell you otherwise.

Think about that.

Ladies and gentlemen, you get to decide the rate.  If you use just a slight improvement on the 3 percent, if you did 3 and-a-half percent, that's about a penny per unit.  5 percent is about a penny and-a-half.  Just to put it in context.

But the key thing is they're going to tell you that the product is not about the switch.  But Dr. Zane told you that the switch feature is essential.  In fact, I think the words he used were "critical," "significant."  He said without the switch, nothing works.

And remember they want to show it -- they want to show you

the picture of the brain and the switch.  And my guess is you'll probably see it again.  But this isn't called the Link Brain II or the Tiny Brain LT.  It's called the LinkSwitch, the TinySwitch, the TinySwitch-LT.

Do not be confused.  These are switches.  They do the exact same thing, and they promote them to work the exact same way.  Because the power -- you have to power it up.  And that's why it's critical and essential.

But what they want to tell you here is that it's something other than the switch, but that's not what they tell the world.  In their data sheet right here:  TinySwitch-LT Family, Efficient Energy Online Switcher (sic).  That's what they tell you right here.  It's a switch.  So do not be misled by what they try to tell you in that regard.  It is critical.

I'm going to sit down now.  I'm not done.  Because that's how the system works, and I get to speak with you a little bit more.  And they have a chance to talk to you, then I get a chance to respond.

But make sure they explain to you a couple of things. Mr. Scherkenbach -- he's probably the one that's going to talk to you.  Make sure he explains to you why no one at Power Integrations took the time to even read the patent.  Make him tell you why a large company with so many engineers and teams of lawyers and they cannot point to a single document, an email, a note, a memo, anything, to support what they're

telling you.  Make him tell you why the data sheet calls it a -- the capacitor a filter -- and it mentions nothing in there about it being a power supply.

The evidence is clear, ladies and gentlemen, they do not respect the property of others.  And if you challenge them, with all their resources, they'll fight.  They'll fight you with all they got.  But remember, you are that anchor that can hold them to the same rules that we all live by.  It's about telling them that you have to respect the property of others.

Thank you.

**THE COURT:**  All right.  Thank you, Mr. Suder.  We've been at it for about an hour and-a-half so we're going to take a short break at this point, then we'll hear from Power Integrations their closing arguments.  So we'll take a 15-minute break.

(The jury exiting the courtroom.)

**THE COURT:**  All right.  I finalized the verdict form. I meant to give it to you before you started closing so you'd have an opportunity to follow.

**MR. SUDER:**  Thank you, Judge.

**THE COURT:**  So, Angie, if you'd give it to them.

**THE CLERK:**  I did.

**THE COURT:**  All right.  So we'll see you in 15.

(Recess taken at 1:58 p.m.)

(Proceedings resumed at 2:11 p.m.)

**THE COURT:**  All right.  Please be seated.  All right.  Thank you again for your patience, ladies and gentlemen.  We're now going to hear from defendants.

And who's going to present closing?

**MR. SCHERKENBACH:**  I will, Your Honor.

**THE COURT:**  All right.  You may proceed.

**MR. SCHERKENBACH:**  Thank you.

**CLOSING ARGUMENT**

**MR. SCHERKENBACH:**  Good afternoon.  I know it can be hard to sit through some of these things, so I want to thank you in advance for sitting through mine.

Most lawyers say about closing it's our favorite time of the case because it's the first time we really get to talk to you about what we think the evidence shows and to tell you how we think you might piece it together.  Most jurors say it's their favorite time of the case, too, because it's the last time the lawyers get to talk to them.

I'm actually going to try to go through the evidence with you.  I hope I don't have to tell you the difference between argument and evidence.  Seems very clear what that difference is.  And the judge, remember, instructed you that what the lawyers say is not evidence.  The evidence is the documents, it's the testimony from the witnesses, and that's what you have to base your decision on.  If what the lawyers say is helpful, that's great.  But it's not the evidence.

I started the case by suggesting to you that these parties came at this technology from opposite directions.  That Mr. Congdon originally had -- or, talked about prior art that had four terminals, as you see on the slide here.  In fact, it was argued to you in opening when counsel characterized Mr. Congdon's invention he said the idea was to go from bigger to smaller.  From four components down to three.  It's a big deal.  It's cheaper, it's more efficient.  And he actually put up that slide which I've recreated on my slide about how traditionally these devices, these switching devices, had four terminals, including one that had to be separate -- connected separately to a power supply.

But they are bigger, they're more complicated, and the invention was going from four to three.  And that is borne out in the patent.  If you actually look at Mr. Congdon's patent he says, when he talks about the prior art there on the left, non-inverting transistor switches typically have at least four terminals.  That's typically how it was done before Mr. Congdon came up with what he thought his invention was.  And one of the four, the last terminal, was connected to a power supply.

That, he said, was not the right way to do it.  That was the old way to do it.  His invention was to use only three.  Only three.  Three terminals do not require a fourth terminal connected to a power supply and they are more desirable than four terminal devices.  Three's better than four.  My invention

is three.  I told you that in opening, and the evidence on that point has been uncontested.

Now, I also told you in opening that Power Integrations went the other direction.  Their initial products, very successful, were three-terminal products.  The TopSwitch and various versions of the TopSwitch.  Three-terminal devices.

As Mr. Kung described -- I won't read all this to you -- he told you a little about the history of the company, the history of the products of the company.  And it was such a breakthrough at the time because power supply controller chips at the time, not just the switch part but the whole controller chip, had as many as 14 pins.  And Power Integrations figured out how to get it to three.  It was a big deal.  Very successful.  Allowed the company to go public.  Allowed the company to really thrive.  So started with three, as opposed to Mr. Congdon who recognized and started with four.

But Power Integrations came to realize there was a better way.  As successful as its three-pin parts were, they realized there was a better way.  And that better way was on/off control.  And you've heard all about on/off control.  I'm going to remind you some of the high points.

But that required going from three to four.  You couldn't do that with three terminals.  You had to have four terminals.  And Power Integrations got a patent on it.  It was a significant development, okay?  So we had Mr. Congdon going

from four to three.  We have Power Integrations going from three to four.

And this evidence is not disputed.  These are the facts the witnesses testified to.  There is no dispute on the overall point.  And you know the '190 patent covers Power Integrations' on/off control.  It was a significant breakthrough.  You know on/off control is what's primarily responsible for the energy efficiency in Power Integrations' products.  There was actually no competing testimony on that.  Mr. Bohannon testified to it, Mr. Kung testified to it, Dr. Zane doesn't contest it.  And you also know the on/off control was used in every accused product in this case.  It's using Power Integrations patented technology.

Now, what else do you know about on/off control and the '190 patent?  And this is particularly critical, okay?  It requires four pins.  And in particular, it required separating -- and you see the four labeled there, you've seen this diagram before, okay?  In particular, it required separating the power supply from the feedback.  It required a dedicated power supply pin.  That's the upper left one.  And I'm going to go through that in a little more detail.

But the very thing that Mr. Congdon's patent excludes is required by the technology in all of the chips at issue in this case.  Mr. Kung was asked about that pin:  So just to be clear, which pin is the power supply pin?  Power supply pin here is

the bypass pin.  It's called BP/M here.  And he identified, also, the feedback pin.  And were those separated because it was required by using on/off control?  Yes, that's the reason.

Now, one other point I want to make here -- and I'm going to come back to it because you heard a whole lot today, and it may have seemed a little bit out of the blue -- did to me -- about filtering.  And the capacitor is a filter.  And it's a filter, and it's not a power supply.  So what do you make of that?  Okay?

There is no inconsistency there.  You see this pin, this pin at the upper left, is labeled bypass/multifunction.  Reference to multifunction.  The two functions are power supply and filter.  That's what the data sheets say.  That capacitor is fundamentally a power supply and in some situations it can operate as a filter.  It's that simple.  It's not either/or.  Witnesses who say -- who focus on the power supply function aren't lying.  Dr. Zane who says "I really think it's a filter" he's not lying, either.  They're discussing various aspects, the multifunctions of that same portion of the circuit.  That's all.

All right.  Now, again, so all of the PI products have this fourth terminal.  It's connected to a power supply which is the capacitor.  I'm going to come back to that.  And it's the very thing Mr. Congdon's patent, which I'm showing you an excerpt of here on slide 609, says is not his invention.  This

is from his patent. Okay? Switches comprising only three terminals do not require a fourth terminal connected to a power supply.

And that, in fact, is why only three-terminal switches are more desirable. Better. He thought they were better. That's fine. That's good for him. He got a patent on it. He can have his patent. He made some products that embodied at least the prior art version of his three-terminal switch. I don't think you saw any evidence that he ever commercialized -- or anyone, actually -- ever commercialized the later version in the '623. But those are both his. Those are both three-terminal switches. Fine. The very thing he says is not desirable is the thing Power Integrations does.

And here I just wanted to show this to you graphically as sort of a summary here in 610. TopSwitch, earlier technology, three terminals. Now, it had a power supply capacitor, also. All these chips do. I mean, remember, this goes back to something that I spoke with you about in the opening. The chips themselves are electronic devices. They require power to operate. You can't only connect the filter to the chip and have the chip run. It's not going to run off a filter. It has to have power. TopSwitch had to have power, the TinySwitch-III with the four-pin design, it has to have power. And that power, as the data sheets say, and as the patents themselves say, come from -- comes from the capacitor. Okay.

Now, a couple of things that you need to be mindful of when you're actually doing the infringement analysis, okay? This is an excerpt from one of the jury instructions. You'll actually have the instructions with you.

You have to compare the product with the patent claim. And in that context, the product there is the accused product. Okay? I'm going to come back to this. But that's important. Because you heard a whole lot of presentation by Opticurrent, and a whole lot of focus on Mr. Congdon's drawing and his breadboard and the things that are not in the patent. Okay?

And the test, the legal test for infringement, is you compare the accused products, Power Integrations' products, to the patent. You don't compare them to Mr. Congdon's drawing, you don't compare them to Mr. Congdon's breadboard. All right? We're going to talk about that, anyway, to put your mind at ease, I hope. But remember that, please. And, of course, Power Integrations has to have every requirement of the claim.

Now, this has come up -- I don't know why -- but Mr. Suder puts his chart up and says: You didn't hear evidence on this element, and you didn't hear evidence on the third element, and you didn't hear evidence on the fourth element. All you heard was evidence on this one element about three versus four and the power supply.

That's true. Because we only have to show we're missing one thing. And we don't need to waste your time and make the

trial even longer proving we don't have three, four, five and six, either.

Mr. Bohannon opined that there were other elements missing, in his expert report. That was brought out on cross-examination. And he said: I stand by that. But that's not what this trial is about. Okay? This trial is about the one that we've brought to you to focus on to make it as clear and as simple as we could.

Okay. So the jury instruction says it's the patent that you compare to the Power Integrations' products. The patent. What does the patent say? What does the patent show?

The figure, the key figures in the patent? Three terminals. Not four. Three. And as has been brought out -- and there won't be any contrary evidence on this, there hasn't been -- there's not a capacitor in sight in the '623 patent. Mr. Congdon's patent. He doesn't talk about capacitors, he doesn't talk about using capacitors. He doesn't say anything at all about them. And so the patent, his patent, Mr. Congdon's patent, isn't any help to you on what these capacitors are doing or not doing in these circuits. That's a fact. All right?

But the figures show -- we know they show three terminals. Not four. Three. And the claim says: Having only three terminals.

Now, that's been construed by the Court, as you see here

on slide 613. You've seen this slide before. It means a switch with three terminals that does not have -- does not have -- a fourth terminal connected to a power supply. And it's a little -- can be a little confusing because it has that negative in there, right?

So if a product that's accused has a fourth terminal connected to a power supply, which we say the evidence shows Power Integrations products do, then it's not covered. It doesn't infringe. Okay?

And it really is pretty simple when you put these things side by side. You know, you heard a lot of evidence from Mr. Suder, Oh, you know, at one point Mr. Kung, you know, a 30-year engineer at Power Integrations, said: Yeah, I looked at the patent. And he did use the word at one point in his deposition "glance." He glanced at the patent. He subsequently explained what he meant. I'll show you that. And he said: Yeah, I glanced at it, I looked at it, we don't infringe. How could he do it that quickly? The same reason you can. This is not difficult unless you're misdirected to things that don't matter.

Three is not four, four is not three. A capacitor is the power supply for these chips. Whether it also performs a filtering function or not, who cares? It's the power supply for the chips. Done. That is what it has taken three days for me to get to this point to tell you that's our view of the

world.  It really is that simple.

And Mr. Kung said it, Mr. Bohannon said it, Mr. Walker said it.  Here's a summary slide of Mr. Bohannon's conclusion. He walked through these figures with you, he explained them to you.  He showed how the fourth pin, the BP -- that's the bypass/multifunction pin -- is connected to that capacitor.  It has to have that capacitor in order to function.  You can't function without it.

And there's testing.  So this is something that came up again today, all right?  So Mr. Kung, when he testified, he showed testing data that's in the data sheets for these parts. Power Integrations, they obviously -- they want their customers to use their parts, they put them in sample power supplies, they test those sample power supplies, and they show the customer how they work.  And Mr. Kung explained this figure in detail to you and said:  We focused on V bypass in the middle because that is the voltage on that capacitor, the power supply capacitor.  And he said, Look -- and he went through this in detail.  I put a little piece up here.  He said:  Look, that shows the capacitor is powering the chip.

It's powering the chip because until that line, the V bypass signal, until it rises to the required voltage, 5.85 in this particular chip -- there's no magic to the number, it has to get to a certain threshold -- the chip doesn't turn on.  It doesn't start switching.  That's what's happening in the bottom

figure.  You see it start switching.

Now, why can it not stop switching until the capacitor gets charged up?  Because it doesn't have power.  The capacitor is the power for the chip.  And so once it's charged up the switch can start -- the chip can start switching.

So does this show the capacitor's the power supply for the chip?  Yes, it does.

Now, how about the squiggly lines?  What I believe today Dr. Zane described as noise in that V bypass trace there.  Dr. Kung explained that, too.  It's not noise.  It is -- and if you blew it up and made it a much more fine resolution trace, you would see that each time the switch switches, the capacitor has to give up a little energy.  Because the chip needs energy to run.  And then the capacitor gets recharged by just that amount for the next cycle.  Use a little power, put a little power back in the capacitor.  And that repeats over and over and over again.  And that is why it has that characteristic.

Now, I think I heard Dr. Zane say two things about Mr. Kung's testimony.  Number one, he said that Mr. Kung mischaracterized the figure.  I don't know what to make of that.  I guess you have to figure out what to make of that.  Did Mr. Kung mischaracterize the figure from his own data sheet for parts he's been working on for 30 years?  And did he do it deliberately, if he did it?  Did he do it because he's here for Power Integrations?  Did he misrepresent things to you?

The other thing Dr. Zane said is:  Well, I would expect -- and I don't know if you caught this.  It was sort of in the middle of that very long answer -- one of the very long answers Dr. Zane gave.  I would expect if the chip -- if the capacitor were working as the power supply, I would expect once it's charged up to that 5.85 it would go all the way down to 4.9 before it would be recharged.

And again, there's no magic to the numbers.  But what he is saying is:  I would expect the chip to have to shut off because the capacitor dropped too low.  Shut off the chip, then recharge the capacitor to where it can turn the chip on.  Then let the chip turn off again.

That, I hope, doesn't make any sense at all to you.  It isn't the way it works.  It's not the way it's described in the data sheet.  And it's not the way anyone who actually has worked with these chips would expect it to work.

Now, there was a lot of challenge to the qualifications and experience of our people, right?  You know, right off the bat:  Mr. Walker, you didn't get a college degree.  What could he possibly know if he doesn't have a college degree?  He's -- everything he's done and said is completely irrelevant because of that.

Mr. Bohannon doesn't have a degree in electrical engineering.  What does he know?  Right?  He's only worked in the field for 40 years for a litany of companies.  But what

could he possibly know?

The only person in this case that's been suggested to you who has anything worth listening to is the young Ph.D. scientist from Utah.  And he's qualified.  You listened to him. He's doing -- he's giving you his honest opinions, with which we honestly disagree.  Is he lying?  No.  He has a different point of view.

But when it comes to understanding how these semiconductor devices work in the real world, it might matter to you that Mr. Kung has worked with them for 30 years and has lived and breathed them.  I don't think we heard from Dr. Zane any evidence that he's actually designed a switch mode power supply chip.  Not even one.  Ever.  Or ever worked for a company in the field.

Now, again, that doesn't mean he's lying, but maybe he doesn't have as much experience interpreting these data sheets as other people do.

Now, it's now become clear, I guess, that Opticurrent's theory is this capacitor.  I mean --

Let me back up a minute.  There's no question all the accused chips have four terminals.  That's a bad fact for Opticurrent because the patent's all about three terminals. Oops, but we have a fourth.

There's no question the fourth terminal's connected to a bypass capacitor, okay?  So now it sounds like the defense is

but the capacitor is only operating as a filter and never has a power supply.  That seems to be where we've arrived.  Okay?

Please look at the documents on this because you will see the data sheets all say that capacitor operates as a power supply.

Here's one example.  This phrase appears in all of the data sheets.  This is TX-14 for the TinySwitch-III.  It says -- and you've seen it before.  I just wanted to highlight one example for you.  The bypass/multifunction pin is the internal supply voltage node.  When the MOSFET is on, the device operates from the energy stored in the bypass capacitor.

As Mr. Bohannon said today in his testimony, I don't know how that could be any clearer.  That capacitor's operating as the power supply.

Now, does it also sometimes have a filtering function?  Does it do both?  Yeah, it does.  We didn't focus on that in our initial presentation.  Doesn't matter if it has other functions.  If it's a power supply for the chip, we don't infringe.  But just so we're clear, there's no conflict in the evidence on this.  In fact, right in this paragraph, if you look toward the bottom it says, the last sentence:  A bypass capacitor value of .1 microfarads is sufficient for both high frequency decoupling -- whatever that is -- I'll come back to that -- and energy storage.  It's doing two things.  No dispute.  It's doing two things.  High frequency decoupling,

Dr. Zane told you, is filtering.  He's right.  We agree.  Fine. But it's also the power supply for the chip.

I showed you this in opening.  I wanted to come back to it just so you can see sort of how it fits in because there was all this discussion of drain pin.  How does that fit in?  What is the drain pin and what is that doing?

The drain pin is involved in charging up that capacitor before -- before the chip is turned on.  Before the chip has enough power to operate.  So the capacitor's dry.  It's empty. It's like a battery that has no power, so it can't power the chip.  How are we going to get this chip powered up initially? Well, we're going to draw current through the chip -- through the chip, through the drain pin, into the capacitor.  And once that capacitor's charged up, the capacitor is the power supply for the chip.  That's all the drain pin is doing in this context.

And Mr. Kung was asked about that, you know.  This whole -- because you heard a whole lot about the drain pin from Dr. Zane during his initial presentation back on Tuesday. Mr. Kung was asked about it.  And, you know, what about this drain pin description?  And is that consistent with the testimony you gave the jury?  Mr. Warren actually asked these questions.

Now, Mr. Suder -- at the beginning here, top here: Mr. Suder questioned you at length about how the power at

startup can come from the drain pin.  Do you recall that?  Yes.  And that's perfectly consistent with what you explained on your direct, is it?  Yeah.  That's why I said it originates from the drain.  And that's what you were describing throughout these graphics, right?  I believe so.  Question:  Does that change the fact that the element providing power during operation is the bypass capacitor?  No.

There's no inconsistency, there's no conflict, nobody's lying.  It all fits together.

Okay.  Shifting to a related but slightly different topic.  If the capacitor were not the power supply for the chip, if something else was powering that chip, you would be able to remove the capacitor and the chip should operate.  Doesn't need power from the capacitor in their view of the world.  It's getting power from somewhere else.

The evidence on that was uncontradicted that you cannot remove that capacitor.  You cannot.  In fact, here's Mr. Kung saying there is circuitry built in to the chip that requires the capacitor to be connected and charged.  It will not work otherwise.

But Opticurrent says:  Well, wait a minute.  There's this passage in the specification that says something like a fourth terminal's okay if the chip will still operate without power applied to the fourth pin.  What about that?  Well, again, Mr. Kung was asked the question directly:  And so is it

possible for this chip to run without a bypass capacitor connected? No. There is no possibility. It cannot.

And by the way, Mr. Bohannon I have here on the next slide. I'll just tell you. You can read it. I'll summarize it. He said exactly the same thing. He independently looked at it and said: These chips will not run without that bypass capacitor connected.

Dr. Zane never addressed this. He did not disagree. So everyone agrees. You got to have the bypass capacitor. Why? Because it has a power supply function and the chips will not run without power.

Okay. Now we get to a couple other things that with all due respect, I think, are a little distracting but there was time spent on them and I want to try to put them in context for you.

Dr. Zane was of the opinion that power only comes from the drain pin, not from any other source.

Now, this is, with all due respect, an area where we disagree with Dr. Zane. It not only -- not only isn't correct to say it doesn't come from any other source; it, in fact, has to come from the bypass capacitor or that chip won't run.

But there was another -- there's another reason, I think, that Dr. Zane -- another thing he overlooked. Let me put it that way. And that's this whole bias winding issue.

Because it turns out that in almost every real world power

supply -- in fact, in every real world power supply you've seen evidence of or heard evidence about -- the capacitor is charged not through the drain pin -- I'm sorry.  That's a little small. I wanted to fit the testimony on the same slide.  But from a bias winding.  So that's a separate part of the power supply circuit that you can pull power from to also charge the capacitor.

Why are you doing that?  Because the capacitor needs power to power the chip.  And Mr. Kung was asked about that and said: Well, you could use the drain pin.  You could do that.  But, really, everybody uses the bias winding.  And why does everyone use the bias winding?  It makes the design a lot more energy efficient.  It actually is what people are looking for in these power supplies is to maximize efficiency.  This is an important way to do that.

Dr. Zane didn't have any opinions on that, he didn't consider the bias winding.  We don't know why or why not, but all the evidence on that is from Mr. Kung and Mr. Bohannon.

Is this just some, you know, odd application?  Is this some sort of outlier?  No.  As Mr. Kung said, you know, in his 30 years he's never seen a power supply application that didn't use the bias winding to charge the capacitor to provide power. It's always done that way.

So that's one topic I respectfully suggest is a little bit of a side show.  You know, the drain pin.  What the drain pin

is doing.  That is not what the case is about.

Here's another important thing that Dr. Zane didn't consider again.  He just didn't consider it.  We don't know why.  But that is, Power Integrations' own '190 on/off control patent.  And on that one -- so this is -- you know it's about on/off control, you know it requires four terminals, one of which is connected to the bypass capacitor.

And this came out today I think for the first time clearly.  But if you actually look at PI's '190 patent -- again, this is something submitted to the patent office, reviewed by the patent office -- it says in at least four or five places explicitly that the bypass capacitor is used to supply power to operate the chip.

So, you know, Mr. Suder was -- sort of challenged Mr. Bohannon.  Said, Hey, you say the capacitor's the power supply.  Show me a document that actually uses those words. "Power supply."  Well, how about PI's own patent?  In multiple spots which were shown to you, says the bypass capacitor is used to supply power.  I put two of them on the slide.  There are more.  This is in evidence.  It's TX-153.  You can look at it.

All right.  Let me get to doctrine of equivalents.  So that's literal.  Why there's no literal infringement.  Okay?

What about the doctrine of equivalents?  There's a big long jury instruction on doctrine of equivalents, and I'm going

to focus on one piece.  They're all important, okay?  One thing I'm just going to note -- I didn't highlight it on my slide -- toward the bottom that first paragraph there there's a sentence:  Two structures may be equivalent if they are interchangeable.  You see that word "interchangeable"?

Okay.  It's an important consideration in assessing equivalence.  In other words, could you take what's shown in the patent, Mr. Congdon's patent, could you exchange that for what PI does?  Or vice versa?  Is the PI solution interchangeable with what the patent shows and vice versa?

I'm just going to ask you to stop and think for a minute. Did you hear any evidence at all that somebody could take Mr. Congdon's three-terminal switch and put it in a PI power supply controller?  Because, remember, Mr. Congdon's switch is just the switch part of the controller.  You've got all this other intelligence in there that PI provides.  Mr. Congdon's patent doesn't say anything about that.  But just the switch part.  Could you take Mr. Congdon's switch and could you put it in PI's controllers?  Could you -- would that even theoretically be something possible?  You didn't hear any evidence on that.  So there's no evidence of interchangeability.  Okay?

But here's the other one I wanted to focus on.  And that's the highlighted one:  You may not use the doctrine of equivalents to find infringement if a finding of infringement

under the doctrine of equivalents would effectively eliminate or ignore an otherwise unmet element or requirement of the claim.

So doctrine of equivalents exists where somebody is doing almost exactly what the claim element says. There's some very small, some very insubstantial change. But you can't use DOE to effectively eliminate or ignore a requirement of the claim. And I suggest to you that is how Opticurrent is using it in this case.

And, again, this is not a complicated issue. PI has a -- has products with three terminals that do have a fourth terminal. I have to phrase it that way because that's the way the claim construction is. But they do have a fourth terminal connected to a power supply. That's PI's products. The claim construction is you cannot have a fourth terminal connected to a power supply. "Does" is not equivalent to "does not." This is not a question of degree, it's not a question of a small change or an insubstantial change or something that's interchangeable. It is the opposite. And you cannot find an opposite is equivalent.

The drawing. I said I would get back to the drawing. What about Mr. Congdon's drawing? Well, here again, remember I already showed you the part of the jury instruction that says you compare PI's products to the claims of the patent, not to some inventor drawing or breadboard. And there actually is a

part of the jury instruction --

May I have the document camera, please?

So this is in number 29.  Again, you have it.  You don't need to write it down.

You've heard evidence about both Mr. Congdon's breadboard product and the accompanying drawing, and PI's accused products.  However, in deciding the issue of infringement you may not compare -- may not compare -- PI's accused products to Mr. Congdon's breadboard product or the accompanying drawing.  Rather, you must compare PI's accused products to claim 1 of the '623 patent when making your decision regarding infringement.  Straight up.  Okay?

Now, but you -- sorry.

Can we switch back to the -- thank you.

But you were shown the drawing, and there was talk about the drawing, and there's argument about the drawing.  So what about the drawing?

Well, Mr. Congdon said, In my drawing -- I'm not going to put the drawing up.  But there's a capacitor in his drawing.  Unlike the patent, his patent doesn't have the capacitor in it.  His drawing does.  And he was asked about that capacitor.

Is it up?  Can you -- no.  Maybe we can try -- it flashed on, but --

(Pause.)

**MR. SCHERKENBACH:**  It's all right.  I'll do the voice

over.

THE COURT:  Sometimes it takes a second.

MR. SCHERKENBACH:  That's okay.  He was asked about the drawing and he said --

It's up now?  Okay.

And he said:  Well, and my circuit works without the capacitor.  You don't have to have that capacitor.  Could be in there, don't need it.  Works without it.  What does that tell you?

That's not the power supply for his circuit, because his circuit works without the capacitor.  It doesn't need that capacitor for power.  That capacitor is acting only as a filter.  It actually -- I believe there was testimony to that effect from both Mr. Congdon and Dr. Zane.  That the filter in -- this is in Mr. Congdon's drawing now, the capacitor in Mr. Congdon's drawing -- is working only as a filter.

Now, compare that to PI's bypass capacitor.  Can PI's chips run without a bypass capacitor connected?  No, there is no possibility.  And that's undisputed.

So even if you want to look at Mr. Congdon's drawing and you try to reconcile these pieces of evidence you're seeing, they do fit together.  Because in Mr. Congdon's drawing you have a capacitor that's only operating as a filter; in PI's designs it is both a power supply and a filter.  It depends on the circuit, it depends on how it's hooked up.  These are

complex things.

But certainly -- let me just finish this thought -- just because Mr. Congdon's drawing has a capacitor does not mean the doctrine of equivalents is satisfied. Not at all.

All right. Inducement. We're getting close to the end here. So inducement is a second flavor of infringement, okay? It's Opticurrent saying: PI, you have actively encouraged other people to infringe when you knew about the patent and you intended them specifically to infringe this patent. It's a very high standard, as the jury instruction lays out.

Now, first of all, the first highlighted part here, if there's no direct infringement by anyone, there can't be inducement. Because you can't -- if I'm accused of inducing somebody, somebody else actually has to be infringing. So for all the reasons I just went through, there's no direct infringement. PI's chips don't infringe.

But separate and apart from that, for inducement they have to show -- I'm going to focus on the last two for now, okay? Was PI aware of the patent?

Well, the whole period of time prior to the lawsuit it's undisputed PI had no awareness of the patent. Okay? So, you know, today you were shown damages numbers, revenue numbers, that go back to 2010, six years before the patent. PI had no knowledge of the patent until this suit was filed. I'll show you some of the evidence on that, but it's not disputed. So

there's no knowledge until the suit was filed.

And then number 3:  Did PI know -- did they know -- that the acts they were causing would infringe?  So we knew about the patent and we knew we were infringing.  We knew customers were infringing.

So Mr. Walker testified on both of these issues.  Said, no, PI was not aware of the patent before the lawsuit was filed.  Mr. Brunnell admitted the same thing.  Opticurrent never approached PI, never offered a license, never mentioned the patent, never said, Hey, you're infringing.  Just filed the lawsuit.  All right?  So knowledge, there is no dispute there is no knowledge before the suit was filed.

Okay.  But then suit gets filed, right?  You get -- Mr. Walker comes into his office that day and, you know, Good morning.  Here's a patent infringement complaint raising this patent.  So we knew as of that time.  2016.

What did he do?  He read the patent.  Now, here's another one where Mr. Walker took a lot of arrows for the fact that he didn't have a college degree.  What could it possibly matter that he read the patent?  Who is he?  You know, someone without a degree can't possibly understand this.  Never mind he's worked for semiconductor company for 20 years.  And a lot like Mr. Bohannon, worked before that for a series of companies doing electronics.

When you read the '623 patent what did you think?  Well,

after I read the patent and the claims I realized it was -- the claim was to a three-terminal device, and that we were -- and then there were a whole bunch of objections. I looked at the claims and realized it was describing only a three-terminal device. Our products from 2006 had gone to four-terminal devices because it was necessary to supply power to the architecture that we had developed for low standby at the time.

Same thing we told you in this lawsuit. Same thing the experts have told you, our expert has told you in the lawsuit, same thing Mr. Kung told you.

How about after learning of the Court's claim construction? Did that change your view of the patent? No. It still said the three-terminal device that didn't have a fourth terminal connected to a power supply. And that's how our products work. So was PI really encouraging people to infringe this patent? No. PI never believed for a second this patent had anything to do with their products. Because it doesn't.

Then we get to Mr. Kung who also took his share of arrows on this. When you read the patent, what did you think? That patent has nothing to do with what we do. Did you read the asserted claim 1 of the patent? Yes, I did. At the time you first read it, what did you think of the asserted claim 1? We do not infringe. How about when you learned of the claim construction? Well, we have the power supply terminal and that

is very different from claim 1.  We have a power supply connected to that fourth terminal.  That's not claim 1.

So let me end with what has got to be Mr. Suder's favorite word in this case.  Respect.  Right?  PI respects this patent.  It just doesn't use it.  PI has many of its own patents.  It respects patents, it respects IP.  If there's been any lack of respect in this courtroom, it hasn't been on our side.

So I want to thank you on behalf of my team, on behalf of Power Integrations.  These cases are always very hard for non-patent people.  And, you know, we can tell you've paid close attention.  I hope you understand most of the evidence.  Three's not four, four's not three.

We look forward to your verdict.

**THE COURT:**  All right.  Thank you, Mr. Scherkenbach.

Mr. Suder, you may do your rebuttal.

### REBUTTAL CLOSING ARGUMENT

**MR. SUDER:**  May it please the Court.  This is the last time I will speak with you.

This case, despite what Mr. Scherkenbach tells you, is all about the drain pin.  He said it's not about the drain pin.  That's exactly what this case is about.

But before I get to that, they are unapologetic about everything.  Don't put bad news in writing.  That's a corporate term of art.  They studied it.  Where are the documents to support what they're saying?  Wouldn't you expect to see

something?  Just one little document.

What's most unapologetic is that Mr. Scherkenbach didn't even apologize for telling you in the opening slide that Mr. Bohannon had a B.S.  It should not even be an issue, but they did it.  He has a bachelor of science in physics and math.  And they put it on a slide.  Did they not think I would challenge them on that?  That they could slide that in?  That they could pull a fast one?

It's a small point, but it's just the arrogance.  They're unapologetic, and it starts at the top and goes throughout.  And that is disrespect.

Now, the -- let's go to the data sheet.  Because it is all about the drain pin.  It just is.  This is how they tell their customers around the world the product works.  And right there on the first one -- let's just start here:  Self-biased, no bias winding (indicating.)  You don't need anything else.  And the reason is, if you go to the next page, what's the first thing they say?  The drain pin.

This case is about the drain pin.  It provides the internal operating current.  That is the power supply.  One one-thousandth of a second is not a power supply.  Think of your battery in your flashlight in your pantry or laundry room that would last for -- forget one one-thousandth, how about a minute.  Would you call that a power supply?  One one-thousandth of a second.

Mr. Kung didn't even -- they don't dispute that it's just one one-thousandth of a second, but that's what lights up the whole world is this one little thing for one one-thousandth of a second.  But here's what they call the drain pin.  And they say the bypass pin right next to it, right below, connects the capacitor for the internally-generated supply. Internally-generated supply from the drain pin.  It's all about the drain pin.

Then -- and there it is.  A .1 microfarad, the one one-thousandth of a second.  Then they talk about the voltage stabilizer.  Charges the bypass connector connected to the pin to the 5.85 volt by drawing a current from the voltage on the drain pin.  It comes from the drain pin.

The bypass pin is the internal supply voltage node. There's nothing external about it.  It's not an external terminal under the Court's definition.  Do not be fooled.  It has to be external connection point.  The bypass pin is to draw current from the internal supply voltage node.

And it says:  Extremely low power consumption of the internal supply circuit allows the TinySwitch to operate continuously from the current it takes from the drain pin.  But they want to tell you this case is not about the drain pin. That's what Mr. Scherkenbach told you.

Then you go to the next page.  Or, a few pages later.  And it says:  No bias winding is needed to provide power to the

chip because it draws the power directly from the drain pin. It says: Two main benefits. This eliminates the cost of bias winding. You don't need it. Because it's about the drain pin. It's right there.

Then the next page on Exhibit 11: The TinySwitch devices are completely self-powered. There is no requirement for an auxiliary or bias winding on the transformer.

You don't need it because it all comes from the drain pin. And then when they called the filter the bypass pin, in addition to using it as an internal filter, the pin capacitor forms an external filter. It smooths the ripple. That fluctuations coming in from the drain pin and comes out a little -- it's called smoothing the ripple.

Think of it like a funnel. That's how I think of it. I don't have an engineering degree. Actually, have a music degree from Tulane and I went to law school to help musicians who I thought were getting treated unfairly. That's how I got in the business of helping inventors.

Think of it as a funnel that's coming down, and just taking it smaller, but then it still comes out. It's a pass through. That's why it's called a bypass. It just goes through: But where does it come from? It comes from the drain pin. But according to Mr. Scherkenbach, this case is not about the drain pin.

And there's more talk about other capacitors being

filters.  It's all right here for you to see (indicating).  They said it.  This is what they told them, tell the world.  But it's a power supply.  There's nothing in here about being a power supply.  Power supply is the drain pin.  Plain and simple.

That is exactly what Mr. Brunnell found out when he acquired the patents, partnered with Mr. Congdon, and he said spent hundreds of thousands of dollars having a company tear these apart, hooking them up, and testing them to satisfy himself that, yes, they're working like they believed and they believe it's infringement.

But another thing about the patent that's very interesting.  We're not asking you to compare the claims to Mr. Congdon's drawing.  And that's simply wordsmithing.  It's almost like what they call a straw man argument.  You set it up, you mischaracterize it, so you can knock it down.

We've never said that.  I've told you what Judge Chen's going to tell you.  You apply the claim.  But it's very interesting on the voltage stabilizer what Mr. Congdon said in his patent.  He says right here on column 6, and he's talking about the voltage stabilizer.  In the MOSFET -- he says: MOSFET 123 functions as a voltage stabilizer for -- switch stabilizer which is dedicated primarily to supply the voltage which is passed from the third terminal to the CMOS inverter.

Third terminal is the drain pin.

As will be described in detail below.  But here's the language:  As a result, it should be noted that the voltage stabilizer could be replaced by alternative types of conventional voltage stabilizers which are well known in the art without changing -- without departing from the spirit of the present invention.

That's what the invention drawing -- Mr. Bohannon said it's not an invention drawing, by the way, which they didn't even address.  He was saying:  I did it differently because it's well known in the art.  But it doesn't change anything.  And that's exactly what Dr. Zane told you.  Do not be fooled.

And the other thing about the patent that Mr. Scherkenbach put up for you was on column 14 about a fourth pin.  And it's a lot of words.  I'm not going to go over it now, but look at it when you get back in the jury room.  It says you can still have a fourth pin power supply for normal operation and still operate, for example, as a fail-safe feature without power applied to the fourth power pin.  All such variations and modifications are intended to be within the scope of the claims.

What is he saying?  He says:  I'm building it this way.  And if you want to add something onto it later, that's okay.

It's within the scope of the claims.  He's telling people in the art:  This is how you do it.  You want to add a bias winding to it when you get it home, that's fine.  But that

doesn't change what this is (indicating.)

Do not be misled, folks.

The other thing I want to tell you about is equivalence. I don't think you get there because a capacitor is not a power supply. But you get to equivalence if you think it is. And then you ask yourself: Okay, it's different, but does it perform substantially the same function?

What's the function? Take that fluctuating voltage from the drain pin through the stabilizer and smooth it so it can go back through. Is that an insubtan -- the function's the same. And what's the wave? You still get it from the drain pin, you still bring it through the voltage stabilizer down to 5.85 volts, and then you run it to the CMOS. And what's the result? It stops the flow. So it is equivalent either way. Do not be fooled by what they tell you.

But the last thing I want to say on that is they love to say it's a battery. And this is what this is important for, this drawing. I don't want to spend much time on this. But Dr. Zane was telling you that if this is truly a battery, when you use a battery you charge it up. Like your cell phone. When you look on your phone you see how much battery you've got left and it's down to 79 percent. You see that go down because you're using the charge.

That's what Dr. Zane is trying to tell you when it's straight through. If it functioned as a battery, just like

your cell phone, if it's using it you'll see it go down.  This is not being used as a battery.  That's how he teaches it.

Now, I'd like to talk to you about the verdict.  You're going to get a verdict and there's going to be a question.  And the first question is:  Do we infringe literally?  And the answer is yes.  Is it more likely so, than not so, that this all comes from the drain pin?  That is the third terminal in Mr. Congdon's invention.

But if you want to say that it functions a little different and you answer equivalents, the answer is also yes.

And on inducement, if you get direct infringement it goes back to 2010, which is what the sales figures showed.  If you want to say it's also inducement from the time we sued them, that's fine.  The point is, they're telling their customers to practice our invention and they're inducing them by telling them not to change it.  That's why it's inducement.  And you can't stick your head in the sand.

You know what is interesting?  They said, Well, we studied it, we studied it.  There's nothing.  No writing.  You'd think Mr. Kung would say:  Customers, we got sued because you're using these products, but don't worry because it doesn't change anything and you're okay.  Did they do that?  Did they write a letter to their customers?  Did they do anything other than hiring a team of lawyers (indicating) to say:  We don't infringe, and here's why.

And they had hundreds of opinions.  We don't have a voltage stabilizer.  It doesn't interrupt.  The patent's invalid.  It's not even in his conception drawing.  They had everything.  That's what they said.  That's how they reacted.  They want to come to you, but sometimes it's better to ask for forgiveness than permission.  Say, All we're saying is this.  But that's not what they said with Mr. Bohannon and all of his opinions.  Is that respect?

So that is the questions on liability.  And let's talk about damages for a second.  I'd like to tell you that on damages, one thing -- in instruction 34 Judge Chen tells you:  Difficulty in ascertaining damages is not fatal to Opticurrent.  You may base your evaluation on reasonable certainty or opinion evidence.  Here's the language:  Any doubts regarding the computation of the damages should be resolved against Power Integrations and in favor of Opticurrent.

If you're not sure, we get it.  Because -- and what has -- did Mr. Scherkenbach say one thing about damages?  Did he say anything about the QBAR?  That it's too low or it's not appropriate value?  I really feel like I should be asking for more.  Because if I did, we might have heard something from them.  It's below their threshold.  He didn't say word one about the damages.

But the best way to think about damages, ladies and gentlemen -- and this is how I understand it.  You go, What is

damages?  It's a hypothetical negotiation.  It says, What if we had to sit down and Jim Congdon had to sit across the table from Mr. -- from Power Integrations.  Little old Jim Congdon.  But this says that in that negotiation they have to assume that the patent is invalid and infringed (sic).  It's that one time in the universe where someone like Jim Congdon can sit *mano a mano* with Power Integrations and has a leg up on them.  Because they can't come in and say in a negotiation, Well, we don't infringe.  That's not what the judge tells you.  The negotiation is assumed that we infringe, we want to practice it, we need a license, how much?

That's what the instruction will tell you in instruction 35.  You must assume that both parties believe the patent was valid and infringed.  It's in instruction 35.  So Mr. Congdon is sitting there going, You infringed my patent.  And they're going, You're right, we do.  How much is it going to cost?

That's the framework that you have to put yourself in when you get to the damage question.  It's not, Oh, little Jim, and they just say -- they're going to say, You got to do this, and we don't have a power supply, and this and whatever.

No.  We infringe.  As much as it must pain them to do that, in a hypothetical negotiation they have to assume that they infringe.  I need this patent, what's it going to take?  That's why 3 percent is too low.

And the best way to think about that, think of a parking

meter.  Licensing -- if they wanted to come and talk to us and we can talk about this and cut a deal, that's licensing.  Damages for infringement is different.  That's where you come in.

And think of a parking meter.  You're running errands, and you go and you find a space and you want to run into the CVS and get whatever real quick, and you don't have any change.  So what do you do?  You go inside and get change and come back out and put it in the meter?  Or do you risk it?  Grab the toothpaste, pay, and come back?  And you grab the toothpaste and you come back, and guess what?  There's a parking ticket on your window.

You don't get to go back and pay the meter.  That's the difference between licensing and damages for infringement.  They don't get to go back and say, Your Honor, I didn't mean to run the red light; because my child was screaming in the backseat and I didn't see it.  No, you broke the law, you got a ticket, you got to pay it.

That's why the QBAR license is just a starting point.  That is the meter.  But now that the patent is assumed to be valid and infringed, they don't get to go back and pay the meter.  They got to pay the ticket.  And it's for you to decide what that fine is.

And the best way to do it, ladies and gentlemen, I went -- and when I knew that Mr. Sutherland said that the average cost

is 28 cents, I went and got 28 pennies.  I'm going to show you something.  Had them nicely stacked up.  But if this is the cost of one chip right here, all these pennies, let's imagine that all of these 28 pennies is the cost of one chip, okay?  That's what he said the average cost.  Actually 28.15 cents.  I didn't know how to get 28.15 cents.

But that's it.  And they've sold 2.4 billion of those 28 pennies (indicating.)  That's what they make in using Mr. Congdon's invention.  And what is it worth, what is the price of that ticket, for taking their chance?  And now they took their chance, and now they got to pay the fine.

Take one penny, just one penny, that is about 3 and-a-half percent.  Not much more than the QBAR.  You take 2 cents, and it's a little bit more than about 5 percent.  Little bit more.  You get the point.

What is the price of respect?  And remember, that it's not on the full 2.4 billion that they sold, because two-thirds of them never make their way back into the U.S.  So they get to take the full 28 cents and put it over there and they get to keep it all.  On the ones they know are being here in the United States, what is that ticket?  It's up to you.  But just to give you a point of reference, one penny is about the QBAR.  That's the meter.

I like to say this much (indicating), but that's not right.  That's not what this is about.  2 cents doesn't seem

like a bad message to learn a lesson of respect.  Think about it.

Now, they promote -- so when I put here in the jury verdict, what I wrote down here, is when you get to the damages finding you can do 1 to 2 cents of the units sold, or 3 to 5 percent of sales just through last March.  And if you use the units, you take that 210-A, divide it by 3, either dollars or units, and that's it.  The judge -- Judge Chen will do the math in the judgment.

But they also say a one-time royalty.  And I crossed that out because you haven't heard any evidence of a lump sum.  They didn't say word one about it.  The only thing you know is that it's a per unit.  It's what the QBAR was, they did it, and their one license.  But, again, it is the parking meter, the patent is valid and infringed.  You have to pay more than the meter.  What's it going to take?  That's for you.

The last thing I want to tell you, they promote their products as the best combatant to the energy vampire.  That is Mr. Congdon's invention.  He didn't think of it as an energy vampire.  He said energy waste.  He said, Yeah, I called it leakage.  Do you remember on the stand?  He said, It really is energy waste.  And I go -- nice way, but I think the patent calls it leakage.

He's talking about energy waste.  That's what he was trying to solve when he was sitting in that cafeteria and saw

the building being evacuated.  And he went home and got the schematics.  He said, I can figure that out.  How do I conserve energy so it doesn't become a danger and a problem?  And they took his idea and ran with it.  An energy vampire stops leakage, saves -- conserves.  That's exactly what Mr. Congdon was trying to do.  What his invention is all about.

Power Integrations is a public company.  They have to report events.  Do you remember we talked about it with Mr. Walker.  They got to report to the SEC, like his salary and big events.  And I told you they have a board of directors.  An independent board of directors.  People from other companies that sit on their board.

So when you say by your verdict that they have to respect other people's property, and you set that fine at the appropriate level, what you're going to do is Mr. Kung and Mr. Walker are going to have to report to their board and to their CEO about what happened here.  And they're going to have to say, Why did this happen?  We didn't respect other people's IP.  And what's going to happen?  Those independent board of directors are going to go back to their companies and say, Let me tell you about this company that I sit on the board on in San Jose.  We better make sure that we have patents out there and that we respect -- as a corporate policy, we respect.  And then they do it.  And then the board members on that company go back to their companies and tell their people, We better

respect intellectual property.  Because if we don't, let me tell you a story about what happened in San Francisco in February.

That's how you send that message.  You know why?  We were talking about our children.  I was talking about my children.  You can't send corporations to time-out.  There's no such thing.  You can't send them -- go sit in that chair for two minutes and learn your lesson.  That's not how they work.  They do think they live by a different set of rules.

You need to tell them.  You need to set the royalty rate at a price -- at a fine, whatever you want to call it -- that recognizes Jim Congdon's life's work.  That he is the type of inventor that our system is designed to look after and protect.  And make sure that his efforts haven't gone in vain and that doesn't happen to someone else.  And maybe they'll change their policy, and maybe they will sometimes feel like they need a license from somebody.  And when that next inventor comes in, they'll bring him in and they'll negotiate something and treat them with respect that they just don't seem to understand.

Thank you.

Thank you, Your Honor.

### JURY INSTRUCTIONS (continuing)

THE COURT:  All right.  Ladies and gentlemen, let me give you some final instructions.

Duty to deliberate.

Angie, can you put that on the screen?  Thank you.

Before you begin your deliberations, elect one member of the jury as your presiding juror.  The presiding juror will preside over the deliberations and serve as a spokesperson for the jury in court.  You shall diligently strive to reach agreement with all the other jurors if you can do so.  Your verdict must be unanimous.  Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Consideration of evidence, conduct of the jury.  Because you must base your verdict only on the evidence received in this case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.

Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way and do not let anyone else communicate with you in any

way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, via text messaging or internet chat room, blog, website or application; including, but not limited to, Facebook, YouTube, Twitter, Instagram LinkedIn, Snapchat or other forms of social media.  This applies to communicating with your family members, your employer, the media or the press, and the persons involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you've been ordered not to discuss the matter, and to report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research such as consulting dictionaries, searching the internet, or using other reference materials. And do not make any investigation or in any other way try to learn about the case on your own.

Do not visit or view any place discussed in this case, and do not use any internet programs or other devices to search for or view any place discussed during the trial.  Also, do not do any research about this case, the law or the people involved, including the parties, the witnesses, or the lawyers until you have been excused as jurors.  If you happen to read or hear anything touching on this case in the media, turn away and

report it to me as soon as possible.

These rules protect each party's rights to have the case decided only on the evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process.

Each of the parties is entitled go a fair trial by an impartial jury. And if you decide the case based on information not presented to you in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow these rules and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the Court immediately.

Communication with the Court. If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk signed by any one or more of you. No member of the jury should ever attempt to communicate with me

except by a signed writing.  I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone, including the Court, how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

Return of verdict.  A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you are ready to return to the courtroom.

And so we will give you several sets of the instructions and the verdict form, as well as have access to the exhibits that have been admitted into evidence.

And with that, I will direct the jury to commence their deliberations.  Thank you for your attention and cooperation.

(The jury exiting the courtroom.)

**THE COURT:**  Counsel, if you could stay within a short radius, within a five-minute radius, in case questions come back from the jury.

I want to commend the parties and counsel for a very

vigorously fought and presented case.  It's not easy to present a case with some technical complexity.  And we'll just wait and see at this point.

Thank you.

(Court adjourned at 3:32 p.m.)

- - - -

CERTIFICATE OF REPORTERS

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Saturday, February 23, 2019




_____
Vicki Eastvold, RMR, CRR
Official Court Reporter




_____
Katherine Powell Sullivan, CSR #5812, RMR, CRR
Official Court Reporter