UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OPTICURRENT, LLC,

Plaintiff,

v.

POWER INTEGRATIONS, INC., et al.,

Defendants.

Case No. 17-cv-03597-EMC

**PUBLIC/REDACTED VERSION**

**ORDER RE POST-TRIAL MOTIONS**

Docket No. 292, 295, 296, 298, 303, 309, 313

Plaintiff Opticurrent, LLC ("Opticurrent") brought this suit against Defendant Power Integrations, Inc. ("PI"), alleging infringement of U.S. Patent No. 6,958,623 (the "'623 patent"). The '623 patent, which was issued to inventor James Congdon in 2005, claims "[a] noninverting transistor switch having only three terminals" which "limits the current leakage between the third terminal and the second terminal." Docket No. 1-1. On February 25, 2019, after a four-day trial, the jury delivered a verdict finding that: (1) PI literally infringed claim 1 of the '623 patent; (2) PI infringed claim 1 of the '623 Patent under the doctrine of equivalents; (3) PI did not induce infringement of the '623 patent; and (4) Opticurrent is entitled to damages in the amount of $6,666,484.77 (*i.e.*, 3% of PI's sales, through March 31, 2018, of $222,216,159). Docket No. 285.

The parties have filed a number of post-trial motions. For the reasons discussed below, the Court rules as follows:

(1) PI's motion for judgment as a matter of law is

    a. **DENIED** as to literal infringement;

    b. **DENIED** as to infringement under the doctrine of equivalents;

    c. **GRANTED** as to the royalty base used to calculate damages;

d. **DENIED** as to the royalty rate used to calculate damages;

e. **DENIED** as to damages;

(2) Opticurrent's motion for judgment as a matter of law on induced infringement is **DENIED**;

(3) Opticurrent's motion for supplemental judgment on accused products excluded from the trial is **DENIED**;

(4) Opticurrent's motion for ongoing royalty is **GRANTED**;

(5) Opticurrent's motion for prejudgment and postjudgment interest is **GRANTED**;

(6) Opticurrent's motion for attorneys' fees is **DENIED**;

(7) PI's motion to stay execution of judgment pending appeal is **DENIED**.

# I.    <u>LEGAL STANDARDS</u>

A.    <u>Judgment as a Matter of Law</u>

A party may make a motion under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law before a case is submitted to the jury. If the court denies or defers ruling on the motion, and the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b). *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). A court "review[s] a jury's verdict for substantial evidence in ruling on a properly made motion under Rule 50(b)." *Id.* "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013) (quoting *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2005)). Thus, judgment as a matter of law should be granted only where "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109–10 (9th Cir. 2013) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003)). "[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence," and "may not substitute its view of the evidence for that of the jury." *Id.* at 1110 (citations and internal quotation marks omitted).

B.    <u>New Trial</u>

A court may grant a new trial under Rule 59 "if 'the verdict is contrary to the clear weight

of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (quoting *Oltz v. Saint Peter's Community Hosp.*, 861 F.2d 1440, 1452 (9th Cir. 1988)). Unlike on a motion for a judgment as a matter of law, when considering a motion for a new trial, the Court "can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). However, a motion for new trial should not be granted "simply because the court would have arrived at a different verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

## II.   DISCUSSION

### A.   PI's Post-Trial Motions

PI moves for judgment as a matter of law or, in the alternative, for a new trial, on several issues. Docket No. 309 ("PI Mot.") at 1.

#### 1.   Literal Infringement

PI argues that Opticurrent failed to prove that PI literally infringed the '623 patent. PI Mot. at 5–6. In so arguing, PI fixates upon the preamble to claim 1 of the '623 patent, which describes the claimed invention as "[a] noninverting transistor switch having only three terminals." Docket No. 1-1. PI insists that its accused products do not literally infringe because they are switches with four terminals, not three. PI Mot. at. 5. However, Judge Gilstrap already declined to adopt this simplistic reading of the claim language during claim construction when he ruled that the phrase "a noninverting transistor switch having only three terminals" means "a noninverting transistor switch with three terminals *that does not have a fourth terminal connected to a power supply*." Docket No. 58 at 13 (emphasis added). Judge Gilstrap explicitly rejected PI's contention that the preamble language limits the '623 patent to switches with "no more than three" terminals, noting that the patent specification "states that a three terminal noninverting transistor switch may have a fourth terminal/pin and still be considered a three terminal switch." *Id.* at 12–13. PI's argument that its accused products do not infringe because they contain more than three terminals is not availing; it ignores the claim construction ruling herein.

The more salient question is whether the fourth terminal in the accused products is "connected to a power supply." *Id.* at 13. If it is, then the accused products would not infringe under the Court's claim construction. PI claims it "introduced unrebutted evidence" at trial that "its accused products cannot be used unless the fourth pin is attached to an external capacitor that is necessary to supply power to the chip." PI Mot. at 5–6. However, Opticurrent's expert testified that the external capacitor is not a "power supply" because the capacitor itself receives its power from an external power source, and serves as a filter for the external power source rather than an independent source of power. *See* Tr. at 345:22–346:9, 347:11–351:13, 621:2–622:23. In the face of this evidence, PI's characterization of its products is not the "only one" permitted by the evidence, *Barnard*, 721 F.3d at 1075; nor is the jury's verdict of infringement "contrary to the clear weight of the evidence," *4.0 Acres of Land*, 175 F.3d at 1139. The jury could reasonably have credited Opticurrent's explanation that the capacitor in PI's accused products is not a "power supply."

Accordingly, PI's motion is **DENIED** with respect to literal infringement.

### 2. Infringement under the Doctrine of Equivalents

PI also contends that Opticurrent failed to prove infringement under the doctrine of equivalents. PI Mot. at 6–8. As with its literal infringement arguments, however, PI's position on this point is fundamentally a disagreement with the Court's claim construction and the jury's weighing of the evidence and is therefore unpersuasive.

PI's primary argument is that Opticurrent was "required to show . . . the presence of a 'noninverting transistor switch having only three terminals'" because the "all elements rule" requires that all claim elements must be established under the doctrine of equivalents. PI Mot. at 6. As explained above, Judge Gilstrap construed "having only three terminals" to mean "not hav[ing] a fourth terminal connected to a power supply.'" Docket No. 58 at 13. And Opticurrent presented evidence to the jury to counter PI's characterization of its accused products containing a fourth terminal connected to a power supply. The jury weighed the competing evidence and concluded that the fourth terminal in PI's products is not connected to a power supply, and therefore that all elements of claim 1 of the '623 patent are present in the accused products. This

4

1    conclusion was not unreasonable in light of the evidence at trial.

2        Citing the proposition that "the concept of equivalency cannot embrace a structure that is

3    specifically excluded from the scope of the claims," *Dolly, Inc. v. Spalding & Evenflo Companies,*

4    *Inc.*, 16 F.3d 394, 400 (Fed. Cir. 1994), PI claims that its four-terminal switches are specifically

5    excluded by the '623 patent's "only three terminals" language, PI Mot. at 7.  Again, the '623

6    patent, as construed by Judge Gilstrap, *does* exclude switches that contain a fourth terminal

7    *connected to a power supply*.  But the jury determined, on the basis of the evidence proffered at

8    trial, that the accused products do *not* contain a fourth terminal connected to a power supply.  PI's

9    accused products thus are not "specifically excluded" from the claims as construed herein.

10        PI's third argument is that Opticurrent's equivalence theory relied on "comparing the

11   internal capacitor in [the inventor] Mr. Congdon's breadboard (and associated drawing) with the

12   external capacitor used by the accused products."  PI Mot. at 7.  According to PI, this contravened

13   the Court's instruction to the jury that "in deciding the issue of infringement you may not compare

14   PI's accused products to Mr. Congdon's breadboard product or the accompanying drawing.

15   Rather, you must compare PI's accused products to claim 1 of the '623 patent when making your

16   decision regarding infringement."  Jury Instruction No. 29.  In particular, PI highlights the

17   following exchange from the direct examination of Dr. Regan Zane, Opticurrent's expert witness:

18            Q:  Now, looking back at the patent, Exhibit 4, in the language we
              were talking about, Dr. Zane, is the use of the capacitor with the
19            voltage stabilizer, like we just described in Exhibit 32, is that an
              alternative type of conventional voltage stabilizer which is well
20            known in the art?

21            A:  It could be considered so, yes. Although in this case in the
              diagram that was shown previously, the voltage stabilizer really is
22            still the transistor I identified as a voltage stabilizer. The capacitor is
              simply helping that voltage stabilizer be more reliable, more robust,
23            because it helps filter that node.

24   Tr. 325:2–12. PI claims that here, Dr. Zane was "expressly using" Trial Exhibit 32—Mr.

25   Congdon's drawing—"to argue equivalents."  PI Mot. at 7.

26        PI did not object to this portion of testimony during trial.  In any event, the context

27   indicates Dr. Zane was merely illustrating a term from the '623 patent itself.  The '623 patent

28   includes circuit diagrams showing a transistor labeled "MOSFET 123."  Docket No. 1-1 at Fig. 5.

5

United States District Court
Northern District of California

The patent explains that "MOSFET 123 functions as a voltage stabilizer," and "could be replaced by alternative types of conventional voltage stabilizers which are well known in the art without departing from the spirit of the present invention." *Id.* at col. 6:37–46. Opticurrent, through Dr. Zane's testimony, referenced this language to demonstrate that a capacitor such as the one in PI's accused products is an example of a "conventional voltage stabilizer which is well known in the art," and therefore that the accused products' use of a capacitor connected to the fourth terminal was contemplated by the '623 patent. *See* Tr. at 321:1–20. In other words, Opticurrent did not compare the accused products to Congdon's drawing but to the '623 patent, to which the drawing gave meaning. Opticurrent's line of questioning was not improper.

Finally, PI argues that Opticurrent's equivalence presentation ran afoul of the principle that "equivalent infringement is not available for structures which were known to the patent applicant at the time of his application but were not disclosed in the patent." PI Mot. at 8 (quoting *Sipex Corp. v. Maxim Integrated Prod., Inc.*, No. CIV.A. 99-10096-RWZ, 2002 WL 1046699, at *1 (D. Mass. May 24, 2002)); *see Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311 (Fed. Cir. 1998) (holding that equivalence cannot be found where "given the prior knowledge of the technology asserted to be equivalent, it could readily have been disclosed in the patent"). PI asserts that Mr. Congdon did not disclose that his claimed invention could incorporate a capacitor in the '623 patent. To the contrary, Mr. Congdon did exactly that in the patent when he made clear that the MOSFET 123 "could be replaced by alternative types of conventional voltage stabilizers which are well known in the art without departing from the spirit of the present invention." Docket No. 1-1 at col. 6:37–46. As Dr. Zane explained at trial, a capacitor is an example of a conventional voltage stabilizer well known in the art. *See* Tr. at 321:1–20.

Accordingly, PI's motion is **DENIED** with respect to infringement under the doctrine of equivalents.

### 3. Royalty Base

The jury awarded Opticurrent damages in the amount of $6,666,484.77, calculated using a royalty rate of 3% and a royalty base of $222,216,159. *See* Docket No. 285 at 2. The royalty base was derived from PI's sales revenue from April 2010 through March 2018. Tr. at 763:1–767:22.

During that period, the worldwide sales of PI's accused products totaled $666,648,477, of which an estimated one-third—$222,216,159—eventually entered the United States. *Id.* PI asserts that the royalty base used by the jury lacks an evidentiary basis because "Opticurrent's argument that one-third of PI's products entered the United States was based on an *inducement* theory." PI Mot. at 4 (emphasis in original). Since the jury has found that there was no induced infringement, PI reasons, the one-third figure cannot be sustained as a basis for damages. *Id.* PI accordingly asks the Court to reduce the royalty base to 6% of PI's sales. *Id.* at 3–4.

### a.  Background Principles

PI's argument implicates two established principles of patent law. The first is that "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'" *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 411–12 (Fed. Cir. 2018) (quoting *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015)). The second is that "patent laws, like other laws, are to be understood against a background presumption against extraterritorial reach." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1306 (Fed. Cir. 2015) (citing *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007)). The patent laws provide "a clear definition of what conduct Congress intended to reach—making *or* using *or* selling in the United States *or* importing into the United States" any patented invention without authority. *Id.* (citing 25 U.S.C. § 271(a)) (emphases in original). Accordingly, "[w]here a physical product is being employed to measure damages for the infringing use of patented methods, . . . territoriality is satisfied when and only when any one of those domestic actions for that unit (*e.g.,* sale) is proved to be present." *Id.*

### b.  Evidence

The uncontroverted evidence at trial showed that PI makes, uses, and sells the vast majority of its accused chips abroad. Although the accused products are designed in California, they are manufactured in Asia. Tr. at 778:14–22. Most of the products are sold in China. *Id.* at 779:2–3. PI only sells "approximately 5 or 6 percent" of its products in the United States. *Id.* at 779:4–9. For the products sold abroad, no part of PI's sales process takes place in the United

United States District Court
Northern District of California

States. *Id.* at 779:10–14. The buyers of those products incorporate PI's chips into power supply products and then sell them to end-users. *Id.* at 779:15–24. PI estimates that approximately one-third of its accused chips "eventually make their way into the United States" through these power supply products manufactured by third parties. *Id.* at 780:4–8. This estimate is based on "a general rule of thumb that roughly for the global volumes of electronic products made . . . roughly 30 percent is consumed in the U.S." *Id.* at 766:9–14. Ben Sutherland, PI's vice president of worldwide sales, made clear that it was PI's customers, not PI itself, that imported the accused products into the United States:

> **Q:** And who is it that is importing that third into the United States?
>
> **A:** That's a good question. *We're kind of disconnected from that part of the process because we're not involved in it.* But I could imagine it's companies like Dell or Samsung themselves would move their goods around the world and bring them into the U.S.

*Id.* at 780:9–15 (emphasis added). Opticurrent introduced no evidence controverting Mr. Sutherland's testimony that only 5 or 6 percent of PI's revenue is domestic. *Id.* at 782:22–783:1.

        c.    <u>Analysis</u>

Courts "afford substantial deference to a jury's finding of the appropriate amount of damages," and must uphold the jury's award "[u]nless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1028 (9th Cir. 2008) (internal quotation marks omitted). On the above evidence, the jury could reasonably conclude that the proper royalty base from which to calculate damages for PI's direct infringement is 6% of PI's worldwide sales, because that is the portion of revenue derived from accused chips that PI itself "makes, uses, offers to sell, or sells . . . within the United States or imports into the United States." 35 U.S.C. § 271(a). But there was no evidentiary basis for the jury to determine that the remainder of PI's accused products that eventually find their way into the United States could be included in the royalty base for *direct* infringement, because Mr. Sutherland's undisputed testimony established that those

products were imported by PI's customers, not by PI.[1]  Thus, PI could only be liable for damages arising from the sales of those products if the jury found that PI *induced* its customers to infringe. The jury found no inducement.  Accordingly, the jury's use of the royalty base of one-third of PI's worldwide sales to assess damages for direct infringement is "clearly not supported by the evidence." *Harper*, 533 F.3d at 1028.  *See France Telecom S.A. v. Marvell Semiconductor Inc.*, 39 F. Supp. 3d 1080, 1103 (N.D. Cal. 2014) (precluding damages based on defendant's sale of accused semiconductor chips because "there is no genuine issue of material fact that all sales of the accused chips happened abroad," notwithstanding that "the chips may ultimately end up and be used in the United States").

Opticurrent nevertheless insists, relying on *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283 (Fed. Cir. 2015), that the jury used the correct royalty base.  Docket No. 321 at 3–4.  In *Carnegie Mellon*, the defendant Marvell, a California-based company, was alleged to have infringed two patents relating to semiconductor chips.  *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 986 F. Supp. 2d 574, 582 (W.D. Pa. 2013).  Marvell manufactured the infringing chips in Taiwan and sold them to makers of hard-disk drives, who incorporated the chips into the drives.  *Id.* at 592–93.  The hard-disk drives were then incorporated into laptops, and some of those laptops were eventually imported back to the United States.  *Id.* at 594.  The jury found that Marvell had infringed both patents, and awarded the plaintiff, CMU, a royalty based on Marvell's worldwide sales.  *Carnegie Mellon*, 807 F.3d at 1291–92.  On appeal, Marvell challenged the royalty base used by the jury.  The Federal Circuit held that the chips that Marvell manufactured and sold abroad but were ultimately imported into the United States were properly included in the royalty base.  *Id.* at 1305.

Opticurrent reads *Carnegie Mellon*'s analysis as controlling the outcome in this case because one-third of the accused chips that PI manufactured and sold abroad were ultimately

---

[1] Opticurrent argues that "the QBar license constitutes . . . evidence permitting the jury to find that, in a hypothetical negotiation, Mr. Congdon and Defendant would have agreed to royalty base used by the jury," because "the QBar license was for 'worldwide' rights."  Docket No. 321 at 5. However, the QBar license was introduced as a reference point for the jury to determine a royalty *rate* for the '623 patent, not a royalty *base*.

imported into the United States. But there is a crucial distinction between the two cases. Unlike here, in *Carnegie Mellon*, the "jury found that Marvell both directly *and indirectly* infringed the two (method) claims at issue by developing, testing, and selling to its customers." *Id.* at 1294 (emphasis added). Indeed, the district court emphasized that "CMU's liability theories against Marvell are critical to understanding the jury's damages award" because "CMU argued that that Marvell directly infringed the CMU Patents . . . as well as indirectly infringed by inducing and contributing to the infringement by its customers in the United States." *Carnegie Mellon*, 986 F. Supp. 2d at 634–35. The finding of inducement allowed the jury to impose liability on Marvell for chips that were imported to the United States by Marvell's customers.

Opticurrent attempts to explain that distinction away by pointing out that "the Federal Circuit expressly analyzed whether Marvell's importation activities triggered damages under Section 271(a)," which supposedly addresses "direct infringement," not induced infringement. Docket No. 321 at 4 n.1. Opticurrent misreads *Carnegie Mellon*. Any finding of induced infringement necessarily hinges on the applicability of § 271(a) because "[i]nducement liability requires a showing of direct infringement by a third party." *Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp.*, 531 F. Supp. 2d 1084, 1112 (N.D. Cal. 2007) (citing *Moleculon Research Corp. v. CBS, Inc.*, 872 F.2d 407, 410 (Fed. Cir. 1989)). The *Carnegie Mellon* court's assessment of damages against Marvell for inducement was thus predicated on the determination that Marvell's customers violated § 271(a). *Carnegie Mellon* does not stand for the proposition that a finding of direct infringement alone subjects the infringer to damages for every subsequent sale, use, or importation by its customers, even if the infringer had no knowledge of or did not foresee its customers' activities. Such a notion defies common sense, as it would render moot inducement as a distinct basis for liability where accused products eventually and indirectly find their way into the United States. Indeed, at the hearing, Opticurrent's counsel acknowledged that his interpretation of *Carnegie Mellon* would allow a patentee to recover damages for induced infringement even after a jury verdict of no inducement. Liability would obtain no matter how remote, unintended, or unforeseeable the ultimate importation of the product incorporating the accused product. A footnote in Opticurrent's motion seeking judgment as a matter of law on

10

inducement similarly exposes the illogicality of Opticurrent's position: "This relief sought in this Motion would be a moot point if the Court upholds the royalty base found by the jury to which Power Integrations now objects." Docket No. 317 at 1 n.1.

Given that PI did not induce infringement, there is no evidentiary basis to support a royalty base of $222,216,159. Instead, the trial evidence can only support a royal base of 6% of PI's worldwide sales.

          d.    <u>Waiver/Estoppel</u>

Opticurrent contends that PI is barred from challenging the royalty base for two reasons. First, Opticurrent asserts that PI waived its challenge by failing to object to the one-third royalty base before and during trial. Not so. Before trial, PI expressly preserved its "challenge [to] the royalty base . . . through fact witnesses, cross-examination, and attorney argument." Docket No. 184 at 4 (PI's opposition to Opticurrent's motions in limine). PI then raised such a challenge at trial by eliciting Mr. Sutherland's testimony that only 6% of PI's revenue derive from its own domestic sales. Moreover, PI filed a Rule 50(a) motion in which it specifically argued that "[m]ost of Opticurrent's claimed damages are based on alleged inducement, not alleged direct infringement" and therefore that "at least 94% of PI's pre-suit sales . . . must be excluded from damages." Docket No. 281 at 2. Accordingly, PI did not waive its challenge to the royalty base.

Second, Opticurrent urges the Court to apply the doctrine of judicial estoppel against PI for a position PI took in *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, No. 04-cv-1371-LPS (D. Del. filed Oct. 20, 2004). Docket No. 321 at 6–8. In that case, as the prevailing plaintiff in a patent infringement action, PI argued that it was entitled to damages from Fairchild for lost profits worldwide due to infringement in the United States. *Id.*, Exh. 7 at 1. PI cited the Supreme Court's recent decision in *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018) as support for its position that "foreseeable foreign losses are properly included in U.S. patent damages." Docket No. 321, Exh. 7 at 2. That position, according to Opticurrent, contradicts PI's position in this case that it is not liable for foreign damages absent a finding of inducement, so PI should be judicially estopped from asserting it here.

Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an

argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). For the doctrine to apply, "a party's later position must be clearly inconsistent with its earlier position." *Id.* at 750–51. There is no clear inconsistency here. In *Fairchild*, PI's assertion that it is entitled to recover for foreign losses relied on evidence in the record that the defendant "manufactured infringing chips in the United States" and "offered infringing products to [customers] with the involvement of its U.S. sales force, causing PI to drastically reduce its prices." Docket No. 321, Exh. 7 at 2. That is, domestic infringement caused the foreign losses. In contrast, there is no evidence in this case that PI manufactured or sold accused chips within the United States. The only type of domestic infringement Opticurrent has established on PI's part is a small percentage of sales within the United States. Opticurrent has presented no evidence that those sales caused it to suffer foreign losses. PI's position in Fairchild is not inconsistent with its position here. Judicial estoppel does not apply.

Therefore, PI's motion for judgment as a matter of law is **GRANTED** as to the royalty base. The royalty base is adjusted to 6% of PI's worldwide sales, *i.e.*, $39,998,908.62. Multiplied by the royalty rate of 3%, this produces a damages figure of $1,199,967.26.

### 4. Royalty Rate

PI next asks the Court to reduce the 3% royalty rate awarded by the jury to 2%. PI Mot. at 4–5. The QBar license, which Opticurrent presented to the jury as a reference point for determining the royalty rate, set a 3% rate for an exclusive license, but specified that "[i]n the event the license granted hereunder is converted into a non-exclusive license . . . the percentage royalty on Net Sales shall be reduced to two percent." Trial Exhibit 2. PI argues that "Opticurrent failed to introduce any evidence that the license resulting from the hypothetical negotiation in this case would be exclusive," and therefore that the 2% rate is appropriate. PI Mot. at 5.

Opticurrent does not dispute that, as a starting point, a royalty rate of 2% may have been appropriate based on the non-exclusive rate in the QBar license. *See* Docket No. 321 at 11. However, Opticurrent asserts that it is a "fair inference" that the jury decided to award a 3% rate in light of the evidence Opticurrent adduced that the '623 patent significantly improves on the '323

patent that was the subject of the QBar license. *Id.* For instance, Mr. Congdon explained that the '323 patent produced a "leakage current" that led to "standby energy waste," such that a product containing the patented switch would "burn power all the time that it's plugged in" to a power outlet. Tr. at 493:20–494:3. The '623 patent improved on the '323 patent by "stop[ping] that energy waste." *Id.* at 494:3–7. Dr. Zane confirmed that the '323 patent had the "drawback" of "leak[ing] current from . . . high voltage, and opined that the '623 patent represented an improvement on the '323 patent because "a modification applied in the '623 [patent] . . . allows it to avoid the problem . . . [of] having that leakage path through the device." Tr. at 296:8–297:4, 298:22–299:12. David Kung, PI's director of design engineering, provided additional context for understanding the value of the improvements in the '623 patent when he explained that energy efficiency is "actually the main advantage" of the design of PI's accused chips (which the jury ultimately decided infringed the '623 patent). Tr. at 633:16–634:11. He informed the jury that "people . . . want high efficiency, they pay a lot of extra money to get high efficiency," and in fact "in the field in real-world power supplies," the "whole world is asking for [energy efficiency] right now." *Id.* The testimony of Mr. Congdon, Dr. Zane, and Mr. Kung are substantial evidence of the value of the '623 patent that support the jury's decision to award a higher royalty rate for that patent than what was set forth in the QBar license.[2] *See Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012) (jury awards are reviewed under the substantial evidence standard).

PI counters that Opticurrent cannot use the 2% non-exclusive rate in the QBar license as the baseline onto which to add the value of the improvements in the '623 patent. Docket No. 323 at 5–6. PI submits that using a 2% baseline would attribute value to the '323 patent, which

---

[2] The jury was instructed that it may consider the *Georgia-Pacific* factors in determining a reasonable royalty rate. *See* Jury Instruction No. 36. Several of those factors bear directly on the issue of discerning the value attributable to an improvement in a patent. For example, factor nine refers to "[t]he utility and advantages of the patented property over the old modes or devices," and factor thirteen refers to "[t]he portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements." *Id.*; *see AstraZeneca*, 782 F.3d at 1338 (noting that "the standard *Georgia-Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation").

Opticurrent has not asserted against PI, and which had expired by the start of the damages period in this case. Docket No. 323 at 5–6. Instead, PI argues that Opticurrent must isolate the value of the improvement in the '623 patent (*i.e.*, the incremental value of the '632 patent over the '323 patent) and use only that value to calculate the royalty rate. *Id.*

PI is correct that in general, "the patent owner must apportion or separate the damages between the patented improvement and the conventional components of the multicomponent product" to "ensure[] that [the patent owner] is compensated for the patented improvement . . . rather than the entire [product]." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (citations omitted); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014) ("[T]he patent holder should only be compensated for the approximate incremental benefit derived from his invention.") (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). However, in reviewing the jury award, the Court must bear in mind that "[t]he determination of a damage award is not an exact science," *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed. Cir. 1987), and when "the amount of the damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringer," *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983). Here, even assuming that no part of the royalty rate can be based on the technology taught by the '323 patent, the evidence presented at trial about the importance of the energy efficiency advantages of the '623 patent and the significant improvement of the '623 patent over the '323 patent was sufficient to support a jury awarding a 3% rate for the value of the improvement alone.

Accordingly, PI's motion is **DENIED** with respect to the royalty rate.

5. <u>Damages</u>

PI next asks the Court to enter judgment as a matter of law that Opticurrent failed to prove damages at trial, in several ways.

a. <u>Apportionment and Entire Market Value Rule</u>

First, PI protests that Opticurrent did not apportion damages between the infringing aspects of PI's products that are attributable to the value of the '623 patent and the noninfringing aspects covered by the expired '323 patent. PI Mot. at 11. Apportionment is the well-established

principle that "where multi-component products are involved," the "damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more." *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (citations and internal quotation marks omitted). Apportionment requires that a damages theory "must separate the value of the allegedly infringing features from the value of all other features." *Id.* (quoting *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014)). At the most basic level, PI is correct that Opticurrent's damages theory had to isolate the value of the '623 patent's improvement on the '323 patent, instead of conflating the worth of the two, at least as to the period after the '323 patent expired.

However, the Federal Circuit "recognizes that, under this apportionment principle, there may be more than one reliable method for estimating a reasonable royalty." *Id.* (citation and internal quotation marks omitted). In this case, Opticurrent opted to invoke one such method of apportionment. That method "values the asserted patent based on comparable licenses"—here, the QBar license. *Id.* at 1303. To properly apportion under a comparable-license theory of damages, a plaintiff must show that the license is in fact comparable by "account[ing] for differences in the technologies and economic circumstances of the contracting parties." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010). PI's apportionment arguments thus are properly directed to whether Opticurrent sufficiently established comparability between the QBar license for the '323 patent and the license that would have resulted from a hypothetical negotiation for the '623 patent. That question is addressed in the next section.

PI also makes the related argument that Opticurrent improperly relied on the entire market value of the accused products by seeking damages as "a percentage of PI's entire revenue or entire average selling price." PI Mot. at 11–12. "The entire market value rule is a narrow exception to th[e] general rule" requiring apportionment. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Under the entire market value rule, "[i]f it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *Id.* (citation omitted). According to PI, Opticurrent invoked the entire market value rule because its

15

damages theory used PI's entire revenue as a royalty base.

This reasoning is at odds with the Federal Circuit's teaching in *Commonwealth* that the entire market value rule is not implicated where apportionment is already built into the royalty rate in a comparable license. In *Commonwealth*, the parties engaged in unsuccessful negotiations over a license for the patent that eventually became the subject of the lawsuit. 809 F.3d at 1302–03. The district court calculated damages using a royalty rate based on a per-unit royalty proposed during the negotiations. *See id.* at 1300, 1303. On appeal, the Federal Circuit rejected the defendant's contention that the district court erred in "not beginning its damages analysis with . . . the smallest salable patent-practicing unit" of the defendant's product. *Id.* at 1301. The court explained that, "[b]ecause the parties' discussions centered on a license rate for the [patent-in-suit], this starting point for the district court's analysis *already built in apportionment*," such that "the parties negotiated over the value of the asserted patent, and no more." *Id.* at 1303 (emphasis added) (citation and internal quotation marks omitted). *Commonwealth* concluded that "otherwise comparable licenses are not inadmissible solely because they express the royalty rate as a percentage of total revenues, rather than in terms of the smallest salable unit." *Id.* (citing *Ericsson*, 773 F.3d at 1228); *see also Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. CV 15-152-RGA, 2018 WL 4691047, at *7 (D. Del. Sept. 28, 2018) (finding "no problem with using comparable licenses to establish a reasonable royalty rate, without performing a separate apportionment analysis, where there is a logical basis for doing so").

Here, Opticurrent's damages theory does not improperly invoke the entire market value rule merely because it references a percentage of PI's total revenues. The Court explained as much at the final pretrial conference:

> MR. THORNBURGH: So what we're asking for, to be very precise, is we're asking for the Court to exclude evidence of PI's total accused revenue because they have not laid the foundation that the Federal Circuit requires. They can't invoke the entire market value rule because they don't even claim that this feature is the basis of demand. They have failed to –
>
> THE COURT: Well, I'm not sure that they're really seeking the entire market theory. I mean, to the extent that -- if they're basing it on a comparable license and putting aside factual questions whether there's enough comparability here, you can sort of make a

16

> reasonable case, normally, if something is a comparable license, as the *Commonwealth-Cisco* case kind of points out, it sort of incorporates an allocation as between patentability or patented and non-patented elements.
>
> So if the patented device is only a small part of whatever the unit is, that's – that's going to be reflected in the fact that, instead of 70 percent or 50 percent or 25 percent royalty, it's a 2 percent or 1 percent. So, I mean, it's -- I don't necessarily see that they are seeking the entire market value if they're trying to use the QBar license, which was, what, 2 to 3 percent.

Docket No. 250 at 48:23–49:20. That is, the royalty rate in the QBar license could be used so long as Opticurrent met its burden of "account[ing] for differences in the technologies and economic circumstances of the contracting parties," including the value of the invention relative to the value of the whole product. *Finjan*, 626 F.3d at 1211.

### b. Comparability of the QBar License

PI asserts that Opticurrent introduced no evidence to permit the jury to determine that the QBar license is comparable considering that: (1) the products covered by the QBar license ("QBar switches alone") and PI's accused products ("a combination of switch and power supply controller") are "very different"; (2) QBar was not commercially successful whereas PI had revenues of over $600 million for the accused products; and (3) Mr. Congdon owned QBar with a friend at the time he entered the licensing agreement with QBar, whereas Opticurrent and PI are competitors. PI Mot. at 9–10.

PI raised the same objections at trial. Tr. at 661:14–17 (Opticurrent "completely failed to show the comparability of the QBar license" and therefore had laid "no foundation" for the proposed royalty rate). However, the Court ruled that "there is a basis for [a royalty rate] because there was testimony about QBar." *Id.* at 660:6–9; *see id.* at 663:6–11. And while there was "not much more testimony in terms of comparing and how much more valuable it is and how you quantify that," the Court noted that those questions fell within the "province of the jury." *Id.* at 660:10–13. While not robust, the record shows that Opticurrent *did* provide a basis for the jury to compare the QBar license and the hypothetical license for the '623 patent, and to account for the differences PI lists above in calculating damages.

First, there was evidence about the distinction between the products covered by the QBar-

license and PI's accused products.[3]  The QBar license covers only the "QBar Switch," which is the

three-terminal switch that is the subject of the '323 patent.  *See* Trial Exhibit 2 § 2 ("'QBAR

Switch' means Three-Terminal Noninverting Transistor Switch as disclosed, claimed, and covered

by U.S. Patent #5,134,323.").  Thus, under the QBar license Mr. Congdon received 3% of the

value of the switch itself.  *See id.* ("'Net Sales' means the sum of Licensee's and Sublicensee's

invoiced sales of QBAR Switches . . . .").  PI characterizes its accused products as containing

more components than just the switch claimed in the '623 patent.  The accused products "are not

themselves the accused 'three-terminal transistor switches,'" but rather larger semiconductor chips

that contain "thousands of three-terminal transistors that form the internal circuitry."  Docket No.

12 at 4–5.

　　　　Had Opticurrent failed to address this distinction with the jury, there may well have been

an apportionment problem, because under the QBar license Opticurrent would have received 3%

of the value of each *switch* the licensee produced, whereas multiplying the total revenue for PI's

accused products by 3% would suggest that the jury awarded Opticurrent 3% of the value of each

*chip* PI produced.  However, the jury was presented with documentary evidence and testimony

that the accused products included more than just a switch.  Brad Brunell, Opticurrent's managing

member, testified that the QBar license covered only the "QBar switch[,] . . . a three terminal

noninverting transistor switch claimed and covered by the '323."  Tr. at 435:21–436:4.  Mr. Kung

then testified at length that PI's accused products consist of an "intelligent circuit" (or "brain") *in*

*addition to* a switch, and that the brain, rather than the switch, "dominates the energy efficiency"

capabilities of the accused products.  *Id.* at 556:23–558:6 (testifying that "[w]ithout the brain, the

switch itself cannot do anything," and that "the energy efficiency of the chip is mainly determined

by the brains and not the switch"); *see also id.* at 559:5–13 (testifying that the "brain" is an

innovation that PI has its own patent on).  Mr. Kung identified the additional circuitry to the jury

by reference to circuit diagrams for the accused products.  *See id.* at 558:11–559:13.  Indeed, PI

---

[3] There is no dispute that the '323 patent and the '623 patent are closely related technologically.
*See, e.g.*, Tr. at 510:19–23 (Congdon testifying on cross-examination that "[t]he '323 is the core of
the '623.").

later told the Court that "evidence has come in from trial[] [that] the QBar license was for a switch, and the accused products are a switch plus the brains, the controller." *Id.* at 661:14–20. In other words, the jury was aware that the QBar switches were not identical to PI's accused products.

Second, Opticurrent presented evidence about the magnitude of QBar's commercial operations and their comparability to PI's operations. Mr. Congdon testified that QBar "manufactured and sold parts for Ford Motor Company, for IBM, for MIT, and several other customers, mostly power supply people." *Id.* at 501:5–10. He acknowledged that he was initially only able to "sell our QBar switches with some amount of success" and "was struggling," but later "got a major customer, Welch Allyn, a medical equipment manufacturer, who started buying these things in significant quantities." *Id.* at 502:2–21. Mr. Brunell also testified that the QBar license was "similar to the type of licenses [he] would negotiate at Microsoft," where he had previously worked in managing intellectual property. *Id.* at 436:18–437:2. He recounted that at Microsoft, he "would negotiate either the acquisition of small companies, or sometimes bigger companies, to get intellectual property rights, or . . . would license technologies from third parties." *Id.* at 416:6–19. The jury thus heard evidence about the ways in which QBar could be considered similar to PI in terms of licensing practices as well as the ways in which QBar differed from PI.

Finally, the jury heard evidence regarding the nature of negotiations that culminated in the QBar license. Mr. Congdon testified that he co-owned QBar with a friend when he entered into a license with the company. *See id.* at 500:4–8 (Congdon testifying that he formed QBar with "[a] friend of mine, David Tralevin"), 511:17–512:6 (Congdon testifying that he and Tralevin each owned 50% of QBar, and "the QBar license agreement was entered into between [Congdon], on the one hand, and QBar, on the other hand"). When cross-examining Mr. Brunell, PI questioned whether the QBar license was the product of arm's-length negotiations. *See id.* at 451:14–24 ("Q. Well, is it fair to say you don't know whether the agreement between Mr. Congdon and QBar was arm's length? A. Uhm, I believe it was arm's length enough, based on the conditions."). This evidence that "[the patentee] did not compete with the licensee as it did with [PI] in the case" was sufficient to "permit[] the jury to properly discount the . . . license." *Finjan*, 626 F.3d at 1212. On

the other hand, the jury also heard evidence that Mr. Congdon was not the solely decisionmaker at QBar—the co-owner had to agree.  *See* Tr. at 500:22–501:4.  Mr. Congdon also testified that the royalty rates were suggested by a seemingly neutral party—an attorney retained by QBar with experience in licensing in the semiconductor industry.  *Id.* at 501:11–20.

Thus, PI is mistaken to claim that Opticurrent introduced no evidence as to the differences between the QBar license and the hypothetical license between Opticurrent and PI.  To be sure, "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."  *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (citation omitted).  "However, we have never required identity of circumstances; on the contrary, we have long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty."  *Id.* (citation and internal quotation marks omitted).  In light of the evidence summarized above, it cannot be said that Opticurrent alleged merely "a loose or vague comparability"; it has done enough to provide the jury with a basis to evaluate the comparability of the QBar license and the hypothetical negotiation in this case.  *See id.* (upholding damages award where the challenged licenses were technologically related, and "all of the other differences . . . complain[ed] of were presented to the jury, allowing the jury to fully evaluate the relevance of the licenses").  Presumably, aware of the trial evidence on these points, the jury also considered the value of the technology taught by the '623 in arriving at a reasonable royalty rate of 3%.

PI faults Opticurrent for failing to *quantify* the differences between the QBar license and the hypothetical license, and that the jury could not have reliably accounted for those differences in determining a reasonable royalty rate.  For the proposition that a comparability analysis must be supported by quantitative evidence, PI cites *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012).  However, the Federal Circuit in *LaserDynamics* refused to allow a patentee to rely on two licenses to establish a royalty rate not for a lack of quantitative evidence, but because the licenses were not comparable to begin with.  As the court explained, the two purportedly comparable licenses "did not involve the [patent-in-suit], and no evidence shows that it even involves [a similar technology]."  *LaserDynamics*, 694 F.3d at 80.  The royalty rate in the

two licenses was therefore "untethered from the patented technology at issue."[4]  *Id.* at 81.

     *Minks v. Polaris Indus., Inc.*, No. 605CV-1894-ORL-31KRS, 2009 WL 3028994 (M.D. Fla. Sept. 17, 2009), cited by Opticurrent, is more apposite.  There, as here, the inventor licensed the patented technology to a company with which he was affiliated.  *Id.* at *1 n.1.  Based on the royalty rate in that license, the jury arrived at a royalty rate for the hypothetical license between the inventor and the defendant.  *Id.* at *2.  The court acknowledged that "the evidence [introduced by the inventor] supporting these royalty figures was vague and imprecise," but nevertheless upheld the damages verdict against the defendant's challenge that the rate determined by the jury was "speculative."  *Id.* at *4.  The court explained that "a hypothetical royalty negotiation . . . is inherently speculative in nature" and that "the factual determination of a reasonable royalty 'frequently is not supported by the specific figures advanced by either party.'"  *Id.* (quoting *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1667 (Fed. Cir. 1991)).  Because the inventor had presented some "evidence of the relationship between [the inventor] and [the licensing company], the relationship and dealings between [the inventor] and [the defendant], and various royalty arrangements over time," the jury could reasonably have reached a decision as to the appropriate royalty rate to award.  *Id.*  The Federal Circuit affirmed the district court's ruling.  *Minks v. Polaris Indus., Inc.*, 404 F. App'x 497 (Fed. Cir. 2010).

     Here, the evidenced presented to the jury regarding the comparability of the QBar license was more fulsome that that deemed adequate in *Minks*.  At the end of the day, "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its

---

[4] PI cites two other cases in which courts have vacated damages awards premised on royalty rates derived from purportedly comparable licenses.  Like *LaserDynamics*, however, both rulings were animated by a fundamental lack of comparability.  In *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010), the patentee's expert "used licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels."  *Id.* at 870.  And in *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), the flaws in the patentee's license theory were manifold: the scopes of the challenged licenses were "vastly different"; the technology covered by some of the challenged licenses was described only vaguely as "PC-related," making it "impossible . . . to determine whether the agreements are at all comparable," and the patentee did not even mention "the subject matter or patents covered" by the remaining licenses; and the patentee pushed for lump-sum damages even though many of the challenged licenses were not lump-sum agreements at all.  *Id.* at 1327–32.  Opticurrent has provided markedly more evidence regarding the QBar license than the bare showings made in *ResQNet.com* and *Lucent Technologies*.

United States District Court
Northern District of California

admissibility," *Ericsson*, 773 F.3d at 1227, and "[d]espite potential flaws in [Opticurrent]'s damages theory, the jury was entitled to hear the [evidence] and decide for itself what to accept or reject," *Finjan*, 626 F.3d at 1212 (citation, internal quotation marks and alterations omitted). The jury, having heard competing evidence, did exactly that here in extrapolating a royalty rate based on the QBar license, and the 3% rate it awarded was "within the range encompassed by the record as a whole." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995).

### c.    Infringing Configuration

PI finally argues that Opticurrent's damages theory is deficient because it relied on "import rates for PI's chips in general" without specifying whether all the power supply units imported into the United States "that include an accused product are built in an allegedly infringing configuration." PI Mot. at 12. PI does not elaborate on this point, but it appears to be suggesting that a larger product can incorporate PI's accused chips—which the jury determined to be infringing—and yet still be built in a configuration that is not infringing. But PI does not point to any evidence it introduced tending to show that the products containing the accused chips are *not* built in an "infringing configuration." In any event, to the extent PI's contention is that damages should not be awarded for infringing products imported by third-party manufacturers, that argument is moot because the royalty base has now been adjusted to exclude those products.

Accordingly, PI's motion for judgment as a matter of law on damages is **DENIED**.

### B.    Opticurrent's Motion for Judgment as Matter of Law on Inducement

Opticurrent argues that the jury's verdict that PI did not induce infringement of the '623 patent is incorrect and asks the Court to grant judgment as a matter of law on inducement or, in the alternative, a new trial. Docket No. 303 at 1.

### 1.    Waiver

PI contends that, as a threshold matter, Opticurrent cannot seek a Rule 50(b) judgment on inducement because it did not make a motion under Rule 50(a) on the issue before the case was submitted to the jury. Docket No. 304 at 5–6. "As explicitly stated in the Rule, a Rule 50(b) motion may be considered only if a Rule 50(a) motion for judgment as a matter of law has been previously made." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1081 (9th Cir. 2009).

Opticurrent concedes that it never explicitly sought a Rule 50(a) ruling on induced infringement, but maintains that it "made a timely oral Motion in accordance with Rule 50(a) before the close of evidence." Docket No. 317 at 4. Namely, when PI rested its case, counsel for Opticurrent stated: "At this time we have a motion under Rule 50 on Power Integrations' case." Tr. at 783:17–18. This so-called "oral motion" does not save Opticurrent's inducement claim. For one thing, it was clearly referencing the written motion for judgment as a matter of law Opticurrent filed on February 12, 2019 (and the only such motion Opticurrent filed during the trial). *See* Docket No. 238. That written motion stated expressly that Opticurrent was only moving for judgment on PI's "counterclaim and affirmative defense of invalidity." *Id.* at 2 (citations omitted). The impression that Opticurrent was moving for judgment only on the issue of invalidity is reinforced by its counsel's statement that "[w]e're going to have a JMOL motion on validity." Tr. at 755:21–22. Nowhere did Opticurrent indicate that it was moving on the issue of inducement.

Undeterred, Opticurrent insists that its oral statement that "we have a motion under Rule 50 on Power Integrations' case" is sufficiently specific to preserve its inducement claim under Rule 50(a). But a Rule 50(a) "motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). The Ninth Circuit has emphasized that "a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *Go Daddy*, 581 F.3d at 961. Opticurrent's oral motion did not assert inducement as a ground for judgment nor specify the law and facts that would entitle it to judgment on inducement. To be sure, Rule "50(b) may be satisfied by an ambiguous or inartfully made motion for a directed verdict." *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989). Even so, Opticurrent is not absolved of responsibility to at least identify the particular legal issue on which its motion is based. *See Cisco Sys. Inc. v. Arista Networks, Inc.*, No. 14-CV-05344-BLF, 2017 WL 4771009, at *10 (N.D. Cal. May 10, 2017) (observing that "[w]hile Rule 50(b) may be satisfied by an ambiguous or inartfully made motion, the argument in some form still needs to be made," and finding that movant forfeited Rule 50(b) issue where it "made no mention" of the issue in its Rule 50(a) motion); *Cotton ex rel. McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1010 (N.D. Cal. 2012) (declining to apply *Reeves* to allow moving party to make Rule 50(b)

motion on one particular claim where the party "ma[de] a Rule 50(a) motion in which they chose to challenge Plaintiffs' [other] claim *only*") (emphasis in original).

Accordingly, Opticurrent has waived its Rule 50(b) challenge to the jury's induced infringement verdict.

### 2. Merits

In any event, Opticurrent's motion would fail on the merits. As the Court instructed the jury, "[i]n order to be liable for inducing infringement, Power Integrations must: (1) have intentionally taken action that actually induced direct infringement; (2) have been aware of the '623 patent; and (3) have known that the acts it was causing would infringe the patent." Jury Instruction No. 33. With respect to the third element, "Power Integrations may be considered to have known that the acts it was causing would infringe the '623 patent if it subjectively believed there was a high probability that the direct infringer's product infringed the patent, in other words, willfully blinded itself to the infringing nature of the direct infringer's act." *Id.*

PI does not dispute Opticurrent established the first two elements.[5] However, PI contends that the jury could reasonably have concluded, based on evidence presented at trial, that PI did not know the acts it was causing would infringe the '623 patent. Docket No. 304 at 2–4. PI is correct. At trial, Cliff Walker, who oversees intellectual property and legal affairs at PI, testified that upon reviewing the '623 patent after the suit was filed, he believed that PI's products did not infringe the patent because "it was describing only a three-terminal device," whereas PI's "products from 2006 had gone to four-terminal devices." Tr. at 518:6–9, 530:3–21. Walker testified that his conclusion regarding noninfringement remained the same after the Court construed the '623 patent to cover four-terminal switches in which the fourth terminal was not connected to a power supply, because he understood PI's products to feature a fourth terminal connected to a power supply. *Id.* at 530:22–531:16. Walker consulted Michael Matthews, an engineer who is PI's vice product of development, before reaching this conclusion. *Id.* at 533:1–11. David Kung, PI's director of

---

[5] As to the second element, Opticurrent only seeks damages for induced infringement "as of the date of commencement of this litigation," when PI became aware of the '623 patent. Docket No. 303 at 4.

24

design engineering, testified similarly. He stated that initially, he believed PI's products "do not infringe" because "they claim three terminals" and "[w]e use four." *Id.* at 596:7–12. After the Court's claim construction, he maintained the same belief because PI products "have the power supply terminal" connected to the fourth terminal "and that is very different from claim 1." *Id.* at 596:12–23.

Opticurrent nevertheless contends that the evidence showed PI was willfully blind. Opticurrent points to the fact that Walker and Kung did not consult each other before reaching their individual determinations of noninfringement, that Kung admitted he did not initially peruse the '623 parent but merely "glanced" through it, and that PI never produced Matthews as a trial witness. However, Opticurrent made these same points to the jury, and the verdict reflects that the jury simply credited the testimony of Mr. Walker and Mr. Kung testimony that PI genuinely believed it was not infringing over Opticurrent's competing evidence. Opticurrent has not demonstrated that a finding of induced infringement was the "only one" permitted by the evidence, *Barnard*, 721 F.3d at 1075, or that the jury's verdict is "contrary to the clear weight of the evidence," *4.0 Acres of Land*, 175 F.3d at 1139.

Accordingly, Opticurrent's motion for judgment as a matter of law on induced infringement is **DENIED**.

C.   Opticurrent's Motion for Supplemental Judgment on Excluded Products

At trial, Opticurrent argued to the jury that certain products[6] within four of PI's product

---

[6] These products are as follows:
- Within the LNK585 and LinkZero-AX Family: the LNK584DG, LNK584GG, LNK585DG, LNK585GG, LNK586DG, and LNK586DG.
- Within the LNK605 and LinkSwitch-II Family: the LNK603PG/DG, LNK613PG/DG, LNK604PG/DG, LNK614PG/DG, LNK605PG/DG, LNK615PG/DG, LNK606PG/DG, LNK616PG/DG, and LNK632DG.
- Within the TNY179 and TinySwitch-LT Family: the TNY174PN, TNY175PN, TNY176PN, TNY177PN, TNY178PN, TNY179PN, and TNY180PN.
- Within the TNY277 and TinySwitch III Family: the TNY274P, TNY274G, TNY275P, TNY275G, TNY276P, TNY276G, TNY277P, TNY277G, TNY278P, TNY278G, TNY279P, TNY279G, TNY280P, and TNY280G.

Docket No. 239, Exh. A (Opticurrent's expert report on infringement).

families infringed the '623 patent.  The jury agreed, entering a verdict for Opticurrent on

infringement.  Opticurrent now moves the Court to enter "supplemental judgment" in its favor and

rule that other PI products which the Court expressly excluded from the trial (the "Excluded

Products")[7] also infringe the '623 patent and that Opticurrent is entitled to damages on those

products.  Docket No. 298 at 1.  Opticurrent's motion is both procedurally improper and

substantively meritless.

This district's Patent Local Rules require a party claiming patent infringement to serve on

the defendant a "Disclosure of Asserted Claims and Infringement Contentions," which "shall

contain":

> (b) Separately for each asserted claim, *each* accused apparatus,
> product, device, process, method, act, or other instrumentality
> ("Accused Instrumentality") of each opposing party of which the
> party is aware."  *This identification shall be as specific as possible.
> Each product, device, and apparatus shall be identified by name or
> model number, if known.*  Each method or process shall be identified
> by name, if known, or by any product, device, or apparatus which,
> when used, allegedly results in the practice of the claimed method or
> process;

N.D. Cal. Pat. L.R. 3-1(b) (emphasis added).  "Rule 3-1(b) does not permit parties to identify

accused products by using categorical or functional identifications, or limited, representative

examples."  *Geovector Corp. v. Samsung Elecs. Co.*, No. 16-CV-02463-WHO, 2017 WL 76950,

at *4 (N.D. Cal. Jan. 9, 2017).  Rather, "a full list of accused products must be disclosed as part of

a party's infringement contentions."  *Oracle Am., Inc. v. Google Inc.*, No. 10-c-03561-WHA, 2011

WL 4479305, at *3 (N.D. Cal. Sept. 26, 2011).

In this case, Opticurrent's expert report on infringement specifically listed the PI products

that it alleged infringed the '623 patent.  *See* Docket No. 239, Exh. A.  The Excluded Products

were not listed.  Opticurrent's infringement contentions and claim charts likewise did not

specifically identify the Excluded Products.  *See* Docket No. 64-3.  Then, shortly before trial

opened, Opticurrent sought to file a trial exhibit summarizing of PI's revenues in which, for the

---

[7] The Excluded Products are: DAP021, SC1011, SC1128, SC1129, SC1138, TNY375, TNY376, TNY377, TNY378, TNY379, TNY380, DAP021, LNK623, LNK624, LNK625, LNK626, SC1097, SC1098, SC1099, SC1103, SC1104, SC1106, SC1125, SC1126, SC1132, SC1135, SC1139, LNK574, LNK576, and SPS1013P-TL.  Docket No. 298-2.

United States District Court
Northern District of California

first time, the Excluded Products were listed as accused products. *See* Docket No. 235 at 2. The Court ordered briefing to address whether the newly-listed products were admissible. *See id.* In its responsive brief, Opticurrent did not dispute that the Excluded Products were not specified in its infringement contentions, but argued that it had from the beginning alleged infringement with respect to certain product *families* "and any other similarly structured or functioning products"; that PI was aware of the scope of the infringement contentions and did not object; and that Opticurrent's revenue summaries were based on financial information provided by PI which included all products within the accused product families, and not just the specific products listed in Opticurrent's infringement contentions. Docket No. 237.

After considering the parties' briefing, the Court ruled as follows:

> Products PI listed as newly accused . . . are inadmissible. There were not specifically disclosed in infringement contentions on Opticurrent's expert's report. Plaintiff is required to remove non-accused products from the summaries and recalculate accordingly. Plaintiff does not effectively dispute these products belong to families different from the enumerated accused products; nor does plaintiff dispute the schematics of the circuitry of these products differ from that of the accused products.

Docket No. 264 at 1.

Opticurrent's present motion seeks to relitigate the issue. Its arguments are substantially identical to the ones made in its pre-trial brief. Namely, Opticurrent asserts that it has always accused PI's entire product families and similar products of infringement, that PI was aware of the scope of those allegations and did not object until shortly before trial, and that the financial information PI had provided to Opticurrent included all products within the accused product families. Docket No. 298 at 1–5. Opticurrent's motion also argues, by reference to PI's datasheets, that the Excluded Products have the same components and functionality as the accused products, *id.* at 5–10, even though the Court had found prior to trial that "Plaintiff does not effectively dispute these [Excluded Products] belong to families different from the enumerated accused products; nor does plaintiff dispute the schematics of the circuitry of these products differ from that of the accused products," Docket No. 264 at 1.

In short, Opticurrent is asking the Court to reconsider its pre-trial ruling excluding the

newly-accused products. *See* N.D. Cal. Civ. L.R. 7-9(a) ("Before the entry of a judgment . . . , any party may make a motion before a Judge requesting that the Judge grant the party leave to file a motion for reconsideration of any interlocutory order . . . ."). However, Local Rule 7-9(b) requires that a motion for reconsideration must be based on either "a material difference in fact or law . . . from that which was presented to the Court before entry of the interlocutory order," the "emergence of new material facts or a change of law occurring after the time of such order," or "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." Opticurrent's motion is not based on any of these three grounds. To the contrary, it simply recycles arguments the Court already rejected in its prior ruling. *See* N.D. Cal. Civ. L.R. 7-9(c) ("No motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party now seeks to have reconsidered.").

Instead of conforming its motion to the standard required for reconsideration, Opticurrent insists that is entitled to recover damages for the Excluded Products as long as it can show that those products are "not colorably different" from the accused products determined to be infringing at trial. *See* Docket No. 298 at 11–12. Opticurrent is incorrect. The "not colorably different" test is applied in the context of "evaluating whether an injunction against continued infringement has been violated by a newly accused product." *Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1370 (Fed. Cir. 2014). Some courts have also applied the same test to determine whether a prevailing plaintiff should be awarded ongoing royalty on newly-accused products that were developed subsequent to the filing of the infringement action. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2018 WL 905943, at *8–10 (N.D. Cal. Feb. 15, 2018) (applying test to defendant's products that were allegedly "designed around" the infringed patent); *Fractus, S.A. v. Samsung Elecs. Co.*, No. 6:12-CV-421, 2012 WL 13042583, at *2 (E.D. Tex. Dec. 26, 2012) (applying test to defendant's products that were purportedly based on "completely different designs" than the infringing products). Opticurrent, however, cannot point to a single instance where the "not colorably different" test was used to determine whether *past* royalty should be awarded on products that *already existed* when the plaintiff brought suit but

were not included in the infringement contentions, much less on products that the court had expressly excluded from the plaintiff's infringement claims.

Accordingly, Opticurrent's motion for supplemental judgment on the Excluded Products is **DENIED**.

### D. Opticurrent's Motion for Ongoing Royalty

"A damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales." *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009). Thus, "[t]he award of an ongoing royalty instead of a permanent injunction to compensate for future infringement is appropriate in some cases." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1192 (Fed. Cir. 2012) (citations omitted). Here, in lieu of an injunction against PI, Opticurrent requests ongoing royalty on PI's infringing products to be awarded at a rate of 5%, rather than the 3% rate set by the jury for past infringement. Docket No. 295 ("Royalty Mot.") at 1. Citing *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008), Opticurrent claims that a higher ongoing royalty rate is warranted because "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." *Id.* at 1361.

Opticurrent's argument implicates a somewhat unsettled area of the law. In *Amado*, the Federal Circuit rejected an infringing defendant's contention that ongoing royalty may not be awarded at a higher rate than the royalty rate determined by the jury for past infringement. *Id.* The court reasoned that "[p]rior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved." *Id.* at 1362. In particular, the defendant in that case had been "enjoined from further infringing activity yet was permitted to continue only by virtue, and with the imprimatur, of [a] court-ordered stay" on the permanent injunction. *Id. Amado* concluded that "[w]hen a district court concludes that an injunction is warranted, but is persuaded to stay the injunction pending an appeal, the assessment of damages for infringements taking place after the injunction should take into account the change in the

29

United States District Court
Northern District of California

parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability." *Id.*

Subsequently, in *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012), the Federal Circuit relied on *Amado* to affirm an award of an ongoing royalty rate that was higher than the rate applied to pre-verdict infringement. *Id.* at 1342. In *ActiveVideo*, as in *Amado*, the ongoing royalty was awarded after the court had stayed a permanent injunction against further infringement. *See id.*

PI argues, and some district courts have surmised, that the Federal Circuit's approval of a higher post-verdict royalty rate in *Amado* and *ActiveVideo* was limited to situations in which the patent holder had secured a permanent injunction against the infringer. *See* Docket No. 308 at 1–3. These courts have interpreted the difference in pre- and post-verdict bargaining power referenced in *Amado* as being "largely due to the threat of an injunction." *Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV-335-IEG NLS, 2010 WL 3070370, at *4 (S.D. Cal. Aug. 5, 2010) (citation omitted), *aff'd in part, vacated in part on other grounds*, 702 F.3d 1351 (Fed. Cir. 2012). Under that view, where a "permanent injunction [is] off the table, the bargaining positions of a willing patentee and infringer are substantially the same as they would have been at the time the infringement began," because in "determining the reasonable royalty rate during trial, both parties assume[] the . . . patent *was valid and infringed.*" *Id.* (emphasis in original); *see, e.g.*, *Univ. of Pittsburgh of Com. Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, No. 08CV1307, 2012 WL 1436569, at *11–12 (W.D. Pa. Apr. 25, 2012) (same), *aff'd in part, vacated in part on other grounds*, 561 F. App'x 934 (Fed. Cir. 2014); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL 3034655, at *4–5 (E.D. Tex. July 18, 2017) (same). Because Opticurrent has not sought an injunction here, PI argues that a higher ongoing royalty rate is not justified.

However, the Federal Circuit has recently reiterated, in a case in the patentee's request for injunctive relief was denied, that "[w]hen patent claims are held to be not invalid and infringed, this amounts to a 'substantial shift in the bargaining position of the parties.'" *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1290, 1297 (Fed. Cir. 2018) (quoting *ActiveVideo*, 694 F.3d at

1342).  Further, in *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350 (Fed.

Cir. 2017), the court affirmed the district court's decision to award an ongoing royalty rate that

was double the jury rate, even though no injunctive relief was sought or granted.  *Id.* at 1370.

Notably, the district court expressly rejected the argument Opticurrent makes here that the

bargaining position between parties in an infringement suit does not change post-verdict unless an

injunction is entered.  *See Arctic Cat Inc. v. Bombardier Recreational Prod., Inc.*, No. 14-CV-

62369, 2017 WL 7732873, at *3 n.3 (S.D. Fla. Jan. 3, 2017).  The district court observed that,

even if the royalty rate set by the jury already assumes patent validity and infringement, once a

verdict is entered in favor of the patent holder, any continuing infringement by the defendant is

willful, which potentially subjects the defendant to enhanced damages.  *Id.* at *3.  However, the

higher ongoing royalty rate in *Arctic Cat* was not based solely on the patentee's stronger post-

verdict bargaining position.  The patentee also made a strong showing on several other *Georgia-*

*Pacific* factors.  *See id.*

Here, even though Opticurrent has not sought injunctive relief, PI's counsel conceded at

the hearing that PI faces some degree of risk going forward by virtue of the fact that its post-

verdict infringement may be deemed willful.  There is thus a basis to award Opticurrent an

ongoing royalty rate higher than 3%.  However, the 5% rate Opticurrent asks for is excessive,

particularly since it has not made a showing on any other *Georgia-Pacific* factor.  Moreover, while

Opticurrent's positioned is strengthened by the possibility that PI may face treble damages for

willful infringement, the award of enhanced damages is not mandatory; "district courts have

discretion to 'increase damages up to three times the amount found or assessed.'"  *Presidio*

*Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017) (quoting 35

U.S.C. § 284).  On balance, the Court finds that an ongoing royalty rate of 3.5% adequately

compensates Opticurrent for its stronger post-verdict bargaining position.

Accordingly, Opticurrent's motion for ongoing royalty is **GRANTED** at the rate of 3.5%.

E.      Opticurrent's Motion for Prejudgment and Postjudgment Interest

Opticurrent seeks an award for prejudgment interest on the jury award, calculated using

California's statutory interest rate from the date of the first infringement through the date of

judgment and compounded quarterly, as well as postjudgment interest.  Docket No. 296 at 1.

### 1.  Prejudgment Interest

Under 35 U.S.C. § 284, a patentee who prevails in an infringement action is entitled to "damages adequate to compensate for the infringement . . . together with interest and costs as fixed by the court."  The Supreme Court has instructed that pursuant to § 284, prejudgment interest "should ordinarily be awarded" because it is "necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement."  *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655, 657 (1983).  Section 284 gives courts discretion to deny prejudgment interest if it finds "some justification for withholding such an award."  *Id.* at 656–57.  "For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit."  *Id.*  However, prejudgment interest may be denied on the basis for undue delay only where the delay caused prejudice to the defendant. *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988).

PI contends that Opticurrent is not entitled to an award of prejudgment interest because it unduly delayed in filing this suit, Docket No. 307 at 1–2, pointing to Mr. Brunell's testimony that Opticurrent had determined PI was infringing the '623 patent by 2014 but did not bring suit against PI until 2016, Tr. at 440:20–441:11.  However, a review of the case law suggests that this delay is not so unreasonable that it precludes Opticurrent from recovering interest.  In most cases in which courts have refused to award prejudgment interest because of undue delay, the delay was longer than the one-and-a-half-year period here, and there was some indication that the delay was self-serving or a litigation tactic.  *See, e.g.*, *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001) (two-year delay that appeared to be a "litigation tactic" and "self-serving"); *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 907 (E.D. Wis. 2017) (five-year delay resulting from plaintiffs' "tactical decision" to first "try[] out claims against the bigger industry players"); *Kaneka Corp. v. SKC Kolon PI, Inc.*, 198 F. Supp. 3d 1089, 1124 (C.D. Cal. 2016) (four-year delay for which patentee "offer[ed] no compelling explanation").

In contrast, Mr. Brunell here explained that Opticurrent was not able to initiate legal proceedings against PI immediately upon verifying infringement because it "had to wait until [it] saved up enough money to afford what this fight would cost." Tr. at 441:1–11. This rationale, undisputed by PI, does not bespeak gamesmanship. Moreover, PI has not articulated any particular prejudice it suffered due to Opticurrent's delay, other than the generic accumulation of damages that is present in most infringement cases. *See EcoServices, LLC v. Certified Aviation Servs., LLC*, 340 F. Supp. 3d 1004, 1032 (C.D. Cal. 2018) (finding no undue delay where defendant put forth no evidence that plaintiff's delay was a litigation tactic or that defendant was prejudiced in any way); *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2006 WL 2522506, at *3 (N.D. Cal. Aug. 30, 2006) (refusing to withhold interest absent a "showing that the delays prejudiced [defendant] or that the delays were undue"). Opticurrent may thus recover prejudgment interest.

      a.   <u>Interest Rate</u>

The Court must then determine what interest rate to apply. "Because there is no standard rate for calculating prejudgment interest provided in the statute, the district court has 'substantial discretion' to determine the interest rate in patent infringement cases." *EcoServices*, 340 F. Supp. 3d at 1033 (quoting *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556–57 (Fed. Cir. 1984)). "A court may use the prime rate, the prime rate plus a percentage, the United States Treasury Bill ('T-Bill') rate, a state statutory rate, the corporate rate, or whatever rate the court deems appropriate under the circumstances." *Fujifilm Corp. v. Motorola Mobility LLC*, 182 F. Supp. 3d 1014, 1042 (N.D. Cal. 2016) (citation and internal quotation marks omitted). Courts have typically "conclude[d] that the prime rate is the most accurate estimate of the interest rate" that the patentee would have charged the infringer for a loan, since that is "the rate charged by banks to its most credit-worthy customers." *Atmel Corp. v. Silicon Storage Tech., Inc.*, 202 F. Supp. 2d 1096, 1101 (N.D. Cal. 2002). Opticurrent urges the Court to apply the higher California statutory interest rate of seven percent. Docket No. 296 at 5. PI, on the other hand, argues that the lower T-bill rate is appropriate. Docket No. 307 at 2.

Opticurrent has identified only one instance in which this district has awarded the

California statutory rate, and there, the plaintiff had demonstrated it "actually borrowed funds at a higher rate [than the statutory rate] during the relevant time period." *In re Hayes Microcomputer Prod., Inc. Patent Litig.*, 766 F. Supp. 818, 824 (N.D. Cal. 1991), *aff'd*, 982 F.2d 1527 (Fed. Cir. 1992). Thus, it was appropriate for the court to award the statutory rate "in order to fully compensate" the plaintiff. *Id.* Here, in contrast, Opticurrent has not produced any evidence that a seven percent interest rate is necessary to make it whole, and so is not entitled to the statutory rate.

As for the choice between the prime rate and the T-bill rate, the law is inconsistent. Some courts have held that the T-bill rate is the proper rate to award unless there is evidence that the patentee borrowed money at a higher rate as a result of the defendant's infringement. *See, e.g.*, *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997); *Apple, Inc. v. Samsung Elecs. Co.*, 67 F. Supp. 3d 1100, 1121–22 (N.D. Cal. 2014). Others have held that such evidence is not necessary to support an award based on the prime rate. *See, e.g.*, *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *Fujifilm Corp.*, 182 F. Supp. 3d at 1043. In the absence of any compelling argument from either party for a higher or lower rate, the Court will award the prime rate here as that would likely be the loan rate that PI, as a large corporation, would be charged by a bank. *See Atmel Corp.*, 202 F. Supp. 2d at 1101.

b.    Interest Period

The parties also dispute when the prejudgment interest began to accrue. Opticurrent believes that it is entitled to interest dating back to 2006, the date of first infringement, shortly after the '623 patent issued. Docket No. 296 at 7. PI disagrees, arguing that Opticurrent's recovery for both damages and interest is limited by statute to the period starting in 2010, six years before Opticurrent's complaint was filed. Docket No. 307 at 4.

By statute, "no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action." 35 U.S.C. § 286. Opticurrent initiated this action in 2016. Thus, once the jury found infringement, it calculated Opticurrent's damages for the period beginning in 2010, six years before this suit was filed, rather than the period beginning in 2006, when the '623 patent was issued and the hypothetical royalty negotiation between the parties would have taken place. Opticurrent has

34

offered no reason why prejudgment interest should be calculated any differently. Indeed, prejudgment interest by definition is interest on the "primary or actual" portion of a damages award. *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1580 (Fed. Cir. 1991). It would make little sense to allow interest to start accruing before damages can be imposed; the interest on zero damages would simply be zero.

Although appellate courts have yet to squarely address the issue, district courts that have been urged by a prevailing plaintiff to award prejudgment interest stretching beyond the six-year statutory limitations period have refused to do so. *See Trustees of Bos. Univ. v. Everlight Elecs. Co.*, 187 F. Supp. 3d 306, 322–23 (D. Mass. 2016); *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, No. 4:14-CV-00371, 2017 WL 1716589, at *4 (E.D. Tex. Apr. 27, 2017). In particular, the court in *Trustees* highlighted the flaws in the exact argument Opticurrent makes here—that the trigger date for awarding interest should be the date of the hypothetical negotiation. The court explained that while the parties may have "stipulated to a hypothetical negotiation taking place. . . on the eve of [the first] infringement," that is not the same as an agreement as to "when infringement for purposes of triggering damages actually began." 187 F. Supp. 3d at 322. To the contrary, the Federal Circuit has expressly instructed courts to be "careful to distinguish the hypothetical negotiation date from other dates that trigger infringement liability." *LaserDynamics*, 694 F.3d at 75. "For example, the six-year limitation on recovery of past damages under 35 U.S.C. § 286 does not preclude the hypothetical negotiation date from taking place on the date infringement began, even if damages cannot be collected until some time later." *Id.*

Opticurrent purports to have found two cases in which the Federal Circuit approved prejudgment interest that extended beyond the six-year limitations period. Opticurrent is wrong on both counts. In *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302 (Fed. Cir. 2017), the Federal Circuit affirmed the district court's decision to award prejudgment interest dating to 2006, the date of the hypothetical negotiation. *Id.* at 1315. But the complaint in that case was filed in 2012, so 2006 was within the limitations period.[8] And in *SSL Servs., LLC v.*

---

[8] Opticurrent quotes as support for its argument the language in *Comcast IP*'s that "[p]rejudgment interest runs from the earliest date of infringement for any patent issued at the time of the

*Citrix Sys., Inc.*, 769 F.3d 1073 (Fed. Cir. 2014), the Federal Circuit affirmed an award of prejudgment interest calculated from 2004. *Id.* at 1094. However, that lawsuit was initiated in 2009, so again, 2004 was within the limitations period. *Id.*

Accordingly, prejudgment interest began to accrue in 2010, at the same time as damages.

### c.    Compounding

Opticurrent asks the Court to compound the prejudgment interest on a quarterly basis. Docket No. 296 at 6. Determining the method of compounding interest is "largely within the discretion of the district court." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995). PI did not express any opposition to quarterly compounding. The Court will thus award Opticurrent prejudgment interest at the prime rate, starting in 2010, compounded quarterly.

### 2.    Postjudgment Interest

Finally, Opticurrent seeks postjudgment interest. Postjudgment interest is mandatory under 28 U.S.C. § 1961, which provides that "interest shall be allowed on any money judgment in a civil case recovered in a district court," and "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." PI does not dispute that Opticurrent is entitled to postjudgment interest as provided in § 1961. Docket No. 307 at 5.

Accordingly, Opticurrent's motion for prejudgment and postjudgment interest is **GRANTED**.

### F.    Opticurrent's Motion for Attorneys' Fees

Opticurrent moves for attorneys' fees and costs under 35 U.S.C. § 285, which authorizes courts to award attorneys' fees in "exceptional cases." Opticurrent asserts that this is an

---

hypothetical negotiation." 850 F.3d at 1315. However, as PI points out, the court made that statement in the context of addressing a completely different question: whether prejudgment interest should be apportioned where only one out of the three infringed patents had been issued at the time of the first infringement. *See id.* at 1314–15. The Federal Circuit allowed interest on all three patents to be calculated from the date of the first infringement, without apportionment, only because the jury had been informed that a hypothetical negotiation for the first patent "would have included the issuance of any later patent relating to the same technology." *Id.* Thus, Opticurrent's reliance on this out-of-context statement is misplaced.

"exceptional case" because PI: (1) willfully blinded itself to the possibility that its products infringe the '623 patent rather than conduct an adequate investigation into infringement; (2) hid a key patent license during discovery; (3) opposed Opticurrent's efforts to amend its infringement contentions in bad faith; (4) misrepresented the nature of PI's products in persuading the Court to exclude them from the trial; (5) introduced improper invalidity arguments through its expert report; (6) abandoned its invalidity contentions shortly before the start of trial; (7) refused to produce updated sales figures; (8) delayed in exchanging pretrial materials; (9) included trial exhibits it never intended to use at trial; (10) and engaged in ad hominem attacks. Docket No. 292 at 2–9.

### 1. Legal Standard

Section 285 of the Patent Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." An exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* Relevant factors in assessing whether a case is exceptional include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6. "[P]ost-*Octane* decisions awarding fees have generally cited egregious behavior" as the basis for deeming a case "exceptional." *Vasudevan Software, Inc. v. Microstrategy, Inc.*, No. 11-CV-06637-RS, 2015 WL 4940635, at *5 (N.D. Cal. Aug. 19, 2015) (citing cases).

### 2. Analysis

Opticurrent asserts that PI litigated this case in an "unreasonable manner" per *Octane*. However, none of the behavior cited by Opticurrent, considered in isolation or in the aggregate, is egregious or exceptional.

Opticurrent first argues that PI conducted a "[s]ham [i]nvestigation" into the merits of the

suit and willfully blinded itself to the possibility that its products infringe the '623 patent. Docket No. 292 at 2–3. However, as discussed in more detail above, in concluding that PI did not induce infringement, the jury found that PI was not willfully blind as to the possibility of infringement. *See* Part II.B.2., *supra*. PI's witnesses Mr. Walker and Mr. Kung both testified that they determined after seeing the '623 patent that PI's products did not infringe. They explained the bases for their determinations—that the accused products were four-terminal switches whereas the '623 patent described a three-terminal switch, and the fourth terminal in the accused product was connected to a power supply whereas Judge Gilstrap construed the '623 patent to cover switches in which the fourth terminal was not connected to a power supply. Although the jury ultimately decided that the accused products did infringe, its verdict of non-inducement reflects that it credited PI's evidence that the infringement was not knowing or willful.

Second, Opticurrent asserts that PI did not disclose a patent license agreement between PI and its subsidiary, Power Integrations International Ltd. (the "License"), even though Opticurrent had made a Rule 30(b)(6) request for PI's patent licensing agreements. Docket No. 292 at 3–4. In addition, Opticurrent represents that it asked Mr. Walker in his deposition "directly about existing licenses to which Power Integrations was a party (including licenses that Power Integrations believed were relevant and those it contends were not relevant), and he did not disclose the existence of this License." *Id.* at 4. It was not until Opticurrent's counsel attended a trial in the litigation between PI and Fairchild Semiconductor that Opticurrent became aware of the License. *Id.*

Once Opticurrent became aware of the License, it moved the Court to compel PI to produce it, to allow Opticurrent to supplement its expert report with information from the License, and to issue sanctions for PI's non-disclosure. Docket No. 174 at 27–28. Judge Orrick denied all three of Opticurrent's requests. He explained that he had already denied Opticurrent's previous "request to compel production of certain damages-related documents arising from the *Fairchild* litigation because the cases were unrelated, the experts were unrelated, they involved different patents, and Opticurrent already had sufficient materials in the public record related to the case." *Id.* at 28 (citing Docket No. 99). Judge Orrick determined that the License was encompassed in

that prior ruling because it was irrelevant to this litigation. *See id.* Moreover, he reminded Opticurrent that its Rule 30(b)(6) request "only sought licenses that PI 'contends are relevant to the hypothetical negotiation,'" and therefore "continues to exclude" the newly-disclosed License. *Id.* at 29. Accordingly, there was no basis to bring the License, much less sanction PI for withholding it. This Court affirmed Judge Orrick's ruling prior to trial, denying Opticurrent's attempt to use the License to establish a royalty rate here. *See* Docket No. 235 at 2 (finding "lack of comparability" between the License and that which would have resulted from the hypothetical negotiation between Opticurrent and PI).

In light of the above, Opticurrent is incorrect to claim that PI "hid" the licensing agreement or otherwise acted inappropriately in not producing it.[9]

Third, Opticurrent argues that PI "vigorously opposed Plaintiff's efforts to amend its Infringement Contentions" despite having "no legitimate basis for doing so." Docket No. 292 at

---

[9] To the extent Opticurrent believes Mr. Walker was less than forthcoming in his deposition when asked about PI's patent licenses, it is worth noting that Opticurrent's questioning was ambiguous. Opticurrent maintains that the follow exchange shows that Mr. Walker's concealed the License:



5–6. In Opticurrent's telling, when it moved to amend its infringement contentions in May 2017, it was merely trying to "update[] the information relating to conception and reduction to practice [of the '623 patent] that had already been produced and identified during discovery," and was "not seeking to provide a new conception date." *Id.* at 5. Opticurrent alleges that PI opposed the motion with "threats" to overhaul its own case in response to Opticurrent's amendments. *Id.* at 6.

Opticurrent's account of events is, at best, skewed. Although Judge Orrick ultimately allowed Opticurrent to amend its infringement contentions, he observed that the need for amendment arose because Opticurrent was "putting PI on notice of its 'new' conception date," which by Opticurrent's own account was "critical because the earlier conception and reduction to practice dates knock out at least one of defendants' prior art references." Docket No. 96 at 9. Judge Orrick also underscored that the dispute was triggered by *Opticurrent's* last-minute production of documents, shortly before the close of fact discovery, indicating the Mr. Congdon had conceived the '623 patent in 1997, significantly earlier than the previously-asserted conception date of 2001. *See id.* Before producing those documents, Opticurrent had informed PI that "no documents pertaining to conception dates and reduction to practice exist because it was not aware of an actual reduction to practice prior to the earliest effective filing date of the '623 patent" in 2001. *Id.* Judge Orrick decided to allow the amendment only after granting PI a two-month discovery extension to ameliorate the prejudice caused by Opticurrent' amended infringement contentions. *See id.* at 11–12.

Fourth, Opticurrent claims that PI's "mischaracterizations about the accused product families resulted in the exclusion of certain products" from this case. Docket No. 292 at 6. As explained above, the Court excluded those products not because PI mischaracterized them, but because Opticurrent did not alert PI that it was including them as accused products until mere days before trial opened. *See* Part II.C., *supra*.

Fifth, Opticurrent contends that PI engaged in litigation misconduct when its technical expert, William Bohannon, submitted a rebuttal report that improperly made a "practicing the prior art" invalidity argument under the guise of providing noninfringement opinions. Docket No. 292 at 6–7. Judge Orrick granted Opticurrent's *Daubert* motion to strike the relevant portion of

Mr. Bohannon's report, agreeing with Opticurrent that "Bohannon's prior art testimony . . . ignores the Federal Circuit's clear directive that 'infringement is determined by construing the claims and comparing them to the accused device, not by comparing the accused device to the prior art.'" Docket No. 174 at 24–27 (quoting *Tate Access Floors v. Interface Architectural Res.*, 279 F.3d 1357, 1366 (Fed. Cir. 2002)). However, "[a]n exclusion of expert testimony under *Daubert* does not in most cases trigger a finding of litigation misconduct" unless "the circumstances are 'sufficiently egregious.'" *Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, No. C 12-1971 CW, 2015 WL 1026226, at *2 (N.D. Cal. Mar. 9, 2015) (quoting *MarcTec v. Johnson & Johnson*, 664 F.3d 907, 920 (Fed. Cir. 2012)). Judge Orrick did not indicate that Mr. Bohannon's references to prior art were egregious or made in bad faith.

Sixth, Opticurrent argues that PI abruptly abandoned its invalidity contentions on the eve of trial after contesting the validity of the '623 patent throughout the litigation, forcing Opticurrent to spend unnecessary time and resources responding. Docket No. 292 at 7–8. But, as the Federal Circuit has explained, withdrawing claims or defenses is not in itself litigation misconduct that gives rise to attorneys' fees under § 285. "Claims . . . frequently are dropped and amended during the course of a lawsuit," and "sound judicial policy encourages a narrowing of issues." *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 694 (Fed. Cir. 2001). Opticurrent has not shown that PI's decision to narrow the scope of the trial by not contesting validity was "exceptional or vexatious as compared to normal litigation." *Id.*; *see Chrimar Holding Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 891 (Fed. Cir. 2018) (affirming district court determination that defendant's conduct in "press[ing] a large number of defenses and counterclaims for years, only to drop most of them (*e.g.*, . . . some invalidity grounds) late in the litigation, even during trial" fell "within the range of ordinary practices involving the narrowing of claims for trial").

Opticurrent cites *Nilssen v. Osram Sylvania, Inc.*, 528 F.3d 1352 (Fed. Cir. 2008) as a case in which the court deemed the withdrawal of claims before trial to be inequitable conduct under § 285. There, however, the "exceptional case" determination was premised on the cumulative effect of numerous instances of inequitable conduct: the appellants "provided incorrect responses to interrogatories and never filed a formal correction, then attempted to exclude the interrogatories

for impeachment purposes because they were not signed; . . . [the inventor] arguably waived his attorney-client privilege during trial without providing notice to [the appellee]; [and] appellants produced documents near the end of trial that had been requested earlier." *Id.* at 1358–59. And the appellant in *Nilssen* did not merely drop one defense or counterclaim before trial; it "withdrew sixteen of the originally-filed patents from their suit." *Id.* at 1359. The circumstances evidencing inequitable conduct in *Nilssen* are not present here.

Seventh, Opticurrent faults PI for "refus[ing] to supplement its damages related documentation" in the weeks leading up to trial. Docket No. 292 at 8. Yet, Opticurrent's own characterization of the supposed dispute shows that PI provided the requested documentation once it became available. When Opticurrent requested updated sales figures before trial, PI did not provide them immediately because that it had not yet "closed its books." *Id.* Once PI's year-end accounting process was completed in March, it produced the requested information. *Id.* Opticurrent argues that PI updates its sales figures on a monthly basis and therefore could have passed that information on to Opticurrent each month, but does not explain why that method of production is preferable to a one-time production.

Eighth, Opticurrent asserts that PI did not provide all the pretrial materials on December 10, 2018, as it was required to. Docket No. 292 at 9. PI does not dispute that it did not turn over some materials on December 10, but notes that it alerted Opticurrent that it would provide them by December 12 and did, in fact, do so. *See* Docket No. 305-3 (email exchange between parties' counsel). There is no evidence that the delay was the result of bad faith or that it prejudiced Opticurrent, as the parties were able to file their pretrial submissions three days before the court-ordered deadline. *See* Docket Nos. 170–73. PI's conduct was not egregious.

Ninth, Opticurrent protests that PI "insisted on the inclusion of hundreds of trial exhibits," of which many were not ultimately introduced at trial. Docket No. 292 at 9. It is perfectly routine for parties to selectively introduce exhibits at trial depending on evolving trial strategies, issues that are raised or not raised during trial, evidentiary objections, and other considerations. Opticurrent certainly did not introduce all the exhibits on its exhibits list and does not cite any authority for the proposition that it is unreasonable for a litigant to not introduce every piece of

evidence on its exhibit list.

Finally, Opticurrent complains that PI has engaged in "[c]onstant ad hominem attacks and unnecessarily heated rhetoric" throughout this litigation. Docket No. 292 at 9–10. The ostensibly supporting examples Opticurrent cites, however, do not contain any language that could be construed as ad hominem or unreasonably heated. Opticurrent merely lists filings PI has made in support of motions that ended up being denied. *See id.* (listing PI's claim construction brief, opposition to Opticurrent's motion to amend infringement contentions, and two case management statements in which PI stated its position that Opticurrent's infringement contentions are meritless).

As the Supreme Court has stressed, the fee-shifting statute that was the precursor to § 285 did not contemplate the award of fees "as a penalty for failure to win a patent infringement suit." *Octane Fitness*, 572 U.S. at 548–49 (noting that § 285 "did not substantively alter the meaning of the [precursor] statute"). Thus, "the mere fact that [PI] moved" for relief of various forms "during the course of this litigation—and that the court ruled in [Opticurrent's] favor each time—does not suggest exceptional circumstances." *Adaptix, Inc. v. Apple, Inc.*, No. 5:13-CV-01776-PSG, 2015 WL 5158716, at *2–4 (N.D. Cal. Sept. 2, 2015) (denying fees under § 285 where the losing party's position "was not entirely unreasonabl[e]" and not "based on anything but a good faith belief"); *see TVIIM, LLC v. McAfee, Inc.*, No. 13-CV-04545-HSG, 2016 WL 74637, at *7 (N.D. Cal. Jan. 7, 2016) ("But the fact that Plaintiff lost on both its infringement and invalidity arguments cannot, by itself, justify a fees award.").

       3.   <u>Conclusion</u>

A case, like this one, that has been "hard fought and zealously litigated" inevitably sees "various disputes between the parties," but Opticurrent "has failed to identify any conduct by [PI] that would rise to the level of misconduct necessary to find this an 'exceptional case' and award attorneys' fees under Section 285." *Finjan, Inc. v. Sophos, Inc.*, 244 F. Supp. 3d 1016, 1029 (N.D. Cal. 2017). Accordingly, Opticurrent's motion for attorneys' fees is **DENIED**.

G.   <u>PI's Motion to Stay Execution of Judgment Pending Appeal</u>

Under Federal Rule of Civil Procedure 62(b), "[a]t any time after judgment is entered, a

party may obtain a stay by providing a bond or other security." A supersedeas bond ensures that the appellee will be able to collect the judgment plus interest should the court of appeals affirm the judgment. *See Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1505 n.1 (9th Cir. 1987). When a party posts a supersedeas bond with the district court in compliance with Rule 62(b), "it [is] entitled to a stay as a matter of right." *Bennett v. Franklin Res., Inc.*, 360 F. Supp. 3d 972, 977 (N.D. Cal. 2018) (quoting *American Civil Liberties Union of Nevada v. Masto*, 670 F.3d 1046, 1066 (9th Cir. 2012)) (alteration in original). If no bond is posted, "the grant or denial of [a] stay[] [i]s a matter strictly within the judge's discretion." *Matter of Combined Metals Reduction Co.*, 557 F.2d 179, 193 (9th Cir. 1977). "The appellant has the burden to 'objectively demonstrate' the reasons for departing from the usual requirement of a full supersedeas bond." *Cotton ex rel. McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1028 (N.D. Cal. 2012) (quoting *Poplar Grove Planting & Refining Co., Inc. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979)).

Here, PI asks the Court to enter a stay pending appeal without requiring a supersedeas bond. Instead, PI proposes that it will provide "other security" in the form of quarterly financial updates to demonstrate its continued ability to pay the judgment and a representation that PI will "pay any judgment within 30 days of the Federal Circuit issuing its mandate." Docket No. 313 at 4. Opticurrent objects, and instead requests that the Court "require Power Integrations to get a letter of credit to secure the judgment on its behalf." Docket No. 322 at 1.

In *Dillon v. City of Chicago*, 866 F.2d 902, 904 (7th Cir. 1988), the Seventh Circuit articulated five factors to guide courts in exercising their discretion regarding whether to waive the bond requirement. "Courts in the Ninth Circuit regularly use the *Dillon* factors in determining whether to waive the bond requirement." *Kranson v. Fed. Express Corp.*, No. 11-CV-05826-YGR, 2013 WL 6872495, at *1 (N.D. Cal. Dec. 31, 2013) (citing *Cotton*, 860 F. Supp. 2d at 1028). The *Dillon* factors are: (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5)

whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position. *Dillon*, 866 F.2d at 904–05.

PI argues that it should not be required to post bond because it satisfies all of the *Dillon* factors. According to PI, the third through fifth factors are met because the judgment in this case is small relative to PI's assets—its latest SEC Form 10K indicates that PI had net revenues of $416 million, shareholders' equity of $527 million, and cash-on-hand of $134 million. Docket No. 313, Exh. A at 21. Further, PI believes its assurance that it will pay any judgment within 30 days of an appellate mandate satisfy the first and second factors. Opticurrent argues, on the other hand, that PI's size is no guarantee of solvency, and indeed that PI has acknowledged in its SEC filings that it is in patent litigation against a competitor, Fairchild Semiconductor, and there is a possibility that PI "may be required to pay substantial damages, stop our manufacture, use, sale, or importation of infringing products, or obtain licenses" if it loses the case. Docket No. 322, Exh. 2 at 15. Opticurrent further contends that PI's "conclusory statements about agreeing to pay within 30 days are not enough to carry its burden" on the first two *Dillon* factors. *Id.* at 3.

Courts have accepted the type of security PI proposes in lieu of supersedeas bond. In *Kranson v. Fed. Express Corp.*, No. 11-CV-05826-YGR, 2013 WL 6872495 (N.D. Cal. Dec. 31, 2013), the court waived the bond requirement in light of the defendant's plain ability to pay the judgment and its counsel's attestation that "once a completed payment request is submitted, it takes less than 30 days . . . to issue payment." *Id.* at *1–2. In *Am. Color Graphics, Inc. v. Travelers Prop. Cas. Ins. Co.*, No. C 04-3518 SBA, 2007 WL 1520952 (N.D. Cal. May 23, 2007), the court allowed the defendant to "submit copies of its quarterly and annual financial statements to [plaintiff] and the Court while the appeal is pending" in lieu of a bond. *Id.* at *2. However, the circumstances in this case are somewhat different. Unlike in *Kranson*, PI's ability to pay the judgment is not beyond question given the risks attendant to its litigation with Fairchild Semiconductor. Unlike in *American Color*, where the plaintiff consented to the defendant's alternative form of security, Opticurrent opposes PI's request here. *Am. Color Graphics*, 2007 WL 1520952, at *2.

Accordingly, the Court finds that PI has not met its burden to demonstrate that the usual requirement of a full supersedeas bond is not warranted. *Cotton*, 860 F. Supp. 2d at 1028. PI's motion the stay execution of the judgment pending appeal is **DENIED**. To stay execution of the judgment pending appeal, PI must file a supersedeas bond equal to 125% of Opticurrent's $1,199,967.26 award, *i.e.*, $1,499,959.08. *See id.* at 1029 ("[A] bond of 1.25 to 1.5 times the judgment is typically required.") (citation omitted).

### III.    CONCLUSION

For the foregoing reasons, PI's motion for judgment as a matter of law is **GRANTED** as to the royalty base and **DENIED** otherwise; Opticurrent's motions for judgment on induced infringement and on the Excluded Products are **DENIED**; Opticurrent's motions for ongoing royalty and for prejudgment and postjudgment interest are **GRANTED**; Opticurrent's motion for attorneys' fees is **DENIED**; and PI's motion to stay execution of judgment pending appeal is **DENIED**.

This order disposes of Docket Nos. 292, 295, 296, 298, 303, 309, and 313.


**IT IS SO ORDERED**.


Dated: June 5, 2019


_____
EDWARD M. CHEN
United States District Judge