**Pages 1 - 53**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

OPTICURRENT, LLC,                     )
                                      )
          Plaintiff,                  )
                                      )
   VS.                                )        **NO. C 17-03597 EMC**
                                      )
POWER INTEGRATIONS, INC.; et   )
al.,                                  )
                                      )
          Defendants.                 )
                                      )

                          San Francisco, California
                          Tuesday, May 28, 2019

                  **TRANSCRIPT OF PROCEEDINGS**

<u>**APPEARANCES**</u>:

For Plaintiff:
                          FRIEDMAN, SUDER & COOKE
                          604 East 4th Street - Suite 200
                          Fort Worth, Texas  76102
                    **BY:  JONATHAN T. SUDER, ATTORNEY AT LAW
                          DAVE ROSS GUNTER, ATTORNEY AT LAW
                          CORBY R. VOWELL, ATTORNEY AT LAW**

                          HUDNELL LAW GROUP
                          800 W. El Camino Real - Suite 180
                          Mountain View, California  94040
                    **BY:  LEWIS HUDNELL, ATTORNEY AT LAW**

         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:   (CONTINUED)

For Defendants:

FISH & RICHARDSON PC
500 Arguello Street - Suite 500
Redwood City, California  94063
BY:  **NEIL A. WARREN, ATTORNEY AT LAW**
     **MICHAEL R. HEADLEY, ATTORNEY AT LAW**

FISH & RICHARDSON PC
222 Delaware Avenue - 17th Floor
Wilmington, Delaware  19801
BY:  **JOSEPH B. WARDEN, ATTORNEY AT LAW**

FISH & RICHARDSON PC
12390 El Camino Real
San Diego, California  92130
BY:  **JOHN W. THORNBURGH, ATTORNEY AT LAW**

Also Present:        **Brad Brunell, Client Representative**
                        **Opticurrent, LLC**
                     **Jeanel Sunga and Rose Sun,**
                        **Summer Associates for Fish &**
                        **Richardson PC**

**Tuesday - May 28, 2019**                              **10:42 a.m.**

P R O C E E D I N G S

---000---

THE CLERK:  Calling civil action 17-3597, Opticurrent, LLC versus Power Integrations, Inc., et al.

Counsel, please approach the podium and state your appearances for the record.

MR. SUDER:  Good morning, Your Honor.  Jon Suder, Dave Gunter, Corby Vowell, and Lewis Hudnell for the plaintiff, along with our client representative Mr. Brunell.

THE COURT:  All right.  Good morning.

MR. WARREN:  Good morning, Your Honor.  Neil Warren for Power Integrations.  Also with me is Joseph Warden, John Thornburgh, Michael Headley, our client representative; and we actually have two of our summer associates with us, Jeanel Sunga and Rose Sun.

THE COURT:  All right.  Welcome, everyone.

All right.  You-all have raised a multiplicity of issues here, and I want to focus on some that are the most worthy of discussion, at least in my view, the first of which is this question about the royalty base, whether any royalty should have been based on roughly a third or 30 percent of PI's worldwide sales or only 6 percent.

And I understand that the 6 percent figure is what the actual PI sales were in the U.S.  The 30 percent or 30 whatever

it was percent figure, a third, was based on the sales to all entities, including those which then incorporated the accused products for then importation back into the U.S.

And the argument is that because the jury did not find inducement -- induced infringement, only direct, that it is not appropriate to base royalties on sales other than those that were made directly into the U.S. and not apply it to those which eventually found their way into the U.S.  And that seems pretty persuasive to me and so why shouldn't the royalty base, in light of the jury's findings, be based on 6 as opposed to 33 percent?

**MR. SUDER:**  Yes, Your Honor.  Thank you.

And the answer is very clearly because that's how the Federal Circuit says you can do it.  The *Carnegie Mellon versus* -- *Carnegie Mellon versus Marvell* case is dispositive of this issue.  We cited it in our brief.  We cited the District Court case and the Federal Circuit case.  It was not raised in their motion originally.

And what's interesting, Your Honor, is that *Carnegie Mellon* -- and I'll explain why and we'll go through the case because I think it's right there -- says that we should not conflate infringement with damages.  If there is infringement under 271(a), then you have infringement and then you deal with the issue of damages.  Inducement is a 271(b) issue.  *Marvell* was very clear in the Federal Circuit's holding that it was

dealing with 271(a), direct infringement.

And, Your Honor, what's very interesting is that we tried our case exactly under the proscripts of the *Marvell* decision, and what's interesting is our expert before he was stricken used this royalty base.  Ned Barnes, the defendant's expert, used -- did not challenge that.  They did not move -- they did not challenge Mr. Evans' methodology on that basis.  They talked about the *Fairchild* verdict, other issues, but they never challenged the use of total products that come into the United States.  Why?  Because that's the *Marvell* holding.

They didn't raise it pretrial.  They didn't raise it in their jury instructions.  They didn't ask for an extraterritorial instruction, which we cite in our cases.  And the reason for all that, Your Honor -- we say that it's invited error and waiver, all that -- is because they knew the law.  As you know, Power Integrations through all the *Fairchild* litigations is very up on the issue of damages in patent cases and has pressed in Delaware for an expansion because they know the law.

And we did exactly what *Marvell* says.  If we had sought all worldwide sales, whether they're imported into the United States or not, that would be a different issue; but if you look at the *Marvell* decision, Your Honor, and particularly it's on page -- 807 F.3d beginning at 1098, I believe that's the page number --

**THE COURT:**  1298 do you mean or 1098?

**MR. SUDER:**  I have the Lexis cite, Your Honor.  It's on the bottom of page 19.

**THE COURT:**  Oh.

**MR. SUDER:**  It is -- it is -- I think it was page 1098 on the bottom.  It says (reading):

"For the present context, we think that 271(a) provides the basis for drawing the needed line.  It states a clear definition of what conduct Congress intended to reach, making or using or selling in the United States or importing into the United States, even if one or more of those activities also occur abroad."

And then it says, it goes on in that paragraph (reading):

"Significantly, once one extends the extraterritoriality principle in defining how damages are calculated, it makes no sense to insist that the action respecting the product being used for measurement itself be an fringing action.  Thus, here the claim is a method claim but the damage measuring product practices the method in its normal intended use."

That's a lot of words, Your Honor, but what they're saying, if you read it carefully, is that under 271(a), if you are found to be a direct infringer by making, using, selling, or importing, you infringe; and then the extraterritorial answer is whatever results from that infringement, comes into

the United States from any source, is a proper measure of damages.

**THE COURT:**  Well, but if you take it literally, if you just say making the product and then you're selling it overseas, why does it matter, though, that it comes back in?

**MR. SUDER:**  Because if it's made -- because in the *Marvell* case, Your Honor, and this is what's very critical, in the *Marvell* case, and it's not in dispute, at the District Court holding there *Marvell* made and sold the products abroad and it sold them to third parties abroad in Taiwan that imported the products into the United States in their laptops. So a different -- a third party was importing the products into the United States.

What the jury found was that part of what *Marvell* made was in the United States, thus triggering 271(a).  So once the jury found that either making -- as long as you've done one of those actions, that's what the case says, once one extends the extraterritoriality principle to how damages are calculated, it makes no sense to insist that the action respecting the product being used be an infringing action.

In other words, that's -- I would have said it more clearly; but if you read the opinion, Judge, once you are found to infringe under 271(a) by any action, then the measure of damages is anything that results from that action that comes into the United States.  And that's exactly what happened in

*Marvell*.  The District Court entered judgment under 271(a).  It has nothing to do with inducement, 271(b).

THE COURT:  Well, the jury did find that *Marvell* had both directly and indirectly infringed the claims.

MR. SUDER:  Yes, you're right.

THE COURT:  So you're saying there was not an inducement in indirect claims?

MR. SUDER:  There was, Your Honor, but the Federal Circuit's opinion dealt with 271(a).  Inducement has nothing to do with 271(a).  271(b) is inducement.

What the Federal Circuit -- what the District Court entered judgment on and what the Federal Circuit affirmed was all imports from anybody that comes into the United States and then remanded it for nonimported products because maybe there were sales activities in the United States.

*Marvell* stands for the principle, Judge, that if you are a direct infringer and you -- which they do, they admit they're 6 percent as a direct infringer, then *Marvell* stands for the proposition that all imports into the United States are properly subject to a damages award under 271(a).

THE COURT:  So that makes an inducement claim superfluous.

MR. SUDER:  Under this verdict, yes.  The inducement, Your Honor, would only relate to damages from the time we filed suit going forward because for inducement you have to be on

notice.

**THE COURT:** Right. But, I mean, what would it add? If your scope of damages --

**MR. SUDER:** It wouldn't add anything, Your Honor. It would not add anything.

**THE COURT:** All right. What's your view?

**MR. THORNBURGH:** Your Honor, we very much agree with the Court. It would be, you know, breaking headline news if the Federal Circuit had held that actions abroad can infringe 271(a). *Carnegie Mellon* does not so hold.

And so when counsel says that you should get damages that results -- all damages that result from infringement, making and selling products abroad is not infringement. Patents are territory --

**THE COURT:** Chips are manufactured abroad?

**MR. THORNBURGH:** Yes. And that was established by Mr. Sutherland's testimony in this case, that the chips are made abroad and at most 6 percent are imported by PI. All the rest are sold by PI abroad.

**THE COURT:** So the only way to obtain 271(a) liability here would be to either import -- well, I don't know how else. If it's something made abroad, it's the sales or importation into the United States.

**MR. THORNBURGH:** That's correct, Your Honor.

**THE COURT:** Well, that's why I still have a problem

with it.  I don't understand how it is simply superfluous to find that there's indirect infringement.  If you're saying, "Well, if it found its way into the United States, even if it wasn't sold in the United States, even if it wasn't made in the United States, even if it wasn't imported into the United States by PI, damages would obtain under 271(a) absent an inducement claim."  I don't quite understand how that happens.

MR. SUDER:  Your Honor -- because, Your Honor, if you read further on in the *Marvell* holding, it says (reading):

"In these circumstances, the inquiry is whether any of the 271(a) listed activities with respect to that product occur domestically."

"Whether any."  Whether there's a sale, a manufacture, a use, or an import.  Power Integrations does sell products to the United States.  They are a 271(a) infringer.

THE COURT:  And there's no doubt that all other things being equally, there are other issues in this case, that liability would obtain for a direct infringement of 271(a) for that?

MR. SUDER:  Right.  Now that's liability.

Now you go to 284, damages.  That's what *Marvell* says. Once you have determined that any of the 271(a) listed activities with respect to that product occurred domestically, then any of those products, regardless of how they get here,

are subject to a damage infringement award.

Your Honor, if we did not have direct infringement, if they did not sell anything into the United States, then we would be limited to 271(b) inducement damages, but do not conflate the two and do not conflate -- do not conflate indirect with direct and do not conflate infringement with damages.

And that's precisely how we tried this case.  If we --

**THE COURT:**  What was presented to the jury?  What about this point about a waiver, if you will, that the expert evidence did not take on this issue?  And I'm trying to remember what was presented to the jury about 6 percent of sales versus -- for some reason that doesn't stand out prominently in my mind, but maybe you can remind me.

**MR. THORNBURGH:**  Yes, Your Honor.  So we mostly made this an issue in the jury instructions and we were very careful to object to the jury instructions where they didn't specify that infringement was limited to U.S. activities, and the Court agreed with us and added that language.  And then we had Mr. Sutherland testify that PI's only U.S. activity is importing no more than 6 percent.

We didn't argue this in closing because, you know, we chose not to argue damages to the jury at all because we wanted to focus on noninfringement, but the case law is clear that you don't even have to make a closing argument.  It has no waiver

effect.  And we did preserve this specific issue in our 50(a) motion.

THE COURT:  So what could the jury -- so how would the jury have found its way to the 6 percent?  Tell me how it treats it.

MR. THORNBURGH:  So if they had paid attention to the jury instruction that said that actions in the U.S. are required and they had remembered Mr. Sutherland's testimony that PI's only action was 6 percent, they could have gotten it right.

THE COURT:  And I'm trying to remember.  Was the jury instruction specific about direct importation versus indirect importation?  I mean --

MR. THORNBURGH:  I think it was for all the verbs, you know, that can constitute infringement, whether it's making, selling, using, or importing, that we added "in the United States."  So any of those verbs have to be done in the United States.

And if I may respond to what counsel said about the *Marvell/Carnegie Mellon* case.  We respond to all of his misreading of that case on page 2 of our reply brief, which is Docket 323.  But the only reason that they were talking about 271(a) is because to prove liability for inducement, you have to show that the customers are direct infringers.  And so the court wasn't analyzing whether the customers were direct

infringers so that they could calculate the inducement liability, but the court made very clear that they were calculating inducement liability.

**MR. SUDER:** Judge, we disagree. The holding says (reading):

"In these circumstances, the inquiry is whether any of the 271(a) listed activities with respect to that product occurred domestically."

It was a 271(a) analysis. Inducement has nothing to do with 271(a). It is 271(b).

Your Honor, how else do you explain that *Marvell* was found liable for products that were imported by third parties into the United States under 271(a)? That's the holding.

**THE COURT:** All right. Do you want to respond to that?

**MR. THORNBURGH:** Yes. And counsel just misreads the case. At page 1294 of the Federal Circuit opinion, it explained that *Marvell* both directly and indirectly infringed the claims at issue.

The District Court was even clearer. We quote this at the same page of our reply brief.

**THE COURT:** What about this reference only to 271(a) and not 271(b)?

**MR. THORNBURGH:** Because, again, that -- in order to figure out the liability for (b), you have to look at what

customers do under (a).

THE COURT:  So that discussion was really a predicate for -- the 271(a) discussion was for a predicate -- is a predicate for the 271(b) liability?

MR. THORNBURGH:  Yes.  Yes.  Because the customers -- in order to have indirect infringement, you have to have a director infringer.  And so in *Marvell* where there was indirect infringement, then they had to examine what the customers did to directly infringe.

MR. SUDER:  Your Honor, that's simply not what the case says.

THE COURT:  All right.  Well, I will take a second look at the case.  My gut tells me that that's a pretty broad reading to suggest that once you're found liable under 271(a), you can be held liable regardless of inducement.  Meaning let's say you didn't even anticipate it, you didn't know, you didn't want it to happen, you didn't intend it to happen but somebody buys your chip, the accused product or whatever it is, and then it finds its way into the U.S., you're saying once there is some shred of direct liability, the universe -- the door is wide open to worldwide importation in the United States that contains your chip, even if it passed through 10 different hands; right?

MR. SUDER:  Yes.  That's exactly what the Federal Circuit said because --

**THE COURT:**  I'm going to read it for that, but I --

**MR. SUDER:**  I understand, Your Honor, and that's how we tried our case because if you look at the issue, it's you look at whether they were a direct infringer because if there was no direct infringement --

**THE COURT:**  I understand that, but you're saying once there is one penny of direct infringement, the door is wide open to any worldwide importation of a product that contains the accused product.  Even if it changed hands 10 times through different manufacturers before it gets to the United States, you're saying once it comes in, that is, quote, "importation" within the meaning of 271 -- you know, within the meaning of the damages liability.

**MR. SUDER:**  I don't know if I would go that far, but here --

**THE COURT:**  Well, why wouldn't you?  What's the limit?

**MR. SUDER:**  Because here the evidence was they made product knowing --

**THE COURT:**  No, no.  My point is, if you're not going to use inducement as the crucible, the elements of inducement, you're saying you don't have to have an inducement, the jury could find, as it did here, no inducement, which means you don't have to find intent, foreseeability, alternate uses, et cetera, et cetera, as long as it found its way in?  Even if you had no idea it would end up there, you are liable,

Mr. Defendant or Ms. Defendant, whoever it is?  There's no --
what I'm suggesting is your argument seems to have no -- has no
limit.

MR. SUDER:  And that's a matter of Congress.  That's
the Federal Circuit interpreting the patent statute saying
Section 271(a) makes clear that Congress meant to reach such
importation and we see no extraterritoriality bar to including
within the royalty base those chips were imported into the
United States for use in the United States.

It makes no mention of the fact that they were imported by
a third party.  That is a matter of how the Federal Circuit
interprets the scope of their extraterritoriality reach under
the patent statute.

MR. THORNBURGH:  And, Your Honor, your skepticism is
exactly right.  If counsel's reading of *Carnegie Mellon* were
right, the subsequent *WesternGeco* litigation would never have
happened.  You know, the idea that 271(a) gives worldwide
liability, absolutely not the law; and the very narrow
exception that the Supreme Court added when it overruled the
Federal Court in *WesternGeco* was that if direct infringement
actually causes worldwide harm, then maybe damages can be
expanded.  So that would never have happened if counsel's
reading of *Carnegie Mellon* were correct.

MR. SUDER:  Your Honor, let me --

THE COURT:  I want to go to the next issue, which I

think is quite critical.  I will look at *Carnegie Mellon* again.

The question about whether the QBar license is comparable, my understanding is that the testimony was that the products covered by the QBar license were the QBar switches alone that was manufactured by the joint venture.  It wasn't licensing of an entire power supply or, you know, a larger circuitry.

And the argument is there was evidence that the accused -- PI's accused products had a larger context; that is, a combination of a switch and power supply controller.  And that, therefore, even if you assume -- and one would assume that, you know, the value of the '623 license would be more than a '323, at least for a particular period of time, because it had a better feature.  It had a high-energy efficiency.

The question is, though, when you apply it and you do the hypothetical negotiation, if what the QBar license was for was a royalty based on the sale of the switch itself, whereas, when you're looking at assessing royalty with respect to PI's accused products, it is a much larger product.  It has, at least as alleged, more going on than just the switch.  So what's wrong with that?

**MR. SUDER:**  Your Honor, it's -- we are here on a JMOL where the standard is that the Court should not substitute its personal judgment over what the jury heard, received, and considered in rendering its verdict.  The jury heard testimony from Regan Zane that this was a comparable product and a

comparable license.

THE COURT:  Remind me.  Was there a discussion about the comparability of the product that is the accused lines of product at issue here?

MR. SUDER:  Yes.  Dr. Zane said you can't operate the product without the switch.  You may put other things on it but at its core, it is a switch; and that's why it's comparable and relevant to the analysis, and it was for the jury to give it the appropriate weight once this Court and Judge Orrick determined that there was competent evidence of comparability.

They didn't offer an expert witness to say it's not comparable or that it -- and they argued that it should be less because of the brains.  They made all those arguments to the jury, and the jury considered them and gave them the appropriate weight it deemed it should be given.

So it is for the jury to decide whether or not, and the jury could have gone more because the jury heard from Dr. Zane that this '623 was much more than the '323, and they could have gone far beyond the QBar license but stuck with the QBar even though it was an improvement.  So whatever weight the jury gave was based on the evidence that was received.

THE COURT:  And what was the -- what was the trial evidence about the value of all of the other components of the accused products beyond the three-terminal or slash four-terminal switch?

**MR. THORNBURGH:**  So, Your Honor, the testimony in the documents are cited in our brief, but in general it was the testimony of our technical witness, Mr. Kung, and the data sheets for the accused products and also Mr. Bohannan, our expert, that PI combined a switch with what we were calling a trial of the brains, which is, you know, most of the circuit is actually -- the switch is just a few gates out of very many. Most of the circuit is deciding how to use that switch, when to turn it on, when to turn it off; and that's the key thing for energy conservation is management of the switch, and so you end up with a more expensive, more complicated product.

And, you know, I would say, you know, that the main case that Opti relies on is the *Commonwealth* case and it says that, you know, if the products are not exactly the same, that's not fatal if the patentee, quote, "accounts for the differences in the technologies and economic circumstances."

But Opti didn't do anything to account for those differences because it had no damages expert and none of its other witnesses even spoke to this issue.  No one said, "Hey, we understand that Mr. Congdon was charging 2 percent for this smaller product.  We understand that PI's product is a larger, more expensive product, and so we're making the following downward adjustment.  So if it's 2 percent of a small product, it would be a smaller percentage of a large product."  They didn't do anything like that and that's the problem.

**THE COURT:** Well, they did produce testimony -- I think it was Mr. Zane or Dr. Zane -- about the importance and characterizing the accused switch circuitry as being central and the accused products wouldn't work without it. I mean, he tried to play it up as a central role, and I think some of your testimony tried to play it down as a central role and the value of the brains and everything else.

But -- so why -- in the end the jury certainly could have gone in different directions, but why couldn't the jury have reasonably found the way it did, that there was sufficient comparability here? And maybe they did make the adjustment. Maybe they would have gone 6 percent or, you know, some other number, but did a fairly modest increase to 3 percent assuming it was -- I think assuming it was a nonexclusive license. I guess that was an issue too.

But why isn't it -- why should this be taken away from the jury?

**MR. THORNBURGH:** So two responses on that. First is that there was no testimony about how to adjust the rate from any witness. Their technical expert said that the switch was of central importance but that he didn't say anything about how that would allow you to change the appropriate rate.

And the point is that if you have a larger and more expensive product, the rate is probably too high because 2 percent of $100 is a lot more than 2 percent of $1. That's

the point, and it doesn't matter how important the feature is. If you're taxing a larger product, you need to make an adjustment, and no such adjustment was made to the price.

THE COURT: Was there any -- I'm trying to remember. Was there cross-examination on that point or any counterevidence presented by PI on that?

MR. THORNBURGH: The -- you know, this is all the plaintiff's burden. This is why we say that their damages case, like the Court excluded Mr. Evans as a matter of law, having seen the trial, it should now exclude their second theory, which is actually more tenuous and less supported than Mr. Evans' theory as a matter of law. And we understand the Court didn't choose to do that before trial, and that created a trial record so that however the Court now decides, the Federal Circuit has a full record and can either affirm or reinstate or whatever.

But the point is that we think the Court should do the same thing it did before trial, and say that this just does not meet the Federal Circuit's requirements for the plaintiff's burden of proof.

The other point that I wanted to make on the value of the switch that we think --

THE COURT: But my factual question was: Was this brought out in cross-examination in terms of the failure to make the appropriate adjustment once there was testimony about

the centrality, the alleged centrality, of this even as to the accused product?  Was there -- I don't remember any contrary evidence and I don't recall cross-examination on this point.

MR. THORNBURGH:  We didn't argue damages to the jury at all, but we did lay the foundation that the products were not comparable.  We put in the evidence of what the products were.  We got the proof that they were not just a switch.  But, no, we didn't try to argue damages at all in any way; but the plaintiff, we still submit, failed its burden of doing the required assessment of the differences.

And it wasn't just the switch thing.  It's also the close relationship of Mr. Congdon to QBar, the small scale of QBar compared to PI, and then the switch thing.  We think that the testimony from Dr. Zane that the switch is the most valuable part is actually a very bad admission against Opti because the switch is the '323 patent.  It's the three-terminal switch; right?  And that patent is not asserted, not infringed, and so the value -- any value that the '323 patent contributes actually has to be subtracted.

If the value of the switch is 2 percent, the value of the '623 improvement is actually quite a bit smaller.  The analogy we put in our brief was say you have a car, a patent on a car, and then you get a patent on a more fuel-efficient engine.  If you were paying 2 percent on the car for having invented the car, that doesn't mean that the fuel-efficient improvement is

2 percent.  It's actually -- you know, it would be a much, much smaller base and a much smaller rate likely.

So the fact that the '323 was the most important thing actually undercuts their damages theory and makes it inconsistent.

THE COURT:  So what about that?  I can understand while the '323 patent was still in effect but it expired in 2010 -- correct?

MR. SUDER:  Yes.

THE COURT:  -- and the alleged infringement -- well, the statute of limitations period starts or reaches back around 2010.

MR. SUDER:  Yes.

THE COURT:  So if we're talking about damages and royalty rates post-2010 and if a large part of the '623 value was in the switching aspects of the '323, which then came into public domain essentially in 2010, why shouldn't one look at just the sort of incremental value, the value added of the '623, the energy-efficient part of it?

MR. SUDER:  Your Honor, for a myriad of reasons.  One, you, the Court, would then be substituting its personal view for that of the jury.  The jury heard this.

What Dr. Zane said and what Mr. Congdon said is that the '323, while it was a new thing with the three-terminal switch, created more problems.  It solved one problem but created a

host of other problems, and it wasn't until the genius of the '623 and adding the voltage stabilizer and using the CMOS inverter in a new way that he was able to go "Voila, now this works for its intended purpose."  And that's what Dr. Zane said was the beauty of this design, and that is Dr. Zane and it goes to the weight.

And everything Mr. Thornburgh just said they said to the jury and the jury discounted it.  And I point out, Your Honor, that Mr. Barnes, their expert, had opinions on this and they chose not to put him on the stand because Dr. Zane testified that the '623 is not simply, oh, a '323.  The '623 had much more to make it work at the level.

And even if you recall, Your Honor, the '623 talks about the problems of the '323; that, yeah, that's a three-terminal noninverted switch but it couldn't do this, it couldn't do this, it couldn't be produced on a mass scale.  If you remember the testimony and the patent on I believe it was column 2, that the '623 wasn't just, oh, it's an improvement.  It was a game changer in taking this idea and making it applicable to such it can be used so extensively.

And if Mr. Thornburgh wanted to argue all this, he did it to a limited extent, but they could have put on evidence.  But, again, this is all for the jury, goes to the weight; and at the JMOL stage, there was more than enough evidence with Dr. Zane and his qualifications talking about the importance of this

invention that this can't be disturbed postverdict.

THE COURT: And so why wouldn't the jury have placed a great deal of weight on the notion and the testimony that the '623 -- the value added was really very, very, very substantial? So even if you were to discount out the function of the switch in the more primitive '323, that there was a lot of value to the '623?

MR. THORNBURGH: The problem is that without a damages expert, Dr. Zane just did not and could not give the kind of testimony that they needed, which is to say that "I'm looking at the difference between this license and this product and this company and this switch versus this improvement on a switch; and taking into account all those economic circumstances, making the following economic adjustments." You know, Dr. Zane wasn't qualified to do that and did not even purport to do it.

And we're not asking the Court to substitute its judgment for the jury. Instead, we're asking the Court to enforce the Federal Circuit's rules as gatekeeper -- to be the gatekeeper to keep a legally deficient damages case from being decided by any jury. That as the Federal Circuit held -- said in *RescueNet*, for example, the trial court must carefully tie proof of damages to the claimed invention's footprint in the marketplace.

And so -- and the Federal Circuit has admittedly been

pretty activist in the damages context and has very often vacated verdicts and affirmed District Courts vacating verdicts because the plaintiffs simply didn't meet their burden of proof.

THE COURT:  So if there is only qualitative testimony, and that's essentially what it is, and not quantitative in an economic sense, you think a jury is not able, absent expert testimony, quantifying to come up with its own numbers?

MR. THORNBURGH:  Possibly, although I don't think the Court has to go that far to reach the same holding here because Dr. Zane, as an engineer, didn't even purport to be testifying qualitatively about economic value.  You know, he said that, you know, technically the switch is super important.

And I would say if the Court also looks at what Mr. Congdon, the inventor, testified, he said that the '323 invention is, quote, "the fundamental core of the '623 patent."

And so no one made any effort to subtract that.  That was never -- never mentioned by any Opticurrent witness how they dealt with the fact that the fundamental core of the '623 was in the public domain.  They didn't make any subtraction.

THE COURT:  What would be your strongest case that's closest on point where there's qualitative testimony about the importance, the functional value of a particular circuit or invention within some product but not any expert evidence about sort of economic value?

MR. THORNBURGH:  Right.

THE COURT:  Is there -- where a jury verdict has been overturned on that basis.

MR. THORNBURGH:  I would say *Laser Dynamics* would be a good one because in that case the patented future was related to the optical disc drive of a laptop computer.  The invention was able to distinguish whether you had inserted a CD or a DVD, and there was testimony that that feature was really important and that, you know, consumers, you know, cared about being able to use optical discs.  This was during an era, you know, before everything was just downloaded, when optical discs mattered.

And, you know, there was testimony that this feature was even necessary, that you couldn't -- you know, that laptops without this feature probably couldn't be sold.

And the Federal Circuit rejected all that and overturned the jury's verdict as a matter of law because they said that, you know, testimony that a feature is important or even necessarily, you know, qualitatively is not enough.  That you actually have to do the economic analysis to show what that feature actually contributes to the laptop in trying to get a percentage royalty on the whole laptop because that this tiny little feature was deemed unacceptable as a matter of law.  So I would say that case would be the strongest.

THE COURT:  What would be your strongest case to show that a jury can, absent any quantification-type testimony,

still --

**MR. SUDER:**  Twofold, Your Honor.

**THE COURT:**  -- base a verdict, a royalty verdict, on really just qualitative-type evidence?

**MR. SUDER:**  First you start with the *Commonwealth* case obviously and the *Minks* case -- I don't have the cite -- that was cited in our briefs, District Court out of Florida that was affirmed by the Federal Circuit, where they went to trial without an expert in a very similar situation and the jury there gave a much higher royalty and it was affirmed by the District Court and the Federal Circuit.  I can get you the cite, Judge.

One point on this I'd like to make, Your Honor, and, again, it's another issue of waiver, is when Judge Orrick struck Mr. Evans and wouldn't allow us to supplement, Mr. Thornburgh stood up there and said, "Your Honor, there is evidence in the record.  They can go to trial with the evidence they presented, the QBar license."

That's what we did, and we went in with the QBar and Dr. Zane had already given a report that this was -- that this '623 was an improvement.  And that was the evidence that they said, "Judge, they can go to trial with what they've got."  And, Judge, that's exactly what we did.  Just like what happened in the *Minks* case.

And, Judge, that case is *Minks versus Polaris*, 2009 U.S.

District Lexis 92865.

So, Your Honor, again, it's another issue just like we think on their misreading of *Commonwealth*.  While there was never a mention pretrial of our sales, how could you even get our imports under any theory prefiling of the lawsuit?  Yet they never challenged it at any time, Judge.  And then not during pretrial, not during trial, and the same thing here.  It's the exact same issue, "You can do it; but if you win, we're going to say you couldn't."

            **MR. THORNBURGH:**  And, Your Honor, if I may respond to that last point.

            **THE COURT:**  Yes.

            **MR. THORNBURGH:**  We didn't object to the introduction of the QBar license.  It's part of the story.  What we objected to was using its rate and applying it to our revenue without any adjustments.  We argued, you know, A, it shouldn't be applied to our revenue at all; but, B, if it is applied to our revenue, and this is what *Commonwealth* actually says, is if you have a noncomparable license, you've got to make -- you've got to have evidence that accounts for the differences.  And without a damages expert, they weren't able to do that.

            **THE COURT:**  All right.  Let's go to the next issue I want to talk about and that's the ongoing royalty, the question about preverdict versus postverdict.  And to the extent that they're assuming arguendo that there is a basis to sustain the

preverdict royalty rate the jury found was 3 percent, why shouldn't there be some upward adjustment?

Even though an injunction is not sought, courts have talked about the fact that there has now been a determination made and so the uncertainty has been lessened considerably and it's a different kind of negotiation postverdict.

**MR. WARDEN:**  Sure, so let me start with the change in bargaining power, so to speak.  Where there hasn't been an injunction sought, where there's no possibility of an injunction, the courts have recognized that in the context of the way damages are calculated, there is no change in bargaining position.

And the reason for this is because the hypothetical negotiation that the jury is required to use to calculate damages, the jury is instructed to assume that both parties will view these patents as being valid and infringed.  So at the hypothetical negotiation, there's no uncertainty about infringement.  There's no uncertainty about validity.  That is an assumption that is baked into the way damages are calculated by a jury.

And so when you get to the posttrial period where validity and infringement has been confirmed, it doesn't change the bargaining power because that was assumed by the parties to the hypothetical negotiation.

And this has been specifically recognized by a number of

courts that have said where there's no injunction on the table, where there's no possibility of an injunction on the table, there's no change in bargaining power.  And we cite a number of those in our briefs, but I think --

THE COURT:  What about the Federal Circuit's decision in the *XY* case?

MR. WARDEN:  Sure.  So a couple of things here. First, if you look at the *XY* case, it actually says the plaintiff had sought an injunction in that case.  So that is -- while there was no specific discussion of that being the basis for the court's decision, it is consistent with what we've cited elsewhere, which is an injunction was sought.  Plaintiff requested it.  And so it's distinguished in that respect from cases like *Pittsburgh versus Varian* where no injunction was sought and where the court said where there's no injunction sought, this takes it sort of outside of the ambit of that line of Federal Circuit cases.

THE COURT:  Well, then you have the *Arctic Cat* case also where the court affirmed the District Court's award of a higher rate even though no injunctive relief was sought or granted.

MR. WARDEN:  So let me -- I'll address that.  If I can make one more point on the *XY* before I get to *Arctic Cat*.

*XY*, it was actually not a case where they affirmed a higher rate.  In *XY* the District Court had awarded a lower rate

and the Federal Circuit said, "There's no justification for a lower rate.  Go back and recalculate it."

Getting to *Arctic Cat*, *Arctic Cat* the court did affirm a higher rate; but if you go back and you look at the District Court's opinion in *Arctic Cat*, that higher rate wasn't based just on some increase in bargaining power.  The District Court, based on evidence presented posttrial by the plaintiff, did a full *Georgia-Pacific* analysis.  It looked at all 15 *Georgia-Pacific* factors again.  It also looked at all the *Reed* factors about enhanced damages in the context of potential willfulness, and it was the assessment based on that complete sort of whole new posttrial record that it decided to then award a higher rate.

Opticurrent hasn't put in any evidence like that.  What they've said is there's an increase in bargaining power.  That's the basis to move it up to 3 to 5 percent.  And then they've also pointed to the QBar license as another reason to move it up, and I'll address that in a moment.

But certainly there's not anything close to the record that you had in *Arctic Cat* where the District Court did a very thorough analysis based on evidence presented by the plaintiff, which has not been presented here, about numerous changes in economic circumstances that would justify a higher rate.

I'll also point out in *Arctic Cat* the plaintiff actually did request an injunction, at least in their complaint.  It may

not have been pressed posttrial; but if you look at the District Court decision, it does say an injunction was requested in the complaint even in *Arctic Cat.*

THE COURT: Well, there wasn't any pursued at the point of the -- after the verdict.

MR. WARDEN: I may be misremembering. My recollection is after the verdict, the plaintiff, although they had pled for an injunction, they requested instead a going-forward royalty. They did not ask for an injunction posttrial.

But that's still a different situation because an injunction was at least a possibility. They could have chosen to pursue it. They chose not to. It was pled. It was on the table as something they could have gone for, and in that case they chose not to.

Opticurrent didn't even seek an injunction in their complaint. It was never on the table. There was no possibility for them to be able to even go after an injunction.

THE COURT: And what about the willfulness, that there's an argument now of willfulness going forward that's more substantial?

MR. WARDEN: Well, I think if they wanted to argue for willfulness going forward, they would have to go through, like the court in *Arctic Cat* did, to analyze the *Reed* factors about enhanced damages and whether there was willfulness going forward. We'd also dispute that there is willfulness going

forward.  I mean, we maintain our belief that we don't infringe.  I mean, we have respectively -- respectfully objected to the claim construction.

THE COURT:  The risks are different.  Certainly you're not in as good a position as you would be had you prevailed.

MR. WARDEN:  I would say we are not in as good a position as we would be if we had prevailed, that's true; but with respect to the question of the validity and infringement of the patent, we're in no different a position than we were at the hypothetical negotiation where we were required to assume that we were an infringer, where we were required to assume that the patent was valid at the hypothetical negotiation.  And so in that respect the risk isn't different because all that's happened is the fact that was assumed at the hypothetical negotiation has now been confirmed, at least for the time being.

THE COURT:  Well, once a verdict has been entered and a jury verdict has been found of infringement, the risk of willfulness certainly is enhanced, isn't it, at that point?

MR. WARDEN:  The risk of willfulness?  There could be a change in the risk of willfulness, I'll agree with that.

They did not put in any kind of record the way that was done in *Arctic Cat* about analyzing the *Reed* factors.  We didn't have a chance -- if they had, we would have responded and explained all the reasons why we think we still have extremely

strong arguments for why we are not infringers, why we still are confident in our -- you know, in our appeal rights sufficiently that we would not be able to be found a willful infringer at this point, but they didn't raise that in their motion.  That's not been briefed to the Court, you know, as to whether or not we are willful infringers.  And so on this record, that simply isn't a basis to increase the postverdict royalty rate.

              **THE COURT:**  All right.  Your response, Mr. Suder?

              **MR. SUDER:**  Yes, Your Honor, severalfold.

       First of all, the *XY* case is the latest word from the Federal Circuit 2018 where an injunction is not required.  So the Court is spot on that it's not.

       The *Amado* case dealt with an injunction, but that wasn't the dispositive issue of the ruling.

       And I would point the Court to two District Court cases that apply *Amado*, which are cited in our briefs, which do not deal with the issue of the injunction.  One is the *I/P Engine versus AOL* out of the Eastern District of Virginia where the court in discussing *Amado* and *Hynix* and the other cases said (reading):

              "Failure to recognize a party's changed legal status
           would create an incentive for every defendant to fight
           each patent infringement case to the bitter end because
           without consideration of the changed legal status, there

is essentially no downside to losing."

And I would also cite the Court, Your Honor, to the *Syntrix* case out of the Western District of Washington that we cite in our brief where there the court said (reading):

"Syntrix seeks an ongoing royalty instead of a permanent injunction."

In citing the *Amado* case, it says, and this is important, Judge (reading):

"An ongoing royalty is a form of equitable relief authorized by law."

So it's up to the Court to use its discretion in applying equitable relief.  And recognizing exactly what the Court said, that Mr. Congdon, just like *Syntrix*, just like *Arctic Cat*, just like *I/P Engine*, they were in a superior bargaining position because they went to battle and won.

And the one persuasive argument that *Syntrix* makes is the parties' relative bargaining position postverdict.  They are a willful infringer at this point, Your Honor.  They can say what they want but a new lawsuit, they are a willful infringer.

And the other --

**THE COURT:**  And how is the Court supposed to make this determination in terms of finding the right number?

**MR. SUDER:**  That is up to you, Judge.  We can say -- we believe that there was some evidence that within this industry, it could be as high as 5 percent.  The cases we cited

imposed up to a 50 percent increased royalty.

Because, Your Honor, the other thing that's going to happen here is that in this future negotiation, which is what the Court is basically doing, you look at it today.  It's not Mr. Congdon by himself wondering how he's going to be able to pay for food and, yet, and pursue his invention like he was in 2006.  It's him having a jury verdict armed with his partner Brad Brunell with his experience sitting across the table from him saying, "Okay.  What should the royalty be?"  And that's why the changed circumstances they are in a better position.

We're not asking to triple it like a willful award, but the cases support, and we've given the cases, anywhere from a 20 percent increase to a 50 percent increase.

THE COURT:  Actually you're looking at 5 percent increase represents a 66 percent increase.

MR. SUDER:  Oh, yes.  We're not -- yes.  Yes.  It could be that high, but we think somewhere in the 3 and a half -- 3 and a half percent royalty to a 4 percent royalty would be supported by what the courts did in other cases.

Really, Your Honor, what you have to look at is what did the courts do, and we cited situations where the courts awarded -- went from -- in the *Syntrix* case they went from 6 percent jury finding to an 8 percent.  In the *I/P Engine* going forward, which was affirmed by the Federal Circuit, it was 3 and a half percent to 6 and a half percent.  That's a lot

more than we're even asking.

So we think based on the record and Mr. Brunell's testimony that in his experience royalties in the 2 to 5 percent in this space is common, and that's what he was looking for when he saw the QBar, is some type of guidance to the Court that, in our view, and I'll be honest, my client may be mad with me on this, but it should be somewhere north of 3 and maybe less than 5.  Somewhere in that reference is what we believe would be supportable.

**MR. WARDEN:**  May I respond to that in a couple ways?

**THE COURT:**  Yes.

**MR. WARDEN:**  First, I think it's clear that there is no *de facto* rule that posttrial you get a higher royalty rate. So the mere fact that there's a verdict in favor of the plaintiff doesn't mean that you get a higher royalty rate.

In all the cases that plaintiffs have cited where a higher royalty rate was awarded, there was other factors that were considered merely than the fact that the plaintiff had won, otherwise they would just say "If you win, you get a higher rate and it's up to the Court to figure out what it is."

And here the only factor they've pointed to, the only basis they've said that the Court should look at other than there's this change in bargaining position because of a higher royalty rate, which for the reasons I've already stated we don't think is true in this case, but setting that aside, is

the reliance on the QBar license, saying the QBar license actually supports something up to 5 percent and also Mr. Brunell's testimony about the QBar license.

So that really is their hook other than just the fact that they won at trial, and I want to address a few of the reasons why that simply doesn't help them here.

First, the argument they make is QBar is 3 percent and that was for the '323 patent. The '623 patent is more valuable and, therefore, it should be higher than 3 percent.

First, that argument was presented to the jury and it was rejected by the jury. In closing argument Mr. Brunell told the jury the '623 patent is more valuable than the '323, therefore, you should award up to 5 percent. The jury said no. The jury rejected that. So the jury has already rejected that argument that the QBar license somehow supports a higher royalty rate for the '623 patent, and there's no reason why that would be different going forward.

Second, and I think more critically is what my colleague Mr. Thornburgh talked about, is that the QBar license is for the '323 patent, which is the fundamental piece of this technology. And Mr. Congdon said the '323 technology is, you know, the fundamental piece.

The '623 improvement is just the incremental value, and so the fact that it's an improvement doesn't mean it should be 3 percent plus the value of the improvement. It means it

should just be the value of the improvement.

THE COURT:  Well, there was some testimony that it was not just a slight incremental improvement; it was a very, very substantial improvement.

MR. WARDEN:  Whatever the value of that improvement is, the value of the '623 patent is not '323 plus the value of the improvement.  Whatever that value is, you don't get the 3 percent for the '323 patent on top of it.  That's in the public domain.

And they've certainly done nothing to show that the '623 patent is worth more than 3 percent once you subtract out the value of the '323 patent.  There's absolutely nothing in the record to support that.

THE COURT:  It seems to me if you don't disturb the jury's finding, they found that when you subtract out the '323, that the '623 invention is worth 3 percent.

MR. WARDEN:  Right, if you don't disturb the jury's finding.  And this is why what we said in our papers is you should stick with whatever you used for past damages.  If the Court were to affirm the jury's finding of 3 percent, which we don't think the Court should do and we've given the reasons why, but if the Court goes with 3 percent for past damages, it should go for 3 percent for going forward.  It should not -- it should not increase it.  That's our position.

THE COURT:  Okay.

**MR. SUDER:**  May I say one last word, Your Honor?

**THE COURT:**  One last word.

**MR. SUDER:**  I mean, *Amado* says that presuit and postjudgment acts of infringement are distinct and may very well warrant different royalty rates to take into account the change in the parties' legal relationship and other factors, including to adequately compensate the plaintiff for the stronger bargaining position.

And the Court just said something that's very interesting. I didn't appreciate that.  The jury very well could have taken Mr. Brunell's 5 percent, subtracted out the 2 percent, and said the improvement is 3 percent.  We don't know.  But the point is the jury could have done that and that should not be disturbed. But, regardless, we are in a better bargaining position right here today than we were back in January.

**THE COURT:**  Does the bargaining position postverdict, it seems like it would, take into account -- we're going to get into the question of stay -- the risks going forward?  I mean, you've got a verdict so the plaintiff is in a stronger position but the defendant has an appeal, they've got a bunch of arguments.

I would think -- does anybody -- would anybody dispute that in assessing the relative bargaining positions postverdict, you do take into account the litigation risks going forward?  Because there are risks still attendant to both

sides.

**MR. SUDER:**  Yes, of course you do.  How can you not?  The book of wisdom says you must; but also if we win the appeal, it's even that much higher, and whatever it is, it's subject to a threefold adjustment for willful infringement by the court.  So even if it's 3 percent and we prevail on appeal and we sue again for ongoing infringement, it could be willful and that 3 percent could be 9 percent if the Court deems it appropriate.  So --

**MR. WARDEN:**  Your Honor --

**MR. SUDER:**  -- that's why this is -- it really is -- if the Court recognizes that we are in a superior bargaining position, then how do you compensate Mr. Congdon and Mr. Brunell for that superior bargaining position on a going-forward basis?

**MR. WARDEN:**  And with respect to that sort of going-forward risks, I would agree the Court should consider it and I point out in two ways.

The Court, as I said, should not consider a change in bargaining position based on the fact that there's validity and infringement because that was assumed into the hypothetical negotiation; but the Court has asked questions about what about a risk of willful infringement, and that's where the Court can consider the ongoing risks.  There is still a very reasonable chance we'll prevail on appeal.  We think we will prevail on

appeal.  You know, we've said we think the claim construction is wrong; three can't be four.  And so there's a good risk that they'll get nothing.

But, most critically, that is why they can't just simply say going forward we're a willful infringer.  They didn't try and prove we're a willful infringer in their briefing, and I think it's because they couldn't.

We have extremely reasonable basis to think that we are still going to prevail on this, and maybe we'll be wrong but it certainly is reasonable and takes us outside of sort of the halo, acting like a pirate world of willful infringement.

One other thing I want to just point out because Mr. Suder pointed out that Mr. Brunell talked about 5 percent and suggested that Mr. Brunell had said that 5 percent would be a reasonable royalty rate in this case.

Mr. Brunell did not say that.  In fact, it was represented to the Court that Mr. Brunell would not say that, that he would not opine on what a reasonable royalty rate would be in this case, that he was just talking about the QBar license as sort of factual background about how they decided to acquire Mr. Congdon's patents.

And so our view is, as we said in our brief, this Court absolutely should not consider anything Mr. Brunell said for purposes of valuing a license in this case.  He is not a damages expert.  He did not negotiate the QBar license.  He has

no factual basis to talk about the value of that license.

And we think the Court already agreed with that in allowing Mr. Brunell to testify merely for background purposes about how that played into his decision to purchase Mr. Congdon's licenses.

**THE COURT:**  Let me ask you about PI's motion to stay execution of judgment pending appeal.  Given the financial strength of PI and I assume that once judgment is entered, that Opticurrent would have priority status as a judgment creditor if we were to get into some kind of bankruptcy or liquidation or some other kind of receivership situation, why isn't the financial strength and the size of PI sufficient to allow this to go forward?

**MR. SUDER:**  Your Honor, I'll let Mr. Gunter address this, but to answer your very specific question, why should we as a judgment creditor have to take the risk of bankruptcy?  They post a bond so that that risk is eliminated, that we -- if they want to appeal and stay of all collection, they can post a letter of credit; and if we're affirmed on appeal, we don't have to come back to this Court, we don't have to go to them.  We can demand payment under a letter of credit to get our money.  That is the traditional way.

But, here, I'm going to let Mr. Gunter.  This is his issue.

**THE COURT:**  Okay.

**MR. GUNTER:**  So a couple points on that, Your Honor, if I may.

So there have been several courts that have addressed that specific issue, and I think the *Translogic* case that we cited in our brief most succinctly puts it that size does not equal solvency.  So just because someone's big and they say "Take us at our word, we can pay it," that's not necessarily enough to carry the heavy burden to move this out of the standard procedure for 62(b).

Another issue that kind of dovetails into that that we cited as well, it's that this isn't just speculation that they're large and there could be a problem in paying back the judgment here.  There's actually -- as they told the SEC in their filings, they've been involved in a long-going lawsuit with one of their competitors, Fairchild, and what they represent to the SEC and to the public is that there's a substantial risk involved in those lawsuits for an injunction.  If that were to happen, that could definitely call into question their ability to pay our judgment.

And, again, if it's -- the purpose is to protect the ability to collect the judgment and it's to safeguard the judgment as completely as possible is what the case law says for that; and so if there is some risk there, we think the risk should be borne by Power Integrations and not Opticurrent.

**THE COURT:**  Okay.  So why not post a bond, put up a

letter of credit?

**MR. THORNBURGH:** So several points, Your Honor. I have not actually heard the plaintiff request a bond. Bonds are very expensive and they would be at risk of having to pay for it as a taxable cost if we prevail on appeal. So, you know, if they are now saying that they really want a bond, this I think is the first time.

**THE COURT:** Well, why don't we clarify that point? Are you --

**MR. GUNTER:** So it's plaintiff's position that there should be no stay. We believe that they should pay the judgment now. That's what 62(b) requires. If they put some sort of security up, then maybe it's a matter of right that they can get a stay. They have not elected to do that so far.

**THE COURT:** So you're saying once a judgment goes forward, that it's not subject to the stay, then it's up to the defendant then --

**MR. GUNTER:** To post a security.

**THE COURT:** -- to post a bond or security?

**MR. THORNBURGH:** And, Your Honor, we filed our motion under Rule 62(b). You know, Power Integrations will offer the security that the Court requires in order to obtain the stay as a right; but we suggest that a bond is an expensive and wasteful security, and we've offered other, we think, actually better security.

A letter of credit doesn't make any sense because it's not a -- it would be a loan to PI that would enhance our ability to pay presumably; but as the record on this brief shows, PI already has a $75 million letter of credit from Wells Fargo. So why is plaintiff saying we need to add 6 million more to our letter of credit when we already have, you know, hundreds of millions of dollars in the bank and a $75 million letter of credit?

**THE COURT:** What about the *Fairchild* situation, that that represents some risk?

**MR. THORNBURGH:** You know, this kind of risk always exists and it's what SEC lawyers require you to put in these financial documents. The reality is PI has won at every stage against Fairchild. Fairchild has only -- only once has PI been found to infringe a Fairchild patent and that got reversed. So, you know, the real risk is quite a bit lower, I think, than what SEC lawyers require us to say.

But our offer to provide updated financial documents every quarter would also address this. If the updated financial document says, "Oh, by the way, we just were found to infringe and our main product got enjoined," that would be in the document and the Court could take action.

And so, you know, we think the update is very good security. We think that, you know, the promise to pay within 30 days of a remanded judgment is a lot of security that most

plaintiffs don't get.

THE COURT:  The norm is 62(b).  The norm is 62(b).  I mean --

MR. THORNBURGH:  Right.  But 62(b) itself says bond or other security, and so we're offering other security.

THE COURT:  It's the other security is the promise to pay with updated financials --

MR. THORNBURGH:  Right.  Right.

THE COURT:  -- as opposed to a letter of credit or actual financial security?

MR. THORNBURGH:  Right, that's the other security.  And the promise is actually huge because normally you have to collect, which is hard, and can be time-consuming and not paying is not contempt.  But if we promise and the Court orders us to pay, well, then it is contempt, and so the plaintiff would have a much greater ability to collect.  So that is a huge amount of security under 62(b).

THE COURT:  All right.  Any final word on that?

MR. SUDER:  I'm sorry.  We shouldn't have to sue them for breach of contract if they don't honor their promise, Judge.  That's what a letter of credit says.  They can go to a bank just like they did or if they have a letter of credit, carve out part of that so that if we prevail, we get to present it and we don't have to go to this Court and get on your docket to enforce a promise that they're making because promises are

broken and breach of contracts exist, and we shouldn't have to take that risk.

**MR. THORNBURGH:**  And, Your Honor, we're not suggesting that we should enter into a contract.  We're inviting the Court to order us to pay within 30 days.

**THE COURT:**  Right.  It would be a judgment.  The question is whether or not that's adequate security in light of the circumstances or whether bond should be required.

All right.  I will take these matters under submission, these posttrial motions, and get out a ruling as quickly as I can.

Let me just ask.  This is always a good opportunity to pause for a moment to see whether there's any way -- any possibility of resolving this case, as we sit here in this *Twilight Zone* right now, prior to final judgment, prior to appeal.  Have you had any discussions at all or engaged in any kind of ADR process?

**MR. THORNBURGH:**  I don't believe we have since before trial.  We met with court-sponsored mediation before trial.  We have not since then.

**MR. SUDER:**  I think it would be a waste of time at this point, to be quite honest, but we would be much in favor of trying to resolve it.  I think the prospects are zero.

And, Your Honor, may I make two other points, if I may? Obviously the prejudgment interest and all that you have.

**THE COURT:**  Yes, I understand that.

**MR. SUDER:**  The issue -- and I'm not asking for a ruling on the emergency motion that we filed about the reexam, but we would ask that if the Court is going to uphold the jury's verdict and the judgment it entered into, that that be done, that that not be modified.  And the Court can always do a supplemental judgment on our 285 motion, prejudgment interest, the bond, everything, because they want to get a resolution. And if that judgment is modified, then they can file a Rule 59 motion and we've got to get on the Court's docket and then, you know, it's next October before we're before you again.

So we would ask if the Court is not going to disturb the verdict and that judgment, there is a judgment in place right now, that the motion as to that judgment become final and start the 28-day appellate timetable because the reexam changes, as we called it, this race that they want to take into who has authority to address the validity.

And also and by the same token, Your Honor, we have that motion for judgment of no invalidity that we think was done pretrial so it's not a Rule 50(a) issue, that that be just affirmed because it impacts the reexam process and it raises this Executive versus Article III issue that we raised.

**THE COURT:**  Well, I understand the argument but, frankly, as to that, I'll say it right now, I don't see a basis for a judgment as a matter of law because the issue was not

placed at issue in trial and there was no admission or concession on that point.

On the other hand, with respect to enjoining the reexamination request, I think that raises some serious questions, but I will look at that.

**MR. SUDER:**  Your Honor, but the judgment -- we filed under Rule 56 a motion for judgment based on their statements before the jury was impaneled to grant us a judgment on their counterclaim of no invalidity.  So it has nothing to do with JMOLs or anything else.

They said there's not going to be any evidence and we immediately moved pretrial, and that would be under Rule 56 just to affirm what we believe has already happened.  They haven't put on any evidence, but there is a claim that they made before Your Honor, a pleading, a counterclaim, that the patent is invalid; and at this stage they said they weren't going to put on any evidence, and we immediately moved for judgment pre the impaneling of the jury.

**THE COURT:**  I'll give you a chance to comment on that.

**MR. THORNBURGH:**  Yes, Your Honor.

So we responded to all of these arguments in writing in our opposition to their emergency motion at Docket 329.  On the particular issue of the judgment that they requested before trial, the particular judgment that they asked for we objected to.  They sought dismissal with prejudice.  We said it should

have been without prejudice.  And we still think that's the right answer, that our counterclaim, which we streamlined out to save trial time, should be dismissed without prejudice.

The technicality that goes beyond that is their failure to file a 50(b) on this; that, yes, they filed the pretrial motion and they renewed it as 50(a) but then they left it out of their posttrial 50(b).  And so we don't think JMOL is appropriate, but the Court should still, you know, dismiss validity without prejudice.

We also pointed out in our brief that this has nothing at all to do with the reexam.  The Patent Office won't care; but as far as this trial goes, we think it should be dismissed without prejudice.

THE COURT:  All right.  I'll take the matters under submission.

MR. SUDER:  May I make one last point, Judge?

THE COURT:  Briefly.

MR. SUDER:  Yes.  Obviously the *Marvell* case is an important issue here and the Court is going to go back and read it; and I ask the Court when it reads it, all those damage summaries that we had that were pre the filing of the lawsuit had nothing to do with inducement.  There was never a challenge to that being used as a royalty base for imported products as we disclosed, and it went all the way to the trial till now.

And I just ask that the Court take that into account when

it reads the opinion and what defendant is trying to say that opinion means because I think their conduct pretrial and during trial actually strenuously supports our position that we tried the case in strict compliance with the *Carnegie Mellon* teachings.

THE COURT:  All right.  Thank you.  I appreciate it.

MR. THORNBURGH:  Thank you, Your Honor.

(Proceedings adjourned at 11:53 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, June 10, 2019

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter